UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS AT KANSAS CITY

| | |
|---|---|
| In re: | ) |
| | ) |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*,[1] | ) Case No. 16-21142 |
| | ) |
| Debtors. | ) |
| | ) |

## MOTION FOR ENTRY OF ORDER AUTHORIZING, BUT NOT DIRECTING, PAYMENTS OF PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS

COME NOW the above-captioned debtors (collectively, the "Debtors") and hereby respectfully submits this Motion for Entry of Order Authorizing, but Not Directing, Payments of Prepetition Claims of Certain Critical Vendors (the "Critical Vendor Motion"). In support of this Critical Vendor Motion, the Debtors state as follows:

### INTRODUCTION

1. On June 26, 2016 (the "Commencement Date"), the Debtors commenced these chapter 11 bankruptcy cases by filing their bankruptcy petitions.

---

[1] The Debtors in this case are: ACLOST, LLC, Bricktown Residence Catering Co., Inc., Chateau Catering Co., Inc., Chateau Lake, LLC, Civic Center Redevelopment Corp., Concord Golf Catering Co., Inc., Concord Hotel Catering Co., Inc., East Peoria Catering Co., Inc., Fort Smith Catering Co., Inc., Franklin/Crescent Catering Co., Inc., Glendale Coyotes Catering Co., Inc., Glendale Coyotes Hotel Catering Co., Inc., Hammons, Inc., Hammons of Colorado, LLC, Hammons of Franklin, LLC, Hammons of Huntsville, LLC, Hammons of Lincoln, LLC, Hammons of New Mexico, LLC, Hammons of Oklahoma City, LLC, Hammons of Richardson, LLC, Hammons of Rogers, Inc., Hammons of Sioux Falls, LLC, Hammons of South Carolina, LLC, Hammons of Tulsa, LLC, Hampton Catering Co., Inc., Hot Springs Catering Co., Inc., Huntsville Catering, LLC, International Catering Co., Inc., John Q. Hammons 2015 Loan Holdings, LLC, John Q. Hammons Fall 2006, LLC, John Q. Hammons Hotels Development, LLC, John Q. Hammons Hotels Management I Corporation, John Q. Hammons Hotels Management II, LP, John Q. Hammons Hotels Management, LLC, Joplin Residence Catering Co., Inc., JQH – Allen Development, LLC, JQH – Concord Development, LLC, JQH – East Peoria Development, LLC, JQH - Ft. Smith Development, LLC, JQH – Glendale AZ Development, LLC, JQH - Kansas City Development, LLC, JQH - La Vista Conference Center Development, LLC, JQH - La Vista CY Development, LLC, JQH - La Vista III Development, LLC, JQH - Lake of the Ozarks Development, LLC , JQH – Murfreesboro Development, LLC, JQH – Normal Development, LLC, JQH – Norman Development, LLC, JQH – Oklahoma City Bricktown Development, LLC, JQH – Olathe Development, LLC, JQH – Pleasant Grove Development, LLC, JQH – Rogers Convention Center Development, LLC, JQH – San Marcos Development, LLC, Junction City Catering Co., Inc., KC Residence Catering Co., Inc., La Vista CY Catering Co., Inc., La Vista ES Catering Co., Inc., Lincoln P Street Catering Co., Inc., Loveland Catering Co., Inc., Manzano Catering Co., Inc., Murfreesboro Catering Co., Inc., Normal Catering Co., Inc., OKC Courtyard Catering Co., Inc., R-2 Operating Co., Inc., Revocable Trust of John Q. Hammons Dated December 28, 1989 as Amended and Restated, Richardson Hammons, LP, Rogers ES Catering Co., Inc., SGF – Courtyard Catering Co., Inc., Sioux Falls Convention/Arena Catering Co., Inc., St Charles Catering Co., Inc., Tulsa/169 Catering Co., Inc., and U.P. Catering Co., Inc.

2. Since the Commencement Date, the Debtors have continued in possession of their property and control of their operations pursuant to §§ 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

3. The Court has jurisdiction of this motion pursuant to 28 U.S.C. § 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(A) and (M) in that it concerns the administration of the estate and use of property of the estate.

