UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS AT KANSAS CITY

| | |
|---|---|
| In re: | ) |
| | ) |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*,[1] | ) Case No. 16-21142 |
| | ) |
| **Debtors.** | ) |
| | ) |

## DECLARATION IN SUPPORT OF FIRST DAY MOTIONS

The undersigned, Greggory Groves, general counsel of the above-captioned debtors (collectively, the "Debtors"), hereby offers and makes this declaration: (i) to provide the Court with an overview of the Debtors; (ii) to explain the events leading to the commencement of these chapter 11 cases; and (iii) in support of the relief sought in the first day motions filed by the Debtors.

## BACKGROUND

1.  The Debtors in these chapter 11 cases consist of the Revocable Trust of John Q.

---

[1] The Debtors in this case are: ACLOST, LLC, Bricktown Residence Catering Co., Inc., Chateau Catering Co., Inc., Chateau Lake, LLC, Civic Center Redevelopment Corp., Concord Golf Catering Co., Inc., Concord Hotel Catering Co., Inc., East Peoria Catering Co., Inc., Fort Smith Catering Co., Inc., Franklin/Crescent Catering Co., Inc., Glendale Coyotes Catering Co., Inc., Glendale Coyotes Hotel Catering Co., Inc., Hammons, Inc., Hammons of Colorado, LLC, Hammons of Franklin, LLC, Hammons of Huntsville, LLC, Hammons of Lincoln, LLC, Hammons of New Mexico, LLC, Hammons of Oklahoma City, LLC, Hammons of Richardson, LLC, Hammons of Rogers, Inc., Hammons of Sioux Falls, LLC, Hammons of South Carolina, LLC, Hammons of Tulsa, LLC, Hampton Catering Co., Inc., Hot Springs Catering Co., Inc., Huntsville Catering, LLC, International Catering Co., Inc., John Q. Hammons 2015 Loan Holdings, LLC, John Q. Hammons Fall 2006, LLC, John Q. Hammons Hotels Development, LLC, John Q. Hammons Hotels Management I Corporation, John Q. Hammons Hotels Management II, LP, John Q. Hammons Hotels Management, LLC, Joplin Residence Catering Co., Inc., JQH – Allen Development, LLC, JQH – Concord Development, LLC, JQH – East Peoria Development, LLC, JQH - Ft. Smith Development, LLC, JQH – Glendale AZ Development, LLC, JQH - Kansas City Development, LLC, JQH - La Vista Conference Center Development, LLC, JQH - La Vista CY Development, LLC, JQH - La Vista III Development, LLC, JQH - Lake of the Ozarks Development, LLC , JQH – Murfreesboro Development, LLC, JQH – Normal Development, LLC, JQH – Norman Development, LLC, JQH – Oklahoma City Bricktown Development, LLC, JQH – Olathe Development, LLC, JQH – Pleasant Grove Development, LLC, JQH – Rogers Convention Center Development, LLC, JQH – San Marcos Development, LLC, Junction City Catering Co., Inc., KC Residence Catering Co., Inc., La Vista CY Catering Co., Inc., La Vista ES Catering Co., Inc., Lincoln P Street Catering Co., Inc., Loveland Catering Co., Inc., Manzano Catering Co., Inc., Murfreesboro Catering Co., Inc., Normal Catering Co., Inc., OKC Courtyard Catering Co., Inc., R-2 Operating Co., Inc., Revocable Trust of John Q. Hammons Dated December 28, 1989 as Amended and Restated, Richardson Hammons, LP, Rogers ES Catering Co., Inc., SGF – Courtyard Catering Co., Inc., Sioux Falls Convention/Arena Catering Co., Inc., St Charles Catering Co., Inc., Tulsa/169 Catering Co., Inc., and U.P. Catering Co., Inc.

Hammons, dated December 28, 1989 (the "Trust"), and 71 of its directly or indirectly wholly owned subsidiaries and affiliates. The Debtors collectively operate as an enterprise known as John Q. Hammons Hotels & Resorts ("JQH").

2. The Trust's wholly owned subsidiary and the manager of all of JQH's hotels, John Q. Hammons Hotels Management, LLC, employs more than 4000 people throughout the United States. Moreover, the Trust and certain of its affiliates own nearly three dozen hotels, as well as numerous and varied other assets, such as: (a) approximately 35 parcels of undeveloped real estate in 12 states (Kansas, Arkansas, Colorado, Iowa, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Texas, Utah and Wisconsin); and (b) the Joplin Convention & Trade Center in Joplin, Missouri. The Trust is also one of the largest owners of real estate in Springfield, Missouri where its buildings include: (i) the Enterprise Building, (ii) a Mini Storage facility, (iii) the JQH Office Building, (iv) Hammons Field (the home of the Springfield Cardinals, the Double-A Texas League affiliate of the St. Louis Cardinals), (v) Kinser House, (vi) the John Q. Hammons Missouri Sports Hall of Fame, (vii) the Jordan Valley Car Park (a parking garage with 970 spaces), and (viii) a residence in Southern Hills.

