The relief described hereinbelow is SO ORDERED.

SIGNED this 13th day of September, 2017.



Robert D. Berger
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

John Q. Hammons Fall 2006, LLC, *et al.*,

Debtors.

Case No. 16-21142
Chapter 11

[Jointly Administered]

### Memorandum Opinion and Order Granting Debtors' Motions
### for Partial Summary Judgment and
### Denying Creditor's Motions for Partial Summary Judgment and Dismissal

The question of whether an entity is eligible to be a "debtor" under the Bankruptcy Code seems, at first blush, to be elementary. Either the entity is or it is not, and let us all move on to the substance of the matter. But that question has consumed the debtors in this case and one of their principal creditors through briefing on a preliminary motion to dismiss, months of discovery, multiple cross-motions for summary judgment related to that motion to dismiss, and in attacks to nearly every substantive decision of this Court. With a full record now before it, the Court is prepared to rule in the affirmative: both the "revocable trust" and the "special purpose debtors"—each term defined more fully below—are eligible to be debtors under the Bankruptcy

Code.

Regarding the bankruptcy filing of the revocable trust, Creditor JD Holdings, L.L.C. (hereinafter "J.D. Holdings") argues that the trust is merely an "ordinary trust" and not a "business trust," and that, therefore, the trust does not qualify as a corporation—an entity specifically defined in the Code so that it is included in the "persons" eligible to file for Chapter 11 bankruptcy relief. Regarding the bankruptcy filings of the special purpose debtors, J.D. Holdings argues that a "status quo order" from the state court where the parties were litigating a breach of contract dispute altered who had the authority to make the bankruptcy filings, and that because the special purpose debtors did not comply with this status quo order, the Court lacks subject matter jurisdiction over them. The specific matters before this Court are:

(1)     J.D. Holdings' Motion to Dismiss Debtors' Chapter 11 Petitions, Abstain from these Chapter 11 Cases, or Alternatively, to Lift or Modify the Automatic Stay (Doc. 257), and related briefing thereto (Docs. 336, 401, 406);[1]

(2)     Debtors' Motion for Partial Summary Judgment Denying JD Holdings' Motion to Dismiss Special Purpose Debtor Cases (Doc. 767), and related briefing thereto (Docs. 768, 888-1, 915);

(3)     J.D. Holdings' Cross-Motion for Summary Judgment Granting J.D. Holdings' Motion to Dismiss Case Filed by the Revocable Trust of John Q. Hammons (Doc. 887), and related briefing thereto (Docs. 887-1, 927, 966);

(4)     Debtors' Motion for Partial Summary Judgment Denying J.D. Holdings'

---

[1] The Court will only address dismissal in this Opinion, and will address stay relief separately. J.D. Holdings withdrew its request for abstention and for dismissal of all cases based on Debtors' alleged lack of good faith in filing.

 Four additional creditors in Debtors' jointly administered cases joined in Debtors' objection to J.D. Holding's requested relief. *See* Doc. 350 (Creditor City of La Vista, Nebraska's joinder in opposition to J.D. Holding's requested relief); Doc. 351 (same from Creditor UMB Bank, N.A.); Doc. 354 (same from Creditor Hawthorn Bank); Doc. 360 (same from Creditor Great Southern Bank).

> Motion to Dismiss Case Filed for Revocable Trust (Doc. 769), and related briefing thereto (Docs. 770, 887-1, 914); and

(5)     J.D. Holdings' Cross-Motion for Summary Judgment Granting J.D. Holdings' Motion to Dismiss the Special Purpose Debtors' Chapter 11 Petitions (Doc. 888), and related briefing thereto (Docs. 888-1, 926, 969).

Final briefing on all motions closed on March 24, 2017, and on the request of the parties, oral argument was heard on June 5, 2017.

The Court first finds, and the parties agree, that there are no genuine disputes as to any material fact. Because the Court then concludes that the undisputed facts show that the trust at issue does qualify as a business trust under the Code, and that the status quo order did not alter who had the authority to authorize a bankruptcy petition for the special purpose debtors, it rules against J.D. Holdings on all motions.

The Court therefore grants the motions for partial summary judgment filed by Debtors,[2] denies the motions for partial summary judgment filed by J.D. Holdings,[3] and denies J.D. Holdings' motion to dismiss based on these issues.[4]

## I.     Findings of Fact[5]

John Q. Hammons began developing hotels in 1958. In 1989, when he was 70 years old, Mr. Hammons created a trust, now titled the Revocable Trust of John Q. Hammons dated December 28, 1989, as Amended and Restated (the "Hammons Trust"). The Hammons Trust

---

[2]  Docs. 767 and 769.

[3]  Docs. 887 and 888.

[4]  Doc. 257.

[5]  The Court's Findings of Fact are established by the Court's record and the parties' statements of undisputed material facts.

was amended multiple times and restated in 2000, when he was over 80 years old, on the same day Mr. Hammons signed his will. Mr. Hammons' will incorporated by reference the Hammons Trust's terms, and called for any assets that remained in his estate when he died to be contributed to the Hammons' Trust. During Mr. Hammons' life, nearly all of his assets were held by the Hammons Trust, and he was the sole contributor of assets to the Hammons Trust. The Hammons Trust does not have shareholders or a similar class of persons who own an interest in the trust, nor a board of directors or similar body elected on behalf of its beneficiaries.

Per its terms, property was transferred by Mr. Hammons personally and individually to the Hammons Trust, and Mr. Hammons then held the trust property as sole trustee. The governing "dispositive provisions" of the trust indicated that during Mr. Hammons' life, the net income of the trust would be paid to him, but upon his resignation as trustee, or if he became "incompetent, physically incapacitated," or "unable to act in his own behalf or manage his own business affairs," then successor trustees would "take possession and control" of the trust estate for the duration of his incapacity, paying for the care and support of Mr. Hammons and his wife, Juanita Hammons. Upon Mr. Hammons' death, the Hammons' Trust would then become irrevocable, and the trust estate would be used to pay all of Mr. Hammons' final expenses, all debts owed by Mr. Hammons, and certain specific bequests to several local colleges, hospitals, etc.[6] The remaining trust estate would be divided into two portions: a Marital Trust and a

---

[6]  The Court does not mean to minimize the specific bequests, as they were substantial by any measure. The Hammons Trust beneficiaries have no ability, however, to exercise any control over the successor trustees, whether as a result of their beneficial interests, or otherwise. The Hammons Trust also contained a spendthrift provision, which restrained all beneficiaries from selling, transferring, assigning, pledging, mortgaging, or alienating "their respective beneficial or legal or equitable right, title, or interest, claim or estate in and to either the income or the principal of the Trust Estate, or any part thereof, during the entire period of the trust for their

-4-

Charitable Trust. The Marital Trust specifically stated its intent to qualify for the marital

deduction for federal estate tax purposes. The Charitable Trust was to continue indefinitely, with

its annual income to be distributed to specific charities as directed therein, and again, complying

with all federal tax code requirements. The Charitable Trust was authorized to form a

corporation if it would be more convenient or efficient to do so.

