# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS AT KANSAS CITY

| | |
|---|---|
| | x |
| | : |
| In re | :   Chapter 11 |
| | : |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*, | :   Case No. 16-21142  (RDB) |
| | :   *Jointly administered* |
| Debtors[1] | : |
| | x |

## MOTION FOR AUTHORITY TO ENTER INTO PLAN SUPPORT AGREEMENT AND COMPROMISE OF CLAIMS

The Revocable Trust of John Q. Hammons, dated December 29, 1989, as amended and restated ("JQH Trust" or "Trust"), together with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for entry of an order pursuant to Sections 105(a) and 363(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 9019 of the Federal Rules of

---

[1] The Debtors in this case are: ACLOST, LLC, Bricktown Residence Catering Co., Inc., Chateau Catering Co., Inc., Chateau Lake, LLC, City Centre Hotel Corp., Civic Center Redevelopment Corp., Concord Golf Catering Co., Inc., Concord Hotel Catering Co., Inc., East Peoria Catering Co., Inc., Fort Smith Catering Co., Inc., Franklin/Crescent Catering Co., Inc., Glendale Coyotes Catering Co., Inc., Glendale Coyotes Hotel Catering Co., Inc., Hammons, Inc., Hammons of Arkansas, LLC, Hammons of Colorado, LLC, Hammons of Franklin, LLC, Hammons of Frisco, LLC, Hammons of Huntsville, LLC, Hammons of Lincoln, LLC, Hammons of New Mexico, LLC, Hammons of Oklahoma City, LLC, Hammons of Richardson, LLC, Hammons of Rogers, Inc., Hammons of Sioux Falls, LLC, Hammons of South Carolina, LLC, Hammons of Tulsa, LLC, Hampton Catering Co., Inc., Hot Springs Catering Co., Inc., Huntsville Catering, LLC, International Catering Co., Inc., John Q. Hammons 2015 Loan Holdings, LLC, John Q. Hammons Center, LLC, John Q. Hammons Fall 2006, LLC, John Q. Hammons Hotels Development, LLC, John Q. Hammons Hotels Management I Corporation, John Q. Hammons Hotels Management II, LP, John Q. Hammons Hotels Management, LLC, Joplin Residence Catering Co., Inc., JQH – Allen Development, LLC, JQH – Concord Development, LLC, JQH – East Peoria Development, LLC, JQH - Ft. Smith Development, LLC, JQH – Glendale AZ Development, LLC, JQH - Kansas City Development, LLC, JQH - La Vista Conference Center Development, LLC, JQH - La Vista CY Development, LLC, JQH - La Vista III Development, LLC, JQH - Lake of the Ozarks Development, LLC , JQH – Murfreesboro Development, LLC, JQH – Normal Development, LLC, JQH – Norman Development, LLC, JQH – Oklahoma City Bricktown Development, LLC, JQH – Olathe Development, LLC, JQH – Pleasant Grove Development, LLC, JQH – Rogers Convention Center Development, LLC, JQH – San Marcos Development, LLC, Junction City Catering Co., Inc., KC Residence Catering Co., Inc., La Vista CY Catering Co., Inc., La Vista ES Catering Co., Inc., Lincoln P Street Catering Co., Inc., Loveland Catering Co., Inc., Manzano Catering Co., Inc., Murfreesboro Catering Co., Inc., Normal Catering Co., Inc., OKC Courtyard Catering Co., Inc., R-2 Operating Co., Inc., Revocable Trust of John Q. Hammons Dated December 28, 1989 as Amended and Restated, Richardson Hammons, LP, Rogers ES Catering Co., Inc., SGF – Courtyard Catering Co., Inc., Sioux Falls Convention/Arena Catering Co., Inc., St Charles Catering Co., Inc., Tulsa/169 Catering Co., Inc., and U.P. Catering Co., Inc.

137635555.3

Bankruptcy Procedure (the "Bankruptcy Rules") approving the terms of the Plan Support Agreement and Claim Allowance attached hereto as Exhibit A (the "Plan Support Agreement") and the Settlement Agreement attached as Exhibit 1 thereto (the "Settlement Agreement"), pursuant to which (a) Debtors would proceed to support the Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors filed by Creditor JD Holdings, L.L.C [ECF No. 1766] (as modified by the terms of the Plan Support Agreement and the Settlement Agreement, collectively, the "Plan") in return for important consideration beneficial to Debtors' estates; and (b) JD Holdings, L.L.C. ("JD Holdings") and Debtors would compromise the claims that JD Holdings has asserted against Debtors. The Debtors intend to file an application to shorten notice for a hearing on the Motion. By this Motion, the Debtors also request that the Court approve for public release the proposed press release attached hereto as Exhibit B (the "Press Release"). In support of the Motion, the Debtors represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334(a) and (b). This is a core proceeding in that this Motion affects the administration of these bankruptcy estates.  28 U.S.C. §§ 157(b)(1) & (2)(A). Venue is proper in this Court.  28 U.S.C. § 1409(a).[2]

2.      The legal predicates for the relief requested herein are Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.

---

[2] JD Holdings' execution of the Plan Support Agreement is not intended to be, and should not be construed as, an admission by JD Holdings that venue in the Court is proper with respect to any current or future proceedings that may arise in connection with these cases, the 2005 Transaction or the ROFR (as those terms are defined below). The Debtors state that they contest JD Holdings' positions on such issues.

# BACKGROUND

## A.    The Prepetition Litigation Between Debtors and JD Holdings

3.    As part of a complex transaction in 2005 in which John Q. Hammons Hotels, Inc., a public company, was taken private (the "2005 Transaction"), certain of the Debtors and JD Holdings executed the Sponsor Entity Right of First Refusal Agreement (the "ROFR Agreement") pursuant to which JD Holdings was granted a number of rights, including rights with respect to the sale of certain assets of the Debtors (the "ROFR Assets"). In December 2008, JD Holdings and certain Debtors executed an amendment to the ROFR Agreement (the "ROFR Amendment," and together with the ROFR Agreement, the "ROFR").

4.    In 2012, JD Holdings commenced litigation against some of the Debtors in the Delaware Court of Chancery (the "Delaware Court" and the "Delaware Litigation"), seeking to redress alleged breaches of the ROFR by the Debtors. John Q. Hammons died on May 26, 2013 while the Delaware Litigation was still pending.

5.    On October 19, 2015, JD Holdings filed a Supplemental Complaint in the Delaware Litigation seeking specific performance of its alleged rights under the ROFR, *i.e.*, to purchase each of the ROFR Assets pursuant to the terms of the ROFR, including at a 20% discount, resulting from Debtors' alleged material breach of the ROFR and with seller financing from the Debtors.[3] Debtors contested JD Holdings' allegations, and the Delaware Court scheduled trial to commence in late July 2016.

