UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

In re:                                          )
                                                )
JOHN Q. HAMMONS FALL 2006, LLC, et al.          )    Case No. 16-21142-11
                                                )    Jointly Administered
                    Debtors.                    )

## OBJECTION OF MISSOURI STATE UNIVERSITY AND THE MISSOURI STATE UNIVERSITY FOUNDATION TO MOTION FOR AUTHORITY TO ENTER INTO PLAN SUPPORT AGREEMENT AND COMPROMISE CLAIMS

COMES NOW Missouri State University and the Missouri State University Foundation (collectively, "**MSU**") and object to the *Motion for Authority to Enter Into Plan Support Agreement and Compromise Claims* (the "**Motion**")[Doc. # 1791]. In support of their objection, MSU states as follows:

**I.     Summary**

1.      By their Motion, the Debtors request that the Court: (a) approve the terms of the Plan Support Agreement and the Settlement Agreement attached as Exhibit A thereto (the "**Plan Support Agreement**"); (b) authorize the Debtors to enter into the Plan Support Agreement and Settlement Agreement; and (c) authorize the Debtors to abide by the terms, obligations and conditions set forth therein. Under the Plan Support Agreement, the Debtors commit to support confirmation of the *Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by JD Holdings, L.L.C.* (the "**Plan**")[Doc # 1766], pursuant to the terms of the Settlement Agreement.

2.      However, the Debtors are requesting authority to pledge their loyalty and support to the Plan before seeing and negotiating the asset purchase agreement, the core transaction

document around which the Plan is designed. For that reason alone, the Court should deny the Motion.

3. Furthermore, the Plan includes provisions that render the plan unconfirmable as a matter of law. First, the Plan compels broad releases from the creditor universe in favor of JD Holdings and an unknown number of parties related to JD Holdings. Second, although the Plan is described as an "unimpairment" plan which ostensibly pays creditors in full, the strategically crafted claim objection procedures result in impairment of, and discrimination against, creditors whose claims JD Holdings, in its absolute discretion, chooses to contest.

4. MSU also objects to the entry of an order granting the Motion which in any respect approves the terms or content of the Plan and Disclosure Statement under Rule 9019 and without the creditor protections of Sections 1125 and 1129 of the Bankruptcy Code.

## II. The APA and New Charitable Trust Are Not Attached

5. Although the centerpiece of the Plan is an asset purchase agreement ("**APA**") pursuant to which the Debtors' assets will be conveyed to JD Holdings, the asset purchase agreement is not attached to the Plan. In fact, the Debtors had not even seen the APA as of the time they filed the Motion. See paragraph 4(f) of the Settlement Agreement (Exhibit 1 to the Plan Support Agreement and Claim Allowance), where the Debtors "want to see the [APA] ASAP …"

6. Furthermore, it is uncertain that the APA will be disclosed prior to the hearing on the adequacy of the Disclosure Statement as the Plan requires that the APA be filed (without schedules unless provided by the Debtors) no later than 10 days prior to the confirmation

2

hearing. See Plan, Article 1, Sections 6 and 67.[1] Although JD Holdings may not want to disclose the terms of the APA until the deadline for creditors to object to confirmation of the Plan has, or will shortly, expire, there is no basis for the Debtors to commit to support the Plan before they see and fully negotiate the APA and all other documents related to the Plan, including the New Charitable Agreement. It is concerning that the Debtors have committed to support the Plan without having seen, negotiated or agreed to the APA.

7. The yet-to-be disclosed APA may impose representations, warranties, and pre-closing conditions and obligations on the Debtors in addition to those disclosed under the Plan. To assess the fairness of the same and the ability of the Debtors to make any such required representations and warranties and to perform those conditions and obligations, the Debtors, creditors and the Court first must see the asset purchase agreement.

8. Should the Debtors be unable to perform, the resulting harm to the creditors could be serious and substantial. The transfer of additional non-hotel assets to the New Charitable Trust of a value of not less than $15 million,[2] as well as the bankruptcy estates' right to retain JD Holdings' $50 million escrow payment should the asset sale not close,[3] turns on the Debtors' performance under the APA. Accordingly, the disclosure of the terms by which the Debtors' cooperation and performance will be judged is critical before the Debtors commitment to support the Plan is authorized.

9. The New Charitable Trust Agreement also is not attached to the Plan. The brief discussion in the Settlement Agreement of the terms of the New Charitable Trust Agreement -

---

[1] The Plan doesn't explain the conflict with Article XIII, Section A, which requires the Plans Supplements to be filed no later than 7 days before confirmation hearing.
[2] "JD Holdings would contribute to the Charitable Trust additional Non-Hotel Assets if the Debtors… voluntarily cooperate in … closing the Sale…" See Plan, Article V.
[3] "[T]he [$50 million] deposit shall not be forfeited if the failure to close the Sale results from a breach by the Debtors or failure of a closing condition in the APA or other Plan Documents…" See Plan, Article VI.

