UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS AT KANSAS CITY

|   |   |   |
|---|---|---|
| In re | : | Chapter 11 |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*, | : | Case No. 16-21142 (RDB) *Jointly administered* |
| Debtors | : | [Related to ECF Nos. 1791; 1815; 1816; 1817; 1820; 1824; 1831] |

**THE OMNIBUS RESPONSE OF JD HOLDINGS, L.L.C. IN OPPOSITION TO CERTAIN OBJECTIONS TO DEBTORS' MOTION FOR AUTHORITY TO ENTER INTO PLAN SUPPORT AGREEMENT AND COMPROMISE OF CLAIMS**

JD Holdings, L.L.C. ("JD Holdings") files this omnibus response in opposition to the objections to Debtors' *Motion For Authority To Enter Into Plan Support Agreement And Compromise Of Claims* [ECF No. 1791] ("Motion for Intended Compromise") filed on behalf of (i) the City of Huntsville, Alabama ("Huntsville") [ECF No. 1815]; (ii) Bank of Blue Valley ("BBV") [ECF No. 1816]; (iii) the City of Springfield, Missouri ("Springfield") [ECF No. 1817]; (iv) Missouri State University and the Missouri State University Foundation (collectively, "MSU") [ECF No. 1820]; and (v) the City of Glendale, Arizona ("Glendale") [ECF No. 1824], (collectively, the "Objecting Creditors").[1] JD Holdings also responds to the Response to the Motion for Intended Compromise [ECF No. 1831] filed by the independent directors or managers for fourteen special purpose entity debtors (collectively, the "Independent Directors"). For ease of reference, the Objecting Creditors' objections and the Independent Directors' response shall be referred to collectively as the "Settlement Objections."

---

[1] Objections have also been filed by UBS Securities LLC [ECF No. 1819] and by the CMBS Lenders [ECF No. 1818]. JD Holdings responds to each of those objections in separate briefings.

## INTRODUCTION

After more than six years of active litigation, the significance of the recent settlement between JD Holdings and the Debtors—and the value that compromise represents to the estates—cannot be overstated. JD Holdings and the Debtors have formally litigated their claims against one another on a wide range of issues beginning with proceedings commenced in the Delaware Court of Chancery in 2012. Then in June 2016, on the eve of trial in that matter, Debtors filed these bankruptcy cases, seeking reprieve from "all-consuming" litigation. But since that time, the parties have continued to engage in substantial and costly litigation including, significantly, the estimation proceeding of JD Holdings' claims, which has already required numerous depositions, expert reports, discovery disputes, and, going forward, would entail significant distraction and expense to bring to trial. The parties' history is long, their willingness to fight is well-documented, their numerous mediation attempts before now were unsuccessful, and the current trajectory of their ongoing disputes suggests resolution through litigation would take several more years at least.

Not only does the settlement Debtors and JD Holdings have now reached allow them to move forward *together* by resolving all of their many disputes, it also does so in a manner that leaves no creditor impaired, protects the Debtors' many employees, and honors the memory of John Q. Hammons with contributions to a new charitable trust. In order to accomplish this welcome state of affairs, the parties entered into a Plan Support Agreement and Settlement Agreement (the "Settlement").

Under the Plan Support Agreement, Debtors have committed to support confirmation of the Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by JD Holdings, L.L.C. ("JD Holdings' Plan" or the "Plan") [ECF Nos. 1766; 1787]. If confirmed, JD Holdings' Plan would pay all allowed claims in full. Indeed, even as they are objecting to the

Motion for Intended Compromise, creditors have themselves acknowledged the significance of this settlement as a case milestone.[2]

In addition to suspending expensive and time-consuming litigation, the Settlement includes significant benefits and its approval enhances those benefits provided under JD Holdings' Plan. The Settlement secures the Debtors' cooperation well in advance of confirmation. This increases the likelihood of confirmation and provides the parties with the ability to proceed quickly on issues that would typically take significant time and resources. As part of this cooperation, for example, Debtors are providing access to their books and records now, which would allow JD Holdings to review the merits of all claims asserted against the estate more quickly than it otherwise could. Based on Debtors' cooperation, JD Holdings also anticipates that it would be able to file a draft of the Asset Purchase Agreement ("APA"), discussed below, in advance of the hearing on the Disclosure Statement. JD Holdings also anticipates that because of Debtors' cooperation, it would be able to close on the sale of Debtors' hotel assets within 30 days of confirmation, and that all allowed claims would be paid in full shortly thereafter.

