## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS AT KANSAS CITY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 16-21142 |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*, | ) | (Lead Case) |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO AMENDED JOINT AND CONSOLIDATED CHAPTER 11 PLANS OF REORGANIZATION FOR ALL DEBTORS FILED BY CREDITOR JD HOLDINGS, L.L.C.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 3

II.    DEBTORS AND RELATED ENTITIES .................................................................. 3

     A.    Debtor Entities ................................................................................................ 3

     B.    JQH Non-Debtor Entities ............................................................................... 3

III.    HISTORY OF THE DEBTORS AND EVENTS LEADING TO
     COMMENCEMENT OF THE CHAPTER 11 CASES .......................................... 3

     A.    Overview of the Debtors' Prepetition Business Operations .......................... 3

         1.    The Hotel Operations ........................................................................ 3

         2.    JQH Trust Operations ........................................................................ 4

     B.    Events Leading to the Chapter 11 Cases ....................................................... 5

     C.    Other Litigation as of the Petition Date ........................................................ 6

IV.    THE CHAPTER 11 CASES .................................................................................... 6

     A.    Significant Events During the Chapter 11 Cases .......................................... 7

         1.    First Day Orders ................................................................................ 7

         2.    JD Holdings' Motion to Dismiss ...................................................... 7

         3.    Rejection of the ROFR ...................................................................... 8

         4.    The Claims Bar Date .......................................................................... 8

         5.    Asset Sales ......................................................................................... 8

         6.    PSA and Settlement Agreement ........................................................ 8

V.    SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS .................. 9

     A.    Administrative Claims and Priority Claims .................................................. 9

         1.    Administrative Claims ....................................................................... 9

         2.    Priority Tax Claims ............................................................................ 9

         3.    U.S. Trustee Fees ............................................................................... 9

i

| | | | |
|---|---|---|---|
| | B. | Classification and Treatment of Claims and Equity Interests | 10 |
| | | 1. Class 1 – Other Priority Claims | 10 |
| | | 2. Class 2 – Secured Claims | 10 |
| | | 3. Class 3 – General Unsecured Claims | 10 |
| | | 4. Class 4 – Equity Interests | 10 |
| VI. | CHARITABLE CONTRIBUTION | | 11 |
| VII. | EFFECT OF CONFIRMATION | | 12 |
| | A. | Actions Required by Confirmation Order | 12 |
| | B. | Cooperation by Debtor Parties | 13 |
| VIII. | IMPLEMENTATION OF THE SALE AND OTHER PLANS TRANSACTIONS | | 14 |
| | A. | Overview | 14 |
| | B. | Anticipated Timeline | 16 |
| | C. | Sources of Consideration for Sale and Other Plans Transactions and Plans Distributions | 17 |
| | D. | Purchaser's Background | 17 |
| | E. | Provisions Governing Distributions | 18 |
| | F. | Compliance Matters | 18 |
| | G. | Exemption from Certain Taxes and Fees | 19 |
| | H. | Employment of Debtors' Employees / Severance Matters | 19 |
| IX. | EFFECTIVE DATE OF PLANS | | 21 |
| | A. | Discharge of Claims | 21 |
| | B. | Releases by the Debtors | 21 |
| | C. | Releases by JD Holdings | 22 |
| | D. | Exculpation | 23 |
| | E. | Dismissal of Delaware Litigation | 23 |
| | F. | Third Party Releases by Holders of Claims and Equity Interests | 23 |

      G.      Preservation, Transfer, and Waiver of Rights of Action ........................................ 24

X.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 24

      A.      Assumption of Executory Contracts and Unexpired Leases................................. 24

      B.      Rejection of Executory Contracts and Unexpired Leases..................................... 24

XI.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
       DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ................................... 25

      A.      Allowance of Claims and Equity Interests............................................................ 25

      B.      Administration of Claims and Equity Interests.................................................... 25

      C.      Interest.................................................................................................................. 25

      D.      Deadline to File Objections to Claims .................................................................. 25

      E.      New Claims and Amendments to Claims .............................................................. 25

XII.   MODIFICATION, AMENDMENT, REVOCATION OR WITHDRAWAL OF
       PLANS......................................................................................................................... 26

XIII.  RETENTION OF JURISDICTION.............................................................................. 26

XIV.  CERTAIN RISK FACTORS TO BE CONSIDERED ...................................................... 26

      A.      Non-Confirmation of the Plans............................................................................. 26

      B.      Possible Objections to the Plans ........................................................................... 26

      C.      Non-Occurrence of the Effective Date .................................................................. 26

      D.      Conversion to Chapter 7 ....................................................................................... 27

      E.      Cooperation by Debtors ........................................................................................ 27

XV.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................ 27

XVI.  REQUIREMENTS FOR CONFIRMATION ................................................................... 28

XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION............................ 29

XVIII. CONCLUSION AND RECOMMENDATION................................................................. 30

# **APPENDICES**

Appendix 1    Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors Filed by Creditor JD Holdings, L.L.C.

Appendix 2    List of Debtors

Appendix 3    List of JQH Non-Debtor Entities

Appendix 4    Sources and Uses

Appendix 5    Equity Letter

Appendix 6    Financing Letter

Appendix 7    APA

# SUMMARY OF THE PLANS

JD Holdings[1] has proposed its *Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors* (the "Plans").[2] This Disclosure Statement contains information relating to the history of the Debtors and their business operations, events which occurred during the Chapter 11 Cases, a summary of the Plans and their terms, and the actions Debtors and JD Holdings need to take to effectuate the Plans.

The Plans provide for a sale of the Debtors' Assets (including Equity Interests) free and clear of all Liens and Claims (except as set forth in the Plans) pursuant to Bankruptcy Code sections 105, 363, 365 and 1129 (among others) to JD Holdings pursuant to the APA, a draft of which is attached hereto as Appendix 7. In consideration, JD Holdings shall pay all Allowed Claims in full in Cash on the Effective Date or as soon thereafter as is practicable, except for any Assumed Loans (whether pursuant to the terms of existing agreements and/or pursuant to new agreements to do so, which shall be paid in accordance with their terms), and contribute certain Cash and Non-Hotel Assets to a new Charitable Trust to honor Mr. Hammons' charitable intent (in an amount that will increase if Debtors cooperate in Confirmation and implementation of the Plans).

There are no contingencies to the implementation of the Plans after Confirmation.

**Because all Holders of Allowed Claims are Unimpaired, they are deemed to accept the Plans, and no voting on the Plans is required. Similarly, because all Equity Interests shall remain outstanding and be transferred to JD Holdings, such Equity Interests are Unimpaired and are deemed to accept the Plans, such that no voting on the Plans is required. Notwithstanding the foregoing, any party in interest may object to Confirmation.**

---

[1] Capitalized terms in this Disclosure Statement have the same meaning as set forth in Section I.A and other provisions of the Plans. The rules of construction set forth in Section I.B of the Plans are incorporated herein by reference. To the extent there is any conflict or inconsistency between this Disclosure Statement and the Plans, the Plans shall govern.

[2] In an abundance of caution, JD Holdings states that the submission of the Plans and this Disclosure Statement is not intended to be, and should not be construed as, an admission that venue in the Bankruptcy Court is proper with respect to any current or future proceedings that may arise in connection with the Chapter 11 Cases, the 2005 Transaction, or the ROFR. Upon consummation of the Sale of the 27 hotels being financed by the Sale Lender, JD Holdings' objections to venue in the Bankruptcy Court shall be deemed withdrawn.

## DISCLOSURE STATEMENT WITH RESPECT TO AMENDED JOINT AND CONSOLIDATED CHAPTER 11 PLANS OF REORGANIZATION FOR ALL DEBTORS FILED BY CREDITOR JD HOLDINGS, L.L.C.

### DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCOMPANIES THE PLANS FILED BY JD HOLDINGS. THIS DISCLOSURE STATEMENT IS BEING TRANSMITTED TO HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF DESCRIBING THE TERMS OF THE PLANS AND TO OTHERS FOR INFORMATIONAL PURPOSES. BECAUSE ALL CLASSES OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE UNIMPAIRED BY THE PLANS, JD HOLDINGS IS NOT SOLICITING VOTES ON THE PLANS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLANS IN THEIR ENTIRETY BEFORE MAKING A DETERMINATION WITH RESPECT TO FILING AN OBJECTION TO CONFIRMATION OF THE PLANS.

THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL ADEQUATE TO ENABLE HOLDERS OF CLAIMS AND EQUITY INTERESTS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO ASSERTING ANY SUCH OBJECTION. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A REPRESENTATION, WARRANTY OR GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLANS BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE CONFIRMATION OF THE PLANS. NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE PLANS OTHER THAN THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE NATURE OF SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT CONSTITUTE OR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR

OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS.

FOR VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLANS AS THEY RELATE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS, PLEASE SEE THE SECTION HEREIN ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLANS AND CERTAIN STATUTORY PROVISIONS, AND DESCRIBES OR CONTAINS CERTAIN DOCUMENTS RELATED TO THE PLANS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH JD HOLDINGS BELIEVES THE SUMMARIES CONTAINED HEREIN ARE ACCURATE AND COMPLETE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLANS OR APPLICABLE STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY JD HOLDINGS AND/OR THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. JD HOLDINGS IS UNABLE TO REPRESENT, WARRANT OR GUARANTY THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS ACCURATE OR COMPLETE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR OR CIRCUMSTANCES THAT MAY EXIST SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED HEREIN. JD HOLDINGS DOES NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE MADE TO REFLECT ANY SUCH EVENTS OR CIRCUMSTANCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS ACCURATE OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

# I.    INTRODUCTION

JD Holdings submits this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code for use in consideration of the Plans. A copy of the Plans is attached hereto as Appendix 1 and incorporated herein by reference.

This Disclosure Statement contains summaries of the Plans and certain information related to the Plans, certain statutory provisions, and certain events that have occurred and circumstances that have existed before and during the Chapter 11 Cases.

# II.    DEBTORS AND RELATED ENTITIES

## A.    Debtor Entities

The JQH Trust, either directly or indirectly, owns 100% of the Equity Interests in each of the other 75 Debtors. A list of all Debtors is attached hereto as Appendix 2 and incorporated herein by reference.

## B.    JQH Non-Debtor Entities

Based upon information provided by the Debtors, JD Holdings understands that the JQH Trust also holds, directly or indirectly, Equity Interests in approximately 30 JQH Non-Debtor Entities. A list of all JQH Non-Debtor Entities is attached hereto as Appendix 3 and incorporated herein by reference.

# III.    HISTORY OF THE DEBTORS AND EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

## A.    Overview of the Debtors' Prepetition Business Operations

The Debtors in the Chapter 11 Cases consist of the JQH Trust and 75 of its directly or indirectly wholly-owned Affiliates. The JQH Trust is administered by two successor trustees – the long-time business colleague of John Q. Hammons and Chief Executive Officer of John Q. Hammons Hotels Management, LLC ("JQH Management"), Jacqueline Dowdy, and Greggory Groves, Senior Vice President and General Counsel of JQH Management. The Debtors state that their business operations are divided into the ownership and operation of thirty-five hotels (collectively, the "Hotel Assets") owned in whole or in part, directly or indirectly, by the JQH Trust (collectively, the "Hotel Operations"), and the ownership and operation of the Non-Hotel Assets owned in whole or in part, directly or indirectly, by the JQH Trust (collectively, the "JQH Trust Operations").

### 1.    The Hotel Operations

The JQH Trust and certain Debtors own or lease the Hotel Assets. The Hotel Assets are located in Alabama, Arizona, Arkansas, Colorado, Illinois, Kansas, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and Virginia. Several of the Hotels Assets include large convention centers and some Hotel Assets

include other amenities. The Hotel Assets are comprised of approximately 8,400 guest rooms and more than one million square feet of meeting space.

The Hotels Assets are operated under various hotel brands pursuant to franchise agreements with Hilton Worldwide (Embassy Suites by Hilton), Marriott International (Marriott, Renaissance, Courtyard by Marriott, Residence Inn, and Sheraton) and Intercontinental Hotel Group (Holiday Inn Express), except for two Hotel Assets that are operated independently without a franchise with a third-party brand.

JQH Management, a Debtor and wholly-owned Affiliate of the JQH Trust, operates and manages the Hotel Assets. JQH Management employs more than 4,000 people in connection with the Hotel Operations. Most of the employees are located at the Hotel Assets, but some management employees are located regionally or at JQH Management's offices in Springfield, Missouri.

In addition, John Q. Hammons Accounting Services, LLC, a non-Debtor and wholly-owned Affiliate of the JQH Trust ("JQH Accounting") provides accounting services for the Hotel Operations.

The Hotel Operations include offering food and beverage services, including alcoholic beverages. The liquor licenses for the Hotel Assets are held by separate Entities that are wholly-owned Affiliates of the JQH Trust (the "Catering Companies"). Most (but not all) of these Catering Companies are Debtors.

> 2.    JQH Trust Operations

JQH Trust also directly owns numerous and varied other Non-Hotel Assets, including more than 30 parcels of undeveloped real estate in 11 states (Arkansas, Colorado, Iowa, Kansas, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Texas, and Utah). The JQH Trust purports to be one of the largest owners of real estate in Springfield, Missouri, where its buildings include: (i) the Enterprise Building; (ii) a Mini Storage facility; (iii) Hammons Field (the home of the Springfield Cardinals, the AA Texas League affiliate of the St. Louis Cardinals); (iv) Kinser House; (v) land and improvements that house the John Q. Hammons Missouri Sports Hall of Fame; and (vi) the Jordan Valley Car Park (a parking garage with 970 spaces). The JQH Trust also owns a residential property in Springfield, Missouri, an ownership interest in a condominium corporation in Walnut Creek, California, and a Learjet 45XR airplane.

JQH Trust also directly or indirectly owns equity interests in approximately 30 other Entities that are not Debtors in the Chapter 11 Cases (the "JQH Non-Debtor Entities"). The JQH Non-Debtor Entities, directly or indirectly, own and/or operate various other assets, including: (1) 100% interests in Catering Companies for some Hotel Operations; (2) 100% interest in JQH Accounting, which provides accounting and related services to the Hotel Operations; (3) a minority interest in the Harrah's hotel and casino in Joliet, Illinois; (4) a 50% interest in W&H Realty, LLC, which owns, directly or indirectly, a 100% interest in four hotels, and a 25% interest in six hotels, located throughout the Midwest; (5) an interest in an office building occupied by JQH Management (among others) in Springfield, Missouri; (6) a 50% interest in the

office building occupied by JQH Accounting (among others) in Cincinnati, Ohio; (7) a 100% interest in the Hammons Tower in Springfield, Missouri; (8) the Highland Springs Country Club and land for related residential development in Springfield, Missouri; (9) the Tiffany Greens golf course and land for related residential development in Kansas City, Missouri; (10) the U.S. Federal Courthouse in Springfield, Missouri; (11) retail buildings leased to three restaurants in Springfield, Missouri; (12) several parcels of vacant land; and (13) the rights to the film "The Great American West."

### B.      Events Leading to the Chapter 11 Cases

These Chapter 11 Cases were commenced by the Debtors one month before the trial on claims asserted by JD Holdings in the Delaware Court of Chancery (the "Delaware Court") regarding the ROFR (the "Delaware Litigation"). Debtors have conceded that they commenced the Chapter 11 Cases to avoid going to trial in the Delaware Litigation because they were "pretty darned sure [they] would lose" on JD Holdings' claim of specific performance to purchase the Hotel Assets. In the Debtors' proposed disclosure statement [ECF No. 1583] (the "Debtors' Disclosure Statement"), Debtors also conceded that Debtors commenced the Chapter 11 Cases "to enable them[selves] to be relieved from the misinterpretation of the ROFR provisions and pre-trial order of the Delaware Chancery Court," among other things. Debtors' Disclosure Statement at 12.

As part of a complex transaction in 2005 in which John Q. Hammons Hotels, Inc., a public company, was taken private (the "2005 Transaction"), the Debtors and JD Holdings executed a right of first refusal agreement (the "Original ROFR") pursuant to which JD Holdings holds a right to purchase certain Assets of the Debtors, including the Hotel Assets (the "ROFR Assets"). In December 2008, JD Holdings and certain Debtors executed an amendment to the Original ROFR (the "ROFR Amendment"; the Original ROFR and the ROFR Amendment are referred to collectively as the "ROFR").

The ROFR provides that if a Debtor defaults on its obligations under the ROFR in a material respect with regard to a ROFR Asset, then JD Holdings is entitled to purchase that related ROFR Asset at a price that is 80% of the price otherwise payable thereunder. In addition, under the ROFR Amendment, in exchange for JD Holdings waiving certain past breaches and modifying a right regarding the assumption of the existing financing for the ROFR Assets, Debtors agreed to provide JD Holdings with subordinate seller financing of up to 22.5% of the purchase price of any ROFR Assets that JD Holdings elected to purchase pursuant to the ROFR.

John Q. Hammons died on May 26, 2013. In October 2014, the Delaware Court issued an order confirming that the ROFR contained a deadline by which all of the ROFR Assets had to be sold for cash, and that deadline was, at the latest, 30 months after Mr. Hammons' death. These sales would have triggered the rights of JD Holdings to purchase each of the ROFR Assets. Any resulting net cash proceeds would have been available to fund the JQH Trust and the charitable trust required to be created upon his death.

Debtors disagreed with the Delaware Court's October 2014 ruling. Debtors did not sell any of the ROFR Assets by the date that JD Holdings contends was the contractually mandated deadline, and as a result, on October 19, 2015, JD Holdings filed a Supplemental Complaint in

5

the Delaware Litigation seeking specific performance of its rights under the ROFR, i.e., to purchase each of the ROFR Assets pursuant to the terms of the ROFR, including at a 20% discount, resulting from Debtors' material breach of the ROFR and with seller financing from the Debtors.

On the same day that JD Holdings filed its Supplemental Complaint, it also filed a motion for an order to prevent Debtors from taking actions that would impair JD Holdings' rights under the ROFR. The Delaware Court held a hearing on October 28, 2015, at which it found that JD Holdings had a reasonable probability of succeeding on the merits of its claim, and that the equities lay with JD Holdings. The Delaware Court determined that "the defendants are currently in breach [of the ROFR], that they have been in breach for some time because they have made zero efforts to attempt to comply with their mandatory sell-for-cash obligation, and that the deadline by which their compliance with the mandatory sell-for-cash obligation has come and gone." The Debtors have alleged that they were not in breach of their obligations under the ROFR under various theories, but no Court has ruled in favor of the Debtors with respect to any such allegations.

The Delaware Court then entered an order preventing Debtors from taking any action "outside of the ordinary course of business as to any of the properties or assets" subject to the ROFR absent JD Holdings' consent or further order from the Court (the "Status Quo Order"). The parties spent the next nine months preparing for trial. They exchanged hundreds of thousands of pages of documents, took dozens of depositions, and exchanged over 60 expert reports.

On June 26, 2016 (the "Petition Date"), just one month before the Delaware Litigation was scheduled to go to trial, Debtors commenced these Chapter 11 Cases.

### C.      Other Litigation as of the Petition Date

Prior to the Petition Date, the Debtors also were involved in litigation with SFI Belmont, LLC ("SFI Belmont") in the Circuit Court of Cook County in Chicago, Illinois regarding the Debtors' alleged breaches of non-monetary covenants in a loan agreement between the parties. SFI Belmont was seeking monetary damages in excess of $140 million.

## IV.      THE CHAPTER 11 CASES

Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and the Office of the United States Trustee. While the Debtors are authorized to operate in the ordinary course of business, transactions out of the ordinary course of business require Bankruptcy Court approval. In addition, the Bankruptcy Court has supervised the Debtors' employment of attorneys and other professionals as required by the Bankruptcy Code.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under section 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of Liens against the Debtors' Assets and litigation against the Debtors.

## A. Significant Events During the Chapter 11 Cases

### 1. First Day Orders

The Debtors filed several motions on the Petition Date seeking the relief provided by certain so-called "first day orders." First day orders are intended to ensure a seamless transition between the Debtors' prepetition and post-petition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day orders in the Chapter 11 Cases addressed, among other things: (a) the use of certain alleged cash collateral and providing adequate protection with such amounts to be used for general business purposes during the course of the Chapter 11 Cases; (b) the payment and reimbursement for the Debtors' employees of the accrued prepetition wages and employee benefit Claims; (c) the continuation and maintenance of the Debtors' existing centralized cash management system, prepetition insurance policies, customer practices, and employee benefit programs; (d) the payment of prepetition sales, use and other tax obligations; (e) the continuation of utility services during the pendency of the Chapter 11 Cases; and (f) the payment of prepetition claims of certain critical vendors identified by the Debtors.

### 2. JD Holdings' Motion to Dismiss

In July 2016, JD Holdings moved to dismiss the Chapter 11 Cases (the "Motion to Dismiss") on the grounds that they were not properly commenced. JD Holdings argued that (i) JQH Trust is not a "debtor" within the meaning of the Bankruptcy Code because it is not a "business trust" as Congress understood that term when it added it to the Bankruptcy Code in 1978, and (ii) the other Debtors' cases were commenced without requisite authority under state law, because the Status Quo Order entered in the Delaware Litigation required JD Holdings' (or the Delaware Court's) consent before they could take any action outside of the ordinary course of business, which included commencing these Chapter 11 Cases (these items are referred to collectively as the "Dismissal Issues").

On January 13, 2017, Debtors filed motions for summary judgment on the Motion to Dismiss. On February 17, 2017, JD Holdings filed cross-motions for summary judgment. On September 13, 2017, the Bankruptcy Court denied the Motion to Dismiss and JD Holdings' request for summary judgment, and granted Debtors' request for summary judgment [ECF No. 1297] (the "Dismissal Order"). JD Holdings appealed the Dismissal Order to the Bankruptcy Appellate Panel of the Tenth Circuit (the "BAP") and sought an expedited hearing for such appeal. The Debtors opposed the BAP's consideration of the appeal, arguing that it was an interlocutory order, and further objected to any effort to expedite the resolution of that appeal. The BAP accepted JD Holdings' appeal stating that "[t]he issue of whether the Debtors were eligible to file bankruptcy is . . . too important to be denied review" (*In re John Q. Hammons Fall 2006, LLC, et al.*, BAP No. 17-43, ECF No. 13 at 2 (B.A.P. 10th Cir. Nov. 7, 2017)), but rejected its request for expedition. The appeal is fully briefed. On February 22, 2018, the Debtors and JD Holdings filed a Joint Motion for Suspension of Appeals. On February 27, 2018, the BAP entered its Order Suspending Appeals, thereby suspending consideration of the appeal pending Confirmation of the Plans.

### 3.    Rejection of the ROFR

On August 16, 2016, the Debtors filed a motion to reject the ROFR (the "Rejection Motion") [ECF No. 338]. In the Rejection Motion, Debtors argued that having to sell the ROFR Assets at the discounted price with subordinate seller financing would be "devastating" to them, and result in a loss of value to the Debtors that would compensate no creditor other than JD Holdings. Debtors further argued that enforcing the ROFR "would be to assure that JD Holdings alone would receive value."

The Bankruptcy Court granted Debtors' request to reject the ROFR on December 13, 2016 (the "Rejection Order") [ECF No. 694]. JD Holdings appealed the Rejection Order to the BAP, arguing primarily that entry of the Rejection Order was inappropriate given the Dismissal Issues.  The BAP affirmed the Rejection Order on December 28, 2017. JD Holdings has appealed the Rejection Order to the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit"). On February 16, 2018, the Tenth Circuit entered an order suspending the deadline for JD Holdings to file its opening brief to April 28, 2018.

### 4.    The Claims Bar Date

On September 28, 2016, the Bankruptcy Court entered its Claims Bar Date Order setting December 23, 2016 as the Claims Bar Date. As of the Claims Bar Date, the Debtors received over 600 filed Claims.

### 5.    Asset Sales

Since the Petition Date, the Bankruptcy Court has approved the sales of nine parcels of real estate in Middleton, Wisconsin (to JD Holdings), Lindon, Utah, and Springfield, Missouri.

### 6.    PSA and Settlement Agreement

On February 10, 2018, following mediation between the Debtors and JD Holdings, the parties entered into the PSA and Settlement Agreement, pursuant to which, among other things: (i) the Debtors agreed to support Confirmation of the Plans; (ii) the Debtors agreed to cooperate with JD Holdings, including in connection with due diligence, consummation of the Sale and other Plans Transactions and implementation of the Plans; and (iii) JD Holdings has an Allowed Claim of $495,938,161.00 for its Claims against each Debtor jointly and severally arising from the ROFR (the "Allowance Provision"); provided, however, if Debtors (i) do not breach the PSA and (ii) cooperate as set forth in the PSA and in the Settlement Agreement, and the Plans are not confirmed or the Effective Date of the Plans does not occur, then the Allowance Provision shall be of no force and effect unless Debtors, their employees, officers, directors, and/or co-trustees nevertheless receive through some alternative plan, sale, or other transaction the benefits of the Plan modifications in the Settlement Agreement, to include the funding of the Charitable Trust and the benefits of the Settlement Agreement, in which case the Allowance Provision will be effective.  The Court approved the terms of the PSA and the Settlement Agreement at a hearing on February 28, 2018 and entered an order approving the PSA and the Settlement Agreement on March 6, 2018.

The CMBS Lenders objected to the underlying Plans altogether, not just the Settlement Agreement and the PSA. In so doing, the representatives of the CMBS Lenders placed at risk the recovery of all CMBS bondholders—whose allowed claims would be paid in full on the Effective Date of the Plans—in an apparent attempt to gain leverage in the anticipated dispute over default interest, which would <u>not</u> be paid to all CMBS bondholders. The information received so far indicates that some of the CMBS Lenders will be seeking default interest from the very inception of the CMBS debt due to the allegedly improper prepetition commingling of funds under the Debtors' then existing (and current) cash management system and even though the CMBS Lenders did not provide the required notice of default (at least for some of the loans). So, too, are some of the CMBS Lenders expected to seek default interest based on an allegation that the mere commencement of the Chapter 11 Cases constituted a default despite case law to the contrary, a plain reading of the Bankruptcy Code, and a lack of harm to the CMBS Lenders. The request for default interest is made even though the CMBS Lenders were not harmed in any way because they continued to receive principal and interest post-petition without interruption, the interest rate was in excess of current market rates, and the CMBS Lenders failed to take any action to expedite the resolution of these cases. JD Holdings does not believe that the CMBS Lenders are entitled to any default interest, let alone default interest since the very commencement of the CMBS loans.

## V.     SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS

As summarized below and set forth more fully in the Plans, the Plans provide for (i) the payment of all Allowed Claims in full in Cash on the Effective Date or as soon thereafter as is practicable, except for any Assumed Loans (whether pursuant to the terms of existing agreements and/or pursuant to new agreements to do so, which shall be paid in accordance with their terms); (ii) contributions of Cash and Non-Hotel Assets by JD Holdings to a new Charitable Trust; and (iii) the transfer of all Equity Interests, such that all Equity Interests shall remain outstanding.

### A.     Administrative Claims and Priority Claims

#### 1.     Administrative Claims

The Plans provide for payment of Allowed Administrative Claims, including Professional Compensation Claims, in full on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Administrative Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

#### 2.     Priority Tax Claims

The Plans provide for payment of Allowed Priority Tax Claims in full on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

#### 3.     U.S. Trustee Fees

9

The Plans provide for payment of all U.S. Trustee Fees that are due and owing on the Effective Date or as soon thereafter as is reasonably practicable. Following the Effective Date, JD Holdings shall pay the U.S. Trustee Fees for each quarter (including any part thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## B. Classification and Treatment of Claims and Equity Interests

The categories listed below summarize the Plans' classification of Claims against, and Equity Interests in, each of the Debtors for all purposes, including Confirmation and Plans Distributions. Under the Plans, (a) Classes 1, 2, 3 and 4 are Unimpaired, (b) the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code, and (c) such Holders are not entitled to vote to accept or reject the Plans, but nonetheless may object to Confirmation.

### 1. Class 1 – Other Priority Claims

Each Allowed Other Priority Claim shall be paid in full on the later of (i) the Effective Date or (ii) the date such Other Priority Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

### 2. Class 2 – Secured Claims

Each Allowed Secured Claim (other than Assumed Loans[3]) shall be paid in full on the later of (i) the Effective Date or (ii) the date such Secured Claim becomes an Allowed Claim or otherwise becomes payable under the Plans, unless such Holder of an Allowed Secured Claim agrees to extend the term of the loan on terms, or accept other treatment, mutually agreeable to such Holder and JD Holdings.

### 3. Class 3 – General Unsecured Claims

Each Allowed General Unsecured Claim shall be paid in full on the later of (i) the Effective Date or (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.[4]

### 4. Class 4 – Equity Interests[5]

---

[3] Certain loans, including a loan originated by Goldman Sachs Mortgage Company secured by Liens on seven Hotel Assets, (the "Goldman 7 Loan") and a loan originated by Prudential Mortgage Capital Company, LLC secured by Liens on one of the Hotel Assets (the "Prudential Loan"), which have several years remaining until maturity, are assumable by JD Holdings under the terms of the respective loan agreements. However, since the Goldman 7 Loan and Prudential Loan are securitized, the assumption process may take some time and requires the cooperation of the Debtors, who are working with JD Holdings in such assumption process. As part of the Confirmation process, JD Holdings will seek an order from the Court requiring such cooperation and/or directing the assumption of the Goldman 7 Loan and Prudential Loan. All loans that JD Holdings intends to assume will be identified in the Plans Supplement. If any such loan is assumed, it shall constitute an Assumed Loan under the Plans. If any such loan is not assumed, it shall be treated as a Class 2 Secured Claim, subject to Allowance.

[4] JD Holdings and SFI Belmont have reached an agreement in principle (subject to definitive documentation and final approvals), pursuant to which SFI Belmont would receive less than payment in full on account of its Claim. Pursuant to such agreement, SFI Belmont would receive Cash on the Effective Date anticipated to be approximately $46 million, with additional consideration to be paid over time.

10

Holders of Equity Interests shall not receive separate consideration for such Equity Interests. Such Equity Interests will be transferred as set forth in Article VI of the Plans.

## VI.  **CHARITABLE CONTRIBUTION**

On the Effective Date, JD Holdings shall establish the Charitable Trust to honor Mr. Hammons' charitable intent, which shall be named the "John Q. Hammons Charitable Trust". JD Holdings will contribute to the Charitable Trust (a) $2.0 million in Cash[6] and (b) one or more Non-Hotel Assets designated by JD Holdings on or before the Effective Date having a value totaling not less than $3.0 million[7] free and clear of all Liens and Claims.

In addition, JD Holdings would contribute to the Charitable Trust additional Non-Hotel Assets as designated by JD Holdings, of no less than $15 million in value[8] free and clear of all Liens and Claims, if Debtors and their Affiliates, the JQH Non-Debtor Entities (other than such JQH Non-Debtor Entities in which the Debtors do not own a controlling interest), and the estate of John Q. Hammons, and their respective principals, trustees, beneficiaries, shareholders, partners, members, directors, officers, employees and other persons or entities under their control (collectively, the "Debtor Parties"), voluntarily cooperate in obtaining the Confirmation Order, closing the Sale and other Plans Transactions, and implementing the Plans, as follows:

> (i)    None of the Debtor Parties Files an objection to the Disclosure Statement or Plans, or opposes Confirmation, or in any manner, directly or indirectly, takes or fails to take any actions, or otherwise work with, consult, encourage or otherwise assist any other Entity to take or fail to take any action that would or would reasonably be expected to prevent, delay, impede, interfere with, or otherwise could be adverse to, obtaining approval of the Disclosure Statement or Plans, or obtaining the Confirmation Order, as determined by JD Holdings in its reasonable judgment;

> (ii)   The Debtor Parties take all such actions, or not take such actions, as necessary or appropriate, or as requested by JD Holdings, to obtain the approval of the Disclosure Statement and Plans, and the Confirmation

---

[5] JD Holdings understands that all Equity Interests in Debtors other than JQH Trust are held by other Debtors and that there are no Equity Interests in JQH Trust.  In addition, Debtors also own certain Equity Interests in JQH Non-Debtor Entities.

[6] JD Holdings shall pay the JQH Trust sufficient funds to wind up the administration and operations of the JQH Trust and the state court probate of the Estate of John Q. Hammons, which is estimated to be $615,000. To the extent these expenses exceed $615,000, the amount of Cash and the Non-Hotel Assets to be contributed to the Charitable Trust shall be decreased on a pro rata basis by an amount equal to such excess.

[7] The value of such additional Non-Hotel Assets shall be based on Debtors' valuations as set forth in the appraisals of the Non-Hotel Assets prepared by Alvarez and Marsal Valuation Services, with an effective date of June 26, 2016.

[8] The value of such additional Non-Hotel Assets shall be based on Debtors' valuations as set forth in the appraisals of the Non-Hotel Assets prepared by Alvarez and Marsal Valuation Services, with an effective date of June 26, 2016.

Order, and provide JD Holdings and its representatives access to review all books, records and other information (including all electronic records) with respect to the Debtors and JQH Non-Debtor Entities, as determined by JD Holdings in its reasonable judgment; and

(iii)  The Debtors perform all of their obligations under the Plans and Plans Documents and otherwise comply with the terms of the Plans and Plans Documents, until the closing of all Plan Transactions contemplated by the APA, as determined by JD Holdings in its reasonable judgment.

The Plans Supplement will disclose the mechanism for how the contributions to the Charitable Trust will take into account certain administrative costs and other Claims.

Notwithstanding JD Holdings' right to designate which Non-Hotel Assets to contribute to the Charitable Trust, the land and building that houses, and the Debtors' interest in, the Missouri Sports Hall of Fame shall be one of the Non-Hotel Assets contributed to the Charitable Trust. In addition, in the event that the baseball stadium located in Springfield, Missouri and leased by the JQH Trust (the "Baseball Stadium") is not one of the Non-Hotel Assets contributed to the Charitable Trust, JD Holdings shall continue to keep the name "Hammons Field" on the Baseball Stadium until and unless JD Holdings transfers its interest in and/or rights with respect to the Baseball Stadium to a third party non-Affiliate of JD Holdings.

Greggory Groves and/or Jacqueline Dowdy shall designate the charitable organizations to which each of the Non-Hotel Assets in the Charitable Trust are distributed. Such designations shall be made in writing to JD Holdings within ten (10) days after JD Holdings informs the Debtors of the Non-Hotel Assets to be contributed to the Charitable Trust. Any disputes regarding the designations of such charitable organizations shall be resolved by Judge Dale Somers, as mediator.

## VII.  EFFECT OF CONFIRMATION

### A.  Actions Required by Confirmation Order

The Confirmation Order shall be deemed to (i) authorize, among other things, the Sale and other Plans Transactions and the implementation of the Plans, and (ii) require the Debtors to execute the APA and other Plans Documents, and all other documents and instruments, and take all other actions, as required under these Plans or that JD Holdings otherwise determines are necessary or appropriate to consummate the Sale and other Plans Transactions and implement the Plans. On and after the Confirmation Date, JD Holdings may take, or require Debtors to take, all actions as may be necessary or appropriate to effect the Sale and other Plans Transactions and the implementation of the Plans.

