UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

In re:                                        )
                                              )
JOHN Q. HAMMONS FALL 2006, LLC, et al.        )    Case No. 16-21142-11
                                              )    Jointly Administered
                    Debtors.                  )


**OBJECTION OF MISSOURI STATE UNIVERSITY AND THE MISSOURI STATE UNIVERSITY FOUNDATION TO CONFIRMATION OF THE MODIFIED AMENDED JOINT AND CONSOLIDATED CHAPTER 11 PLANS OF REORGANIZATION FOR ALL DEBTORS FILED BYCREDITOR JD HOLDINGS, L.L.C.**

COMES NOW Missouri State University (the "**University**") and the Missouri State University Foundation (the "Foundation" and together with the University, "**MSU**") and object to confirmation of the *Modified Amended Joint and Consolidated Chapter 11 Plan of Reorganization for All Debtors Filed by Creditor JD Holdings, L.L.C.* (the "**Plan**")[Doc. # 1946]. In support of their objection, MSU states as follows:

**THE OBJECTIONS**

I.  **The Plan Does Not Comply with the Applicable Provisions of Title 11 – Section 1129(a)(1)**

    A.  **The Plan Discriminates Against Creditors Holding Disputed Claims**

1. Despite the Plan representation that JD Holdings shall pay all Allowed Claims *in full* in Cash, those creditors who hold claims which are allowed after the Effective Date receive dissimilar and less favorable treatment that those creditors who are paid on the Effective Date. Such treatment violates section 1123(a)(4) which requires a plan to provide the same treatment for each claim of a particular class.

2. To comply with the mandate of section 112(a)(4), the plan proponent must take reasonable measures to ensure that the disputed and not yet allowed claims (which have the

potential to be allowed) receive the same treatment as the allowed claims within that same class. *See e.g., In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986)(a debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment). Here the Plan fails in two critical respects.

3. First, the Plan does not establish and fund a reserve for the payment of disputed claims that subsequently become allowed claims. Although disputed claims need not be paid until the claims are fixed, the Plan must make provision for payment of the disputed claims so that, if and when allowed, the claims have a reasonable assurance that they will receive identical treatment to the claims paid on the Effective Date. *See e.g., In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986). *See also, In re AMR Corporation*, 562 B.R. 20, 26 (Bankr. S.D.N.Y. 2016); *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011).

4. In this case, a funded reserve is even more essential for creditors holding disputed claims because the promise to pay comes from JD Holdings, a party that: (a) owes no fiduciary duty to the creditors of these estates (and upon whom the Plan imposes no such duty), (b) has no economic incentive to pay such claims after it has acquired the Debtors' assets, (c) has continuously objected to the jurisdiction of this Court,[1] and (d) has provided no information, financial, operational or otherwise, to indicate its ability to pay when a disputed claims is allowed.[2] The holders of disputed claims which are allowed after the Effective Date bear the risk of non-payment and the cost of collection, neither of which is borne by creditors that are

---

[1] Even in its own Plan, JD Holdings does not concede jurisdiction of this Court. Rather, the Plan simply states that the Court "would retain any jurisdiction *it has*…" Plan, Article, XII, p. 31 (emphasis added).

[2] At a minimum, the holders of subsequently allowed claims will be subordinate to at least $1 billion of debt held by Goldman Sachs Mortgage Company, the Sale Lender. See *Modified Amended Disclosure Statement With Respect to Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by Creditor JD Holdings, L.L.C.*, Appendix 6 [Doc#1788].

paid on the Effective Date. Accordingly, in the absence of a segregated and funded disputed claims reserve administered by an independent party, the Plan discriminates against those claim holders in violation of section 1123(a)(4) of the Bankruptcy Code.

