# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| In re: | ) |
| | ) |
| **JOHN Q. HAMMONS FALL 2006, LLC,** *et al.* | ) **Case No. 16-21142** |
| | ) |
| Debtors. | ) **(Jointly Administered)** |
| | ) |

## CMBS LENDERS' MOTION TO ALLOW OVERSECURED CMBS CLAIMS

The CMBS Lenders[1] respectfully submit this motion (the "Motion") seeking allowance of the CMBS Claims (defined below) filed in the jointly-administered chapter 11 bankruptcy cases (the "Bankruptcy Cases") of the above-captioned debtors (the "Debtors"), including the post-petition additions allowable to their oversecured claims pursuant to § 506(b) of the Bankruptcy Code. In support of the Motion, the CMBS Lenders respectfully state as follows:

## PRELIMINARY STATEMENT[2]

After nearly two years in a bankruptcy dominated by litigation between the Debtors and JD Holdings, L.L.C. ("JDH") over control of the Debtors' hotel business, these cases are

---

[1] The CMBS Lenders include the following secured creditors: (a) U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-LDP7, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Nomura Portfolio Loan"); (b) Wilmington Trust, National Association, as Trustee for the registered holders of Wells Fargo Commercial Mortgage Trust 2015-C26, Commercial Mortgage Pass-Through Certificates, Series 2015-C26 by and through Midland Loan Services, a division of PNC Bank, National Association, solely in its capacity as Special Servicer (holder of the loan known as the "Chateau Lake Loan"); (c) Deutsche Bank Trust Company Americas, as Trustee, on behalf of the Registered Holders of Citigroup Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2015-GC33, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Goldman Portfolio Loan"); (d) U.S. Bank National Association, as Trustee for the Registered Holders of Banc of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-3, by and through C-III Asset Management LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Euro-Hypo Portfolio Loan"); and (e) Wells Fargo Bank, N.A., as successor to LaSalle Bank National Association, as Trustee for the registered holders of COMM 2006-C8 Commercial Mortgage Pass-Through Certificates, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Barclays Portfolio Loan") (collectively, the "CMBS Lenders").

[2] Capitalized terms used but not defined in the Preliminary Statement have the same definitions set forth below.

approaching their conclusion. Throughout the bankruptcy process, the CMBS Lenders have successfully avoided entanglement in the protracted litigation and have held to one goal and one goal only – full payment on account of their oversecured claims. According to JDH, the Plan is a "full payment" plan that renders all creditors, including the CMBS Lenders, who are collectively the largest creditor constituency by far, unimpaired for Chapter 11 plan purposes and therefore presumed by law to have accepted the Plan.

Indeed, JDH's Disclosure Statement was approved without the need for either a valuation of assets, including the CMBS Lenders' collateral, or a liquidation analysis because the Court was assured that valuations did not matter since <u>all</u> creditors were being rendered unimpaired and would be paid in full. Attached hereto as **Exhibit A** is a summary of the all amounts owed to the CMBS Lenders on account of their claims.

While this Motion seeks the allowance of the CMBS Lenders' claims in full, this memorandum is addressed to the only point of contention that JDH and the Debtors have raised informally to date – the legal claim to default interest. These objections center on four legal issues, none of which presents a valid objection to the calculation or allowance of the CMBS Lenders' claims:

**Post-Petition Default Interest Accruals:** Courts in the Tenth Circuit have widely enforced default-upon-bankruptcy provisions, recognizing that loan agreements are not executory contracts and are therefore excluded from the provisions of § 365(e) of the Bankruptcy Code.

**Default Interest from the Maturity Date:** With regard to the Matured Loans, virtually every reported case has allowed the accrual and payment of default interest on matured loans in the case of a full payment plan proposed by a liquidating debtor.

- 2 -

**Assumption/Reinstatement:** It is well established that courts in the Tenth Circuit, and in every decision rendered at the Circuit Court level in other jurisdictions, require that if JDH seeks to assume or reinstate a loan, the CMBS Lenders must be paid in full, including all default interest and fees and costs that are contractually owing pursuant to the terms of the loan documents, without any change or reduction. In the context of an assumption or reinstatement, allowance is irrelevant. All of the courts have found that it is a question of contractual legal entitlement. In this instance, each of the loans to be assumed provides for the accrual and payment of default interest from the date of any default – here the filing of the bankruptcy petition.

**Guaranty Claims:** Regardless of whether the Court allows or disallows amounts on account of the CMBS Lenders' claims against their Borrowers, all such claims must still be paid in full by the guarantor, the JQH Trust, under the JQH Trust's full payment plan.

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief in this Motion are §§ 105(a), 502, and 506 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3012 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### I.  The Bankruptcy Filings

On June 26 and July 5, 2016 (the "Petition Date"), the seventy-six Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") initiating the Bankruptcy Cases. The Bankruptcy Court entered orders jointly

- 3 -

20302482-v5

Case 16-21142   Doc# 2038   Filed 04/16/18   Page 3 of 26

administering the Debtors' bankruptcy estates on June 29, 2016, July 12, 2016, and July 18, 2016 [Doc. 40, 52, 53, 123, and 197].

## II.     The JDH Disclosure Statement and Plan

On March 30, 2018, JDH filed its amended disclosure statement [Doc. 1948] (the "Disclosure Statement") along with its amended proposed plan of reorganization [Doc. 1946] (the "Plan"). On March 28, 2018, the Court entered an order approving the Disclosure Statement [Doc. 1940] and setting a hearing on confirmation of the Plan (the "Confirmation Hearing") for April 27, 2018 at 9:30 a.m. (prevailing Central Time). Although the CMBS Lenders objected to the Disclosure Statement due to its lack of specific valuations for their collateral and the lack of a liquidation analysis, the Court approved the Disclosure Statement over those objections due to the full payment nature of the JDH Plan.

