The relief described hereinbelow is SO ORDERED.

SIGNED this 8th day of March, 2019.



_____
Robert D. Berger
United States Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

| | |
|---|---|
| **JOHN Q. HAMMONS FALL 2006, LLC, et al.**, | Case No. 16-21142 |
| | Chapter 11 |
| Debtors. | Jointly Administered |

_____

## MEMORANDUM OPINION AND ORDER

The debtors in these jointly-administered Chapter 11 cases are The

Revocable Trust of John Q. Hammons dated December 28, 1989, as Amended and

Restated (the "**Trust**") and a number of its subsidiaries and affiliates.  In 2016, the

Trust employed UBS Securities LLC as Debtors' financial advisor pursuant to 11

U.S.C. § 328.  This matter now comes before the Court on UBS's application for fees

and expenses.[1] Creditor JD Holdings, L.L.C., which is obligated under Debtors' confirmed joint Chapter 11 plans to pay those fees and expenses to the extent awarded by the Court,[2] opposes UBS's application and moves for a scheduling order, arguing that the application cannot be resolved without discovery and/or summary judgment. For the reasons set forth in this order, UBS's fee application will be granted in part and denied in part, and JD Holdings' motion for scheduling order will be denied.

A. **Procedure**

As an initial matter, this order must address a procedural issue raised by JD Holdings. JD Holdings is correct that its objection to UBS's fee application creates a contested matter governed by Fed. R. Bankr. P. 9014.[3] However, JD Holdings continues:

> The current posture at best, Your Honor, for UBS, I suppose would be - - and I believe the Court alluded to this previously - - akin to a motion for judgment on the pleadings, but I think it's important to remember that

---

[1] This order refers to UBS's two fee applications (ECF 1966; ECF 2387) together as one "**application**," to JD Holdings' two objections (ECF 2077; ECF 2424) together as one "**objection**," and to UBS's two replies (ECF 2183; ECF 2434) together as one "**reply**."

[2] Under the confirmed "Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by Creditor JD Holdings, L.L.C." ("**Joint Plans**"), JD Holdings agreed to pay all "Allowed Claims" (which would include any fees and expenses awarded to UBS) in exchange for Debtors' "Assets."

[3] *See* Fed. R. Bankr. P. 9014 advisory committee's note ("If a party in interest opposes the amount of compensation sought by a professional, there is a dispute which is a contested matter.").

2

> there is no rule.  The rule for judgment on the pleadings
> does not apply in this bankruptcy court.[4]

Because the rule for judgment on the pleadings (Fed. R. Civ. P. 12(c), made

applicable to adversary proceedings through Fed. R. Bankr. P. 7012) is not among

the rules listed in Rule 9014(c) as applicable to a contested matter, JD Holdings

concludes that this Court cannot resolve this contested matter absent a separate

motion for summary judgment.

JD Holdings' argument fails because contested matters are raised by motion,

*see* Fed. R. Bankr. P. 9014(a), and a motion is not a "pleading" as that term is used

in the federal rules.  *See Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F.

Supp. 2d 1022, 1029 (D. Kan. 2006).  C*ompare* Fed. R. Bankr. P. 7007(a)

("Pleadings") *with* Fed. R. Bankr. P. 7007(b) ("Motions and Other Papers").  Thus,

the rule for judgment on the pleadings does not apply to this motion because that

rule, by definition of a "pleading," does not apply to *any* motion.  Under JD

Holdings' interpretation of Rule 9014, every motion to which a party in interest has

objected would require up to four months of discovery and a separate motion for

summary judgment in order for the bankruptcy court to rule—an absurd result.

The better interpretation is this:  Rule 9014(a) mandates "reasonable notice

and an opportunity for hearing" in a contested matter, both of which have occurred

here.  Because application of the rules listed in Rule 9014(c), including Rule 7056, is

discretionary, no more is necessarily required.  *See* Fed. R. Bankr. P. 9014(c)

---

[4] Hr'g Tr. 15:2-9, June 11, 2018, ECF 2375.

3

("Except as otherwise provided in this rule, and *unless the court directs otherwise*, the following rules shall apply . . . .") (emphasis added). If this Court can permissibly rule on UBS's fee application now, it will do so. Alternatively, if the fee application and objection thereto should be considered "pleadings," this Court has the discretion to direct that Rule 7012 shall apply to this matter. *See* Fed. R. Bankr. P. 9014(c) ("The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply."). Either way, a separate motion for summary judgment is unnecessary.

## B.  **Factual Background**

John Q. Hammons, a hotel developer, created the Trust in 1989. In 2005, Mr. Hammons and the Trust entered into an agreement with JD Holdings that granted JD Holdings a right of first refusal on the sale of Debtors' hotels (the "**ROFR**"). JD Holdings subsequently sued the Trust and other Debtors for breach of the ROFR in the Delaware Court of Chancery.

Debtors filed their Chapter 11 petitions on June 26, 2016. JD Holdings moved to dismiss the petitions or, in the alternative, for stay relief to pursue the Delaware litigation. This Court denied the motion, and JD Holdings appealed the order with the Tenth Circuit BAP. Meanwhile, Debtors rejected the ROFR and set out to sell their assets, including 35 hotels, under 11 U.S.C. § 363. JD Holdings appealed the order allowing rejection of the ROFR as well.