## BACKGROUND

4. The Debtors in these chapter 11 cases consist of the Revocable Trust of John Q. Hammons, Dated December 28, 1989 as Amended and Restated (the "Trust"), and 71 of its directly or indirectly wholly owned subsidiaries and affiliates. The Debtors collectively operate as an enterprise known as John Q. Hammons Hotels & Resorts ("JQH").

5. The Trust's wholly owned subsidiary and the manager of all of JQH's hotels, John Q. Hammons Hotels Management, LLC, employs more than 4,000 people throughout the United States. Moreover, the Trust and certain of its affiliates own nearly three dozen hotels, as well as numerous and varied other assets, such as: (a) approximately 35 parcels of undeveloped real estate in 12 states (Kansas, Arkansas, Colorado, Iowa, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Texas, Utah and Wisconsin); and (b) the Joplin Convention & Trade Center in Joplin, Missouri. The Trust is also one of the largest owners of real estate in Springfield, Missouri where its buildings include: (i) the Enterprise Building, (ii) a Mini Storage facility, (iii) the JQH Office Building, (iv) Hammons Field (the home of the Springfield Cardinals, the Double-A Texas League affiliate of the St. Louis Cardinals), (v) Kinser House, (vi) the John Q. Hammons Missouri Sports Hall of Fame, (vii) the Jordan Valley Car Park (a parking garage with 970 spaces), and (viii) a residence in Southern Hills.

6. In the 1950s, John Q. Hammons recognized a growing need for quality hotels throughout the country. As a successful real estate investor and developer, Mr. Hammons had the experience and knowledge required to achieve his ambitions. In 1958, he partnered with Roy Winegardner, and the two purchased ten Holiday Inn Hotel franchises. These properties were immediately successful and served as an early indicator of Mr. Hammons' future success in the industry.

7. The partners went on to found Winegardner and Hammons, Inc. and developed a total of 67 Holiday Inn Hotels. In 1969, Mr. Hammons formed an additional company, John Q. Hammons Hotels, Inc., and relied on his own strategies and acumen for site selection. The company's portfolio quickly grew to include Embassy Suites, Marriott, Sheraton and Radisson Hotels as well as several independently branded hotels and resorts.

8. In 1994, Mr. Hammons took his company public and launched a new era of hotel development. Today, the company is once again privately owned, currently operating 35 hotels in 16 states.

9. Mr. Hammons died on May 26, 2013 at the age of 94. Over the course of his impressive 52-year career in the lodging industry, Mr. Hammons developed 210 hotel properties in 40 states and was honored with numerous lifetime achievement awards, including "Hotelier of the World."

10. Today, the group of affiliated companies operate hotels independently as well as under the flags of Embassy Suite by Hilton, IHG (Holiday Inn Express), Marriott (Courtyard by Marriott, Marriott, and Residence Inn), and Starwood. The hotels are located in Alabama, Arizona, Arkansas, Colorado, Illinois, Kansas, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and Virginia. Several of the properties serve as convention centers. The affiliated companies comprise an integrated family of hotel companies that, in the aggregate, is one of the largest private independent owner and hotel management companies in the United States, with a portfolio that is comprised of more than approximately 8,400 guest rooms and more than 1 million square feet of banquet space. The Trust also directly or indirectly owns and operates interests in more than 15 other entities that are not Debtors in these chapter 11 cases that own and operate, among other things, vacant land, office buildings, the Federal Courthouse in Springfield, Missouri, golf courses, real estate leased to restaurants, a minority interest in a casino, and the rights to the film: "The Great American West."

11. Among many duties, members of the John Q. Hammons & Resorts team oversee food and beverage services, identify sales opportunities and manage the operations of each hotel to ensure quality lodging experiences, rewarding employee tenure and the fiscal health of each hotel.

**OPERATIONS RELATING TO MOTION**

12. In the day to day operation of the hotel properties, the Debtors use goods and services from vendors throughout the United States. Many of these goods and services are essential for the Debtors' to conduct their day to day business.