3. In the 1950s, John Q. Hammons recognized a growing need for quality hotels throughout the country. As a successful real estate investor and developer, Mr. Hammons had the experience and knowledge required to achieve his ambitions. In 1958, he partnered with Roy Winegardner, and the two purchased ten Holiday Inn Hotel franchises. These properties were immediately successful and served as an early indicator of Mr. Hammons' future success in the industry.

4. The partners went on to found Winegardner and Hammons, Inc. and developed a total of 67 Holiday Inn Hotels. In 1969, Mr. Hammons formed an additional company, John Q.

2

Hammons Hotels, Inc., and relied on his own strategies and acumen for site selection. The company's portfolio quickly grew to include Embassy Suites, Marriott, Sheraton and Radisson Hotels as well as several independently branded hotels and resorts.

5. In 1994, Mr. Hammons took his company public and launched a new era of hotel development. Today, the company is once again privately owned, currently operating 35 hotels in 16 states.

6. Mr. Hammons died on May 26, 2013 at the age of 94. Over the course of his impressive 52-year career in the lodging industry, Mr. Hammons developed 210 hotel properties in 40 states and was honored with numerous lifetime achievement awards, including "Hotelier of the World."

7. Today, the group of affiliated companies operate hotels independently as well as under the flags of Embassy Suite by Hilton, IHG (Holiday Inn Express), Marriott (Courtyard by Marriott, Marriott, and Residence Inn), and Starwood. The hotels are located in Alabama, Arizona, Arkansas, Colorado, Illinois, Kansas, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and Virginia. Several of the properties serve as convention centers. The affiliated companies comprise an integrated family of hotel companies that, in the aggregate, is one of the largest private independent owner and hotel management companies in the United States, with a portfolio that is comprised of more than approximately 8,400 guest rooms and more than 1 million square feet of banquet space. The Trust also directly or indirectly owns and operates interests in more than 15 other entities that are not Debtors in these chapter 11 cases that own and operate, among other things, vacant land, office buildings, the Federal Courthouse in Springfield, Missouri, golf courses, real estate leased to restaurants, a minority interest in a casino, and the rights to the film: "The Great

3

American West."

8. Among many duties, members of the John Q. Hammons & Resorts team work oversees food and beverage services, identify sales opportunities and manage the operations of each hotel to ensure quality lodging experiences, rewarding employee tenure and the fiscal health of each hotel.

9. Hammons and many JQH hotels have been the recipients of prestigious awards in the hospitality industry. Some of the most recent awards and acknowledgments include:

(a) The Marriott International Inc.'s Spirit to Preserve Award for continued support and focus on sustainability. The award recognizes those groups who have the highest percentage of activated hotels and highest level of environmental practices based on Green Hotels Global data and company-wide sustainability programs;

(b) Seven prestigious recognitions as a part of the 2014 Embassy Suites Brand Awards, more than any other management company of Embassy Suites branded properties;

(c) Embassy Suites San Marcos awarded 2014 sales team of the year by Embassy Suites Hotels;

(d) Embassy Suites - Loveland Hotel, Spa & Convention Center in Colorado received the "Connie Award" for being one of the top three ranked hotels in the 2014 Embassy Suites brand, and was named the #1 Embassy Suites in the world for 2013;

(e) Embassy Suites Omaha - La Vista / Hotel & Conference Center ranked #10 and Embassy Suites Nashville SE Murfreesboro -- Hotel & Conference Center ranked #13 among the best of more than 215 upscale, all-suite Embassy Suites hotels across the Americas;

(f) Embassy Suites Omaha - La Vista recognized with the 2014 Platinum Adrian Award from HSMAI[2] for project research success;

(g) Embassy Suites Nashville SE - Murfreesboro and Embassy Suites Omaha La Vista Hotel & Convention Center were Embassy Suites Quality Award Winners for 2013, top 10%;

(h) Seven JQH Embassy Suites Hotels ranked among the best in 2013 and five more recognized for performance that same year;

---

[2] The Hospitality Sales and Marketing Association International (HSMAI) is an organization with more than 7,000 members worldwide that is committed to increasing business for hotels and their partners and is the industry's leading advocate for hotel revenue growth. *See* www.hsmai.org.