The Hammons Trust granted broad powers to the trustee. It gave the trustee the power to

"hold, possess, manage, and control" the trust estate and gave "full power to sell, transfer,

convey and dispose" of the trust property on the terms and prices that the trustee deemed proper.

The trustee was also given "full power" to invest or reinvest all or any of the trust estate upon the

terms the trustee deemed in the best interest of the trust estate, with the statement that it was:

> intended hereby to vest in the Trustee full power and complete authority to hold,
> possess, manage, control, sell, convey, encumber or lease the real estate for any term
> although extending beyond the term of the trusts, and to invest and reinvest the
> whole and every part of the Trust Estate according to the Trustee's sole judgment
> and discretion without any other limitation upon the Trustee's power so to do.

The discretionary actions taken by the trustee were declared conclusive and binding, and the

trustee was not "liable for any mistake in judgment in the making or retaining of investments . . .

so long as any decision is made in good faith." The trustee was also granted the power to borrow

money in the trustee's "absolute discretion," and "whether or not that borrowing is for trust

purposes," and the power "to pledge, mortgage, assign or grant a security interest or lien in any

trust assets to secure any indebtedness," again, "whether or not the granting of the security

interest or lien is for a trust purpose, or is for the purpose of the protection, preservation or

---

benefit." Quarterly financial compilations of the Hammons Trust's financial condition were
never shared with any beneficiaries.

Case 16-21142   Doc# 1298   Filed 09/13/17   Page 5 of 29

improvement of the Trust Estate." And finally, the trustee was given "the power to carry out agreements made by [Mr. Hammons] and to continue, operate, and control any businesses which are held in the Trust Estate."

Likewise, successor trustees were authorized to "hold securities, real estate and other investments" and "sell or otherwise dispose of any investments if, in their sole discretion to do so would be in the best interest of the trusts." The successor trustees were released from personal liability:

> Being aware of the fact that, in operating any business, risks must be taken, [Mr. Hammons] hereby releases the Successor Trustees from any personal liability for any shrinkage of income or loss of capital value that may be incurred in the authorized operation of the businesses, except loss that may result from . . . willful misconduct or action in other than good faith; and in any measurement of the degree of care, diligence and prudence exercised . . . , [Mr. Hammons] directs that their actions be considered in relation to the inherent risks involved in the continued operation of businesses of the character represented, and that it be borne in mind that the Successor Trustees have been engaged in a business enterprise for the reasons and purposes hereinbefore stated pursuant to [Mr. Hammons's] request and desire.

The successor trustees were "expressly authorized" "to operate any business" in which Mr. Hammons was "engaged at the time of his resignation, death, or incapacity . . . in order to accomplish an orderly disposition of that business over the period of the trust in the best interest of the beneficiaries thereof, and to do all things necessary in connection with the operation and conduct of that business or businesses so long as the Successor Trustees shall consider it advisable to continue the operation and conduct thereof." The successor trustees have never drawn a salary or payment in their capacity as successor trustees.

From the establishment of the Hammons Trust in 1989 through September 28, 2010, the sole trustee of the Hammons Trust was Mr. Hammons. On September 16, 2005, Mr. Hammons and the Hammons Trust entered into a right of first refusal agreement (the "ROFR") with J.D.

Holdings and others.[7] The ROFR applied to "JQH Subject Hotels," and defined that phrase as specific properties included on an attached list "and any Hotel Properties or any direct or indirect interests in Hotel Properties now or hereafter acquired by [Mr. Hammons] or any [of Mr. Hammons' entities]. . . ."[8] The ROFR set forth an affirmative obligation for Debtors to begin to sell for cash all of the ROFR assets upon the death of Mr. Hammons.[9] In 2012, J.D. Holdings filed suit in Delaware state court for breach of contract, specifically, to redress breaches of the ROFR that was entered between J.D. Holdings, Mr. Hammons, and the Hammons Trust in 2005. The litigation has been ongoing since that date.

Mr. Hammons died on May 26, 2013.[10] From September 28, 2010, Jacqueline Dowdy and others have served as successor trustees, and from September 4, 2013 through the Hammons' Trust's bankruptcy petition date, the successor trustees have been Ms. Dowdy and Greggory Groves. Neither Ms. Dowdy nor Mr. Groves were present at the Hammons Trust's

---

[7] The ROFR was broadly applicable to the Hammons Trust, Mr. Hammons, and Mr. Hammons's businesses, and bound Mr. Hammons and "any other entity directly or indirectly controlled" by Mr. Hammons "which owns a Hotel Property (hereinafter defined) now or at any time in the future, each of which will be added as parties to this Agreement."

[8] The phrase "Hotel Properties" is itself defined, and includes "interests in real property and personal property, tangible or intangible. . . , used in the operation of a hotel facility, or any interests in any related convention or entertainment facility, retail facility, parking facility or gaming facility, including, without limitation, fee interests, leasehold interests, interests in ground leases, easements and rights of way, air rights, surface rights, subsurface rights, debt or equity interests in corporations, limited liability companies, joint ventures, partnerships or other entities holding title to, or a leasehold interest in, any of the forgoing, contractual management interests, and debt instruments. . . ."

[9] The timing of those sales is a heavily litigated issue elsewhere, but not relevant to the specific issues herein.

[10] The Court is aware that Mr. Hammons was previously incapacitated, although this fact is not established in the parties' briefing.

-7-

creation, or ever had a discussion with Mr. Hammons about why the Hammons Trust was created. Rather, their understanding of its purpose comes from the four corners of the Hammons Trust documents.

At all times since its inception, Missouri has been the situs of the Hammons Trust and the Hammons Trust has received income from business activities. The Hammons Trust has not registered as a business trust, however, or otherwise attempted to comply with state laws pertaining to qualification as a business trust under state law. The Hammons Trust has filed income tax returns each year since 2013. The Hammons Trust has elected to be treated as part of Mr. Hammons' estate under the Internal Revenue Code, and the successor trustees indicated this was done for convenience and cost savings.