## B.    The Chapter 11 Cases

6.    On June 26, 2016 and July 5, 2016, the Debtors commenced these cases. For purposes of this Motion, all of the Debtors shall refer to June 26, 2016 as the "Commencement

---

[3] For further information concerning the prepetition litigation between Debtors and JD Holdings as well as other events leading up to the filing of these Chapter 11 cases, Debtors refer the Court to the Declaration of Greggory Groves in Support of First Day Motions [ECF No. 16].

137635555.3

Date." Since the Commencement Date, the Debtors have continued in possession of their property and control of their operations pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.      Shortly after Debtors filed their petitions, JD Holdings moved to dismiss the Chapter 11 Cases (the "Motion to Dismiss") on the grounds that they were not properly commenced.  On August 16, 2016, the Debtors filed a motion to reject the ROFR [ECF No. 338] (the "Rejection Motion").

8.      The Bankruptcy Court granted the Rejection Motion on December 13, 2016 [ECF No. 694] (the "Rejection Order") and on December 22, 2017, JD Holdings appealed the Rejection Order to the Bankruptcy Appellate Panel of the Tenth Circuit (the "BAP").   On December 28, 2017, the BAP entered its opinion affirming the Rejection Order. On January 19, 2018, JD Holding appealed the BAP's opinion to the Tenth Circuit Court of Appeals.

9.      The same day that JD Holdings appealed the Rejection Order to the BAP, JD Holdings also filed seventy-six proofs of claim (one against each of the Debtors in these cases), each in the amount of $587.6 million for damages JD Holdings claims were caused by Debtors' alleged pre-petition breach of the ROFR (the "Pre-Petition Claims").

10.     On January 10, 2017, JD Holdings filed an additional seventy-six proofs of claim (one against each of the Debtors in these cases), each in the amount of $565.3 million for damages JD Holdings claims arise as a result of the Rejection Order ("Rejection Claims" and the Pre-Petition Claims are collectively referred to herein as the "Claims").

11.     On January 13, 2017, Debtors filed motions for summary judgment on the Motion to Dismiss. On February 17, 2017, JD Holdings filed cross-motions for summary judgment. On September 13, 2017, the Bankruptcy Court denied the Motion to Dismiss and JD Holdings' request for summary judgment, and granted Debtors' request for summary judgment [ECF No.

- 4 -

1297] (the "Dismissal Order"). JD Holdings appealed the Dismissal Order to the BAP. The BAP accepted JD Holdings' appeal, which is now fully briefed.

12. On August 30, 2017, Debtors filed their Omnibus Objection to JD Holdings' Claims and certain other claims, and on October 3, 2017, JD Holdings filed its Response.

13. On December 20, 2017, Debtors filed a proposed plan of reorganization [ECF No 1584] and accompanying disclosure statement (the "Debtors' Disclosure Statement"). On January 29, 2018, the Bankruptcy Court issued its Order Denying Approval of Debtors' Disclosure Statement [ECF No. 1728]. Three days later, the Court entered its Order Terminating Debtors' Exclusivity Periods [ECF No. 1750].

## C.      The Plan and the Plan Support Agreement

14. On February 6, 2018, JD Holdings filed its Plan and accompanying disclosure statement. Under JD Holdings' Plan, all allowed claims would be paid as set forth in the Plan and money would be contributed to a new charitable trust to honor Mr. Hammons' charitable intent. The sum contributed to the charitable trust would increase if Debtors cooperate with respect to the confirmation and implementation of the Plan.

15. On February 9, 2018, Debtors entered into settlement discussions (the "Settlement Discussions") with JD Holdings in an effort to avoid costly and protracted litigation regarding JD Holdings' Claims and JD Holdings' Plan, and as required by the Court's Order Directing Parties to Return to Mediation [ECF No. 1749].

16. As a result of the Settlement Discussions, Debtors entered into the Plan Support Agreement and the Settlement Agreement with JD Holdings. That agreement incorporated the Plan and a Settlement Agreement negotiated by the Debtors for the benefit of the estates.

17. The Plan Support Agreement, which is attached as Exhibit A hereto, contains the following material terms:

- 5 -

a.  Debtors shall support the confirmation and implementation of JD Holdings' Plan as modified by the Settlement Agreement. Debtors' cooperation will increase the amount of money contributed to a new charitable trust and could expedite implementation of JD Holdings' Plan during a time of increasing market volatility and declining financial performance. If confirmed, JD Holdings' Plan would pay all allowed claims as set forth in the Plan.

b.  Although JD Holdings has represented that it or its affiliate intends to retain nearly all of Debtors' existing employees, those employees of Debtors that are not offered continuing employment with JD Holdings or its affiliate upon the Effective Date of the Plan or thereafter will be provided COBRA access and defined severance payments.

c.  Debtors and JD Holdings agree that JD Holdings shall have an allowed claim of $495,938,161 (the "Allowance Provision"), provided, however, if Debtors (i) do not breach the Plan Support Agreement and (ii) cooperate as set forth in the Plan Support Agreement, and the Plans are not confirmed or the Effective Date of the Plans does not occur, then the Allowance Provision shall be of no force and effect unless Debtors, their employees, officers, directors, and/or co-trustees nevertheless receive through some alternative plan, sale, or other transaction the benefits of the Plan modifications in the Settlement Agreement, to include the funding of the new Charitable Trust and the benefits of the Settlement Agreement, in which case the Allowance Provision will be effective. This provision will most likely obviate the need for costly litigation regarding JD Holdings' Claims. This amount is significantly less than the full amount claimed in the Claims.

d.  Debtors and JD Holdings shall jointly request that the Court suspend the deadlines related to the estimation of the Claims, and hold further proceedings related to that estimation in abeyance. The parties shall also jointly request that JD Holdings' pending appeals arising out of these bankruptcy cases be stayed, and, if JD Holdings' Plan is confirmed, ultimately be dismissed with prejudice, thus obviating the cost to continue litigation of these appeals and avoiding potential appellate rulings adverse to Debtors' estates.

## **RELIEF REQUESTED**

18.  Debtors request that the Court enter an order pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 6004 and 9019 approving the terms of the

137635555.3

Plan Support Agreement and the Settlement Agreement attached thereto that compromised the ROFR-related claims of JD Holdings, and authorizing Debtors to enter into the Plan Support Agreement and Settlement Agreement and abide by the terms, obligations, and conditions set forth therein.