3
Case 16-21142   Doc# 1820   Filed 02/21/18   Page 3 of 9

i.e., that JD Holdings will inform the Debtors of the assets to be contributed, that Dowdy and Groves will not be trustees of the New Trust, but that they will designate the charitable organizations to which the Trust assets are to be distributed, is inadequate. The New Charitable Trust Agreement, like the APA, must be fully documented before the Court authorizes the Debtors to abide by the terms, obligations and conditions set forth in those agreements.

**III.    The Plan Cannot Be Confirmed As a Matter of Law**

  **A.    The Plan Impairs and Discriminates Against Creditors Holding Disputed Claims**

10.    Although denominated as an "unimpairment" plan, the Plan impairs the claims of creditors that JDH determines to challenge. As to those claims which are or become the subject of an objection, the Plan prohibits the post-Effective Date accrual or payment of interest, even if the disputed claims is later allowed. See Plan, Article X, Section C. Even with the stated exceptions to the prohibition, the Plan does not require JD Holdings to pay interest accrued on the claim pending allowance. Therefore, creditors holding disputed claims as of the Effective Date will receive less than payment in full when their claims are finally allowed.

11.    To render those claims unimpaired and to avoid discriminatory treatment, the Plan must require JD Holdings to pay to those creditors who hold claims that are not paid in full on the Effective Date interest accruing from the Effective Date through the date on which the claim is allowed. Only with that protection will the creditors whose claims are targeted by JD Holdings receive the same treatment as those creditors who are paid on the Effective Date.

12.    Furthermore, the Plan must establish and require the funding of an escrow account, controlled by a neutral party, in the full amount of the disputed claims, together with interest accruing thereon. In the absence of the establishment and funding of a "Disputed Claims

Reserve" on the Effective Date, the Plan both impairs and discriminates against those claim holders in violation of Sections 1124 and 1123(a)(4) of the Bankruptcy Code.

### B. The Third Party Releases Are Prohibited, Not Consensual and Not Supported by Consideration

13. The Third Party Releases set forth in the Plan are impermissible. *See In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990). Even in the most lenient of jurisdictions, the Plan's releases would be prohibited as they are neither consensual, as balloting is absent under the Plan, nor supported by consideration.

14. Furthermore, the Plan's releases are offensively broad and vague. To start, the beneficiaries of the release, listed below, are so numerous, too vaguely described to be identifiable or undisclosed to those parties from whom releases are compelled:

  (a) JD Holdings;

  (b) Each of JD Holdings' (undisclosed) Affiliates;

  (c) Misters Eilian and Brown, personally;

  (d) Any Entity in which Mr. Eilian or Mr. Brown has any equity interest, as well as any trust in which either of them is a grantor, trustee or beneficiary;

  (e) Each (undisclosed) predecessor, successor and assign of JD Holdings and of JD Holdings' Affiliates;

  (f) Each current and former shareholder, subsidiary, member (including ex-officio members), officer, director, principal, manager, trustee, employee, partner, attorney, lender, financial advisor, accountant, investment banker, investment advisor, actuary, professional, consultant, agent and representative of JD Holdings, JD Holdings' undisclosed Affiliates, predecessor, successor and assign (but only in his, her, or its capacity as such); and

  (g) The lenders, agents and arrangers providing the Sale Financing Facility.

See Plan, Article 1, Section A(76).

15. Similarly stunningly in its overreach, the parties from whom the releases are involuntarily extracted include not only the current holders of claims or equity interests, but also former holders of claims, as well as the Affiliates, shareholders, members, directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, etc. of the current and former claim holders and of their Affiliates. See Plan, Article VIII, Section F.

16. As the final piece , the Plan calls for each of those parties to release the JD Holdings' group from any claim arising from ***"(xi) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.***" See Plan, Article VIII, Section F (emphasis added). Accordingly, a cause of action held by officer of an affiliate of a creditor against a company in which the principals of JD Holdings have an interest, and which cause of actions arises out of a transaction which is completely unrelated to these Debtors, this case or even JD Holdings, would be released without consideration or consent and likely without any notice.

17. These release provisions are fatal to confirmation of the Plan and the Court should not countenance the Debtors' support for such unfair and unenforceable provisions.