Under the Settlement, Debtors' cooperation also will likely increase the contribution to the new charitable trust, contracts with officers and employees will be honored, and non-contract employees who might not otherwise have been entitled to severance if terminated are being offered severance. Without the cooperation secured by the Settlement, the confirmation process could be more expensive, more adversarial, and take significantly longer to conclude.

---

[2] *See* Independent Directors Response at 2 ("The Independent Directors commend the Debtors for reaching a proposed resolution with JD Holdings."); *id.* at 10 ("The JD Holdings Plan may be the best plan in these cases."); BBV Obj. at 1 ("While BBV concedes that reaching an amicable resolution of this long-running dispute is likely the only means of reaching finality in this case, BBV has substantial concerns that the 'deal' that Debtors are committing to support does not deliver the unimpaired treatment that it suggests."). Separately, the CMBS Lenders also stated that they "are pleased that the Debtors and JDH have decided to stop fighting and settle their differences after twenty months in bankruptcy." CMBS Obj. at 2.

None of the Settlement Objections prevent approval of the Settlement. Indeed, the vast majority of the arguments raised by the Settlement Objections concern substantive issues related to allowance, the confirmability of JD Holdings' Plan, or the adequacy of its Disclosure Statement. Although these substantive objections are meritless, for current purposes, it suffices to say that they simply are not pertinent to approval of the Settlement under Rule 9019. They are premature and more properly heard at confirmation. Similarly, none of the arguments in the Settlement Objections remotely demonstrate that the Settlement is somehow unfair, inequitable, or not in best interests of creditors. To the contrary, the proposed Settlement satisfies all of the standards applicable to Rule 9019 and should be approved by the Court.

JD Holdings notes that in the Settlement Objections, certain creditors have raised concerns about the how they will be treated under JD Holdings' Plan. But ***JD Holdings' Plan means what it says—all allowed claims will be paid in full.*** In order to alleviate the expressed concerns, JD Holdings has reached out (or will reach out) to each of the Objecting Creditors to inquire as to their payoff amounts in order to provide each of them with more definitive answers concerning the allowance of their claims. To the extent the Objecting Creditors can provide JD Holdings with detailed payoff letters, it may be possible to stipulate to an allowance of their claims well in advance of confirmation. Representatives of JD Holdings have already been in contact with representatives of many of the Objecting Creditors in order to address their concerns.

Likewise, the Independent Directors are rightly concerned about matters of Debtors' corporate governance. Although JD Holdings does not have insight or control over those matters, in an abundance of caution (and although it is unnecessary because all allowed claims will be paid in full), JD Holdings has requested that, upon approval of the Settlement, Debtors provide the Independent Directors with the Material Decision Notice the Independent Directors' response

invites Debtors to send, as discussed below, (although JD Holdings shares Debtors' concerns about costs). JD Holdings also notes that the Debtors have no opposition to the provision of the notice.

These efforts demonstrate JD Holdings' continuing willingness to seek compromise in furtherance of its Plan and to advance these bankruptcy cases to a conclusion. The Settlement should be approved so that the parties' efforts may continue.

## ARGUMENT

### I. Standard for Approval of a Rule 9019 Motion.

Bankruptcy Rule 9019 vests the Court with broad authority to approve or disapprove all compromises and settlements affecting the bankruptcy, providing that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Courts in the Tenth Circuit have adopted a four-prong test to evaluate such proposed compromises: "(1) the chance of success on the litigation on the merits; (2) possible problems in collecting the judgment; (3) the expense and complexity of the litigation; and (4) the interest of the creditors." *In re Southern Medical Arts Cos., Inc.*, 343 B.R. 250, 256 (B.A.P. 10th Cir. 2006).