Upon execution of the APA pursuant to the Confirmation Order, JD Holdings shall deposit $50 million into escrow (the "Deposit"), to be disbursed to the Debtors in the event that the Effective Date does not occur by the Outside Effective Date; provided, however, the Deposit shall not be forfeited if the Effective Date does not occur by the Outside Effective Date as a result of a breach by the Debtors of their obligations under the APA, Plans, the PSA or the Settlement Agreement, or failure of a closing condition in the APA or other Plans Documents, or

an appeal of the Confirmation Order. If the Effective Date does not occur by the Outside Effective Date, then forfeiture of such Deposit shall be the sole remedy for such failure.[9]

**B.    Cooperation by Debtor Parties**

From the Confirmation Date until the Effective Date:

(i)     The Debtor Parties shall continue, and cause their Affiliates, to operate the Assets in the ordinary course consistent with Debtors' past custom and practice and the industry standards for the operation of similar Assets and Debtors' operating budget for 2018 (the "Ordinary Course of Business"), including (i) maintaining the inventories at levels maintained in the Ordinary Course of Business; (ii) performing maintenance and repairs in the Ordinary Course of Business, and, subject to approval by JD Holdings, commencing or continuing any capital projects scheduled in the capital budget for the Assets; (iii) taking or ceasing such action as is necessary, appropriate or advisable to cure any violation of applicable laws; (iv) renewing all licenses and permits before their expiration; (v) maintaining all existing insurance policies; (vi) subject to approval by JD Holdings, not making any alterations or improvements at the Assets, or demolishing any of the Assets, other than in the Ordinary Course of Business or as provided in Debtor's capital expenditures budget for the relevant period; (viii) not removing any property from the Assets, other than in the Ordinary Course of Business; and (ix) not taking, or causing or permitting to be taken, any action that could impair Debtors' title to any of the Assets or create any Lien or encumbrance on the Assets; (x) complying with all leases, convention center agreements, franchise agreements, operating agreements, management agreements, licenses and permits; (xi) amending, extending, renewing or terminating any leases, agreements, licenses or permits, except in the Ordinary Course of Business, without JD Holdings' prior written consent; (xi) not entering into any new leases or agreements with respect to the Assets, without JD Holdings' prior written consent, unless such leases or agreements are terminable by JD Holdings without any termination fee, penalty or other amount upon not more than 30 days' notice; (xii) not entering into any agreement or understanding with Insiders, without JD Holdings' prior written consent; and (xiii) not paying bonuses or other amounts in excess of base salary to any employees of Debtors;

(ii)    The Debtor Parties shall permit JD Holdings to take such actions with respect to the Assets as JD Holdings deems necessary or advisable to facilitate the transition of the operation of the Assets at closing of the Sale pursuant to which the employees, agents and representatives designated by JD Holdings shall have unrestricted access to the Assets and Debtors' offices in Springfield, Missouri and Cincinnati, Ohio during normal business hours to facilitate the transition of the management and operation of the Assets upon closing of the Sale, including, the right to review all books, records and other information (including all electronic records) with respect to the Assets in Debtors' possession, provided that neither

---

[9] In addition, the allowance of JD Holdings' Claims may be reversed as set forth in the PSA.

JD Holdings nor the Sale Lender shall be deemed to have assumed any management or operational responsibilities prior to closing of the Sale by virtue of such activities and shall not have the right to direct any of Debtors' employees or otherwise have any right to make any decisions for or on behalf of Debtors with respect to the operation of the Assets;

(iii)    The Debtor Parties shall provide all financial statements and other reports, documents, notices and information to JD Holdings and access to the Assets that Debtors otherwise would be required to provide to any of its lenders under the applicable loan agreements with Debtors for Assets secured by any Liens, or as requested by JD Holdings for such Assets that are not secured by any Liens, and any such documents and information requested by JD Holdings;

(iv)    JD Holdings shall have the right to conduct, or engage a third-party to conduct, a forensic audit of all books and records of Debtors and its Affiliates and the Assets for any time period, and the Debtor Parties shall cooperate fully in such forensic audit;

(v)    The Debtor Parties shall take all such actions, or not take such actions, necessary or appropriate to consummate the Sale and all other Plans Transactions and implement the Plans, including permitting JD Holdings and its lenders, agents and representatives to communicate directly with any ground lessors, franchisors, governmental authorities and other third-parties, obtaining all consents, approvals, estoppel certificates and other documents, materials or information as requested by any lenders, ground lessors, franchisors, governmental authorities or other third parties, or as JD Holdings reasonably determines necessary or appropriate, to consummate the assumption of the Assumed Loans, the Sale and other Plans Transactions; and

(vi)    The Debtor Parties shall not in any manner, directly or indirectly, take or fail to take any actions, or otherwise work with, consult, encourage or otherwise assist any other Entity to take or fail to take any action that would or would reasonably be expected to prevent, delay, impede, interfere with, or otherwise could be adverse to, the consummation of the Sale and any other Plans Transactions or implementation of the Plans, including any appeal relating to the Plans.

After the Effective Date, Debtor Parties shall continue to perform their obligations in this Section B. to the extent that they have personnel and resources available to perform such obligations. Any disputes regarding Debtor Parties' performance of their obligations in this Section B. shall be resolved by Judge Dale Somers, as mediator.

## VIII.    IMPLEMENTATION OF THE SALE AND OTHER PLANS TRANSACTIONS

### A.    Overview

The Plans contemplate a sale of all Assets (including Equity Interests) free and clear of all Liens and Claims (except as set forth in these Plans) pursuant to Bankruptcy Code sections 105, 363, 365 and 1129 (among others) to JD Holdings pursuant to the APA. JD Holdings shall

file a Plans Supplement no later than seven (7) days before the Confirmation Hearing. This Plans Supplement shall include the schedules to the APA and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms of the Plans. In consideration, on or shortly after the Effective Date, JD Holdings shall pay all Allowed Claims in full in Cash, except for any Assumed Loans (whether pursuant to the terms of the existing agreements and/or pursuant to new agreements to do so, which shall be paid in accordance with their terms), and contribute certain Cash and Non-Hotel Assets to a new Charitable Trust as set forth in Article V hereof. At or prior to the Effective Date, JD Holdings may elect to leave certain Assets with the JQH Trust either pending subsequent closings as set forth hereafter, may direct certain Assets to be conveyed or transferred directly to the Charitable Trust free and clear of all Liens and Claims, or if JD Holdings determines not to close with respect to such Assets, then such Assets shall remain with the JQH Trust free and clear of all Liens and Claims.

JD Holdings shall be obligated to proceed to closing of the Sale pursuant to the APA following the Confirmation Order becoming a Final Order, except in the event of an appeal of the Confirmation Order, a breach by Debtors of their obligations under the APA, Plans, the PSA, or the Settlement Agreement, and certain other customary sale conditions to be set forth in APA, as set forth more fully in the Disclosure Statement. The APA contemplates a series of closings, starting on the Effective Date and ending no later than the Outside Closing Date. Notwithstanding the foregoing, if JD Holdings is unable to obtain a required consent for certain Assets, a waiver of a third-party termination right that would be triggered by the sale of certain Assets or consent for the assumption of the Assumed Loans, by such Outside Closing Date (the "Delayed Assets"), but all Allowed Claims existing as of the Outside Closing Date have been paid by the Outside Closing Date, Debtors shall retain such Delayed Assets free and clear of all Liens and Claims until such time that such Delayed Assets are transferrable to JD Holdings. In such case, all economic benefits and interests from such Delayed Assets shall inure to the benefit of JD Holdings pending such closing on the Delayed Assets. The Plans Supplement will disclose additional details regarding the administration and operation of any Delayed Assets after the Outside Closing Date.

As part of the Plans, JD Holdings will subordinate its Claim arising from the ROFR to the payment of all Allowed Claims. JD Holdings has an Allowed Claim of $495,938,161.00 for its Claims against each Debtor jointly and severally arising from the ROFR (as defined above, the "Allowance Provision"); provided, however, if Debtors (i) do not breach the PSA and (ii) cooperate as set forth in the PSA and in the Settlement Agreement, and the Plans are not confirmed or the Effective Date of the Plans does not occur, then the Allowance Provision shall be of no force and effect unless Debtors, their employees, officers, directors, and/or co-trustees nevertheless receive through some alternative plan, sale, or other transaction the benefits of the Plan modifications in the Settlement Agreement, to include the funding of the Charitable Trust and the benefits of the Settlement Agreement, in which case the Allowance Provision will be effective. Accordingly, a determination of the amount of such Claim, and all litigation relating thereto, will not be needed or affect the Plans Distributions to other Holders of Claims. The subordination of JD Holdings' Claim arising from the ROFR shall become effective upon consummation of the Sale and implementation of the Plans, and shall be subject to Debtors' compliance with these Plans.

JD Holdings will have a limited period of time until the Claims Objection Bar Date in which to determine the Claims, if any, to which an objection would be Filed. All Claims to which an objection is not Filed will be deemed Allowed. If a Claim objection is Filed, the undisputed portion of that Claim will be deemed Allowed, entitled to payment along with all other Allowed Claims upon the Effective Date of the Plans or as soon thereafter as is practicable, and the disputed portion of that Claim will not be paid until such dispute is resolved by settlement or adjudication and determined to be an Allowed Claim. Prior to the Effective Date, JD Holdings will identify what Assets, if any, it will not purchase as part of the Sale or other Plans Transactions, in which case the JQH Trust shall retain any such Assets free and clear of all Liens and Claims.

As set forth more fully in the Disclosure Statement, some of Debtors' debts are assumable by a purchaser of the related Assets. Upon Confirmation, Debtors shall cooperate fully and take all steps necessary to effectuate such assumptions by JD Holdings, and the lenders relating thereto shall be obligated to perform as required by the respective loan agreements. JD Holdings shall work with the lenders of such loans to ensure timely assumption.

**B.    Anticipated Timeline**

The following timeline summarizes the dates related to Confirmation and implementation of the Plans. Certain of these dates might be moved up significantly now if Debtors cooperate with JD Holdings:

| Day | Event(s) |
|---|---|
| -7 | Plans Supplement Filed |
| 1 | Confirmation Hearing |
| 2 | Entry of Confirmation Order |
| 62 | Effective Date |
| | Claims Objection Bar Date |
| | Deadline for designation of Rejected Executory Contracts and Unexpired Leases |
| | Deadline for designation of Assets to be left with the JQH Trust |
| | Deadline for designation of Non-Hotel Assets to be contributed to the Charitable Trust |
| | Establishment of Charitable Trust |
| | Commencement of closings for Sale and other Plan Transactions under APA |
| | Commencement of Plans Distributions |

16

| | |
|---|---|
| 82 | Deadline for non-Debtor parties to Assumed Agreements to file proposed Cure Costs<br><br>Deadline for non-Debtor parties to Rejected Executory Contracts and Unexpired Leases to File Claims for rejection damages |
| 142 | Administrative Claims Bar Date |

### C.  Sources of Consideration for Sale and Other Plans Transactions and Plans Distributions

JD Holdings shall (i) assume the Assumed Loans, (ii) assume the Assumed Agreements, (iii) assume and pay the Allowed Claims, (iv) establish and contribute assets to the Charitable Trust, (v) pay the JQH Trust sufficient funds to wind up the administration and operations of the JQH Trust and the state court probate of the Estate of John Q. Hammons, and (vi) pay taxes as a result of dispositions (including but not limited to capital gains taxes and other taxes payable under 26 U.S.C. § 1231) resulting from the Sale and Plans Transactions described in the Plans and the APA, all as set forth above. Pursuant to the Plans, JD Holdings is purchasing all Assets, except those Assets, if any, that JD Holdings elects not to purchase as part of the Sale or other Plans Transactions, in which case the JQH Trust shall retain any such Assets free and clear of all Liens and Claims. Funds to consummate the Plans Transactions shall come from JD Holdings and its affiliates and financing from third parties, including the Sale Lender pursuant to the Sale Financing Facility. The sources and uses of funds is set forth in Appendix 4 attached hereto and incorporated herein by reference.

A redacted copy of a letter from a major financial institution confirming the availability of funds to JD Holdings and its affiliates sufficient to fund the amount of equity required in the sources and uses statement is attached hereto as Appendix 5 and incorporated herein by reference.

At this time, JD Holdings intends to obtain acquisition financing for the Sale and Other Plan Transactions from the Sale Lender. The Sale Lender has issued a "highly confident" letter for such financing. A copy of such letter is attached hereto as Appendix 6 and incorporated herein by reference. JD Holdings will obtain a loan commitment letter to be disclosed in the Plans Supplement.

### D.  Purchaser's Background

JD Holdings bona fides in the hotel industry is well known.  JD Holdings is an affiliate of Atrium Holding Company and Atrium Hospitality.  Atrium Holding Company was founded by Jonathan Eilian and Ronald Brown in 2005, and owns 48 hotels throughout the country.  Atrium Hospitality was founded in 2015, and manages 47 hotels in 25 states.  Mr. Eilian and Mr. Brown each have extensive experience as owners and operators of hotels.  Mr. Eilian has held a number of leadership positions in the hotel industry, was a founding member of Starwood Capital Group, LLC, and served on the Board of Directors and 2-member Executive Committee of Starwood Hotels and Resorts Worldwide, Inc. from its founding until 2001.  Mr. Brown's career spans

over 30 years in the hotel industry. Prior to co-founding Atrium, Mr. Brown was Chief Financial Officer and EVP of Strategy of Starwood Hotels & Resorts during its years of rapid growth. Prior to Starwood, he was Chairman and President of Doubletree Hotels Corporation.

### E.      Provisions Governing Distributions

As of the close of business on the Distribution Record Date, the Claims Register for each of the Classes of Claims and Equity Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Except as otherwise provided in the Plans, the Debtors and JD Holdings, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. Except as otherwise provided in the Plans, the Debtors and JD Holdings, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the Claims Register as of the close of business on the Distribution Record Date.

Unless otherwise provided in the Plans, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or Equity Interest shall receive the full amount of the Plans Distribution that such Holder is entitled to pursuant to the Plans.

During the course of the Chapter 11 Cases, the Debtors have stipulated to limited relief from the automatic stay (the "Stay Relief Stipulations") to permit certain potential Holders of Claims arising out of or related to the allegations contained in their respective causes of action (collectively, the "Action"). Pursuant to those Stay Relief Stipulations, the Holders of such Claims were permitted to litigate the issues raised in the Actions to completion, and the parties in the Actions were permitted to pursue any appeals of any decisions to any court with appellate jurisdiction, for the purpose of establishing the amount, if any, of their claims (the "Personal Injury Claim Amount"). The Holders of such Claims were also permitted to settle, enforce and collect the Personal Injury Claim Amount directly from all insurance policies and proceeds without having to seek a further order of the Bankruptcy Court.[10]

All tort Claims subject to litigation and defended by the Debtors' insurers shall be treated as disputed Claims. Accordingly, any such Claim shall be paid by JD Holdings only to the extent that (i) the claimant prevails in litigation and (ii) the Debtors' insurance policies do not cover the Claim. JD Holdings shall take any actions necessary to continue the coverage for such Claims under the applicable insurance policies.

### F.      Compliance Matters

In connection with the Plans, to the extent applicable, the Debtors and JD Holdings shall comply with all tax withholding and reporting requirements imposed on them by any governmental authority, and all Plans Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision to the contrary in the Plans, the Debtors

---

[10] Such Claims shall be disputed Claims.

and JD Holdings shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any Plans Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Plans Distributions pending receipt of information necessary to facilitate such Plans Distributions, or establishing any other mechanisms they reasonably believe are necessary or appropriate. The Debtors and JD Holdings reserve the right to allocate all Plans Distributions in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### G.      Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from any Debtor to JD Holdings, the Sale Lender or to any other Entity pursuant to, in contemplation of, or in connection with the Plans, including (1) the issuance, distribution, transfer, or exchange of any debt, Equity Interest, or other interest in any Debtor, (2) the creation, amendment, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of any indebtedness by any document or instrument or other means, (3) the making, assignment, or recording of any lease or sublease, or memorandum of such lease or sublease, or (4) the making, delivery, or recording of any deed, bill or sale, assignment or other document or instrument of transfer of any real property or personal property, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, mortgage tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or fee imposed by any governmental authority, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or fee by such governmental authority, and accept for filing and recordation any of the foregoing documents and instruments without the payment of any such tax or fee.

### H.      Employment of Debtors' Employees / Severance Matters

With respect to the approximately 4,000 employees (the "Employees") employed by Debtors and Non-Debtors JQH Entities ("Existing Employer"), upon consummation of the Sale and Other Plan Transactions, JD Holdings or its Affiliates ("New Employer") will offer employment to substantially all of the Employees of Debtors and JQH Accounting (subject to standard background and compliance checks), but in any event a sufficient number of Employees that will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (the "WARN Act"). New Employer will (a) pay salaries or wages to the Employees who accept such offer of employment (the "Rehired Employees") at no less than ninety (90%) of the salary or wages of such Rehired Employees existing as of the rehiring date, and (b) recognize the Rehired Employee's prior years of employment with Existing Employer (including any prior employment with Winegardner & Hammons, Inc. and any predecessor-in-interest to the Debtors).

New Employer shall be responsible for all claims and liabilities with respect to (1) application of the WARN Act, (2) salaries, wages, bonuses, profit sharing and other compensation, vacation and sick leave, worker's compensation, employer's contribution under F.I.C.A., unemployment compensation, welfare benefits, deferred compensation, savings, pension, 401(k) and retirement plan and insurance and other benefits of whatever kind which

19

becomes payable to any Employee, and (3) any alleged or actual unfair labor practices, employment discrimination charges and lawsuits, and other similar claims of any Employees regarding employment matters arising out of or alleged acts or omissions of Existing Manager.

New Employer shall defend, indemnify and hold harmless the Trustees Released Parties from and against all loss, cost, express liabilities, causes of action and claims with respect to the application of the WARN Act.

With respect to the Employees identified in Exhibit A to the Settlement Agreement (the "Designated Employees") who are terminated or resign within 180 days after consummation of the Sale or other Plan Transactions, each Designated Employee shall promptly receive from Existing Employer a lump sum severance payment in the amounts set forth in Exhibit A to the Settlement Agreement upon such termination or resignation.

With respect to the Employees at JQH Management's offices in Springfield, Missouri, or its regional offices, or at JQH Accounting Services, LLC, but are not specifically identified in Exhibit A to the Settlement Agreement (the "Non-Designated Employees") who are terminated without cause within 180 days after consummation of the Sale or other Plan Transaction, each Non-Designated Employee shall promptly receive from Existing Employer a lump sum severance payment equal to one week of salary for every full year of employment by such Non-Employee with any Debtors or Non-Debtor JQH Entities (including any prior employment with Winegardner & Hammons, Inc. or a predecessor-in-interest of the Debtors) up to twenty (20) years of employment.[11]

JD Holdings (or its Affiliate) shall provide access to COBRA health insurance coverage to all Employees (both Designated Employees and Non-Designated Employees) who are terminated or resign upon consummation of the Sale or other Plan Transaction.

Prior to the Effective Date, each of Ms. Dowdy and Mr. Groves shall continue to perform their regular duties and the duties set forth in the Plan, the Settlement Agreement, and the Plan Support Agreement and receive their regular compensations and benefits provided to them by Existing Employer. Except as otherwise set forth in the Plans Supplement (as agreed to by the Debtors and JD Holdings) to be filed prior to the Confirmation Hearing (or other agreement), from and after the Effective Date Ms. Dowdy and Mr. Groves: (a) shall resign from their positions with JQH Management and each and every position they hold with any of the other Debtors (with the exception of their role as successor trustees of the JQH Trust) and (b) shall receive no further compensation from the Debtors in connection with their resignations from such management positions, *provided however,* that promptly upon their respective resignations from JQH Management, unless otherwise agreed to between the Debtors and JD Holdings and as set forth in the Plans Supplement, the Existing Employer or JD Holdings (or its Affiliate) shall pay in a lump sum the severance payable to Ms. Dowdy and Mr. Groves as set forth on Exhibit A to the Settlement Agreement.

---

[11] If a Non-Designated employee is offered employment in a location more than 50 miles from his or her current place of employment, the Non-Designated employee may reject such offer of employment without waiving his or her right to severance under Article VII.F. of the Plans.

With respect to all payments to be made by Existing Employer under this paragraph F, JD Holdings (or its Affiliate) shall cause Existing Employer to have sufficient Cash to make such payments.

## IX. <u>EFFECTIVE DATE OF PLANS</u>

The Plans shall become effective and binding on all parties in interest on the Effective Date. In addition, the discharges and releases set forth in this Article X shall become effective and binding on the Effective Date.

### A. Discharge of Claims

Except as otherwise expressly provided by section 1141 of the Bankruptcy Code or the Plans, and in consideration of the obligation of JD Holdings to make the Plans Distributions, any debt that arose before the Confirmation Date and any debt of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and all Claims of any nature will be released and discharged in full on the Effective Date, including any interest accrued thereon from and after the Petition Date, whether or not (i) a Proof of Claim based on such debt or obligation is filed or deemed Filed under section 501 of the Bankruptcy Code, (ii) such Claim is Allowed or (iii) the Holder of such Allowed Claim has accepted the Plans.

### B. Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plans, for good and valuable consideration, including the service of the JD Holdings Released Parties and the Trustees Released Parties to facilitate the reorganization of the Debtors, the consummation of the Plans Transactions and the implementation of the Plans, from and after the Effective Date, the Debtors (including the respective estates), for themselves and on behalf of their Affiliates, the JQH Non-Debtor Entities and the estate of John Q. Hammons, and each of the foregoing Entities' respective and current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries, donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing, including, without limitation, Greggory Groves and Jacqueline A. Dowdy, individually and in their respective capacities as co-successor trustees of the JQH Trust, and as officers, directors, and employees of any Debtors and JQH Non-Debtor Entities (in each case, in his, her, or its capacity as such, the "<u>Debtor Releasing Parties</u>"), hereby conclusively, absolutely, unconditionally, irrevocably, fully and forever release and discharge each of the JD Holdings Released Parties and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of any federal state or other laws, or otherwise, that any of the Debtor Releasing Parties have asserted, could have asserted or might be entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors (including their respective estates); (ii) the Chapter 11 Cases; (iii) the subject matter of,

or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements between the Debtors and any Released Party (including the ROFR); (v) the restructuring of any Debtors or JQH Non-Debtor Entities; (vi) the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plans Documents or other agreements, instruments or documents relating to the Plans; or (viii) the subject matter of the Delaware Litigation. Notwithstanding anything to the contrary in the Plans, the foregoing release does not release any obligations of any Entity under the Plans or any Plans Documents executed to consummate any Plan Transactions, or other agreement, instrument or documents executed to implement the Plans.

## C. Releases by JD Holdings

Except as otherwise specifically provided in the Plans, for good and valuable consideration, including the service of the Debtors Released Parties and the Trustees Released Parties to facilitate the reorganization of the Debtors, the consummation of the Plans Transactions and the implementation of the Plans, from and after the Effective Date, the JD Holdings, for itself and on behalf of its Affiliates, and each of the foregoing Entities' respective and current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries, donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing, including, without limitation, Jonathan D. Eilian and Ronald C. Brown, individually and in their respective capacities as officers, directors, and employees of any JD Holdings or any of its Affiliates (in each case, in his, her, or its capacity as such, the "JD Holdings Releasing Parties"), hereby conclusively, absolutely, unconditionally, irrevocably, fully and forever release and discharge each of the Debtors Released Parties and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of any federal state or other laws, or otherwise, that any of the JD Holdings Releasing Parties have asserted, could have asserted or might be entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors (including their respective estates); (ii) the Chapter 11 Cases; (iii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements between the Debtors and any Released Party (including the ROFR); (v) the restructuring of any Debtors or JQH Non-Debtor Entities; (vi) the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plans Documents or other agreements, instruments or documents relating to the Plans; (viii) the subject matter of the Delaware Litigation; or (ix) the probate estates of John Q. Hammons and Juanita Hammons. Notwithstanding anything to the contrary in the Plans, the foregoing release does not release any obligations of any Entity under the Plans or any Plans Documents executed to consummate any Plan Transactions, or other agreement, instrument or documents executed to implement the Plans.

## D.    Exculpation

Except as otherwise specifically provided in the Plans, no Exculpated Party shall be responsible or have any liability for, and each Exculpated Party is hereby released and exculpated from, any claim, Cause of Action, duty, obligation, liability, damage, loss, cost or expense for (i) any act taken or not taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Disclosure Statement, Plans, Confirmation, Plans Transactions, the Plans, or any Plan Documents or other agreement, document, instrument or release created or entered into in connection with the Plans; (ii) any act taken or not taken in connection with, or related to, the negotiation of Cure Costs; (iii) any act taken or not taken in connection with, or related to, the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases; or (iv) any other prepetition or post-petition act taken or not taken in connection with, or related to, the restructuring of the Debtor, except for (A) willful misconduct (including fraud), (B) the rights of any Entity to enforce the Plans and the Plans Documents, or (C) the rights of any Entity to enforce any Final Order, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties, responsibilities and obligations under the Plans or any Final Order.

## E.    Dismissal of Delaware Litigation

Upon consummation of the Sale of the 27 hotels being financed by the Sale Lender, Debtors and JD Holdings shall, and shall cause their Affiliates, and Debtors shall cause the estate of John Q. Hammons, to take all such actions necessary to dismiss the Delaware Litigation and all pending appeals in the Chapter 11 Cases, with prejudice to all parties thereto.

## F.    Third Party Releases by Holders of Claims and Equity Interests

Except as otherwise specifically provided in the Plans, on and after the Effective Date, (1) each present and former Holder of a Claim or Equity Interest (other than JD Holdings and its Affiliates), and each of their respective Affiliates, and each of the foregoing Entities' respective current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries (including undesignated beneficiaries), donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing (in each case, in his, her, or its capacity as such, a "Third-Party Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, fully and forever released and discharged the JD Holdings Released Parties, the Debtors Released Parties, and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of any federal, state or other laws or otherwise, that each Third-Party Releasing Party have asserted, could have asserted or might be entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors; (ii) the Chapter 11 Cases; (iii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements

between the Debtors and any Released Party; (v) the restructuring of any Debtors or JQH Non-Debtor Entities; (vi) the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plan Documents or other agreements, instruments, or documents relating to the Plans; (vii) any act taken or not taken in connection with, or related to, the negotiation of Cure Costs; (ix) the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases; (x) the probate estates of John Q. Hammons and Juanita Hammons; and (xi) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

### G.    Preservation, Transfer, and Waiver of Rights of Action

All rights to commence and pursue any and all Causes of Action, whether arising before, on or after the Petition Date, including the Debtors' right to commence, prosecute, or settle such Causes of Action, shall be transferred to JD Holdings on the Effective Date, and JD Holdings thereafter shall commence, prosecute, terminate, or settle such Causes of Action in its sole discretion. If any Causes of Action cannot be transferred to JD Holdings under applicable law, such Causes of Action shall be retained by the Debtors notwithstanding the occurrence of the Effective Date, and Debtors shall commence, prosecute, terminate, or settle such Causes of Action solely at JD Holdings' direction, in JD Holdings' sole discretion, and at JD Holdings' expense.

## X.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases

JD Holdings shall have until the Effective Date to identify the Rejected Contracts and Unexpired Leases. Any Assumed Agreements not identified as Rejected Contracts and Unexpired Leases shall be assumed and assigned to JD Holdings as of the Effective Date. At this time, JD Holdings intends to assume all of the ground leases and convention center agreements relating to the hotels.[12]

Non-Debtor parties to the Assumed Agreements shall File, within twenty (20) days following the Effective Date, a proposed amount of the Cure Costs, and the assumption and assignment of such Assumed Agreement may be conditioned upon the disposition of all issues with respect to such Cure Costs.

### B.    Rejection of Executory Contracts and Unexpired Leases

All Rejected Executory Contracts and Unexpired Leases shall be deemed rejected on the Effective Date, except for those Executory Contracts and Unexpired Leases that have been

---

[12] As to Springfield, the parties in interest are advised that the City of Springfield, Missouri, rather than the Debtors, owns the Baseball Stadium, and leases the Baseball Stadium to JQH Trust under a ground lease with JQH Trust for the Baseball Stadium, thus any transfer of an interest in that property to JD Holdings must necessarily be limited to JQH Trust's interest in the leasehold estate under the ground lease, whether in this bankruptcy proceeding or otherwise. The City of Springfield has not consented to or authorized the assignment or any other transfer of title to the Baseball Stadium.

assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date.

Non-Debtor parties to Rejected Executory Contracts and Unexpired Leases shall have the right to assert a Claim on account of the rejection of such Rejected Executory Contracts and Unexpired Leases, including under section 502(g) of the Bankruptcy Code, which shall be Filed within twenty (20) days after the Effective Date.

## XI.     PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

### A.     Allowance of Claims and Equity Interests

After the Effective Date, JD Holdings shall have and retain all rights, claims and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date.  Except as expressly provided in the Plans, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Plans or the Bankruptcy Code.

### B.     Administration of Claims and Equity Interests

Except as otherwise provided in the Plans, after the Effective Date, JD Holdings shall have the sole and exclusive right and authority to (1) File, withdraw, or litigate to judgment, objections to Claims and Equity Interests, (2) settle or compromise any disputed Claim or Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

### C.     Interest

Unless otherwise (1) specifically provided for in the Plans or the Confirmation Order, (2) agreed to in writing by JD Holdings, or (3) allowed pursuant to Court order, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Additionally, and without limiting the foregoing, and except as otherwise set forth in the Plans or the Confirmation Order, if any Disputed Claim becomes an Allowed Claim, interest shall not accrue or be paid on such disputed portion of such Disputed Claim with respect to the period from the Effective Date to the date a final Plans Distribution is made on account of such Disputed Claim unless otherwise (1) specifically provided for in the Plans or the Confirmation Order, (2) agreed to in writing by JD Holdings, or (3) allowed pursuant to Court order.

### D.     Deadline to File Objections to Claims

Any objections to any Claims shall be Filed no later than the Claims Objection Bar Date.

### E.     New Claims and Amendments to Claims

A Claim may not be Filed or amended on or after the Effective Date without the prior authorization of the Bankruptcy Court or JD Holdings, and any such new or amended Claim Filed without such authorization shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## XII. MODIFICATION, AMENDMENT, REVOCATION OR WITHDRAWAL OF PLANS

Except as otherwise specifically provided in the Plans, JD Holdings reserves the right to modify or amend the Plans as to material terms prior to entry of a Confirmation Order, and to seek approval of the Plans as modified or amended consistent with the Bankruptcy Code, provided, however, that such modifications or amendments shall not be inconsistent with the terms and conditions of the PSA and Settlement Agreement. The entry of a Confirmation Order shall mean that all modifications or amendments to the Plans are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure. JD Holdings reserves the right to revoke or withdraw the Plans prior to the Confirmation Date and to File subsequent chapter 11 plans, provided that such plans shall not be inconsistent with the terms and conditions of the PSA and Settlement Agreement.

## XIII. RETENTION OF JURISDICTION

The Bankruptcy Court would retain any jurisdiction it has to the maximum extent possible to interpret the Plans, its Confirmation Order, the PSA, and the Settlement Agreement, and all matters relating thereto.

## XIV. CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of a Claims and Equity Interests should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents filed herewith and/or incorporated by reference herein), before deciding whether to support or object to Confirmation.

### A. Non-Confirmation of the Plans

Although JD Holdings believes the Plans will satisfy all requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications or amendments to the Plans will not be required for Confirmation.

### B. Possible Objections to the Plans

Although JD Holdings believes the Plans comply with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to Confirmation.

### C. Non-Occurrence of the Effective Date

26

Although JD Holdings believes that the Effective Date will occur no later than 75 days after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the Effective Date does not occur by such date, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plans, the Debtors and all Holders of Claims and Equity Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Equity Interests would remain unchanged.

### D.    Conversion to Chapter 7

If no plan of reorganization is confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Equity Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the procedures established by the Bankruptcy Code.

### E.    Cooperation by Debtors

For the consummation of the Sale and other Plans Transactions and implementation of the Plans to occur by the Outside Effective Date, the Debtors have begun providing JD Holdings with access to all information JD Holdings requests but Debtors must continue to cooperate with JD Holdings as needed to consummate the Plans Transactions, including as described in Section VII.D. Under the PSA and Settlement Agreement, the Debtors have agreed to provide JD Holdings with such access and cooperation.

## XV.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general summary of certain material federal income tax consequences that implementation of the Plans may have on Holders of Claims and Equity Interests. This summary does not discuss all aspects of federal income taxation that may be relevant to the Debtors, to a particular Holder in light of its individual investment circumstances, or to certain Holders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, foreign corporations or individuals who are not citizens or residents of the United States). This summary also does not discuss any aspects of state, local or foreign taxation.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plans as discussed herein. JD Holdings has not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters, and no opinion of counsel has been sought or obtained by JD Holdings with respect thereto. FOR THE FOREGOING REASONS, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLANS. JD

HOLDINGS IS NOT MAKING ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLANS AS TO ANY HOLDER, NOR IS JD HOLDINGS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

The federal income tax consequences arising from implementation of the Plans to a Holder of a Claim against the Debtors will depend upon a number of factors, including whether the Holder is deemed to have participated in an exchange for federal income tax purposes, and, if so, whether such exchange transaction constitutes a tax-free recapitalization or a taxable transaction; whether the Holder's Claim constitutes a "security" for federal income tax purposes; the type of consideration received by the Holder in exchange for its Allowed Claim; and whether the Holder reports income on the accrual basis.

A Holder whose Claim is paid in full or otherwise discharged on the Effective Date will recognize gain or loss for federal income tax purposes in an amount equal to the difference between (i) the fair market value on such date of any property received by such Holder in respect of its Claim (excluding any property received in respect of a Claim for accrued interest that had not been included in income) and (ii) the holder's adjusted tax basis in the Claim (other than any Claim for such accrued interest). A Holder's adjusted tax basis in property received in exchange for its Claim will generally be equal to the fair market value of such property on such date. The holding period for any such property will begin on the day after such date.

Under the Plans, some Assets may be distributed or deemed distributed to certain Holders with respect to their Claims for accrued interest. Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the fair market value of the property received with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plans (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of the property received in exchange for Claims for accrued interest will equal the fair market value of such property on such date, and the holding period for the property received in exchange for such Claims will begin on the day after such date. The extent to which consideration distributable under the Plans is allocable to interest is not clear. Holders are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plans that is allocable to interest.

## XVI.   <u>REQUIREMENTS FOR CONFIRMATION</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including whether:

> (i)      the Plans comply with the applicable provisions of the Bankruptcy Code;

28

(ii)     JD Holdings has complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plans have been proposed in good faith and not by any means prohibited by law;

(iv)     any payment made or promised by JD Holdings or by a person issuing securities or acquiring Assets under the Plans, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plans and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation is reasonable, or if such payment is to be fixed after Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)      each Class of Claims either are deemed to have accepted the Plans or are Unimpaired under the Plans;

(vi)     except to the extent that the Holder of a Claim has agreed to a different treatment of such Claim, the Plans provide that Administrative Claims and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years, of a value, as of the Effective Date of the Plans, equal to the Allowed amount of such Claims;

(vii)    Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plans other than the liquidation described in the Plans; and

(viii)   all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plans provide for the payment of all such fees on the Effective Date of the Plans.

JD Holdings believe the Plans satisfy each of the requirements of Bankruptcy Code section 1129 for confirmation.

## XVII.  <u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION</u>

JD Holdings is not aware of any viable alternatives at this time that would pay Holders of all Allowed Claims in full and avoid the risks of (a) JD Holdings' Claims being Allowed in full (which could adversely affect the recoveries of other Holders of Claims and Equity Interests), (b) a reversal by the BAP of the Dismissal Order, and (c) further deterioration of the Debtors' net operating income.