5.      Second, the Plan prohibits the post-Effective Date accrual or payment of interest, even as to those disputed claims which are later allowed. See Plan, Article X, Section C. Short of the Plan *requiring* JD Holdings to pay interest accrued on the claim pending allowance, those creditors holding claims to which JD Holdings objects will receive less when their claims are finally allowed than they would have received had they been paid on the Effective Date.[3]

6.      To comply with the mandate of section 1123(a)(4), the distribution to the holders of disputed claims that later become allowed must be made "as if such Allowed Claims had been Allowed Claims on the dates distributions were previously made to the holders of Allowed Claims in the applicable Class." *AMR*, 562 B.R. at 26. Only by compensating the holder of a later allowed claim for the delay in receiving a distribution after the Effective Date (on which all Allowed Claims are to be paid in full) will the Plan's treatment satisfy the requirement of section 1123(a)(4).

7.      Although the creditors in *AMR* received distribution of shares of stock of the reorganized debtor rather than cash, Judge Lane's decision regarding section 1123(a)(4) is instructive. On the effective date of AMR's plan, the debtors established a reserve for the payment of disputed claims that would subsequently become allowed claims. Under the plan, creditors holding disputed claims that were allowed after the plan's effective date received distributions of shares of stock, the number of which had been reduced by the taxes accrued on

---

[3] This discrimination would be avoided if the Plan, as is routine, provided for the establishment and funding of a segregated interest bearing disputed claims reserve on the Effective Date.

the disputed claims reserve (between 27.526 and 28.4351 shares for each $1000 of allowed claims). 562 B.R. at 27. Those creditors moved to require the reorganized debtor to distribute additional shares so they received the same number of shares that had been distributed to the holders of claims that were allowed as of the effective date (30.7553 shares for each $1000 of allowed claims). *Id.* The debtors, in opposition to the request, argued that the creditors had already received all of the "value" to which they were entitled as a result of the appreciation of the stock between the effective date and the date upon which distribution to the creditors was made. The Court rejected the Debtors' interpretation of the plan because, in part, it did not ensure an equitable distribution of value to all unsecured creditors. *Id.* at 34. Only by distributing the same number of shares to the effective date allowed claims and the formerly disputed claimholders did the plan satisfy the principle of equal treatment of claims within a class. *Id.* at 34. *See also, In re Mesa Air Group, Inc.*, 2011 WL 320466 at *8 (Bankr. S.D.N.Y. 2011)(a 10% premium above the value of the new common stock issued to U.S. citizen-creditors on the effective date was necessary to ensure the equal treatment of creditors who were non-U.S. citizens).

8. That the claims of certain creditors are disputed is not justification for discriminatory treatment. *Weiss-Wolf, Inc.*, 59 B.R. at 655. To avoid discriminatory treatment, the Plan must require JD Holdings to establish and fund a disputed claims reserve in the full amount of the disputed claims (with interest accruing for the benefit of the disputed claims) and provide for payment to those creditors who hold claims that are not paid in full on the Effective Date interest accruing from the Effective Date through the date on which the claim is allowed. Only with those protections will the creditors whose claims are targeted by JD Holdings receive the same treatment as those creditors who are paid on the Effective Date.

B. **The Plan Releases Non-Debtor Third Parties**

i. **The Bankruptcy Code Prohibits Third Party Releases**

9. The presence of the releases contained in Article VIII, Sections E and G of the Plan renders the Plan non-confirmable as a matter of law. In interpreting the provisions of the Bankruptcy Code, the Supreme Court has mandated that where, as in the case of sections 524(e) and 1129(a), a statute's language is clear and unambiguous, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241 (1989). The very first test for confirmation, found in section 1129(a)(1), requires that a plan comply with the applicable sections of the Bankruptcy Code. Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. 524(e). Therefore, if a plan violates section 524(e), then it cannot, as a matter of law, satisfy the confirmation requirement of section 1129(a)(1).[4]

10. Consistent with the principles enunciated above, the Tenth Circuit Court of Appeals has ruled that non-debtor releases and permanent injunctions are impermissible as a matter of law. *See, Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601 (10th Cir. 1990)(citation omitted).