The Plan purports to be a "full payment" plan, paying all claims, including the CMBS Claims, in full on the Plan's effective date. JDH contends that their full payment plan renders all claims "unimpaired" under § 1124 of the Bankruptcy Code and therefore all creditors are presumed to have accepted the plan under § 1126(f) of the Bankruptcy Code. *See* Disclosure Statement, § V.B. at 15 ("Under the Plans, Classes 1, 2, 3 and 4 are Unimpaired"). Indeed, the Disclosure Statement provides as a condition to confirmation that "each Class of Claims either are deemed to have accepted the Plans or are Unimpaired under the Plans." *See id.*, § XVI(v) at 34.

## III.     The CMBS Lenders' Claims

The five CMBS Lenders each hold one of five oversecured claims against certain of the Debtors (the "Borrowers"). Combined, the CMBS Lenders' Loans total at least $772,452,770.74 (collectively, the "Secured Claims") making them the largest creditor constituency in this case. Each of the five oversecured claims is secured by, among other things, undisputed valid and

20302482-v5

perfected first priority liens and security interests against one or more of 24 of the Debtors' 35 hotels (the "Hotels").

The Revocable Trust of John Q. Hammons, dated December 29, 1989, as amended and restated (the "JQH Trust"), a debtor in these bankruptcy cases, unconditionally, irrevocably, and absolutely guaranteed the payment and performance of the Borrowers on all of the CMBS loans (collectively, the "Guarantee Claims" and, together with the Secured Claims, the "CMBS Claims").

The CMBS Lenders timely filed proofs of claim numbered 614-616 and 624-630 (the "Proofs of Claim") against (i) their respective Borrowers, and (ii) the JQH Trust, as guarantor. The amounts owed, as of the Petition Date, and the legal bases for the CMBS Claims are more fully set forth in the respective Proofs of Claim which are hereby incorporated by reference. As noted in the Proofs of Claim, interest, default interest, attorneys' fees and costs, and other amounts have continued to accrue post-bankruptcy pursuant to the CMBS loan documents and applicable law.

A confirmation hearing on JDH's Plan has been set for April 27, 2018. JDH hopes to close on a sale of the Debtors' assets pursuant to the Plan as quickly as possible following confirmation. At JDH's request, the CMBS Lenders prepared preliminary pay-off statements for each of the following CMBS loans, using a payoff date in late April or early May of 2018, as requested by JDH. The calculations below are shown next to the pre-petition amounts due as reflected on the Lenders' proof of claim.

[Table on following page]

20302482-v5

| Loans | POC No. | Petition Date POC Amount | Amount Due with Post-Petition Accruals | Preliminary Payoff Date |
|---|---|---|---|---|
| Chateau Lake[3] | 614 | $58,650,230.06 | **$53,900,733.3** | 5/1/2018 |
| Goldman Portfolio[4] | 629 | $315,539,401.64 | **$296,060,068.03** | 5/6/2018 |
| Euro-Hypo Portfolio[5] | 626 | $156,583,829.63 | **$164,907,767.19** | 4/30/2018 |
| Barclays Portfolio[6] | 627 | $112,703,918.15 | **$116,456,399.05** | 5/1/2018 |
| Nomura Portfolio[7] | 624 | $140,174,148.41 | **$141,127,803.17** | 5/11/2018 |
| **Total – All Loans** | | | **$772,452,770.74** | |

A detailed breakdown of each component of the CMBS Lenders' claims, including, among other things, (i) unpaid principal balance, (ii) interest due, including default interest, (iii) out of pocket costs including attorneys' fees and fees paid to appraisers, (iv) servicing fees, (v) resolution fees, and (vi) miscellaneous document and payoff fees, is attached hereto as **Exhibit A**. All of these loans were guaranteed by the JQH Trust, which is also a debtor in these bankruptcy cases.

---

[3] The Borrower liable on the Chateau Lake Loan is Chateau Lake, LLC.

[4] The Borrowers liable on the Goldman Portfolio Loan are: (i) Hammons of Hunstville, LLC; (ii) JQH - Allen Development, LLC; (iii) JQH – Concord Development, LLC; (iv) JQH - Glendale AZ Development, LLC; (v) JQH - Kansas City Development, LLC; (vi) JQH - Murfreesboro Development, LLC; and (vii) JQH -Norman Development, LLC.

[5] The Borrowers liable on the Nomura Portfolio Loan are (i) Hammons of Lincoln, LLC; (ii) Hammons of New Mexico, LLC; (iii) Hammons of Oklahoma, LLC; (iv) Hammons of Sioux Falls, LLC (v) Hammons of South Carolina, LLC; and (iv) Hammons of Tulsa, LLC.

[6] The Borrower liable on the Barclays Portfolio Loan is John Q. Hammons Fall 2006, LLC.

[7] The Borrower liable on the Euro-Hypo Portfolio Loan is Richardson Hammons, LP.

20302482-v5

Three of the CMBS loans are in maturity default. The Nomura Portfolio Loan entered maturity default on April 11, 2016, prior to the Petition Date. After the filing of bankruptcy, the Barclays Portfolio Loan went into maturity default on November 1, 2016 and Euro-Hypo Portfolio Loan on May 6, 2017.

The Chateau Lake Loan and the Goldman Portfolio Loan (collectively, the "Unmatured Loans"), have not yet matured. The Chateau Lake Loan matures on January 1, 2025 and the Goldman Portfolio Loan on September 6, 2025. JDH has indicated a desire to assume or reinstate the Unmatured Loans but has not yet provided the CMBS Lenders with all materials needed to complete the necessary review and documentation.

In addition to the maturity defaults, the CMBS Loans went into default as a result of (i) the Debtors' bankruptcy filings and (ii) the bankruptcy filing of the JQH Trust guarantor.[8] A chart detailing the relevant default provisions in each of the CMBS loan agreements is attached hereto as **Exhibit B**.