In September 2016, the Trust hired UBS to provide financial advisory services to Debtors in connection with their Chapter 11 bankruptcy. The letter

agreement between the Trust and UBS (the "**Agreement**") entitles UBS to (*inter alia*):

- a "Restructuring Transaction Fee" upon consummation of a "Restructuring Transaction";

- a "Sale Transaction Fee" upon consummation of a "Sale Transaction";

- a "Monthly Advisory Fee" of $175,000;

- reasonable expenses, including reasonable legal fees, incurred by UBS in entering into and performing services under the Agreement; and

- costs and expenses incurred by UBS to enforce its rights under the Agreement.

By order dated October 19, 2016 ("**Approval Order**"), this Court granted Debtors' application to employ UBS under § 328. The Approval Order provides, in relevant part:

4. UBS is hereby engaged by the Debtors pursuant to § 328 of the Bankruptcy Code.

5. The terms and provisions of UBS's engagement as well as the payments for services and success fees are reasonable and are hereby approved pursuant to § 328 of the Bankruptcy Code.

6. The Debtors are authorized to pay all fees and expenses of UBS on the terms and conditions of [the Agreement], including but not limited to payment of any success fee from the proceeds of asset sales, restructuring or any financing transaction, as applicable.

7. UBS shall not be required to maintain time records for its services.

Following entry of the Approval Order, UBS conducted "extensive and robust

5

marketing efforts"[5] on Debtors' behalf. However, Debtors' planned asset sale under § 363 stalled when they could not find a company willing to provide title insurance to a buyer pending resolution of JD Holdings' appeals. Although Debtors identified a possible supplemental insurance product from Concord Specialty Risk that might have solved the title insurance issue for potential buyers other than JD Holdings (whom Concord refused to insure because its appeals caused the need for supplemental insurance in the first place), Debtors had not reached an agreement with Concord when their exclusive period in which to file a plan of reorganization began to run out. Consequently, on December 20, 2017, Debtors filed a disclosure statement and proposed plan under which Debtors' assets would not be sold—and creditors would not be paid—until 270 days after JD Holdings' appeals had concluded, which Debtors predicted would take place sometime in the year 2020.

On January 30, 2018, this Court denied approval of Debtors' disclosure statement as not containing the "adequate information" required by 11 U.S.C. § 1125(b). The Court reasoned that Debtors' disclosure statement lacked adequate information because it (1) listed "as-improved" hotel values without accounting for the significant capital expenditures necessary to reach those values and (2) relied on overly-optimistic financial projections rather than Debtors' actual financial performance. The Court also denied approval of Debtors' disclosure statement because their proposed plan was patently unconfirmable under 11 U.S.C. § 1129. The Court reasoned that the plan was unconfirmable because it (1) was not feasible,

---

[5] Debtors' Disclosure Statement 17, ECF 1583.

Case 16-21142    Doc# 2641    Filed 03/08/19    Page 6 of 29

as its success hinged on the outcome of Debtors' litigation with JD Holdings over the allowance of JD Holdings' claims; and (2) denied impaired creditors a vote in violation of § 1129(a)(8).  The next day, the Court terminated Debtors' exclusivity period (which would otherwise have ended on February 26, 2018) and ordered Debtors and JD Holdings to return to mediation.  Five days later, JD Holdings filed its own plans of reorganization, under which it would pay all "Allowed Claims" in exchange for all of Debtors' "Assets."

Following a successful mediation, Debtors and JD Holdings entered into a Plan Support Agreement ("**PSA**") under which, *inter alia*, Debtors agreed to support confirmation of JD Holdings' proposed plans.  The PSA included a Settlement Agreement between Debtors and JD Holdings.  This Court approved the PSA under Rule 9019 on February 28, 2018, approved JD Holdings' amended disclosure statement on March 23, 2018, and confirmed the Joint Plans on May 11, 2018.  Debtors' counsel argued in favor of the PSA, the disclosure statement, and the Joint Plans at each relevant hearing.[6]  JD Holdings' counsel acknowledged Debtors' contributions at the March 23, 2018 disclosure statement hearing:

> First, since the last hearing, I want to bring you up to speed.  One, we want to thank the Debtor[s] for their [cooperation], both counsel, advisors, and the principals have been available to us, have been cooperating, sharing information, telling us where the bodies are buried, telling us what we have to deal with, helping us understand the structure, and working towards

---

[6] Hr'g Tr. 14-32, Feb. 28, 2018, ECF 1891; Hr'g Tr. 46, Mar. 23, 2018, ECF 2090; Hr'g Tr. 93-96, Apr. 27, 2018, ECF 2202.

Debtors' counsel shared a table with JD Holdings' counsel at those hearings.  *See, e.g.*, Hr'g Tr. 32:15-18, Feb. 28, 2018, ECF 1891.

confirmation of the plan and implementation of the plan.

> So I'm also happy to announce that we have attached a form of the asset purchase agreement to the disclosure statement, again because of the cooperation, we all sat down and worked very hard on moving that forward.

> So the Debtor has been a very big partner with us in going forward at this point.

> . . .