13. If payments are not made to vendors who supply goods and services that are

4

Case 16-21142    Doc# 12    Filed 06/26/16    Page 4 of 15

critical to the operation of the Debtors' business, goods may not be delivered and services may not be provided, thereby damaging the Debtors' ability to offer the highest quality experience to its guests and its visitors, their reputation, and their cash flow. Prompt and continued payment to the vendors the Debtors determine are critical to their operations is therefore necessary to continue the Debtors' business operations.

14. The ability to maintain relationships with key vendors and suppliers at this critical juncture is essential to the Debtors' ability to reorganize as going concerns. Flexibility to pay prepetition claims of certain critical vendors is crucial to the Debtors' reorganization.

## **RELIEF REQUESTED**

15. Pursuant to §§ 105(a) and 363 of the Bankruptcy Code, and under the "necessity of payment" doctrine, the Debtors seek the entry of an order authorizing them, in their sole discretion and subject to the terms and conditions set forth herein, to pay, in the ordinary course of the their businesses, the prepetition claims of certain vendors and shippers who supply goods or services critical to the continued operation of the Debtors' businesses.

16. Through the Critical Vendor Motion, the Debtors are not seeking to pay all prepetition claims of the critical vendors or shippers immediately. Rather, the Debtors propose only to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on such terms and conditions as are consistent with the Debtors' prepetition practices and agreements.

17. Payment as provided herein will not create an undue hardship on the Debtors' cash flows because the Debtors propose to pay per their customary, prepetition terms and not on an accelerated basis. Current cash, plus cash generated in the ordinary course of the Debtors' businesses are reasonably expected to provide sufficient liquidity for payment of the critical

5

vendor claims.

18. The Debtors also requests a waiver of the notice requirement and the 14-day stay requirement under Fed. R. Bankr. P. 6004(a) and (h).

## **IDENTIFICATION OF CRITICAL VENDORS**

19. In conjunction with the commencement of these cases, the Debtors are developing a list of certain critical vendors that provide essential goods and services (the "Critical Vendors"). The criteria used to identify Critical Vendors include the following:

    a. Whether the vendor provided goods or services essential to the Debtors' businesses;

    b. Whether the goods and services could be supplied by a different vendor without disrupting the Debtors' operations;

    c. Whether the vendor has (i) goods currently in transit to the Debtor which such goods are vital to the Debtors' operations; or (ii) services the vendor is in the midst of providing that are critical to the operation and maintenance of the hotels;

    d. Whether the vendor has expressed willingness to continue supplying goods and services to the Debtors on a post-petition basis without payment of all or a substantial portion of the vendor's prepetition claim; and

    e. Whether the vendor is obligated by contract or otherwise to supply goods or services to the Debtors post-petition.

20. When the Debtors have completed their analysis, they will file a list of the identified Critical Vendors in which they will set forth the amounts due to each such Critical Vendors (the "Critical Vendors List") and serve the Critical Vendors List on the proposed Critical Vendors. Debtors request that proposed Critical Vendors have 10 days after the filing of

6

the Critical Vendors List to object to treatment as a critical vendor subject to the terms and conditions requested herein.

21. The Debtors propose to condition payment to Critical Vendors upon an agreement by the Critical Vendors to continue supplying goods and services to the Debtors on terms that are acceptable to the Debtors. Such terms shall be in consideration of industry trade terms and existing contractual obligations between the parties and shall in no event be less than the Debtors' most favorable trade terms that were in effect within 180 days prior to the Commencement Date (the "Trade Terms").

22. As a further condition to payments to the Critical Vendors, the Debtors request that any order granting the relief requested herein impose the express condition that by accepting payments hereunder, any Critical Vendor agrees as follows:

a. To provide the Debtors with normalized trade credit and provide other business terms on a post-petition basis consistent with the Trade Terms;

b. Not to file or otherwise assert against the Debtors or any of their respective assets or property, whether real or personal, any lien related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendors by the Debtors arising from agreements entered into prior to the Commencement Date and that to the extent such a lien was previous obtained, the Critical Vendor agrees to immediately take all necessary actions to remove such lien;

c. That if the Critical Vendor's participation in the payment program authorized by this Motion terminates, or if a Critical Vendor refuses to continue to supply goods to the Debtors on the Trade Terms, any payments received by such Critical Vendors will be deemed to have been in payment of then outstanding post-petition obligations, if any, owed

7

Case 16-21142    Doc# 12    Filed 06/26/16    Page 7 of 15

to such Critical Vendor and that such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of a prepetition claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of reclamation or trust fund claims or otherwise; and

   d. To consent to the jurisdiction of the Bankruptcy Court for enforcement of any Order issued granting the relief requested herein.