4

(i) Courtyard by Marriott Dallas-Allen named 2012 "Hotel of the Year" at the Hotel Association of North Texas' Sixth Annual HOSPY's Awards Gala;

(j) Renaissance Oklahoma City Convention Center, Hotel & Spa received several prestigious awards for outstanding performance, including Convention South's 2011 Class of Readers' Choice Awards, Smart Meetings' 2011 Platinum Choice Awards, and 2011 CMUS Talk of the Town Award for Excellence in Customer Satisfaction;

(k) Lodging Hospitality has named 18 JQH hotels in the top 100 on their list of best-performing hotels;

(l) In 2009, Hammons received the Hilton Hotels Corporation: Hilton Family Lifetime Achievement Award;

(m) In 2009, Hammons received the Lodging Conference: Above & Beyond Award;[3] and

(n) In 2009, JQH owned and operated 11 hotels in the top 20 of all Embassy Suites hotels in the world, including 4 in the top 5.

10. In addition to forming the Trust to own and operate the JQH enterprise, Hammons formed the Trust, in part, to make charitable contributions to numerous institutions, many of which are located in Springfield, Missouri, following his death. Millions of dollars have already been bequeathed to institutions near and dear to Hammons heart. The Trust is administered by two Trustees -- Hammons' long-time confidant and Chief Executive Officer of John Q. Hammons Hotels & Resorts, Jacqueline Dowdy, and Greggory Groves, Senior Vice President and General Counsel of John Q. Hammons Hotels & Resorts.

11. Under the leadership and oversight of Ms. Dowdy, the Trust has steadily improved its financial position since 2010.

12. An Organizational chart depicting all Debtors and their respective assets is attached hereto as Exhibit A.

---

[3] The Lodging Conference is one of the top hotel industry events in the world where thousands of high-powered hotel owners and executives from around the world congregate to strategize about development, financing, franchising, management, construction, design and operations. *See* www.lodgingconference.com.

5

Case 16-21142    Doc# 16    Filed 06/26/16    Page 5 of 20

## EVENTS LEADING UP TO CHAPTER 11 FILINGS

13. Notwithstanding its sustained growth, profitability and commitment to excellence, since 2012, JQH has been mired in litigation with entities owned and controlled by New York financier Jonathan Eilian ("Eilian"), resulting from a 2005 transaction between Hammons and Eilian that is described in more detail below.

14. Eilian and his companies, JD Holdings, L.L.C. ("JD"), Rogers Funding, LLC and Atrium TRS, LLC have engaged in contentious, far-reaching, expensive, and sustained litigation with the Debtors since May, 2012. In addition, SFI Belmont, LLC ("SFI"), a wholly owned subsidiary of iStar Financial, Inc. ("iStar"), a party directly involved in the 2005 transaction described hereafter, has also engaged in protracted litigation since August 2013.

15. The ongoing litigation brought by JD seeks to force JQH to liquidate and sell the hotel properties as well as numerous other real estate holdings to JD at a substantial discount off of fair market value and thereby transfer to JD the JQH hospitality enterprise that Hammons dedicated his life to building and maintaining for substantially less than fair value. JD also seeks to require the Debtors to finance 22.5% of the discounted purchase price. This litigation is pending in state court in the Delaware Chancery Court. At the same time, SFI seeks a money judgment against the Trust in excess of $140 million in litigation pending in the Circuit Court of Cook County in Chicago.

16. Eilian's efforts have cast a dark cloud over the JQH enterprise and, among other things, directly caused six of the JQH entities to default on an approximately $140 million loan because of a court order obtained by Eilian that severely restricts JQH's ability and right to conduct its business as it sees fit. The Debtors' Chapter 11 bankruptcy cases will enable them to gain the necessary breathing space and relief from this litigation to develop and implement a reorganization strategy that could maximize the value of the JQH enterprise for the benefit of all

6

creditors and stakeholders.

17. As set forth hereafter, in the absence of such bankruptcy filings, if JD were to have its way, substantial equity in the various assets will be lost to JD, otherwise performing loans will go into default, fully secured creditors may be rendered undersecured, unsecured creditors will be left "out of the money" and therefore unpaid, and the remaining charitable beneficiaries of the Trust will receive little or nothing of Hammons' legacy. Moreover, as set forth hereafter, the are no viable options other than commencing bankruptcy cases to protect against the materially adverse financial results that will be occasioned in the litigation if judgments are rendered against JQH.