In 2014, the Hammons Trust made payments totaling $6,982,718.72, per the special bequests stated therein for the Charitable Trust.[11] (Note that the Charitable Trust did not make these transfers, as discussed below.) Additional "ongoing special bequest payments" to certain charitable organizations have been made, totaling almost $8.3 million. None of the recipients of any of these payments made any capital contribution to the Hammons Trust. None of the assets of the Hammons Trust were ever delivered to the Marital Trust after Mr. Hammons' death, and, likewise, no assets have ever been transferred to the Charitable Trust. Rather, funds held by the Hammons Trust were disbursed to cover the expenses of Ms. Hammons after Mr. Hammons' death until her death on April 29, 2014. And the special bequests stated in the Hammons Trust related to the Charitable Trust have all been made directly by the Hammons Trust. Assets were

---

[11] Of that sum, just over $2 million was paid to individuals who were employees of the Hammons Trust or its subsidiaries (none of these individuals were related to either of the Hammonses). The remainder of the total sum was paid to institutions.

not transferred to the Marital Trust or the Charitable Trust after Mr. Hammons' death because the successor trustees decided that those transfers should not be made in light of financial uncertainty caused by the litigation commenced by J.D. Holdings.

In that state court litigation, J.D. Holdings filed an amended complaint and ultimately sought specific performance of the ROFR in the form of a compelled transfer of the "JQH Subject Hotels" to J.D. Holdings. Also, in October 2015, J.D. Holdings filed a motion in the state court litigation over the ROFR seeking a status quo order. The motion stated:

> JD Holdings seeks a status quo order to protect its rights with respect to the JQH Subject Hotels. In particular, JD Holdings respectfully requests that the Court enter an Order preventing Defendants from taking actions that would impede JD Holdings' ability to specifically enforce the ROFR Agreement, including by developing, encumbering, or otherwise altering, the JQH Subject Hotels in any way.

Nothing in the motion seeking the status quo order expressly mentioned bankruptcy or any attempt to restrict the right of any Debtor to commence a bankruptcy case.

The Delaware state court found, in a preliminary ruling on October 28, 2015, that Debtors had "made zero efforts to attempt to comply" with the sale provisions of the ROFR agreement. The transcript of the hearing on the status quo motion gives the state court's oral decision on the motion. It states that it was reasonably probable that J.D. Holdings would be able to show at trial that Debtors were in breach of the ROFR, and the ROFR provided for specific performance in the event of a breach. The state court judge then listed the factors it would consider in assessing J.D. Holding's motion (that the court characterized as seeking injunctive relief): equity, harm, and balancing. Regarding equity, the state court judge stated:

> In terms of the equities, equitable ownership lies with the plaintiffs. This is like an ordinary real estate transaction where Laster [sic] enters into a contract with seller to buy a house. Seller is supposed to close on date X but doesn't. The equity of ownership lies with the buyer. Real estate is unique. The specific performance right is in effect. Equity treats the buyer as having the superior title in this instance, not

the breaching sellers.

The state court then indicated it would enter an order prohibiting Debtors from taking any action

outside the ordinary course of business.[12]

The ultimate order entered by the Delaware state court on the status quo motion was

three paragraphs in total. The status quo order stated, in its entirety:

> 1.      Pending further order of this Court or final disposition of this action,
> Defendants shall not take action outside of the ordinary course of business as to any
> of the properties or assets that are subject to the Sponsor Entity Right of First Refusal
> Agreement, dated September 15, 2005 (the 'JQH Subject Hotels'), including those
> JQH Subject Hotels identified on Annex A of the Supplemental Complaint filed in
> this action by JD Holdings, L.L.C. on October 19, 2015.
> 2.      Defendants shall provide at least five (5) business days' notice to
> Plaintiffs before taking any action outside of the ordinary course of business as to
> any JQH Subject Hotel.
> 3.      The restrictions imposed by this Order may be waived on a case-by-
> case basis by written waiver signed by JD Holdings.

J.D. Holdings sought no change in management of any of the JQH Subject Hotels after entry of

the status quo order.[13] No judgment was ever entered granting to J.D. Holdings any title

(equitable or otherwise) in any property of any Debtor. On the other hand, Debtors never

consulted with J.D. Holdings or the Delaware state court to clarify the meaning or scope of the

status quo order, either.

In April, 2016, J.D. Holdings filed a motion for contempt for a violation of the status quo

order stemming from a loan default on one of the JQH Subject Hotels. That same month, the

---

[12]  Regarding the phrase "ordinary course of business," the state court judge asked
counsel to flesh that out, but also gave the example of refinancing on market terms.

[13]  The JQH Subject Hotels include one corporation, one limited partnership, and multiple
limited liability companies. It is undisputed that for each of these entities, the appropriate board
of directors, general partner, members, directors, or managers authorized the bankruptcy filing of
that particular entity, and that J.D. Holdings was not ever appointed as a director, general
partner, member, or manager of those entities.

-10-

Delaware state court entered an order on the contempt motion, and stated that because trial in the case was already scheduled for July 2016, the court would hear evidence on the contempt issue and rule simultaneously. The Delaware state court also permitted a representative of J.D. Holdings to participate in every call and be present at every meeting between Debtors and a lender whose loan was secured by six ROFR assets.

On June 26, 2016, essentially on the eve of trial on the state court litigation, the Hammons Trust and 71 of its directly or indirectly wholly owned subsidiaries and affiliates, including the "JQH Subject Hotels" that Debtors and J.D. Holdings refer to as the "Special Purpose Debtors," filed Chapter 11 bankruptcy petitions.[14] The petitions were jointly administered, as reflected in the caption above. The petition of the Hammons Trust was marked as a "trust," not a "corporation." No trustee of the Hammons Trust had ever filed for bankruptcy on behalf of the Special Purpose Debtors until the present filings, and no Special Purpose Debtor had ever filed for bankruptcy before. Prior notice of the commencement of the bankruptcy cases was not given to J.D. Holdings or the Delaware state court.

The Hammons Trust had seven employees on its petition date. The assets held by the Hammons Trust on that date consisted of three hotels, a storage facility, parking lots and garages, unimproved land, a baseball stadium, a building that houses a sports hall of fame operation, and ownership of all the equity issued by entities that in turn owned the equity issued by subsidiary entities owning hotels, casinos, office buildings, trade centers, a federal

---

[14]  Four additional closely related companies filed bankruptcy petitions on July 5, 2016, and those cases were also ordered to be jointly administered with the above caption.

courthouse, etc.[15] All assets held by the Hammons Trust were operated for profit, and profits were generated by the Hammons Trust in most, if not all, years.