19.     The Court is authorized to grant the Debtors the relief requested in the Motion to aid them in pursuing and achieving value maximization for the benefit of creditors and the estates.  Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

20.     It is axiomatic that a debtor should be authorized to use assets out of the ordinary course of business pursuant to Section 363 of the Bankruptcy Code and in connection with the confirmation of a plan of reorganization if it demonstrates a sound business purpose for doing so. *See In re Allen*, 607 F. App'x 840, 843 (10th Cir. 2015) (evaluating Debtors' proposed action under section 363 pursuant to the "business judgment" test); *see also In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that "a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction").

21.     The Court also has the authority pursuant to Section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

22.     Additionally, Bankruptcy Rule 9019 vests the Court with broad authority to approve or disapprove all compromises and settlements affecting the bankruptcy, providing that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and

137635555.3

indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." "The purpose behind compromises is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *In re Southern Medical Arts Cos., Inc.*, 343 B.R. 250, 255 (B.A.P. 10th Cir. 2006).

23.     In *Southern Medical Arts*, the BAP established the following four-prong test for evaluating compromises:  "(1) the chance of success on the litigation on the merits; (2) possible problems in collecting the judgment; (3) the expense and complexity of the litigation; and (4) the interest of the creditors." *Id.*; *see also In re Kopexa Realty Venture Co.*, 213 B.R. 1020 (B.A.P. 10th Cir. 1997).  A bankruptcy court's decision to approve a settlement must be an informed one based upon objective evaluation of developed facts. *Reiss v. Hagmann*, 881 F.2d. 890 (10th Cir. 1989).

24.     In reviewing a proposed settlement, the bankruptcy court considers the likelihood of success and the expected delay caused by the litigation and should not substitute its judgment for that of the debtor, but instead should canvass the issues to determine that the settlement does not fall below the lowest point in the range of reasonableness. *Id.*; *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988) (holding that the standard for approval of a compromise is whether the proposed compromise is "fair and equitable" and in the best interests of the estate and that the debtor's judgment in recommending a settlement should not be substituted as long as the settlement is reasonable); *see also In re Texas Extrusion Cor*p., 836 F.2d 217 (5th Cir. 1988). The decision of whether to approve a proposed settlement is within the sound discretion of the Bankruptcy Court.  *In re Flight Transportation Corporation Securities Litigation*, 730 F.2d 1128, 1136 (8th Cir. 1984); *In re Revelle*, 259 B.R. 905 (Bankr. W.D. Mo. 2001). Compromises are favored in bankruptcy.  *Southern Medical Ar*ts, 343 B.R. at 256.

137635555.3

25. The Debtors believe that the Plan Support Agreement and Settlement Agreement and the compromise of JD Holdings' Claims set forth therein achieves value maximization for the benefit of creditors and the estate. As to the *Southern Medical Arts* factors, the Debtors and JD Holdings reached this compromise after evaluating the possibility that JD Holdings would prevail in its litigation against the Debtors and/or the possibility of confirmation of the JD Holdings Plan. In addition, continuing the litigation would have been very costly to the estates, particularly given the complexity of the legal and factual issues presented by the litigation and the number of contested matters between the parties pending before this Court or at various stages of appeal. The compromise in the Plan Support Agreement and the Settlement Agreement represents a potential savings to the Debtors' estate of nearly $95,000,000 if JD Holdings were to prevail on its Claims.[4] In addition, as set forth hereafter, the Debtors believe the compromise protects the interests of their workforce.

26. Importantly, the Plan Support Agreement and the Settlement Agreement eliminate significant uncertainty between JD Holdings, as plan proponent, and Debtors' estates, and accordingly, facilitates confirmation of JD Holdings' Plan, and will accelerate the Effective Date of the Plan, which provides for the payment of all allowed claims as set forth therein.

27. The Plan Support Agreement also contains other, important compromises that benefit the Debtors and which JD Holdings' Plan did not previously include, such as clarification of the assets JD Holdings shall contribute to Debtors in exchange for their cooperation and Debtors' rights concerning the disposition of those assets. And although JD Holdings has represented that it intends to offer the vast majority of Debtors' current employees continuing employment with one of JD Holdings' affiliates upon the Effective Date of the Plan or thereafter,

---

[4] Pursuant to the terms of the Plan Support Agreement and the Settlement Agreement, the parties' compromise concerning the allowed amount of JD Holdings' Claims might be of no force or effect if the Plan is not confirmed or the Plan's Effective Date does not occur. Debtors respectfully submit that the second *Southern Medical Arts* factor—possible problems in collecting the judgment—is not relevant here.

- 9 -

the Plan Support Agreement and the Settlement provide compensation to those employees who are not being offered continuing employment in the form of COBRA access and defined severance payments.

28. Finally, Debtors request that the Court approve for public release the Press Release. The Press Release provides information concerning the settlement between JD Holdings and Debtors that key constituents to these cases may find useful.

## CONCLUSION

For the foregoing reasons, the Debtors request that the Court enter an order pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019: (i) approving the terms of the Plan Support Agreement and the Settlement Agreement; (ii) authorizing the intended compromise of claims set forth therein; (iii) authorizing the Debtors' performance under the Plan Support Agreement and the Settlement Agreement; (iv) approving the Press Release for public release; and (v) granting such other and further relief as the Court deems just and proper.

Dated: February 13, 2018

STINSON LEONARD STREET LLP

By:   /s/ Mark Shaiken
Mark Shaiken KS # 11011
Nicholas Zluticky KS # 23
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone:  (816) 842-8600
Facsimile:  (816) 691-3495
mark.shaiken@stinson.com
nicholas.zluticky@stinson.com

*Counsel for Debtors*

- 10 -

**EXHIBIT A**

137635555.3

## PLAN SUPPORT AGREEMENT AND CLAIM ALLOWANCE

This PLAN SUPPORT AGREEMENT AND CLAIM ALLOWANCE dated February 10, 2018 (this "Agreement") is made by and among JQH Trust, for itself and on behalf of all other Debtors, Jacqueline A. Dowdy ("JD") and Greggory Groves ("GG"), individually and as Co- Trustees of the JQH Trust, and as directors, officers and employees of various Debtors and related entities, and JD Holdings (each of Debtors, including JQH Trust, JD, GG and JD Holdings are referred to individually as a "Party", and collectively the "Parties").[1]

All initial capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the *Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors* filed by JD Holdings in the United States Bankruptcy Court for the District of Kansas at ECF 1766 (the "Plans").