**IV.  The Claim Objection Process Is Unfair and Prejudicial to Creditors**

18. The Plan contains many non-monetary provisions that are fundamentally unfair to creditors and violate Sections 1129(a)(1) and (3) of the Bankruptcy Code. As the purchase price of the assets is determined by the amount of "Allowed Claims," the prohibition against accruing interest on strategically disputed claims incentivizes JD Holding to engage in a widespread and extended claim objection process. When coupled with the following Plan provisions, the potential prejudice to creditors, as well as the Plan proponent's motivation in attempting to manipulate the claim objection process, are obvious.

19. First, the Plan grants to JD Holdings the sole right to object to Claims and Equity Interests. See Plan, Article X, Section B. This exclusivity provision violates Section 502(a) and, on its face, deprives parties in interest from objecting to claims, including the claims of JD Holdings.

20. Second, neither the Disclosure Statement nor the Plan identifies those Claims or Equity Interests to which JD Holdings may or will object. Instead, the Plan sets the Claims Objection Bar Date no earlier than the Effective Date. See Plan, Article I, Section A(24). Accordingly, unsuspecting creditors who anticipate receiving payment in full on the Effective Date may refrain from objecting to confirmation of the Plan, only to receive a claim objection, rather than payment, on the Effective Date. Not only is it unfair in this case to approve a Disclosure Statement and allow the Plan to proceed to confirmation without requiring the listing of the claims to which JD Holdings intends to object in the Disclosure Statement, the omission of such relevant information disguises the true impairment of those creditor claims to which JD Holdings intends to object. Although post-confirmation claim objections may be common in other cases, as a matter of fundamental fairness, in this case where the universe of claims is not large, JD Holdings has been very active, and the purchase price is determined by the amount of allowed claims, the Claim Objection Bar Date must precede the date by which creditors are required to object to the Plan or, alternatively, the Disclosure Statement must identify each claim to which JD Holdings will or may object.[4]

21. Third, although JD Holdings commits to pay creditors the full amount of their allowed claims, the date on which JD Holdings will make payments is not set. Rather, it is to be

---

[4] Likewise, the Causes of Action to be transferred to JD Holdings under Article VIII, Section G of the Plan must be disclosed in the Disclosure Statement. As an "unimpairment" plan providing for payment in full, the creditors should know, prior to confirmation, whether they are a potential target of JD Holdings' use of litigation as a strategy to contest claims and reduce its purchase price.

determined by JD Holdings. See Plan, Article I, Section A(41). In the absence of a date certain, JDH can unilaterally delay the Effective Date without cause, explanation or recourse to the creditors.

## V. The Court Should Deny the Debtors' Request for Approval of the Plan Terms

22. As a form of relief, the Debtors seek the Court's approval of the terms of the Plan Support Agreement and the Settlement Agreement. However, such request to approve terms is beyond the scope of Bankruptcy Rule 9019. Court authorization to enter into the Plan Support Agreement is far different than Court approval of the terms of those agreements. Here, the Plan Support Agreement requires modification of the Plan and Disclosure Statement to include, for example: (a) releases for the Debtors' principals; (b) termination of the Debtors' fiduciary duties; (c) severance/change of control payments for certain employees; and (d) the appointment of persons to designate the charitable organizations to which the assets in the New Charitable Trust are to be distributed. See Settlement Agreement, Section 1. Should the Court authorize the Debtors to enter into the Plan Support Agreement, the order must be clear that the Court is not approving, prior to the confirmation hearing, the content of such agreement and, specifically, those terms which are incorporated into the Plan.

WHEREFORE, Missouri State University and the Missouri State University Foundation pray for the entry of an order denying the *Debtors' Motion for Authority to Enter into Plan Support Agreement and Compromise Claims* and for such other relief as is just and proper.

Respectfully submitted,

ARMSTRONG TEASDALE LLP

By: *s/ Christine L. Schlomann*
Christine L. Schlomann, KS # 18712
John McClelland, KS Fed. 70724
2345 Grand Blvd., Suite 1500
Kansas City, MO 64108
(816) 472-3153   Fax: (816) 221-0786
jmcclelland@armstrongteasdale.com
cschlomann@armstrongteasdale.com

and

David L. Going MO #33435
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri  63105
(314) 621-5070 Fax: (314)621-5065
dgoing@armstrongteasdale.com

COUNSEL FOR MISSOURI STATE
UNIVERSITY AND THE MISSOURI STATE
UNIVERSITY FOUNDATION

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the *Objection Of Missouri State University and The Missouri State University Foundation to the Motion for Authority to Enter Into Plan Support Agreement and Compromise Claims* was served electronically on those parties having entered their appearance in the Court's Electronic Court Filing (ECF) System and conventionally, via first-class mail, postage prepaid, to those parties who have requested notice but are not participating in the ECF System, pursuant to instructions appearing on the Electronic Filing Receipt received from the U. S. Bankruptcy Court on this 21st day of February, 2018.

s/ *Christine L. Schlomann*