"Compromises are favored in bankruptcy." *Southern Medical Arts*, 353 B.R. at 255 (quoting 10 Collier on Bankruptcy ¶ 9019.01, at 9019–2.) In reviewing a proposed settlement, the bankruptcy court should not substitute its judgment for that of the debtor, but instead should review the issues to determine whether the settlement is reasonable. *See, generally,* 8 Norton Bankr. Law & Prac. § 167:2 (3d ed. 2011) ("In evaluating a proposed settlement, the bankruptcy court is not required to conduct a mini-trial of the claims being compromised or decide the numerous questions of law and fact. . . . Rather the court must canvas the issues to determine whether the proposed settlement falls below the lowest point in the range of reasonableness.")(internal citation and quotation omitted).

Substantive objections to a plan or a disclosure statement are premature and irrelevant to deciding a Rule 9019 Motion. *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 76 nn. 29 & 31, 79 (D. Del. 2012) (affirming approval of settlement agreement and confirmation of a reorganization plan and noting that objections related to confirmation were irrelevant to the discussion regarding the settlement agreement and were properly considered separately); *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013). "Approval of a settlement agreement and confirmation of a reorganization plan are two entirely distinct matters, governed by different provisions of law and sections of the Bankruptcy Code." *Id.* The Court therefore need not consider these objections before approving a settlement.

## II. Substantive Objections to JD Holdings' Plan and Disclosure Statement and Reservations of Rights Do Not Bar Approval of the Settlement Under Rule 9019.

The majority of the Settlement Objections concern alleged deficiencies with JD Holdings' Plan or Disclosure Statement or raise questions concerning allowance. Matters of confirmation and allowance are distinct from issues related to a compromise settlement, are governed by different standards, and are to be heard later when those matters are ripe. They are not pertinent to approval of the Settlement. Moreover, even though they are premature, the Settlement Objections challenging JD Holdings' Plan or the Disclosure Statement are based on misunderstandings regarding the terms of the plan and lack merit. Nevertheless, JD Holdings will address a number of these disclosure statement/confirmation issues hereafter in the interest of transparency and to continue to foster the post-settlement theme of consensual conflict resolution.

### a. BBV's Objections raise allowance issues and are based on a misunderstanding of JD Holdings' Plan.

BBV admits that it "would concede that given the circumstances and challenges of the litigation that the first three prongs of the *Southern Medical Arts* case would weigh in favor of settlement." BBV Obj. ¶ 9. BBV therefore states that it objects under only the fourth prong of the

- 6 -
Case 16-21142 Doc# 1841 Filed 02/26/18 Page 6 of 18

*Southern Medical Arts* test concerning whether settlement is in the interest of creditors, and argues that because JD Holdings' Plans simply "*appears* to not deliver the unimpaired treatment for Class 2 creditors that it promises," it is not in the secured creditors' interest to have the Debtors support such a plan. *Id.* (emphasis added). In support of this argument, BBV identifies fives reasons why it claims BBV and other secured creditors should question whether they are "truly impaired" under the JD Holdings' Plan. *Id.* at ¶ 4. All of these points, however, raise claim allowance issues, and none of these objections bar approval of the Settlement or Debtors' support for the Plan. Nevertheless, JD Holdings addresses them in turn. Since the filing of BBV's objection, representatives of JD Holdings and BBV have been in contact and are working toward a consensual resolution of BBV's claim.

BBV first argues that the Plan does not individually identify the secured creditors, with their claims, security, and amounts owed listed in writing. *Id.* at ¶ 4. Such a provision is unnecessary. Nothing in the Bankruptcy Code requires a plan to specifically identify which creditors would be paid what precise amount, nor does unimpairment require that all asserted claims be allowed. The Bankruptcy Code only requires provisions for how specific *classes* of creditors will be paid, which JD Holdings' Plan provides. *See* 11 U.S.C. 1123(a); Plan at 12-14. Under the Plan, all allowed claims would be paid in full on the Effective Date or as soon thereafter as is practicable. *See* Plan at 12-14.