## XVIII. CONCLUSION AND RECOMMENDATION

JD Holdings believes the Plans are in the best interests of all Holders of Claims and Equity Interests. Given that all Allowed Claims will be paid in full under the Plans and that there are no viable alternatives that would pay all such Allowed Claim in full, and further acknowledging that JD Holdings would make valuable contributions to the Charitable Trust, JD Holdings recommends that all parties in interest file a joinder in support of Confirmation.

Date: March 16, 2018

**JD HOLDINGS, L.L.C.**

By: _____

Name: Ronald C. Brown

Title: President

**APPENDIX 1**

**Amended Joint and Consolidated Chapter 11 Plans of Reorganization
for all Debtors Filed by Creditor JD Holdings, L.L.C.**

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 16-21142** |
| **JOHN Q. HAMMONS FALL 2006, LLC, et al.,** | ) | **(Lead Case)** |
| | ) | |
| Debtors. | ) | **Chapter 11** |
| | ) | |

## AMENDED JOINT AND CONSOLIDATED CHAPTER 11 PLANS OF REORGANIZATION FOR ALL DEBTORS FILED BY CREDITOR JD HOLDINGS, L.L.C.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW ................................................................ 1

    A.      Defined Terms ............................................................................ 1
    B.      Rules of Interpretation ............................................................... 9
    C.      Computation of Time ................................................................ 10
    D.      Governing Law ......................................................................... 10

ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS ........................... 10

    A.      Allowed Claims and Equity Interests ....................................... 10

ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS ............................... 11

    A.      Administrative Claims (Other Than Professional Compensation Claims) ............ 11
    B.      Professional Compensation Claims ........................................... 12

         1.      Final Fee Applications ..................................................... 12

    C.      Priority Tax Claims ................................................................... 12
    D.      U.S. Trustee Fees ...................................................................... 12

ARTICLE IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................................................ 12

    A.      Summary ................................................................................... 12
    B.      Classification and Treatment of Claims and Equity Interests ............... 12

         1.      Class 1 – Other Priority Claims ...................................... 13
         2.      Class 2 –Secured Claims ................................................. 13
         3.      Class 3 – General Unsecured Claims .............................. 13
         4.      Class 4 – Equity Interests ............................................... 14

    C.      Special Provision Governing Unimpaired Claims and Equity Interests ............ 14
    D.      Acceptance or Rejection of Plan ............................................... 14

         1.      Voting Classes Under Plans ............................................ 14
         2.      Presumed Acceptance Under Plans ................................ 15

    E.      Confirmation Pursuant to Section 1129(b) of Bankruptcy Code ............ 15

ARTICLE V. CHARITABLE CONTRIBUTION ........................................... 15

ARTICLE VI. EFFECT OF CONFIRMATION ............................................. 16

    A.      Actions Required By Confirmation Order .................................. 16
    B.      Cooperation by Debtor Parties .................................................. 17

ARTICLE VII. IMPLEMENTATION OF THE SALE AND OTHER PLANS TRANSACTIONS ................................................................ 19

    A.      Overview .................................................................................. 19

i

B.    Sources of Consideration for Sale and Other Plans Transactions and Plans Distributions.............................................................................................................20
C.    Provisions Governing Distributions...........................................................................21
D.    Compliance Matters ...................................................................................................21
E.    Exemption from Certain Taxes and Fees...................................................................22
F.    Employment of Debtors' Employees / Severance Matters ........................................22

ARTICLE VIII. EFFECTIVE DATE OF PLANS .........................................................................24

A.    Binding Effect of Plans..............................................................................................24
B.    Discharge of Claims...................................................................................................24
C.    Releases by the Debtors .............................................................................................24
D.    Releases by JD Holdings ...........................................................................................25
E.    Exculpation ................................................................................................................26
F.    Dismissal of Delaware Litigation ..............................................................................26
G.    Third Party Releases by Holders of Claims and Equity Interests..............................26
H.    Preservation, Transfer, and Waiver of Rights of Action ..........................................27

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................................................27

A.    Assumption of Executory Contracts and Unexpired Leases.....................................27
B.    Rejection of Executory Contracts and Unexpired Leases.........................................28

ARTICLE X. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS...............28

A.    Allowance of Claims and Equity Interests................................................................28
B.    Administration of Claims and Equity Interests.........................................................28
C.    Interest.......................................................................................................................28
D.    Deadline to File Objections to Claims ......................................................................29
E.    New Claims and Amendments to Claims ..................................................................29

ARTICLE XI. MODIFICATION, AMENDMENT, REVOCATION OR WITHDRAWAL OF PLANS .........................................................................29

A.    Modification and Amendments...................................................................................29
B.    Effect of Confirmation on Modifications and Amendments ......................................29
C.    Revocation or Withdrawal of Plans ...........................................................................29

ARTICLE XII. RETENTION OF JURISDICTION .....................................................................29

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...................................................................30

A.    Additional Documents ...............................................................................................30
B.    Reservation of Rights.................................................................................................30
C.    Successors and Assigns..............................................................................................30
D.    Service of Documents ................................................................................................30
E.    Entire Agreement .......................................................................................................32
F.    Non-severability of Plans Provisions.........................................................................32
G.    Votes Solicited in Good Faith....................................................................................32
H.    Waiver or Estoppel ....................................................................................................32

I.        Conflicts ......................................................................................................... 32

iii

# INTRODUCTION

JD Holdings[1] hereby proposes the following plans of reorganization for the resolution of outstanding claims against, and equity interests in, all Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532.[2] Schedule 1 sets forth a list of each Debtor.

As detailed below, these Plans provide for the Sale of the Assets to JD Holdings and payment in full of all Allowed Claims against Debtors (except to the extent a Holder of an Allowed Claim agrees to an alternative treatment) upon the Effective Date of the Plans or as soon thereafter as is practicable, with JD Holdings subordinating its Claims arising from the ROFR to all other Allowed Claims. In addition, JD Holdings will contribute assets to a new Charitable Trust to honor Mr. Hammons' charitable intent (in an amount that will increase if Debtors cooperate in Confirmation and implementation of the Plans), even though such beneficiaries have not been identified, do not have standing under the Bankruptcy Code, and are not parties in interest.

There are no contingencies to the implementation of these Plans after Confirmation.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

The following capitalized terms shall have the following meanings when used herein:

1.    "**2005 Transaction**" means the transaction in 2005 entered into by Mr. Hammons, JQH Trust, and certain of their Affiliates, in which, among other things, Jonathan Eilian and his Affiliates took private John Q. Hammons Hotels, Inc., a publicly traded company.

2.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), 331, or 332 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

---

[1] Capitalized terms are defined in Article I hereof.

[2] In an abundance of caution, JD Holdings states that the submission of these Plans is not intended to be, and should not be construed as, an admission that venue in the Bankruptcy Court is proper with respect to any current or future proceedings that may arise in connection with the Chapter 11 Cases, the 2005 Transaction, or the ROFR. Upon consummation of the Sale of the 27 hotels being financed by the Sale Lender, JD Holdings' objections to venue in the Bankruptcy Court shall be deemed withdrawn.

1

3.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

4.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "**Allowed**" means any Claim that (a) is evidenced by a Proof of Claim that has been timely Filed by the applicable Claims Bar Date, or is not required to be evidenced by a Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order, or (d) is Allowed pursuant to the Plans or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, (1) no objection to the allowance of such Claim, request for estimation, motion to amend the Schedules, or other challenge of such Claim has been made by the Claims Objection Bar Date, or (2) such objection, request, motion or challenge is made and the Claim is Allowed for distribution purposes by a Final Order. Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is deemed Disallowed and shall be expunged without further action by the Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding the foregoing or anything else to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors.

6.      "**APA**" means the Asset Purchase Agreement for the sale of the Assets between Debtors, as sellers, and JD Holdings, as purchaser.

7.      "**Assets**" means all title, rights, interests and other forms of ownership of the Debtors of any nature in property of any kind, whether vested or contingent, wherever located, including all real property, personal property (both tangible and intangible), cash, Causes of Action, and Equity Interests held by any Debtor in any other Debtors or JQH Non-Debtor Entities.

8.      "**Assumed Agreements**" means all of the Executory Contracts and Unexpired Leases of Debtors other than Rejected Executory Contracts and Unexpired Leases to be (a) assumed by the Debtors and assigned to JD Holdings, or (b) assumed and retained by Debtors.

9.      "**Assumed Liabilities**" means any liabilities of the Debtors to be (a) assumed by JD Holdings pursuant to the APA, or (b) retained by the Debtors.

10.     "**Assumed Loans**" means those loans to be identified in the Plans Supplement to be reinstated, as necessary, and assumed by JD Holdings pursuant to the terms of the underlying loan agreement(s) and/or an agreement between JD Holdings and the applicable lender or its authorized representative.

11.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553,

2

and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

12. "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

13. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Kansas.

14. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15. "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16. "**Cash**" means the legal tender of the United States of America.

17. "**Causes of Action**" means any claim, cause of action, controversy, demand, action, suit, defense, offset, setoff, counterclaim, recoupment, power, privilege or license of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including: (a) the right to object to Claims; (b) any claim pursuant to section 362 of the Bankruptcy Code; (b) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (d) any Avoidance Actions; (e) indemnification, reimbursement or recovery under any insurance policies; and (e) any cause of action to be identified in any Plans Supplement.

18. "**Chapter 11 Cases**" means *In re John Q. Hammons Fall 2006, LLC, et al.*, Case No. 16-21142.

19. "**Charitable Trust**" means a new charitable trust to be established by JD Holdings to honor the charitable intent of Mr. Hammons.

20. "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

21. "**Claims and Solicitation Agent**" means BMC Group, Inc., the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

22. "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order.

3

23. "**Claims Bar Date Order**" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and Interest, (II) Establishing Procedures for Filing Proofs of Claim and Interest, and (III) Approving Form and Manner of Notice Thereof* [ECF No. 525].

24. "**Claims Objection Bar Date**" means the deadline for JD Holdings and other parties in interest to object to a Claim, other than Administrative Claims (which are addressed separately), which shall be on the date that is the later of (a) the Effective Date and (b) such later period of limitation as may be specifically fixed or extended by a Final Order of the Bankruptcy Court.

25. "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

26. "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27. "**Collateral**" means any property or interest in property of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

28. "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29. "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plans pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

31. "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

32. "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plans pursuant to section 1129 of the Bankruptcy Code.

33. "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed and assigned by the Debtors to JD Holdings pursuant to sections 365 or 1123 of the Bankruptcy Code.

34. "**Debtor Parties**" has the meaning set forth in Article V.

35. "**Debtors**" means those Entities listed on Schedule 1.

36. "**Debtors Released Party**" means the Debtors and each of their respective predecessors, successors and assigns, and each of the current and former officers, directors, and

4

employees thereof, and Stinson Leonard Street LLP and Merrick, Baker & Strauss, P.C. (in each case, in his, her, or its capacity as such).

37.     "**Delaware Litigation**" refers to the matter captioned *JD Holdings, L.L.C. v. Dowdy*, C.A. No. 7480-VCL, commenced in the Delaware Court of Chancery on May 1, 2012.

38.     "**Disallowed**" means, as it relates to any Claim, that it (a) has been disallowed under these Plans, (b) has been found by a Final Order not to be an Allowed Claim, (c) is listed on the applicable Schedule at zero or as contingent, disputed or unliquidated and as to which no proof of claim has been timely Filed, (d) is not listed on the Schedules and as to which no proof of claim has been timely Filed, or (e) has been withdrawn.

39.     "**Disclosure Statement**" means the written Disclosure Statement that relates to the Plans, as supplemented or modified from time to time and that is prepared and disseminated in accordance with Section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules.

40.     "**Distribution Record Date**" means the Confirmation Date.

41.     "**Effective Date**" means a date selected by JD Holdings that is any Business Day after the Confirmation Order is a Final Order on which the first closing under the APA occurs.

42.     "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code which, for avoidance of doubt, shall include a limited liability company.

43.     "**Equity Interest**" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor or JQH Non-Debtor Entity, including any issued or unissued share of common stock, preferred stock, membership interests in limited liability companies, general and limited partnership interests in partnerships, or other ownership interest in a Debtor or JQH Non-Debtor Entity, whether or not transferable or represented by a certificate, including any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor or JQH Non-Debtor Entity that existed immediately prior to the Effective Date, any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors JQH Non-Debtor Entity pursuant to any equity plan maintained by the Debtors or JQH Non-Debtor Entity or under any existing employment agreement of the Debtors' or JQH Non-Debtor Entities' existing employees, any Existing Shares, and any Claim against any Debtor or JQH Non-Debtor Entity subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing. For the avoidance of doubt, Equity Interest does not include beneficial interests in the JQH Trust.

44.     "**Executory Contract**" means a contract to which any Debtor is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

45.     "**Exculpated Parties**" means the Debtors Released Parties, the JD Holdings Released Parties, and the Trustees Released Parties.

5

46. "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

47. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari or leave to appeal has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari or leave to appeal was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure may be Filed relating to such order shall not prevent such order from being a Final Order. Notwithstanding the foregoing, JD Holdings shall have the right to waive the conditions set forth herein with regard to the Confirmation Order, in which case the Confirmation Order shall be deemed a Final Order for purposes of the Plans and the APA.

48. "**General Unsecured Claim**" means any Claim against a Debtor that is not one of the following Claims: (a) Administrative Claim; (b) Priority Tax Claim; (c) Other Priority Claim; or (d) Secured Claim.

49. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

50. "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

51. "**Impaired**" means a Class of Claims that is not Unimpaired.

52. "**Insider**" has the meaning set forth in section 101(31) of the Bankruptcy Code.

53. "**JD Holdings**" means JD Holdings, L.L.C., and/or its subsidiary Entities, and/or its designees (as the context requires).

54. "**JD Holdings Released Party**" means (i) JD Holdings and each of its Affiliates, and each of their respective predecessors, successors and assigns, and each of the current and former shareholders, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, lenders, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents and representatives of each of the foregoing Entities (in each case, in his, her, or its capacity as such); and (ii) the Sale Lender. The term "Affiliate" as used in this definition includes Jonathan D. Eilian and Ronald C. Brown, personally, and any Entity in which either of them has any equity interest, and any trust in which either of them is a grantor, trustee, or beneficiary.

55. "**JQH Non-Debtor Entities**" means those Entities listed on Schedule 2.

56. "**JQH Trust**" means The Revocable Trust of John Q. Hammons, dated December 29, 1989, as amended and restated.

6

57. "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

58. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

59. "**Non-Hotel Assets**" means all Assets of Debtors other than hotels or cash.

60. "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

61. "**Outside Effective Date**" means the date that is 60 days after the Confirmation Order becomes a Final Order.

62. "**Outside Closing Date**" means the date that is 120 days after the Confirmation Order becomes a Final Order.

63. "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

64. "**Petition Date**" means June 26, 2016.

65. "**Plans**" mean these *Chapter 11 Plans of Reorganization for all Debtors* (as amended, supplemented, or modified from time to time in accordance with the terms hereof), including, the Plans Supplement, which are incorporated herein by this reference. For ease of reference, the term "Plan" may be used throughout this document in place of "Plans".

66. "**Plans Distribution**" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under the Plans.

67. "**Plans Documents**" means the documents other than the Plans, to be executed, delivered, assumed, or performed to consummate the Plans Transactions and implement the Plans on the Effective Date.

68. "**Plans Supplement**" means all documents that supplement this *Amended Joint and Consolidated Chapter 11 Plans of Reorganization for all Debtors Filed by Creditor JD Holdings, L.L.C.* that are Filed no less than seven (7) days prior to the Confirmation Date.

69. "**Plans Transactions**" means one or more transactions to occur on or before the closing dates set forth in the APA or other Plans Documents (as the case may be) or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plans, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or necessary or appropriate to implement the terms of the Plans and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, conveyance, assignment, assumption, delegation or other transfer of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plans; and (c) all other actions that are consistent with the terms

7

of the Plans that JD Holdings reasonably determines in its sole discretion are necessary or appropriate.

70. "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

71. "**Professional**" means any Entity employed by a Debtor pursuant to a Bankruptcy Court order in accordance with section 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

72. "**Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Compensation Claim.

73. "**Proof of Claim**" means a proof of Claim Filed against a Debtor in the Chapter 11 Cases.

74. "**PSA**" means the Plan Support Agreement and Claim Allowance dated February 10, 2018 by and among (i) the JQH Trust, for itself and on behalf of all other Debtors; (ii) Greggory Groves and Jacqueline A. Dowdy, individually and as co-successor trustees of the JQH Trust, and as officers, directors and employees of various Debtors and JQH Non-Debtor Entities; and (iii) JD Holdings.

75. "**Purchased Assets**" means those Assets purchased by JD Holdings pursuant to the APA.

76. "**Purchased Assets Secured Claim**" means a Secured Claim on any of the Purchased Assets.

77. "**Rejected Executory Contracts and Unexpired Leases**" means those Executory Contracts and Unexpired Leases that JD Holdings identifies on a schedule of Rejected Executory Contracts and Unexpired Leases on or before the Effective Date, which shall be deemed rejected pursuant to section 365 of the Bankruptcy Code on the Effective Date.

78. "**ROFR**" means the Sponsor Entity Right of First Refusal Agreement provided by the Debtors and the JQH Trust to JD Holdings in 2005, including all amendments thereto.

79. "**Sale**" means the sale contemplated by the APA.

80. "**Sale Financing Facility**" means the secured credit facility to be entered into by JD Holdings as of and subject to the occurrence of the Effective Date in order to facilitate the consummation of the Sale.

8

81.	"**Sale Lender**" means the lenders, agents and arrangers providing the Sale Financing Facility, including Goldman Sachs Mortgage Company and certain of its affiliates, in their capacity as such.

82.	"**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

83.	"**Secured Claim**" means a Claim against any Debtor that is secured by a Lien on property in which such Debtor has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code.

84.	"**Settlement Agreement**" means the Settlement Agreement dated February 10, 2018 by and among (i) the Debtors; (ii) Greggory Groves and Jacqueline A. Dowdy, individually and as co-successor trustees of the JQH Trust, and as officers, directors and employees of various Debtors and JQH Non-Debtor Entities; and (iii) JD Holdings and its affiliates.

85.	"**Third-Party Releasing Party**" has the meaning set forth in Section VII.G. hereof.

86.	"**Trustees Released Party**" means Greggory Groves and Jacqueline A. Dowdy, individually and in their respective capacities as co-successor trustees of the JQH Trust, officers, directors, general counsel, managers, representatives, agents, and employees of any Debtors and JQH Non-Debtor Entities.

87.	"**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code, or may be amended by mutual agreement of the parties thereto.

88.	"**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

89.	"**U.S. Trustee**" means the United States Trustee for Region 20.

90.	"**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

B.	*Rules of Interpretation*

The following rules for interpretation and construction shall apply to the Plans: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form

9

or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim includes that Entity's successors and assigns; (6) unless otherwise stated, all references herein to "Articles" or "Sections" are references to Articles or Sections hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plans in their entirety rather than to a particular portion of the Plans; (8) unless otherwise stated, the words "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation"; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (10) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York shall govern the construction and implementation of the Plans and any agreements, documents, and instruments executed in connection with the Plans.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

A.    *Allowed Claims and Equity Interests*

The Allowed Claims against, and Equity Interests in, each of the Debtors are divided into the following classes:

(1)    Class 1 shall consist of all Other Priority Claims.

(2)    Class 2 shall consist of all Secured Claims.

(3)    Class 3 shall consist of all General Unsecured Claims.

10

(4)     Class 4 shall consist of all Equity Interests[3].

# ARTICLE III.
## TREATMENT OF CLAIMS AND INTERESTS

All Claims (except Administrative Claims and Priority Tax Claims) and Equity Interests are placed in the Classes set forth in Article II hereof. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plans. A Claim is placed in a particular Class only to the extent that the Claim falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim falls within the description of such other Classes.

A.    *Administrative Claims (Other Than Professional Compensation Claims)*

Except to the extent the Holder of an Allowed Administrative Claim agrees to an alternative treatment, each Holder of an Allowed Administrative Claim (other than of a Professional Compensation Claim) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Cash in an amount equal to the unpaid amount of such Allowed Administrative Claim on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Administrative Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

Except for Professional Compensation Claims and U.S. Trustee Fees, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on JD Holdings and other parties in interest no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Effective Date. Objections to such requests may be Filed by JD Holdings or any party in interest and must be Filed and served by the Claims Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, JD Holdings or its Affiliates, or any of their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or JD Holdings or any action by the Bankruptcy Court.

---

[3] JD Holdings understands that all Equity Interests in Debtors other than JQH Trust are held by other Debtors and that there are no Equity Interests in JQH Trust.  In addition, Debtors also own certain Equity Interests in JQH Non-Debtor Entities.

*B.*     *Professional Compensation Claims*

1.     Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

*C.*     *Priority Tax Claims*

Except to the extent the Holder of an Allowed Priority Tax Claim agrees to an alternative treatment, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

*D.*     *U.S. Trustee Fees*

On the Effective Date or as soon thereafter as reasonably practicable, JD Holdings shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, JD Holdings shall pay the U.S. Trustee Fees for each quarter (including any part thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

**ARTICLE IV.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

*A.*     *Summary*

The categories listed in Section IV.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including Confirmation and Plans Distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plans Distributions only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

*B.*     *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for purposes of Plans Distributions is specified below:

12

1. <u>Class 1 – Other Priority Claims</u>

    (a)  *Classification*: Class 1 consists of all Other Priority Claims.

    (b)  *Treatment*: Except for any Allowed Priority Claim that relates to an Assumed Agreement, each Holder of an Allowed Other Priority Claim shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, Cash in an amount equal to the unpaid amount of such Allowed Other Priority Claim on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Other Priority Claim becomes an Allowed Claim or otherwise becomes payable under the Plans. Allowed Priority Claims relating to Assumed Agreements shall receive Cure Costs in accordance with Section VII hereof.

    (c)  *Voting*: Class 1 is Unimpaired by the Plans. Each Holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 1 Other Priority Claim is entitled to vote to accept or reject the Plans.

2. <u>Class 2 –Secured Claims</u>

    (a)  *Classification*: Class 2 consists of all Secured Claims other than Assumed Loans.

    (b)  *Treatment*: Each Holder of an Allowed Secured Claim shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Secured Claim, Cash in an amount equal to the unpaid amount of such Allowed Secured Claim on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Secured Claim becomes an Allowed Claim or otherwise becomes payable under the Plans, unless such Holder of an Allowed Secured Claim agrees to extend the term of the loan on terms, or accept other treatment, mutually agreeable to such Holder and JD Holdings.[4]

    (c)  *Voting*: Class 2 is Unimpaired by the Plans. Each Holder of a Class 2 Secured Claim is conclusively presumed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 2 Secured Claim is entitled to vote to accept or reject the Plans.

3. <u>Class 3 – General Unsecured Claims</u>

    (a)  *Classification*: Class 3 consists of all General Unsecured Claims.

---

[4] For the avoidance of doubt, to the extent that any loan is identified in the Disclosure Statement or Plans Supplement as an Assumed Loan but is not assumed, then such loan shall be treated as a Secured Claim.

(b)  *Treatment*: Except to the extent a Holder of an Allowed General Unsecured Claim agrees to an alternative treatment, each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each General Unsecured Claim, Cash in an amount equal to the unpaid amount of such Allowed General Unsecured Claim on the date, or as soon thereafter as is reasonably practicable, that is the later of (i) the Effective Date or (ii) the date such Claim becomes an Allowed Claim or otherwise becomes payable under the Plans.

(c)  *Voting*: Class 3 is Unimpaired by the Plans. Each Holder of a Class 3 General Unsecured Claim is conclusively presumed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 3 General Unsecured Claim is entitled to vote to accept or reject the Plans.

4.  <u>Class 4 – Equity Interests</u>

(a)  *Classification*: Class 4 consists of all Equity Interests in each of the Debtors.

(b)  *Treatment*: Holders of Equity Interests shall not receive separate consideration for such Equity Interests. Such Equity Interests will be transferred as set forth in Article VI hereof.

(c)  *Voting*:  Class 4 is Unimpaired by the Plans. Each Holder of a Class 4 Equity Interest is deemed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 Equity Interest is entitled to vote to accept or reject the Plans.

C.  *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plans, nothing under the Plans shall affect the rights of the Debtors, JD Holdings, and any other party in interest in respect of any Unimpaired Claims or Equity Interests, including all rights in respect of legal and equitable defenses to all claims for relief and causes of action against the Holder of such claims and interests, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests. For the avoidance of doubt, JD Holdings may interpose an objection to any Claim at any time up to the Claims Objection Bar Date.

D.  *Acceptance or Rejection of Plan*

1.  <u>Voting Classes Under Plans</u>

Under the Plans, there are no Impaired Classes entitled to vote to accept or reject the Plans.

14

2. <u>Presumed Acceptance Under Plans</u>

Under the Plans, (a) Classes 1, 2, 3 and 4 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plans pursuant to section 1126(f) of the Bankruptcy Code, and (c) such Holders are not entitled to vote to accept or reject the Plans.

E.     *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

JD Holdings will request Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that is deemed to reject the Plans or votes to reject the Plans. JD Holdings reserves the right to revoke or withdraw the Plans or any document in the Plans Supplement, subject to and in accordance with the terms of the Plans, at any time prior to Confirmation. JD Holdings also reserves the right to alter, amend, or modify the Plans, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to and in accordance with the terms of the Plans, at any time prior to Confirmation.

Notwithstanding that voting on the Plans is not required, any party in interest may object to Confirmation.

# ARTICLE V.
# CHARITABLE CONTRIBUTION

On the Effective Date, JD Holdings shall establish the Charitable Trust to honor Mr. Hammons' charitable intent, which shall be named the "John Q. Hammons Charitable Trust". JD Holdings will contribute to the Charitable Trust (a) $2.0 million in Cash[5] and (b) one or more Non-Hotel Assets designated by JD Holdings on or before the Effective Date having a value totaling not less than $3.0 million[6] free and clear of all Liens and Claims.

In addition, JD Holdings would contribute to the Charitable Trust additional Non-Hotel Assets as designated by JD Holdings, of no less than $15 million in value[7] free and clear of all Liens and Claims, if Debtors and their Affiliates, the JQH Non-Debtor Entities (other than such JQH Non-Debtor Entities in which the Debtors do not own a controlling interest), and the estate of John Q. Hammons, and their respective principals, trustees, beneficiaries, shareholders, partners, members, directors, officers, employees and other persons or entities under their control (collectively, the "<u>Debtor Parties</u>"), voluntarily cooperate in obtaining the Confirmation Order, closing the Sale and other Plans Transactions, and implementing the Plans, as follows:

---

[5] JD Holdings shall pay the JQH Trust sufficient funds to wind up the administration and operations of the JQH Trust and the state court probate of the Estate of John Q. Hammons, which is estimated to be $615,000. To the extent these expenses exceed $615,000, the amount of Cash and the Non-Hotel Assets to be contributed to the Charitable Trust shall be decreased on a pro rata basis by an amount equal to such excess.

[6] The value of such additional Non-Hotel Assets shall be based on Debtors' valuations as set forth in the appraisals of the Non-Hotel Assets prepared by Alvarez and Marsal Valuation Services, with an effective date of June 26, 2016.

[7] The value of such additional Non-Hotel Assets shall be based on Debtors' valuations as set forth in the appraisals of the Non-Hotel Assets prepared by Alvarez and Marsal Valuation Services, with an effective date of June 26, 2016.

(i)     None of the Debtor Parties Files an objection to the Disclosure Statement or Plans, or opposes Confirmation, or in any manner, directly or indirectly, takes or fails to take any actions, or otherwise work with, consult, encourage or otherwise assist any other Entity to take or fail to take any action that would or would reasonably be expected to prevent, delay, impede, interfere with, or otherwise could be adverse to, obtaining approval of the Disclosure Statement or Plans, or obtaining the Confirmation Order, as determined by JD Holdings in its reasonable judgment;

(ii)    The Debtor Parties take all such actions, or not take such actions, as necessary or appropriate, or as requested by JD Holdings, to obtain the approval of the Disclosure Statement and Plans, and the Confirmation Order, and provide JD Holdings and its representatives access to review all books, records and other information (including all electronic records) with respect to the Debtors and JQH Non-Debtor Entities, as determined by JD Holdings in its reasonable judgment; and

(iii)   The Debtors perform all of their obligations under the Plans and Plans Documents and otherwise comply with the terms of the Plans and Plans Documents, until the closing of all Plan Transactions contemplated by the APA, as determined by JD Holdings in its reasonable judgment.

The Plans Supplement will disclose the mechanism for how the contributions to the Charitable Trust will take into account certain administrative costs and other Claims.

Notwithstanding JD Holdings' right to designate which Non-Hotel Assets to contribute to the Charitable Trust, the land and building that houses, and the Debtors' interest in, the Missouri Sports Hall of Fame shall be one of the Non-Hotel Assets contributed to the Charitable Trust. In addition, in the event that the baseball stadium located in Springfield, Missouri and leased by the JQH Trust (the "Baseball Stadium") is not one of the Non-Hotel Assets contributed to the Charitable Trust, JD Holdings shall continue to keep the name "Hammons Field" on the Baseball Stadium until and unless JD Holdings transfers its interest in and/or rights with respect to the Baseball Stadium to a third party non-Affiliate of JD Holdings.

Greggory Groves and/or Jacqueline Dowdy shall designate the charitable organizations to which each of the Non-Hotel Assets in the Charitable Trust are distributed. Such designations shall be made in writing to JD Holdings within ten (10) days after JD Holdings informs the Debtors of the Non-Hotel Assets to be contributed to the Charitable Trust. Any disputes regarding the designations of such charitable organizations shall be resolved by Judge Dale Somers, as mediator.

## ARTICLE VI.
## EFFECT OF CONFIRMATION

A.    *Actions Required By Confirmation Order*

The Confirmation Order shall be deemed to (i) authorize, among other things, the Sale and other Plans Transactions and the implementation of the Plans, and (ii) require the Debtors to

16

execute the APA and other Plans Documents, and all other documents and instruments, and take all other actions, as required under these Plans or that JD Holdings otherwise determines are necessary or appropriate to consummate the Sale and other Plans Transactions and implement the Plans. On and after the Confirmation Date, JD Holdings may take, or require Debtors to take, all actions as may be necessary or appropriate to effect the Sale and other Plans Transactions and the implementation of the Plans.

Upon execution of the APA pursuant to the Confirmation Order, JD Holdings shall deposit $50 million into escrow (the "Deposit"), to be disbursed to the Debtors in the event that the Effective Date does not occur by the Outside Effective Date; provided, however, the Deposit shall not be forfeited if the Effective Date does not occur by the Outside Effective Date as a result of a breach by the Debtors of their obligations under the APA, Plans, the PSA or the Settlement Agreement, or failure of a closing condition in the APA or other Plans Documents, or an appeal of the Confirmation Order. If the Effective Date does not occur by the Outside Effective Date, then forfeiture of such Deposit shall be the sole remedy for such failure.[8]

B.    *Cooperation by Debtor Parties*

From the Confirmation Date until the Effective Date:

(i)    The Debtor Parties shall continue, and cause their Affiliates, to operate the Assets in the ordinary course consistent with Debtors' past custom and practice and the industry standards for the operation of similar Assets and Debtors' operating budget for 2018 (the "Ordinary Course of Business"), including (i) maintaining the inventories at levels maintained in the Ordinary Course of Business; (ii) performing maintenance and repairs in the Ordinary Course of Business, and commencing or continuing any capital projects scheduled in the capital budget for the Assets; (iii) taking or ceasing such action as is necessary, appropriate or advisable to cure any violation of applicable laws; (iv) renewing all licenses and permits before their expiration; (v) maintaining all existing insurance policies; (vi) not making any alterations or improvements at the Assets, or demolishing any of the Assets, other than in the Ordinary Course of Business or as provided in Debtor's capital expenditures budget for the relevant period; (viii) not removing any property from the Assets, other than in the Ordinary Course of Business; and (ix) not taking, or causing or permitting to be taken, any action that could impair Debtors' title to any of the Assets or create any Lien or encumbrance on the Assets; (x) complying with all leases, convention center agreements, franchise agreements, operating agreements, management agreements, licenses and permits; (xi) amending, extending, renewing or terminating any leases, agreements, licenses or permits, except in the Ordinary Course of Business, without JD Holdings' prior written consent; (xi) not entering into any new leases or agreements with respect to the Assets, without JD Holdings' prior written consent, unless such leases or agreements are terminable by JD Holdings without any termination fee, penalty or other amount upon not more than 30 days' notice; (xii) not entering into any agreement or understanding with Insiders, without JD

---

[8] In addition, the allowance of JD Holdings' Claims may be reversed as set forth in the PSA.

17

Holdings' prior written consent; and (xiii) not paying bonuses or other amounts in excess of base salary to any employees of Debtors;

(ii)     The Debtor Parties shall permit JD Holdings to take such actions with respect to the Assets as JD Holdings deems necessary or advisable to facilitate the transition of the operation of the Assets at closing of the Sale pursuant to which the employees, agents and representatives designated by JD Holdings shall have unrestricted access to the Assets and Debtors' offices in Springfield, Missouri, during normal business hours to facilitate the transition of the management and operation of the Assets upon closing of the Sale, including, the right to review all books, records and other information (including all electronic records) with respect to the Assets in Debtors' possession, provided that neither JD Holdings nor the Sale Lender shall be deemed to have assumed any management or operational responsibilities prior to closing of the Sale by virtue of such activities and shall not have the right to direct any of Debtors' employees or otherwise have any right to make any decisions for or on behalf of Debtors with respect to the operation of the Assets;

(iii)    The Debtor Parties shall provide all financial statements and other reports, documents, notices and information to JD Holdings and access to the Assets that Debtors otherwise would be required to provide to any of its lenders under the applicable loan agreements with Debtors for Assets with any Liens, or as requested by JD Holdings for such Assets that are not secured by any Liens, and any such documents and information requested by JD Holdings;

(iv)    JD Holdings shall have the right to conduct, or engage a third-party to conduct, a forensic audit of all books and records of Debtors and its Affiliates and the Assets for any time period, and the Debtor Parties shall cooperate fully in such forensic audit;

(v)     The Debtor Parties shall take all such actions, or not take such actions, necessary or appropriate to consummate the Sale and all other Plans Transactions and implement the Plans, including permitting JD Holdings and its lenders, agents and representatives to communicate directly with any ground lessors, franchisors, governmental authorities and other third-parties, obtaining all consents, approvals, estoppel certificates and other documents, materials or information as requested by any lenders, ground lessors, franchisors, governmental authorities or other third parties, or as JD Holdings reasonably determines necessary or appropriate, to consummate the assumption of the Assumed Loans, the Sale and other Plans Transactions; and

(vi)    The Debtor Parties shall not in any manner, directly or indirectly, take or fail to take any actions, or otherwise work with, consult, encourage or otherwise assist any other Entity to take or fail to take any action that would or would reasonably be expected to prevent, delay, impede, interfere with, or otherwise could be adverse to, the consummation of the Sale and any other Plans Transactions or implementation of the Plans, including any appeal relating to the Plans.

18

After the Effective Date, Debtor Parties shall continue to perform their obligations in this Article VI.B to the extent that they have personnel and resources available to perform such obligations. Any disputes regarding Debtor Parties' performance of their obligations in this Article VI.B. shall be resolved by Judge Dale Somers, as mediator.