> [I]t is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders… we follow the Ninth Circuit's lead in In re American Hardwoods, Inc. 855 F.2d at 621 and hold that … the stay may not be extended post confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor (citations omitted). Not only does such a permanent injunction improperly insulate nondebtors in violation of Section 524(e), it

---

[4] In addition, the inclusion in the Plan of releases which are neither consensual nor supported by consideration also violate section 1129(a)(3)'s requirement that the plan be proposed in good faith.

does so without any countervailing justification of debtor protection…

*In re Western Real Estate Fund Inc.*, 922 F.3d at 600-02. *See also, Resorts Intl v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-2 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors").

11. The 1994 Amendments to the Bankruptcy Code likewise support the Tenth Circuit's holding that section 524(e) does not permit bankruptcy courts to release claims against non-debtors. Following the asbestos cases of the 1980's and early 1990's, Congress took specific action, by enacting Section 524(g), which provides that in asbestos cases only, if a series of limited conditions are met, an injunction issued in connection with a reorganization plan may preclude litigation against third parties. This Congressional action, providing for releases in specific and limited circumstance, and the requirements and conditions precedent of section 524(g), make it clear that this subsection constitutes a Congressionally-sanctioned narrow exception to the prohibition contained in section 524(e), specifically designed to apply in asbestos cases only. "That Congress provided explicit authority to bankruptcy courts to issue injunctions in favor of the third parties in an extremely limited class of cases reinforces the conclusion that § 524(e) denies such authority in other, non-asbestos, cases." *In re Lowenschuss*, 67 F.3d at 1402, n.6.

12. The Plan's provisions which enjoin action against, and release, non-debtor parties from the claims of creditors are contrary to the provisions of title 11 and impermissible *See In re Western Real Estate Fund*, 922 F.2d at 600-02. The non-consensual exculpations and releases contained in Article VIII, Sections E and G of the Plan violate Section 524(e) and, as a result, the

Plan does not satisfy section 1129(a)(1)'s mandate that the plan comply with the applicable provisions of the Bankruptcy Code.

### ii. The Releases Do Not Meet the Requirements Imposed Under the "Permissive View"

13. Even in the most lenient of jurisdictions outside of the Tenth Circuit, the Plan's releases would be prohibited as they are not consensual, not supported by consideration and not essential to confirmation of the Plan. *See, e.g., In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994). After reviewing case law throughout the nation, the *Master Mortgage* Court adopted the "permissive view" that a bankruptcy court has the power to issue a permanent injunction or third party releases. Notwithstanding this conclusion, the Master Mortgage Court recognized the "knotty problems" created by such third-party releases and issued the following caution:

> ... a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above [discussed herein below] are present will this Court even entertain the possibility of a permanent injunction.

*Master Mortgage*, 168 B.R. at 937.

14. The releases in the Plan and the circumstances herein most certainly do not meet the "exceptional circumstances" threshold. Furthermore, the *Master Mortgage* "factors" are not present in these cases. First, there is no identity of interest, such as an indemnity obligation, between the Debtors and the third parties to be released such that an action against a non-debtor third party will deplete the assets of the bankruptcy estates. Second, the non-debtor third parties are not contributing consideration to the reorganization. Nowhere has plan proponent identified what value each "releasee" will contribute in consideration for the respective release, leaving the Court to speculate as to what consideration, if any, such party is giving. Third, the release is not essential to the reorganization. Lastly, the release is not consensual as creditors have not voted

to accept or reject the Plan. *Id.* at 935. *See also, In re Sun Edison,* Case No. 16-10992 (Bankr. S.D.N.Y. Nov. 8, 2017)(creditors who did not vote on the plan did not consent to the plan releases); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)[Doc. # 4253](any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the plan and not opting out of the third party releases). Even if the Tenth Circuit's holding in *Western Real Estate Fund* does not create an absolute bar to releases, the plan proponent cannot meet the high threshold necessary for approval of non-consensual third party releases in these cases.