---

[8] Assuming this Motion is granted, the CMBS Lenders will not seek default interest prior to the Petition Date except where the loan matured before bankruptcy, but reserve all rights to assert other pre-bankruptcy defaults and do not waive a claim to the same should the Motion be denied or the proposed Plan fail to be confirmed or consummated. All of the CMBS Loans were in default long prior to the Petition Date due to other defaults under the governing loan documents. Some of these defaults arose due to the Borrower's violation of loan covenants reflecting the Borrower's special status as a bankruptcy remote, "special purpose entity" or "SPE." Under the governing SPE covenants, each of the Borrowers is required to be a bankruptcy remote entity, contractually obligated, among other things, not to (i) commingle its assets with those of other entities, or (ii) incur liabilities beyond CMBS Lender's mortgage debt and ordinary-course operating expenses. Accordingly, all of the CMBS Loans were in default long before bankruptcy because the relevant Borrowers: (i) have admitted in the Bankruptcy Case that they all commingled revenues with their affiliates in violation of the SPE covenants of the loan documents; (ii) assert that they are obligated under an order making them all jointly and severally liable for JDH's $500 million claim based upon rejection of its Right of First Refusal Agreement ("ROFR") with the Debtors which is obviously not an ordinary-course operating liability; and because (iii) the $500 million ROFR liability rendered the Borrowers insolvent.

20302482-v5

## IV.    The Collateral

It has been uncontested since the very beginnings of these cases that all of the Debtors' secured loans, including those held by the CMBS Lenders, are oversecured.[9]  In their Disclosure Statement, the Debtors attributed values to the hotels securing all of the CMBS Lenders collateral that were sufficient to provide an ample equity cushion for all of the CMBS Lenders' loans.[10]  The CMBS Lenders do not expect that any party-in-interest will contend that the collateral securing the CMBS Claims has insufficient value to allow for addition of all post-bankruptcy accruals to their oversecured claims.  Nonetheless, the CMBS Lenders can have admissible evidence available at any trial or hearing on this Motion that will conclusively prove the existence of sufficient equity in the relevant collateral should any party contest their oversecured status.

## RELIEF REQUESTED

The CMBS Lenders respectfully request entry of an order (i) granting this Motion, (ii) allowing the CMBS Claims in full, including accrued and unpaid interest, default interest, attorneys' fees and costs, and other amounts due under the loan documents, whether accrued before or after the Petition Date, (iii) finding the CMBS Lenders to be sufficiently oversecured, and (iv) granting such other and further relief as is just and appropriate under the circumstances of these Bankruptcy Cases.

---

[9] See, e.g., Transcript of July 15, 2016 hearing at page 34-35, an excerpt of which is attached as **Exhibit D**: "The debtor believes fervently that its assets for the CMBS lenders, looking at it as a pool for each of them, that they are oversecured.  And to start with, we've provided sworn declarations to that effect." (quoting Debtors' counsel Mark Shaiken, arguing in support of the Motion for Authorization to Continue to Use Existing Bank Accounts, Check Stock, Existing Business Forms and Cash Management Systems as of the Commencement Date, filed on June 26, 2016 [Doc. 18].)

[10] Appendix 4 to the Disclosure Statement with Respect to Debtors' Joint Unimpairment Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Dated as of December 20, 2017, filed on December 20, 2017 [Doc. 1583]

# ARGUMENT

Under § 506(b) of the Bankruptcy Code, an oversecured creditor is entitled to include post-petition interest and other amounts due under the controlling loan documents as part of its secured claim up to the value of the collateral. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988) (explaining that an oversecured creditor is entitled to add post-petition interest and fees to the extent it is oversecured). The CMBS Lenders are, therefore, entitled under § 506(b) of the Bankruptcy Code to include all post-petition accruals as a part of their allowed claims.

The specific amounts of post-petition additions to claims to which the CMBS Lenders are entitled are reflected in the attached Exhibit A, detailing the amount owing on each component of the claim. At the request of JDH, as proponent of the currently pending Plan, the payoff dates reflected on Exhibit A are at the end of April or the beginning of May, 2018.

Adjustments to Exhibit A will need to be made prior to any payoff or hearing on this Motion. First, it is unlikely that a closing on the sales contemplated by the JDH's Plan will take place exactly on the payoff dates reflected in Exhibit A. Additionally, some of the amounts in Exhibit A, such as default interest and property protection advances continue to accrue. Any necessary adjustments will be reflected in a supplemental pleading that will be filed prior to any hearing on this Motion, indicating the amount due at the time of any hearing, including additional per diem accrual of interest, accrual of property protection advances, including attorneys' fees and other out-of-pocket costs, and any appropriate credits on account of any interest paid and/or principal curtailed.

## A. The CMBS Lenders are Entitled to Post-Petition Interest at the Default Rate[11]

### i. Oversecured lenders are entitled to default interest.

Under *United States v. Ron Pair Enterprises, Inc.*, the CMBS Lenders are entitled to add post-petition interest, fees and expenses to their oversecured claims. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235 (1989) (holding that § 506(b) applies with respect to consensual and nonconsensual liens and security interests); *see also In re Tucker Bros., L.L.C.*, No. 13-22462, 2014 WL 6435817, at \*4 (Bankr. D. Kan. Nov. 13, 2014) (recognizing that a "Bank's allowed secured claim may be increased under § 506(b)" to include "post petition interest, fees, and expenses" where the value of the collateral exceeds the prepetition secured claim).

Courts in the Tenth Circuit routinely include postpetition interest at the rate specified in the underlying agreement – the "contract rate" of interest *including contractual default interest* – as a part of an oversecured claim under § 506(b). *See In re K & J Props., Inc.*, 338 B.R. 450, 460 (Bankr. D. Colo. 2005) (allowing oversecured claim including 36% postpetition default interest because "Section 506(b) mandates that interest on oversecured claims is allowable, and this statute draws no distinction between pre and post-default interest."); *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 117 (Bankr. D. Colo. 1988) ("11 U.S.C. § 506(b) gives an oversecured creditor the right to accrue interest at the rate provided for under the agreement between the creditor and its debtor."); *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 358 (Bankr. D.N.M. 2010) ("the federal courts have adopted a rule regarding default interest rates: The bankruptcy court should apply a presumption of allowability for the contracted for default

---

[11] In addition to post-bankruptcy default interest, the CMBS Lenders are entitled to all pre-bankruptcy default interest that accrued on their claims. Pre-bankruptcy default interest is allowable if provided for under the loan documents and applicable law. *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998).