> So since cooperation and peace broke out between the Debtors and JD Holdings, that has had an infectious effect on the rest of the case and things are going the way one would hope.[7]

and again at the April 27, 2018 plan confirmation hearing:

> I also want to thank Mr. Shaiken, who is not here, for his hard work, Mr. Zluticky who has been working very [] hard for us, Mr. Strauss, the principals, Ms. Dowdy and Mr. Groves. We worked in the spirit of cooperation for the last six weeks very carefully, very closely together, to get to this point.[8]

The Tenth Circuit BAP described the Joint Plans' progress as of August 2018:

> After entry of the order approving the PSA and the order confirming the Joint Plans, JDH and its affiliates: (a) paid more than 296 claims in full totaling some $397 million, paid the principal balance of two additional loans in the amount of approximately $252 million, and paid approximately $390 million to [commercial mortgage-backed securities lenders], such payments totaling more than $823 million; (b) acquired management companies that continue to employ thousands of employees at the 35 hotels that JDH and its affiliates acquired or intend to acquire pursuant to the confirmed Joint Plans; (c) acquired 27 of the hotels to be acquired by them under the

---

[7] Hr'g Tr. 17:14-18:4, 20:5-8, Mar. 23, 2018, ECF 2090.

[8] Hr'g Tr. 15:4-11, Apr. 27, 2018, ECF 2202.

> Joint Plans; and (d) closed on a financing arrangement
> with Goldman Sachs through which JDH and its affiliates
> have drawn down approximately $635 million used to pay
> off mortgage loans on hotels it acquired pursuant to the
> confirmed Joint Plans.[9]

Although Debtors and JD Holdings have not yet closed on eight hotels subject to commercial mortgage-backed securities loans, JD Holdings is currently managing those hotels and making payments on the loans. All economic benefits from those hotels, and from all other assets whose transfer under the Joint Plans has been delayed by litigation (such as Debtors' interest in W&H Realty, LLC), are now flowing to JD Holdings.

JD Holdings' objection to UBS's fee application presents three issues. First, is UBS entitled to the fees and expenses it requests under the terms and conditions of the Agreement? Second, have those terms and conditions proved improvident under § 328? Third, does JD Holdings' objection merit discovery?

## C. Entitlement to Fees and Expenses Under the Agreement

UBS requests payment of the following fees and expenses under the Agreement: (1) "Transaction Fees," consisting of a Restructuring Transaction Fee and a Sale Transaction Fee; (2) unpaid Monthly Advisory Fees, if any; and (3) unpaid expenses (including legal fees). JD Holdings argues that UBS should not be awarded the fees and expenses it requests because (1) UBS breached the Agreement's implied covenant of good faith and fair dealing and (2) UBS is not

---

[9] Order Dismissing Appeals, BAP Appeal No. 18-69, ECF 37 (B.A.P. 10th Cir. Aug. 1, 2018).

9

entitled to the fees and expenses under the language of the Agreement and Approval Order.

## 1.     <u>Implied Covenant of Good Faith and Fair Dealing</u>

The Agreement is governed by New York law. "[T]here exists under New York law an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)); *see also EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 33 (N.Y. 2005) (holding that plaintiff had failed to plead cause of action for breach of implied covenant where plaintiff had not adequately alleged that defendant injured plaintiff's "right to receive the benefits of their agreement") (citations omitted). This implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *George Town Assocs. S.A. v. Abakan, Inc.*, No. 15cv3435 (DLC), 2015 WL 4923040, at *9 (S.D.N.Y. Aug. 18, 2015). Where the contract in question was executed by sophisticated parties on both sides, "the courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 571-72 (N.Y. 1978) (observing that one party was "an experienced attorney and businessman knowledgeable in real estate transactions," and the other was "a

national firm presumably represented by capable agents").

Breach of the implied covenant also requires "substantially more" than negligence or inept action. *See Security Plans Inc. v. Cuna Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (citations omitted). Thus, "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden," *Rowe*, 385 N.E.2d at 570, for "[t]he covenant will be breached only in a narrow range of cases," *Security Plans,* 769 F.3d at 817.

> The narrow circumstances in which the implied covenant will be breached include situations where "an implied promise was so interwoven in the whole writing of a contract as to be necessary for effectuation of the purposes of the contract" or "a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties."

*George Town Assocs.*, 2015 WL 4923040, at *9 (quoting *M/A-COM*, 904 F.2d at 136).

JD Holdings argues that UBS breached the implied covenant of good faith and fair dealing through its "apparent failure" to "address or avoid" the title insurance issue pending the resolution of JD Holdings' own appeals. This argument is unavailing for a number of reasons. First, it fails to allege that UBS injured Debtors' right to receive the benefits of the Agreement. Specifically, JD Holdings fails to identify any benefit of the Agreement that Debtors didn't receive;[10] in fact,

---

[10] To the extent JD Holdings is arguing that the benefit not received by Debtors is a Financial Transaction or Sale Transaction *caused* by UBS, that argument begs the question of whether causation is an element of the Agreement. As explained at pages 14-16 *infra*, it is not.

JD Holdings fails to allege that Debtors suffered any damages at all as a result of UBS's alleged breach.[11]  *Cf. EBC I*, 832 N.E.2d at 33; *see also Canzona v. Atanasio*, 989 N.Y.S.2d 837, 838 (N.Y. App. Div. 2014) (stating that damages are an essential element of a cause of action for breach of contract).  Second, it adds to the Agreement a substantive provision—title insurance research and consulting— neither included by the parties nor required to effectuate the purposes of the Agreement.  *Cf. George Town Assocs.*, 2015 WL 4923040, at *9.  Because UBS and the Trust are sophisticated parties represented by highly competent counsel, this Court is particularly reluctant to interpret the Agreement as impliedly stating a requirement that the parties did not specifically include.  *Cf. Rowe*, 385 N.E.2d at 571-72.  Third, it alleges (at most) negligence or inept action on the part of UBS, which does not state a claim for breach of the implied covenant as a matter of New York law.  *Cf. Security Plans*, 769 F.3d at 817.  In short, the implied covenant of good faith and fair dealing that exists in the Agreement under New York law cannot prevent an award of fees and expenses to UBS here.