23. The Debtors agrees to maintain a matrix summarizing, with respect to the period following the Commencement Date: (a) the name of each Critical Vendor; (b) the amount each Critical Vendor has been paid on account of its claims; and (c) the goods or services provided by each Critical Vendor.

## BASIS FOR RELIEF REQUESTED

24. Payment to the Critical Vendors for prepetition obligations is authorized under § 363 of the Bankruptcy Code, which provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." This section has been interpreted to authorize the payment of certain prepetition claims. *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 397 (S.D.N.Y. 1983). The payments that the Debtors are requesting the Court to authorize would be made pursuant to a legitimate business justification as outlined above and is not for the preferential benefit of certain creditors. *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that payments under § 363 must be made pursuant to a "business justification" and not simply to appease certain creditors).

25. The Court also has the power to grant the relief requested herein pursuant to its

8

general equitable powers set forth in § 105(a) of the Bankruptcy Code. That section grants the Court the authority to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." Payments of prepetition debts prior to implementation of a plan have been authorized under § 105(a) where payment of the prepetition obligation was essential to the debtor's continued operation. *See In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

26. Under the "doctrine of necessity," the Court may exercise its equitable powers to authorize a debtor to pay the prepetition claims of certain critical vendors. *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992).

27. Under Fed. R. Bankr. P. 6003, the Court may also authorize the Debtors to satisfy certain prepetition claims of the Critical Vendors because such relief is necessary to avoid immediate and irreparable harm. "[I]mmediate and irreparable harm" as used in Rule 6003 exists where the absence of relief would impair a debtor's ability to reorganize or would threaten the debtor's status as a going concern. *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 36, n.2 (Bankr. S.D.N.Y. 1990).

28. If the Debtors are not authorized to pay the Critical Vendors as set forth in this Motion, immediate and irreparable harm would result. The Debtors depend heavily on an uninterrupted supply of goods and services in order to maintain their business operations and provide a top quality guest experience at each hotel property. Without payment, some of the Critical Vendors could refuse to conduct future business with the Debtors or could refuse to complete pending transactions. The loss of such vendors and shippers would immediately and irreparably harm the Debtors and would jeopardize the Debtors' ability to reorganize. Accordingly, authorization to make payments to the Critical Vendors in the ordinary course of business and as set forth above during the first twenty days of this case is essential.

29. Based on the foregoing facts and legal bases, the Debtors submit the relief requested in necessary and appropriate, is in the best interests of the Debtors' estate and its creditors and should be granted in all respects.

30. Nothing contained in this Motion is intended to be or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any ground; (c) a promise to pay any claim; (d) an implication or admission that any particular claim constitutes a claim of a Critical Vendor; or (e) a request to assume any executory contract or unexpired lease, pursuant to § 365 of the Bankruptcy Code.

## **NOTICE**

31. Notice of this Motion has been given to: (a) the United States Trustee; (b) Debtors' secured lenders; (c) Atrium Holding Company; (d) SFI Belmont LLC; (e) JD Holdings, LLC; (f) Debtors' combined 40 largest unsecured creditors; and (g) any party that has appeared and/or requested notice. Debtors submit that, under the circumstances, no further notice of the hearing is necessary and request that any further notice be dispensed with and waived.

WHEREFORE the Debtors request that the Court enter an order, substantially in the form attached as <u>Exhibit A</u>, granting the relief requested herein, and granting such other and further relief as the Court deems just and proper.