## THE 2005 TRANSACTION WITH JONATHAN EILIAN

18. In 2005, Hammons agreed to sell the JQH, Inc. portfolio of 43 publicly-owned hotels to Eilian as part of a complex, multi-step transaction (the "2005 Transaction"), through which JQH, Inc. merged with an entity controlled by Eilian that ultimately became Atrium Hotels, LP ("Atrium LP"). Ownership of JQH, Inc. was held through two classes of stock. The Class A stock was publicly traded and entitled to one vote per share. The Class B common stock was not publicly traded and was entitled to fifty votes per share. John Q. Hammons ("Hammons") and his affiliates owned approximately 5% of the Class A common stock and all of the Class B common stock.

19. As part of the 2005 Transaction, holders (including the Trust) of Class A common shares in JQH, Inc. received $24 per share.

20. Additionally, Hammons (through the Trust and Hammons, Inc.) did not receive cash for his Class B shares, but in exchange for his Class B shares and other consideration was allocated collectively a 2% interest in the cash-flow distributions and received a preferred equity interest of Atrium LP.

7

21. Atrium GP, LLC, an Eilian-owned and controlled company, became Atrium LP's general partner and received a 98% common equity interest in Atrium LP. Atrium LP is governed by the Fourth Amended and Restated Agreement of Limited Partnership of John Q. Hammons Hotels, L.P. (as amended and restated, the "Atrium Partnership Agreement"). As expressly set forth in the Atrium Partnership Agreement, the equity interests held by the Trust and Hammons, Inc. in Atrium LP had a redemption value before liquidation of at least $335 million, such that Atrium LP could redeem these preferred equity interests at any time before liquidation by paying the Trust and Hammons, Inc., no less than $335 million. Additionally, and in the event no redemption occurred before liquidation, then the equity interests held by the Trust and Hammons had a liquidation preference that entitled the Trust and Hammons to receive proceeds from a liquidation under the Atrium Partnership Agreement of no less than $335 million before other common units received any distribution.

## THE iSTAR FINANCING

22. The 2005 Transaction also contemplated that Hammons would receive a $25 million short-term line of credit and a $275 million long-term line of credit designed to permit Hammons to continue to develop hotels.

23. To close on the merger and provide the lines of credit to Hammons, Eilian obtained financing from iStar, an entity, as described in more detail below, closely connected and aligned with Eilian.

24. Eilian utilized such financing, in part, to issue a line of credit up to $275 million loan (the "Atrium Loan") from Atrium Lendco, LLC ("Atrium Lendco") to John Q. Hammons Hotels Development, LLC ("Hammons Development").

25. In exchange for the Atrium Loan: (a) Hammons, the Trust and Hammons, Inc. guaranteed the Atrium Loan; (b) Hammons Development pledged to Atrium Lendco 100% of the

8

equity interests in all entities that would come to own hotels that were acquired and/or developed through the use of the Atrium Loan proceeds; and (c) Hammons, the Trust and Hammons, Inc. pledged to Atrium Lendco 100% of the equity interests in Hammons Development.

26.     iStar and Atrium Lendco entered into separate agreements governing the loan from iStar to Atrium Lendco and iStar retained the right to unilaterally enforce all of Atrium Lendco's rights under the Atrium Loan.

## THE ROFR AGREEMENT

27.     As part of the 2005 Transaction, the Trust and certain of the JQH affiliates (collectively, and as defined by the ROFR, the "JQH Entities") granted right of first refusal on sales of hotels owned by JQH (the "ROFR") to JD, an entity owned and controlled by Eilian. The ROFR concerns so-called "JQH Subject Hotels". The pertinent provisions of the ROFR can be summarized as follows:

- upon Hammons' death, the JQH Entities shall sell for cash the JQH Subject Hotels upon the later to occur of (i) two years after Hammons' death or (ii) "full redemption or other permitted disposition by [Hammons] and his Affiliates of all of his and their preferred interests in [Atrium LP]";

- under the second (ii) trigger, one of two events had to occur, (1) full redemption of the preferred equity interest (meaning payment by Atrium LP to Hammons of no less than $335 million); or (2) the occurrence of "other permitted disposition *by Hammons* and his affiliates of all of his and their preferred interests in Atrium LP;

- prior to the sale of any JQH Subject Hotel, the applicable JQH Entity owning such hotel shall provide notice to JD of the terms of such sale and JD shall have 30 days within which to purchase the subject hotel on the same economic terms, subject to certain adjustments;

- each JQH Entity shall ensure that any new deeds of trust and/or mortgages pertaining to any JQH Subject Hotel shall include a provision that such deed of trust and/or mortgage shall be transferrable to JD without the consent of the lender or mortgagor, and each JQH Entity shall use its best efforts to negotiate that no fee shall be payable upon such transfer;

- **if any JQH Entity shall materially breach the ROFR, JD shall have the right to purchase any JQH Subject Hotel pursuant to the terms of the ROFR, except that**

9

**the purchase price shall be 80% of the price otherwise required to be paid under the agreement.**

28. Pursuant to an amendment to the ROFR in 2008 (the "ROFR Amendment"), the provisions were amended. **Among other things, the ROFR was amended to provide that the JQH Entities would have to provide JD with 22.5% subordinated seller financing with respect to any JQH Subject Hotel that is actually acquired by JD pursuant to the other terms and conditions of the ROFR**.

### THE DELAWARE LITIGATION

29. In May 2012, and in addition to two other lawsuits commenced by Eilian affiliated entities between April 2012 and July 2012, JD commenced an action against the JQH Entities in the Chancery Court, which remains pending as Civil Action No. 7480-VCL (the "Delaware Litigation").

30. In its original complaint, JD alleged that the JQH Entities breached their obligations under the ROFR by: (a) failing to deliver to JD documents necessary for JD to record its right of first refusal against the JQH Subject Hotels; and (b) failing to ensure that all mortgage loans relating to JQH Subject Hotels provide that a transfer of the subject hotel to JD is permitted. JD sought mandatory injunctive relief and compensatory damages relating to the JQH Entities' alleged breaches of the ROFR.

31. In May 2013, while the Delaware Litigation was pending, Hammons passed away at the age of 94.

32. In January 2014, JD filed its amended complaint in the Delaware Litigation to also seek a declaratory judgment that the ROFR was enforceable and that the JQH Entities must complete the sale of all JQH Subject Hotels within the timeframe set forth in the ROFR. The amended complaint also sought an order for specific performance to force the JQH Entities to

10

Case 16-21142    Doc# 16    Filed 06/26/16    Page 10 of 20

sell those properties.

33. In March 2014, the JQH Entities responded to the amended complaint. They denied that they had breached the ROFR and contended that the ROFR was unenforceable because it violated the rule against perpetuities (since it did not have any definitive time limitations), that the ROFR was too vague to be enforceable, that since Hammons had not disposed of his preferred equity interest in Atrium L.P., the JQH Entities were not required to sell their respective hotels unless and until Atrium LP redeemed Hammons' preferred interests by paying the Trust and Hammons, Inc. at least $335 million, and that JD could not enforce the ROFR because it had materially breached the ROFR and related documents.

34. The JQH Entities also asserted counterclaims to recover monetary damages arising from the breach of the Atrium Partnership Agreement by Eilian entities following the 2005 Transaction and through 2009, due to the fact that Eilian encumbered Atrium LP's hotels with significant additional debt and caused Atrium LP to make distributions to Atrium GP and its affiliates totaling more than $750 million without the consent and to the detriment of the Hammons' entities holding the preferred equity interests in Atrium LP.

35. In April 2014, JD filed a motion for partial judgment on the pleadings, pursuant to which it sought a determination that it's a unilateral liquidation of Atrium LP's hotels trigger the obligations of the JQH Entities under the ROFR.

36. For their part, the JQH Entities likewise filed a motion for partial judgment on the pleadings, pursuant to which they argued that the ROFR was unenforceable because it violated the rule against perpetuities. Additionally, the JQH entities argued that a mere liquidation of Atrium LP would not constitute a permitted disposition that would require the sale of all JQH Subject Hotels, but rather such an obligation did not arise under the ROFR, if at all, unless and

11

until Hammons' preferred units were redeemed for no less than $335 million.

37. In October 2014, the Delaware Chancery Court issued a Memorandum Opinion with respect to the parties' competing motions for judgment on the pleadings. The Court rejected JQH's contention that the ROFR violated the rule against perpetuities and held that the JQH Entities would be in breach of the ROFR if they did not sell all of the JQH Subject Hotels by the later of May 26, 2015 (which was two years after Hammons' death) or "a full redemption or other disposition by Hammons or his affiliates of all of his Preferred Equity Units."

38. Notably, the Delaware Court (in an interlocutory order) held that the phrase "other permitted disposition by Hammons or his affiliates of all of his Preferred Equity Units" contained in the ROFR includes any liquidation *by Eilian* of Atrium LP's assets - even absent a voluntary act by the Hammons entities holding the preferred equity interests in Atrium LP or their receipt of the $335 million liquidation preference.

### EILIAN'S PURPORTED LIQUIDATION OF ATRIUM LP'S ASSETS

39. In October 2015, JD filed a supplemental complaint against the JQH Entities alleging that, on September 21, 2015, Atrium LP completed the liquidation of its assets and made distributions to its limited partners.[4] Eilian simultaneously caused Atrium LP to file a Certificate of Cancellation of Certificate of Limited Partnership. Consequently, JD sought a ruling that the JQH Entities were in breach of the ROFR because they did not complete the sale of the JQH Subject Hotels prior to Atrium LP's "liquidation."

40. JD also requested a decree of specific performance requiring the JQH Entities to sell the JQH Subject Hotels to JD at a 20% discount and provide the 22.5% subordinated seller financing contemplated by the ROFR Amendment. Eilian would not match an arms-length

---

[4] The JQH entities believe that Eilian did not engage in good faith in the way it offered the assets for sale to third parties and in tendering less than $1 million to the Trust and Hammons, Inc.

purchase offer from a third party, but instead would be allowed to buy the properties for 80% of their value as determined by the Delaware Chancery Court by forced sale under a court order.

## DELAWARE CHANCERY COURT "STATUS QUO" ORDER

41. Contemporaneous with its supplemental complaint, JD filed a motion for a status quo order, pursuant to which it requested the entry of an order precluding the JQH Entities from engaging in any conduct with respect to the JQH Subject Hotels outside of the ordinary course of business.

42. JD sought to enjoin the JQH Entities from taking actions that JD' believed could impair its rights under the ROFR and/or its ability to acquire the JQH Subject Hotels. In particular, JD sought to limit the JQH Entities' rights to develop certain vacant land or further encumber any of the JQH Subject Hotels pending trial in the Delaware Litigation, which is scheduled to commence on July 26, 2016. The JQH Entities opposed the extraordinary relief sought by JD and contended that the purported "liquidation" of Atrium LP violated the ROFR and Partnership Agreement.

43. On October 28, 2015, the Delaware Chancery Court entered a Status Quo Order, which stated that "[p]ending further order of this Court or final disposition of this action, [the JQH Entities] shall not take action outside the ordinary course of business as to any of the properties or assets that are subject to the [ROFR]."

44. In issuing its ruling, the Court sought to ensure that the JQH Entities would refrain from developing, encumbering or altering the JQH Subject Hotels or refinancing any of them on what the Court considered non-market terms. The Delaware Chancery Court was particularly critical of a $250 million CMBS refinancing that certain of the JQH Entities accomplished months earlier with Goldman Sachs (the "Goldman Sachs Loan") despite an absence in the ROFR of any prohibition against refinancing or prepayment penalties.

13

45. The Delaware Court believed that the prepayment premiums included in the Goldman Sachs Loan (standard in all CMBS loans) prejudiced JD and its right to acquire certain of the JQH Subject Hotels under the ROFR; thus, the Court made it clear that the JQH Entities could not refinance any of their debts on terms similar to the Goldman Sachs Loan absent JD' consent or further court order. As a result of the Status Quo Order and the Delaware Court's comments, the JQH Entities were (and continue to be) unable to refinance certain of their debts on or before their maturity date on reasonable terms which, caused a loan secured by six hotels to go into default at maturity on April 11, 2016.

## THE NOMURA DEFAULT AND CONTEMPT PROCEEDING IN THE DELAWARE LITIGATION

46. On March 30, 2006, six of the JQH Entities (the "Nomura Borrowers")[5] obtained a $162 million CMBS loan (the "Nomura Loan") from Nomura Credit & Capital, Inc. ("Nomura").

47. When the Delaware Chancery Court entered the Status Quo Order, the Nomura Borrowers were in negotiations with numerous potential lenders, including Goldman Sachs, to refinance the Nomura Loan prior to its maturity on April 11, 2016. At the time, the Nomura Borrowers intended to refinance on similar favorable terms to those obtained in connection with the Goldman Sachs Loan. The comments made by the Delaware Court in connection with the Status Quo Order (entered at Atrium's urging), however, precluded the Nomura Borrowers from entering into a CMBS transaction.

48. As a result, following entry of the Status Quo Order, the Nomura Borrowers sought unsuccessfully to obtain alternative financing. Consequently, the Status Quo Order directly led to the Nomura Borrowers' default under the Nomura Loan at its maturity.

---

[5] The Nomura Borrowers are: Hammons of Oklahoma City, LLC; Hammons of Lincoln, LLC; Hammons of South Carolina, LLC; Hammons of New Mexico, LLC; Hammons of Tulsa, LLC; and Hammons of Sioux Falls, LLC.

49. On April 11, 2016, JD filed a motion for contempt in the Delaware Litigation, in which it alleged that the Nomura Loan's maturity default -- which JD ensured by seeking and obtaining the Status Quo Order to preclude any further CMBS refinancing -- was the result of the Nomura Borrowers' conduct outside the ordinary course of business in violation of the Status Quo Order.

50. JD requested that the Delaware Chancery Court require the Nomura Borrowers to refinance the Nomura Loan or sell the underlying hotel assets to JD for the amount of the outstanding debt, subject to adjustment at trial. On April 21, 2016, the Delaware Court deferred ruling on JD' request to force a sale of the hotels to it and stated that any request for contempt could be heard at the trial scheduled to commence on July 26, 2016.

## THE iSTAR LOAN AND SFI BELMONT LITIGATION

51. As set forth above, as part of the 2005 Transaction, Hammons Development obtained the Atrium Loan from Atrium Lendco. This loan was guaranteed by the Trust. Atrium Lendco, in turn, obtained the funds to make the Atrium Loan from iStar, with which it shared close relations.

52. iStar's principal, Jay Sugarman, and Eilian served together on the board of directors of Starwood Financial, Inc., the predecessor to iStar. Additionally, Eilian previously served as a director of iStar. Moreover, iStar and Eilian both have offices located in the same building in New York City. Thus, Eilian's tight connections to Sugarman made iStar an ideal candidate to fund Eilian's obligations related to the 2005 Transaction.

53. As set forth above, as partial security for the Atrium Loan, Hammons Development pledged its ownership interests in any entity that would become the owner of a hotel acquired through the use of the Atrium Loan proceeds.

54. In that regard, Hammons Development indirectly owns five hotels that are part of

15

the assets owned by the JQH entities (collectively, the "Hammons Development Hotels") consisting of the following: (a) JQH - Murfreesboro Development, LLC [Embassy Suites Nashville SE - Murfreesboro]; (b) JQH - Glendale AZ Development, LLC [Renaissance Phoenix Glendale Hotel & Spa]; (c) JQH - Concord Development, LLC [Embassy Suites Charlotte - Concord Golf Resort & Spa]; (d) Hammons of Huntsville, LLC [Embassy Suites Huntsville Hotel & Spa]; and (e) JQH Rogers Convention Center Development, LLC [Embassy Suites Northwest Arkansas - Hotel, Spa & Convention Center].

55. Hammons Development never missed a payment under the Atrium Loan. Nevertheless, on August 12, 2013, iStar's assignee, SFI, commenced an action against, among others, Hammons Development, in a case that remains pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division (the "Illinois Court") as Case No. 13 CH 18740 (the "Original SFI Belmont Litigation").[6]

56. In this litigation, SFI Belmont alleges that Hammons Development defaulted under the Atrium Loan because it failed to maintain certain non-monetary, net worth covenants. Hammons Development has denied the allegations and continued to timely make its monthly debt service to SFI Belmont. Indeed, the JQH entities believe that Atrium Lendco was in default of its loan obligations under the iStar loan and yet, iStar never sued Atrium Lendco. Instead, iStar has pursed litigation against the Trust and Hammons Development even though Hammons Development has missed no payments.

57. In July, 2014, SFI Belmont scheduled a sale under the Uniform Commercial Code (the "UCC") of all of the equity pledges made by Hammons Development, the Trust and Hammons, Inc. in connection with the Atrium Loan. In response, Hammons Development and

---

[6] The Original SFI Belmont Litigation was consolidated with another case pending by SFI Belmont solely against Jacquie Dowdy, as the Personal Representative of the Jon Q. Hammons Estate.

16

the other defendants sought and obtained injunction temporary restraining order prohibiting SFI Belmont from proceeding with the UCC sale. Hammons Development believes that SFI Belmont's lawsuit and corresponding UCC sale efforts were undertaken at the urging of Eilian in an effort to disrupt the JQH enterprise and bolster Eilian's chances of acquiring its valuable hotel assets. Indeed, had SFI Belmont been permitted to consummate its proposed UCC sale, it would have become the indirect owner of the Hammons Development Hotels and could have transferred them to Eilian, thereby allowing Eilian to acquire substantial assets of the JQH enterprise without the need to await trial in the Delaware Litigation.

58. On June 30, 2015, Atrium Lendco assigned and transferred to SFI Belmont all of its right, title and interest in the Atrium Loan. As a result, SFI Belmont now owns all the loans made directly or indirectly in this credit arrangement.

59. In November 2015, SFI filed additional and separate litigation against Hammons Development and others, seeking acceleration of the full balance due under the Atrium Loan based on a financing deal between seven of the JQH Debtors and Goldman Sachs. In August 2015, seven JQH affiliates borrowed $250.8 million from Gold Sachs to refinance the first mortgages on seven hotel properties pursuant to a Loan Agreement (the "GS Loan Agreement"). SFI asserted that the "joint and several" provisions of the GS Loan Agreement violated the "Permitted Indebtedness" covenant of the Atrium Loan Agreement.

60. Commencing in December 2015, and before Hammons Development even filed an answer to the additional litigation, SFI Belmont began filing motions for summary judgment in the SFI Belmont Litigation seeking immediate judgment without trial of the outstanding principal amount of the Atrium Loan, which currently totals approximately $148 million. The Trust and the other defendants opposed the motions. The Illinois Court denied the first motion

17

but the others are pending and would have been heard on June 28, 2016 absent the imposition of the automatic stay.

## JQH'S NEED FOR CHAPTER 11 PROTECTION

61. As the foregoing demonstrates, the pending litigation is all-consuming. In Delaware, JD seeks ownership of the hotels at a substantial discount with additional seller financing along with damages. In Chicago, SFI seeks a nine figure money judgment despite no payment defaults.

62. Commencement of these Chapter 11 bankruptcy cases stays any proceedings in the litigation. Absent this stay, there was a substantial risk that the Delaware Chancery Court would enter an order compelling the JQH Entities to transfer substantially all of their assets to JD and Eilian at a 20% discount from the court-determined market value and to provide Eilian with 22.5% subordinated seller financing. Such a ruling would end the JQH hospitality enterprise and undoubtedly drain much, if not all, of JQH's cash. Moreover, the Trust, Hammons Development and Hammons, Inc. would then not be able to satisfy a judgment in the Illinois Court of approximately $148 million in favor of SFI Belmont.

63. Such an outcome would be devastating to the creditors (secured and unsecured), stakeholders, and trust beneficiaries of JQH as well as the legacy Hammons spent most of his long life building.

64. Thus, these bankruptcy cases will provide the JQH entities (a) the automatic stay breathing spell; (b) the various powers available to bankruptcy debtors including the power to "reject" the ROFR and free the JQH Entities to maximize the value of the hotels; (c) a forum to repay all creditors not just Eilian and JD; (d) a mechanism to restructure the JQH Entities in an organized fashion to the highest bidder under the protection of the bankruptcy court for the benefit of all creditors, not just Eilian and JD; (e) the opportunity to refinance loans if in the best

18

interest of the Debtors and the bankruptcy estates without interference by the Status Quo Order; (f) an organized and established set of rules and statutes to determine the extent of claims that are allowable; and (g) the time necessary to implement a reorganization that maximizes the value of its vast enterprise for the benefit of all creditors and stakeholders.

65. I have reviewed and approved the various first day motions filed in these cases and the factual averments contained in such motions are true and correct to the best of my knowledge and information and I would so testify if called as a witness. In addition, I note that the Debtors will suffer immediate and irreparable harm if the "first day" relief requested in those pleadings is not granted.

**ENGAGEMENT OF STINSON LEONARD STREET LLP AND MERRICK BAKER AND STRAUSS, P.C.**

66. As general counsel of the Debtors, I determined to hire Stinson Leonard Street LLP ("SLS") and Merrick Baker and Strauss, P.C. ("MBS", and along with SLS, the "Law Firms").

67. SLS will serve as lead bankruptcy counsel in these bankruptcy cases and MBS will serve as conflicts counsel handling issues that SLS cannot due to ethical conflicts.

68. I selected SLS as lead counsel based on my years of working with the firm. The Trust and Mr. Hammons before his death utilized SLS's services over the years on, *inter alia,* tax, trust and litigation matters. I am very comfortable with the firm, its experience in the District of Kansas, and its bankruptcy group. I selected MBS as conflicts counsel based on my research of Bruce Strauss' experience, reputation, and based on SLS's recommendation.

69. I will personally review all fee applications, invoices, and budgets of the Law Firms in compliance with fee guidelines. I intend to work with the Law Firms to finalize their respective budgets which have not been as of the Commencement Date. As to staffing of these

19

cases, for SLS, the attorneys principally in charge of the engagement are Mark Shaiken and Mark Carder, and others including Nicholas Zluticky will report to them.  For MBS, the attorney principally in charge of the engagement is Bruce Strauss and Victor Weber will report to him.  I have approved the staffing of these cases as described herein.

## COMPLIANCE WITH UNITED STATES TRUSTEE GUIDELINES

70. It is the intent of the Debtors to work with the United States Trustee's office ("UST") in all respects to comply with all guidelines and requirements for cases of this size, including reporting, disclosure, and calculation and payment of UST fees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 26, 2016

                                                                                                              __/s/ Greggory Groves_____
                                                                                                              Greggory Groves