The three hotels directly owned by the Hammons Trust have been held for many years. Since the inception of the Hammons Trust, however, the Hammons Trust has controlled a single, global, consolidated cash management system for the businesses it operates directly and through its subsidiary entities. The Hammons Trust has personal liability for the promissory notes secured by the assets that it directly owns, and the cumulative debt owed on those loans was approximately $62.7 million on the Hammons Trust petition date. In addition, the Hammons Trust has executed unlimited guaranties of debts incurred by its subsidiary entities that cumulatively exceed $1 billion. A consolidated financial statement issued March 31, 2016 reported that the Hammons Trust held approximately $108 million of cash or cash equivalents and marketable securities of less than $8 million. Per that financial statement, which was not based on audited information or generally accepted accounting principles but was simply a compilation of financial statements, remaining assets (composed of business properties, investments in operating entities, and Mr. Hammons' former personal residence) exceeded $2.2 billion with over $1.3 billion in debt.

The Hammons Trust has not issued written instruments reflecting a beneficial interest or ownership interest, such as stock certificates. Rather, certain beneficiaries are designated in the Hammons Trust and the authority is granted within the Hammons Trust to the successor trustees to name additional beneficiaries.

---

[15] The entities listed above employ "more than 4,000 people throughout the United States," with employee payroll for a single pay period exceeding several million dollars. Doc. 10 ¶ 5, ¶ 12 (Debtors' motion seeking court authority to, among other things, pay prepetition employee obligations); Doc. 45 (Order).

-12-

## II.    Analysis

A proceeding to determine eligibility for relief under the Bankruptcy Code is a core proceeding under 28 U.S.C. § 157(b)(2)(A), over which this Court may exercise subject matter jurisdiction.[16]

### A.    Legal Standard for Assessing Cross Motions for Summary Judgment

Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] An issue is 'genuine' if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[18] 'Material facts' are those that are "essential to the proper disposition of [a] claim" under applicable law.[19] The party moving for summary judgment bears the initial burden of demonstrating—by reference to

---

[16]  28 U.S.C. § 157(b)(1) and § 1334(b).

[17]  Fed. R. Civ. P. 56(a). Rule 56 is incorporated and applied in bankruptcy courts via Federal Rule of Bankruptcy Procedure 7056.
        In its response to a few of Debtors' statements of fact, J.D. Holdings argues that it lacks knowledge or information sufficient to form a belief as to the truth of Debtors' purported facts. But under Rule 56(c), if a party wishes to dispute a fact, the proper way to do so is to cite to portions of the record supporting that assertion or show that the materials cited do not support the fact. Fed. R. Civ. P. 56(c). The time for claims that the party lacks sufficient knowledge of the facts has long passed. As a result, the Court considered those facts undisputed. Fed. R. Civ. P. 56(e)(2) (stating that if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion"); *see also* D. Kan. LBR 7056.1(a) (stating that under the District of Kansas Local Bankruptcy Rules regarding summary judgment, "[t]he court will deem admitted . . . all material facts contained in the statement of the movant unless the statement of the opposing party specifically controverts those facts").

[18]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[19]  *Id.*

-13-

pleadings, depositions, answers to interrogatories, admissions, or affidavits—the absence of genuine issues of material fact.[20] When analyzing summary judgment, the Court draws all reasonable inferences in favor of the non-moving party.[21]

In a scenario with cross-motions for summary judgment, the Court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[22] In addition, the court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."[23] "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[24]

## B. Whether the Hammons Trust is a "Person" Eligible to be a "Debtor" Under the Code

"Interpretation of the Bankruptcy Code starts where all such inquiries must begin: with the language of the statute itself."[25] The problem, however, is that the Bankruptcy Code is not

---

[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Debtors attempted, in footnotes, to challenge both of the affidavits supporting J.D. Holdings' motions for partial summary judgment, alleging that they do not establish personal knowledge of the allegations therein. But both affidavits are from attorney members of the law firms representing J.D. Holdings, and while they are not perfect examples of what an affidavit should be, the Court finds they adequately support their respective motions for partial summary judgment under Rule 56(c)(4).

[21] *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013).

[22] *A. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotations omitted).

[23] *United States v. S. Ct. of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

[24] *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (internal quotations omitted).

[25] *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 694 (10th Cir. 2014).

-14-

always crystal clear, and the following scenario is no exception. Under 11 U.S.C. § 301(a),[26]

only an "entity that may be a debtor" can file a voluntary petition for relief. Those terms are then

specifically defined. An "entity" is a "person, estate, trust, governmental unit, and United States

trustee."[27] A "debtor" is a "person or municipality concerning which a case under this title has

been commenced."[28] But then there are further manipulations of the English language—the word

"person" is also defined by the Code, and its definition includes an "individual, partnership, and

corporation."[29] And we're not done, the term "corporation" is itself defined; that definition of

corporation is the cause of the current quagmire:

> The term "corporation"--
> (A) includes--
> > (I) association having a power or privilege that a private corporation, but not
> > an individual or a partnership, possesses;
> > (ii) partnership association organized under a law that makes only the capital
> > subscribed responsible for the debts of such association;
> > (iii) joint-stock company;
> > (iv) unincorporated company or association; or
> > (v) business trust; but
> (B) does not include limited partnership.[30]

After all that, this conclusion is clear and the parties and the Court agree: only a business trust

may be a debtor under the Code—an ordinary trust is an entity not eligible for bankruptcy

---

[26] *See also* 11 U.S.C. § 109(a) ("only a person . . . may be a debtor"). All future statutory references are to the Bankruptcy Code, title 11, unless otherwise stated.

[27] § 101(15).

[28] § 101(13).

[29] § 101(41).

[30] Because the definition of "corporation" uses the word "includes," the Court notes that the definition is not limited to the items listed, perhaps signaling Congress's intent that "corporation" be broadly construed. *See* § 102(3) (stating that the use of the word "includes" in the Code is "not limiting").

-15-

treatment.[31] J.D. Holdings generally argues that the Hammons Trust is not a "business trust"

under the Code because it does not have traditional attributes of a corporation (such as

transferable interests or pooled capital), and therefore is not a "person" eligible to be a

"debtor."[32]

The Code does not further define "business trust," however. Luckily, prior cases have

had occasion to interpret the phrase; not so luckily, the case law is not from this Circuit and it is

divergent, at best.[33] There are two circuit courts to address the issue. The first, *Brady-Morris v.*

---

[31] Because, therefore, both a trust (as a business trust) and a corporation are entitled to seek Chapter 11 relief, it is immaterial that the Hammons Trust checked the box for trust rather than corporation in the "type of debtor" section of its petition.

[32] Who has the burden of proof in this scenario? Neither party addresses the issue and it is not clear:

> While typically the party seeking dismissal bears the burden of proof, debtors also bear the burden of establishing that they are eligible for relief under § 109. The case law on point is not particularly instructive. At least one court [addressing the question of business trusts] has opined that the burden is on the moving party seeking dismissal, while others, including the Second Circuit, have placed the burden of proof on the debtor. Still a third court created a shifting burden of proof in requiring the creditor to make a prima facie showing that the trust was not a business trust, but imposing the ultimate burden of persuasion on the debtor.

David S. Jennis & Kathleen L. DiSanto, *Trust or Debtor: You Decide*, 32 Am. Bankr. Inst. J. 34, 80–81 (December 2013) (internal citations omitted) Because the Court finds, below, that the Hammons Trust is clearly a business trust regardless of who has the burden of proof, this procedural question is not important to the holding.

[33] The parties agree that federal law, not state law, should be used to determine the scope of the phrase "business trust," and the Court so finds. *See, e.g.*, *Brady-Morris v. Schilling (In re Kenneth Allen Knight Trust)*, 303 F.3d 678–79 (6th Cir. 2002) (concluding that "the definition of 'business trust' properly belongs to federal, rather than state, law"); *In re Sung Soo Rim Irrevocable Intervivos Trust*, 177 B.R. 673, 676 (Bankr. C.D. Ca. 1995) (calling the "availability of access to the federal bankruptcy courts and the availability of bankruptcy relief itself" a question of "federal, not state, law").

-16-

*Schilling (In re Kenneth Allen Knight Trust)*,[34] is a 2002 case from the Sixth Circuit. In *Kenneth Allen Knight Trust*, the court first notes the varying case law on the matter,[35] and then gives some history: prior to 1978, the Code as it existed then "did not include the term 'business trust,' but instead provided that a 'corporation' could be 'any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument.'"[36] Courts construed this definition of "corporation" to require that shares of "beneficiaries be transferable and that they be evidenced by a certificate or writing."[37]

But Congress changed the definition of corporation in 1978, and included the phrase "business trust" in "corporation." Since then, two lines of cases have developed. Some courts "continued to require transferable certificates of ownership, relying on *Morrissey* [*v. Comm'r of Internal Revenue*], 296 U.S. 344 [(1935)], in which the Supreme Court set out the test for when trusts may be treated as corporations under the Internal Revenue Code—a test requiring, inter alia, transferable certificates of ownership."[38] The Sixth Circuit chose not to follow this line of cases, because "the *Morrissey* criteria were meant for the Internal Revenue Code, and they contradict the 1978 liberalization of the Bankruptcy Code's treatment of business trusts."[39] The second line of cases "concluded that Congress intended to dispense with the

---

[34] 303 F.3d 671 (6th Cir. 2002).

[35] *Id.* at 679 (stating that "there are a number of court-made definitions [of business trust], and indeed perhaps the only thing that all the cases have in common is the recognition that they all differ." and citing cases with same view).

[36] *Id.* (citing 1976 version of § 101(8)).

[37] *Id.*

[38] *Id.* (citing cases).

[39] *Id.*

-17-

transferable-certificate-of-ownership requirement when it changed the statute in 1978" and instead looked to a variety of different characteristics based on a fact-specific analysis of the particular trust.[40]

Ultimately, the Sixth Circuit concluded the appropriate standard for that circuit was as follows:

> first, trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts; and second, the determination is fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions—findings, that is, regarding what was the intention of the parties, and how the trust operated.[41]

The underlying trust in *Kenneth Allen Knight Trust*: (1) was created by an individual using solely that's individual's funds, (2) designated only the settlor and his daughters as beneficiaries, (3) gave "virtual total control" of the trust and management of trust assets to the settlor, (4) held both personal and business property (namely, the trust itself owned the settlor's personal residence and 100% of the stock of a holding company, and the holding company then owned four subsidiary corporations that owned multiple business entities), and (5) most or all of the subsidiary corporation's financial activities were conducted through the trust and the trust's bank accounts.[42] Because the bankruptcy court was correct to find that the "primary purpose" of the trust in that case "was to transact business or carry on commercial activity for the benefit of . . . the investor, and not merely to preserve the Trust's res for the beneficiaries," the Sixth Circuit

---

[40] *Id.* at 679–80. See also 8A C.J.S. *Bankruptcy* § 24 (2017) for further discussion of tests that have developed from the varying case law interpreting the phrase business trust.

[41] *Kenneth Allen Knight Trust*, 303 F.3d at 680 (internal quotations omitted).

[42] *Id.* at 674–75.

-18-

upheld the bankruptcy court's business trust designation.[43]

The only other circuit court to address this issue is the Second Circuit in *Shawmut Bank Connecticut v. First Fidelity Bank (In re Secured Equipment Trust of Eastern Air Lines, Inc.)*.[44] This opinion from the Second Circuit, nearly ten years prior to the Sixth Circuit's opinion, affirmed the bankruptcy court's conclusion that the trust at issue was *not* a business trust. The Second Circuit stated "two general points" upon which the case law was in agreement: 1) "business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res," and 2) "while a trust must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily demonstrate that a trust is a business trust."[45] Beyond that, the Second Circuit declared that "a very fact-specific analysis of the trust at issue" was required.[46]

In the trust at issue in *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, the Second Circuit focused on two facts particular to the trust at issue in that case: namely, that the trust "was not established to generate a profit," and that the trust was not "established to 'transact business' as that phrase is commonly interpreted."[47] Rather, the trust was "merely created to serve as a vehicle to facilitate a secured financing" transaction.[48] The Second Circuit, therefore,

---

[43]  *Id.*

[44]  38 F.3d 86 (2d Cir. 1994).

[45]  *Id.* at 89.

[46]  *Id.*

[47]  *Id.* at 90.

[48]  *Id.*

-19-

concluded the trust at issue did not qualify as a business trust under the Code.[49]

The parties cite numerous additional cases, and they each have specific factors within that the particular court found important to whether the trust at issue qualified as a business trust.[50] Newer cases seem to favor a global, totality of the circumstances approach, however, and

---

[49] A dissenting judge in *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, disagreed with the majority's conclusions that the trust was formed only to preserve assets and that excess profits were paid out in set amounts per contractually limited terms, and instead focused on the facts that the trust had beneficial owners whose interests were reflected by investment certificates and was created to enter into transactions that would generate income to create certificateholders' profits. *Id.* at 92–93. Because the dissent concluded that the legislative history showed that the term business trust "was intended to include an entity that conducts business through a trustee and issues certificates or other written instruments to evidence beneficial interest or ownership in the entity," *id.* at 92, the dissent concluded the trust at issue was a business trust. But both the majority and dissent ultimately conducted a fact-based review of the terms of the trust at issue, and the fact that they relied on different factors to reach their conclusions merely emphasizes for this Court that the a global, totality view is important.

[50] *See, e.g.*, *In re Gaetano Trust*, No. 16-00719, 2016 WL 4150257, at *1 (Bankr. D. Haw. Aug. 3, 2016) (using three factors to determine whether a trust is a business trust—"the trust must (1) be actively engaged in and doing business, (2) have some of the significant attributes of a corporation, primarily the transferability of interest in the trust, and (3) have been formed primarily for a business purpose"—and concluding there was no business trust because the trust instrument showed the trust was "an ordinary estate planning trust," one asset was the personal residence of the settlor, the trust was not doing business on the petition date, and there was no indication that the beneficial and other interests of the trust were transferable); *In re Rubin Family Irrevocable Stock Trust*, No. 13-72193, 2013 WL 6155606, at *8–9 (Bankr. E.D.N.Y. Nov. 21, 2013) (focusing on the primary purpose and actions of the trust to determine if it is a business trust; concluding that having "employees, an independent board, shareholders, alienable ownership interests, and other 'corporate' attributes" were not necessary; finding that if a trust is established with a profit motive, that is a significant factor in favor of finding a business trust); *In re Jin Suk Kim Trust*, 464 B.R. 697, 704 (Bankr. D. Md. 2011) (stating that the "determination of whether a trust is a business trust is fact-specific and focuses on the purpose and operations of the trust;" finding a business trust where trust was managed as a business and "not consistent with a fiduciary's obligation to prudently protect and preserve the res of a trust" and beneficiary paid no income, but profit was all reinvested); *In re Sung Soo Rim Irrevocable Intervivos Trust*, 177 B.R. 673 (Bankr. C.D. Ca. 1995) (rejecting the business trust designation because the trust at issue was not created for a business purpose and did not constitute a business trust under state law); *In re Woodsville Realty Trust*, 120 B.R. 2, 4–6 (Bankr. D.N.H. 1990) (requiring that a business trust "must have at least some of the attributes of a corporation" and stating that transferability is relevant to finding a business trust); *In re Arehart*, 52 B.R. 308, 310

-20-

the older cases seem focused on specific factors that the court felt "should" be shown by typical business trusts. This court finds the Sixth Circuit's approach articulated in *Kenneth Allen Knight Trust*, and newer cases that have developed as the use of trusts has developed over the last 20 years, to be more persuasive for the task at hand. It would be illogical to do as J.D. Holdings suggests, and impose a formalistic, rigid test to define a business trust that requires transferable interests or pooled capital, because the very nature of a business trust—just like any business entity—is that it is suited to whatever particular task is at hand. The Code imposes no such rigid rule or express requirements on business trusts, and the Court will not read the requirement into the Code without a direction to do so.[51]

As the Sixth Circuit directed, this Court will instead conduct a fact-specific analysis of the particular trust in front of it. The Hammons Trust, as detailed above, was created in 1989,

_____

(Bankr. M.D. Fla. 1985) (finding a business trust where the trustee had the power to dispose of trust property, the trust was "formed for the express purpose" of developing and selling trust property for the economic benefit of the beneficiaries, and the trustee had "substantial management power" and was subject to little control from the beneficiaries ); *In re Armstead & Margaret Wayson Trust*, 29 B.R. 58, 59 (Bankr. D. Md. 1982) (rejecting the business trust designation where there was no "voluntary pooling of capital by a number of people who are the holders of freely transferrable certificates evidencing beneficial interests in the trust estate").

[51] *See, e.g.*, *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 694 (10th Cir. 2014) (instructing bankruptcy courts to enforce the plain language of the statute, and begin the analysis by "examining the subsection's structure"). Rather, the Court interprets the Code broadly in order to favor one of its chief objectives: the equal distribution of a debtor's assets amongst its creditors. *See Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006) ("the Bankruptcy Code aims, in the main, to secure equal distribution among creditors"). Other Code provisions are similarly interpreted broadly, for example, property of the estate under § 541. *See, e.g.*, *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) (stating that the scope of § 541 "is broad and should be generously construed").

-21-

and existed for over twenty years with Mr. Hammons at the helm.[52] During that time, Mr. Hammons continued his business enterprise through the Hammons Trust and the Hammons Trust held nearly all of his assets. As trustee, as permitted by the Hammons Trust's terms, Mr. Hammons bought and sold hotel and other commercial properties. Mr. Hammons built the trust, and thus his business empire, throughout those more than twenty years, such that on its petition date, the Hammons Trust had assets of over $2 billion.

And while that $2 billion number is significant, it is not just the fact that the Hammons Trust had and has significant assets; rather, the Hammons Trust has multiple other characteristics making this Court easily able to determine that it is a business trust. The Hammons Trust itself had seven employees on its petition date, but its combined entities employ thousands of people. Since its inception, it has been operated for profit, and has generated a profit in most, if not all, years of its existence. The Hammons Trust itself owns multiple properties (three hotels, a storage facility, parking lots and garages, unimproved land, a baseball stadium, and a building that houses a sports hall of fame), and then also owns all of the equity issued by subsidiary entities owning hotels, casinos, office buildings, trade centers, a federal courthouse, etc. Yes, the Hammons Trust also owns Mr. Hammons' former personal residence, but owning one piece of residential property does not change the fact that the primary purpose of the Hammons Trust was to buy, sell, hold, and develop commercial real estate. The Hammons Trust could borrow money, enter into contracts, purchase property, sell property, invest, etc., and it, in fact, did do all of

---

[52] Mr. Hammons was seventy years old at the time he created the Hammons Trust and over eighty when he restated it, and J.D. Holdings points to this fact as evidence that the Hammons Trust must have been an estate planning device. But Mr. Hammons was apparently still actively managing his business at the time, and continued to do so for a lengthy time thereafter, so the Court does not impute end-of-life concerns solely by the fact of Mr. Hammons' age.

those things. The trust document even guarded the trustee and successor trustees against any personal liability for risks taken by these business decisions. In addition, the Hammons Trust, since its inception, has had a central cash management system for the business it owns directly and though all its subsidiaries, and it has issued guarantees of those subsidiaries' debts. This Court cannot overlook that even the relationship between J.D. Holdings and Debtors springs from a complex business transaction valued in the hundreds of millions of dollars.[53] There is no doubt that the purpose of the Hammons Trust was to engage in business, not to preserve the res of the trust.

Did Mr. Hammons give some thought to estate planning when he created the Hammons Trust? It seems so.[54] There are provisions for tax planning, there are provisions relating to the care of his and his wife's final expenses, and there are detailed instructions as to payments to beneficiaries after Mr. Hammons's death. But again, this does not change the fact that the overwhelming body of the Hammons Trust's work was to operate a massive business enterprise.[55] In addition, the Hammons Trust does not have shareholders or a board of directors,

---

[53] *See JD Holdings, LLC v. Dowdy*, No. 7480-VCL, 2014 WL 4980669, at \*3–4 (Del. Ch. Oct. 1, 2014).

[54] *In re Rubin Family Irrevocable Stock Trust*, No. 13-72193-dts, 2013 WL 6155606, at \*8 (Bankr. E.D.N.Y. Nov. 21, 2013) ("Any given trust may have multiple purposes, but ultimately the trust's *primary* purpose is the decisive factor in the analysis.").

[55] *See In re Blanch Zwerdling Revocable Lining Trust*, 531 B.R. 537, 545 (Bankr. D.N.J. 2015) (stating that the focus for determining whether a trust is a business trust is "both the purpose of the trust and the actual operations of the trust" and "A trust that contains provisions regarding the distribution of the trust corpus upon the death of a trustor, does not preclude a finding that the trust is a 'business trust' so long as its primary purpose is to do business. On the other hand, just because a trust engages in business like activities, without more, it does not necessarily follow that the trust is a business trust."); Robert J. D'Agostino, *The Business Trust and Bankruptcy Remoteness*, 2011 Norton Ann. Surv. of Bankr. Law 4, 35 ("In examining the person seeking relief the focus is not on what the debtor is called but on what the debtor is

-23-

but these corporate formalities are also not shared by other categories of entities included in the definition of "corporation," so the Court does not find that significant.

Like the underlying trust in the Sixth Circuit's *Kenneth Allen Knight Trust* opinion, the Hammons Trust: (1) was created by an individual (Mr. Hammons) using solely that's individual's funds, (2) designated only Mr. Hammons as the beneficiary during his lifetime, and only a limited number of beneficiaries after his death, (3) gave not just "virtual total control," but exclusive control of the trust and management of trust assets to Mr. Hammons during his lifetime, (4) had both personal and business property (but in this case, only one personal residence, and the overwhelming majority of the property was commercial real estate or subsidiary business entities), and (5) all of the subsidiary entities cash management activities were conducted through the Hammons Trust.[56] This Court finds, just as the Sixth Circuit found, that the primary purpose of Hammons Trust is to "transact business or carry on commercial activity for the benefit of . . . the investor, and not merely to preserve the Trust's res for the beneficiaries,"[57] and concludes that the Hammons Trust is appropriately designated as a business trust.[58]

---

[56] *See Kenneth Allen Knight*, 303 F.3d at 674–75.

[57] *Id.* at 680.

[58] Even if using the older guidance from the Second Circuit's decision in *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, this Court would reach the same conclusion. In the trust at issue there, the Second Circuit focused on two factors when it found that the trust was not a business trust: namely, that the trust "was not established to generate a profit," and that the trust was not "established to 'transact business' as that phrase is commonly interpreted." 38 F.3d at 90. But the Hammons Trust *was* established for the purpose of generating profit and has generated that profit ever since. In addition, the Hammons Trust was established to transact

-24-

For these reasons, the Court rules against J.D. Holdings, and for Debtors, on the issue of whether the Hammons Trust qualifies as a business trust.

### C.     The Status Quo Order and the Special Purpose Debtors

The U.S. Constitution grants the federal government the power to establish uniform bankruptcy laws.[59] As a result, "bankruptcy law is paramount" to state law and "is essentially exclusive,"[60] and federal courts "maintain exclusive jurisdiction of deciding who can and cannot be a bankrupt."[61] On the other hand, it is also well established that "[a] bankruptcy case filed on behalf of an entity without authority under state law to act for that entity is improper and must be dismissed."[62]

The parties do not really dispute these basic fundamentals of bankruptcy law. Instead, they dispute the legal impact of the status quo order entered by the Delaware state court. The

---

business, and again, has done so since its inception. Regardless of whether this Court uses the tests articulated by the Sixth or Second Circuits, the Court concludes that the Hammons Trust is a business trust.

[59]  U.S. Const. art. I, § 8.

[60]  *In re Watts*, 190 U.S. 1, 27 (1903).

[61]  *Lawson v. Kreisers, Inc. (In re Kreisers, Inc.)*, 112 B.R. 996, 999 (Bankr. D.S.D. 1990) ("Preemption mandates Congress and the federal court system maintain exclusive jurisdiction of deciding who can and cannot be a bankrupt.").

[62]  *DB Capital Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capital Holdings, LLC)*, No. CO-10-046, 2010 WL 4925811, at *2 (10th Cir. BAP 2010). J.D. Holdings cites and discusses several cases standing for the proposition that state law governs whether a person is authorized to file a bankruptcy petition on behalf of an entity. *See, e.g.*, *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1259 (8th Cir. 1994); *Sino Clean Energy Inc. v. Seiden*, 565 B.R. 677 (D. Nev. 2017); *In re S&R Grandview, LLC*, No. 13-03098-8-RDD,  2013 WL 5525729 (Bankr. E.D.N.C. Oct. 4, 2013). But Debtors do not dispute that legal point; as discussed above, they dispute the interpretation of the status quo order and its effect. As a result, the Court will not discuss these cases herein.

-25-

status quo order is itself brief. It contains only three paragraphs, and only two of those are at issue. The pertinent language is that Debtors 1) "shall not take action outside of the ordinary course of business as to any of the properties or assets that are subject to [the ROFR]" and 2) Debtors "shall provide at least five (5) business days' notice to [J.D. Holdings] before taking any action outside of the ordinary course of business as to any JQH Subject Hotel."

J.D. Holdings argues that this brief language actually altered who had the authority to authorize a bankruptcy petition for the Special Purpose Debtors. But the facts just do not support this contention. If the Delaware state court was going to impose such a drastic change—actually altering the governing structure of each of the corporations, limited partnerships, and limited liability companies at issue—would not it have expressly said so? It seems more likely that the status quo order was exactly that: a way to maintain the standard day-to-day business operations (i.e., the "ordinary course of business") of the Special Purpose Debtors, while prohibiting actions that would limit J.D. Holdings potential recovery of specific performance of the ROFR. Lets look at the spectrum: obviously, the Special Purpose Debtors were not prohibited from entering into daily supplies contracts as that would be an action in the ordinary course of business. But on the other end of the spectrum, the Special Purpose Debtors would have been prohibited from pledging as collateral the hotels subject to the ROFR upon which J.D. Holdings sought its remedy using non-market terms.

In addition, the status quo order must be read in context of the litigation at hand.[63] The amended complaint in the state court action sought specific performance of the ROFR in the

---

[63] *Union Pac. R.R. Co. v. Mason City & Fort Dodge R.R. Co.*, 222 U.S. 237, 247 (1911) (stating that when the parties' dispute the meaning of a court's order, the order "must be determined by what preceded it and what it was intended to execute").

-26-

form of a compelled transfer of the subject hotels—essentially a breach of contract action seeking specific performance as a remedy. The motion filed by J.D. Holdings sought:

> a status quo order to protect its rights with respect to the JQH Subject Hotels. In particular, JD Holdings respectfully requests that the Court enter an Order preventing Defendants from taking actions that would impede JD Holdings' ability to specifically enforce the ROFR Agreement, including by developing, encumbering, or otherwise altering, the JQH Subject Hotels in any way.

Nothing in the motion expressly mentioned bankruptcy or any attempt to restrict the right of any Debtor to commence a bankruptcy case, or a change in the governance of any of the entities. Rather, the motion referred to "development or alteration" of the properties at issue as an example. The order entered, again, did not mention anything at all related to governance or bankruptcy, and cannot fairly be read as J.D. Holdings proposes.

J.D. Holdings repeatedly emphasizes that in the state court's preliminary ruling on the motion for a status quo order, the state court judge stated that "equitable ownership lies with [J.D. Holdings]." But J.D. Holdings conveniently fails to report the context of that statement, which was stating the factors for injunctive relief and assessing the equities of the situation, not actually transferring equitable ownership of the property. Such a transfer was what the upcoming trial—and related remedy of specific performance—was for. The argument that one comment in a preliminary ruling could actually transfer title to property, equitable or otherwise, to change the governance of an entity is frivolous.[64]

---

[64] The facts at hand are also wholly distinguishable from those in *DB Capital Holdings, LLC,* 2010 WL 4925811, a Tenth Circuit BAP case relied on by J.D. Holdings. In *DB Capital Holdings, LLC*, the debtor's own LLC governing documents dictated who of its members had authority to commence bankruptcy on its behalf, required the LLC to be operated "as presently conducted," and prohibited acts "that would make it impossible to carry on the ordinary business" of the LLC. *Id.* at *2–3, 5. The Tenth Circuit BAP unremarkably found that placing the debtor into bankruptcy ran afoul of all these contract provisions, but this is in no way similar to the facts in this case.

Even if the order were susceptible to different interpretations, "it is the duty of the court to adopt the one which renders it more reasonable, effective and conclusive in the light of the facts and the law of the case."[65] And because the reading J.D. Holdings proposes would be contrary to "overwhelming authority" holding otherwise,[66] this court adopts the more permissible reading of the status quo order that does not read into it a forced change of the Special Purpose Debtors' governance structure.[67]

For these reasons, the Court rules against J.D. Holdings, and for Debtors, on the issue of whether the Special Purpose Debtors were authorized to file their bankruptcy petitions.

---

[65] *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 447 (D.N.J. 2002). An entirely separate question is how a state court even could have the authority to order a change to an entity's internal governance as a remedy for a breach of contract allegation.

[66] *Lawson v. Kreisers, Inc. (In re Kreisers, Inc.)*, 112 B.R. 996, 1000–01 (Bankr. D.S.D. 1990) (stating that "[a] state court's receivership appointment for the express purpose of restraining an entity, which otherwise would be allowed to seek the refuge of the bankruptcy court, from filing bankruptcy is an intolerable abuse" and referencing "[o]verwhelming authority" that "holds that, generally, corporate officers and directors may enact a resolution authorizing bankruptcy despite a receiver being appointed. Neither a state court injunction nor the pendency of a state receivership can bar the filing of an otherwise permitted bankruptcy due to the grant of the exclusive bankruptcy jurisdiction to the federal courts and the constitutional principle of supremacy" (internal citations omitted)).

[67] For example, in a case where a state court order attempted to change the corporate governance of an entity and specifically enjoined that entity from filing bankruptcy—facts even more express than those stated here—the bankruptcy court concluded that the state court order could not "bar debtors from resorting to the exclusive bankruptcy court jurisdiction." *In re Corp. & Leisure Event Prods., Inc.*, 351 B.R. 724, 729 (Bankr. D. Ariz. 2006). As the *Corporate & Leisure* case indicates, it is not that state law has no place at all. Rather, "bankruptcy case law generally refers to state law to determine who has eligibility to file the petition," *id.* at 732 ("While bankruptcy case law generally refers to state law to determine who has eligibility to file the petition, it unanimously refuses to do so (in the absence of an intracorporate dispute) when state law has provided a creditor's remedy to vest that authority in a receiver."). But J.D. Holdings does not dispute that each entity at issue here properly exercised its authority to file its petition.

-28-

### III.     Conclusion

The Court wishes to draw this portion of Debtors' Chapter 11 case to a close, and continue to deal with the merits of Debtors' petitions as it has preferred all along. For the reasons set forth above, the Court concludes that the Hammons Trust qualifies as a business trust and that the Delaware state court litigation did not alter the Special Purpose Debtors' authority to file for bankruptcy relief.

**It is, therefore, by the Court ordered** that Debtors' motions for partial summary judgment[68] are granted, J.D. Holdings' motions for partial summary judgment[69] are denied, and the portions of J.D. Holdings' motion to dismiss based on the issues discussed above[70] are also denied.

IT IS SO ORDERED.

### ###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS

---

[68]  Docs. 767 and 769.

[69]  Docs. 887 and 888.

[70]  Doc. 257.

-29-