WHEREAS, on June 26, 2016, Debtors commenced the Chapter 11 Cases in the Bankruptcy Court;

WHEREAS, Debtors and JD Holdings and their respective affiliates have asserted various claims against one another both in the Bankruptcy Court and in the Delaware Court, which each Party contests;

WHEREAS, JD Holdings has filed the Plans pursuant to which (among other things) Debtors would sell and JD Holdings would purchase the Assets, and JD Holdings would make certain contributions to the Charitable Trust to honor Mr. Hammons charitable intent;

WHEREAS, in conjunction herewith, the Debtors and JD Holdings have agreed upon terms of an executed settlement ("Settlement Agreement"), which is attached as Exhibit 1 hereto;

WHEREAS, Debtors are willing to support the Confirmation of the Plans pursuant to the terms of the Settlement Agreement and this Agreement;

WHEREAS, Debtors are willing to cooperate with JD Holdings pursuant to the terms of the Settlement Agreement and this Agreement, such support to include due diligence, consummation of the Sale and other Plans Transactions and implementation of the Plans; and

WHEREAS, the Parties are willing to stipulate to the Allowed amount of JD Holdings' Claim arising from the ROFR under the terms and conditions set forth hereafter.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party intending to be legally bound hereby, agrees as follows:

---

[1] JD Holdings states that this Agreement is not intended to be, and should not be construed as, an admission that venue in the Bankruptcy Court is proper with respect to any current or future proceedings that may arise in connection with the Chapter 11 Cases, the 2005 Transaction, or the ROFR. The Debtors state that they contest JD Holdings positions on such issues.

**Section 1.      Exhibits Incorporated by Reference.**

The Settlement Agreement, and the Plans, as modified by the Settlement Agreement, each are expressly incorporated herein and made part of this Agreement, and all references to this Agreement, unless specified otherwise, shall include references to the Settlement Agreement and Plans.    In the event of any inconsistency between this Agreement without reference to the Plans, and the Plans as modified by the Settlement Agreement, the Plans as modified by the Settlement Agreement shall govern.

**Section 2.      Allowance of Claims.**

The Parties agree that JD Holdings shall have an Allowed Claim of $495,938,161.00 for its Claims against each Debtor jointly and severally arising from the ROFR (the "Allowance Provision"); provided, however, if Debtors (i) do not breach this Agreement and (ii) cooperate as set forth in this Agreement and in the Settlement Agreement, and the Plans are not confirmed or the Effective Date of the Plans does not occur, then this Allowance Provision shall be of no force and effect unless Debtors, their employees, officers, directors, and/or co-trustees nevertheless receive through some alternative plan, sale, or other transaction the benefits of the Plan modifications in the Settlement Agreement, to include the funding of the NCT and the benefits of the Settlement Agreement, in which case the Allowance Provision will be effective.

**Section 3.      Proposed Plans of Reorganization.**

Debtors shall support the Confirmation and implementation of the Plans as modified by the Settlement Agreement. Specifically, and without limiting the generality of the foregoing:

(a)      Debtors shall, and shall cause all other Debtor Parties to, take all such actions, or not take such actions, as necessary or appropriate, or as reasonably requested by JD Holdings, to obtain the approval of this Agreement and the Settlement Agreement, the Disclosure Statement and Plans, and the Confirmation Order, and any disputes regarding the Debtors' satisfaction of such obligations shall be resolved by Judge Somers;

(b)      Debtors shall not, and shall cause the other Debtors Parties not to, file an objection to this Agreement, the Settlement Agreement, the Disclosure Statement or Plans, or oppose Confirmation, or in any manner, directly or indirectly, take or fail to take any actions, or otherwise work with, consult, encourage or otherwise assist any other Entity to take or fail to take any action that would or would reasonably be expected to prevent, delay, impede, interfere with, or otherwise could be adverse to, obtaining approval of this Agreement, the Disclosure Statement or Plans, or obtaining the Confirmation Order; and

(c)      Debtors shall, and shall cause all of their agents and representatives to, cease marketing the Assets and terminate all sale processes, and shall deny potential buyers (other than JD Holdings) access to any data room or similar information repository relating to Debtors or their Assets. If Debtors or any of their agents or

2

representatives receive any new bids or offers to acquire some or all of the Assets after the date of this Agreement, Debtors shall provide a copy of such bids and offers to JD Holdings no later than one business day after receipt.

**Section 4.      Modifications to the Plans.**

The Plans and Disclosure Statement shall be modified as set forth in the Settlement Agreement.

**Section 5.      Performance Under Settlement Agreement.**

The Parties shall perform their obligations under the Settlement Agreement.

**Section 6.      Cooperation and Support.**

The Parties shall cooperate with each other in all reasonable respects in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters relating to obtaining Bankruptcy Court approval of this Agreement and the Settlement Agreement (the "Bankruptcy Court Approval"), the implementation of this Agreement and the Settlement Agreement, the Confirmation, JD Holdings' due diligence of the Assets, the consummation of the Sale and other Plans Transactions and the implementation of the Plans.

Specifically, and without limiting the generality of the foregoing:

(a)      from and after the date that is the earlier of (i) Bankruptcy Court Approval, or (ii) satisfaction or waiver of the conditions in the Settlement Agreement, Debtors shall, and shall cause the other Debtor Parties, to perform all of the obligations set forth in Section VI.B of the Plans regarding the Interim Period, including, without limitation, (x) permitting JD Holdings to communicate with, and taking actions reasonably requested by JD Holdings with respect to, existing lenders, ground lessors, convention center authorities, gaming regulators and other governmental authorities, franchisors, brokers and all other third parties whose consent, approval, estoppel or cooperation is required to consummate the Sale and other Plan Transactions, and implementation of the Plans, and (y) provide JD Holdings and its representatives access to review all books, records and other non-privileged information (including all electronic records) with respect to the Assets, Debtors and Non-Debtor JQH Entities.

(b)      from and after the date of this Agreement, Debtors shall, and shall cause Debtor Parties to, cooperate with JD Holdings to structure the Sale and other Plans Transactions in a manner to minimize any potential tax liability to JD Holdings and to the Debtors.

(c)      from and after the date of this Agreement, Debtors shall not support any alternative to the Plans and shall not have any "fiduciary duty out" to accept any other plan of reorganization, bid, or proposed sale (given that the Plans pay all Allowed Claims in full) as more fully set forth in the Settlement Agreement.

3

(d)     from and after the date of this Agreement, each of the Parties shall execute and deliver any other documents or instruments, and take any other actions as may be necessary or appropriate, from time to time, to carry out the purposes and intent of this Agreement, and shall not take any action that would frustrate the purposes and intent of this Agreement.

(e)     from and after the date of this Agreement, any disputes with respect to this Section 6 shall be resolved by Judge Somers.

**Section 7.     Representations and Warranties.**

Each Party represents and warrants to the other Parties, as of the date of this Agreement and the Settlement Agreement (and each of which is a continuing representation and warranty), as follows:

7.01.     Existence, Power and Authority. Such Party is validly existing and in good standing under the laws of the state of its organization, and such Party has the power and authority under applicable law and its organizational documents to enter into and perform this Agreement and the Settlement Agreement.

7.02.     Enforceability. Subject to Bankruptcy Court Approval, this Agreement and the Settlement Agreement are the legally valid and binding obligations of such Party, and enforceable against such Party in accordance with its terms.

7.03.     No Violation. Subject to Bankruptcy Court Approval, the execution, delivery and performance of this Agreement and the Settlement Agreement by such Party does not (i) violate any applicable law, or any of its organization or other governing documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which such Party or any of its subsidiaries is a party.

7.04.     No Consent or Approval. Subject to Bankruptcy Court Approval, no consent or approval is required by any other person or entity in order for such Party to perform such Party's obligations under this Agreement and the Settlement Agreement.

**Section 8.     Settlement Discussions.**

This Agreement and the Settlement Agreement evidences a proposed settlement of disputes among the Parties. Except as expressly provided in this Agreement or the Settlement Agreement, nothing in this Agreement or the Settlement Agreement is intended to, or does, in any manner waive, limit, impair, or restrict or otherwise affect any right or ability of any Party to protect and preserve its rights, remedies and interests. Subject to the foregoing sentence in any way, if the Plans are not Confirmed, or Sale or other Plans Transactions are not consummated, or if this Agreement or the Settlement Agreement is terminated, for any reason, each of the Parties fully reserves all of its rights, remedies, and interests. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and the Settlement Agreement and all negotiations relating hereto shall not be admissible into evidence in any action, case, or

4

proceeding other than an action, case or proceeding to enforce the terms of this Agreement or the Settlement Agreement.

**Section 9.    Effective Date.**

(a)    The Parties shall execute and exchange the signature pages to this Agreement and the Settlement Agreement, and acknowledge and agree that this Agreement and the Settlement Agreement are binding on the Parties.    Debtors shall file a motion on behalf of and binding on each Debtor, seeking such Approval Order no later than 4:00 p.m. prevailing Central Time on February 13, 2018, and such motion shall include a request for an expedited hearing, and shall diligently pursue such motion thereafter.    This Agreement and the Settlement Agreement shall become effective and enforceable on all Parties on the date on which such Approval Order is obtained, without further action of the Parties.

(b)    Notwithstanding anything in this Agreement or the Settlement Agreement to the contrary, JD Holdings' obligations hereunder are subject to satisfaction of the conditions set forth in the Settlement Agreement.

**Section 10.    Term and Termination.**

10.01.    Term.    The term of this Agreement and Settlement Agreement shall commence upon the date of the Bankruptcy Court Approval and shall expire on the Effective Date of the Plans (at which time the Plans shall supersede this Agreement and the Settlement Agreement, except for Section 2, which shall survive the termination of this Agreement and the Settlement Agreement).

10.02.    Termination.

(a)    This Agreement and the Settlement Agreement may be terminated by written agreement of Debtors and JD Holdings, as set forth in the Settlement Agreement, or upon further order of the Bankruptcy Court.

(b)    JD Holdings shall have the right to terminate this Agreement and the Settlement Agreement by providing written notice to Debtors if (i) a motion seeking the Approval Order is not filed before 4:00 p.m. prevailing Central Time on February 13, 2018; (ii) Debtors do not simultaneously request an expedited hearing on such motion; (iii) Debtors do not immediately comply with Section 3(c) above; or (iv) the Approval Order has not been obtained on or before March 12, 2018.

(c)    The conditions set forth in Section 5 of the Settlement Agreement shall either have been satisfied or waived by JD Holdings by the day proceeding any hearing to approve this Agreement.    If those conditions are neither satisfied nor waived by JD Holdings, then the Agreement and Settlement Agreement shall terminate automatically, unless otherwise agreed to in writing by the Parties.

5

## Section 11.     Miscellaneous.

11.01.     Integration.     This Agreement and the Settlement Agreement together form the entire agreement between the Parties with respect to the subject matter hereof and thereof, and supersede all prior agreements, whether oral or written, between the Parties with respect thereto.     No claim of waiver, modification, consent or acquiescence with respect to any provision of this Agreement or the Settlement Agreement shall be made against any Party, unless by written agreement executed by or on behalf of such Party.

11.02.     Assignment; Third-Party Beneficiaries.     This Agreement and the Settlement Agreement shall be binding upon, and inure to the benefit of, the Parties. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement or the Settlement Agreement to any other person or entity. Nothing in this Agreement or the Settlement Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement or the Settlement Agreement.

11.03.     Headings.     The headings of all sections of this Agreement or the Settlement Agreement are solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof or thereof.

11.04.     GOVERNING LAW.     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF KANSAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

11.05.     Specific Performance. Subject to the provisions in this Agreement and the Settlement Agreement calling for resolution of disputes by Judge Somers or the Court, the Parties acknowledge and agree that money damages would be an insufficient remedy for any breach of this Agreement or the Settlement Agreement by any Party, and a non-breaching Party may be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, without necessity of proving the inadequacy of money damages as a remedy, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations under this Agreement or the Settlement Agreement; provided, however, that each Party agrees to waive any requirement for the posting of a bond in connection with such remedy.

11.06.     Interpretation.     This Agreement and the Settlement Agreement are the product of negotiations between the Parties, and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner to effect the intent of the Parties, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or the Settlement Agreement, or any portion hereof or thereof, shall not be effective in the interpretation of this Agreement or the Settlement Agreement.

6

137617496.2

11.07. <u>Notices</u>. All notices under this Agreement or the Settlement Agreement shall be given in writing and delivered by electronic mail, courier or by certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by notice under this Section 11.07):

        (a)    if to the JD Holdings, to:

JD Holdings, L.L.C.
1114 Avenue of the Americas, 39th Floor
New York, New York 10036
Attn: General Counsel
Tel: (212) 730-7211
bcameron@atriumllc.com

With a copy to:

Jonathan Margolies (MO 30770)
McDowell, Rice, Smith & Buchanan
Skelly Building, Suite 350 (KS Fed 70693)
605 West 47th Street
Kansas City, Missouri 64112
Tel: (816) 753-5400
jmargolies@mcdowellrice.com

Scott A. Edelman
Jed M. Schwartz
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005-1413
Tel: (212) 530-5000
sedelman@milbank.com
jschwartz@milbank.com

Mark Shinderman
MILBANK, TWEED, HADLEY & McCLOY LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067-3019
Tel: (424) 386-4000
mshinderman@milbank.com

And if to DEBTORS, to:

John Q. Hammons Fall 2006, LLC
Attn: Gregg Groves
300 John Q. Hammons Pkwy, Suite 900
Springfield, MO 65806

7

gregg.groves@jqh.com

with a copy to:

Mark A. Shaiken
Stinson Leonard Street LLP
6400 So. Fiddlers Green Circle
Suite 1900
Greenwood, CO 80111
(303) 376-8400
Email: mark.shaiken@stinson.com

Nicholas J. Zluticky
Stinson Leonard Street LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
(816) 842-8600
Email: nicholas.zluticky@stinson.com

Bruce A. Strauss
Merrick Baker & Strauss, P.C.
1044 Main Street, Suite 500
Kansas City, MO 64105
Tel – 816-221-8855
Fax – 816-221-7886

Any notice given by a Party (or attorney on behalf of a Party) shall be deemed to have been received by the recipient Party on (a) the date of delivery to the recipient Party's address, provided that such delivery is before 5:00 p.m. (local time for the recipient Party) on any business day, otherwise the following business day, except in the case of delivery by email, the date the recipient Party responds in writing (by email or otherwise) affirmatively acknowledging receipt of delivery (expressly excluding any automated reply to the sending Party regarding delivery to the recipient Party's email address), or (b) the attempted delivery of such notice if the recipient Party refuses delivery or is no longer at such address and failed to provide the sending Party with its current address pursuant to this Section 10.08.

      11.08.   No Solicitation.   This Agreement and the Settlement Agreement are not and shall not be deemed to be a solicitation for votes to accept or reject the Plans for purposes of sections 1125 and 1126 of the Bankruptcy Code.

     **Section 12.**   **Public Disclosure.**   The Parties hereby consent to the disclosure of the execution and contents of this Agreement and the Settlement Agreement solely for the purposes of seeking Bankruptcy Court approval of this Agreement or the Settlement Agreement.

[END OF TEXT – CONTINUED ON NEXT PAGE]

8

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

The Revocable Trust of John Q. Hammons, for itself and on behalf of all other Debtors

By: _____
Name: Jacqueline A. Dowdy
Title: Co-Trustee

By: _____
Name: Greggory D. Groves
Title: Co-Trustee

By: _____
Name: Jacqueline A. Dowdy, in her capacity as Co-Trustee and as director, officer and employee of various Debtors, and personally

By: _____
Name: Greggory D. Groves, in his capacity as Co-Trustee and as director, officer and employee of various Debtors, as Co-Trustee and personally

[Signature Page to Plan Support Agreement]

137617496.2

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

JD HOLDINGS, L.L.C.

By: _____
Name: Jonathan D. Eilian
Title: Chairman

[Signature Page to Plan Support Agreement]

137617496.2

## Exhibit 1

## Settlement Agreement

<u>Exhibit 1 to Plan Support Agreement and Claim Allowance</u>

<u>Settlement Agreement</u>

This Agreement (the "<u>Agreement</u>") sets forth the terms of a settlement among John Q. Hammons Fall 2006, LLC, and related entities, including The Revocable Trust of John Q. Hammons dated December 28, 1989, as Amended and Restated (the "<u>JQH Trust</u>") as debtors and debtors in possession ("<u>Debtors</u>") in pending bankruptcy cases before the United States Bankruptcy Court for the District of Kansas (the "<u>Court</u>"), administratively consolidated in Case No. 16-21142 (the "<u>Case</u>"), Greggory Groves ("<u>GG</u>") and Jacqueline A. Dowdy ("<u>JD</u>"), individually and as co-successor trustees of the JQH Trust, and as officers, directors and employees of various Debtors and related entities, and JD Holdings, L.L.C. and its affiliates, including but not limited to Atrium Gaming, LLC, Eastgate Funding, LLC, Jonesboro Funding, LLC, Rogers Funding, LLC, Atrium TRS IV, LP and/or Atrium Finance IV, LP ("<u>JDH</u>" and, with the other parties, the "<u>Parties</u>") related to that certain Joint and Consolidated Chapter 11 Plans or Reorganization for All Debtors Filed by Creditor JD Holdings, L.L.C. on February 6, 2018 (ECF Doc. 1766) (the "<u>Plan</u>"), including the new Charitable Trust ("<u>NCT</u>") identified therein. The provisions of this Agreement shall be binding on the parties hereto in all respects and shall be governed by the laws of the State of Kansas, and the Bankruptcy Code where applicable, and shall be subject to interpretation and enforcement by the Court.[1]

1.  Plan and related disclosure statement ("<u>JDH Disclosure Statement</u>") modifications:

    a.  Releases for GG and JD from JDH and the Debtors in Plan, and from all creditors (to the extent permitted by the Court), which creditor releases JDH shall support, upon Effective Date of Plan.

    b.  Severance / change of control payment for Debtors' employees that are terminated or resign as set forth in the spreadsheet attached hereto as Exhibit A.

    c.  Modification of the word "policy" on page 19 of the JDH Disclosure Statement to conform to 1(b) above.

    d.  GG and JD stay on through Effective Date of Plan and GG and JD to resign from the Debtor entities (other than the JQH Trust) on the Effective Date, rather than be terminated. GG and JD shall remain as co-trustees of the JQH Trust.

    e.  Name of NCT shall be John Q. Hammons Charitable Trust.

    f.  While JD and GG understand that they will not be trustees of NCT, they would designate the charitable organizations to whom each of the assets in NCT are distributed to be disclosed within ten days after JDH informs the Debtors of the assets to be contributed to the NCT at the June 26, 2016 Alvarez and Marsal

---

[1] JD Holdings states that this Agreement is not intended to be, and should not be construed as, an admission that venue in the Court is proper with respect to any current or future proceedings that may arise in connection with the Case, the 2005 Transaction, or the ROFR. The Debtors state that they contest JD Holdings positions on such issues. Any capitalized terms not defined in this Agreement shall have the meaning ascribed to them the Plan Support Agreement and Claim Allowance being executed herewith ("<u>PSA</u>"), or if not defined in the PSA, the JDH Disclosure Statement.

137617264.2

value. The sports hall of fame shall be one of the assets transferred to the NCT. Any disputes as to the designation to be resolved by Judge Dale Somers, as mediator ("Judge Somers").

g. Any disputes as to Plan / JDH Disclosure Statement language modifications to be resolved by Judge Somers.

h. Modifications to be completed to reflect the provisions of this Agreement by three days after approval of the Plan Support Agreement.

i. Based on JDH's payment of all allowed claims as set forth in the Plan, the Debtors have no further fiduciary duty to the Estates or their creditors and as a result, will neither seek nor accept higher or better offers for their assets.

j. Upon request, Debtors will assist JDH (i) with respect to information related to the Debtors' tax obligations; (ii) with respect to information or objections relating to any aspect of any proof of claim filed by any creditor. Debtors will have no communications with MSU with respect to MSU claims filed in the bankruptcy cases unless requested by JDH. To the extent that JDH objects to any claims of UBS, the Debtors will take no position with respect to such objection, other than to respond to any subpoena and testify truthfully.

2. Debtors and JDH shall immediately jointly request that (a) the Court suspend the deadlines for the JDH Estimation Motion and hold further proceedings on the Estimation Motion in abeyance, (b) the appeals courts handling all pending appeals stay any further action on such appeals; and (c) the Court enter an order extending the time for the Debtors to appeal and the to-be-filed appeal the Order Denying Approval of Debtors' Disclosure Statement to coincide with confirmation of the Plan. Upon Effective Date of Plan, all appeals shall be dismissed with prejudice.

3. On Effective Date of Plan,

   a. JDH shall pay Trust sufficient funds to wrap up trust and state court probate estate, estimated to be $615,000. To the extent that these expenses, REDACTED , exceed $615,000, the funds to be deposited in the NCT Trust shall be decreased by a like amount, REDACTE REDACTED

   b. COBRA access by JDH / Atrium agreement for discharged / resigned / terminated JQH employees. COBRA access would be to Atrium / JDH health plans.

4. Additional Terms:

137617264.2

a. By no later than March 1, 2018, parties hereto shall issue a mutually acceptable joint written statement explaining the transaction that will be positive for all sides involved. Any disputes as to this written statement to be resolved by Judge Somers.

b. Promptly after execution of this Agreement, the Debtors shall inform their workforce of the proposed Agreement. JDH and its related companies shall not communicate with the Debtors' workforce until after the Debtors have informed their workforce pursuant to this paragraph.

c. ASAP Identification by JDH of non-cash assets to be contributed to NCT.

d. Subject to paragraph 6 below, confirmation that JDH will pay all allowed claims under plan, to include all professionals[2]; all disposition taxes (including but not limited to capital gains and 1231 taxes) resulting from these transactions; MSU's bequest claim as well as MSU's contract claim, but in each case only to the extent such claims are allowed.

e. Cooperation provisions in Plan as condition to $15 million additional NCT funding: if there is a dispute as to whether Debtors, GG, or JD are cooperating, the Court — not JDH — resolves any such issues and consequences on expedited basis.

f. APA – want to see it ASAP and it must provide limited reps and warranties and no recourse to individuals if there is a rep / warranty bust. Any disputes as to language modifications to be resolved by Judge Somers.

g. Subject to paragraph 1(b) above, all employees of JQH Management's offices in Springfield, Missouri and regionally and all employees of JQH Accounting Services LLC who are terminated following the Effective Date shall receive severance pay equal to one week of salary for every year of employment at the Debtors (or in the case of JQH Accounting employees, for each year of employment at either JQH Management or JQH Accounting) up to twenty years of employment.

h. Hammons name to remain on the baseball stadium, until the time such asset is sold by JDH or contributed to the NCT.

5. Subject to Court approval, this agreement is binding on the parties hereto provided however that JDH's obligations hereunder are subject to: (a) satisfaction of the condition that JDH finish its due diligence regarding tax liabilities created as a result of the transactions set forth herein and determine it will proceed with this transaction based on

---

[2] Professionals include, but are not limited to, Stinson Leonard Street LLP, Merrick Baker Strauss, P.C., UBS Securities, LLC, TS Worldwide, LLC d/b/a HVS, Alvarez & Marsal, BKD LLP, Concord Specialty Insurance, and all other professionals who have been approved by prior orders of the Court and/or who have been deemed approved as ordinary course of business professionals in the bankruptcy case under the terms and conditions of the Order Approving Procedures for Employment of Professionals in the Ordinary Course of Business.

such due diligence in its sole and absolute discretion, and (b) JDH reaching a settlement that is acceptable in its sole and absolute discretion as to the amount of the allowed claims of MSU and its related foundation.

6. In addition to paragraph 2, until the conditions in paragraph 6 are met, the parties shall have deadlines related to all appeals in the bankruptcy cases and the claims estimation process held in abeyance and shall cooperate to obtain court orders from the relevant courts effecting this abeyance.

[the remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the 10th day of February 2018.

The Revocable Trust of John Q. Hammons, for itself and on behalf of all other Debtors

By: _____
Name: Jacqueline A. Dowdy
Title:   Co-Trustee

By: _____
Name: Greggory D. Groves
Title:   Co-Trustee

By: _____
Name: Jacqueline A. Dowdy, in her capacity as Co-Trustee and as director, officer and employee of various Debtors, and personally

By: _____
Name: Greggory D. Groves, in his capacity as Co-Trustee and as director, officer and employee of various Debtors, as Co-Trustee and personally

IN WITNESS WHEREOF, the Parties have executed this Agreement on the 10th day of February 2018.

JD HOLDINGS, L.L.C.

By: _____

Name: Jonathan D. Eilian

Title: Chairman

| Prop No | Property | Name | PosTitle | HourlyRate | Weekly | Annual Rate | OrigHire | LastHire | Medical Plan | Medical Election | Med COBRA $ | Dental Election | Dent COBRA $ | Vision Election | Vision COBRA $ | Total COBRA $ | Years of Service as of 2/1/2018 2.5-18 | 2.5-8 | 3 Months COBRA Cost and VP Avg x 12 | 183 Med and at VP x 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 701 | 2QHHM LLC Rego Pashey, John J | | Regional VP Region I | $101.24 | $4,049.61 | $210,579.82 | 29-Jun-00 | 29-Jun-00 | UMR Medical A Medium | Emp + Family HRA | 1844.69 | Family | 77.23 | Family | 16.08 | 1938.00 | 17 | | 17,405.679 | 210,579.82 | 222,207.82 |
| 701 | 2QHHM LLC Rego Niehaus, Robert R | | Regional VP Region III | $104.91 | $4,196.28 | $218,206.79 | 04-Sep-90 | 04-Sep-90 | UMR Medical A Medium | Emp + Spouse HRA | 1190.13 | Emp+1 | 61.8 | EE+1 | 8.96 | 1260.89 | 27 | | 22,430.137 | 218,206.79 | 235,772.13 |
| 753 | 2QHHM LLC | Morrissey, Joseph M | Senior VP of Operations | $119.44 | $4,777.45 | $248,427.39 | 02-Jan-99 | 02-Jan-99 | UMR Medical A Medium | Emp + Family HRA | 1844.69 | Family | 77.23 | Family | 16.08 | 1938.00 | 19 | 19.05989 | 11,628.00 | 385,062.45 | 396,690.45 |
| 753 | 2QHHM LLC | Beran, Rick A | VP, Food & Beverage | $80.53 | $3,221.22 | $167,503.37 | 09-Mar-92 | 09-Mar-92 | UMR Medical A Medium | Emp + Family HRA | 1844.69 | Family | 77.23 | Family | 16.08 | 1938.00 | 26 | 25.917808 | 11,628.00 | 167,503.37 | 179,131.37 |
| 753 | 2QHHM LLC | Groves, Gregory | Senior VP President & Gen Counsel | $108.81 | $4,352.44 | $226,327.11 | 14-May-12 | 14-May-12 | UMR Medical A Medium | Emp + Family HRA | 1844.69 | Family | 77.23 | Family | 16.08 | 1938.00 | 7 | 5.723877 | 11,628.00 | 316,857.96 | 328,485.96 |
| 753 | 2QHHM LLC | Burgess, Walter P | VP Sales & Revenue Optimization | $82.14 | $3,285.67 | $170,854.77 | 29-Nov-10 | 29-Nov-10 | UMR Medical A Medium | Emp + Spouse | 1190.13 | Emp+1 | 61.8 | EE+1 | 8.96 | 1260.89 | 7 | 7.1808219 | 7,565.34 | 170,854.77 | 178,420.11 |
| 753 | 2QHHM LLC | Foster, Kent S | VP Human Resources | $86.89 | $3,475.73 | $180,738.03 | 01-Oct-99 | 01-Oct-99 | UMR Medical A Medium | Emp + Spouse HRA | 1190.13 | Emp+1 | 61.8 | EE+1 | 8.96 | 1260.89 | 18 | 18.350885 | 7,565.34 | 180,738.03 | 188,303.37 |
| 753 | 2QHHM LLC | George, William Thad | VP Capital Planning and Asset Mgmt | $87.77 | $3,510.85 | $182,563.94 | 22-Aug-94 | 01-Jul-15 | UMR Medical A Medium | Emp + Spouse HRA | 1190.13 | Emp+1 | 61.8 | EE+1 | 8.96 | 1260.89 | 2 | 2.5917808 | 7,565.34 | 182,563.94 | 190,129.28 |
| 753 | 2QHHM LLC | Smith, Christopher D | Senior VP Administration & Control | $108.28 | $4,331.24 | $225,224.39 | 13-Apr-87 | 13-Apr-87 | UMR Medical A Medium | Emp HRA | 595.06 | Emp | 23.78 | EE | 6.23 | 625.07 | 30 | 30.827397 | 3,750.42 | 315,314.15 | 319,064.15 |
| 753 | 2QHHM LLC | Bleche, Patrick | VP of Information Technology | $72.12 | $2,884.62 | $150,000.00 | 15-Jan-15 | 15-Jan-15 | WAIVE Medical | None | | #N/A | | #N/A | | 0.00 | 2 | 2.6356164 | 150,000.00 | 150,000.00 |
| 754 | 2QH Hotels (Indust Dowds, Jacquie A | | CEO) | $176.78 | $7,071.35 | $367,710.00 | 13-Jul-81 | 13-Jul-81 | UMR Medical A Medium | Emp + Spouse HRA | 1190.13 | Emp+1 | 61.8 | EE+1 | 8.96 | 1260.89 | 36 | 36.580822 | 7,565.34 | 542,710.00 | 550,275.34 |
| | | | | | | | | | | | | | | | | | | | $ 88,089.12 | $ 2,840,391.28 | $ 2,928,480.40 |

**EXHIBIT B**

137635555.3

**CONTACT:**    Sheri D. Smith
WiseHive Public Relations LLC
(214) 454-3969; sheri.smith@wisehivepr.com

## JQH AND JD HOLDINGS REACH BANKRUPTCY SETTLEMENT

**SPRINGFIELD, Mo. – February 13, 2018 –** A compromise between John Q. Hammons Hotels & Resorts, the Revocable Trust of John Q. Hammons, and related affiliates (collectively "JQH") and JQH's largest creditor, JD Holdings, L.L.C. (together with its affiliates, "JDH"), has been reached and submitted for approval to the bankruptcy court presiding over JQH's bankruptcy cases. The settlement was filed February 13, 2018, in the United States Bankruptcy Court of the District of Kansas at Kansas City, and the parties plan to move forward together to expedite the settlement and the successful resolution of the JQH bankruptcy cases.

The settlement requires the parties to move forward in support of the plan of bankruptcy reorganization that JDH filed on February 6, 2018, (the "Plan") with a number of agreed-upon modifications. The Plan provides for JDH to acquire all assets of the bankruptcy estates while satisfying all allowed claims of creditors, except to the extent creditors have agreed otherwise. The Plan and settlement also provide for the continued employment of virtually all of JQH's approximately 4,000 employees and for the creation of a charitable trust to honor the legacy of Mr. John Q. Hammons.

JQH owns and operates 35 hotels and related parking garages and regional convention facilities in 16 states, as well as residential communities, golf courses, numerous undeveloped hotel parcels, and interests in a number of operating businesses. JQH is also one of the largest owners of real estate in Springfield, Missouri, with properties spanning Hammons Field (home to the St. Louis Cardinals' Double-A Minor League Team, the Springfield Cardinals), the Hammons Office Tower, the United States Courthouse, the John Q. Hammons Missouri Sports Hall of Fame, and the Jordan Valley Car Park, among others.

Upon the Plan effective date, JDH's affiliate, Atrium Hospitality, L.P., a leading independent hotel management company based in Alpharetta, Georgia, will manage the JQH hotels.

Jonathan Eilian, JDH's Chairman, stated, "We are glad to have reached a settlement with the trustees of the John Q. Hammons Trust. With our disputes behind us, we look forward to combining the management of Atrium's existing portfolio with the hotel properties held by the Trust, all of which were developed by Mr. Hammons over the course of his visionary and distinguished career in the hotel industry."

Jacquie Dowdy, JQH's CEO, recognized the settlement agreement as an opportunity to protect the legacy of Mr. John Q. Hammons, which he spent more than five decades successfully building.

-MORE-

"This is a historic day as we celebrate coming to a satisfactory agreement with Mr. Eilian to ensure that Mr. Hammons' legacy can properly live on," Dowdy said. "I look forward to working with Mr. Eilian on a smooth transition that leverages JQH's award-winning, performance-oriented qualities."

JQH is represented by Stinson Leonard Street LLP, and JDH by Milbank, Tweed, Hadley & McCloy LLP.

# # #