In the same vein, BBV also incorrectly argues that if the secured lenders' claims were "truly unimpaired they would already be allowed," and JD Holdings' reservation of rights to challenge certain claims means that the "claimant's treatment is impaired" as they are left without knowing what their treatment will be. BBV Obj. ¶ 5. Again, nothing in the Bankruptcy Code requires that all *asserted* claims must be allowed in order for a creditor to be unimpaired or that the claims allowance process conclude prior to confirmation. As noted above, however, at the

outset, Debtors' cooperation under the settlement will permit JD Holdings and Debtors to assess claims more quickly. Therefore, in the spirit of consensual conflict resolution, it would be very helpful, as BBV has recently done, for other secured creditors to provide JD Holdings with payoff letters at this time.

BBV further argues that JD Holdings' Plan is "silent as to legal fees" and "silent on whether interest will be paid, at the contract rate, through the date of payoff" of their loan upon the sale of their collateral. *Id.* at ¶¶ 6, 7. If creditors are entitled to legal fees, interest payments, late fees, or other kinds of payments under the agreements supporting their claims, their allowed claims presumably would so provide; and, to the extent a claim is allowed, it will be paid in full.[3] This concern is therefore unfounded. Any payoff letter provided to JD Holdings should speak to whether any such amounts are claimed.

Finally, BBV is incorrect that the Plan provides JD Holdings with the ability to opt-out of purchasing certain assets, which will remain with the Trust. *Id.* at ¶ 8. This misapprehends the Plan. JD Holdings will purchase of all of the Debtors' hotel assets. JD Holdings may contribute certain of the non-hotel assets to *the new trust*, but all debt on those assets must first be paid because any transfer to the new trust must be free and clear of all liens. While it may be necessary to leave other assets behind within the Trust for a period of time, all allowed claims will be paid (even if the claims are secured by the assets temporarily left behind in the old trust). There is, therefore no risk that BBV's (or any secured lender's) collateral will be "split between the two." (Similar concerns raised by the Independent Directors, discussed below, are also unfounded.)

---

[3] The Court has already addressed attorneys' fees in the context of a CMBS Lenders motion early in these cases and ruled that attorneys' fees will be taken up, by motion if an agreement is not reached, at the end of the case, here, confirmation of JD Holdings' Plan. *See Order Denying Motion To Modify Order Approving Procedures For Interim Compensation And Reimbursement Of Expenses For Professionals And Official Committee Members* [ECF No. 523]; Sept. 26, 2016 Hr'g Tr., at 18-19.

To alleviate the concerns raised in BBV's objection, JD Holdings has requested and received from BBV a payoff letter with an assumed effective date of May 15, 2018, and specifying a per diem thereafter, in order for JD Holdings to review its claims and reach an understanding prior to the confirmation. *That said, there should be no confusion that all allowed claims will be paid in full. JD Holdings is willing to work with those creditors who would like additional comfort in advance of confirmation as to what those allowed amounts shall be.*

### b. MSU objects on the basis of Plan confirmability and the adequacy of disclosure, neither of which are matters that prevent approval of the settlement.

Rather than discuss the relevant standard for approval of a Rule 9019 motion, MSU objects to the settlement on the basis that the Plan is "unconfirmable as a matter of law." MSU Obj. ¶ 9. MSU also objects on the grounds that the APA and the New Charitable Trust Agreement have not been made available or attached to the Plan as filed. Neither of these objections defeats approval of the Settlement. Representatives of JD Holdings and MSU have been in contact regarding the allowance of MSU's claims.

### i. MSU's substantive objections are premature and incorrect.

MSU argues that the JD Holdings Plan cannot be confirmed because the Plan (i) impairs and discriminates against creditors holding disputed claims; (ii) contains third-party releases that are not permitted; and (iii) contains a claims objection process that is unfair and prejudicial to creditors. MSU is wrong on all counts.

First, creditors are not impaired under the Plan. All allowed claims will be paid in full. As to interest, as noted above, JD Holdings acknowledges that if a creditor is entitled to interest because of the delay engendered by the dispute, such interest would be part of the allowed claim.[4] MSU argues that holders of claims challenged by JD Holdings will not be unimpaired without

---

[4] *See* Corrected Disclosure Statement, ECF No. 1788, at 13-14; Plan at 18.

- 9 -
Case 16-21142 Doc# 1841 Filed 02/26/18 Page 9 of 18

certain protections, including an escrow account for the full amount of each disputed claim, and undertaking to pay interest accruing from the Effective Date through the date on which the claim is allowed. This is untrue. No such protections are required under the Bankruptcy Code. The Plan must be feasible, i.e., able to sustain such claims if allowed, and JD Holdings will make such a showing at confirmation. MSU's objection is therefore without merit.

Second, MSU argues that the third-party releases contained within the Plan render it unconfirmable because the releases are either nonconsensual or not supported by any consideration. This is clearly an issue for plan confirmation. And contrary to MSU's assertion, third-party releases are permissible in certain circumstances.[5]

Third, MSU asserts that the claim objection process proposed under the Plan is unfair. MSU argues that the structure incentivizes JD Holdings to pursue a prolonged claim objection process in order to drive down the purchase price of Debtors' assets, which is determined by the amount of allowed claims. MSU could not be more wrong. JD Holdings is, in fact, highly motivated to review and pay all allowed claims in a short time period, as memorialized under the terms of the Settlement, and as evidenced by all of its prior conduct to date. The Settlement requires Debtors to cooperate in order to facilitate an expedited claim review process. For those claims that will accrue interest as provided by underlying agreement, until they are paid in full, JD Holdings would want to pay them quickly, contrary to MSU's suggestion otherwise.

MSU critiques three provisions of the Plan in support of its view. Each of these critiques is wrong. MSU is wrong that JD Holdings holds the exclusive right to object to claims under the Plan. JD Holdings has the exclusive right to object to claims *after the Effective Date, see* Plan at

---

[5] MSU cites *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990), in support of its argument. *Western Real Estate* does not create an absolute bar to releases in all cases, *see, e.g., In re Van Vleet*, No. 08-CV-01645-WYD, 2009 WL 3162212, at *13 (D. Colo. Sept. 30, 2009), especially where allowed claims are being paid in full.

23-24, which does not incentivize delay.[6] MSU is also wrong that the fact that the date on which JD Holdings will make payments on allowed claims is not set forth in the Plan incentivizes delay. Undisputed claims will be paid on the Effective Date, or as soon thereafter as is practicable.[7] *See* Plan at 12-14. The disputed portion of a claim would be paid when allowed, and paid with interest if the underlying agreement so provides. MSU is also wrong that "[a]lthough post-confirmation claim objections may be common in other cases, *as a matter of fundamental fairness* . . . the Claim Objection Bar Date must precede the date by which creditors are required to object to the Plan or, alternatively, the Disclosure Statement must identify each claim to which JD Holdings will or may object." MSU Obj. ¶ 20 (emphasis added). Confirmation and claims allowance are two different things. There is no requirement under the Bankruptcy Code that the Disclosure Statement or the Plan identify those claims to which JD Holdings intends to object, and MSU concedes post-confirmation claim objections are common. JD Holdings is, however, as discussed, actively soliciting payoff letters from creditors in order to review claims and alleviate creditor uncertainty in advance of confirmation, although it is under no obligation to do so.

In any event, it is disingenuous for MSU to argue that the claim objection process must proceed differently than set forth in the Plan. MSU has been informed by JD Holdings that it is very troubled by MSU's claims. Indeed, in connection with Debtors' motion for the use of cash collateral [ECF No. 1488], JD Holdings established that MSU improperly received payments on its pre-petition unsecured claims after the commencement of these bankruptcy cases. As described more fully in JD Holdings' *Objection to Debtors Motion for an Order Authorizing the Debtors to*

---

[6] Nor is it a violation of Section 502(a) of the Bankruptcy Code, as MSU suggests. In these circumstances, limiting post-confirmation claim objections to JD Holdings is entirely appropriate where the burden of payment will fall solely on JD Holdings and all allowed claims will be paid in full.
[7] Due to the magnitude of the case and the number of asserted claims, payment could clearly take some time. However, with cooperation of Debtors as contemplated by the Settlement, one of the Settlement's major benefits is that JD Holdings expects to reduce that time significantly.

*Continue to (A) Use Cash Collateral and (B) Grant Adequate Protection* [ECF No. 1523], MSU has received charitable donations post-petition consistent with an existing charitable gift agreement between MSU and the Trust. Notwithstanding the apparently charitable nature of the obligation, Debtors and MSU have improperly treated these contribution as a payment for goods or services provided by MSU, and even designated MSU as a *critical vendor* without any defensible justification. MSU, meanwhile, *has itself recorded these payments as charitable contributions and reported them as such to the Internal Revenue Service*. When confronted about these inconsistencies, MSU provides ever changing accounts of why it was paid in this manner and for what those funds were used.

        **ii. MSU's objection that the Asset Purchase Agreement and the New Charitable Trust Agreement referenced in the Plan must be "fully documented" and disclosed before the settlement may be approved is misplaced.**

The Plan provides that the APA, pursuant to which the Debtors' assets will be conveyed to JD Holdings, must be filed no later than 10 days prior to the confirmation hearing. *See* Plan, Art. 1, §§ 6, 67. The new charitable trust agreement ("NCTA") pursuant to which the parties will transfer assets into a charitable trust in honor of Mr. Hammons' legacy, is contingent upon Debtors' compliance with the APA. MSU argues that because neither of these agreements are attached to the Plan, the Court cannot approve the settlement because it is not possible to authorize the Debtors to perform under the terms, obligations, and conditions of those agreements. MSU also is concerned that the APA will not be available before the hearing on the adequacy of the Disclosure Statement.

MSU overstates the importance of these agreements. The parties have begun to negotiate the APA and anticipate it will be filed before the hearing on the Disclosure Statement. The APA, however, merely implements the sale transaction to which Debtors and JD Holdings already have agreed under the terms of the Settlement *if* the Plan is confirmed. It need not be executed

beforehand. Ironically, because of the settlement, JD Holdings expects to be able to provide a draft of the APA earlier than anticipated and in advance of the Disclosure Statement hearing. The NCTA, on the other hand, has nothing to do with the current creditors and has no effect on their claims or interests whatsoever. Nothing under the terms of that agreement will affect the payment in full of all allowed claims.

### iii. Huntsville's objection addresses plan confirmation and disclosure issues only.

Like MSU, Huntsville does not object to the Settlement pursuant to the pertinent standard for a Rule 9019 approval. Huntsville's objections instead raise issues relating to confirmation and disclosure. Huntsville first objects to the Plan arguing that, in 2004, it leased to Debtors certain property from the city for one of their hotels pursuant to the terms of a ground lease which includes a right of first refusal in favor of Huntsville. Huntsville alleges that because the Plan provides that JD Holdings will acquire all of Debtors' hotel assets and other properties, Huntsville's right of first refusal has not been honored. JD Holdings invites Huntsville to submit a proposed insert to the Disclosure Statement to describe its interest and contention.[8] Huntsville's objection is thus not a bar to approving the Settlement. Representatives from JD Holdings and Huntsville are also scheduled to meet tomorrow in order to discuss the issues raised in Huntsville's objection.

Huntsville further objects on the grounds that adequate information has not been provided regarding the purchaser of this property, including information about "JD Holdings and its experience in operating hotels, its intentions regarding the Huntsville Property, and other vital information." Huntsville Obj. ¶ 14. JD Holdings and its affiliates ("Atrium") bona fides in the hotel industry is well known. JD Holdings' intention to purchase the Huntsville property and all

---

[8] And, in any event, Huntsville's right of first refusal will not apply if the Debtors assume and assign the relevant lease, which is what the Debtors intend to do as part of the confirmation process.

- 13 -

of Debtors' other hotel assets is clearly stated in the Plan Support Agreement. The Disclosure Statement can be amended to provide additional information about JD Holdings and its principals. JD Holdings is an affiliate of Atrium Hotels and Atrium Hospitality. Atrium Hotels was founded by Jonathan Eilian and Ronald Brown in 2005, and owns 48 hotels throughout the country. Atrium Hospitality was founded in 2015, and manages 47 hotels in 25 states. Mr. Eilian and Mr. Brown each have extensive experience as owners and operators of hotels. Mr. Eilian has held a number of leadership positions in the hotel industry, was a founding member of Starwood Capital Group, LLC, and served on the Board of Directors and 2-member Executive Committee of Starwood Hotels and Resorts Worldwide, Inc. (NYSE: HOT) from its founding until 2001. Mr. Brown's career spans over 30 years in the hotel industry. Prior to co-founding Atrium, Mr. Brown was Chief Financial Officer and EVP of Strategy of Starwood Hotels & Resorts during its years of rapid growth. Prior to Starwood, he was Chairman and President of Doubletree Hotels Corporation. Atrium has participated in the development and operations of the Huntsville property since its construction, including funding its development through the Atrium Lendco line of credit.

### iv. The City of Springfield's objection addresses plan confirmation issues only.

The City of Springfield also fails to object to approval of the settlement under the applicable Rule 9019 standard. Instead, Springfield's objection amounts to a notification that the Plan and the Disclosure Statement are allegedly inaccurate concerning the ownership of one of the Debtors' alleged assets. Specifically, Springfield objects to the Plan to the extent it suggests that JD Holdings will become the owner of the Hammons Field baseball stadium because Debtors do not own Hammons Field and is not theirs to sell; rather Hammons Field is owned by Springfield. This objection does not bar approval of the Settlement. The Disclosure Statement can be amended to cure any inaccuracies in the description of the ownership interest in Hammons Field and Springfield's claim. JD Holdings invites Springfield to propose additional disclosure for the

Disclosure Statement. Moreover, even though Springfield's objection is premature, JD Holdings notes that the lease for Hammons Field can be assumed and assigned as part of the Plan and that the purported lease may be nothing more than a disguised seller-financing transaction (in which case the Debtors own the asset and can sell it to JD Holdings).

### v. Glendale does not object to approval of the settlement.

Glendale concedes that it "has no objection to a compromise being approved," but rather files a reservation rights with regard to its ability to "(1) to object to the adequacy of the JD Holdings' Disclosure Statement and/or to the confirmation of the JD Holdings' Plan, (2) to object to any assumption or rejection, cure, and treatment of claims arising from the [City's Management and Lease Agreement and the Master Development Agreement], and (3) to enforce and assert the City's right of first refusal on the Glendale Hotel pursuant to the Agreements." Glendale Obj. 1-2. Glendale's reservation of rights is premature as it addresses confirmation issues only. If the agreements are assumed, Glendale's objection will be dealt with at confirmation.[9] Glendale's reservation of rights in no way precludes approval of the Settlement. Representatives from JD Holdings and Glendale met on February 23, 2018 to discuss the issues raised in Glendale's reservation of rights and the dialogue between the parties is ongoing.

### vi. Concerns raised by the Independent Directors do not preclude approval of the Settlement.

The Independent Directors take the position that their corporate governance obligations may require them to review and approve the terms of the Settlement. Because the Independent Directors have not, as of the filing, been asked to review the Settlement, "out of an abundance of caution," the Independent Directors filed a response, (rather than an objection) to the Motion for Intended Compromise, in order to raise two "concerns" with the terms of JD Holdings' Plan. These

---

[9] And, like Huntsville, JD Holdings does not believe that Glendale's right of first refusal applies if the Debtors assume and assign the lease.

concerns do not prevent approval of the Settlement, but merely raise the issue of whether, absent full payment of the SPE Debtors' loans, consent by the Independent Directors is required on a Material Action or Major Decision (as those terms are defined under the relevant governance documents), such as on the sale of the SPE Debtors' assets, in order to meet any remaining fiduciary obligations. As stated above, although neither JD Holdings nor Debtors believes such review is necessary because all allowed claims will be paid in full, JD Holdings has asked Debtors to provide the Independent Directors with the notice the directors request so that they may review and consider the Plan, and the Debtors have no opposition to giving such notice.

The Independent Directors' concern is based on their view that the terms of the proposed settlement are unclear as to whether "payment of allowed claims" includes "full payment of the loans." Response ¶ 16. The Independent Directors take the view that if the underlying loans are paid in full, then unanimous consent by the Independent Directors would likely ***not*** be required for a sale of the SPE Debtors' assets. Absent payment in full, however, they believe their approval would be required. They are also concerned about the acquisition of assets that are cross-collateralized. In order to give the Independent Directors additional comfort, JD Holdings has communicated with the lenders of the relevant loans to request payoff letters in order to stipulate to allowance of their claims. (In the case of the CMBS Lenders, first the Debtors, and now JD Holdings have made numerous requests for a payoff letter and to start the loan assumption process, but the CMBS Lenders have consistently—for months—refused to provide the payoff letters.) Nevertheless, JD Holdings reiterates its intention to purchase all of the hotel assets; JD Holdings will not attempt to split up the collateral for any loans that are assumed, and all allowed claims would be paid in full.

The Independent Directors are also concerned that JD Holdings' Plan apparently lacks any reference to the Independent Directors and there is no mention of the mechanism for transfer of all

the stock or membership equity interests; nor does the Plan appear to state who will serve as directors on the transferred entities. The Disclosure Statement can be revised to clarify the role of the Independent Directors; this does not preclude approval of the Settlement. JD Holdings invites the Independent Directors to provide a proposed insert for the Disclosure Statement.[10]

### III. Approval of the terms of the Plan Support Agreement and Settlement Agreement is not beyond the scope of Rule 9019.

In addition to its objections that address only the substance of JD Holdings' Plan, MSU also objects on the grounds that Debtors' request that the Court approve the terms of the Plan Support Agreement and the Settlement Agreement is beyond the scope of Rule 9019 because it purportedly seeks approval of the *contents* of the Plan, effectively resulting in an end-run on the confirmation process by having those terms approved now.

MSU misstates the terms of the Settlement and the purpose of seeking approval under Rule 9019. The Debtors and JD Holdings have merely agreed that the Plan and the Disclosure Statement will be amended to reflect a number of compromises between them and that the parties will cooperate in moving the Plan towards a swift confirmation. ***The Plan, as so-amended, still needs to be confirmed.*** Creditors and other interested parties will still have the opportunity to litigate the details of the reorganization plan, and to explain to the court why they believe the plan is or is not confirmable. The Plan and Disclosure Statement will be revised further still to reflect any additional the agreements with Debtors and any other parties with whom JD Holdings has reached a compromise, and will be filed prior to the Disclosure Statement hearing. (If any compromises are made after that prior to confirmation, the Plan and Disclosure Statement will be similarly amended and made available.) If any of the changes were material and adverse to creditors, JD

---

[10] Notwithstanding the foregoing, JD Holdings shares Debtors' concerns about the costs of the Independent Directors. Given the full pay plan in this case, one would assume that such costs should be minimal.

Holdings understands that confirmation could be delayed to provide sufficient notice. No adverse changes are contemplated, however.

Debtors' request for relief is therefore entirely appropriate. Plan confirmation, and all objections related thereto, are for the confirmation process. The best way to proceed to that process quickly and efficiently is for the Court to approve the Settlement now.

## CONCLUSION

For the foregoing reasons, the Settlement Objections should be overruled and the Motion for Intended Compromise should be granted.

Dated: February 26, 2018
Kansas City, Missouri

OF COUNSEL:

Scott A. Edelman (admitted *pro hac vice*)
Jed M. Schwartz (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY &
M<sup>c</sup>CLOY LLP
28 Liberty Street
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
sedelman@milbank.com
jschwartz@milbank.com

Mark Shinderman (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY &
M<sup>c</sup>CLOY LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067-3019
Tel: (424) 386-4000
Fax: (213) 629-5063
mshinderman@milbank.com

MCDOWELL RICE SMITH & BUCHANAN

/s/   Jonathan Margolies
Jonathan Margolies (MO 30770)
Skelly Building, Suite 350 (KS Fed 70693)
605 West 47th Street
Kansas City, Missouri 64112
Tel: (816) 753-5400
Fax: (816) 753-9996
jmargolies@mcdowellrice.com

*Counsel for JD Holdings, L.L.C.*