# ARTICLE VII.
## IMPLEMENTATION OF THE SALE AND OTHER PLANS TRANSACTIONS

A.    *Overview*

The Plans contemplate a sale of all Assets (including Equity Interests) free and clear of all Liens and Claims (except as set forth in these Plans) pursuant to Bankruptcy Code sections 105, 363, 365 and 1129 (among others) to JD Holdings pursuant to the APA. JD Holdings shall file a Plans Supplement no later than seven (7) days before the Confirmation Hearing. This Plans Supplement shall include the schedules to the APA and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms of the Plans. In consideration, on or shortly after the Effective Date, JD Holdings shall pay all Allowed Claims in full in Cash, except for any Assumed Loans (whether pursuant to the terms of the existing agreements and/or pursuant to new agreements to do so, which shall be paid in accordance with their terms), and contribute certain Cash and Non-Hotel Assets to a new Charitable Trust as set forth in Article V hereof. At or prior to the Effective Date, JD Holdings may elect to leave certain Assets with the JQH Trust either pending subsequent closings as set forth hereafter, may direct certain Assets to be conveyed or transferred directly to the Charitable Trust free and clear of all Liens and Claims, or if JD Holdings determines not to close with respect to such Assets, then such Assets shall remain with the JQH Trust free and clear of all Liens and Claims.

JD Holdings shall be obligated to proceed to closing of the Sale pursuant to the APA following the Confirmation Order becoming a Final Order, except in the event of an appeal of the Confirmation Order, a breach by Debtors of their obligations under the APA, Plans, the PSA, or the Settlement Agreement, and certain other customary sale conditions to be set forth in the APA, as set forth more fully in the Disclosure Statement. The APA contemplates a series of closings, starting on the Effective Date and ending no later than the Outside Closing Date. Notwithstanding the foregoing, if JD Holdings is unable to obtain a required consent for certain Assets, a waiver of a third-party termination right that would be triggered by the sale of certain Assets or consent for the assumption of the Assumed Loans, by such Outside Closing Date (the "Delayed Assets"), but all Allowed Claims existing as of the Outside Closing Date have been paid by the Outside Closing Date, Debtors shall retain such Delayed Assets free and clear of all Liens and Claims until such time that such Delayed Assets are transferrable to JD Holdings. In such case, all economic benefits and interests from such Delayed Assets shall inure to the benefit of JD Holdings pending such closing on the Delayed Assets. The Plans Supplement will disclose additional details regarding the administration and operation of any Delayed Assets after the Outside Closing Date.

As part of the Plans, JD Holdings will subordinate its Claim arising from the ROFR to the payment of all Allowed Claims. JD Holdings has an Allowed Claim of $495,938,161.00 for

19

its Claims against each Debtor jointly and severally arising from the ROFR (the "Allowance Provision"); provided, however, if Debtors (i) do not breach the PSA and (ii) cooperate as set forth in the PSA and in the Settlement Agreement, and the Plans are not confirmed or the Effective Date of the Plans does not occur, then the Allowance Provision shall be of no force and effect unless Debtors, their employees, officers, directors, and/or co-trustees nevertheless receive through some alternative plan, sale, or other transaction the benefits of the Plan modifications in the Settlement Agreement, to include the funding of the Charitable Trust and the benefits of the Settlement Agreement, in which case the Allowance Provision will be effective. Accordingly, a determination of the amount of such Claim, and all litigation relating thereto, will not be needed or affect the Plans Distributions to other Holders of Claims. The subordination of JD Holdings' Claim arising from the ROFR shall become effective upon consummation of the Sale and implementation of the Plans, and shall be subject to Debtors' compliance with these Plans.

JD Holdings will have a limited period of time until the Claims Objection Bar Date in which to determine the Claims, if any, to which an objection would be Filed. All Claims to which an objection is not Filed will be deemed Allowed. If a Claim objection is Filed, the undisputed portion of that Claim will be deemed Allowed, entitled to payment along with all other Allowed Claims upon the Effective Date of the Plans or as soon thereafter as is practicable, and the disputed portion of that Claim will not be paid until such dispute is resolved by settlement or adjudication and determined to be an Allowed Claim. Prior to the Effective Date, JD Holdings will identify what Assets, if any, it will not purchase as part of the Sale or other Plans Transactions, in which case the JQH Trust shall retain any such Assets free and clear of all Liens and Claims.

As set forth more fully in the Disclosure Statement, some of Debtors' debts are assumable by a purchaser of the related Assets. Upon Confirmation, Debtors shall cooperate fully and take all steps necessary to effectuate such assumptions by JD Holdings, and the lenders relating thereto shall be obligated to perform as required by the respective loan agreements. JD Holdings shall work with the lenders of such loans to ensure timely assumption.

B.   *Sources of Consideration for Sale and Other Plans Transactions and Plans Distributions*

JD Holdings shall (i) assume the Assumed Loans, (ii) assume the Assumed Agreements, (iii) assume and pay the Allowed Claims, (iv) establish and contribute assets to the Charitable Trust, (v) pay the JQH Trust sufficient funds to wind up the administration and operations of the JQH Trust and the state court probate of the Estate of John Q. Hammons, and (vi) pay taxes as a result of dispositions (including but not limited to capital gains taxes and other taxes payable under 26 U.S.C. § 1231) resulting from the Sale and Plans Transactions described in the Plans and the APA, all as set forth above. Pursuant to these Plans, JD Holdings is purchasing all Assets, except those Assets, if any, that JD Holdings elects not to purchase as part of the Sale or other Plans Transactions, in which case the JQH Trust shall retain any such Assets free and clear of all Liens and Claims. Funds to consummate the Plans Transactions shall come from JD Holdings and its affiliates and financing from third parties, including the Sale Lender pursuant to the Sale Financing Facility (as discussed in greater detail in the Disclosure Statement).

## C. Provisions Governing Distributions

As of the close of business on the Distribution Record Date, the Claims Register for each of the Classes of Claims and Equity Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Except as otherwise provided in the Plans, the Debtors and JD Holdings, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. Except as otherwise provided in the Plans, the Debtors and JD Holdings, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the Claims Register as of the close of business on the Distribution Record Date.

Unless otherwise provided in the Plans, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or Equity Interest shall receive the full amount of the Plans Distribution that such Holder is entitled to pursuant to the Plans.

During the course of the Chapter 11 Cases, the Debtors have stipulated to limited relief from the automatic stay (the "Stay Relief Stipulations") to permit certain potential Holders of Claims arising out of or related to the allegations contained in their respective causes of action (collectively, the "Action"). Pursuant to those Stay Relief Stipulations, the Holders of such Claims were permitted to litigate the issues raised in the Actions to completion, and the parties in the Actions were permitted to pursue any appeals of any decisions to any court with appellate jurisdiction, for the purpose of establishing the amount, if any, of their claims (the "Personal Injury Claim Amount"). The Holders of such Claims were also permitted to settle, enforce and collect the Personal Injury Claim Amount directly from all insurance policies and proceeds without having to seek a further order of the Bankruptcy Court.[9]

All tort Claims subject to litigation and defended by the Debtors' insurers shall be treated as disputed Claims. Accordingly, any such Claim shall be paid by JD Holdings only to the extent that (i) the claimant prevails in litigation and (ii) the Debtors' insurance policies do not cover the Claim. JD Holdings shall take any actions necessary to continue the coverage for such Claims under the applicable insurance policies.

## D. Compliance Matters

In connection with the Plans, to the extent applicable, the Debtors and JD Holdings shall comply with all tax withholding and reporting requirements imposed on them by any governmental authority, and all Plans Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision to the contrary in the Plans, the Debtors and JD Holdings shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plans Distribution generate sufficient funds to pay applicable withholding taxes, withholding Plans Distributions pending receipt of information necessary to facilitate such Plans Distributions, or

---

[9] Such Claims shall be disputed Claims.

establishing any other mechanisms they reasonably believe are necessary or appropriate. The Debtors and JD Holdings reserve the right to allocate all Plans Distributions in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### E.    Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from any Debtor to JD Holdings, the Sale Lender or to any other Entity pursuant to, in contemplation of, or in connection with the Plans, including (1) the issuance, distribution, transfer, or exchange of any debt, Equity Interest, or other interest in any Debtor, (2) the creation, amendment, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of any indebtedness by any document or instrument or other means, (3) the making, assignment, or recording of any lease or sublease, or memorandum of such lease or sublease, or (4) the making, delivery, or recording of any deed, bill or sale, assignment or other document or instrument of transfer of any real property or personal property, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, mortgage tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or fee imposed by any governmental authority, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or fee by such governmental authority, and accept for filing and recordation any of the foregoing documents and instruments without the payment of any such tax or fee.

### F.    Employment of Debtors' Employees / Severance Matters

With respect to the approximately 4,000 employees (the "Employees") employed by Debtors and Non-Debtors JQH Entities ("Existing Employer"), upon consummation of the Sale and Other Plan Transactions, JD Holdings or its Affiliates ("New Employer") will offer employment to substantially all of the Employees of Debtors and JQH Accounting (subject to standard background and compliance checks), but in any event a sufficient number of Employees that will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (the "WARN Act"). New Employer will (a) pay salaries or wages to the Employees who accept such offer of employment (the "Rehired Employees") at no less than ninety (90%) of the salary or wages of such Rehired Employees existing as of the rehiring date, and (b) recognize the Rehired Employee's prior years of employment with Existing Employer (including any prior employment with Winegardner & Hammons, Inc. and any predecessor-in-interest to the Debtors).

New Employer shall be responsible for all claims and liabilities with respect to (1) application of the WARN Act, (2) salaries, wages, bonuses, profit sharing and other compensation, vacation and sick leave, worker's compensation, employer's contribution under F.I.C.A., unemployment compensation, welfare benefits, deferred compensation, savings, pension, 401(k) and retirement plan and insurance and other benefits of whatever kind which becomes payable to any Employee, and (3) any alleged or actual unfair labor practices, employment discrimination charges and lawsuits, and other similar claims of any Employees regarding employment matters arising out of or alleged acts or omissions of Existing Manager.

New Employer shall defend, indemnify and hold harmless the Trustees Released Parties from and against all loss, cost, express liabilities, causes of action and claims with respect to the application of the WARN Act.

With respect to the Employees identified in Exhibit A to the Settlement Agreement (the "Designated Employees") who are terminated or resign within 180 days after consummation of the Sale or other Plan Transactions, each Designated Employee shall promptly receive from Existing Employer a lump sum severance payment in the amounts set forth in Exhibit A to the Settlement Agreement upon such termination or resignation.

With respect to the Employees at JQH Management's offices in Springfield, Missouri, or its regional offices, or at JQH Accounting Services, LLC, but are not specifically identified in Exhibit A to the Settlement Agreement (the "Non-Designated Employees") who are terminated without cause within 180 days after consummation of the Sale or other Plan Transaction, each Non-Designated Employee shall promptly receive from Existing Employer a lump sum severance payment equal to one week of salary for every full year of employment by such Non-Employee with any Debtors or Non-Debtor JQH Entities (including any prior employment with Winegardner & Hammons, Inc. or a predecessor-in-interest of the Debtors) up to twenty (20) years of employment.[10]

JD Holdings (or its Affiliate) shall provide access to COBRA health insurance coverage to all Employees (both Designated Employees and Non-Designated Employees) who are terminated or resign upon consummation of the Sale or other Plan Transaction.

Prior to the Effective Date, each of Ms. Dowdy and Mr. Groves shall continue to perform their regular duties and the duties set forth in this Plan, the Settlement Agreement, and the Plan Support Agreement and receive their regular compensations and benefits provided to them by Existing Employer. Except as otherwise set forth in the Plans Supplement (as agreed to by the Debtors and JD Holdings) to be filed prior to the Confirmation Hearing (or other agreement), from and after the Effective Date Ms. Dowdy and Mr. Groves: (a) shall resign from their positions with JQH Management and each and every position they hold with any of the other Debtors (with the exception of their role as successor trustees of the JQH Trust) and (b) shall receive no further compensation from the Debtors in connection with their resignations from such management positions, *provided however,* that promptly upon their respective resignations from JQH Management, unless otherwise agreed to between the Debtors and JD Holdings and as set forth in the Plans Supplement, the Existing Employer or JD Holdings (or its Affiliate) shall pay in a lump sum the severance payable to Ms. Dowdy and Mr. Groves as set forth on Exhibit A to the Settlement Agreement.

With respect to all payments to be made by Existing Employer under this paragraph F, JD Holdings (or its Affiliate) shall cause Existing Employer to have sufficient Cash to make such payments.

---

[10] If a Non-Designated employee is offered employment in a location more than 50 miles from his or her current place of employment, the Non-Designated employee may reject such offer of employment without waiving his or her right to severance under this Article VII.F.

## ARTICLE VIII.
## EFFECTIVE DATE OF PLANS

### A.    *Binding Effect of Plans*

Subject to Section IX.B of these Plans, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), and 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plans shall be immediately effective and enforceable and binding upon the Debtors, the JQH Non-Debtor Entities, JD Holdings, the Sale Lender and any and all Holders of Claims and Equity Interests (irrespective of whether such Claims and Equity Interests accepted or are deemed to have accepted the Plans), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plans, all Entities acquiring or receiving property under the Plans, and all non-Debtor parties to Executory Contracts or Unexpired Leases with any Debtor, and all Releasing Parties. All Claims and Equity Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plans regardless of whether any Holder of a Claim or Equity Interest has supported the Plans. In addition, the discharges and releases set forth in this Article IX shall become effective and binding on the Effective Date.

### B.    *Discharge of Claims*

Except as otherwise expressly provided by section 1141 of the Bankruptcy Code or the Plans, and in consideration of the obligation of JD Holdings to make the Plans Distributions, any debt that arose before the Confirmation Date and any debt of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and all Claims of any nature will be released and discharged in full on the Effective Date, including any interest accrued thereon from and after the Petition Date, whether or not (i) a Proof of Claim based on such debt or obligation is Filed or deemed Filed under section 501 of the Bankruptcy Code, (ii) such Claim is Allowed or (iii) the Holder of such Allowed Claim supports the Plans.

### C.    *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plans, for good and valuable consideration, including the service of the JD Holdings Released Parties and the Trustees Released Parties to facilitate the reorganization of the Debtors, the consummation of the Plans Transactions and the implementation of the Plans, from and after the Effective Date, the Debtors (including the respective estates), for themselves and on behalf of their Affiliates, the JQH Non-Debtor Entities and the estate of John Q. Hammons, and each of the foregoing Entities' respective and current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries, donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing, including, without limitation, Greggory Groves and Jacqueline A. Dowdy, individually and in their respective capacities as co-successor trustees of the JQH Trust, and as officers, directors, and employees of any Debtors and JQH Non-Debtor Entities (in each case, in his, her, or its capacity as such, the "Debtor Releasing Parties"), hereby conclusively, absolutely, unconditionally, irrevocably, fully and forever release

24

and discharge each of the JD Holdings Released Parties and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of any federal state or other laws, or otherwise, that any of the Debtor Releasing Parties have asserted, could have asserted or might be entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors (including their respective estates); (ii) the Chapter 11 Cases; (iii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements between the Debtors and any Released Party (including the ROFR); (v) the restructuring of any Debtors or JQH Non-Debtor Entities; (vi) the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plans Documents or other agreements, instruments or documents relating to the Plans; or (viii) the subject matter of the Delaware Litigation. Notwithstanding anything to the contrary in the Plans, the foregoing release does not release any obligations of any Entity under the Plans or any Plans Documents executed to consummate any Plan Transactions, or other agreement, instrument or documents executed to implement the Plans.

D.      *Releases by JD Holdings*

Except as otherwise specifically provided in the Plans, for good and valuable consideration, including the service of the Debtors Released Parties and the Trustees Released Parties to facilitate the reorganization of the Debtors, the consummation of the Plans Transactions and the implementation of the Plans, from and after the Effective Date, the JD Holdings, for itself and on behalf of its Affiliates, and each of the foregoing Entities' respective and current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries, donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing, including, without limitation, Jonathan D. Eilian and Ronald C. Brown, individually and in their respective capacities as officers, directors, and employees of any JD Holdings or any of its Affiliates (in each case, in his, her, or its capacity as such, the "JD Holdings Releasing Parties"), hereby conclusively, absolutely, unconditionally, irrevocably, fully and forever release and discharge each of the Debtors Released Parties and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of any federal state or other laws, or otherwise, that any of the JD Holdings Releasing Parties have asserted, could have asserted or might be entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors (including their respective estates); (ii) the Chapter 11 Cases; (iii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements between the Debtors and any Released Party (including the ROFR); (v) the restructuring of any Debtors or JQH Non-Debtor

25

Entities; (vi) the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plans Documents or other agreements, instruments or documents relating to the Plans; (viii) the subject matter of the Delaware Litigation; or (ix) the probate estates of John Q. Hammons and Juanita Hammons. Notwithstanding anything to the contrary in the Plans, the foregoing release does not release any obligations of any Entity under the Plans or any Plans Documents executed to consummate any Plan Transactions, or other agreement, instrument or documents executed to implement the Plans.

E.      *Exculpation*

Except as otherwise specifically provided in the Plans, no Exculpated Party shall be responsible or have any liability for, and each Exculpated Party is hereby released and exculpated from, any claim, Cause of Action, duty, obligation, liability, damage, loss, cost or expense for (i) any act taken or not taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Disclosure Statement, Plans, Confirmation, Plans Transactions, the Plans, or any Plan Documents or other agreement, document, instrument or release created or entered into in connection with the Plans; (ii) any act taken or not taken in connection with, or related to, the negotiation of Cure Costs; (iii) any act taken or not taken in connection with, or related to, the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases; or (iv) any other prepetition or post-petition act taken or not taken in connection with, or related to, the restructuring of the Debtor, except for (A) willful misconduct (including fraud), (B) the rights of any Entity to enforce the Plans and the Plans Documents, or (C) the rights of any Entity to enforce any Final Order, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties, responsibilities and obligations under the Plans or any Final Order.

F.      *Dismissal of Delaware Litigation*

Upon consummation of the Sale of the 27 hotels being financed by the Sale Lender, Debtors and JD Holdings shall, and shall cause their Affiliates, and Debtors shall cause the estate of John Q. Hammons, to take all such actions necessary to dismiss the Delaware Litigation and all pending appeals in the Chapter 11 Cases, with prejudice to all parties thereto.

G.      *Third Party Releases by Holders of Claims and Equity Interests*

Except as otherwise specifically provided in the Plans, on and after the Effective Date, (1) each present and former Holder of a Claim or Equity Interest (other than JD Holdings and its Affiliates), and each of their respective Affiliates, and each of the foregoing Entities' respective current and former shareholders, members (including ex-officio members), partners, directors, principals, managers, officers, trustees, beneficiaries (including undesignated beneficiaries), donees, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and the predecessors, successors and assigns of each of the foregoing (in each case, in his, her, or its capacity as such, a "Third-Party Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, fully and forever released and discharged the JD Holdings Released

26

Parties, the Debtors Released Parties, and the Trustees Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of any federal, state or other laws or otherwise, that each Third-Party Releasing Party have asserted, could have asserted or might be entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, or in connection with, in whole or in part, (i) the Debtors; (ii) the Chapter 11 Cases; (iii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is the subject of the Plans; (iv) the business or contractual arrangements between the Debtors and any Released Party; (v) the restructuring of any Debtors or JQH Non-Debtor Entities; (vi) the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases; (vii) the negotiation, formulation, or preparation of the Plans and the Disclosure Statement, Plan Documents or other agreements, instruments, or documents relating to the Plans; (viii) any act taken or not taken in connection with, or related to, the negotiation of Cure Costs; (ix) the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases; (x) the probate estates of John Q. Hammons and Juanita Hammons; and (xi) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

H.     *Preservation, Transfer, and Waiver of Rights of Action*

All rights to commence and pursue any and all Causes of Action, whether arising before, on or after the Petition Date, including the Debtors' right to commence, prosecute, or settle such Causes of Action, shall be transferred to JD Holdings on the Effective Date, and JD Holdings thereafter shall commence, prosecute, terminate, or settle such Causes of Action in its sole discretion. If any Causes of Action cannot be transferred to JD Holdings under applicable law, such Causes of Action shall be retained by the Debtors notwithstanding the occurrence of the Effective Date, and Debtors shall commence, prosecute, terminate, or settle such Causes of Action solely at JD Holdings' direction, in JD Holdings' sole discretion, and at JD Holdings' expense.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption of Executory Contracts and Unexpired Leases*

JD Holdings shall have until the Effective Date to identify the Rejected Executory Contracts and Unexpired Leases.  Any Assumed Agreements not identified as Rejected Executory Contracts and Unexpired Leases shall be assumed and assigned to JD Holdings as of the Effective Date.

Non-Debtor parties to the Assumed Agreements shall File, within twenty (20) days following the Effective Date, a proposed amount of the Cure Costs, and the assumption and assignment of such Assumed Agreement may be conditioned upon the disposition of all issues with respect to such Cure Costs.

*B.      Rejection of Executory Contracts and Unexpired Leases*

All Rejected Executory Contracts and Unexpired Leases shall be deemed rejected on the Effective Date, except for those Executory Contracts and Unexpired Leases that have been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date.

Non-Debtor parties to Rejected Executory Contracts and Unexpired Leases shall have the right to assert a Claim on account of the rejection of such Rejected Executory Contracts and Unexpired Leases, including under section 502(g) of the Bankruptcy Code, which shall be Filed within twenty (20) days after the Effective Date.

## ARTICLE X.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

*A.      Allowance of Claims and Equity Interests*

After the Effective Date, JD Holdings shall have and retain all rights, claims and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Section I.A.5 hereof or the Bankruptcy Code.

*B.      Administration of Claims and Equity Interests*

Except as otherwise provided in the Plans, after the Effective Date, JD Holdings shall have the sole and exclusive right and authority to (1) File, withdraw, or litigate to judgment, objections to Claims and Equity Interests, (2) settle or compromise any disputed Claim or Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

*C.      Interest*

Unless otherwise (1) specifically provided for in the Plans or the Confirmation Order, (2) agreed to in writing by JD Holdings, or (3) allowed pursuant to Court order, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Additionally, and without limiting the foregoing, and except as otherwise set forth in the Plans or the Confirmation Order, if any Disputed Claim becomes an Allowed Claim, interest shall not accrue or be paid on such disputed portion of such Disputed Claim with respect to the period from the Effective Date to the date a final Plans Distribution is made on account of such Disputed Claim unless otherwise (1) specifically provided for in the Plans or the Confirmation Order, (2) agreed to in writing by JD Holdings, or (3) allowed pursuant to Court order.

28

*D.*      *Deadline to File Objections to Claims*

Any objections to any Claims shall be Filed no later than the Claims Objection Bar Date.

*E.*      *New Claims and Amendments to Claims*

A Claim may not be Filed or amended on or after the Effective Date without the prior authorization of the Bankruptcy Court or JD Holdings, and any such new or amended Claim Filed without such authorization shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE XI.
## MODIFICATION, AMENDMENT, REVOCATION OR WITHDRAWAL OF PLANS

*A.*      *Modification and Amendments*

Except as otherwise specifically provided in the Plans, JD Holdings reserves the right to modify or amend the Plans prior to the Confirmation Date as to material terms and to seek Confirmation as modified or amended consistent with the Bankruptcy Code, provided, however, that such modifications or amendments shall not be inconsistent with the terms and conditions of the PSA and Settlement Agreement.

*B.*      *Effect of Confirmation on Modifications and Amendments*

The entry of a Confirmation Order shall mean that all modifications or amendments to the Plans since the solicitation of approval for such Plans are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

*C.*      *Revocation or Withdrawal of Plans*

JD Holdings reserves the right to revoke or withdraw the Plans prior to the Confirmation Date and to File subsequent chapter 11 plans, provided that such plans shall not be inconsistent with the terms and conditions of the PSA and Settlement Agreement.

## ARTICLE XII.
## RETENTION OF JURISDICTION

The Bankruptcy Court would retain any jurisdiction it has to the maximum extent possible to interpret the Plans, its Confirmation Order, the PSA, and the Settlement Agreement, and all matters relating thereto.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.    Additional Documents

JD Holdings shall File the Plans Supplement no later than seven (7) days before the Confirmation Hearing. The Plans Supplement shall include such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms of the Plans.

### B.    Reservation of Rights

Except as expressly set forth in the Plans, the Plans shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order. None of the Filing of the Plans, any statement or provision in the Plans, or the taking of any action by the Debtors or JD Holdings with respect to the Plans or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of JD Holdings or the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

If any objections to Confirmation are Filed, JD Holdings may choose to pursue Confirmation and proceed with the Confirmation Hearing as to some Debtors, but not others upon notice in writing to the Entity making such objection.

### C.    Successors and Assigns

Except as expressly set forth in the Plans, the rights, benefits, and obligations of any Entity named or referred to in the Plans shall be binding on, and shall inure to the benefit of, (i) any heir, devisee, donee, executor, administrator, guardian of any such individual, and (ii) any Affiliate of such Entity, and each of the foregoing Entities' respective shareholders, members, partners, directors, principals, managers, officers, trustees, beneficiaries, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, and (iii) the predecessors, successors and assigns or each of the foregoing Entities in clauses (i) and (ii).

### D.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plans to be served on or delivered to:

JD Holdings, shall be served on:

JD Holdings, L.L.C.
1114 Avenue of the Americas, 39th
Floor
New York, New York 10036
Attn: General Counsel
Tel: (212) 730-7211
bcameron@atriumllc.com

30

With a copy to:

Jonathan Margolies (MO 30770)
McDowell, Rice, Smith & Buchanan
Skelly Building, Suite 350 (KS Fed
70693)
605 West 47th Street
Kansas City, Missouri 64112
Tel: (816) 753-5400
Fax: (816) 753-9996
jmargolies@mcdowellrice.com

Scott A. Edelman
Jed M. Schwartz
MILBANK, TWEED, HADLEY &
McCLOY LLP
28 Liberty Street
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219
sedelman@milbank.com
jschwartz@milbank.com

Mark Shinderman
MILBANK, TWEED, HADLEY &
McCLOY LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067-3019
Tel: (424) 386-4000
Fax: (213) 629-5063
mshinderman@milbank.com

The Debtors shall be served on:

Nicholas Zluticky
STINSON LEONARD STREET LLP
1201 Walnut Street
Suite 2900
Kansas City, Missouri 64106
Tel: (816) 691-3278
Fax: (816) 691-3495
nicholas.zluticky@stinson.com

31

After the Effective Date, JD Holdings shall have the right to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have Filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

E.    *Entire Agreement*

Except as otherwise indicated, the Plans supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on subjects and matters addressed in the Plans, all of which have become merged and integrated into the Plans.

F.    *Non-severability of Plans Provisions*

If, prior to Confirmation, any term or provision of the Plans is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose and intent of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plans shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plans, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plans and may not be deleted or modified without the consent of JD Holdings, and (3) non-severable and mutually dependent.

G.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, JD Holdings shall be deemed to have solicited acceptance of the Plans in good faith and in compliance with the Bankruptcy Code.

H.    *Waiver or Estoppel*

**Each Holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, if such agreement was not disclosed in the Plans, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

I.    *Conflicts*

Except as set forth in the Plans, to the extent that any provision of the Disclosure Statement, the Plans Supplement, or any other order (other than the Confirmation Order) referenced in the Plans (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the

Plans, unless otherwise ordered by the Bankruptcy Court, the portion of the Plans shall govern and control.

**JD HOLDINGS, L.L.C.**

By: _____

Name: <u>Ronald C. Brown</u>

Title: <u>President</u>

33

**SCHEDULE 1**
**List of Debtors**

1.      ACLOST, LLC

2.      Bricktown Residence Catering Co. Inc.

3.      Chateau Catering Co. Inc.

4.      Chateau Lake, LLC

5.      City Centre Hotel Corporation

6.      Civic Center Redevelopment Corp

7.      Concord Golf Catering Co. Inc.

8.      Concord Hotel Catering Co. Inc.

9.      East Peoria Catering Co. Inc.

10.     Fort Smith Catering Co. Inc.

11.     Franklin/Crescent Catering Co. Inc.

12.     Glendale Coyotes Catering Co. Inc.

13.     Glendale Coyotes Hotel Catering Co. Inc.

14.     Hammons of Arkansas, LLC

15.     Hammons of Colorado LLC

16.     Hammons of Franklin, LLC

17.     Hammons of Frisco, LLC

18.     Hammons of Huntsville, LLC

19.     Hammons of Lincoln, LLC

20.     Hammons of New Mexico, LLC

21.     Hammons of Oklahoma City, LLC

34

22. Hammons of Richardson, LLC

23. Hammons of Rogers, Inc.

24. Hammons of Sioux Falls, LLC

25. Hammons of South Carolina, LLC

26. Hammons of Tulsa, LLC

27. Hammons, Inc.

28. Hampton Catering Co. Inc.

29. Hot Springs Catering Co. Inc.

30. Huntsville Catering, LLC

31. International Catering Co. Inc.

32. John Q. Hammons 2015 Loan Holdings, LLC

33. John Q. Hammons Center, LLC

34. John Q. Hammons Fall 2006, LLC

35. John Q. Hammons Hotels Development, LLC

36. John Q. Hammons Hotels Management I Corporation

37. John Q. Hammons Hotels Management II, L.P.

38. John Q. Hammons Hotels Management, LLC

39. Joplin Residence Catering Co. Inc.

40. JQH - Allen Development, LLC

41. JQH - Concord Development LLC

42. JQH - East Peoria Development, LLC

43. JQH - Ft. Smith Development, LLC

44. JQH - Glendale, AZ Development, LLC

45. JQH - Kansas City Development, LLC

46. JQH - La Vista Conference Center Development, LLC

47. JQH - La Vista CY Development, LLC

48. JQH - La Vista III Development, LLC

49. JQH - Lake of the Ozarks Development LLC

50. JQH - Murfreesboro Development, LLC

51. JQH - Normal Development, LLC

52. JQH - Norman Development, LLC

53. JQH - Oklahoma City Bricktown Development, LLC

54. JQH - Olathe Development, LLC

55. JQH - Pleasant Grove Development LLC

56. JQH - Rogers Convention Center Development, LLC

57. JQH - San Marcos Development, LLC

58. Junction City Catering Co., Inc.

59. KC Residence Catering Co., Inc.

60. La Vista CY Catering Co., Inc.

61. La Vista ES Catering Co., Inc.

62. Lincoln P Street Catering Co., Inc

63. Loveland Catering Co., Inc.

64. Manzano Catering Co., Inc.

65. Murfreesboro Catering Co., Inc.

66. Normal Catering Co., Inc.

67. OKC Courtyard Catering Co., Inc.

68. R-2 Operating Co., Inc.

69. Richardson Renaissance Catering Co., Inc.

70. Rogers ES Catering Co., Inc.

71. SGF-Courtyard Catering Co., Inc.

72. Sioux Falls Convention/Arena Catering Co., Inc.

73. St. Charles Catering Co., Inc.

74. The Revocable Trust of John Q. Hammons dated December

75. Tulsa/169 Catering Co., Inc.

76. U.P. Catering Co., Inc.

**SCHEDULE 2**
**List of JQH Non-Debtor Entities**

1. Allen CY Catering Co., Inc.

2. Arkansas Pinnacle Catering Co., Inc.

3. Baker Smith Jones Inc.

4. Blue Hill Company

5. Burger Station, LLC (successor in interest to Burger Station, Inc.)

6. Des Plaines Development Holdings, LLC (successor in interest to Des Plaines Development Corporation)

7. Des Plaines Development Limited Partnership

8. Eisemann Renaissance Club Company

9. Frisco Catering Co., Inc.

10. Harrah's Joliet Landco LLC

11. Highland Springs, LLC (successor in interest to Highland Springs Corporation)

12. Highland Springs Country Club, Inc.

13. Highland Springs Realty, Inc.

14. John Q. Hammons Accounting Services, LLC

15. John Q. Hammons Film Entertainment, LLC (successor in interest to John Q. Hammons Film Entertainment, Inc.)

16. John Q. Hammons Industries, Inc.

17. JQH - Springfield Courthouse, LLC

18. JQH Industries, LLC (successor in interest to JQH Industries, Inc.)

19. JQH Springfield Tower, LLC

20. Plaza Associates Partnership

38

21.    Plaza Realty and Management Services, Inc.

22.    REW/JQH Holdings, Inc. (merged into W&H Realty, LLC)

23.    Richardson Renaissance Catering Co., Inc.

24.    San Marcos ES Catering Co., Inc.

25.    SGF/Residence Catering Co., Inc.

26.    The Tower Club of Springfield, Inc.

27.    Tiffany Greens, LLC (successor in interest to Tiffany Greens, Inc.)

28.    T-K Enterprises, Inc.

29.    University Plaza Redevelopment Corporation

30.    W&H Realty, LLC (successor in interest to W&H Realty Inc.)

31.    Winegardner & Hammons Inc. (merged into W&H Realty, LLC)

32.    Any other Entity in which JQH Trust or any Debtors holds any Equity
       Interests in such Entity, but which Entity is not a Debtor

# APPENDIX 2

## List of Debtors

1.   ACLOST, LLC

2.   Bricktown Residence Catering Co. Inc.

3.   Chateau Catering Co. Inc.

4.   Chateau Lake, LLC

5.   City Centre Hotel Corporation

6.   Civic Center Redevelopment Corp

7.   Concord Golf Catering Co. Inc.

8.   Concord Hotel Catering Co. Inc.

9.   East Peoria Catering Co. Inc.

10.  Fort Smith Catering Co. Inc.

11.  Franklin/Crescent Catering Co. Inc.

12.  Glendale Coyotes Catering Co. Inc.

13.  Glendale Coyotes Hotel Catering Co. Inc.

14.  Hammons of Arkansas, LLC

15.  Hammons of Colorado LLC

16.  Hammons of Franklin, LLC

17.  Hammons of Frisco, LLC

18.  Hammons of Huntsville, LLC

19.  Hammons of Lincoln, LLC

20.  Hammons of New Mexico, LLC

21.    Hammons of Oklahoma City, LLC

22.    Hammons of Richardson, LLC

23.    Hammons of Rogers, Inc.

24.    Hammons of Sioux Falls, LLC

25.    Hammons of South Carolina, LLC

26.    Hammons of Tulsa, LLC

27.    Hammons, Inc.

28.    Hampton Catering Co. Inc.

29.    Hot Springs Catering Co. Inc.

30.    Huntsville Catering, LLC

31.    International Catering Co. Inc.

32.    John Q. Hammons 2015 Loan Holdings, LLC

33.    John Q. Hammons Center, LLC

34.    John Q. Hammons Fall 2006, LLC

35.    John Q. Hammons Hotels Development, LLC

36.    John Q. Hammons Hotels Management I Corporation

37.    John Q. Hammons Hotels Management II, L.P.

38.    John Q. Hammons Hotels Management, LLC

39.    Joplin Residence Catering Co. Inc.

40.    JQH - Allen Development, LLC

41.    JQH - Concord Development LLC

42.    JQH - East Peoria Development, LLC

43.    JQH - Ft. Smith Development, LLC

44. JQH - Glendale, AZ Development, LLC

45. JQH - Kansas City Development, LLC

46. JQH - La Vista Conference Center Development, LLC

47. JQH - La Vista CY Development, LLC

48. JQH - La Vista III Development, LLC

49. JQH - Lake of the Ozarks Development LLC

50. JQH - Murfreesboro Development, LLC

51. JQH - Normal Development, LLC

52. JQH - Norman Development, LLC

53. JQH - Oklahoma City Bricktown Development, LLC

54. JQH - Olathe Development, LLC

55. JQH - Pleasant Grove Development LLC

56. JQH - Rogers Convention Center Development, LLC

57. JQH - San Marcos Development, LLC

58. Junction City Catering Co., Inc.

59. KC Residence Catering Co., Inc.

60. La Vista CY Catering Co., Inc.

61. La Vista ES Catering Co., Inc.

62. Lincoln P Street Catering Co., Inc

63. Loveland Catering Co., Inc.

64. Manzano Catering Co., Inc.

65. Murfreesboro Catering Co., Inc.

66. Normal Catering Co., Inc.

67. OKC Courtyard Catering Co., Inc.

68. R-2 Operating Co., Inc.

69. Richardson Renaissance Catering Co., Inc.

70. Rogers ES Catering Co., Inc.

71. SGF-Courtyard Catering Co., Inc.

72. Sioux Falls Convention/Arena Catering Co., Inc.

73. St. Charles Catering Co., Inc.

74. The Revocable Trust of John Q. Hammons dated December

75. Tulsa/169 Catering Co., Inc.

76. U.P. Catering Co., Inc.

**APPENDIX 3**

**List of JQH Non-Debtor Entities**

1. Allen CY Catering Co., Inc.

2. Arkansas Pinnacle Catering Co., Inc.

3. Baker Smith Jones Inc.

4. Blue Hill Company

5. Burger Station, LLC (successor in interest to Burger Station, Inc.)

6. Des Plaines Development Holdings, LLC (successor in interest to Des Plaines Development Corporation)

7. Des Plaines Development Limited Partnership

8. Eisemann Renaissance Club Company

9. Frisco Catering Co., Inc.

10. Harrah's Joliet Landco LLC

11. Highland Springs, LLC (successor in interest to Highland Springs Corporation)

12. Highland Springs Country Club, Inc.

13. Highland Springs Realty, Inc.

14. John Q. Hammons Accounting Services, LLC

15. John Q. Hammons Film Entertainment, LLC (successor in interest to John Q. Hammons Film Entertainment, Inc.)

16. John Q. Hammons Industries, Inc.

17. JQH - Springfield Courthouse, LLC

18. JQH Industries, LLC (successor in interest to JQH Industries, Inc.)

19. JQH Springfield Tower, LLC

20. Plaza Associates Partnership

21. Plaza Realty and Management Services, Inc.

22. REW/JQH Holdings, Inc. (merged into W&H Realty, LLC)

23. Richardson Renaissance Catering Co., Inc.

24. San Marcos ES Catering Co., Inc.

25. SGF/Residence Catering Co., Inc.

26. The Tower Club of Springfield, Inc.

27. Tiffany Greens, LLC (successor in interest to Tiffany Greens, Inc.)

28. T-K Enterprises, Inc.

29. University Plaza Redevelopment Corporation

30. W&H Realty, LLC (successor in interest to W&H Realty Inc.)

31. Winegardner & Hammons Inc. (merged into W&H Realty, LLC)

32. Any other Entity in which JQH Trust or any Debtors holds any Equity Interests in such Entity, but which Entity is not a Debtor

# APPENDIX 4

## Sources and Uses[1]
### (in thousands)

**Sources**

| | | |
|---|---|---:|
| New loan from Goldman Sachs Mortgage Company | $ | 1,000,000 |
| JD Holdings Equity | | 200,000 |
| **Total Sources** | **$** | **1,200,000** |

**Uses[2]**

| | | |
|---|---|---:|
| Mortgage Debt Secured by Hotels[3] | $ | 960,099 |
| Potential Yield Maintenance at Payoff[4] | | 50,000 |
| Mortgage Debt Secured by Non-Hotel Land Owned by Trust[3] | | 34,696 |
| Debt Owed to Fifth Third Bank on Airplane[3] | | 2,806 |
| Debt Owed to First National Bank of Omaha on Loveland land[3] | | 382 |
| Estimated Amount of Allowed Unsecured Claims[3] | | 27,149 |
| Estimated Amount of Allowed Non-Debtor Guaranty Claims[3] | | 10,000 |
| Bankruptcy Exit Costs[3] | | 30,000 |
| Cash to SFI Belmont | | 45,849 |
| Cash Contribution to New Charitable Trust | | 2,000 |
| JD Holdings Reserve for Disputed Claims and Unknown Liabilities | | 37,019 |
| **Total Uses** | **$** | **1,200,000** |

---

[1] This Sources and Uses statement assumes no assumption of the Goldman 7 Loan or Prudential Loan. If the Goldman 7 Loan and/or Prudential Loan are assumed, certain amounts in this Sources and Uses statement will be reduced accordingly.

[2] The amounts set forth for the Uses does not constitute an admission that any disputed Claims are Allowed. Whether a Claim is Allowed will be determined in accordance with the Plans.

[3] This amount is set forth in the *Disclosure Statement With Respect To Debtor's Joint Unimpairment Plan of Reorganization* filed by the Debtors on December 20, 2017 [ECF 1583]. JD Holdings does not make any representation or warranty about the accuracy of such amount.

[4] This amount is based on Debtors' statement at the hearing in the Bankruptcy Court on January 23, 2018, regarding the Goldman 7 Loan and Prudential Loan that "it would not be unreasonable for you to add to the debt amounts that we accurately set forth in the disclosure statement, a yield maintenance number in the range of $50 million."

**APPENDIX 5**

**Equity Letter**



February 5, 2018

ATTN JED SCHWARTZ
MILBANK
28 LIBERTY STREET
NEW YORK NY 10005-1413

Dear Mr. Schwartz:

I am writing to confirm to you that Jonathan D. Eilian, and the entities that he controls, had marketable securities, in excess of $200,000,000.00, readily available for liquidation, as of January 31, 2018.

Brokerage holdings must be sold █████████████ before proceeds are available for withdrawal from the brokerage account. Proceeds are available for withdrawal on the settlement date of the executed trade(s). The settlement period for brokerage trades varies based on the security type. Most domestic stock, bond, and American Depositary Receipt (ADR) trades settle on the second business day after the trade date. ████████████ held in a brokerage account can be exchanged to another fund or redeemed by submitting a sell. Proceeds of █████████ redemption are sent on the settlement date (generally, the business day following the trade date).

If you have any questions, please call me at **800-**███████ on business days from 8 a.m. to 10 p.m., Eastern time. If I'm unavailable, you can speak with another representative, or you can leave me a voice mail and I will return your call.

Sincerely,



Registered Representative

, member FINRA and SIPC.

# APPENDIX 6

## Finance Letter

**Goldman Sachs Mortgage Company**
**200 West Street**
**New York, New York 10282**

<u>**PERSONAL AND CONFIDENTIAL**</u>

February 6, 2018

JD Holdings, L.L.C.
c/o Atrium Holding Company
1114 Avenue of the Americas, 39th
New York, NY 10036
Attn: Jonathan D. Eilian

Ladies and Gentlemen:

You have advised Goldman Sachs Mortgage Company ("GSMC" and together with its affiliates, "Goldman Sachs") that JD Holdings, L.L.C. or its affiliates (the "Company") intends to acquire pursuant to a plan of reorganization (the "Acquisition") all or substantially all of the real property assets (and certain related personalty) (the "Properties") owned by The Revocable Trust of John Q. Hammons, dated December 29, 1989, as amended and restated (the "JQH Trust"), and the affiliates of JQH Trust that hold any of the Properties, certain of which are debtors and debtors in possession, in the bankruptcy cases pending in the United States Bankruptcy Court for the District of Kansas (the "Court") jointly administered as *In re John Q. Hammons Fall 2006, LLC,* Case No. 16-21142.11 (the "Seller"). You have advised us that the Acquisition will be financed from a combination of equity contributed by the Company in cash (the "Equity Contribution") and indebtedness of approximately $1.0 billion (the "Loan") to be incurred by the Company (or affiliates thereof). The Loan will be secured by (i) first mortgages on a portfolio of thirty-five hotels more fully described in the attached Exhibit A (and such other assets described on Exhibit A as Lender shall determine in its sole discretion) and (ii) pledges of the equity interests in the borrower under the Loan (the "Borrower") in connection with any mezzanine component of the financing. You have consulted with Goldman Sachs concerning the proposed Loan.

In connection with this letter, we have relied without independent verification upon the accuracy and completeness of all of the financial, accounting, tax and other information reviewed by us for purposes of this letter. Based on the information available to us to date, and assuming satisfactory market conditions for commercial mortgage loans and capital markets, as applicable, and subject to the immediately succeeding paragraph and such other matters as we consider relevant, we are pleased to inform you that, as of the date hereof, we are highly confident that the structuring and syndication of the Loan can be accomplished by Goldman Sachs as part of the financing for the Acquisition as described above. We are also pleased to inform you that we have received the appropriate internal approvals to issue this letter to you.

Our ability to consummate the closing of the Loan is subject to the satisfaction of conditions customary for financings of the type contemplated hereby or otherwise deemed appropriate by Goldman Sachs for this transaction, including, without limitation, (i) the satisfactory completion

of our due diligence investigation with respect to the Properties, and such due diligence investigation not disclosing any facts that would materially alter our current view with respect to the Properties taken as a whole, (ii) to the extent there exists or occurs with respect to any Property material defects (including any material matters disclosed by current engineering, environmental, seismic, title and zoning reports), or there are any circumstances or conditions with respect to any Property, the Borrower or Company that either have or are reasonably expected to have a material adverse effect on the value of the Loan (or of certificates issued in a rated securitization containing the Loan) or on the obligors' performance thereunder, as reasonably determined by Lender, then (x) Borrower shall covenant to correct such defects, including providing appropriate insurance as reasonably determined by Lender, promptly following the Closing Date, and (y) Lender may establish one or more special reserves in respect thereof, up to the full loan amount allocated to the applicable Property, and (iii) the Court shall have entered a confirmation order confirming a plan of reorganization, which order shall have become final and non-appealable, and both of which shall be in form and substance acceptable to Goldman Sachs in its sole discretion, which discretion shall be exercised in good faith, with respect to any provision that could affect in any manner, and in Goldman Sachs's sole determination, (a) the Properties, (b) the assets listed on Exhibit A, (c) the ability of the Company to perform its obligations in connection with the Loan, or (d) the legal rights, obligations or liabilities of Goldman Sachs in its capacity as a lender to the Company, including, for the avoidance of doubt, with respect to any provisions which, if inclusive of Goldman Sachs, would affect such rights, obligations or liabilities.. Further, at Borrower's option exercised prior to closing of the Loan, Borrower may remove from the collateral up to eight Properties, and the Loan amount will be adjusted accordingly.

Obtaining financing for the Acquisition is inherently subject to uncertainties and contingencies beyond our control; accordingly, this letter is not a commitment by GSMC or any of its affiliates to provide the Loan. Any such commitment would be subject to (i) receipt of internal Goldman Sachs committee approvals, (ii) the terms and conditions of the Loan and all related documentation being executed and delivered and satisfactory in form and substance to Goldman Sachs, (iii) the terms and conditions of the Acquisition (including purchase prices and the receipt of necessary governmental, regulatory or other third party consents and approvals), the Equity Contribution and all related documentation being in form and substance satisfactory to Goldman Sachs, and (iv) satisfaction of other conditions customary for financings of the type contemplated hereby or otherwise deemed appropriate by Goldman Sachs for this transaction. The structure, covenants and terms of the Loan will be determined by Goldman Sachs, in consultation with the Company, based on market conditions at the time of the issuance of a binding Loan commitment (if any) and on the structure and documentation of the Acquisition. Based on our experience dealing with loans similar to the Loan, and our experience closing loans with affiliates of the Company, we would expect that, once we have access to all available information relating to the Properties, and subject to the satisfaction of conditions customary for financings of the type contemplated hereby or otherwise deemed appropriate by Goldman Sachs for this transaction, we would be in a position to issue a binding commitment for the Loan within a fifteen business day period, assuming diligent cooperation by the Company with respect to the same.

This letter and any written or oral communications provided by us are exclusively for your information and assistance in evaluating the financing of the Acquisition and may not be used, circulated, quoted or otherwise referred to with any other person or for any other purpose; nor is

this letter or any such communications or information contained therein to be filed with, included in or referred to in whole or in part in any registration statement, proxy statement or any other document, except in each case in accordance with the prior written consent of Goldman Sachs. Notwithstanding the foregoing, this letter may be shown to the Seller and its advisors and counsel, provided that the Seller, its advisors and counsel each agree to treat this letter as confidential, and may be submitted to the Court in connection with the Company's proposal relating to the Acquisition including being referenced in, and included as an exhibit to, the Company's disclosure statement to be filed with the Court in conjunction with the Company's proposed plan of reorganization.

The parties hereto agree that any suit or proceeding arising in respect of this letter or the matters discussed herein will be tried exclusively in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Company hereby submits to the exclusive jurisdiction of, and to venue in, such court.

In addition, please note that Goldman Sachs does not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, you are authorized to disclose to any person the U.S. federal and state income tax treatment and tax structure of the potential transaction and all materials of any kind (including tax opinions and other tax analyses) provided to you relating to that treatment and structure, without Goldman Sachs imposing any limitation of any kind. However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax structure" is limited to any facts that may be relevant to that treatment.

Very truly yours,

GOLDMAN SACHS MORTGAGE COMPANY

Name: Miriam Wheeler
Title: Authorized Person

# Exhibit A

| Hotels | | | | | |
|---|---|---|---|---|---|
| **Hotel Name** | **Rooms** | **Street** | **City** | **State** | **Zip** |
| Embassy Suites by Hilton Albuquerque - Hotel & Spa | 261 | 1000 Woodward Place NE | Albuquerque | NM | 87102 |
| Courtyard by Marriott Dallas Allen at the John Q. Hammons Center | 228 | 210 E Stacy Rd | Allen | TX | 75022 |
| Chateau on the Lake Resort Spa and Convention Center | 301 | 415 North State Hwy 265 | Branson | MO | 65616 |
| Embassy Suites by Hilton Charlotte Concord Golf Resort & Spa | 308 | 5400 John Q. Hammons Dr. NW | Concord | NC | 28026 |
| Embassy Suites by Hilton East Peoria Riverfront Hotel & Conference Ce | 226 | 100 Conference Center Dr. | E. Peoria | IL | 61611 |
| Embassy Suites by Hilton Nashville South Cool Springs | 250 | 820 Crescent Centre Drive | Franklin | TN | 37067 |
| Embassy Suites Dallas Frisco Hotel Convention Center & Spa | 330 | 7600 John Q. Hammons Drive | Frisco | TX | 75034 |
| Courtyard by Marriott Fort Smith Downtown | 138 | 900 Rogers Avenue | Fort Smith | AR | 72901 |
| Renaissance Phoenix Glendale Hotel & Spa | 320 | 9495 West Coyotes Blvd | Glendale | AZ | 85305 |
| Embassy Suites by Hilton Hampton Hotel Convention Center & Spa | 295 | 1700 Coliseum Drive | Hampton | VA | 23666 |
| Embassy Suites Hot Springs - Hotel & Spa | 246 | 400 Convention Boulevard | Hot Springs | AR | 71901 |
| Embassy Suites by Hilton Huntsville Hotel & Spa | 295 | 800 Monroe Street | Huntsville | AL | 35801 |
| Residence Inn by Marriott Joplin | 114 | 3128 E. Hammons Boulevard | Joplin | MO | 64804 |
| Courtyard by Marriott Junction City | 119 | 310 Hammons Drive | Junction City | KS | 66441 |
| Residence Inn by Marriott Kansas City Airport | 152 | 10300 N Ambassador Dr | Kansas City | MO | 64153 |
| Courtyard by Marriott Omaha La Vista | 246 | 12560 Westport Parkway | La Vista | NE | 68128 |
| Embassy Suites by Hilton Omaha La Vista Hotel & Conference Center | 257 | 12520 Westport Parkway | La Vista | NE | 68128 |
| Embassy Suites Lincoln | 252 | 1040 P Street | Lincoln | NE | 68508 |
| Embassy Suites by Hilton Loveland Hotel Conference Center & Spa | 263 | 4705 Clydesdale Pkwy | Loveland | CO | 80538 |
| Embassy Suites by Hilton Nashville SE Murfreesboro | 283 | 1200 Conference Center Boulevard | Murfreesboro | TN | 37130 |
| Residence Inn by Marriott Charleston Airport | 150 | 5035 International Boulevard | N.Charleston | SC | 29418 |
| Bloomington-Normal Marriott Hotel & Conference Center | 228 | 201 Broadway Ave | Normal | IL | 61761 |
| Embassy Suites by Hilton Norman Hotel & Conference Center | 283 | 2501 Conference Dr | Norman | OK | 73069 |
| Residence Inn by Marriott Oklahoma City Downtown/Bricktown | 151 | 400 East Reno Avenue | Oklahoma City | OK | 73102 |
| Courtyard by Marriott Oklahoma City Downtown | 225 | 2 West Reno Avenue | Oklahoma City | OK | 73102 |
| Renaissance Dallas Richardson Hotel | 335 | 900 East Lookout Drive | Richardson | TX | 75082 |
| Embassy Suites Northwest Arkansas - Hotel, Spa & Convention Center | 400 | 3303 Pinnacle Hills Pkwy | Rogers | AR | 72758 |
| Embassy Suites by Hilton San Marcos Hotel Conference Center & Spa | 283 | 1001 McCarty Lane | San Marcos | TX | 78666 |
| Sheraton Sioux Falls & Convention Center | 243 | 1211 N. West Avenue | Sioux Falls | SD | 57104 |
| Holiday Inn Express & Suites Springfield | 120 | 1117 E. St. Louis St. | Springfield | MO | 65806 |
| Residence Inn by Marriott Springfield | 136 | 1303 E. Kingsley Street | Springfield | MO | 65806 |
| Courtyard by Marriott Springfield Airport | 142 | 3527 W. Kearney | Springfield | MO | 65803 |
| University Plaza Hotel & Convention Center | 267 | 333 John Q. Hammons Pkwy | Springfield | MO | 65806 |
| Embassy Suites by Hilton St. Louis St. Charles | 296 | Two Convention Center Plaza | Saint Charles | MO | 63303 |
| Renaissance Tulsa Hotel & Convention Center | 300 | 6808 South 107th East Ave. | Tulsa | OK | 74133 |
| | #### | | | | |

| Land | | | |
|---|---|---|---|
| **Asset Description** | **Acres** | **City** | **State** |
| Tiffany Greens, Inc. (Vacant Land) | 743.6 | Kansas City | MO |
| Kanis Blvd. (4 different lots) | 4.5 | Little Rock | AR |
| Kanis Road (2 different lots) | 3.4 | Little Rock | AR |
| Tulsa Commons (4 different lots) | 21.4 | Tulsa | OK |
| Table Rock Lake Development (2 lots) | 87.4 | Branson | MO |
| Winegard Land | 71.8 | Branson | MO |
| Commercial Site | 2.8 | Albuquerque | NM |
| Comm'l Site, I-44 and 3657 Kearney St | 9.8 | Springfield | MO |
| Merriman Land | 15.7 | Branson | MO |
| UP Warehouse Annex | 0.7 | Springfield | MO |
| Comm'l Lot - Tiffany, Springs Parkway | 4.8 | Kansas City | MO |
| 8000 Tiffany Spring Road – Commercial | 2.2 | Kansas City | MO |
| Chamber Parking Lot | 0.8 | Springfield | MO |
| Commercial Sites – N 2000 W | 11.9 | Pleasant Grove | UT |
| Commercial Site – SEC of I-15 & Pleasant Grove Blvd | 35.4 | Pleasant Grove | UT |
| Commercial Site, Parkwood Blvd | 11.3 | Frisco | TX |
| Comm'l and Ind. Site - 3 Separate Parcels | 63.4 | Joplin | MO |
| Osage Beach | 27.9 | Osage Beach | MO |
| Unimproved Residential Lots | 92 | Springfield | MO |
| Lot 11 | 11.2 | Olathe | KS |
| Commercial Site | 16 | Springfield | MO |
| Comm'l Site - Gulf Freeway and Airport Rd | 8.2 | Houston | TX |
| Lake Norman Property | 8 | Lake Norman | NC |

# Exhibit A

| | | | City | State |
|---|---|---|---|---|
| Comm'l Site | 14.5 | | Loveland | CO |
| Highland Springs Residential Lots | 20.4 | | Springfield | MO |
| Kinser House | 54.7 | | Springfield | MO |
| Osage Beach (Windjammer Drive) | 12.5 | | Osage Beach | MO |
| Comm'l Site | 4.9 | | Cedar Rapids | IA |
| Comm'l Site - I-44 and US 71 (2 separate lots) | 9 | | Joplin | MO |
| 1525 S Glenstone Site | 1.3 | | Springfield | MO |
| Burger Station Land (3 separate locations) | 1.6 | | Springfield | MO |
| Commercial Site - 1010 N Garnett Rd East | 6.3 | | Tulsa | OK |
| Comm'l Site - 1800 50th St (Back Lot) | 2.3 | | Des Moines | IA |
| Commercial (4 separate lots) | 2.1 | | Reno | NV |
| South Shore, 210 Highway 50 Property | 5 | | Lake Tahoe | NV |
| Walnut Street Lot (UP) | 0.2 | | Springfield | MO |
| Ingram Mill and Seminole Alley, Commercial | 0.5 | | Springfield | MO |

## Other Assets

| Asset Description | City | State |
|---|---|---|
| 1132 Running Springs #8 | | |
| 1136 E. St. Louis St (Improvement District) | Springfield | MO |
| Airplane | | |
| Enterprise Building and Land | Springfield | MO |
| Hammons Field Baseball Stadium and Parking Lot A | Springfield | MO |
| Highland Springs Golf Course and Country Club | Springfield | MO |
| Improved Residential—Sales Pavilion and Office Bldg. | Springfield | MO |
| Interests in Harrah's | | |
| Joplin Trade Center | Joplin | MO |
| JQH Building | Springfield | MO |
| JQH Industries, Inc. I44 Service Station & Land | Springfield | MO |
| JQH Residence | Springfield | MO |
| Oklahoma City Parking Garage | | |
| Parking Garage, Springfield (JV Carpark) | Springfield | MO |
| South Parking lot .97 acres | | |
| Sports Hall of Fame | | |
| Springfield Mini-Storage, Building and Land | Springfield | MO |
| The Café | Springfield | MO |
| The Hammons Tower | Springfield | MO |
| Tiffany Greens, Inc. Golf Course | Kansas City | MO |
| Tower Club | | |
| U.P. Warehouse Annex, Building | Springfield | MO |
| US Court House | Springfield | MO |

## Entities

**Name**
Blue Hill Company
Burger Station LLC
Des Plaines Development Holdings LLC
Highland Springs LLC
John Q Hammons Film Entertainment LLC
John Q Hammons Hotels Management LLC
JQH Accounting Services LLC
JQH Industries Inc
JQH Springfield Courthouse LLC
JQH Springfield Tower LLC
Plaza Associate Partnership
Plaza Realty & Management Services
W&H Realty LLC
Winegardner & Hammons, Inc.

## Catering Companies

**Name**
Allen CY Catering Co., Inc.

# Exhibit A

Arkansas Pinnacle Catering Co., Inc.
Bricktown Residence Catering Co. Inc.
Chateau Catering Co. Inc.
Concord Golf Catering Co. Inc.
Concord Hotel Catering Co. Inc.
East Peoria Catering Co. Inc.
Eisemann Renaissance Club Company
Fort Smith Catering Co. Inc.
Franklin/Crescent Catering Co. Inc.
Frisco Catering Co., Inc.
Glendale Coyotes Catering Co. Inc.
Glendale Coyotes Hotel Catering Co. Inc.
Hampton Catering Co. Inc.
Hot Springs Catering Co. Inc.
Huntsville Catering, LLC
International Catering Co. Inc.
Joplin Residence Catering Co. Inc.
Junction City Catering Co., Inc.
KC Residence Catering Co., Inc.
La Vista CY Catering Co., Inc.
La Vista ES Catering Co., Inc.
Lincoln P Street Catering Co., Inc
Loveland Catering Co., Inc.
Manzano Catering Co., Inc.
Murfreesboro Catering Co., Inc.
Normal Catering Co., Inc.
OKC Courtyard Catering Co., Inc.
R-2 Operating Co., Inc.
Richardson Renaissance Catering Co., Inc.
Rogers ES Catering Co., Inc.
San Marcos ES Catering Co., Inc.
SGF-Courtyard Catering Co., Inc.
SGF/Residence Catering Co., Inc.
Sioux Falls Convention/Arena Catering Co., Inc.
St. Charles Catering Co., Inc.
Tulsa/169 Catering Co., Inc.
U.P. Catering Co., Inc.

# APPENDIX 7

## APA

**PURCHASE AND SALE AGREEMENT**


**Between**


**JACQUELINE DOWDY AND GREGGORY GROVES AS SUCCESSOR TRUSTEES OF
THE REVOCABLE TRUST OF JOHN Q. HAMMONS,
DATED DECEMBER 28, 1989, AS AMENDED AND RESTATED
AND THE SELLING ENTITIES SET FORTH ON SCHEDULE A**
**collectively as Sellers,**


**and**


**JD HOLDINGS, L.L.C., a Connecticut limited liability company,**
**as Purchaser**

**Dated: As of _____, 2018**

# TABLE OF CONTENTS

ARTICLE I. Sale and Purchase; Property..................................................................... 1
    1.1      Sale and Purchase of the Property ............................................. 1
    1.2      Assumed Liabilities ................................................................... 5
    1.3      Assumption; Deemed Consents. ................................................ 6

ARTICLE II. Consideration ...................................................................................... 6
    2.1      Consideration ............................................................................ 6
    2.2      Earnest Money .......................................................................... 6
    2.3      Loan Assumptions .................................................................... 7

ARTICLE III. Inspection ......................................................................................... 8
    3.1      Inspection Period ...................................................................... 8
    3.2      Inspection ................................................................................. 8
    3.3      Inspection Obligations .............................................................. 9
    3.4      Property Conveyed "AS IS" ..................................................... 10

ARTICLE IV. Survey .............................................................................................. 13
    4.1      Survey ..................................................................................... 13

ARTICLE V. Title ................................................................................................... 14
    5.1      Title Report and Title Policy .................................................... 14

ARTICLE VI. Remedies .......................................................................................... 14
    6.1      Sellers' Remedies ..................................................................... 14
    6.2      Purchaser's Remedies .............................................................. 15
    6.3      Attorneys' Fees ....................................................................... 15
    6.4      Disposition of Earnest Money .................................................. 15
    6.5      Surviving Representations and Warranties ............................... 15

ARTICLE VII. Closing ............................................................................................ 16
    7.1      Closing Date ............................................................................ 16
    7.2      Closing Matters ....................................................................... 17
    7.3      Form of Conveyance ................................................................ 21
    7.4      Closing Costs ........................................................................... 21
    7.5      Intentionally Deleted.............................................**Error! Bookmark not defined.**
    7.6      Cooperation ............................................................................. 21
    7.7      Guest Baggage and Lost and Found ......................................... 21
    7.8      Safe Deposit Boxes .................................................................. 21

ARTICLE VIII. Condemnation ................................................................................ 22
    8.1      Condemnation .......................................................................... 22

ARTICLE IX. Casualty ............................................................................................ 22
    9.1      Casualty .................................................................................. 22

ARTICLE X. Representations and Warranties........................................................ 23

i

| | | | |
|---|---|---|---|
| 10.1 | Purchaser's Representations and Warranties | | 23 |
| 10.2 | Sellers' Representations and Warranties | | 23 |

**ARTICLE XI. Conditions and Covenants** ......................................................................... **26**
| | | | |
|---|---|---|---|
| 11.1 | Sellers' Covenants | | 26 |
| 11.2 | Conditions to Purchaser's Obligation to Close | | 26 |
| 11.3 | Failure to Satisfy Purchaser's Closing Conditions | | 28 |
| 11.4 | Conditions to Sellers' Obligation to Close | | 28 |

**ARTICLE XII. Intentionally Deleted** ..............................................Error! Bookmark not defined.

**ARTICLE XIII. Miscellaneous** ...................................................................................... **29**
| | | | |
|---|---|---|---|
| 13.1 | Entire Agreement | | 29 |
| 13.2 | Binding | | 29 |
| 13.3 | Effective Date | | 29 |
| 13.4 | Notice | | 29 |
| 13.5 | Time | | 31 |
| 13.6 | Governing Law; Submission to Jurisdiction | | 31 |
| 13.7 | Currency | | 31 |
| 13.8 | Section Headings | | 31 |
| 13.9 | Obligations | | 31 |
| 13.10 | Business Days | | 31 |
| 13.11 | No Recordation | | 31 |
| 13.12 | Multiple Counterparts | | 32 |
| 13.13 | Severability | | 32 |
| 13.14 | Waivers | | 32 |
| 13.15 | Negotiations | | 32 |
| 13.16 | Escrow Instructions | | 32 |
| 13.17 | No Partnership | | 32 |
| 13.18 | Intentionally Deleted | | 32 |
| 13.19 | Intentionally Deleted | | 32 |
| 13.20 | Limitation of Liability | | 32 |
| 13.21 | Intentionally Deleted | | **Error! Bookmark not defined.** |
| 13.22 | Exhibits and Schedules | | 33 |

Case 16-21142    Doc# 1900    Filed 03/16/18    Page 100 of 172

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>") dated as of _____, 2018, is made by and between Jacqueline Dowdy and Greggory Groves as Successor Trustees of the Revocable Trust of John Q. Hammons, dated December 28, 1989, as Amended and Restated (the "<u>JQH Trust</u>"), and the selling entities set forth on <u>Schedule A</u> attached hereto (individually, a "<u>Seller</u>" and, collectively with the JQH Trust, the "<u>Sellers</u>"), and JD Holdings, L.L.C., a Connecticut limited liability company ("<u>Purchaser</u>"; Sellers and Purchaser are referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>").

## RECITALS:

A. Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Kansas (the "<u>Court</u>"). Their cases are being jointly administered under Case No. 16-21142-11 (collectively the "<u>Bankruptcy Case</u>").

B. Subject to the terms, covenants, conditions and provisions in this Agreement and the *Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by JD Holdings, L.L.C.* filed in the United States Bankruptcy Court for the District of Kansas at ECF 1766 (the "<u>Plan</u>"), Sellers wish to sell and, subject to the entry of the order confirming the Plan (the "<u>Confirmation Order</u>"), Purchaser wishes to buy all property and assets of Sellers relating to the hotels set forth on Schedule B-1 (each, a "<u>Hotel</u>" and collectively, the "<u>Hotels</u>"), the other improved real estate set forth on Schedule B-2 (each, a "<u>Development</u>" and collectively, the "<u>Developments</u>"), and the unimproved real estate set forth on Schedule B-3 (the "<u>Vacant Land</u>") (the Hotels, the Developments and Vacant Land are referred to individually as a "<u>Business</u>" and collectively as the "<u>Businesses</u>"), free and clear of all claims, interests, liens, charges or other encumbrances (other than in connection with the Loan Assumptions as defined herein) and for the consideration and subject to the terms, covenants, conditions and provisions in this Agreement.

## AGREEMENT:

## ARTICLE I.
## Sale and Purchase; Property

1.1 **Sale and Purchase of the Property**. Pursuant to section 105, 363, 365 and 1129 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein and in the Confirmation Order, on the Closing Date or Closing Dates as set forth herein, Sellers agree to sell and convey unto Purchaser, and Purchaser agrees to purchase and accept from Sellers, free and clear of all claims, interests, liens, charges or other encumbrances (other than in connection with the Loan Assumptions as defined herein) and for the consideration and subject to the terms, covenants, conditions and provisions in this Agreement, the following:

(a) Fee simple title owned by such Seller to (i) those certain tracts of land relating to each of the Businesses, each as more particularly described on <u>Schedule 1.1(a)</u> (each, a "<u>Fee Parcel</u>", collectively, the "<u>Fee Premises</u>");

(b)     Subject to Section 1.3, all ground leases for each of the Businesses, together with all amendments, modifications, renewals and extensions thereof (each a "Ground Lease", and collectively, the "Ground Leases"), as described on Schedule 1.1(b), for those certain parcels of land as described in the Ground Leases (each, a "Ground Lease Parcel", and collectively, the "Ground Lease Premises"; the Fee Premises and the Ground Lease Premises are referred to collectively as the "Land");

(c)     All buildings, structures and improvements on the Land (the "Improvements");

(d)     All right, title and interest, if any, of Sellers, in and to any land lying in the bed of any street, road or access way, opened or proposed, in front of, at a side of or adjoining each Fee Parcel to the centerline thereof (the "Property Rights");

(e)     All right, title and interest of Sellers, reversionary or otherwise, in and to all easements in or upon each Fee Parcel and all other rights and appurtenances belonging or in anywise pertaining thereto (the "Appurtenances");

(f)     Subject to Section 1.3, all leases, subleases, licenses, concessions, management and similar agreements (other than the Ground Leases) pursuant to which another person or entity has granted to a Seller the right to use or occupy any real property, facility or amenity in connection with the ownership, maintenance, use or operation of any Business, together with all amendments, modifications, renewals and extensions thereof (collectively, the "Facility Agreements"), including, without limitation, convention center leases or management agreements, parking agreements, and food and beverage catering agreements (the Fee Premises, the Ground Leases together with the leasehold estate in the Ground Lease Premises, the Improvements, the Property Rights, the Appurtenances and the Facility Agreements are referred to collectively as are referred to collectively as the "Real Property");

(g)     All right, title and interest of Sellers in and to all tangible personal property and fixtures, attached to, located at any Business or ordered for future use at the Business in connection with the ownership, maintenance, use or operation of the Business, including, but not limited to, all furniture, furnishings, fixtures, equipment, and signs; all heating, lighting, plumbing, drainage, electrical, air conditioning, and other mechanical fixtures and equipment and systems; all elevators, escalators, and related motors and electrical equipment and systems; all hot water heaters, furnaces, heating controls, motors and boiler pressure systems and equipment; all shelving and partitions; all ventilating, incinerating and disposal equipment; all tennis, pool and health club and fitness equipment and furnishings; all vans, automobiles and other motor vehicles; all carpet, drapes, beds, furniture, televisions, telephones and other furnishings; and all stoves, ovens, freezers, refrigerators, dishwashers, disposals, kitchen equipment and utensils, tables, chairs, plates and other dishes, glasses, silverware, serving pieces and other restaurant and bar equipment, apparatus and utensils; all computer, telecommunications and information technology hardware, components and systems (collectively, the "FF&E");

2

(h)     All right, title and interest of Sellers in and to all merchandise, supplies, inventory and other items located at the Hotels or ordered for future use at the Hotels in connection with the ownership, maintenance, use or operation of the Hotels, including, without limitation, the guest rooms, guest services, restaurants, lounges, swimming pools, health clubs, and other facilities, amenities, common areas and recreational areas relating to the Hotels, including, without limitation, all food and beverage (alcoholic and non-alcoholic) inventory (except to the extent any applicable law prohibits the transfer of unopened alcoholic beverages), office supplies and stationery, advertising and promotional materials, towels, washcloths, mattresses, pillows, linens and bedding, cleaning, paper and other supplies, napkins and tablecloths, upholstery material, carpets, rugs, furniture, engineers' supplies, paint and painters' supplies, employee uniforms, and pool, tennis court and other recreational area cleaning and maintenance supplies (collectively, the "Supplies");

(i)     Subject to Section 1.3, all right, title and interest of Sellers in and to (i) all leases, subleases, and other agreements pursuant to which such Seller has granted to another person or entity a leasehold interest in any of the Land, together with all amendments, modifications, renewals and extensions thereof and all guaranties by third parties of the obligations of tenants, licensees, and similarly situated parties thereunder (the "Tenant Leases"), and (ii) licenses, concessions, occupancy agreements, "trade-out" agreements or similar agreements (other than Tenant Leases), together with all bookings and reservations for guest, conference and banquet rooms or other facilities (collectively, the "Bookings"), providing for the use or occupancy of, or otherwise similarly affecting or relating to the use or occupancy of, any Land, together with all amendments, modifications, renewals and extensions thereof, and all guaranties by third parties of the obligations of the holder of the occupancy right and similarly situated parties thereunder (the "Occupancy Agreements");

(j)     All right, title and interest of Sellers in and to all prepaid rents and deposits, including, but not limited to, refundable security deposits and rental deposits, and all other deposits for advance reservations, banquets or future services, held by Sellers or any party that manages any Property (all such managers, collectively, the "Existing Manager") in connection with the use or occupancy of guest room, conference center, meeting room or other facility, amenity or area of the Business, and not applied in accordance with the terms of the applicable Tenant Lease, Occupancy Agreement, or other agreement (collectively the "Deposits");

(k)     All right, title and interest of Sellers in and to any and all of the following, subject to Section 1.3, all contracts and agreements (together with all amendments, modifications, renewals and extensions thereof) for goods or services in connection with the ownership, maintenance, use or operation of the Business, together with all amendments, modifications, renewals and extensions thereof and all guaranties by third parties of the obligations of the counterparties thereunder, including, without limitation, purchase, supply, service or maintenance contracts, utility contracts, purchase orders, construction contracts (including, without limitation, for capital projects ongoing as of the Effective Date), software licenses, credit card agreements, airline agreements, corporate account agreements, travel agency agreements, telecommunications service

3

agreements, yellow pages or other advertising agreements, that Purchaser has agreed to assume as of the Effective Date as set forth in the "Service Contracts" portion of Schedule C (collectively, the "Service Contracts");

(l)     All right, title and interest of Sellers in and to all warranties, guaranties, indemnities, and claims for the benefit of Sellers with respect to the Improvements and FF&E, if any (collectively, the "Warranties");

(m)     Subject to Section 1.3, all right, title and interest of Sellers in and to all licenses (including, without limitation, liquor, beer, wine, bar and similar licenses, unless otherwise herein provided), permits, authorizations, registrations, utility reservations, certificates of occupancy, and similar documents, consents or approvals issued by any federal, state, or municipal authority or any other person or entity in connection with the Business (collectively, the "Licenses");

(n)     All right, title and interest of Sellers, if any, in and to all plans, drawings, specifications, diagrams, surveys, soil reports, engineering reports, inspection reports, environmental audits and other technical descriptions and reports with respect to any Real Property, to the extent in Sellers' or Existing Manager's possession or control (collectively, the "Plans and Specs");

(o)     Subject to Section 1.3, all leases of any FF&E and other contracts permitting the use of any FF&E in connection with the ownership, maintenance, use or operation of the Hotels, together with all amendments, modifications, renewals and extensions thereof, that Purchaser has agreed to assume as of the Effective Date as set forth in the "FF&E Leases" portion of Schedule C (collectively, the "FF&E Leases"; together with the Ground Leases, Facility Agreements, Tenant Leases, Occupancy Agreements, Service Contracts, and Licenses, the "Assigned Contracts");

(p)     Subject to Section 1.3, all right, title and interest of Sellers in and to all trademarks, trade names, service marks and other intellectual property rights held by Sellers or Existing Manager relating exclusively to the any Business, whether registered or unregistered, including, without limitation, URLs and telephone numbers for the Business (collectively, the "Intellectual Property"), but expressly excluding those brand names, trademarks, logos and other intellectual property rights licensed to or used by Sellers pursuant to all franchise agreements for the brands under which the Hotels are operated, together with all amendments, modifications, renewals and extensions thereof (the "Existing Franchise Agreements");

(q)     All books and records in Sellers' or Existing Manager's possession, or with respect to which Sellers or Existing Manager have the right to request from legal and accounting professionals engaged in connection with the Businesses, including, without limitation, historical and current financial information, maintenance logs, guest data, tenant data, work papers, and other documents and materials (whether in tangible or electronic form or otherwise) of any kind which are or may be used in the construction, ownership, occupancy, use or operation of the Business (collectively, the "Records");

4

(r)     All right, title and interest of Sellers in any cash and cash equivalents (including marketable securities and short-term investments), including any amounts as of any Closing in those certain accounts set forth on Schedule 1.1(r) which relate to the Businesses transferred on the applicable Closing Date, all accounts receivable and reserves, any amounts accrued to the open accounts of any guests or customers at any of the Hotels or tenants or customers at any Business, that are open as of the applicable Closing for such Business, all cash held in petty cash, cash drawers, and house accounts at the Business as of the Closing for such Business (the "Cash and Equivalents");

(s)     All of Sellers' shares and other equity ownership interests (the "Acquired JQH Entity Interests") in the entities set forth on Schedule 1.1(s) attached hereto (the "Acquired JQH Entities");

(t)     All of Sellers' shares and other equity ownership interests (the "Acquired JV Interests") in the entities set forth on Schedule 1.1(t) attached hereto (the "Acquired JV Entities"); and

(u)     All of Seller's rights in other property, assets rights and interests used in the operation of each of the Businesses, or any other businesses that are not listed on Schedule B-1, B-2 or B-3 as of the Effective Date whether discovered before or after the Closing Date for such Business (the "Miscellaneous Assets").

Each of the items described in (a) through (u) of this Article I are collectively called the "Property".

Notwithstanding any other provision in this Agreement, Purchaser shall be entitled to, in its sole discretion and upon written notice to Seller, not purchase all or any portion of the Property which shall remain with Seller, or direct Seller to convey or transfer any portion of the Property directly to the new Charitable Trust (as defined in the Plan), whereupon there shall be no reduction in the Consideration, such portion of the Property shall be excluded from this Agreement (any such Property, the "Excluded Property"), this Agreement otherwise shall remain in full force and effect as to the remainder of the Property, if any, and Purchaser shall remain responsible for satisfying all "Claims" that are "Allowed" (as such terms are defined in the Plan) whether or not all or any portion of the Property is excluded from purchase by Purchaser. In the event of Excluded Property, the terms of the Plan shall govern the transfer of such property to the Charitable Trust and the terms under which such property shall remain with Seller.

1.2     **Assumed Liabilities**.  Subject to Section 2.3 below, Purchaser shall assume (i) all liabilities associated with the Property to the extent and as set forth in the Plan, which shall be paid by Purchaser or by JQH Accounting Services, LLC at the direction of Purchaser, or (ii) which accrue or arise after the Closing Date for such Property. In addition, Purchaser shall assume such liabilities of the Acquired JQH Entities that are not debtors in the Bankruptcy, as listed on the Joinder of Non-Debtor Acquired JQH Entities attached hereto (the "Non-Debtor Acquired JQH Entities") on the applicable Closing Date. For the avoidance of doubt, all liabilities assumed by Purchaser shall be subject to defenses, setoffs, recoupment rights and similar rights.

5

1.3    **Assumption; Deemed Consents**.

(a)    <u>Assignment and Assumption at Closing</u>.

(i)    Seller shall take all actions required to assume and assign the Assigned Contracts to Purchaser (subject to provision by Purchaser of adequate assurance of future performance as may be required under §365 of the Bankruptcy Code and payment by Purchaser of all costs incurred in connection with such assignment and assumption of the Assigned Contracts to Purchaser, including any cure amounts required to be paid under section 365 of the Bankruptcy Code). Seller shall use commercially reasonable efforts to facilitate any negotiations with the counterparties of the Assigned Contracts and to obtain an order of the Bankruptcy Court, which order may include the Confirmation Order, including a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of §365 of the Bankruptcy Code.

(ii)    At each Closing, (A) Seller shall, pursuant to the Confirmation Order, assign to Purchaser each of the Assigned Contracts that is capable of being assumed and assigned under applicable law which is related to the Property being conveyed at such Closing, and (B) Purchaser shall assume such Assigned Contracts and Seller shall be released from further performance under such Assigned Contracts.

(b)    <u>Deemed Consents</u>.  For all purposes of this Agreement, Seller shall be deemed to have obtained the required consents in respect of the assignment of any Assigned Contract if, and to the extent that, pursuant to the Confirmation Order or other order of a court of competent jurisdiction, Seller is authorized to assume and assign to Purchaser, and Purchaser is authorized to accept, such Assigned Contract pursuant to §365 of the Bankruptcy Code.  In such cases, except to the extent Purchaser otherwise requests, Seller shall not be required to seek nor obtain any written consent to assignment and assumption from the counterparty to such Assigned Contract. To the extent Purchaser requests that Seller shall seek any written consent to assignment and assumption from the counterparty to any Assigned Contract, Seller shall use commercially reasonable efforts to obtain such written consent; provided, however, failure to obtain such written consent shall not be a default by Sellers under this Agreement.

## ARTICLE II.
## Consideration

2.1    **Consideration**. The consideration for the sale and conveyance of the Property shall be as set forth in the Plan (the "<u>Consideration</u>"), which shall become payable at each Closing of the transaction contemplated hereby, or if Purchaser elects to acquire the Property in multiple Closings, the Consideration shall become payable only with respect to the Property being acquired at each such Closing.

2.2    **Earnest Money**.  Purchaser shall deposit with First American Title Insurance Company (the "<u>Title Company</u>") in an amount equal to $50,000,000 (such deposit and all

interest earned thereon being referred to herein as the "Earnest Money") in good funds within three (3) business days after the Confirmation Order becomes a Final Order (as defined in the Plan). Purchaser shall deposit with Sellers the sum of One Hundred and No/100 Dollars ($100.00) as independent consideration (the "Independent Consideration") within three (3) business day after the Effective Date, which Independent Consideration shall be retained by Sellers in all instances. The Title Company shall deposit the Earnest Money into a segregated interest-bearing money market account or other investment instrument or account constituting immediately available funds designated by Purchaser which in any case is maintained at a federally insured bank or savings and loan located in Kansas City, Missouri. If the Earnest Money and Independent Consideration are not deposited within the required periods, Sellers may terminate this Agreement by delivering written notice to Purchaser and the Title Company. Upon said termination, the Title Company shall immediately destroy all executed originals of this Agreement in its possession. Thereafter, neither Sellers nor Purchaser shall have any further rights or obligations hereunder. If the purchase of the Property or any portion thereof is consummated in accordance with the terms and provisions hereof, then the Earnest Money shall be returned to Purchaser on the "Effective Date" (as such term is defined in the Plan). If the transaction contemplated hereby is not so consummated, the Earnest Money shall be held and delivered by the Title Company as set forth in Section 6.4. All interest accrued shall inure to the benefit of Party entitled to receive the Earnest Money under this Agreement. All interest earned shall be reported to the Internal Revenue Service as income of the Party receiving the Earnest Money. Purchaser and Sellers shall promptly execute all forms reasonably requested by the Title Company in connection with any reporting to the Internal Revenue Service.

2.3     **Loan Assumptions**.

(a)     Seller shall use commercially reasonable efforts to cause the lenders under the Loan Documents described below to approve (A) of (i) Seller assigning to Purchaser, and (ii) Purchaser assuming from Seller, Seller's obligations and liabilities as borrower and/or indemnitor, which respect to obligations first arising or accruing from and after the Closing Date for the Goldman Hotels or the Prudential Hotel, as applicable, under (x) the documents and instruments described on Schedule 2.3(b)(i) attached hereto and made a part hereof (the "Goldman Loan Documents") evidencing that certain loan in the original principal amount of $250,800,000.00 (the "Goldman Loan") secured by a mortgage lien on the property described on Schedule 2.3(b)(ii) (the "Goldman Hotels") and (y) the documents and instruments described on Schedule 2.3(b)(iii) attached hereto and made a part hereof (the "Prudential Loan Documents" and, collectively with the Goldman Loan Documents, the "Loan Documents") evidencing that certain loan in the original principal amount of $46,000,000.00 (the "Prudential Loan") secured by an mortgage lien on the property described on Schedule 2.3(b))(iv) attached hereto (the "Prudential Hotel"), and (B) of an affiliate of Purchaser serving as a replacement (x) non-recourse carveout guarantor under the non-recourse guaranties (collectively, the "Guaranties") executed by the JQH Trust in connection with the Goldman Loan or Prudential Loan, with respect to all obligations and liabilities arising or accruing under the Guaranties from and after the Closing Date for the Goldman Hotels or the Prudential Hotel, as applicable, and (y) indemnitor under the environmental indemnity agreements executed by the JQH Trust in connection with the Goldman Loan or Prudential Loan (collectively, the "Environmental

7

Indemnity Agreements"), with respect to all obligations and liabilities arising or accruing under the Environmental Indemnity Agreements, in each case pursuant to a replacement non-recourse carveout guaranty and replacement environmental indemnity, respectively, in the same form as the Guaranties and the Environmental Indemnity Agreements, respectively (the foregoing items (A) and (B) are referred to herein collectively as, the "Loan Assumptions"); provided, however, that failure by lenders to approve of any or all of the Loan Assumptions shall not be a default by Sellers under this Agreement and shall not be a condition precedent to Purchaser's obligation to close.

(b)     Thereafter until the Closing of the Goldman Hotels or Prudential Hotel, as applicable, or until notified otherwise by Purchaser in writing, Sellers shall comply with the obligations under the Loan Documents and as set forth in the Plan with respect to pursuing all approvals required for the Loan Assumptions, including, without limitation, satisfying all requests for information or other evidence necessary for each respective lender or servicer to approve the applicable Loan Assumption; provided, however, that failure by Sellers to obtain approval of the Loan Assumptions shall not be a default by Sellers under this Agreement, and shall not be a condition precedent to Purchaser's obligation to close.

## ARTICLE III.
### Inspection

3.1     **Inspection Period**.  Purchaser and its employees and authorized agents and representatives have conducted inspections of the Property prior to the Effective Date. Purchaser may continue to conduct inspections of the Property until the Closing Date for such Property (the "Inspection Period") in accordance with Section 3.3, but shall have no right to terminate this Agreement based on such further inspections after executing this Agreement. Sellers agree to cooperate in accordance with the Plan and provide any additional information with respect to the Property as Purchaser may request from time to time.

3.2     **Inspection**.

(a)     **Inspection Documents**.  Purchaser acknowledges receipt of the documents and information made available by Seller or UBS in the virtual data room provided by Intralinks (the "Inspection Documents").

(b)     **Proprietary Information**.  Purchaser acknowledges receipt of certain confidential and proprietary information of Sellers relating to the transaction contemplated by this Agreement (collectively, the "Information"), pursuant to that certain Non-Disclosure and Non-Solicitation Agreement dated June 2, 2017 (the "NDA"), and that, to the extent that the terms of the NDA have not expired, Purchaser continues to be bound by the NDA; provided that, notwithstanding the foregoing or anything to the contrary in the NDA, Purchaser and its Related Parties (as defined in the NDA) and Purchaser's lenders and investors, and their respective employees, agents and representatives, may communicate with, and enter into discussions, negotiations, agreements, arrangements and understandings (whether written or oral) with any person or entity as necessary or appropriate for the purpose of consummating the transaction

8

contemplated in this Agreement, including, without limitation: (i) any ground lessor under the Ground Leases ("Ground Lessors") or any landlord under the Facility Agreements ("Facility Landlords"), (ii) any counterparty to a Services Contract or FF&E Lease, Tenant Lease, or Occupancy Agreement, (iii) any counterparty to the Existing Franchise Agreements (the "Existing Franchisors"), (iv) any direct or indirect joint venture partner of either the JQH Trust or an Acquired JQH Entity (the "JV Partners"), (v) any governmental or regulatory authority with jurisdiction with respect to any Real Property or any Business operating at any Real Property, (vi) the Title Company, and (vii) in the case of Purchaser's lender, any rating agency and any potential investors for the placement of the acquisition financing.

(c)     **No Representation or Warranty by Sellers.**  Purchaser acknowledges that much of the Information (including many of the Inspection Documents) were prepared by third parties that are not affiliated to Sellers or Existing Manager, and in several instances, were prepared prior to Sellers' ownership of the respective Hotels.   Purchaser hereby acknowledges that, except as expressly set forth in this Agreement including Article X,  none of Sellers have made and none of  Sellers hereby make any warranty or representation regarding the truth, accuracy, enforceability, validity or completeness of the Information (including the Inspection Documents) or the source thereof, and Sellers expressly disclaim any and all liability for representations and warranties, express or implied, statements of facts and other matters contained in the Information (including the Inspection Documents), or for omissions from the Information (including the Inspection Documents) or in any other written or oral communications transmitted or made available to Purchaser.  Sellers have not undertaken any independent investigation as to the truth or accuracy of the Information (including the Inspection Documents) and is providing the Information (including the Inspection Documents) solely as an accommodation to Purchaser. Purchaser shall rely solely upon its own investigation with respect to the Property, and the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit or regulation or any other attribute or matter relating thereto.

(d)     **Acknowledgement by Purchaser.**  Purchaser hereby acknowledges and agrees that it has been given the opportunity to fully inspect the Property and that, if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property and in reliance upon its own determination of the value and condition of the Property but not on any information provided or to be provided by Sellers.

3.3     **Inspection Obligations**.

(a)     **Purchaser's Responsibilities**.    In conducting any inspections, investigations or tests of the Property and/or the Information (including the Inspection Documents), Purchaser and its employees, agents and representatives shall:  (i) not unreasonably disturb the tenants or guests of any Business, or interfere with their use of the Business; (ii) not unreasonably interfere with the operation and maintenance of the Business; (iii) not damage any part of the Property or any personal property owned or held by any tenant, guest or other third party; (iv) not injure or otherwise cause bodily

9

harm to any person at any Business, including, without limitation, any of Sellers' or Existing Manager's employees, agents, guests, invitees, or contractors any tenant, or any of their respective guests or invitees; (v) maintain comprehensive general liability (occurrence) insurance in terms and amounts satisfactory to Sellers covering any accident arising in connection with the presence of Purchaser, its agents and representatives on the Property; (vi) promptly pay when due the costs of all tests, investigations, and examinations done with regard to the Property by or at the direction of Purchaser; (vii) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder; (viii) fully restore the Property to the condition in which the same was found before any such inspection or tests were undertaken; and (ix) not reveal or disclose any information obtained during the Inspection Period concerning the Property and the Information to anyone outside Purchaser's organization, except in accordance with the confidentiality standards set forth in the NDA and Section 3.2(b); and (x) before the Confirmation Order, coordinate communications with any employee of Sellers for each Business through a representative designated by Sellers. Without limiting the generality of anything in Section 3.2 or this Section 3.3, Purchaser shall not conduct any intrusive physical testing (environmental, structural or otherwise) at the Property (such as soil borings or the like) without obtaining Sellers' prior written consent to such testing, which consent shall not be unreasonably withheld.

(b) **Purchaser's Agreement to Indemnify**. Purchaser hereby indemnifies, defends and holds Sellers and all their respective partners, directors, officers, shareholders, employees, agents and attorneys (the "Sellers Parties") harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Purchaser's inspections or tests permitted hereunder or any violation of the provisions of Section 3.2(b) or this Section 3.3, provided that the foregoing indemnity shall be limited by the extent of the gross negligence of any Seller Parties and shall not extend to any liens, claims, causes of action, damages, liabilities, losses or expenses incurred by Sellers as a result of the discovery by Purchaser or any of its employees, agents or representatives of matters or conditions that existed prior to such inspections or tests unless caused or exacerbated by such inspections or tests. Purchaser also indemnifies, defends and holds any tenant under a Tenant Lease harmless from and against any and all claims, causes of action, damages, liabilities and expenses which such tenant may suffer or incur due to Purchaser's breach of its obligation to maintain the confidential nature of any documents or other information relative to such tenant. Notwithstanding any provision of this Agreement, no termination hereof shall terminate Purchaser's obligations pursuant to this Section, and the limitation of damages set forth in Section 6.1 shall not be applicable to any cause of action arising pursuant to Sections 3.2(b) and 3.3. This Section shall survive the Closing.

3.4 **Property Conveyed "AS IS"**.

(a) **Disclaimer of Representations and Warranties By Sellers**. Notwithstanding anything contained herein to the contrary, it is understood and agreed that, except as expressly provided in this Agreement including Article X, Sellers have not made and are not now making, and specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, past, present or

10

future, with respect to the Property, including, but not limited to, warranties, representations or guaranties as to (i) matters of title (other than Sellers' warranty of title set forth in the Deed (hereinafter defined) to be delivered at the Closing for such Property), (ii) environmental matters relating to the Property or any portion thereof, (iii) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and earthquake faults and the resulting damage of past and/or future earthquakes, (iv) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, flood prone area, flood plain, floodway or special flood hazard, (v) drainage, (vi) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (vii) zoning to which the Property or any portion thereof may be subject, (viii) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (ix) usages of adjoining property, (x) access to the Property or any portion thereof, (xi) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (xii) the presence of Hazardous Substances (hereinafter defined) in or on, under or in the vicinity of the Property or any portion thereof, (xiii) the condition or use of the Property or any portion thereof or compliance of the Property or any portion thereof with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (xiv) the existence or non-existence of underground storage tanks, (xv) any other matter affecting the stability or integrity of the Property or any portion thereof, (xvi) the potential for further development of the Property or any portion thereof, (xvii) the existence of vested land use, zoning or building entitlements affecting the Property or any portion thereof, (xviii) the merchantability of the Property or any portion thereof or the fitness of the Property or any portion thereof for any particular purpose (Purchaser affirming that Purchaser has not relied on Sellers' skill or judgment to select or furnish the Property for any particular purpose, and that Sellers make no warranty that the Property or any portion thereof is fit for any particular purpose), or (xix) tax consequences.

(b)     **Sale "AS IS".**  Purchaser has not relied upon and will not rely upon, either directly or indirectly, any representation or warranty of Sellers or any of their agents except as set forth in this Agreement including <u>Article X</u>, and acknowledges that no representations have been made except as set forth in this Agreement including <u>Article X</u>. Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and related businesses and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property.  Purchaser will conduct such inspections and investigations of the Property as Purchaser deems necessary, including, but not limited to, the physical and environmental conditions thereof, and shall rely upon same.  Upon the applicable Closing, Purchaser shall assume the risk that adverse matters for the Property being conveyed at such Closing, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Purchaser's

11

inspections and investigations. Purchaser acknowledges and agrees that upon the applicable Closing, Sellers shall sell and convey to Purchaser and Purchaser shall accept the portion of the Property being conveyed at such Closing "AS IS, WHERE IS" and "WITH ALL FAULTS." Purchaser further acknowledges and agrees that there are no oral agreements, warranties or representations, collateral to or affecting the Property by Sellers, any other agent of Sellers, or by any third party. The terms and conditions of this Section 3.4 shall expressly survive each Closing, not merge with the provisions of any closing documents. Sellers are not liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property furnished by UBS or any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth or referred to herein. Purchaser acknowledges that the Consideration reflects the "AS IS" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property. Purchaser has fully reviewed the disclaimers and waivers set forth in this Agreement with its counsel and understands the significance and effect thereof.

(c) **Hazardous Substances Defined.** For purposes hereof, "Hazardous Substances" means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Sections 9601 et seq.), as amended ("CERCLA"), or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.), as amended ("RCRA"), or any other federal, state or local law, ordinance, rule or regulation applicable to the Property, or any substance which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, polychlorinated biphenyls (pcbs), radon gas, urea formaldehyde, asbestos, lead, or electromagnetic waves.

(d) **Purchaser Represented by Counsel.** Purchaser hereby represents and warrants to Sellers that: (i) Purchaser is not in a significantly disparate bargaining position in relation to Sellers; (ii) Purchaser is represented by legal counsel in connection with the transaction contemplated by this Agreement; and (iii) Purchaser is purchasing the Property for business, commercial, investment or other similar purpose.

3.5 **Purchaser's Release of Sellers**.

(a) **Sellers Released from Liability**. Sellers and Sellers Parties are hereby released from all responsibility and liability to the extent relating to the condition (including the presence in the soil, air, structures and surface and subsurface waters, of materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines), construction, valuation, salability or utility of the Property or any portion thereof, or its suitability for any purpose whatsoever. Purchaser expressly acknowledges that Purchaser has not relied on any warranties, promises, understandings or representations, express or implied, oral or written, of Sellers or Sellers Parties or their agents, relating to the Property which are not contained in this Agreement,

12

and that Purchaser is acquiring the Property in its present condition and state of repair, "AS IS, WHERE IS", "WITH ALL DEFECTS," latent or apparent. Purchaser acknowledges that any Information of any type which Purchaser has received or may receive from Sellers or Sellers Parties or their agents, including, without limitation, any environmental reports and surveys, is furnished on the express condition that Purchaser shall make an independent verification of the accuracy of such Information, all such Information being furnished without any warranty whatsoever.

(b) **Waiver of Claims against Seller Parties**.  Purchaser agrees that Purchaser will not attempt to assert any liability against Sellers or Seller Parties to the extent relating to the furnishing of such Information to Purchaser, and Purchaser agrees to indemnify, defend and hold Sellers and the Seller Parties free and harmless for, from and against any and all such claims of liability to extent arising from the furnishing of such Information to Purchaser.  This indemnity shall survive closing or the earlier termination of this Agreement.

(c) **Purchaser's Waiver of Objections**.  Purchaser acknowledges having inspected the Property, having observed its physical characteristics and existing conditions and having had the opportunity to conduct such investigation and study on and of said Property and adjacent areas as it deems necessary and hereby waives any and all objections to or complaints regarding (including, but not limited to, federal, state of common law based actions and any private right of action under state and federal law to which the Property is or may be subject, including, but not limited to, CERCLA and RCRA) physical characteristics and existing conditions, including, without limitation, structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Substances on, under, adjacent to or otherwise affecting the Property.  Purchaser further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Substances or other contaminants, may not have been revealed by its investigation.

### ARTICLE IV.
### Survey

4.1  **Survey**.  Sellers have delivered to Purchaser an existing ALTA or other survey of each Fee Parcel and Ground Lease Parcel of the Land, if any, in Sellers' or Existing Manager's possession (the "Surveys").  Sellers shall have no obligation to cause any Survey to be updated, or to obtain any Survey if Sellers do not have a Survey of any parcel. Notwithstanding the foregoing, Sellers shall reasonably cooperate with Purchaser to the extent Purchaser desires to obtain updated Surveys, and Seller shall use commercially reasonable efforts as may be required by the Title Company to assist with Seller's request for extended coverage over the standard survey exception to an Owner's Title Policy.

13

## ARTICLE V.
## Title

5.1     **Title Report and Title Policy**.

(a)     Sellers shall cause the Title Company to prepare and deliver to Purchaser preliminary commitments for owner title insurance policies for each Fee Parcel and Ground Lease Parcel of the Land (the "Title Commitments") showing the condition of title to the Land, together with legible copies of all instruments referred to in the Title Commitments (collectively, the "Title Exceptions").  The Title Commitments shall be issued by the Title Company in an amount determined by Purchaser.  Purchaser shall have reviewed the Title Commitments, Title Exceptions and Surveys and shall have satisfied itself with the condition thereof prior to executing this Agreement.

(b)     As used in this Agreement, the term "Permitted Exceptions" shall mean all matters shown on the Surveys and/or listed in on Schedule 5.1(b) attached hereto, other than those matters which would have a Material Adverse Effect (as defined herein) on the transactions contemplated herein taken as a whole.

(c)     At the Closing for any Property, Purchaser shall require at Purchaser's expense a standard ALTA or other applicable form of owner's title insurance policies for the applicable Land issued by the Title Company or its title insurer in the amount determined by Purchaser (the "Title Policy"), insuring fee simple or leasehold title subject only to such Permitted Exceptions.  The charges of the Title Company or its title insurer for or otherwise related to the issuance of the Title Policy shall be paid by Purchaser.  If Purchaser desires an ALTA extended coverage endorsement or any other endorsements to the Title Policy, Purchaser shall pay any additional cost for such extended coverage and other endorsements.  Seller shall satisfy each of the requirements set forth on Schedule B-1 of the Title Commitments which are within the power of the Seller to satisfy and use commercially reasonable efforts to comply with customary requirements of the Title Company in connection with the issuance of the Title Policies.

## ARTICLE VI.
## Remedies

6.1     **Sellers' Remedies**.

(a)     If the "Effective Date" (as defined in the Plan) does not occur by the "Outside Effective Date" (as defined in the Plan), and such failure is not due to a failure of any of the conditions to Closing set forth in this Agreement to occur, a Seller Default, a breach by Sellers of any obligations under the Plan, the PSA (as defined in the Plan), the Plans Supplement (as defined in the Plan) or the Settlement Agreement (as defined in the Plan), or a termination by Purchaser in accordance with this Agreement (any such failure, a "Purchaser Default"), then Sellers, as their sole and exclusive remedy for such Purchaser Default, may elect to terminate this Agreement by providing written notice to Purchaser and Title Company, in which case the Earnest Money shall be disbursed to Sellers pursuant to Section 6.4 and the Parties shall have no further rights or obligations

14

under this Agreement, except for those that expressly survive termination. Sellers hereby specifically waives any and all right to seek any other equitable relief or consequential, punitive or other damages in connection with this Agreement and/or the transactions contemplated hereby.

(b)     The Parties acknowledge and agree that if this Agreement is terminated by Sellers pursuant to <u>Section 6.1(a)</u>, the damages that Sellers would sustain as a result of such termination would be difficult if not impossible to ascertain. Accordingly, the parties agree that Sellers shall retain the Earnest Money as full and complete liquidated damages (and not as a penalty) as Sellers' sole and exclusive remedy for such termination, provided that in addition to the Earnest Money, Seller shall retain all rights and remedies under this Agreement with respect to those obligations of Purchaser that expressly survive termination.

6.2     **Purchaser's Remedies**. If, prior to or at any Closing, any of Sellers fail to perform its obligations pursuant to this Agreement in any material respect (including, without limitation, a Sellers representation or warranty that was inaccurate in any material respect when made as of the Effective Date), such failure is not due to a Purchaser default, and, except for a failure by Sellers to perform on a Closing Date, such failure continues for a period of ten (10) days after Sellers provide Purchaser written notice of such failure (a "<u>Seller Default</u>"), then, Purchaser shall have, in addition to all rights and remedies at law or in equity, the right to seek specific performance under this Agreement or terminate this Agreement by giving Sellers and Title Company written notice of such termination, in which case the Title Company shall refund the Earnest Money to Purchaser pursuant to <u>Section 6.4.</u>

6.3     **Attorneys' Fees**. If either Party is required to employ an attorney because any litigation or arbitration arises out of this Agreement between the Parties, the nonprevailing Party shall pay the prevailing Party, as determined by the court or arbitrator, all reasonable attorneys' fees and expenses incurred in connection with such litigation or arbitration. This Section shall survive Closing or the earlier termination of this Agreement.

6.4     **Disposition of Earnest Money**. In the event of a termination of this Agreement by either Sellers or Purchaser, the Title Company is authorized to deliver the Earnest Money to the Party entitled to the same pursuant to the terms hereof on or before the third (3rd) business day following receipt of written notice of such termination by the Title Company and non-terminating party from the terminating Party, unless the other Party notifies the Title Company that it disputes the right of the other Party to receive the Earnest Money within three (3) business days after such notice of termination to the Title Company. In such event, the Title Company shall interplead the Earnest Money into a court of competent jurisdiction. All attorneys' fees and costs and the Title Company's costs and expenses incurred in connection with such interpleader shall be assessed against the Party that is not awarded the Earnest Money or if the Earnest Money is distributed in part to both Parties, then in the inverse proportion of such distribution. This Section shall survive Closing or the earlier termination of this Agreement.

6.5     **Surviving Representations and Warranties**. The representations and warranties set forth in this Agreement shall be deemed to be merged into the instruments

15

delivered at the Closing applicable to such Property, and shall not survive Closing. Sellers shall have no surviving liability or obligation to Purchaser with respect to the representations and warranties set forth in this Agreement which are specific to a Property after the occurrence of the Closing of the Property as to which the representations and warranties relate.

**ARTICLE VII.**
**Closing**

7.1     **Closing.**

(a)     **Closing Date.** Upon the terms and subject to the conditions in this Agreement, the closing of the transactions set forth in this Agreement (the "Closing") shall occur on one or more Closing Dates, as elected by Purchaser in Purchaser's sole discretion, on a date or dates chosen by Purchaser with no less than five (5) business days' notice to Sellers. The date and time at which any Closing actually occurs hereinafter is referred to as the "Closing Date". If the Closing is effectuated through more than one transaction on more than one Closing Date, than the term "Closing Date" for such applicable transaction shall be the date and time at which the Closing for each such transaction actually occurs for the applicable Property. In all events, the Effective Date (as defined in the Plan) shall occur on or before the Outside Effective Date (as defined in the Plan).

(b)     **Outside Closing Date**. Except as set forth in Section 7.1(c), the final Closing Date shall occur no later than the "Outside Closing Date" (as defined in the Plan).

(c)     **Extension of Outside Closing Date for Delayed Closing Properties**. Notwithstanding Section 7.1(b), provided that all "Allowed Claims" (as defined in the Plan) existing as of the Outside Closing Date have been paid by the Outside Closing Date, then, in the event that Purchaser is unable to obtain by the Outside Closing Date (i) a Required Consent for any Properties for which a Required Consent is applicable (the "Required Consent Properties", (ii) a waiver of a third party termination right for a Property for which a third party termination right (a "Termination Right") would be triggered by Closing on such Property (the "Termination Waiver Properties"), and (iii) lender approval of a Loan Assumption for any Goldman Hotel or Prudential Hotel (the "Loan Assumption Properties", and, collectively with the Required Consent Properties and the Termination Waiver Properties, collectively the "Delayed Closing Properties" and each a "Delayed Closing Property"), then Purchaser shall have the right in Purchaser's sole discretion to delay the Closing for any such Delayed Closing Property to a date selected by Purchaser after (x) for Required Consent Properties, Purchaser's receipt of the Required Consent or waiver of such Required Consent, or adjudication that such Required Consent is deemed to be provided or is not required, (y) for Termination Waiver Properties, Purchaser's receipt of a waiver or expiration of such Termination Right, Purchaser's election to not pursue waiver of such Termination Right, or adjudication that such Termination Right is deemed to have been waived or is not required, or (z) for Loan Assumption Properties, the occurrence of the approval of the applicable Loan Assumption or Purchaser's election to not pursue approval of such Loan

16

Assumption (any such date on which the Closing for a Delayed Closing Property occurs shall be a "<u>Delayed Closing Date</u>"). Purchaser shall give no less than five (5) business days' notice to Sellers of the Closing Date for any Delayed Closing Property.

(d)　**Delayed Closing Properties After Outside Closing Date**.　If Purchaser delays the Closing for any Delay Closing Property, all distributions and other economic benefits and interests from such Delayed Closing Property shall inure to the benefit of Purchaser. Sellers and Purchaser shall comply with the terms of any Plans Supplement (as defined in the Plan) with respect to the administration and operation of any Delayed Closing Property after the Outside Closing Date.

7.2　**Closing Matters**.

(a)　**Sellers' Obligations**.　At each Closing, as applicable for the Property being conveyed at such Closing, Sellers shall:

(i)　Deliver possession of the Property, subject only to the rights of transient guests at the Hotels, the rights of parties in possession under the Tenant Leases and the Occupancy Agreements as set forth on <u>Schedule 10.2(a)(xiii)</u>, and the Permitted Exceptions set forth on <u>Schedule 5.1(b)</u> but otherwise free and clear of all claims, interests, liens, charges or other encumbrances (other than in connection with the Loan Assumptions).

(b)　**Sellers' Deliveries**.　At each Closing, as applicable for the Property being conveyed at such Closing, the appropriate Seller shall deliver, or shall cause to be delivered, and, where appropriate, execute and acknowledge the following documents:

(i)　Limited warranty deeds in substantially the form attached hereto as <u>Exhibit A</u> for each Fee Premises (collectively, the "<u>Deed</u>"), conformed as necessary to comply with the laws of the applicable jurisdictions, conveying the Land, Improvements, Property Rights and Appurtenances, and subject only to the Permitted Exceptions set forth on <u>Schedule 5.1(b)</u>;

(ii)　Assignment and assumption agreements in substantially the form attached hereto as <u>Exhibit B</u> for each of the Ground Leases (collectively, the "<u>Assignment of Ground Leases</u>"), assigning the Ground Leases to Purchaser, subject only to the Permitted Exceptions set forth on <u>Schedule 5.1(b)</u>, and subject to §1.3(b) of this Agreement, together with a consent from the Ground Lessor;

(iii)　Assignment and assumption agreements in substantially the form attached hereto as <u>Exhibit C</u> for each of the Facility Agreements (collectively, the "<u>Assignment of Facility Agreements</u>"), assigning the Facility Agreements to Purchaser, and subject to §1.3(b) of this Agreement, together with a consent from the Facility Landlords;

(iv)　Bills of sale in substantially the form attached hereto as <u>Exhibit D</u> for each Business (collectively, the "<u>Bill of Sale</u>"), conformed as necessary to comply with the laws of the applicable jurisdictions, conveying the FF&E and

17

Supplies, Cash and Equivalents and Miscellaneous Assets, and assigning such Sellers' interest in the Service Contracts set forth in the "Service Contracts" portion of <u>Schedule C</u>, Warranties, Licenses, Plans and Specs, FF&E Leases set forth on the "FF&E Leases" portion of <u>Schedule C</u>, Intellectual Property and Records;

(v)      An affidavit in the form attached hereto as <u>Exhibit E</u> executed by Sellers, stating Sellers' U.S. Taxpayer identification number and that Sellers are not "<u>foreign persons</u>" or a "<u>foreign corporations</u>" (as defined under the Internal Revenue Code Sections 1445 and 7701) and that Purchaser is not required to withhold any portion of the Consideration under the provisions of such Act;

(vi)     Assignment and assumption agreements in substantially the form attached hereto as <u>Exhibit F</u> for each Business (collectively, the "<u>Assignment of Leases</u>"), conformed as necessary to comply with the laws of the applicable jurisdictions, assigning such Sellers' interest in the Tenant Leases set forth on <u>Schedule 10.2(a)(xiii)</u>, Occupancy Agreements set forth on <u>Schedule 10.2(a)(xiii)</u>, and Deposits as set forth on <u>Schedule 10.2(a)(xvi)</u>;

(vii)    Notice letters in substantially the form attached hereto as <u>Exhibit G</u> (collectively, the "<u>Notice Letters</u>") to the Ground Lessor under each of the Ground Leases, the Facility Landlords under each of the Facility Agreements and tenants under each of the Tenant Leases, if applicable, for each Business, conformed as necessary to comply with the laws of the applicable jurisdictions;

(viii)   Evidence reasonably satisfactory to Purchaser, in Purchaser's sole discretion, of the termination of the Existing Management Agreements;

(ix)     To the extent applicable, written agreements between Seller and Existing Franchisors terminating the Existing Franchise Agreements *provided however* that if the Existing Franchise Agreements do not permit Sellers to require termination of such agreements, then Seller agrees to make commercially reasonable efforts to obtain such terminations and Seller shall reject such agreements pursuant to §365 of the Bankruptcy Code;

(x)      To the extent required by the applicable agreements in connection with the transactions described herein, (i) consents from Ground Lessors for the assignment to, and assumption by, Purchaser of the Ground Leases, free and clear of any right of first refusals or any similar rights to acquire the Property, (ii) consents from the Facility Landlords for the assignment to, and assumption by, Purchaser of the Facility Agreements, in substantially the form of <u>Exhibit I</u>, (iii) consents from the JV Partners which have consent or right of first refusal rights triggered by the assignment of the interests in any of the Acquired JQH Entities or JQH Trust's interests in any Acquired JV Entity, including, without limitation, a consent from AJJ Hotel Holdings, Inc. consenting to the assignment of Seller's membership interest in W&H Realty, LLC, and admitting Purchaser or its designee as a substitute member of W&H Realty LLC, and transfer to Purchaser

18

of all of Seller's economic and management rights in W&H Realty, LLC, (iv) approvals of any governmental or regulatory authority, including without limitation approval of gaming counsel, which are necessary in order to effectuate the conveyances contemplated herein and for the continuance of the Businesses at the Property, and (v) any other consents or any releases from any other rights of first refusal or similar rights which are applicable to the transfer of any Property ((i)-(v) collectively, the "Required Consents"); provided, however, that failure by Sellers to obtain and deliver such Required Consents shall not be a default by Sellers under this Agreement, and further provided however that the Parties shall request that the Bankruptcy Court (as defined in the Plan) include in its order approving this Agreement a direction to all contracting parties to immediately provide such Required Consents to Seller upon request.

(xi)    To the extent obtained, estoppel certificates from Ground Lessors and Facility Landlords (the "Estoppel Certificates"), in the form set forth in the applicable Ground Lease or Facility Agreement, or if no such form is set forth therein, an estoppel certificate substantially in the form of Exhibit J, each such form of which shall be completed by Purchaser and sent to Seller prior to being delivered to the Ground Lessor or Facility Landlord; provided, however, that failure by Sellers to obtain and deliver such Estoppel Certificates shall not be a default by Sellers under this Agreement, and shall not be a condition precedent to Purchaser's obligation to close;

(xii)    Wire transfers, intrabank credits or other methods of transfer of all Cash and Cash Equivalents to Purchaser's bank or brokerage accounts, reserves, petty cash, cash drawers, house accounts or otherwise, as determined by Purchaser;

(xiii)    All real estate transfer tax declaration or similar documents required under applicable law in connection with the conveyance of the Real Property;

(xiv)    An Assignment and Assumption of Membership Interests of each applicable Acquired JQH Entity in substantially the form of Exhibit H, executed by Seller, assigning the applicable Acquired JQH Entity Interests;

(xv)    An Assignment and Assumption of Membership Interests for each of the Acquired JV Entities in substantially the form of Exhibit H, executed by Seller, assigning the applicable Acquired JV Interests;

(xvi)    To the extent applicable, resignations of any officers, directors or managers of the Acquired JQH Entities, or any other persons with signatory or decision making authority for the Acquired JQH Entities, in such form as mutually acceptable to Sellers and Purchaser;

(xvii)    To the extent applicable, resignations of any officers, directors or managers of the Acquired JV Entities, or any other persons with signatory or

19

decision making authority for the Acquired JV Entities, to the extent any such person was appointed by is acting on behalf of any Seller, solely with respect to in such form as mutually acceptable to Sellers and Purchaser;

(xviii) Notice letters to each of the JV Partners, in a form approved by Purchaser in its sole discretion;

(xix) Payoff letters and appropriate termination statements under the Uniform Commercial Code and other instruments as may be necessary to extinguish indebtedness not assumed by Purchaser under this Agreement (collectively "Payoff Documentation"), and all security interests related thereto; provided, however, that failure by Sellers to obtain and deliver such payoff letters or termination statements shall not be a default by Sellers under this Agreement;

(xx) Any instruments and documents as may be necessary or appropriate to appoint a representative of Purchaser as trustee, director, member or officer or other management position of Seller (including as a co-trustee of JQH Trust) solely for the purposes of exercising all of Seller's rights of ownership and control with respect to such Delayed Closing Property;

(xxi) Such further instruments and documents as may be reasonably required by the Title Company on or before the applicable Closing Date for any Property, including owner's affidavits and gap undertakings, or as are customary for similar transactions in the counties in which the Business is located, including, but not limited to, a certified copy of a resolution of the board of directors of each Seller authorizing such entities to consummate the purchase of the Property in accordance with this Agreement and designating those persons authorized to execute and deliver all necessary documents at any applicable Closing and any other documents requested by Purchaser which are necessary or advisable to facilitate the transfer of the Property or any portion thereof to Purchaser, including without limitation, any instruments or documents necessary or advisable to facilitate the transfer of the Cash and Equivalents to Purchaser at any applicable Closing; and

(xxii) The closing statements prepared in connection with the transaction (the "Closing Statements").

(c) **Purchaser Deliveries**. At each Closing, Purchaser shall, as applicable for the Property being conveyed at such Closing:

(i) Deliver the Consideration, as adjusted for closing costs, to the Title Company (all monies Purchaser is required to deliver shall be wired to the account designated by the Title Company and available for disbursement no later than 2:00 p.m., Central Time, on the applicable Closing Date);

(ii) Execute and deliver the Assignment of Ground Leases, Assignment of Facility Agreements, Bill of Sale, Assignment of Leases, Notice Letters, and Closing Statements; and

20

(iii)     Execute and deliver such other documents as may be reasonably required by Sellers or the Title Company, including, but not limited to, such authorization documents for Purchaser and its constituent entities as Sellers and/or the Title Company shall reasonably request authorizing Purchaser to consummate the purchase of the Property in accordance with this Agreement and designating those persons authorized to execute and deliver all necessary documents at any applicable Closing.

7.3     **Form of Conveyance.**  Notwithstanding anything herein to the contrary, in lieu of acquiring the Property with respect to any Business, Purchaser shall have the right to structure any acquisition of any Property as it elects in its sole discretion, including, without limitation, to acquire any Property or the equity interests in the entity holding title to such portion of the Property rather than acquiring such Property in an asset transaction. In the event that Purchaser elects to acquire the equity interests of any entity pursuant to this Section 7.3, then such entity shall become an Acquired JQH Entity for the purposes of this Agreement.

7.4     **Closing Costs**.  Any escrow fee charged by the Title Company shall be paid by Purchaser.  Purchaser shall pay the cost for the Title Policy, and any new survey or survey updates obtained by Purchaser.  All document stamp fees, sales tax, transfer taxes, and recording fees and taxes shall, to the extent not exempt, be paid by Purchaser. Purchaser shall pay all other costs and fees incurred in connection with this transaction and all costs of any inspections or tests it authorizes or conducts, subject to the terms of this Agreement.  Except as otherwise provided in Sections 6.3 and 6.4, each party shall be responsible for the payment of its own attorneys' fees incurred in connection with the transaction which is the subject of this Agreement.

7.5     **Indemnity**. Purchaser shall defend, indemnify and hold harmless Sellers, Jaqueline Dowdy and Greggory Groves (collectively, the "Indemnified Parties") against any and all claims, obligations, losses, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and other charges) (a "Loss") to the extent such Loss results directly from the Indemnified Parties complying with Purchaser's written direction (which may be by email) to take an action or to refrain from taking an action with respect to an Acquired JV Entity.

7.6     **Intentionally Deleted.**

7.7     **Guest Baggage and Lost and Found**.  All baggage of guests or customers at any Hotel which has been checked with or left in the care of Sellers or the Existing Manager at such Hotel, and all items found by Sellers or the Existing Manager at such Hotel, its employees or guests and left with Sellers or the Existing Manager at such Hotel in its "lost and found" shall be inventoried and tagged jointly by Sellers and Purchaser.

7.8     **Safe Deposit Boxes**.  Before the applicable Closing for a Hotel, Seller shall notify all guests and customers who are then using a safe deposit box at any Hotel advising them of the pending change in management of the Hotel and requesting them to conduct an inventory and verify the contents of such safe deposit box.  All inventories by such guests and customers shall be conducted under the joint supervision of employees, agents or representatives of the

21

Parties. Upon such inventory and verification, Seller shall deliver to Purchaser all keys, receipts and agreements for such safe deposit box (and thereafter such safe deposit box shall be an "Inventoried Safe Deposit Box"). If this Agreement is terminated after such inventory, Purchaser shall return all keys, receipts and agreements to Seller for such Inventoried Safe Deposit Boxes immediately upon such termination. Upon any applicable Closing for a Hotel, Seller shall deliver to Purchaser all keys in Seller's possession for all safe deposit boxes not then in use, and a list of all safe deposit boxes which are then in use, but not yet inventoried by the depositor, with the name and room number of such depositor. After any applicable Closing for a Hotel, the Parties shall make appropriate arrangements for guests and customers at such Hotel to inventory and verify the contents of all safe deposit boxes not yet inventoried by the depositor, and upon such inventory and verification, Seller shall deliver to Purchaser all keys, receipt and agreements for such safe deposit box (and thereafter such safe deposit box shall be an Inventoried Safe Deposit Box).

## ARTICLE VIII.
## Condemnation

8.1 **Condemnation**. If, prior to the Closing of any Fee Parcel, Ground Lease Parcel or Improvements thereon, any governmental authority or other entity having condemnation authority shall commence an eminent domain proceeding or take any steps preliminary thereto (including the giving of any direct or indirect notice of intent to institute such proceedings) with regard to any portion of such Fee Parcel, Ground Lease Parcel or any Improvements thereon which are to be conveyed as part of such Closing, the affected Seller shall provide written notice of such action to Purchaser promptly upon obtaining knowledge of such eminent domain proceeding, but in any event before the applicable Closing, Sellers and Purchaser shall close this Agreement in accordance with the terms hereof with no reduction in the Consideration, and the affected Seller shall assign to Purchaser at such Closing all of such Seller's right, title and interest in and to all proceeds resulting or to result from said condemnation. If Sellers receive any proceeds resulting in from said condemnation prior to the applicable Closing Date, Sellers shall pay Purchaser any such proceeds at such Closing, minus any actual third party costs actually expended by Sellers in connection with the condemnation, reasonable evidence of which shall be provided to Purchaser.

## ARTICLE IX.
## Casualty

9.1 **Casualty**. If, prior to the Closing of a Property, any of the Improvements or FF&E shall be damaged by fire or other casualty ("Casualty"), the affected Seller shall deliver to Purchaser written notice of such Casualty promptly after such Casualty occurs, but in any event before the applicable Closing for such Property, and shall assign to Purchaser all of its rights in the resulting casualty insurance proceeds, or if Sellers receive any insurance proceeds prior to the applicable Closing, cause such insurance proceeds to be assigned to Purchaser minus any actual third-party costs expended by Sellers in connection with repairing the Casualty, evidence of which shall be provided to Purchaser, Sellers and Purchaser shall notify all appropriate insurance companies of Purchaser's interest in the insurance proceeds, and all casualty insurance proceeds payable as a result of the Casualty and Purchaser's pro rata share

22

of any rental or business loss proceeds shall be assigned to Purchaser at such applicable Closing.

## ARTICLE X.
## Representations and Warranties.

10.1 **Purchaser's Representations and Warranties**.  Purchaser makes the following representations and warranties for the benefit of Sellers, each of which is true and correct as of the Effective Date and each of which shall be true and correct on each Closing Date:

(a)     Purchaser (and each entity comprising Purchaser) is an entity duly organized and validly existing under the laws of the State of its organization and has full right, power and authority to enter into this Agreement and, following the Inspection Period, will have full right, power and authority to consummate all of the transactions contemplated hereby, and the persons executing this Agreement and all other documents required to consummate the transactions contemplated hereby on behalf of Purchaser are duly authorized to execute this Agreement and such other documents on behalf of Purchaser, and are authorized to bind Purchaser.  This Agreement constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with its terms, covenants and conditions.

(b)     The execution of this Agreement by Purchaser does not, and the performance by Purchaser of the transactions contemplated by this Agreement will not, violate or constitute a breach of the organization and governance documents of Purchaser or, to Purchaser's Knowledge, any contract, permit, license, order or decree to which Purchaser is a party or by which Purchaser or its assets are bound.

As used herein, "Purchaser's Knowledge" means the actual knowledge of Mr. Jonathan Eilian, Mr. Ron Brown or Mr. Brian Cameron, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Seller or any of its affiliates.

10.2 **Sellers' Representations and Warranties**.

(a)     Each Seller, severally (not jointly and severally), makes the following representations and warranties with respect to itself and with respect to the portion of the Property and the Business relating to its Real Property, each of which is true, correct and complete as of the Effective Date and as of the applicable Closing Date, as to the Property being transferred on such Closing Date:

(i)     Seller is duly organized and validly existing under the laws of the State of its organization and has full right, power and authority to enter into this Agreement and to consummate all of the transactions contemplated hereby, and the persons executing this Agreement and all other documents required to consummate the transactions contemplated hereby on behalf of Seller are duly authorized to execute this Agreement and such other documents on behalf of Seller, and are authorized to bind Seller.  Upon the Confirmation Order becoming

23

a Final Order (as defined in the Plan), this Agreement constitutes the legal, valid and binding obligation of Seller enforceable in accordance with its terms, covenants and conditions.

(ii)     The execution of this Agreement by Seller does not, and the performance by Seller of the transactions contemplated by this Agreement will not, violate or constitute a breach of the organization and governance documents of Seller or, to Seller's Knowledge, any contract, permit, license, order or decree to which Seller is a party or by which Seller or its assets are bound.

(iii)     Seller is a "United States person", as defined by Internal Revenue Code Section 1445 and Section 7701.

(iv)     Seller holds of record and owns such interest in the Acquired JQH Entities as set forth on Schedule 1.1(s), free and clear of any restriction on transfer, state securities laws, lien, claim, pledge, hypothecation or other encumbrance, option, warrant, purchase right, contract, commitment, claim or demand, except as disclosed on Schedule 10.2(a)(iv).     Seller has provided Purchaser with true, complete and correct copies of all organizational documents of such Acquired JQH Entities, that Seller is directly or indirectly a party to, a list of which is set forth on Schedule 10.2(a)(iv) (the "Acquired JQH Entity Organizational Documents"). Except as disclosed on Schedule 10.2(a)(iv)(1), no Seller, affiliate of Seller or any counterparty to the Acquired JQH Entity Organizational Documents is in default thereunder. Attached hereto on Schedule 10.2(iv)(2) is a list of all real property held by the Acquired JQH Entities (the "Acquired JQH Entity Assets").

(v)     Except as disclosed on Schedule 10.2(a)(v) attached hereto and other than the Bankruptcy Case, there is no pending action, suit, claim, litigation or proceeding as to which Seller has been served with process which affects Seller with respect to its portion of the Property and, to Seller's Knowledge, no such action, suit, claim, litigation or proceeding is pending.

(vi)     Except as disclosed on Schedule 10.2(a)(vi) attached hereto, Seller has not received any written notice of violation of any law from any governmental authority which affects Seller with respect to its portion of the Property.

(vii)     Except as disclosed on Schedule 10.2(a)(vii) attached hereto, there are no pending condemnation or similar proceedings affecting the Property or any part thereof as to which Seller has been served with process and, to Seller's Knowledge, no such proceedings are pending or threatened.

(viii)     Except as set forth in Schedule 10.2(a)(viii) and the FF&E Leases, Seller has good and valid title to all FF&E, which shall be free and clear of all liens and encumbrances for such FF&E as of the applicable Closing.

24

(ix)     Seller has made available to Purchaser and its consultants all material Records in Seller's or Existing Manager's possession or control relating to the Property.

(x)     Attached hereto as Schedule 1.1(b) is a true, correct and complete list of all documents comprising the Ground Leases. Seller has made available to Purchaser a true, correct and complete copy of all Ground Leases. Except as set forth in Schedule 1.1(b) Seller has neither given nor received any written notice of any breach or default under the Ground Leases which has not been cured.

(xi)     Attached hereto as Schedule 1.1(f) is a true, correct and complete list of all documents comprising the Facility Agreements. Seller has made available to Purchaser a true, correct and complete copy of all Facility Agreements. Except as set forth in Schedule 1.1(f), Seller has neither given nor received any written notice of any breach or default under the Facility Agreements which has not been cured.

(xii)     The Property to be sold, conveyed, transferred, assigned and delivered to Purchaser at the Closing or Closings consummated pursuant to this Agreement includes all property, assets, rights and interests of Seller, except for Excluded Property.

(xiii)    Except as set forth on Schedule 10.2(a)(xiii), there are no loans, leases or other contracts between Sellers and any equity holder, director, manager, officer or employee of Sellers or any of its subsidiaries, or any member of such equityholder's, director's or officer's immediate family (whether related by blood, marriage or adoption) or any person controlled by such equityholder, director or officer.

(xiv)    Except as set forth on Schedule 10.2(a)(xiv), all of the representations and warranties for Property set forth in this Section 10.2(a) are true, correct and complete as to the Property owned by Non-Debtor Acquired JQH Entities, and such representations and warranties are made as if "Seller" was such applicable Non-Debtor Acquired JQH Entity.

(xv)     Seller, or if applicable, an Acquired JQH Entity, holds of record and owns such interest in the Acquired JV Entities as set forth on Schedule 1.1(t), free and clear of any restriction on transfer, state securities laws, lien, claim, pledge, hypothecation or other encumbrance, option, warrant, purchase right, contract, commitment, claim or demand, except as disclosed on Schedule 10.2(a)(xv). Seller has provided Purchaser with true, complete and correct copies of all organizational documents of such Acquired JV Entities and its subsidiaries, a list of which is set forth on Schedule 10.2(a)(xv) (the "Acquired JV Entity Organizational Documents"). Except as disclosed on Schedule 10.2(a)(xv), no Seller, affiliate of Seller or any counterparty to the Acquired JV Entity Organizational Documents is in default thereunder. Attached hereto on Schedule

25

10.2(x)(v)(2) is a list of all real property held by the Acquired JV Entities (the "Acquired JV Entity Assets").

The term "Seller's Knowledge" means the actual knowledge of Ms. Jacquie Dowdy, Mr. Greggory Groves and Mr. Joseph Morrissey of Existing Manager as to all Property, the regional Vice Presidents of Existing Manager as to each of their respective Hotels, and the general managers of Existing Manager as to each of their respective Hotels (each, a "Seller Knowledge Party"), without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Seller or any of its affiliates. In no event shall any Seller Knowledge Party have any personal liability for any claim, cause of action or other liability arising out of or relating to the representations and warranties set forth in this Agreement.

(b)     If at any time prior to a Closing any Sellers learn or have reason to believe that any of the aforesaid representations and warranties are no longer true or valid and/or the information on the Schedules attached is no longer accurate as to any applicable Closing for such Property, Sellers shall notify Purchaser in writing within five (5) business days, but in no event later than one business day before such applicable Closing Date, specify the factors rendering or likely to render such representations or warranties untrue or invalid (and, if, to Purchaser's Knowledge, any of said representations or warranties has become inaccurate between the Effective Date and the applicable Closing Date, then Purchaser shall promptly notify Seller in writing of such change), and update all Schedules which must be updated at such Closing in order to be true and valid at such Closing (any such disclosure or update, a "New Disclosure").

## ARTICLE XI.
## Conditions and Covenants

11.1    **Sellers' Covenants**.

(a)     Seller shall, with respect to the portion of the Property it owns, comply in all respects with the covenants and obligations set forth in the the Plan, including, without limitation, such covenants and obligations set forth in Article VI(b) of the Plan.

(b)     Seller shall, and shall cause Existing Manager to, comply in all respects with the covenants and obligations with respect to employees as set forth in the Plan.

(c)     Sellers shall cause each of the Non-Debtor Acquired JQH Entities to comply with all covenants set forth in this Agreement which are applicable to any Property held by such Non-Debtor Acquired JQH Entities, and to convey any such Property held by such Non-Debtor Acquired JQH Entities to Purchaser at the Closing applicable to such Property in accordance with the terms of this Agreement.

11.2    **Conditions to Purchaser's Obligation to Close**.  The obligations of Purchaser to close the transactions contemplated by this Agreement and to pay the Consideration are conditioned upon and subject to the satisfaction on or before any Closing Date (or written waiver by Purchaser) of each of the following conditions, as described in Section 11.3 below:

26

(a)     Sellers shall have performed and complied with all material agreements, covenants and conditions to be performed or complied with by Sellers on or prior to the applicable Closing Date, other than as a result of a Purchaser Default.

(b)     All of Sellers' representations and warranties set forth in this Agreement shall be materially true and correct as of the applicable Closing Date (or shall have been amended to be true in accordance with Section 10.2(b)), except for any failure of such representations and warranties to be true and correct that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect with respect to the Property, the Business, or this transaction, taken as a whole.  "Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of Sellers, (b) the ability of Sellers to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which Sellers operate; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Purchaser; (vi) any matter within Purchaser's Knowledge as of the date hereof; (vii) any changes in applicable laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; or (viii) any natural or man-made disaster or acts of God.

(c)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to Purchaser in its sole discretion and such Confirmation Order shall have become a Final Order (as defined in the Plan).  For the avoidance of doubt, the Confirmation Order must, *inter alia*, (i) approve, pursuant to §§105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery, and performance by Seller of this Agreement and the terms of this Agreement in all respects, (B) the sale of the Property to Purchaser on the terms set forth herein and free and clear of all claims, interests, liens, charges or other encumbrances (other than in connection with the Loan Assumptions), and (C) the performance by Seller of its obligations under this Agreement; (ii) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts; (iii) enjoin and forever bar any creditors or any other person from bringing any claims or asserting any liens against Purchaser or the Property other than in connection with the Loan Assumptions or as otherwise permitted by the Plan; and (iv) finding that (A) the consideration provided by Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Property, (B) as of each Closing, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Property, (C) Seller gave due and proper notice of the transactions contemplated by this Agreement to each party entitled to such notice, (D) this Agreement was negotiated and entered into at arms' length and Purchaser is a "good faith" buyer within the meaning of §363(m) of the Bankruptcy Code and grants Purchaser the protections of §363(m) of the Bankruptcy Code, (E) Purchaser is not a successor to

the Seller, and (F) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof, as provided for in Section 13.6.

(d)     All conditions to the effectiveness of the Plan on the Effective Date shall have been waived or satisfied other than (i) consummation of the transactions contemplated hereby and (ii) conditions within the control of the Seller to cause to occur on any applicable Closing Date.

(e)     All closing conditions set forth in the "Plans Documents" (as defined in the Plan) have been satisfied.

(f)     Subject to §1.3(b) of this Agreement, Seller shall have obtained all Required Consents or has obtained through the Confirmation Order or other order of a court of competent jurisdiction authorizing the assumption and assignment to Purchaser of the Assigned Contracts.

(g)     Seller shall have obtained all Payoff Documentation related to any Property being conveyed on the applicable Closing Date and the Parties shall request that the Bankruptcy Court (as defined in the Plan) include in its order approving this Agreement a direction to all lenders and contracting parties to immediately provide such Payoff Documentation to Seller upon request.

11.3   **Failure to Satisfy Purchaser's Closing Conditions**.  If any one or more of the closing conditions set forth in Sections 11.2(a) (with respect to the Property, the Business, Purchaser or this transaction), 11.2(b) (with respect to the Property, the Business, Purchaser or this transaction), 11.2(c), 11.2(d), 11.2(e), 11.2(f) or 11.2(g) have not been satisfied as of any Closing Date, then Purchaser shall be entitled to terminate this Agreement by written notice to Seller, in which case the Title Company shall refund the Earnest Money to Purchaser, and the parties shall have no further rights or obligations hereunder, except for those which expressly survive such termination. For the avoidance of doubt, in the event that the transactions described in this Agreement are consummated on more than one Closing Date, in no event shall any failure of a closing condition for a subsequent Closing Date cause the unwinding of any Closings which have occurred on a prior Closing Date.

11.4   **Conditions to Sellers' Obligation to Close**.  The obligation of Sellers to close the transactions contemplated by this Agreement is conditioned upon and subject to the satisfaction on or before any Closing Date (or written waiver by Sellers) of all of the following conditions:

(a)     Purchaser shall have performed and complied with all material agreements, covenants and conditions to be performed or complied with by Purchaser on the applicable Closing Date, other than as a result of a Seller Default.

(b)     All Purchaser's representations and warranties set forth in this Agreement shall be materially true and correct as of the applicable Closing Date.

28

(c)     At no time on or before the applicable Closing Date shall any Bankruptcy Event have occurred with respect to Purchaser, and if Purchaser is a partnership, any general partners of Purchaser.  As used herein, a "<u>Bankruptcy Event</u>" means any of the following:  (1) the commencement of a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable federal or state bankruptcy law or other similar law; (2) the appointment of a trustee or receiver of any property interest; (3) an assignment for the benefit of creditors; (4) an attachment, execution or other judicial seizure of a substantial property interest; (5) the taking of, failure to take, or submission to any action indicating an inability to meet its financial obligations as they accrue; or (6) a dissolution or liquidation, death or incapacity.

**ARTICLE XII.**
**<u>Intentionally Deleted</u>**

**ARTICLE XIII.**
**<u>Miscellaneous</u>**

13.1     **<u>Entire Agreement</u>**.  This Agreement contains the entire agreement of the Parties.  There are no other agreements, oral or written, and this Agreement may be amended or modified, and any obligation, liability, breach or default may be waived, only by written agreement signed by the Parties, and by reference, made a part hereof.

13.2     **<u>Binding</u>.**  This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto.  Purchaser may assign its rights under this Agreement, in whole or in part, to any person or entity, or may designate any person or entity to be a designee, in whole or in part, at any Closing, provided that the following conditions are met:  (a) the assignment may only occur upon, and be effective as of the applicable Closing Date; (b) the assignee of Purchaser must be an entity which is owned or controlled by Purchaser and (c) Purchaser shall remain primarily liable for the performance of Purchaser's obligations.  Purchaser further acknowledges that it shall not be entitled to increase or "mark up" the Consideration in assigning this Agreement to a third party, and Sellers shall have no obligation to approve any such proposed assignment.

13.3     **<u>Effective Date</u>**.  The Effective Date of this Agreement shall be the date the Confirmation Order becomes a Final Order (as defined in the Plan).

13.4     **<u>Notice</u>**.  Any notice, communication, request, reply or advice (collectively, the "<u>Notice</u>") provided for or permitted by this Agreement to be made or accepted by either Party must be in writing.  Notice may, unless otherwise provided herein, be given or served by (i) sending the Notice by the United States mail, postage paid, certified, and addressed to the Party to be notified, with return receipt requested, (ii) sending the Notice by a national recognized courier service, and addressed to the Party to be notified, with a written receipt of delivery, or (iii) delivering the Notice in person to such Party, and addressed to the Party to be notified, with a written receipt of delivery.  Notice shall be effective only if and when received by the Party to be notified between the hours of 8:00 A.M. and 5:00 P.M. Central time of any business day with delivery made after such hours to be deemed received the following business

Case 16-21142    Doc# 1900    Filed 03/16/18    Page 129 of 172

day, provided that a Notice shall be effective upon the date of attempted delivery if the Party to be notified refuses to accept delivery of such Notice, or such Party is no longer at the address set forth below and has not notified the sending Party of its new address.  For the purposes of notice, the addresses of the Parties shall, until changed as hereinafter provided, be as follows:

Sellers: _____
_____
_____
_____

with a copy to: Stinson Leonard Street LLP
6400 S. Fiddlers Green Circle, Suite 1900
Greenwood Village, CO 80111
Attention:  Mark A. Shaiken

Stinson Leonard Street LLP
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Attention:  Alan W. Van Dellen

Stinson Leonard Street LLP
1201 Walnut, Suite 500
Kansas City, MO 64106
Attention:  Nicholas J. Zluticky

Purchaser: J.D. Holdings, L.L.C.
1114 Avenue of the Americas, 39th Floor
New York, NY 10036
Attention:  General Counsel

with a copy to: Kirkland & Ellis
300 N. LaSalle Street
Chicago, IL 60654
Attention: Andrew Small

and

with a copy to: Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005
Attention: Scott Edelman

The parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America by at least five (5) days written notice to the other Party.

30

13.5 **Time**. Time is of the essence in all things pertaining to the performance of this Agreement.

13.6 **Governing Law; Submission to Jurisdiction**. This Agreement shall be construed in accordance with the laws of the State of Kansas. By executing this Agreement, the parties hereto submit themselves to the jurisdiction of the Court in the Bankruptcy Case solely for the purpose of the consummation of the transactions contemplated herein, and interpretation and enforcement of this Agreement.

13.7 **Currency**. All dollar amounts are expressed in United States currency.

13.8 **Section Headings**. The section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

13.9 **Obligations**. In addition to all the obligations of the Parties regarding cooperation as set forth in the Plan, until the last Delayed Closing Date, or the earlier termination of this Agreement, with respect to all Property which has not yet been conveyed, the Parties shall use commercially reasonable efforts to take, or cause to be taken, all actions necessary, appropriate or advisable to complete the transaction described in this Agreement, including (a) obtaining all necessary consents, approvals and authorizations required to be obtained from any governmental authority or other person or entity under this Agreement or applicable law, (b) providing written notice to any person or entity under any Ground Leases, Facilities Agreements, Service Contracts, FF&E Leases, Licenses, Existing Franchise Agreements, Tenant Leases, or JV Agreements, regarding the change in ownership of the Property, (c) obtaining any Required Consents, (d) making all registrations and filings required under this Agreement or applicable law, (e) cooperating with requests of Purchaser and Purchaser's lender in connection with the Financings, and (f) preparing, executing and filing any affidavits and questionnaires required by any governmental entity in connection with the payment and calculation of transfer and sales taxes, including any transferee affidavits. In addition to the foregoing, Sellers shall take any actions necessary or advisable to perform its obligations under Section 7.1(d) until the last Delayed Closing Date. After any Closing, the Parties shall use commercially reasonable efforts to take, or cause to be taken, all actions necessary, appropriate or advisable to further effect the transaction described in this Agreement, including the execution of any further required documentation to convey any portion of the Property. This Section shall survive any Closing, provided, however, the obligations of Seller hereunder after Closing shall be limited to the extent that Seller has the personnel and resources available to perform such obligations. Any dispute regarding Seller's performance of its obligations under this Section 13.9 shall be resolved by Judge Dale Somers, as mediator.

13.10 **Business Days**. In the event that any date or any period provided for in this Agreement shall end on a Saturday, Sunday or legal holiday, the applicable date or period shall be extended to the first business day following such Saturday, Sunday or legal holiday.

13.11 **No Recordation**. Without the prior written consent of Sellers, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining

31

hereto and any such recordation of this Agreement or memorandum hereto, by Purchaser without the prior written consent of Sellers shall constitute a default hereunder by Purchaser, whereupon this Agreement shall, at the option of Sellers, terminate and be of no further force and effect. Upon such termination of this Agreement all Earnest Money shall be immediately delivered to Sellers, whereupon the parties shall have no further duties or obligations one to the other except the obligations which expressly survive Closing.

13.12 **Multiple Counterparts**. This Agreement may be executed in multiple counterparts (each of which is to be deemed an original for all purposes).

13.13 **Severability**. If any provision hereof, or any portion of any provision hereof, shall be deemed to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of any provision, or any other provisions hereof, as each provision of this Agreement shall be deemed to be severable from all other provisions hereof.

13.14 **Waivers**. The waiver of either Party of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted herein, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

13.15 **Negotiations**. This Agreement is the result of negotiations between the Parties and, accordingly, shall not be construed for or against either Party regardless of which Party drafted this Agreement, or any portion thereof.

13.16 **Escrow Instructions**. This Agreement constitutes escrow instructions to Title Company as escrow agent for the purchase of and conveyance of title to the Property. The Title Company shall submit any filings to the Internal Revenue Service required from any of the Parties under Section 6045(a) of the Internal Revenue Code of 1986 and regulations promulgated thereunder (the "<u>Code</u>"), and the Parties hereto shall cooperate with the Title Company as necessary to comply with applicable laws and regulations.

13.17 **No Partnership**. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest.

13.18 **Waiver of Jury Trial**. **THE PARTIES HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE PROVISIONS OF THIS AGREEMENT, ANY OF THE CLOSING DOCUMENTS AND ANY OF THE TRANSACTIONS DESCRIBED HEREIN OR THEREIN, OR IN ANY WAY RELATED TO ANY OF THE FOREGOING.**

13.19 **Intentionally Deleted.**

13.20 **Limitation of Liability**. In no event shall any Seller, its direct or indirect partners, shareholders, owners or affiliates, any officer, director, employee or agent of the

32

foregoing, or any affiliate or controlling person thereof, have any liability, beyond its interest in the Property, for any claim, cause of action or other liability arising out of or relating to this Agreement, any agreement made or entered into under or in connection with this Agreement, any amendment hereof or thereof, or the Property, whether based on contract, common law, statute, equity or otherwise. The limitations of liability contained in this Section shall survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to Sellers provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument.

    13.21  **Intentionally Deleted.**

    13.22  **Exhibits and Schedules**. The following Exhibits and Schedules are attached hereto and incorporated herein for all purposes:

| | |
|---|---|
| Exhibit A | - Form of Deed |
| Exhibit B | - Form of Assignment and Assumption of Ground Lease |
| Exhibit C | - Form of Assignment of Facility Agreement |
| Exhibit D | - Form of Bill of Sale |
| Exhibit E | - Form of Non-Foreign Affidavit |
| Exhibit F | - Form of Assignment and Assumption of Tenant Leases and Occupancy Agreements |
| Exhibit G | - Form of Notice Letter |
| Exhibit H | - Form of Assignment and Assumption of Membership Interest |
| Exhibit I | - Form of Required Consent |
| Exhibit J | - Form of Estoppel Certificate |
| Exhibit K | - Omnibus Waiver and Release |

| | |
|---|---|
| Schedule A | - List of Sellers |
| Schedule B-1 | - Hotels |
| Schedule B-2 | - Developments |
| Schedule B-3 | - Vacant Land |
| Schedule C | - Assigned Contracts |
| Schedule 1.1(a) | - Fee Premises |
| Schedule 1.1(b) | - Ground Leases |
| Schedule 1.1(f) | - Facility Agreements |
| Schedule 1.1(r) | - Accounts |
| Schedule 1.1(s) | - Acquired JQH Entities |
| Schedule 1.1(t) | - Acquired JV Entities |
| Schedule 2.3(b)(i) | - Goldman Loan Documents |
| Schedule 2.3(b)(ii) | - Goldman Loan Hotels |
| Schedule 2.3(b)(iii) | - Prudential Loan Documents |
| Schedule 2.3(b)(iv) | - Prudential Loan Hotel |
| Schedule 5.1(b) | - Permitted Exceptions |
| Schedule 10.2(a)(iv)(1) | - Acquired JQH Entity Organizational Documents |
| Schedule 10.2(a)(iv)(2) | - Acquired JQH Entity Assets |
| Schedule 10.2(a)(v) | - Pending Litigation |
| Schedule 10.2(a)(vi) | - Written Notice of Violation of Any Law |

33

Schedule 10.2(a)(vii)    - Pending Condemnations
Schedule 10.2(a)(viii)   - FF&E Encumbrances
Schedule 10.2(a)(xiii)   - Affiliate Agreements
Schedule 10.2(a)(xiv)    - Non-Debtor Acquired JQH Entities Representation and Warranty Exceptions
Schedule 10.2(a)(xv)     - Acquired JV Entity Organizational Documents

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly signed, all as of the date first above written.

**SELLERS**:

JACQUELINE DOWDY AND GREGGORY GROVES AS SUCCESSOR TRUSTEES OF THE REVOCABLE TRUST OF JOHN Q. HAMMONS, DATED DECEMBER 28, 1989, AS AMENDED AND RESTATED

By: _____
Name:  Jaqueline Dowdy
Title:  Successor Trustee


Date: _____


By: _____
Name:  Greggory Groves
Title:  Successor Trustee


Date: _____


**PURCHASER**:

JD HOLDINGS, L.L.C., a Connecticut limited liability company,

By: _____
Name: _____
Title: _____


Date: _____

35

## JOINDER BY NON-DEBTOR PARTIES

The undersigned Non-Debtor Acquired JQH Entities hereby acknowledge and agree that each such Non-Debtor Acquired JQH Entity shall comply with the covenants and obligations set forth in this Agreement as such covenants and obligations relate to any Property owned by such Non-Debtor Acquired JQH Entity, and that, to the extent action or cooperation of such Non-Debtor Acquired JQH Entity is required in order to effectuate the terms and covenants of the Agreement that such Non-Debtor Acquired JQH Entity is obligated to take such action and is liable under this Agreement as it relates to any Property owned by such Non-Debtor Acquired JQH Entity. To the extent that a representation or warranty under this Agreement pertains to a portion of the Property owned by a Non-Debtor Acquired JQH Entity, such representation or warranty shall be deemed to be given jointly by such applicable Non-Debtor Acquired JQH Entity.

[NON-DEBTOR ACQUIRED JQH ENTITY SIGNATURE BLOCKS TO BE INSERTED]

## JOINDER BY TITLE COMPANY

First American Title Insurance Company, referred to in this Agreement as the "Title Company," hereby acknowledges that it received this Agreement executed by Sellers and Purchaser on the _____ day of _____, 2018, and accepts the obligations of the Title Company as set forth herein. It further acknowledges that it received the Earnest Money on the _____ day of _____, 2018. The Title Company hereby agrees to hold and distribute the Earnest Money in accordance with the terms and provisions of this Agreement.

First American Title Insurance Company

By:_____
Name: _____
Title: _____

Date:_____

## EXHIBIT A

### Form of Deed

[to be conformed as necessary in each jurisdiction]

THE STATE OF _____§
§
COUNTY OF _____§

_____, a _____ ("Grantor"), whose address is _____, _____, _____, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) paid to Grantor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has, subject to the exceptions hereinafter set forth, GRANTED, SOLD, and CONVEYED and does hereby GRANT, SELL, and CONVEY unto _____, a _____ (the "Grantee"), whose address is _____, certain land, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Land"), together with all improvements on the Land (the "Improvements") and Seller's right, title and interest, if any, in all water rights and minerals associated with the Land, including, without limitation, any oil, gas, lignite, coal, or other hydrocarbon substance and minerals located in, on or under the Land, together with all rights, privileges and appurtenances pertaining to such minerals (such Land and Improvements and all other property specified above being hereinafter collectively referred to as the "Property").

This conveyance is made and accepted subject to all matters of public record, including, without limitation those set out in Exhibit B attached hereto and incorporated herein by reference.

TO HAVE AND TO HOLD the Property, together with all rights and appurtenances pertaining thereto, including all of Grantor's right, title and interest, if any, in and to any land lying in the bed of any street, road or access way, opened or proposed, in front of, at a side of or adjoining the Land to the centerline thereof and all right, title and interest of Grantor, reversionary or otherwise, in and to all easements in or upon the Land and all other rights and appurtenances belonging or in anywise pertaining thereto, unto Grantee and Grantee's successors, heirs, and assigns forever; and Grantor does hereby bind itself and its successors and assigns to warrant and, to the extent practicable, forever defend the Property unto Grantee and Grantee's successors, heirs, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

This Deed is given pursuant to that certain Purchase and Sale Agreement (as amended, the "Agreement") dated as of _____, 2018, between Grantor and Grantee, providing for, among other things, the conveyance of the Property. All taxes and assessments for the year as of which this Deed is executed have been prorated as of the effective date of this Deed, and Grantee hereby assumes liability for the payment thereof.

EXECUTED on the date set forth in the acknowledgement, to be effective as of the _____ day of _____, 2018.

A-1

THE STATE OF _____ §
                               §
COUNTY OF _____ §


    This instrument was acknowledged before me on _____, 2018, by _____, _____ of _____, a _____, on behalf of said _____.


                                      _____
                                      Notary Public

                                      Name of Notary: _____
                                      My Commission Expires: _____

A-2

<u>**EXHIBIT B**</u>

<u>Form of Assignment and Assumption of Ground Lease</u>

[to be conformed as necessary in each jurisdiction]

[See attached]

---

(Above space for Recorder's use only)

<u>**ASSIGNMENT AND ASSUMPTION OF GROUND LEASE**</u>

(Recorder's Cover Page)

**Assignor:**
[•], a [•]

**Assignee:**
[•], a [•]

**Legal Description:**  See "<u>Exhibit A</u>" on page 4

**Tax Parcel Number(s):**

**Taxpayer:**
[•]

_____

_____

_____
Attention:_____
Phone:_____

**Document prepared by:**
[•]

_____

_____

Phone:_____

B-1

**Recording requested by and return to:**

[•]

_____

_____

Attention:_____

Phone:_____

This cover page is provided for information purposes only.

**(Above Space for Recorder's Use Only)**

**PREPARED BY:**

[•]

_____

_____

Phone:_____

**RECORDING REQUESTED BY**
AND UPON RECORDATION RETURN TO:

[•]

_____

_____

Attention:_____

B-2

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASE (this "Assignment") is made as of this ___ day of _____, 2018 (the "Effective Date"), by and between [•], a [•] ("Assignor"), and [•], a [•] ("Assignee").

## RECITALS

WHEREAS, Assignor has agreed to sell, assign, transfer and convey to Assignee, and Assignee has agreed to assume all of Assignor's right title and interest under that certain _____, dated as of [•], [•], and as amended from time to time, with _____ (the "Agreement") related to the property described on Exhibit A, and commonly known as _____ (the "Property");

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. ASSIGNMENT AND ASSUMPTION

a)   Assignment by Assignor.  As of the Effective Date, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in and to the Agreement, together with any deposits thereunder made or held by Assignor.

b)   Acceptance and Assumption by Assignee.  As of the Effective Date, Assignee hereby accepts the assignment, transfer and conveyance of the Agreement, together with the deposits thereunder made or held by Assignor, and agrees to assume and perform all of the obligations, liabilities, covenants, duties and agreements of Assignor under the Agreement.

2. MISCELLANEOUS

a)   Governing Law and Jurisdiction.  This Assignment shall be governed by and construed in accordance with the domestic laws of the State of _____, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of _____.

b)   Entire Agreement.  This Assignment and the other documents, agreements and instruments executed and delivered in connection herewith (a) constitute the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof, and (b) is for the benefit only of the parties hereto and is not intended to create any obligations to, or rights in respect of, any persons other than the parties hereto.

c)   Amendments and Waivers.  This Assignment may not be modified or amended except by a written instrument signed by the Parties. No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach of the same or similar nature.

B-3

d)    <u>Assignment; Third Party Beneficiaries</u>.  This Assignment shall be binding upon and inure to the benefit of the successors and permitted assigns of each of the parties hereto. Any assignment by a party hereto requires consent of the other parties hereto except that any party may assign its rights and obligations hereunder to an affiliate of such party.  There shall be no third party beneficiaries to this Assignment.

e)    <u>Severability</u>.  If any provision of this Assignment shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Assignment shall not in any way be affected or impaired thereby and shall continue in full force and effect.

f)    <u>Counterparts</u>.  For the convenience of the parties hereto, this Assignment may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

g)    <u>Captions</u>.  The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Assignment and shall not be deemed to limit or otherwise affect any of the provisions hereof.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be executed and delivered in their names by their respective duly authorized officers or representatives as of the date set forth above.

**ASSIGNOR**:

_____

By: _____
Name: _____
Title: _____

STATE OF _____)
                             ) SS.
COUNTY OF _____)

THIS INSTRUMENT was acknowledged before me on _____ ___, 2018, by _____, the _____ of _____, a _____, on behalf of said _____.

WITNESS my hand and official seal.

_____
Notary's Signature

Printed Name: _____
My commission expires: _____
                              (SEAL)

B-5

**ASSIGNEE**:

_____

By: _____
Name: _____
Title: _____


STATE OF _____ )
                                 ) SS.
COUNTY OF _____ )


      THIS INSTRUMENT was acknowledged before me on _____ ___, 2018, by _____, the _____ of _____, a _____, on behalf of said _____.

                                WITNESS my hand and official seal.

                                _____
                                Notary's Signature

                                Printed Name: _____
                                My commission expires: _____
                                            (SEAL)

B-6

**EXHIBIT A**

**THE PROPERTY**

**<u>EXHIBIT C</u>**

<u>Form of Assignment of Facility Agreement</u>

[to be conformed as necessary in each jurisdiction]

[See attached]

C-1

---

(Above space for Recorder's use only)

## **ASSIGNMENT AND ASSUMPTION OF [•]**

(Recorder's Cover Page)

**Assignor:**
[•], a [•]

**Assignee:**
[•], a [•]

**Legal Description:** See "Exhibit A" on page 4

**Tax Parcel Number(s):**

**Taxpayer:**
[•]

_____

_____

Attention:_____
Phone:_____

**Document prepared by:**
[•]

_____

_____

Phone:_____

**Recording requested by and return to:**
[•]

_____

_____

Attention:_____
Phone:_____

C-2

## ASSIGNMENT AND ASSUMPTION OF [•]

THIS ASSIGNMENT AND ASSUMPTION OF [•] (the "Assignment") is made and entered into as of _____, 2018 (the "Effective Date"), between [•], a [•] ("Assignor"), and [•], a [•] ("Assignee").

### RECITALS OF FACT

A.      Assignor has agreed to sell, assign, transfer and convey to Assignee, and Assignee has agreed to assume all of Assignor's right, title and interest under that certain _____, dated as of [•], [•], and as amended from time to time, with _____ (the "Agreement") related to the property described on Exhibit A, and commonly known as _____ (the "Property").

NOW, THEREFORE, incorporating the foregoing recitals of fact, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

### ARTICLE I

Section 1.1.      Assignment.  As of the Effective Date, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in and to the Agreement, together with any deposits thereunder made or held by Assignor.

Section 1.2.      Assumption.  As of the Effective Date, Assignee hereby accepts the assignment, transfer and conveyance of the Agreement, together with the deposits thereunder made or held by Assignor, and agrees to assume and perform all of the obligations, liabilities, covenants, duties and agreements of Assignor under the Agreement.

Section 1.3.      Cooperation.  Assignor and Assignee agree to cooperate in a commercially reasonable manner with each other, without being obligated to incur expense, in enforcing all rights of Assignor or Assignee, as the case may be, against persons obligated under the Agreement.

### ARTICLE II
### MISCELLANEOUS PROVISIONS

Section 2.1      Governing Law and Jurisdiction.  This Assignment shall be governed by and construed in accordance with the domestic laws of the State of _____, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of _____.

Section 2.2      Entire Agreement.  This Assignment and the other documents, agreements and instruments executed and delivered in connection herewith (a) constitute the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof, and (b) is for the benefit only of the parties hereto and is not intended to create any obligations to, or rights in respect of, any persons other than the parties hereto.

C-3

Section 2.3    Amendments and Waivers.  This Assignment may not be modified or amended except by a written instrument signed by the Parties. No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach of the same or similar nature.

Section 2.4    Assignment; Third Party Beneficiaries.  This Assignment shall be binding upon and inure to the benefit of the successors and permitted assigns of each of the parties hereto. Any assignment by a party hereto requires consent of the other parties hereto except that any party may assign its rights and obligations hereunder to an affiliate of such party.  There shall be no third party beneficiaries to this Assignment.

Section 2.5    Severability. If any provision of this Assignment shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Assignment shall not in any way be affected or impaired thereby and shall continue in full force and effect.

Section 2.6    Counterparts.  For the convenience of the parties hereto, this Assignment may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 2.7    Captions.  The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Assignment and shall not be deemed to limit or otherwise affect any of the provisions hereof.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

C-4

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be executed and delivered in their names by their respective duly authorized officers or representatives as of the date set forth above.

**ASSIGNOR**:

_____

By:_____
Name: _____
Title: _____

STATE OF _____)
                                                    ) SS.
COUNTY OF _____)

THIS INSTRUMENT was acknowledged before me on _____ ___, 2018, by _____, the _____ of _____, a _____, on behalf of said _____.

WITNESS my hand and official seal.

_____
Notary's Signature

Printed Name: _____
My commission expires: _____
                                              (SEAL)

**ASSIGNEE**:

_____

By:_____
Name: _____
Title: _____

STATE OF _____)
                                                    ) SS.
COUNTY OF _____)

C-5

THIS INSTRUMENT was acknowledged before me on _____ ___, 2018, by _____, the _____ of _____, a _____, on behalf of said _____.

WITNESS my hand and official seal.

_____
Notary's Signature

Printed Name: _____
My commission expires: _____
(SEAL)

C-6

# **EXHIBIT A**

THE PROPERTY

C-7

Form of Bill of Sale

[to be conformed as necessary in each jurisdiction]

## BILL OF SALE AND ASSIGNMENT

THIS Bill of Sale and Assignment (the "<u>Bill of Sale</u>") is executed as of _____, 2018, by _____, a _____ ("<u>Seller</u>").

## RECITALS OF FACT

Concurrently with the delivery of this instrument, Seller has sold to _____, a _____, (the "<u>Purchaser</u>") and Purchaser has purchased from Seller that certain real property, as more particularly described on <u>Exhibit A</u> attached hereto and incorporated by reference (the "<u>Property</u>") pursuant to that certain Purchase and Sale Agreement between Purchaser and Seller dated as of _____, 2018 (the "<u>Purchase and Sale Agreement</u>").

Pursuant to the Purchase and Sale Agreement, Seller agreed to sell to Purchaser certain personal property.

Capitalized terms used herein and not otherwise defined have the meanings assigned to them in the Purchase and Sale Agreement.

NOW, THEREFORE, incorporating the foregoing recitals of fact, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller agrees as follows:

ARTICLE I
SALE OF FF&E

A.    <u>Sale</u>.  Seller hereby sells, assigns and transfers to Purchaser, without warranty or recourse, all Sellers' right, title and interest in and to the FF&E and Supplies (collectively, the "<u>FF&E</u>").

ARTICLE II
ASSIGNMENT OF INTANGIBLE FF&E

A.    <u>Assignment</u>.  Seller hereby sells, assigns and transfers to Purchaser, without warranty or recourse, all of Sellers' right, title and interest in and to all Service Contracts, Warranties, Licenses, Plans and Specs, FF&E Leases, Intellectual Property, and Records (collectively, the "<u>Intangible Personal Property</u>").

Section 2.1    <u>Assumption</u>.  Purchaser hereby accepts the foregoing assignment, assumes the Service Contracts, Warranties, Licenses, and FF&E Leases and agrees to timely keep,

D-1

perform and discharge all of the obligations of Seller under the Service Contracts, Warranties, Licenses, and FF&E Leases.

Section 2.2    Cooperation.  Purchaser and Seller agree to cooperate in a commercially reasonably with each other, without having to incur expense, in enforcing all rights of Purchaser or Seller, as the case may be, against all persons obligated under the Service Contracts, Warranties, Licenses, and FF&E Leases.

ARTICLE III
MISCELLANEOUS PROVISIONS

Section 3.1    Attorneys' Fees.  In the event of any litigation or arbitration arising out of the subject matter of this Bill of Sale, the non-prevailing party as determined by the court or arbitrator, shall pay the prevailing party's costs and expenses, including without limitation, reasonable attorneys' fees.

Section 3.2    Inurement.  This Bill of Sale shall be binding on and inure to the benefit of the parties and their respective heirs, successors and assigns and representatives, as may be the case.

Section 3.3    Governing Law.  This Bill of Sale shall be governed by and construed in accordance with the laws of the State in which the Property is located.

Section 3.4    Counterparts.  This Bill of Sale may be executed in several counterparts, and all executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart signed by the party to be charged in proving this Bill of Sale.

**[END OF PAGE]**

D-2

IN WITNESS WHEREOF the undersigned has executed this Bill of Sale as of the day and year first above written.

**SELLERS**:

_____

By:_____
Name: _____
Title: _____

D-3

**EXHIBIT E**

Form of Non-Foreign Affidavit

**NON-FOREIGN AFFIDAVIT**

STATE OF _____ §
§
COUNTY OF _____ §

    The undersigned, as authorized agent of _____, a _____ ("Transferor"), after being duly sworn upon his oath deposes and says that:

    Section 1445 of the Internal Revenue Code provides that a transferee of the U.S. real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____, (the "Transferee"), that withholding of tax is not required upon the disposition of Transferor's interest in the real property described on <u>Exhibit A</u> attached hereto and by this reference included herein (the "Property"), the undersigned hereby certifies the following:

    1.    Transferor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust, foreign estate, or other foreign person within the meaning of Sections 1445 and 7701 of the Internal Revenue Code and the treasury regulations promulgated thereunder;

    2.    Transferor's U.S. taxpayer identification number is: _____; and

    3.    Transferor's business address is: c/o _____.

    Transferor understands that Transferee intends to rely on the foregoing representation in connection with the U.S. Foreign Investment in Real Estate Property Tax Act (the "Act") and that this certification may be disclosed to the Internal Revenue Service by Transferee in connection with the Act and that any false statement contained herein could be punished by fine, imprisonment or both.

    Under penalty of perjury, I declare that I have examined this certification and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**SELLERS**:

_____

By: _____
Name: _____
Title: _____

E-1

STATE OF _____ §
                                §
COUNTY OF _____ §


      THIS INSTRUMENT was acknowledged before me on _____ ___, 2018, by _____, the _____ of _____, a _____, on behalf of said _____.


                                      _____
                                      Notary Public

                                      Name of Notary:_____
                                      My Commission Expires:_____

E-2

<u>**EXHIBIT F**</u>

<u>Form of Assignment and Assumption of Tenant Leases and Occupancy Agreements</u>

[to be conformed as necessary in each jurisdiction]

This Instrument Prepared By and When Recorded Mail To:

_____

_____

_____

_____

## <u>ASSIGNMENT AND ASSUMPTION OF TENANT LEASES AND OCCUPANCY AGREEMENTS</u>

THIS ASSIGNMENT AND ASSUMPTION OF TENANT LEASES AND OCCUPANCY AGREEMENTS (the "<u>Assignment</u>") is made and entered into as of _____, 2018, between _____, a _____ ("<u>Seller</u>"), and _____, a _____, (the "<u>Purchaser</u>").

<u>RECITALS OF FACT</u>

A.     Concurrently with the delivery of this Assignment, Seller has sold to Purchaser and Purchaser has purchased from Seller that certain real property, as more particularly described on <u>Exhibit A</u> attached hereto and incorporated by reference (the "<u>Property</u>") pursuant to that certain Purchase and Sale Agreement dated as of _____, 2018 (the "<u>Purchase and Sale Agreement</u>").

B.     Pursuant to the Purchase and Sale Agreement, Seller is to assign to Purchaser and Purchaser is to assume from Seller certain rights and obligations with respect of the Tenant Leases, Occupancy Agreements, and Deposits affecting the Property.

C.     Capitalized terms used herein and not otherwise defined have the meanings set forth in the Purchase and Sale Agreement.

NOW, THEREFORE, incorporating the foregoing recitals of fact, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

## <u>ARTICLE I</u>

Section 1.1.   <u>Assignment</u>.   Sellers hereby assign and transfer to Purchaser, without warranty, recourse or representation of any kind, all of Sellers' right, title and interest in and to the Tenant Leases and Occupancy Agreements (collectively, the "<u>Assigned Documents</u>") and Deposits,

F-1

Section 1.2.    Assumption.  Purchaser hereby accepts the foregoing assignment, assumes the Assigned Documents and Deposits and agrees to timely keep, perform and discharge all of the obligations of Seller under the Assigned Documents.

Section 1.3.    Cooperation.  Purchaser and Seller agree to cooperate in a commercially reasonable manner with each other, without being obligated to incur expense, in enforcing all rights of Purchaser or Seller, as the case may be, against persons obligated under the Tenant Leases and Occupancy Agreements.

## ARTICLE II
## MISCELLANEOUS PROVISIONS

Section 2.1    Incorporation.  The Purchase and Sale Agreement is incorporated in this Assignment as if set forth in full herein.

Section 2.2    Attorneys' Fees.  In the event of any litigation or arbitration arising out of the subject matter of this Assignment, the non-prevailing party as determined by the court or arbitrator, shall pay the prevailing party's costs and expenses, including without limitation, reasonable attorneys' fees.

Section 2.3    Inurement.  This Assignment shall be binding on and inure to the benefit of the parties and their respective heirs, successors, assignees, and representatives, as may be the case.

Section 2.4    Governing Law.  This Assignment shall be governed by and construed in accordance with the laws of the State in which the Property is located.  Any action brought to enforce this Assignment shall be commenced and maintained in state or federal court in the County and State in which the Property is located.  Purchaser irrevocably consents to jurisdiction and venue in such court.

Section 2.5    Counterparts.  This Assignment may be executed in several counterparts, and all executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart signed by the party to be charged in proving this Assignment.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the day and year first above written.

**SELLERS**:

By:  _____
Name:  _____
Title:  _____

F-2

**PURCHASERS**:

_____

By: _____
Name: _____
Title: _____

THE STATE OF _____ §
                                 §
COUNTY OF _____ §


    This instrument was acknowledged before me on _____, 2018, by _____, _____ of _____, a _____, on behalf of said _____. He/she is personally known to me or has produced _____ as identification and did (did not) take an oath.


_____
Notary Public

Name of Notary: _____
My Commission Expires: _____

F-3

## EXHIBIT G

### Form of Notice Letter

[to be conformed in each jurisdiction and to each Premises and use as necessary]


_____, 2018

TO:    [_____]
**[Name of Hotel]**
**[City]**, **[State]**

      This is to notify you that **[Name of Hotel]**, **[City]**, **[State]** (the "Property") has been sold by _____, a _____ ("Seller") to _____, a _____, (the "Purchaser"). Purchaser's address is _____, Attention: _____. All payments of rentals and other amounts hereafter due, under the terms of leases, from tenants of the Property shall be payable as Purchaser shall direct.

      As a part of that sale, liability for all refundable tenant deposits, if any, (and the interest thereon, if any) with respect to the Property has been assumed by Purchaser.

**SELLERS**:

_____
_____, a _____

By: _____
Name: _____
Title: _____


**PURCHASER**:

_____
_____, a _____

By: _____
Name: _____
Title: _____

Case 16-21142   Doc# 1900   Filed 03/16/18   Page 162 of 172

## <u>EXHIBIT H</u>

<u>Form of Assignment of Membership Interest Assignment</u>

<u>Assignment of Membership Interest</u>

THIS ASSIGNMENT OF MEMBERSHIP INTEREST is made as of the __ day of _____, 2018 by [ ] ("**Assignor**") to and in favor of [ ] ("**Assignee**").

WHEREAS, Assignor owns [ ]% of the [_____] interests in [_____] (the "**Membership Interest**"); and

WHEREAS, Assignor desires to assign 100% of its Membership Interest (the "**Transferred Membership Interest**") and Assignee desires to accept the Transferred Membership Interest.

NOW, THEREFORE, in consideration of the payment of Ten and NO/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor, Assignor hereby assigns, transfers and conveys the Transferred Membership Interest to Assignee effective on the date first set forth above.

[SIGNATURES FOLLOW]

[ ]

By: _____
Name: _____
Title: _____

(signatures continuing on the following page)

Assignment of Membership Interests

## ACCEPTANCE OF ASSIGNMENT

       The foregoing Assignment is hereby accepted this ___ day of _____, 2018, and the undersigned assumes the obligations, including accrued obligations, of Assignor related to the Transferred Membership Interest.

[_____]

By: _____

Name: _____

Title: _____

# EXHIBIT I

## Form of Required Consent

[Form to be adapted for Facility Agreements and JV Agreements]

## GROUND LESSOR CONSENT TO THAT CERTAIN ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

WHEREAS, [•], a [•] ("Assignor") has agreed to sell, assign, transfer and convey to [•], a [•] ("Assignee"), and Assignee has agreed to assume all of Assignor's right title and interest under that certain _____, dated as of [•], [•], by and between Assignor, as lessee, and [•], a [•], as lessor ("Ground Lessor"), as amended from time to time (the "Ground Lease").

Ground Lessor under that certain Ground Lease hereby consents to the foregoing Assignment and Assumption of Ground Lease ("Assignment") to which this consent ("Consent") is attached and confirms that the Ground Lease shall continue in full force and effect as assigned to Assignee by the Assignment.

Except as expressly set forth in this Consent, this Consent shall not impose any additional liabilities or obligations on Ground Lessor or otherwise affect any of the rights or remedies of Ground Lessor under the Ground Lease.

This Consent shall not constitute Ground Lessor's consent to any further assignment, subletting or other transfer which requires Ground Lessor's consent under the Ground Lease.

Executed as of this _____ day of _____, 2018.

[•],
a [•]


By: _____
Name: _____
Title: _____

I-1

## GROUND LESSOR ACKNOWLEDGEMENT

COUNTY OF _____)
                                    ) ss:
STATE OF _____)

On _____, before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

State of _____
My Commission Expires: _____

I-2

# EXHIBIT J[1]

## Form of Estoppel Certificate

[Form to be adapted for Facility Agreements]

## GROUND LESSOR ESTOPPEL

### Property Commonly Known As

_____

This GROUND LESSOR ESTOPPEL (this "Agreement") is made as of _____, 2018, by _____, a _____ (the "Lessor"), for the benefit of _____, a _____, in its capacity as the lender of one or more loans (together with its successors and assigns, the "Lender"), _____, a _____ ("[Company]") and _____, a _____ (the "Lessee").

## RECITALS

A.     The Lessor and Lessee have entered into that certain _____, dated as of _____, as amended by that certain _____ (as modified, amended, extended, supplemented, restated or replaced from time to time, collectively, the "Ground Lease"), with respect to the Premises described therein.  Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Ground Lease.

B.     WHEREAS, Lessee and Company will enter into an assignment and assumption of ground lease, whereby Lessee shall assign all of its right, title and interest in the Ground Lease to Company.

C.     WHEREAS, Company and the Lender contemplate entering into a loan agreement (the "Loan Agreement"), whereby the Lender will make a loan (collectively, the "Loan") to Company, to finance the operations of Company, including without limitation, the _____ (the "Hotel"), which shall be secured in part by a mortgage and security agreement (the "Mortgage") upon the leasehold interest in the Premises. In connection with the Loan Agreement, the Lender, Company and the Lessee hereby request the Lessor execute this Agreement.

## AGREEMENT

1.     Entire Agreement.  The Lessor represents and warrants to the Lender, Company and Lessee that (i) the Ground Lease is in full force and effect and, together with the documents specifically enumerated therein, constitutes the entire understanding and agreement of the Lessor and the Lessee with respect to the lease of the Premises to the Lessee, (ii) a true, correct and

---

[1] [NTD: Form will be subject to Lender's review and comment.]

complete copy of the Ground Lease is attached hereto as Exhibit A, and (iii) the Lessor has full power and authority to enter into the Ground Lease and this Agreement.

2.    <u>No Defaults, Offsets and Defenses</u>.  To the best of the Lessor's knowledge, as of the date hereof, (i) neither Lessor nor Lessee is in default under the Ground Lease nor does Lessor have any facts which, with the giving of notice or the passage of time, or both, would constitute a default by Lessor or Lessee under the Ground Lease and (ii) Lessee has no offsets, counterclaims, defenses, deductions or credits whatsoever with respect to the Ground Lease.  All monetary obligations due under the Ground Lease to date have been fully and currently paid.  No controversy presently exists between Lessor and Lessee, including any litigation or arbitration, with respect to the Ground Lease or the Property.

3.    <u>Ownership</u>.  Lessor is the sole record owner of the [leasehold] interest in the land on which the Premises exists and the sole [landlord] under the Ground Lease.  Lessor hereby acknowledges that Lessor's [leasehold] interest in the Premises is not currently subject to any mortgage or other encumbrances and the Mortgage shall not be subject or subordinate to any mortgage encumbering the Lessor's sub-leasehold interest in the Premises.

4.    <u>Rent</u>.  The rent payable under the Ground Lease is $_____ for the term of the Ground Lease, and such rent has been paid through the end of the term.

5.    <u>Security Deposit</u>.  Lessee deposited with Lessor a security deposit in the amount of $_____.

6.    <u>Term; Renewal</u>.  The current term of the Ground Lease commenced on _____ and expires, as described in Section ___ of the Ground Lease. The Ground Lease grants to Lessee [no] options to renew the lease for an additional term.

7.    <u>Notice of Default</u>.  Lessor shall promptly deliver to Lender a copy of any written notice of default that Lessor delivers pursuant to the Ground Lease.  Any such notice to the Lessor shall be sent in the manner provided by Section 8 of this Agreement.  Lessor agrees to accept any cure of such a default tendered by Lender to the same extent as if tendered by the lessee under the Ground Lease.

8.    <u>Notices</u>.  Pursuant to Section ___ of the Ground Lease, notice is hereby given of the Leasehold Mortgage to Lender. Any notice, communication, request or other document or demand required or permitted under this Agreement with respect to Lessor or Lender shall be in writing and shall be deemed delivered on the earlier to occur of (i) receipt or (ii) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to (or such other address as may be designated in writing by such party):

In the case of the Lender:

_____

_____

_____

I-2

Attention:_____
Facsimile No.:_____

With a copy to:

_____
_____
_____
Attention:_____
Facsimile No.:_____

In the case of the Lessor:

_____
_____
_____
Attention:_____
Facsimile No.:_____

With a copy to:

_____
_____
_____
Attention:_____
Facsimile No.:_____

9.    No Waiver.  No waiver of any breach of any of the covenants or conditions of this Agreement shall be construed to be a waiver of or an acquiescence in or a consent to any previous or subsequent breach of the same or of any other condition or covenant.

10.    Third Parties, Successors and Assigns.  This Agreement is made for the benefit of the Lender (and its successors and assigns), Company and Lessee, and no other person or persons shall have any rights or remedies under or by reason of this Agreement or any right to the exercise of any right or power of the Lender hereunder or arising from any default by the Lessor hereunder.

11.    No Modification.  The Ground Lease shall not be modified or amended except by virtue of a written amendment executed by both Lessor and Company, with the consent of Lender. This Agreement shall not be modified or amended except by virtue of a written amendment executed by both Lessor and Lender.

12.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of _____.

I-3

13.     Termination of Agreement.  This Agreement shall remain in full force and effect, and shall be binding on the Lessor and Company so long as the Loan, or any part of it, remains outstanding and unpaid.

14.     Counterparts.  This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing such counterpart.  This Agreement shall be effective when it has been executed by the Lessor and delivered to the Lender.

15.     Approval and Recognition of Lender.  Notwithstanding anything to the contrary set forth in the Ground Lease, the Lessor expressly acknowledges and agrees that (i) the Loan is permitted pursuant to the terms of the Ground Lease and is "Leasehold Loan" (as defined in the Ground Lease) and for all purposes of the Ground Lease, the Mortgage is a "Leasehold Mortgage" and Lender is "Tenant's Mortgagee" and a "Leasehold Lender" (as such terms are defined in the Ground Lease); and (ii) Lender may exercise its rights under the Loan resulting in the acquisition of the Ground Lease or a direct or indirect interest in Company without the need for Lessor consent, (iii) any exercise of the aforementioned rights of Lender shall not trigger any default under the Ground Lease with respect to Company's transfer rights nor, if applicable, any rights of recapture available to Lessor.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Ground Lessor Estoppel to be duly executed and delivered as of the day and year first above written.

**LESSOR**:

_____

By: _____
Name: _____
Title: _____