### iii. The Releases Are So Vague As to Be Unenforceable

15. Lastly, the Plan's release provisions are too broad and vague to be enforceable. To start, the beneficiaries of the release, listed below, are so numerous, too vaguely described to be identifiable or are undisclosed to those parties from whom releases are compelled. The released parties include:

- JD Holdings;

- Each of JD Holdings' (undisclosed) Affiliates;

- Misters Eilian and Brown, personally;

- Any Entity in which Mr. Eilian or Mr. Brown has any equity interest, as well as any trust in which either of them is a grantor, trustee or beneficiary;

- Each (undisclosed) predecessor, successor and assign of JD Holdings and of JD Holdings' Affiliates;

- Each current and former shareholder, subsidiary, member (including ex-officio members), officer, director, principal, manager, trustee, employee, partner, attorney, lender, financial advisor, accountant, investment banker, investment advisor, actuary, professional, consultant, agent and representative of JD Holdings, JD Holdings' (undisclosed) Affiliates, predecessor, successor and assign (but only in his, her, or its capacity as such); and

- Goldman Sachs Mortgage Company and undisclosed affiliates, lenders, agents and arrangers providing the Sale Financing Facility.

See Plan, Article I, Section A(54).

16. Second, and similarly stunningly in its overreach, the parties from whom the releases are involuntarily extracted include not only the current holders of claims or equity interests, but also former holders of claims, as well as the Affiliates, shareholders, members, directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, etc. of the current and former claim holders and of their Affiliates. See Plan, Article VIII, Section G.

17. As the final piece of the release, the Plan calls for each of those released parties to be released from any claim, in relevant part, arising from "(xi) **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date**." See Plan, Article VIII, Section G (emphasis added). The Plan as drafted attempts to release claims which neither arise under title 11 nor arise in or are related to these cases – such as a cause of action held by an officer of an affiliate of a creditor against a company in which the principals of JD Holdings have an interest or against a former employee of a predecessor of JD Holdings, and which cause of action arises out of a transaction which is completely unrelated to these Debtors, these cases or even JD Holdings.

18. The release provisions are so broad that the affected claims and causes of action haven't been and can't be identified. Consideration in exchange for, notice of and consent to the releases are all absent. Inclusion of these releases is fatal to confirmation of the Plan.

**C. The Plan Does Not Comply with Sections 363 and 365 of the Bankruptcy Code**

19. Under Article IX of the Plan, JD Holdings shall have until the Effective Date to identify and have the Debtors assume or reject executory contracts or unexpired leases. Furthermore, the schedules to the APA which identify the assets to be acquired by JD Holdings may not be filed until seven days prior to the Confirmation Date. Currently lacking such

fundamental information, MSU objects to confirmation if and to the extent the Plan provides for: (a) the assumption or assumption and assignment of any executory contract between the Debtors and MSU; (b) the sale of any assets of JQH Trust in which MSU may have an interest, unless the interests of MSU are adequately protected under section 363(e); or (c) the sale, transfer or assignment of any assets of JQH Trust unless authorized under section 363(f) or 365.

## II.     The Plan Is Not Proposed in Good Faith – Section 1129(a)(3)

19.     Section 1129(a)(3) expressly requires that a plan of reorganization be proposed in "good faith." 11 U.S.C. § 1129(a)(3). "Good faith" requires "a reasonable likelihood that the plan will fairly achieve a result consistent with the standards prescribed under the Code." *See Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987), *declined to follow on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S 380 (1993*); In re Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir. 1984)*; see also In re Union Fin. Servs. Group, Inc.*, 303 B.R. 390, 423 (Bankr. E.D. Mo. 2003)("The focus under Section 1129(a)(3) is on whether the proposal of a plan is consistent with the objectives of the Bankruptcy Code"). Good faith requires a fundamental fairness in dealing with one's creditors. *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986)

20.     Here, as a matter of law and fact, the terms of the Plan compel the conclusion that JD Holdings has neither provided fundamental fairness to certain of the Debtors' creditors and interest holders nor proceeded with honesty and intentions which are consistent with the objectives of, and required in order to access the extraordinary protections of, the Bankruptcy Code. As detailed herein, the Plan is the vehicle through which JD Holdings is to acquire all of the Debtors assets to the prejudice of the holders of claims yet to be disputed and interests. Under the mantra of a full payment plan, protections of the Code are being ignored.

21. The Debtors are charged with the duty of maximizing the value of the estate for the benefit of their creditors. *See, e.g., In re Enron Corp.,* 279 B.R. 695, 703 (Bankr. S.D.N.Y. 2002)("The Debtors are mindful of their fiduciary duty to maximize the value of the assets of the estate..."). In this case, however, the Debtors' efforts to maximize the value of their assets through a sale or plan have been stymied by the plan proponent's continuing challenge to this Court's jurisdiction. Rather than having a robust auction, the Debtors' assets are to be sold to JD Holdings for a price that is not now, and may never be, known except to the purchaser. There is no valuation of the assets. There is no auction or competitive bidding. There is no "market test." Instead, the Plan offers no means by which the Plan's promise to pay an undisclosed amount to creditors, albeit in "full," and contribute assets to a new charitable trust can be tested for compliance with this primary tenant of bankruptcy – the maximization of asset values. In the absence of a set minimum purchase price and appraisal testimony or a market test, whether the estates have maximized the value of their assets and whether JD Holdings is paying fair consideration for the purchased assets is unknown.

22. JD Holdings' "ulterior motive" to acquire the Debtors assets for less than fair value, a claim to which it asserts entitlement under the right of first refusal, is further evidenced by a combination of less obvious provisions of the Plan which undercut the promise of full payment to creditors. First, the Plan provides that JD Holdings obtains the exclusive right to object to claims and is not required to do so until the Effective Date. Accordingly, those creditors who hold allowed claims as of the Confirmation Date are not assured of receiving the promised 100% dividend on the Effective Date. Second, the Plan fails to establish an interest bearing disputed claims reserve, under the control of an independent party, from which the holders of subsequently allowed claims will be paid. As discussed hereinabove, creditors with

post-Effective Date allowed claims will be faced with the potential and substantial cost of extracting payments from JD Holdings or, worse, the risk that JD Holdings, having pledged its assets to secure at least $1 Billion in loans, can't make such payments. Lastly, it is far from clear that the broad release by creditors in favor of JD Holdings under Article VIII, Section G does not impair or enjoin creditor action resulting from JD Holdings' objection or refusal to pay allowed claims.

23. Nothing in the Plan precludes JD Holdings, which is not assuming a fiduciary duty to creditors under the Plan, from objecting to claims for the purpose of using litigation to delay, or as leverage to negotiate a reduction in, the payments that would otherwise be due and payable on the Effective Date. To the contrary, the absence of a funded reserve and the refusal to pay post-Effective Date interest incentivizes the use of litigation to reduce or defer payment of JD Holdings' purchase price for the Debtors' assets. The decision by JD Holdings to refuse to establish a disputed claims reserve, a common fixture in a Chapter 11 case, speaks more loudly of its true intentions than the potentially illusory promise to pay allowed claims in full.

### III. The Plan Does Not Disclose the Identity and Affiliations of JD Holdings – Section 1129(a)(5)

24. JD Holdings, by retaining the consideration for the purchase of the Debtors' assets, by choosing to pay creditors directly, and by controlling the claim objection process, thereby determining which creditors get paid and when, is the successor to these Debtors. As the Debtors' successor under the Plan, section 1129(a)(5) requires that JD Holdings disclose the identity and affiliations of any individual proposed to serve as its director or officer. However, the Plan is silent. Furthermore, the Plan fails to disclose the identity of the trustee(s) under the New Charitable Trust. Accordingly, for each reason the Plan violates section 1129(a)(5).

**IV.   The Plan is Not Feasible – Section 1129(a)(11)**

25.     JD Holdings has proposed a plan that provides it with great flexibility.  For example, the Plan (a) doesn't expose the Debtors' assets to the market, (b) doesn't require a firm purchase price for the Debtors' assets, (c) permits JD Holdings to retain the sale proceeds, and (d) permits JD Holdings to defer payments to creditors through the potential artifice of claim objections.  But such flexibility must come at a price.  By refusing to establish and fund a disputed claims reserve, the plan proponent makes relevant the financial condition of JD Holdings and its ability to make post-Effective Date payments to the holders of allowed claims.  However, the Disclosure Statement and Plan provide no information regarding JD Holdings' operations or other financial information from which the Court can evaluate JD Holdings ability to make all post-Effective Date payments, including those due on subsequently allowed claims.  In the absence of such detailed financial information, the feasibility of JD Holdings' promise to pay all allowed claims in full cannot be evaluated or established.

26.     Under the Purchase and Sale Agreement, the purchaser may choose, in its sole discretion, to "not purchase all or any portion of the Property…" *Purchase and Sale Agreement*, Section 1.1, p.5.  In that event, the "Excluded Property" is to either (a) remain with the Seller or (b) be conveyed to the new Charitable Trust, if directed by the Seller.  *Id.*  As a result of this provision, Excluded Property, which may include operating assets such as an office buildings or ball park, may remain, post-confirmation, under the ownership of a Debtor, such as the JQH Trust.  However, the Plan does not provide for the post-Effective Date continuation, management or operation of any such Debtor or the retention on any leases and contracts with such Debtor.  Neither does the Plan provide for the liquidation of any Excluded Assets.  As such, the Plan is incomplete and violates section 1129(a)(11).

27. The New Charitable Trust Agreement is not attached to the Plan or Disclosure Statement. The brief discussion of the terms of the New Charitable Trust Agreement – to wit, that JD Holdings will inform the Debtors of the assets to be contributed, that Dowdy and Groves will not be trustees of the New Trust, but that they will designate the charitable organizations to which the Trust assets are to be distributed – is inadequate to establish feasibility. Here again, the incompleteness of the Plan violates section 1129(a)(11).

WHEREFORE, Missouri State University and the Missouri State University Foundation pray for the entry of an order denying confirmation of the *Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors filed by Creditor JD Holdings, L.L.C.* and for such other relief as is just and proper.

Respectfully submitted,

ARMSTRONG TEASDALE LLP

By: *s/ Christine L. Schlomann*
Christine L. Schlomann, KS # 18712
John McClelland, KS Fed. 70724
2345 Grand Blvd., Suite 1500
Kansas City, MO 64108
(816) 472-3153   Fax: (816) 221-0786
jmcclelland@armstrongteasdale.com
cschlomann@armstrongteasdale.com

and

David L. Going MO #33435
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070 Fax: (314)621-5065
dgoing@armstrongteasdale.com

COUNSEL FOR MISSOURI STATE UNIVERSITY AND THE MISSOURI STATE UNIVERSITY FOUNDATION

## CERTIFICATE OF SERVICE

  The undersigned certifies that a copy of the *Objection Of Missouri State University and The Missouri State University Foundation to the Adequacy of the Amended Disclosure Statement with Respect to Amended Joint and Consolidated Chapter 11 Plan of Reorganization for All Debtors Filed by Creditor JD Holdings* was served electronically on those parties having entered their appearance in the Court's Electronic Court Filing (ECF) System and conventionally, via first-class mail, postage prepaid, to those parties who have requested notice but are not participating in the ECF System, pursuant to instructions appearing on the Electronic Filing Receipt received from the U. S. Bankruptcy Court on this 13th day of April, 2018.

                    s/ *Christine L. Schlomann*


                    */s/ David L. Going*