Case 16-21142   Doc# 2038   Filed 04/16/18   Page 10 of 26

rate, provided that the rate is not unenforceable under applicable nonbankruptcy law.") (quoting *Gen. Elec. Capital Corp. v. Future Media Prods., Inc. (In re Future Media Prods., Inc.)*, 547 F.3d 956, 961 (9th Cir. 2008) (quotations omitted.))

These courts hold that default interest is generally allowed where the bankruptcy estate is solvent. *See, e.g.*, *K & J Props, Inc.*, 338 B.R. at 459 ("Particularly important in this line of cases [discussing equitable considerations] . . . is whether the bankruptcy estate is solvent, thereby goring the ox of those who agreed to the default rate rather than that of unsecured creditors."); *Consol. Operating Partners L.P.*, 91 B.R. 113 (Bankr. D. Colo.1988) ("The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11.") The Disclosure Statement and all of the statements made to the Court by JDH and the Debtors make clear JDH's belief that the Debtors' estates are solvent. *See* Disclosure Statement, § V.B. at 15 (providing that priority, secured, unsecured, and equity claims and interests are unimpaired). Therefore, the equities of these Bankruptcy Cases favor addition of all interest on the CMBS Lenders' oversecured claims at the default rate to prevent JDH or the Debtors from obtaining a windfall through alteration of the contractual obligations under the CMBS loan documents.

The default interest rates at issue, 5% for the Chateau Lake and Euro-Hypo Portfolio Loans and 4% for the Goldman, Nomura and Barclays Portfolio Loans, are reasonable. The 4% and 5% default rates are materially lower than default rates allowed by other courts. Courts routinely uphold default interest rates much higher than the 4% or 5% default rate applicable to the CMBS Loans. *See, e.g., In re Walnut Assocs.*, 473 B.R. 603, 611 (E.D. Penn. 2012) (holding that creditor was entitled to include default interest at contractual rate of 11% over non-default

interest in claim and noting that courts routinely enforce even higher default interest rates); *Summit Creditors' Trust v. Hawaii Forest Preservation, LLC (In re Metro. Mortgage & Securities, Co.)*, 448 B.R. 527, 539-40 (D. Haw. 2011) (affirming award of 24% default interest); *Good v. RMR Invests., Inc.,* 428 B.R. 249, 253-55 (E.D. Tex. 2010) (affirming order requiring debtor's plan to provide interest at contractual default rate of 4% above non-default rate); *see also In re Terry L.P.,* 27 F.3d 241, 244 (7th Cir. 1994) (enforcing a 17.25% default rate); *Citibank v. Nyland*, 878 F.2d 620, 625 (2d Cir. 1989)(upholding a 17.5% default rate); *In re Schaumburg Hotel Owner*, 97 B.R. 943, 951 (Bankr. N.D. Ill. 1989) (enforcing a 19% default rate of interest.)[12]

Application of the default rate of interest is also consistent with the prevailing majority view in other circuits which allow default interest unless "the higher rate would produce an inequitable . . . result." *See Southland Corporation v. Toronto Dominion (In re Southland)*, 160 F.3d 1054, 1059 (5th Cir. 1998) (quoting *In re Laymon* and affirming the bankruptcy court's imposition of post-petition interest at the contractual default rate, which was 2% higher than the note rate); *see also In re Terry Ltd. Partnership*, 27 F.3d 241, 243 (7th Cir. 1994) ("What emerges from the post-*Ron Pair* decisions is a presumption in favor of the [default] contract rate subject to rebuttal based upon equitable considerations.")  Other bankruptcy courts do not even

---

[12] The CMBS loan documents are clear that upon a default the CMBS Lenders are immediately entitled to interest at the default rate, without notice.  *See* Claim Nos. 614, 624, 626, 627, 629; *see also* Ex. C hereto.  For example, under the Chateau Lake Loan:

> So long as any Event of Default exists, regardless of whether or not there has been an acceleration of the Debt evidenced hereby, and at all times after maturity of the Debt evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the Debt from the date of the default at the Default Rate (*without regard to any notice or grace period*), and such default interest shall be immediately due and payable.  Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment, Event of Default or prepayment and the Late Charges, interest at the Default Rate and prepayment fees, Prepayment Premium, fees and/or other charges described herein or in the Note are reasonable estimates of those damages and do not constitute a penalty (italics added.) *See,* Chateau Lake Loan Agreement at § 1.4.

20302482-v5

consider equitable considerations in a solvent debtor, full payment case. *See, e.g., In re: Dow Corning Corp.,* 456 F. 3d 668, 679 (6th Cir. 2006) (holding that "courts generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor" rather than considering "equitable considerations.")

None of the equitable considerations taken into account by the minority of bankruptcy courts in determining the allowability of post-petition default interest are present here: (i) creditor misconduct, (ii) adverse impact on unsecured creditors; (iii) the default rate constituting a penalty; and (iv) default interest jeopardizing the debtor's "fresh start". *See, e.g., P.G. Realty*, 220 B. R. 773, 780 (Bankr. E.D.N.Y. 1998). In this case, no evidence or allegation exists of any misconduct of the CMBS Lenders – they have waited patiently for these bankruptcy cases to work to a conclusion and have not interfered, participated in or prolonged the litigation between JDH and the Debtors which has lengthened this case. Because the JDH Plan is a full payment plan, payment of the CMBS Lenders' post-bankruptcy additions to claims will not affect or diminish the full recovery promised to junior creditors. Finally, allowance and payment of the default rate of interest applicable to the CMBS Loans will not hinder the Debtors' fresh start because the JDH Plan is a liquidating sale plan to which the Debtors have consented.

### ii. *Ipso facto* prohibitions do not apply.

It was an automatic event of default for every one of the CMBS Loans when the Debtors filed the instant bankruptcy petitions. The defaults triggered by the bankruptcy filings of the Debtors are not voided by the *ipso facto* prohibitions of § 365 of the Bankruptcy Code because the CMBS Loans are not executory contracts. The plain language of § 365 of the Bankruptcy Code excludes non-executory contracts from the limitation on *ipso facto* clauses. *See, e.g., Travelers Cas. Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 452 (2007)("claims

- 13 -

enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed").

The Tenth Circuit has adopted the "Countryman test" to analyze whether a contract is executory. *See In re Baird*, 567 F.3d 1207, 1211 (10th Cir. 2009) (adopting the Countryman definition and explaining that "the Countryman definition [] seems to count only the remaining material obligations of both parties in determining whether contract is executory") (emphasis in original). Courts, including those in the Tenth Circuit, view real property mortgages as non-executory under the Countryman definition of executory contracts. *See*, *e.g.*, *Thomas Am. Stone & Bldg., Inc. v. White*, 142 B.R. 449, 453 (D. Utah 1992) (seller of real property by purchase money loan secured by a deed of trust "fully performed its obligations under the contract when it deeded the property to [buyer]"); *see also In re N. Am. Dealer Grp., Inc.,* 16 B.R. 996, 1000 (Bankr. E.D.N.Y. 1982) (a "mortgage is not an executory contract which required an assumption or rejection by the trustee pursuant to Section 365(d) (1)"); *In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986); *In re Kash & Karry Wholesale, Inc.*, 28 B.R. 66, 69 (Bankr. D.S.C. 1982); H.R. Rep. No. 95–595, 95th Cong., 2d Sess. 347, reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 5963, 6303–04 (a "note is not usually an executory contract if the only performance that remains is repayment").

As a result, courts in the Tenth Circuit enforce default-upon-bankruptcy provisions contained in loan documents notwithstanding the limitation on *ipso facto* provisions found in § 365 of the Bankruptcy Code. *See Thomas Am. Stone & Bldg.,* 142 B.R. 449 (D. Utah 1992) (enforcing right to foreclose contained in deed of trust where sole default was triggered by borrower's bankruptcy filing); *Webster Capital Fin., Inc. v. Newby*, No. 12-2290-EFM, 2013 WL 3989557 (D. Kan. Aug. 2, 2013) *reconsideration denied* 2014 WL 672930 (D. Kan. Feb. 21,

- 14 -

2014) (bankruptcy filing was sufficient to trigger borrower's liability under loan agreement as well as non-debtor guarantors' liability under guarantee); *In re St. Vincent's Catholic Med. Centers of N.Y.*, 440 B.R. 587, 601 (Bankr. S.D.N.Y. 2010) (noting that "[g]enerally, mortgages are not executory contracts" and finding that the loan documents at issue were not executory for purposes of the limitation on ipso facto provisions); *In re AMR Corp.*, 485 B.R. 279, 296-97 (Bankr. S.D.N.Y. 2013) (explaining that indenture is not an executory contract and thus not subject to the prohibition on *ipso facto* clauses set forth in section 365 of the Bankruptcy Code); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011) (explaining that "the only obligation remaining to be performed by GGP under the . . . Note is repayment and that loan agreements are generally not considered to be executory contracts"). Therefore, bankruptcy courts enforce ip*so facto* clauses triggering a right to default interest under loan documents. *See Gen. Growth Props., Inc.,* 451 B.R. at 331 (enforcing *ipso facto* provision triggering right to default interest); *accord St. Vincent's Catholic Med. Centers of N.Y.*, 440 B.R. at 601-02.[13]

### iii. Default interest is owing from the maturity dates.

Each of the Nomura, Barclays and Euro-Hypo Portfolio Loans matured on April 11, 2016, November 1, 2016 and April 6, 2017 respectively, and from the date of these maturity defaults, default interest accrued as well. Maturity defaults trigger accrual of interest under the governing loan documents and applicable law.14 *In re K & J Props., Inc.*, 338 B.R. 450, 460- (Bankr. D. Colo. 2005) (noting that secured debt "began accruing interest on each loan's outstanding principal at the 36% default rate" after the "loan matured" and concluding default

---

[13] Some courts in the Tenth Circuit have held *ipso facto* default provisions to be unenforceable. However, these cases are not commercial real estate cases, but rather are consumer bankruptcy matters in which the debtors' "fresh start" was threatened by the *ipso facto* defaults. *See,* In re Hutchins, 99 B.R. 56, 57 (Bankr. D. Colo. 1989); *In re Peacock*, 87 B.R. 657, 659 (Bankr. D. Colo. 1988).

[14] *See supra note 12.*

interest is allowable because "Section 506(b) mandates that interest on over-secured claims is allowable, and this statute draws no distinction between pre and post-default interest").  *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 355-58 (Bankr D.N.M. 2010) (granting postpetition interest at the default rate under § 506(b) of the Bankruptcy Code following prepetition maturity default). *See also In re 785 Partners LLC*, 470 B.R. 126, 133-36 (Bankr. S.D.N.Y. 2012) (allowing prepetition and postpetition interest at the default rate following a prepetition maturity default) *In re Residential Capital*, LLC, 508 B.R. 851 (Bankr. S.D.N.Y. 2014) (granting postpetition interest at default rate following postpetition maturity default); *In re Chateaugay Corp.,* 150 B. R. 529, 542-43 (Bankr. S.D.N.Y. 1993).

### iv.        Assumed or reinstated loans must include all amounts owing.

The JDH Plan seeks to retain for JDH the option to have an affiliate assume the Unmatured Loans or to have the current Borrowers (the equity of which will be purchase by JDH under the JDH Plan) reinstate the Unmatured Loans.  Under either scenario, default interest must be paid in full.

Assumption of the Unmatured Loans can only be accomplished under the assumption provisions of the governing loan documents and state contract law – it is not a function of bankruptcy power.  A bankruptcy court has no jurisdiction to change or alter the loan documents between a CMBS Lender and JDH under the loan documents' own assumption provisions because the dispute is between two non-debtors and would have *no impact whatsoever* on recoveries to creditors or the Debtors under the full payment JDH Plan.  *Gardner v. United States*, 913 F.2d 1515, 1518 (10th Cir.1990) (holding that disputes are not "related to" bankruptcy if the outcome of the dispute has no effect on the bankruptcy estate) *see also In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987) ("The bankruptcy jurisdiction is designed to provide a single

- 16 -

forum for dealing with all claims to the bankrupt's assets. It extends no farther than its purpose. That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt's property have been resolved.") Pursuant to the loan documents governing both the Goldman Portfolio Loan and the Chateau Lake Loan and, assuming arguendo that JDH satisfies the other pre-conditions to assumption, the lender is under no obligation to accept a new borrower in an assumption unless all criteria for assumption are met – including curing of any defaults such as payment of all amounts owing including contractual default interest. In an assumption, a lender cannot be compelled to change any of the terms of the loan documents, including the default interest provisions.

Reinstatement also requires that the entire suite of loan documents be reinstated without alteration. However, unlike assumption which concerns application of state law outside of bankruptcy, reinstatement arises from § 1124 of the Bankruptcy Code. Specifically, §1124(2) of the Bankruptcy Code allows a debtor to reinstate a loan to its original terms provided that all pre- and post-bankruptcy defaults are cured. While the Tenth Circuit itself has not addressed § 1124 of the Bankruptcy Code, lower courts in the Tenth Circuit have uniformly found that payment of default interest is an absolute prerequisite for purposes of cure and reinstatement under § 1124 of the Bankruptcy Code. *See In re K & J Props., Inc.*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) (noting that "Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest claimed by [creditor] to the extent it is otherwise allowable under [creditor]'s loan documents and applicable nonbankruptcy law"); In re Sweet, 369 B.R. 644, 650-51 (Bankr. D. Colo. 2007) (requiring payment of interest at the contract default rate to effect cure under section 1124(2)); *accord In re Consolidated Operating Partners L.P.*, 91 B.R. 113, 117 (Bankr. D. Colo. 1988).

20302482-v5

The Tenth Circuit's view is consistent with the majority of other courts, including all of the appellate courts that have considered the issue. *See In re New Investments, Inc.,* 840 F.3d 1137, 1142 (9th Cir. 2016) ("Consistent with § 1124(2), the debtor can return to pre-default conditions…only by fulfilling the obligations of the underlying loan agreement")(citations omitted); *In re Moshe*, 567 B.R. 438 (Bankr. E.D.N.Y. 2017) ("by proposing to cure its default and reinstate the Loan by paying the arrears at the non-default interest rate, Yeshivah does not cure the default in accordance with the underlying loan agreement…. This renders the Amended Chapter 11 Plan patently unconfirmable."); *In re Southland Corp.*, 160 F.3d 1054, 1059 n. 6 (5th Cir. 1998) ("Congress, in bankruptcy amendments enacted in 1994, arguably rejected the *Entz–White* denial of contractual default interest rates"); *In re Sagamore Partners, Ltd.,* 620 Fed. Appx. 864, 869 (11th Cir. 2015) (concluding court could not "ignore the clear mandate of § 1123 that allows a creditor to demand default-rate interest as a condition for reinstating the loan").

Accordingly, regardless of whether JDH elects to pay the Unmatured Loans in full on the Effective Date[15] or to assume or reinstatement those loans, all contractual amounts owing to the CMBS Lender counterparties including default interest must be paid under the governing loan documents, statutes and case law.[16] The CMBS Lenders are therefore entitled to include all amounts reflected in Exhibit A, including applicable default interest, to their oversecured claims.

---

[15] Should JDH decide to pay the Unmatured Loans in full on the effective date rather than assuming or reinstating them, the yield maintenance premium due upon a payment prior to the loans' stated maturities will be due and payable. The amount of yield maintenance premium due on account of each loan as of the date of the respective preliminary payoff statements is reflected on Exhibit A.

[16] Given the "full payment" nature of JDH's Plan and the solvency of the Borrowers, JDH would stand to gain a nearly $60 million windfall if the negotiated and legally-enforceable default interest rates were not enforced. *See* Exhibit A.

20302482-v5

## B. **Guarantor Liability**

To the extent that any portion of the CMBS Claims are disallowed or discharged against a Borrower/Debtor, they must be allowed against the JQH Trust which is also a Debtor and which guaranteed the loans. Disallowance or discharge of the primary obligor on guaranteed debt does not affect the liability of the guarantor. *See In re Gentry*, 807 F.3d 1222, 1227 (10th Cir. 2015) ("The Bankruptcy Code provides – and multiple courts have confirmed –that discharge of a borrower's debt in bankruptcy does not affect a guarantor's liability.") (citing 11 U.S.C. § 542(e)); *see also In re Vogt*, 257 B.R. 65, 70 (Bankr. D. Colo. 2000) ("holding that creditors may pursue guarantors or other third party obligors regardless of the disposition of the claim of the borrower in bankruptcy); *see also In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir. 1990.) The Bankruptcy Code expressly "preserves creditors' claims against co-debtors and guarantors and provides an avenue for creditors to freely prosecute those claims." *Id.* (citing *In re Fasse*, 40 B.R. 198, 200 (Bankr. D. Colo. 1984)).

Furthermore, under the Supreme Court's opinion in *Ivanhoe*, a bankrupt entity such as the JQH Trust is liable for distribution on the full amount of a claim until the creditor is paid in full, regardless of recoveries from other bankruptcy estates, co-obligors or collateral. *See, e.g., Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 246 (1935)); *Nuveen Mun. Trust v. Withum Smith Brown, P.C.*, 692 F.3d 283, 295 (3rd Cir. 2012) ("Ivanhoe thus provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has recovered or may recover all or a portion of that amount from a non-debtor."); *In re Nat'l Energy & Gas Transmission, Inc.*, 492 F.3d 297, 300-01 (4th Cir. 2007) (rejecting debtor's contention that the value of creditor's claim should be reduced by substantial payments made by third-party obligor); *In re Gessin*, 668 F.2d 1105, 1107 (9th Cir. 1982) ("It has long been established that a creditor is entitled to pursue his claims against others liable on the same debt to the full extent of

the amount owed on that debt."); *Bd. of Comm'rs of Shawnee Cnty., Kansas v. Hurley*, 169 F. 92, 97 (8th Cir. 1909) ("[T]he holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payments after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in bankruptcy upon the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim."); *In re Stone & Webster, Inc.*, 547 B.R. 588, 607 (Bankr. D. Del. 2016) (relying on <u>Ivanhoe</u>: "Therefore, unless Travelers receives payment in full of the amount owed, the proceeds from the letters of credit will not reduce its claim.")

> **C.** **The CMBS Lenders are Entitled to Attorneys' Fees and Other Costs, Fees and Expenses**

Section 506(b) of the Bankruptcy Code also permits the CMBS Lenders to include attorneys' fees and other costs and fees owing under the loan documents provided that (i) the CMBS Claims are allowed secured claims; (ii) the CMBS Lenders are oversecured; (iii) the fees, costs and charges are provided for in the agreements; and (iv) such fees, costs and charges are reasonable. *See Eastman Nat'l Bank v. Sun 'N Fun Waterpark, LLC (In re Sun 'N Fun Waterpark, LLC)*, 408 B.R. 361, 366 (B.A.P. 10th Cir. 2009); *see also Tucker Bros., L.L.C.*, 2014 WL 6435817, at \*4 (Bankr. D. Kan. Nov. 13, 2014) (recognizing that a "Bank's allowed secured claim may be increased under § 506(b)" to include "post petition interest, fees, and expenses" where the value of the collateral exceeds the prepetition secured claim); *see also Rushton v. State Bank of Southern Utah (In re Gledhill)*, 164 F.3d 1338, 1342 (10th Cir. 1999) (noting that, under Ron Pair, "creditors having oversecured consensual claims may recover attorney fees, costs, or other charges under § 506(b)").

20302482-v5

All of the fees and costs sought by the CMBS Lenders are reasonable and provided for in the loan documents and therefore have clearly satisfied the requirements imposed by the Tenth Circuit to include postpetition attorneys' fees, costs and other charges under § 506(b) to their claims. *See, e.g., In re Sun 'N Fun Waterpark*, 408 B.R. at 366; Mkt. Ctr. E. Retail Prop., Inc., 433 B.R. at 372 n.41 ("Because the 'fees, costs or charges' represented by the [attorney's] bills are provided for in the loan documents, they are, subject to reasonableness . . . , collectible from the collateral pursuant to section 506(b).") (*citing Gledhill*, 164 F.3d at 1340). *See also In re Krug*, 189 B.R. 948, 965 (Bankr. D. Kan. 1995) (allowing oversecured claim including postpetition interest, expenses to care for collateral, and attorney's fees); *In re Williams*, 174 B.R. 307, 309 (Bankr. D. Kan. 1994) (allowing attorney's fees a part of oversecured claim); *In re Dalessio*, 74 B.R. 721, 724 (B.A.P. 9th Cir. 1987) (holding an appraisal fee was reasonable where the creditor needed an appraisal to assess whether its security interest was jeopardized.)

The circumstances surrounding this case justify an award of the CMBS Lenders' attorneys' fees. The CMBS Lenders did not ask for or consent to this bankruptcy. Rather, it was the Debtors' decisions – pre- and postpetition – that required the CMBS Lenders to appear in these bankruptcy cases to enforce their rights as secured creditors and consequently incur legal fees and other costs. The CMBS Lenders continue to require legal representation in these cases and their legal fees and other costs, such as fees for appraisers, continue to accrue.[17]

Moreover, in addition to fees of professionals such as attorneys and appraisers, miscellaneous other fees which are specifically provided for in the loan documents are reflected on Exhibit A, including, without limitation (i) document fees, (ii) resolution fees, (iii) payoff

---

[17] The legal fees incurred by the CMBS Lenders are reflected in the attached Exhibit A as either "Legal Fees" or "Property Protection Advances" (which also includes other non-legal out-of-pocket costs.) Prior to any hearing on this Motion, the CMBS Lenders will file an appropriate supplemental pleading which will contain detailed records of the legal fees incurred in connection with protecting their interests and collateral in these cases and which are being shared among all of the CMBS Lenders.

20302482-v5

processing fees, (iv) administrative fees, (v) liquidation fees, (vi) interest on advances, (vii) title fees, (viii) property inspection fees, (ix) appraisal fees (x) yield maintenance fees and, (xi) for some loans, special servicing fees. All of these amounts are also reasonable and provided for under the terms of the operative loan documents and must be included as a part of the allowed CMBS Claims under Tenth Circuit precedent. *In re Sun 'N Fun Waterpark,* 408 B.R. at 366.

## CONCLUSION

WHEREFORE, for all the foregoing reasons and based upon the entire record before the Court in this Bankruptcy Case, the Trust respectfully requests that the Court enter an Order granting the Motion in its entirety and granting such other and further relief as is just and appropriate under the circumstances of this case.

Dated: Kansas City, Kansas
      April 16, 2018

      Respectfully Submitted,

      _____
      Gregory A. Cross (pro hac vice)
      Darek S. Bushnaq (pro hac vice)
      Frederick W. H. Carter (pro hac vice)
      Venable LLP
      750 East Pratt Street, Suite 900
      Baltimore, Maryland 21202
      Telephone: 410-244-7400
      Facsimile: 410-244-7742
      dsbushnaq@venable.com
      fwhcarter@venable.com

      and

      Stephen B. Sutton
      Lathrop & Gage LLP
      2345 Grand Blvd., Suite 2200
      Kansas City, Missouri 64108
      Telephone: 816-460-5525
      Facsimile: 816-292-2001
      ssutton@lathropgage.com

20302482-v5

**Exhibit A**

**Claim Summary**

| | LNR - Goldman as of 5/6/2018 | LNR-Nomura as of 5/11/2018 | LNR-Barclays as of 5/1/2018 | C-III - Euro-Hypo as of 4/30/2018 | Midland - Chateau Lake as of 5/1/2018 |
|---|---|---|---|---|---|
| Principal Payment | 241,241,569.36 | 127,700,056.61 | 106,173,705.45 | 150,000,000.00 | 43,629,046.06 |
| Note Pay Interest | 995,825.10 | 1,959,936.14 | 565,374.98 | 1,971,595.83 | 0.00 |
| Default Interest | 18,459,450.12 | 11,086,456.85 | 9,395,735.75 | 14,020,833.33 | 7,699,342.62 |
| Interest on Advances | 0.00 | 0.00 | 0.00 | 0.00 | 467,036.82 |
| Escrow/Reserves | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Yield Maintenance Premium | 32,813,588.75 | 0.00 | 0.00 | 0.00 | 4,909,514.24 |
| Appraisal Fees | 95,550.00 | 92,500.00 | 79,250.00 | 0.00 | 0.00 |
| Inspection | 2,100.00 | 2,625.00 | 1,500.00 | 0.00 | 0.00 |
| Legal Fees | 259,534.34 | 273,906.98 | 235,539.37 | 0.00 | 750.00 |
| Other Charges | 475.00 | 400.00 | 475.00 | 0.00 | 0.00 |
| Title Expense | 6,285.50 | 11,071.59 | 4,393.50 | 0.00 | 0.00 |
| Interest on Advances | 42,437.59 | 0.00 | 0.00 | 0.00 | 0.00 |
| Liquidation Feee | 1,000,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| LNR Admin Fee | 500.00 | 250.00 | 125.00 | 0.00 | 0.00 |
| MS Payoff Processing Fee | 2,850.00 | 600.00 | 300.00 | 0.00 | 0.00 |
| Special Servicing Fee | 1,139,902.27 | 0.00 | 0.00 | 0.00 | 0.00 |
| Credit Suspence Funds | 0.00 | 0.00 | 0.00 | (829,204.15) | 0.00 |
| Credit Escrow Funds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Credit Reserve Funds | 0.00 | 0.00 | 0.00 | (656,391.33) | (3,456,636.32) |
| Lockbox Funds | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Property Protection Advances | 0.00 | 0.00 | 0.00 | 323,721.66 | 214,389.42 |
| Accrued Additional Expenses | 0.00 | 0.00 | 0.00 | 74,401.61 | 0.00 |
| UCC Fee-Wells Fargo | 0.00 | 0.00 | 0.00 | 210.25 | 0.00 |
| KeyBank/Wells Payoff Processing Fees | 0.00 | 0.00 | 0.00 | 2,600.00 | 0.00 |
| Late Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Prudential Doucment Fee | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| Resolution Fee | 0.00 | 0.00 | 0.00 | 0.00 | 436,290.46 |
| Payoff Processing Fee | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| Tax Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL | 296,060,068.03 | 141,127,803.17 | $116,456,399.05 | 164,907,767.20 | $53,900,733.30 |

20302482-v5

**Exhibit B**

**Default Provisions**

| Loan (Claim No.) | Notice Provisions | Events of Default | | | |
|---|---|---|---|---|---|
| | | Commingling Funds | Indebtedness and/or Insolvency | Borrower Bankruptcy | Guarantor Insolvency/Bankruptcy |
| **Chateau Lake Loan** (POC 614) | § 1.4 at 10 (Default Interest upon Event of Default "without regard to any notice or grace period") | Art. III.D. at 84 (breach of covenants), § 2.28.A.16. at 71, 73-74 (covenant re commingling); *see also id.* Art. III.S. at 87 (Borrower actions without prior Lender consent) | § 2.28.A4 at 72;.Art. III.H. at 85 (prohibited debt and insolvency of Borrower or principal) | Art. III.H. at 85 (bankruptcy of Borrower) | Art. III.H. at 85 (insolvency or bankruptcy of Guarantor) |
| **Goldman Portfolio Loan** (POC 629) | § 1.2(a) at 37 (Default Interest "during the continuance of an Event of Default"); | § 7.1(h) at 97 (breach of Article VI), § 6.15 at 94 (covenant that Borrower remain an SPE), Definitions at 30 (defining SPE as an entity that does not commingle assets) | § 7.1(h) at 97 (breach of Article VI), § 6.15 at 94 (covenant that Required SPE remain an SPE), Definitions at 30 (defining Single Purpose Equityholder as an entity that does not have debt other than the iStar Debt, administrative expenses and state taxes) | §7.1(d)A. at 95 (bankruptcy) | §7.1(d)A. at 95 (bankruptcy) |
| **Euro-Hypo Portfolio Loan** (POC 626) | § 2.2.3 at 24 (Default Rate interest upon Event of Default "without regard to any grace or cure periods contained herein") | § 10.1(a)(xii) at 82 (breach of Section 3.1.24 concerning SPE covenants), §3.1.24(l) at 35 (covenant re commingling) | § 10.1(a)(xii) at 82 (breach of Section 3.1.24 concerning SPE covenants), §§ 3.1.24(f) at 36 3.1.24(o) at 37 (Borrower and principal solvency) | § 10.1(a)(viii) at 81 (bankruptcy) | § 10.1(a)(viii) at 81 (bankruptcy) § 10.1(a)(xv) at 82 (breach of guaranty covenant); Guaranty § 3.4 at 6 (solvency) |
| **Barclays Portfolio Loan** (POC 627) | § 2.2.4(a) at 25 (Default Rate interest upon Event of Default "without regard to any grace or cure periods contained herein") | § 8.1(a)(xii) at 98 (breach of Section 4.1.35), § 4.1.35(f) at 47 (covenant re commingling) | § 8.1(a)(xii) at 98 (breach of Section 3.1.24 concerning SPE covenants), §§ 4.1.35 (g) &(h) at 47 (prohibited debt and Borrower and principal solvency) | § 8.1(a)(vii) at 98 (bankruptcy) | § 8.1(a)(vii) at 98 (bankruptcy) |
| **Nomura Portfolio Loan** (POC 624) | § 1.02(a) at 26 (Default Interest "during the continuance of an Event of Default"); | § 7.01(h) at 74 (breach of Article VI), § 6.15 at 71 (covenant that Borrower remain an SPE), Definitions at 21 (defining SPE as an entity that does not commingle assets) | § 7.01(h) at 74 (breach of Article VI), §§ 6.04 & r6.15 at 71 (covenant that Required SPE remain an SPE), Definitions at 21 (defining Single Purpose Equityholder as an entity that does not have debt) | §7.01(d)(i) at 73 | §7.01(d)(i) at 73 |