---

[11] Even assuming JD Holdings is arguing that Debtors were harmed by this Court's rejection of Debtors' own disclosure statement, Debtors appear to be better off under the Joint Plans, pursuant to which the Trust retains $20 million in cash and real property, than Debtors would have been under their own proposed plans, pursuant to which they would have been left with nothing.  Moreover, while the title insurance issue did apparently lead Debtors to propose a plan under which creditors would be impaired via delayed payment, nothing about the title insurance issue prevented Debtors from proposing a plan on which those impaired creditors would be allowed to *vote*.  It was the lack of voting, not the creditor impairment (and therefore not the title insurance issue), that made Debtors' plan patently unconfirmable under § 1129(a)(8).  Thus, if Debtors were harmed when their disclosure statement was rejected, that harm was caused by Debtors themselves.

12

2. **Transaction Fees**

UBS requests payment of a Restructuring Transaction Fee and a Sale Transaction Fee.  Under the terms of the Agreement, those fees are due upon "consummation" of a Restructuring Transaction and a Sale Transaction, respectively.  The Agreement defines "**Restructuring Transaction**" and "**Sale Transaction**":

> As used in this Agreement, the term "Restructuring Transaction") means, *whether effected directly or indirectly by the Company* and/or through an affiliate and/or a subsidiary, any restructuring, reorganization, rescheduling, refinancing or recapitalization or the Company's (or any other Debtor's or any of their respective subsidiaries) liabilities, including contingent liabilities (whether on or off balance sheet), whether through a plan of reorganization or liquidation, a comprehensive settlement arrangement, including with respect to any material litigation, an exchange, consent solicitation, repurchase, or repayment of any such liabilities, or any modification, amendment, deferral, forgiveness, restructuring, recapitalization, rescheduling, moratorium, or adjustment of the terms and/or conditions of any such liabilities.
>
> As used in this Agreement, the term "Sale Transaction" means in one transaction or a series of transactions or potential transactions: . . . *the marketing for, and the sale, transfer or other disposition of* any portion of the capital stock or assets of the Company, any other Debtor or any of their respective subsidiaries by way of a tender or exchange offer, option, negotiated purchase, leveraged buyout, lease or license, minority investment or partnership, joint or collaborative venture or otherwise . . . .

JD Holdings opposes both fees.  First, JD Holdings argues that no Restructuring Transaction has occurred because the restructuring of Debtors'

liabilities under the Joint Plans was not "effected directly or indirectly" by the Trust. This argument fails because the Trust *did* effect a restructuring of Debtors' liabilities through its execution of the Settlement Agreement and PSA, its cooperation with JD Holdings, and its support of the Joint Plans, as previously acknowledged by counsel for JD Holdings.[12]

Next, JD Holdings argues that no Sale Transaction has occurred because there was no connection between the marketing conducted by UBS and the disposition of Debtors' assets under the Joint Plans. This argument fails because a plain reading of the Agreement's definition of "Sale Transaction" does not require any *causal connection* between marketing and disposition; rather, it requires simply marketing *and* disposition, both of which have occurred. UBS and the Trust, both sophisticated parties represented by highly competent counsel, could have defined "Sale Transaction" to require a causal connection between the two. They did not. This Court will not do so after the fact. *Cf. In re River Road Hotel Partners, LLC*, 520 B.R. 691, 703 (Bankr. N.D. Ill. 2014) ("If [attorneys] wanted the Restructuring Fee to be expressly contingent on the results of [financial advisor's] efforts or on the confirmation of a debtor-sponsored plan, there are ways they could have drafted the Retention Order to accomplish that goal."); *In re Borders Group, Inc.*, No. 11-10614 (MG), 2011 WL 6026158, at *5 (Bankr. S.D.N.Y. Dec. 5, 2011) ("[I]f [debtors' financial advisor] was only to receive a restructuring or liquidation fee following a sale resulting from [the financial advisor's] successful efforts, it could have and

---

[12] *See supra* pp. 7-8.

should have been clearly stated in the Engagement Letter and any retention order.").

The Court also rejects JD Holdings' argument that the Approval Order's use of the term "success fee" introduces a causal-connection requirement into the term "Sale Transaction." The Approval Order states: "The Debtors are authorized to pay all fees and expenses of UBS on the terms and conditions of [the Agreement], *including but not limited to payment of any success fee* from the proceeds of asset sales, restructuring or any financing transaction, as applicable" (emphasis added). That language entitles UBS to *all* fees and expenses under the terms and conditions of the Agreement regardless of what a "success fee" might be.[13] Because UBS is entitled to all fees and expenses under the Agreement regardless of what "success fee" means, the Approval Order's use of the ambiguous term "success fee" does not

---

[13] The present case is therefore distinguishable from *FBR Capital Markets & Co. v. Bletchley Hotel at O'Hare LLC*, No. 13 C 746, 2013 WL 5408848, at *2 (N.D. Ill. Sept. 24, 2013), in which a district court held that a bankruptcy court's approval order introduced ambiguity into a financial advisor's engagement letter. In that case, the approval order made the payment of the advisor's restructuring fee contingent upon a restructuring "contemplated by the Engagement Letter." The district court held that the approval order created ambiguity as to the meaning of the term "restructuring" because it "suggests that some restructurings would not be so contemplated." *Id.* at *3. Here, although the meaning of "success fee" in the Approval Order might be ambiguous, it does not create ambiguity as to the meaning of the term "Sale Transaction" because it does not limit that term (or any other term in the Agreement) in any way.

To understand this distinction, it's useful to understand what the Approval Order in this case did *not* say. The Approval Order did *not* authorize Debtors "to pay all *success fees* of UBS on the terms and conditions of the Agreement," which could arguably have limited the fees recoverable by UBS to "success fees," thus triggering inquiry as to whether that term introduces a causal-connection requirement into the Agreement.

15

limit, or introduce any ambiguity into, the term "Sale Transaction."[14]

JD Holdings argues that "Sale Transaction" must be interpreted in light of parol evidence showing what the parties intended that term to mean. However, since JD Holdings concedes that the term is itself unambiguous,[15] it is unnecessary and, in fact, impermissible, to consult parol evidence—such as court transcripts and earlier drafts of the Agreement—as to whether that term contains a causal-connection requirement. *See Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013) ("Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract."); *Hoeg Corp. v. Peebles Corp.*, 60 N.Y.S.3d 259, 261 (N.Y. App. Div. 2017) ("[T]he court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities.") (citations omitted). The plain meaning of "Sale Transaction" as defined in the Agreement contains no such requirement. This Court's inquiry ends there.

Finally, JD Holdings argues that neither a Restructuring Transaction nor a Sale Transaction will be "consummated" until the Joint Plans are "fully executed."

---

[14] *Cf. In re Relativity Fashion, LLC*, No. 15-11989 (MEW), 2016 WL 8607005, at *4 (Bankr. S.D.N.Y. Dec. 16, 2016) ("Other parties and courts refer to transaction fees as 'success fees' and, having applied that label, then treat the transaction fees as though they implicitly require a special kind of success in order to be earned."); *In re Hipcricket, Inc.*, No. 15-10104 (LSS), 2015 WL 5728552, at *3 (Bankr. D. Del. Sept. 29, 2015) ("Canaccord's right to a Success Fee is based upon the Retention Terms, not the characterization of the transaction for purposes of the Sale Hearing.").

[15] *See, e.g.*, Hr'g Tr. 22:8, June 11, 2018, ECF 2375 ("We believe it's unambiguous."); *see also id.* at 23:2-3 ("We believe in the first instance [the Agreement is] not ambiguous.").

16

However, the Joint Plans extinguish Debtors' liabilities and transfer liability for all Allowed Claims to JD Holdings. A Restructuring Transaction was thus consummated on May 17, 2018, when the Joint Plans became effective. Furthermore, the Joint Plans transferred an immediate equitable interest in all of Debtors' assets[16] to JD Holdings; the economic benefits from all assets, even those to which JD Holdings does not yet have legal title, are flowing to JD Holdings under the Joint Plans. In consideration for those assets, JD Holdings has assumed liability for all Allowed Claims. Whether JD Holdings has yet to pay some *creditors* is beside the point; the transfer of consideration from JD Holdings to *Debtors*, in the form of assumption of liability, is complete. Under these circumstances, a Sale Transaction was also consummated on May 17, 2018.

Because the Agreement provides that UBS is entitled to a **Restructuring Transaction Fee** of $7,000,000 upon consummation of a Restructuring Transaction, UBS will be awarded $7,000,000 as a Restructuring Transaction Fee. Calculation of the **Sale Transaction Fee**, which employs a sliding, percentage-based schedule, is not so simple:

> Upon consummation of a Sale Transaction, whether in connection with the consummation of a Restructuring Transaction or not, an amount to be determined according to the following schedule (the "Sale Transaction Fee"), subject to a minimum Sale Transaction Fee of $3,000,000:
>
> 1.5% of Sale Transaction Value (as defined in Annex A) for amounts up to and including $300 million; plus

---

[16] All of Debtors' assets, that is, except those few assets that are to remain with the Trust under the Joint Plans.

1.0% of Sale Transaction Value for amounts in excess of $300 million and up to and including $600 million; plus

0.75% of Sale Transaction Value for amount[s] in excess of $600 million and up to and including $1 billion; plus

0.5% of Sale Transaction Value for amounts in excess of $1 billion.

If a Sale Transaction involves all or substantially all of the capital stock or assets of the Debtors, such Sale Transaction Fee shall be offset dollar for dollar against the Restructuring Transaction Fee otherwise payable in respect thereof.

Neither party has used Annex A of the Agreement to calculate a Sale Transaction Value. UBS argues that its Sale Transaction Fee should be calculated using an "implied" Sale Transaction Value of $1.2 billion. The Court declines to adopt this value for two reasons: (a) the $1.2 billion figure, which includes over $150 million in disputed claims, estimated amounts, and general reserve, is obviously inaccurate; and (b) Annex A states precisely how the Sale Transaction Value is to be calculated.[17] Therefore, although UBS will be awarded a Sale Transaction Fee, this portion of UBS's fee application will remain under advisement. The parties must first come to an agreement as to (a) a Sale Transaction Value, calculated pursuant to Annex A as of March 8, 2019; and (b) a Sale Transaction Fee based on that amount, with any disputes to be resolved by this Court. These amounts may be recalculated after Debtors' remaining assets are sold, bearing in mind that all

---

[17] *See* Agreement Annex A ¶ 1, ECF 552 ("For the purposes hereof, '**Sale Transaction Value**' shall equal the sum of . . . .").

transactions shall be considered part of a single Sale Transaction[18] in calculating the Sale Transaction Fee. Per the Agreement, this Fee shall be offset dollar-for-dollar by the Restructuring Transaction Fee and by 50% of any Monthly Advisory Fees paid to UBS in excess of $1,050,000.

### 3. Monthly Advisory Fees

The Agreement provides for a "**Monthly Advisory Fee**" of $175,000 to UBS. In its objection, JD Holdings alleges that UBS has performed no services for months. However, at oral argument, UBS's attorney represented that UBS did perform work for Debtors under the Agreement each month through confirmation of the Joint Plans. The Agreement, which excuses UBS from timekeeping, requires nothing more. To the extent unpaid, UBS is hereby awarded Monthly Advisory Fees of $175,000 per month through May 11, 2018.

### 4. Expenses (Including Legal Fees)

#### a. Service Expenses

Section 2 of the Agreement provides that UBS shall be reimbursed "for all reasonable expenses incurred by UBS in entering into and performing services pursuant to this Agreement, including the reasonable fees, disbursements, and other charges of UBS's legal counsel" ("**Service Expenses**"). JD Holdings argues that UBS should not be awarded its claimed Service Expenses yet because UBS has not shown that those Service Expenses were reasonable. UBS responds that, as

---

[18] The single Sale Transaction is JD Holdings' assumption of liability for all Allowed Claims in exchange for Debtors' Assets.

19

observed by this Court, approval of an agreement under § 328 is incompatible with a subsequent review for reasonableness under 11 U.S.C. § 330. This observation does not support UBS's position, however, because JD Holdings does not seek to review the Service Expenses for reasonableness under § 330. Rather, JD Holdings seeks to review the Service Expenses for reasonableness *under the Agreement itself*, which imposes a standard independent of § 330:

> Whether or not any Transaction is consummated, and in addition to any fees payable to UBS, the Company shall reimburse UBS . . . for all *reasonable* expenses incurred by UBS in entering into and performing services pursuant to this Agreement, including the *reasonable* fees, disbursements, and other charges of UBS's legal counsel . . . .

Thus, JD Holdings is correct that UBS must show that its Service Expenses are reasonable—not under § 330, but under the Agreement itself.[19] While UBS will be awarded Service Expenses, UBS has not yet made such a showing. Therefore, this portion of UBS's fee application will remain under advisement pending a demonstration of reasonableness to JD Holdings, with any disputes to be resolved by this Court.

### b. Fee Defense Expenses

Section 9 of the Agreement provides that UBS shall be entitled to "any costs and expenses incurred by UBS after the Termination Date to enforce its rights

---

[19] *Cf.* 3 *Collier on Bankruptcy* ¶ 328.02[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("For the most part, courts construing section 328(a) have limited its application to compensation to professionals and have not addressed reimbursement of expenses.").

hereunder" ("**Fee Defense Expenses**").  UBS thus asks for an award of Fee

Defense Expenses, arguing that (1) UBS is entitled to reimbursement of such

expenses under the Agreement, and (2) the Court approved the Agreement as

"reasonable" under § 328, such that (3) those expenses may not now be reviewed for

reasonableness under § 330.

However, § 330—the mechanism by which this Court may award

compensation to UBS—requires more than a determination that a professional's

compensation is "reasonable"; it also limits reasonable compensation to that which

is for "actual, necessary services rendered" by the professional.  As used in § 330,

"services rendered" does not include "[t]ime spent litigating a fee application against

the administrator of a bankruptcy estate."  *See Baker Botts L.L.P. v. ASARCO LLC*,

135 S. Ct. 2158, 2165 (2015).  This limitation means that § 330 "does not authorize

the award of fees for defending a fee application."  *Id.* at 2169.

In response, UBS cites *In re Hungry Horse, LLC*, 574 B.R. 740 (Bankr.

D.N.M. 2017), which held that that *Baker Botts* does not prevent a court from

approving a fee-defense provision as "reasonable" under § 328.  *Hungry Horse*, 574

B.R. at 747.  *Hungry Horse* reasoned that *Baker Botts* "was not focused on whether

the fee charged was 'reasonable,' but instead on whether the fee was for 'services'

rendered to the estate."  *Id.* at 744.  The court continued:  "If employment terms and

conditions are approved by a bankruptcy court under § 328(a), then the

professional's compensation is governed by those terms and conditions, rather than

the general 'reasonable compensation for services rendered' language of

§ 330(a)(1)(A)." *Id.* at 746.

This Court agrees that *Baker Botts* is about "services rendered" under § 330 rather than what is "reasonable" under § 328.[20] The Court also agrees that once terms and conditions of employment are approved as reasonable pursuant to § 328, a party cannot later challenge those terms and conditions as unreasonable under § 330. However, the Court respectfully disagrees with the *Hungry Horse* position that approval of a professional's terms and conditions of employment as "reasonable" under § 328 governs whether the professional "rendered services" to the estate under § 330.[21]

Section 328 provides a mechanism by which parties and the court may decide *ex ante* what is "reasonable" for purposes of § 330. However, whether "services" were "rendered" for purposes of § 330 is one that must necessarily be made *ex post*. Both logic and language dictate this conclusion. Logically, if the determination were not made *ex post*, then a professional employed under § 328 could be entitled to payment under § 330 for doing nothing at all, or despite a material breach of the underlying employment agreement. Put differently, while § 328 examines the *substance* of a professional's terms and conditions of employment, it says nothing about whether the professional *complied* with those terms and conditions. Linguistically, because "rendered" is in the past tense, one can—by definition—only

---

[20] Indeed, in *Baker Botts*, the law firms in question had been employed pursuant to § 327, not § 328.

[21] *Cf. In re Boomerang Tube, Inc.*, 548 B.R. 69, 75 (Bankr. D. Del. 2016) (holding that fee-defense provision was not "reasonable" under § 328(a)).

22

determine whether that condition is met after the fact.[22]  For these reasons, the

Court concludes that a determination that the terms and conditions of an

agreement are "reasonable" under § 328 does not determine whether services were

rendered pursuant to that agreement under § 330.  Because *Baker Botts* holds that

fee-defense work is not "services rendered" under § 330, UBS will not be awarded

its Fee Defense Expenses incurred in defending its fee application against JD

Holdings' objection.[23]

## D.    **"Improvidence" under § 328**

Section 328(a) authorizes employment of a professional person on any

"reasonable" terms and conditions.  If a court approves terms and conditions as

reasonable, though, § 328(a) provides that

> the court may allow compensation different from the
> compensation provided under such terms and conditions
> after the conclusion of such employment, if such terms
> and conditions prove to have been *improvident in light of*

---

[22] Moreover, whereas § 330 refers to "actual" services, a determination *ex ante* could only address theoretical services not yet provided.

[23] *Baker Botts* held that "[b]ecause § 330(a)(1) does not explicitly override the American Rule with respect to fee-defense litigation, it does not permit bankruptcy courts to award compensation for such litigation."  *Baker Botts*, 135 S. Ct. at 2169. *Baker Botts* therefore dealt with the statutory exception to the American Rule that each litigant pays its own legal fees.  While there also exists a contract exception to the American Rule, that exception is inapposite in a matter arising under § 330, where the terms of § 330 must be met even where the contract itself would award such compensation.  *Cf. Boomerang Tube*, 548 B.R. at 75 ("Therefore, the Court concludes that the retention agreements are not contractual exceptions to the American Rule.  Even if they were, the Court must still determine if they are permissible under the Bankruptcy Code.");  *In re Nortel Networks, Inc.*, No. 09-10138(KG), 2017 WL 932947, at *8-9 (Bankr. D. Del. Mar. 8, 2017) (awarding fees for fee-defense work, in matter *not* arising under § 330, after reasoning that pre-petition indenture in question was "a contract which qualifies for an exception to the American Rule").

> *developments not capable of being anticipated* at the time of the fixing of such terms and conditions [emphasis added].

This language "creates a 'high hurdle' for a movant seeking to revise the terms governing a professional's compensation *ex post facto*." *ASARCO, L.L.C. v. Barclays Capital, Inc. (In re ASARCO)*, 702 F.2d 250, 258 (5th Cir. 2012). It means that the developments must have been "*incapable* of anticipation, not merely unanticipated." *See id.* (quoting *In re Barron*, 325 F.3d 690, 693 (5th Cir. 2003)); *see also 3 Collier on Bankruptcy* ¶ 328.01 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("After the approval of the professional's employment and terms and conditions thereunder, the only way to modify an approved employment is for the bankruptcy court to determine that what developed in the case could not have been anticipated at the time of approval."). "Fee arrangements approved under § 328(a) may not be cast aside merely because the fee appears excessive in hindsight at the end of the case." *ASARCO*, 702 F.2d at 259. "There is wide agreement that unanticipated events are not grounds for revisiting a pre-approved fee award." *In re Smart World Techs.*, 383 B.R. 869, 877 (S.D.N.Y. 2008), *aff'd*, 552 F.3d 228 (2d Cir. 2009).

Here, JD Holdings argues that the terms and conditions of the Agreement are improvident under § 328 in light of three developments: (1) the title insurance issue; (2) UBS's alleged breach of its professional duties; and (3) an alleged lack of causal connection between the work performed by UBS and the disposition of Debtors' assets and liabilities under the Joint Plans.

First, JD Holdings argues that the title insurance issue was not capable of

anticipation when UBS and the Trust entered into the Agreement. However, as UBS correctly points out, the title insurance issue is a red herring. That issue did not cause UBS to earn fees without a § 363 sale. Rather, UBS earned fees without a § 363 sale because of Debtors' settlement with JD Holdings and the sale of Debtors' assets under the Joint Plans.

Settlement was clearly contemplated by the Agreement, which includes "a comprehensive settlement arrangement, including with respect to any material litigation," as a method of effecting a Restructuring Transaction. Thus, settlement was not only *capable* of anticipation, it was *actually* anticipated. As for the sale of Debtors' assets through the Joint Plans, liquidating plans are contemplated by the Bankruptcy Code itself. *See* 11 U.S.C. § 1141(d)(3)(A) (addressing debtor discharge where "the plan provides for the liquidation of all or substantially all of the property of the estate"). And, while the Joint Plans are a creditor plan, JD Holdings' own objection—which argues that "[t]he submission and confirmation of a creditor plan in a Chapter 11 proceeding is *uncommon*"—implicitly acknowledges that creditor plans *are* sometimes confirmed. Under these circumstances, settlement and the sale of Debtors' assets through a creditor plan were clearly *capable* of anticipation. Even if UBS and the Trust did not *actually* anticipate those developments when they executed the Agreement, that lack of anticipation does not establish grounds for disturbing UBS's pre-approved fee award. *See Smart World*, 383 B.R. at 877.

Second, JD Holdings alleges that UBS had a professional duty to anticipate and address the title insurance issue, and that UBS's failure to satisfy that alleged

25

duty was a development not capable of anticipation.  However, the Agreement itself addresses UBS's liability to the Trust in the event UBS did not meet its professional obligations, providing that UBS would be liable only for "gross negligence or willful misconduct . . . in performing the services that are the subject of the Agreement." Because the Agreement itself anticipates UBS's alleged failure to meet its professional obligations, JD Holdings' argument that UBS's alleged failure was incapable of anticipation at the time UBS and the Trust entered into the Agreement must fail.[24]

Third, JD Holdings argues that it could not be anticipated that UBS might be awarded fees under the Agreement absent a causal connection between the work performed by UBS and the disposition of Debtors' assets and liabilities.  This argument fails because it conflates the relevant "developments" analyzed under § 328 (here, Debtors' settlement with JD Holdings and the sale of Debtors' assets through the Joint Plans) with the *outcome* of those developments (an award of fees to UBS).  Because this argument does not identify any relevant "developments," it is—along with UBS's argument that a fee award would be "unfair and inequitable" under the circumstances—essentially an impermissible argument as to the reasonableness of UBS's fees.  *Cf. In re River Road Hotel Partners, LLC*, 536 B.R.

---

[24] JD Holdings' breach-of-professional-duty argument is ill-suited for § 328(a) in any event, as it does not assert that UBS's alleged breach rendered any of the terms and conditions of the Agreement improvident.  Put differently, this argument appears to conflate improvidence (which challenges the *substance* of a contract's terms and conditions) with breach of contract (which challenges a party's *compliance* with the contract's terms and conditions).

228, 239 (Bankr. N.D. Ill. 2015) ("[Transferee's] claims that [financial advisor's] work did not benefit the Debtors' bankruptcy estates or contribute value to the success of the chapter 11 case are not appropriately considered in a prospective analysis under § 328(a).").

In short, JD Holdings has not presented a viable argument that any developments rendered the terms and conditions of the Agreement "improvident" for purposes of § 328(a). Thus, the Court will not disturb UBS's fee award.

## E.   **Discovery**

JD Holdings argues that this Court should not rule on UBS's fee application without discovery. However, Fed. R. Civ. P. 26(b)(1) limits discovery to that which is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Evid. 401(b), in turn, limits "relevant" evidence to facts that are "of consequence in determining the action." Here, because each of JD Holdings' theories fails as a matter of law, no facts JD Holdings might discover would be of consequence to its objection. JD Holdings is not entitled to search the records of Debtors and UBS in order to develop new avenues of objection to UBS's fee application. *Cf. Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) ("Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through bank books and records for evidence of some unknown wrongdoing."). Under these circumstances, Fed. R. Civ. P. 26(b)(1) does not require discovery.

While JD Holdings argues that the terms of § 328 "necessarily entail[] a factual inquiry that cannot be conducted without discovery," the Court disagrees.

All parties to this contested matter are aware of the relevant "developments" for purposes of § 328: Debtors' comprehensive settlement with JD Holdings and the confirmation of a creditor plan. Discovery could only ever answer the wrong question: whether anyone *actually* anticipated those developments. The right question—whether those developments were *capable* of anticipation—has already been answered in the affirmative here. No more is required.

## F. <u>Conclusion</u>

JD Holdings' motion for scheduling order is hereby denied.

UBS's fee application is hereby granted in part and denied in part as follows:

1. UBS is awarded a Restructuring Transaction Fee of $7,000,000.

2. UBS will be awarded a Sale Transaction Fee, which shall be offset dollar-for-dollar by the $7,000,000 Restructuring Transaction Fee and by 50% of any Monthly Advisory Fees paid to UBS in excess of $1,050,000. However, this portion of UBS's fee application will remain under advisement pending the parties' determination of (a) a Sale Transaction Value, calculated pursuant to Annex A of the Agreement as of March 8, 2019; and (b) a Sale Transaction Fee based on that amount, with any disputes to be resolved by this Court. The Sale Transaction Value and Sale Transaction Fee amounts may be recalculated after Debtors' remaining assets are sold, bearing in mind that all transactions shall be considered part of a single Sale Transaction in calculating the Sale Transaction Fee.

28

3. UBS is awarded Monthly Advisory Fees through May 11, 2018, to the extent unpaid.

4. UBS will be awarded its reasonable Service Expenses to the extent unpaid. However, this portion of UBS's fee application will remain under advisement pending the parties' determination of whether UBS's claimed Service Expenses are "reasonable," with any disputes to be resolved by this Court.

5. UBS's application is denied as to Fee Defense Expenses.

IT IS SO ORDERED.

###