STINSON LEONARD STREET LLP

By: ____/s/ Mark Shaiken_____
Mark Carder KS # 11529
Mark Shaiken KS # 11011
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
mark.carder@stinson.com
mark.shaiken@stinson.com

COUNSEL FOR THE DEBTORS

# EXHIBIT A – FORM OF ORDER

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS AT KANSAS CITY**

| | |
|---|---|
| In re: | ) |
| | ) |
| **JOHN Q. HAMMONS FALL 2006, LLC,** *et al.*, | ) Case No. 16-_____ |
| | ) |
| **Debtors.** | ) |
| | ) |

## ORDER AUTHORIZING, BUT NOT DIRECTING, PAYMENTS OF PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS

Upon the Motion for Entry of Order Authorizing, but Not Directing, Payments of Prepetition Claims of Certain Critical Vendors (the "Motion")[2] of the above-captioned debtors (collectively, "Debtors") seeking authorization to make payments, within their sole discretion, on the prepetition claims of certain parties who supply goods or services critical to the continued operation of the Debtors' business, and to condition those payments on certain agreements and acknowledgements by the Critical Vendors; the Court having reviewed the Motion; and the Court having determined that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties-in-interest; and it appearing that notice of the

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

hearing on the Motion was good and sufficient under the particular circumstances and that no other or further notice need be given; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1. The Motion is GRANTED as set forth herein.

2. The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition claims of the Critical Vendors upon the terms and in the manner provided in this Order.

3. Nothing in this Order shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant.

4. Nothing in this Order shall be deemed to constitute an assumption, adoption or rejection of any executor contract or agreement between the Debtors and any third party or to require the Debtors to make any of the payments authorized herein.

5. Nothing in this Order shall be construed (a) to limit, or in any way affect, the Debtors' ability to dispute any claim of any Critical Vendor or (b) as a waiver by the Debtors of their rights to contest any invoice or other claim of a Critical Vendor under applicable law.

6. When the Debtors have completed their analysis, they shall file a list of the identified Critical Vendors in which they will set forth the amounts due to each such Critical Vendors (the "Critical Vendors List") and serve the Critical Vendors List on the proposed Critical Vendors.

7. Vendors identified as proposed critical vendors shall have 10 days after the filing of the Critical Vendors List to object to treatment as a critical vendor subject to the terms and conditions requested herein.

8. The Debtors shall maintain a matrix beginning on the Commencement Date summarizing (a) the name of each Critical Vendor; (b) the amount each Critical Vendor was paid on account of its prepetition claim and (c) the goods and/or services provided by each Critical Vendor.

9. By accepting any payments authorized hereunder, each Critical Vendor shall be deemed to have agreed to the following:

(i) To provide the Debtors with normalized trade credit and provide other business terms on a post-petition basis consistent with terms acceptable to the Debtors. Such terms shall be in consideration of industry Trade Terms[3] and existing contractual obligations between the parties and shall in no event be less than the Debtors' most favorable trade terms that were in effect within 180 days prior to the Commencement Date;

(ii) Not to file or otherwise assert against the Debtors or any of their respective assets or property, whether real or personal, any lien related in any way to any remaining prepetition amounts alleged owed to the Critical Vendors by the Debtors arising from agreements entered into prior to the Commencement Date and that to the extent such a lien was previous obtained, the Critical Vendor agrees to immediately take all necessary actions to remove such lien;

(iii) That if the Critical Vendor's participation in the payment program authorized by this Motion terminates, or if a Critical Vendor refuses to continue to supply goods to the Debtor on the Trade Terms, any payments received by such Critical Vendor will be deemed to have been in payment of then outstanding post-petition obligations, if any, owed to such Critical Vendor and that such Critical Vendor shall immediately repay to the applicable Debtor any payments made to it on account of a prepetition claim to the extent that the aggregate amount of

---

[3] Capitalized terms shall have the same meaning as set forth in the Motion.

3

such payments exceeds the post-petition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of reclamation or trust fund claims or otherwise; and

(iv) To consent to the jurisdiction of the Bankruptcy Court for enforcement of any Order issued granting the relief requested herein.

10. The requirements set forth in Fed. R. Bankr. P. 6003(b) are satisfied by the averments in the Motion or are otherwise deemed waived.

11. Notwithstanding any provision of the Bankruptcy Rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # #