The relief described hereinbelow is SO ORDERED.

SIGNED this 3rd day of January, 2020.



_____
Robert D. Berger
United States Bankruptcy Judge

_____

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

**JOHN Q. HAMMONS FALL 2006, LLC**, *et al*.,

Debtors.

Case No. 16-21142-11

(Jointly Administered)

_____

### Memorandum Opinion and Order Overruling, in Part, and Granting, in Part, Joint Objection to "Chateau Lake Loan" Claim and Overruling in Part, and Granting, in Part, CMBS Lenders' Motion to Allow Claims

When an oversecured commercial lender contracts for post-petition default-upon-bankruptcy interest, is that loan agreement provision enforceable under bankruptcy law against a Chapter 11 debtor? Does the answer change when the debtor is paying all its creditors in full, via a full-payment Chapter 11 liquidating plan? The parties to this litigation have opposing views, and the Court spends a majority of this Order resolving this dispute. The Court also addresses pre-petition default interest, and various other disputed fees and costs claimed by the lender.

In this case, the lender's claim arises out of an unmatured loan. Since filing bankruptcy in 2016, the borrower on that loan has made all monthly payments, as authorized by this Court's

cash collateral order. Nonetheless, the loan is in default under the terms of the loan: *ipso facto* default, as filing for bankruptcy constitutes an event of default under the applicable loan agreement, and guarantor default, as the borrower's guarantor is also part of these jointly administered cases. The Court first concludes that a third asserted basis for default—that funds were commingled by the borrower—has not been proven.

The Court next addresses whether—because of these bankruptcy filings—the lender is entitled to post-petition default interest, in addition to the regular interest it has received during the pendency of these cases. Under 11 U.S.C. § 506(b),[1] the holder of an oversecured claim is allowed "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." Section 506(b) thus allows an oversecured creditor to include post-petition interest in its claim to the extent of the debtor's "equity cushion" in the collateral.[2] The parties do not dispute that there is sufficient equity in the relevant collateral to make the creditor oversecured.

The Court then addresses whether a special servicing fee, a workout fee, and substantial attorneys' fees and costs have been supported as "reasonable" under § 506(b). And finally, the Court assesses the guarantor's liability on these claims.

Ultimately, the Court allows proofs of claim numbers 614 and 615 in the amount of $50,689,895.56 (consisting of $42,124,649.94 principal, $151,999.78 interest, $7,521,751.82 post-petition default interest, and $891,494.02 legal fees, expenses, and appraisal fees). The Court disallows pre-petition default interest of $3,554,981.98, a special servicing fee of $351,143.12, and a workout fee of $608,340.32. As a result, the parties' objections to claim and

---

[1] All statutory references in this order are to Title 11, United States Code (the Bankruptcy Code) unless otherwise indicated.
[2] *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372-73 (1988).

2

motion to allow claims are granted in part, and denied in part, as more fully set out herein.

## I.     Procedural Background

The parties' dispute has been convoluted. On April 16, 2018, the Jointly Administered Debtors[3] and JD Holdings, LLC—the former foe of the Jointly Administered Debtors that has since acquired all of Debtors' real property assets through a purchase and sale agreement—filed objections to certain of the claims filed by certain secured creditors, called the CMBS Lenders.[4] Namely, the so-called "Joint Objectors" filed an objection to proofs of claim 614 and 615, known as the Chateau Lake Loan and the guaranty thereon given by the Revocable Trust of John Q. Hammons.[5] The Joint Objectors also filed an objection to proofs of claim 629 and 630, known as the G7 Loan and again, the guaranty given by the Revocable Trust of John Q. Hammons.[6] The same date, the CMBS Lenders filed a motion to allow its claims in total, seeking allowance of

---

[3]  The Jointly Administered Debtors consist of the Revocable Trust of John Q. Hammons and 75 of that Trust's directly or indirectly wholly owned subsidiaries and affiliates.

[4]  At that time, the CMBS Lenders were made up of five groups of secured creditors: (a) U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass- Through Certificates, Series 2006-LDP7, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Nomura Portfolio Loan"); (b) Wilmington Trust, National Association, as Trustee for the registered holders of Wells Fargo Commercial Mortgage Trust 2015-C26, Commercial Mortgage Pass-Through Certificates, Series 2015-C26 by and through Midland Loan Services, a division of PNC Bank, National Association, solely in its capacity as Special Servicer (holder of the loan known as the "Chateau Lake Loan"); (c) Deutsche Bank Trust Company Americas, as Trustee, on behalf of the Registered Holders of Citigroup Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2015-GC33, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "G7 Loan"); (d) U.S. Bank  National Association, as Trustee for the Registered Holders of Banc of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-3, by and through C-III Asset Management LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Euro-Hypo Portfolio Loan"); and (e) Wells Fargo Bank, N.A., as successor to LaSalle Bank National Association, as Trustee for the registered holders of COMM 2006-C8 Commercial Mortgage Pass-Through Certificates, by and through LNR Partners, LLC, solely in its capacity as Special Servicer (holder of the loan known as the "Barclays Portfolio Loan").

[5]  Doc. 2032.

[6]  Doc. 2033.

proofs of claim 614 (Chateau Lake Loan), 624 (Nomura Portfolio), 626 (Euro-Hypo Portfolio), 627 (Barclays Portfolio), and 629 (G7 Loan).[7] In total, the CMBS Lenders asserted a total amount due from the bankruptcy estate in excess of $750,000,000 (claims 614 through 616, and 624 through 630). The CMBS Lenders sought allowance of an array of monetary components (e.g., default interest, yield maintenance penalties, legal fees and other charges, assumption costs, etc.) in addition to recovery of principal.

The issues concerning the allowance of all the disputed claims were similar, and the parties briefed the issues jointly, culminating in oral argument on May 22, 2018, after which the Court took the matters under advisement. The Court was informed that all issues surrounding proof of claim 626 (Euro-Hypo Portfolio) had been settled, and were no longer at issue.[8] Shortly thereafter, on July 5, 2018, the Court issued an Order indicating it needed additional argument and evidence from the CMBS Lenders before it could rule.[9] The CMBS Lenders provided that information, and a subsequent round of briefing occurred, finally ending at the end of September, 2018.[10] The Court conducted a status conference with the parties on October 3, 2018, and indicated that the Court could not render a final adjudication based upon the pleadings and documents filed because the Joint Objectors objected to the Court's consideration of an expert declaration submitted by the CMBS Lenders in support of their claims, without being given an opportunity to cross-examine or present their own testimony in response. The Court indicated that a limited evidentiary hearing would be required.

On November 29, 2018, however, the parties jointly asked that their matter be referred to mediation with Judge Barry Schermer of the United States Bankruptcy Court for the Eastern

---

[7] Doc. 2038.
[8] Doc. 2235 p.1 n.1.
[9] Doc. 2396.
[10] Docs. 2428, 2442, 2449, 2487, and 2501.

4

District of Missouri,[11] which this Court ordered.[12] Mediation was scheduled for December 17, 2018. Although the parties reported that the mediation concluded without a settlement, select parties to the dispute continued negotiations beyond the mediation, and ultimately, filed a motion to approve a settlement of all issues relating to claims 624 (Nomura Portfolio), 627 (Barclays Portfolio), and 629 (G7 Loan), and the guarantees thereon (claims 625, 628, and 630).[13] That settlement was approved on March 8, 2019.[14]

As a result of the winnowing of the dispute discussed herein, the Court held a status conference with the parties on August 22, 2019 to determine what remained for trial and decision. The Court set a one-day trial on the Joint Objectors' objection to proofs of claim 614 and 615 (the Chateau Lake Loan and the guaranty thereon given by the Revocable Trust of John Q. Hammons), wherein the Court would accept testimony on the default interest rate sought to be applied by the CMBS Lender to that loan.

## II.    Factual Findings

On December 11, 2014, Chateau Lake, LLC (hereinafter, the Borrower) executed a promissory note to Prudential Mortgage Capital Company, LLC to evidence a loan for a principal amount of $46,000,000.[15] Through a series of allonges, the note is now held by the Wells Fargo Commercial Mortgage Trust 2015-C26, Commercial Pass-Through Certificate, Series 2015-C26, with Wilmington Trust, National Association, serving as Trustee and Midland Loan Services, Inc. serving as Special Servicer.[16] The note is secured by a valid and perfected first priority lien and security interest in a parcel of real property in Taney County, Missouri,

---

[11]  Doc. 2580.
[12]  Doc. 2585.
[13]  Doc. 2627.
[14]  Doc. 2639.
[15]  Exh. I.
[16]  Exh. E, Attachment to Proof of Claim.

5

along with all improvements, fixtures, interests, personalty, leases, rents, and proceeds thereon. The security interest was recorded on December 12, 2014. Again, through a series of assignments, the Wells Fargo Commercial Mortgage Trust is the current holder of the mortgage. The parties also executed an assignment of leases and rents and a revocable license to collect and use rents, and the security interest in all personal property assets was also properly perfected. Also on December 11, 2014, the Revocable Trust of John Q. Hammons executed an Indemnity and Guaranty Agreement.[17]

The Chateau Lake Loan was financed on the CMBS market.[18] A CMBS is a "commercial mortgage-backed security." "In a typical CMBS transaction, multiple mortgages are sold to a trust qualified as a real estate mortgage conduit ('REMIC') for tax purposes. The REMIC [here, the Wells Fargo Commercial Mortgage Trust] in turn sells certificates entitling the holders to payments from principal and interest on this large pool of mortgages. The holders of the CMBS securities typically have different rights to the income stream and bear different interest rates; they may or may not have different control rights."[19] In the typical transaction, the Wells Fargo Commercial Mortgage Trust would have been managed by a Master Servicer, who would handle the "day-to-day loan administration functions" and servicing of the loan.[20] Once the Jointly Administered Debtors filed bankruptcy however, the Special Servicer (here, Midland Loan Servicing, Inc.) took over management.[21] A special servicer's fee for servicing a CMBS loan is higher than a master servicer's fee.

The Borrower, Chateau Lake, LLC, is a special purpose entity ("SPE"). An SPE is a

---

[17] Exh. J.
[18] Exh. F (Pooling and Servicing Agreement).
[19] *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 51 (Bankr. S.D.N.Y. 2009).
[20] *Id.*
[21] *Id.*

6

borrowing structure designed to minimize the possibility of a bankruptcy filing and avoid the negative consequences of bankruptcy. The SPE's powers are restricted to the bare activities necessary for the transaction so that the risk of claims created by activities unrelated to the lending transaction are minimized.

The Jointly Administered Debtors filed bankruptcy petitions in late June and early July 2016. Their Plan, confirmed nearly two years later, in May 2018, specifies that all classes of creditors are unimpaired and that all allowed claims will be paid in full, except for any assumed loans, which would be paid according to their terms.[22] The Plan permits loans to be reinstated and assumed by JD Holdings "pursuant to the terms of the underlying loan agreement," but does not require reinstatement.[23] The Plan specifies that if a loan is "neither reinstated nor assumed, then such loan shall be treated as a Secured Claim."[24] The Supplement to the Plan indicates that the Chateau Lake Loan was to be assumed,[25] although that apparently has not occurred. The parties have stipulated that all scheduled principal and interest payments on the loan have been made on time, at the standard interest rate.

Midland Loan Servicing claims the Lender is entitled to a default interest rate of 9.33% per annum, contrasted with the note's standard interest rate of 4.33% per annum. In other words, the default interest rate adds a five-percentage-point premium to the interest charged. According to the Lender, the loan is in default based on three occurrences. First, the parties' loan agreement prohibits the commingling of assets,[26] and Midland Loan Servicing claims the Jointly

---

[22]  Doc. 2188 p.8; Doc. 1946 p.17 (Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by Creditor JD Holdings, L.L.C. at § IV.B.2(c)). Under the Plan, JD Holdings agreed to pay all "Allowed Claims" in exchange for Debtors' "Assets." *See* Doc. 1946 p.23.
[23]  Doc. 1946 p.6, p.17 n.4.
[24]  *Id.*
[25]  Doc. 2050, Exh. E p.308 (Chateau Lake Loan to be reinstated and assumed).
[26]  *See* Exh. K § 2.28A.16 p.73 (requiring the Borrower to "separately identify, maintain and

Administered Debtors admitted in their motion to use cash collateral (filed the same date as their petitions) that their hotels used a cash management system whose express purpose was to fund expenses through a common cash management account.[27] Second, Midland Loan Servicing claims the loan entered default status when Debtor Chateau Lake, LLC filed its individual Chapter 11 bankruptcy petition on June 26, 2016.[28] And finally, Midland Loan Servicing claims the loan also entered default status due to the Chapter 11 petition filed by one of the guarantors of the loan, the Revocable Trust of John Q. Hammons, on the same date.[29]

As of the petition date, Midland Loan Servicing claimed the following amounts owed, totaling $58,650,230.06:

- an unpaid principal balance of $44,945,977.02;
- a yield maintenance premium of $10,013,171;
- accrued interest of $135,150.06;
- prepetition default interest of $3,554,681.98;
- legal review fees of $750; and
- a document fee of $500.[30]

By the time Midland Loan Servicing filed its claim on December 23, 2016, additional default interest of $797,965.11 through October 31, 2016, and lender expenses of $44,406.81 were also claimed, for a total claim amount of $59,492,601.98.[31] The Chateau Lake Loan matures on

---

segregate its assets" but if held by another entity, "be kept identifiable (in accordance with customary usages) as assets owned by Borrower"); *id.* ¶ 17 p.74 (requiring that the borrower "shall maintain (and has continuously maintained) its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate of same or other person or entity").

[27]  Docs. 17 (Motion for Authorization to Continue to Use Existing Bank Accounts, Check Stock, Existing Business Forms and Cash Management Systems) and 18 (Motion to Use Cash Collateral).

[28]  *See* Exh. K Art. III.H. p.85 (an Event of Default includes a Borrower or any Guarantor filing a "petition in bankruptcy").

[29]  *Id.*; Exh. L § 1.(a) (Guaranty Agreement).

[30]  Exh. E, Attachment to Proof of Claim p.3.

[31]  Exh. E, Attachment to Proof of Claim p.4. A payoff quote prepared for May 1, 2018, states the total amount due as $53,900,733.30. Doc. 2038 p.6. That number was made up of: an unpaid

8

January 1, 2025. There is no dispute that the loan is oversecured.[32]

To put it mildly, and due to the evolving nature of this dispute over the last year and a half, the Court has been frustrated trying to determine what, exactly, is being claimed, and what, exactly, is being disputed. The Joint Objectors' initial objection to the Chateau Lake Loan claim sought disallowance of any portion of the claim based on default interest (i.e., both prepetition default interest and post-petition default interest) and then disallowance of certain charges they characterized as unreasonable (namely, resolution fees, property protection advances, "other amounts," and attorneys' fees).[33] The Joint Objectors also argued, "to the extent the Chateau Loan is not assumed in connection with the consummation of the Plan," the claim amount for a yield maintenance premium should also be disallowed.[34] Simultaneously, Midland Loan Servicing moved for allowance of its claim in full as filed.[35]

At oral argument on the parties' dispute shortly after briefing concluded, the parties indicated all disputes concerning legal fees incurred through that point had been resolved,[36] and disputes concerning "out of pocket" fees were likely to be resolved.[37] What was intended by the

---

principal balance of $43,629,046.06; a yield maintenance premium of $4,909,514.24; interest on advances of $467,036.82; default interest of $7,699,342.62; a resolution fee of $436,290.46; legal fees of $750; a document fee of $500; property protection advances of $214,389.42; a payoff processing fee of $500; and a credit from credit reserve funds of ($3,456,636.32). Doc. 2038 Exh. A.

[32] In fact, the parties stipulated at trial of this matter that the loan was oversecured on the date of petition and currently remains oversecured.

[33] Doc. 2032 p.9. Specifically, the Joint Objectors sought disallowance of a $436,290 "resolution fee" and a $214,389 "property protection advances." *Id.* p.24. In later briefing, the Joint Objectors sought disallowance of all "lender expenses," attorneys' fees and costs," and "other amounts" listed in the proof of claim as they were not supported by the CMBS Lenders. Doc. 2180 p.54.

[34] Doc. 2032 p.11.

[35] Doc. 2038.

[36] Doc. 2330 Tr. p.11 lines 19-25 ("legal fees were reasonable under the circumstances, and so we no longer have that objection").

[37] *Id.* Tr. p.102 line 23 through p.103 line 17.

9

resolution of "out of pocket fees" was not clarified, however. On September 7, 2019, in preparation for trial, Midland Loan Servicing filed a supplement to its claims briefing updating select portions of its claim, that showed:

- total legal fees requested of $841,135.72;
- total legal expenses of $30,858.30;
- total appraisal fees of $19,500;
- a special servicing fee of $359,936.92; and
- a work-out fee of $608,340.32.[38]

Post-trial, the parties then filed a joint stipulation confirming the mathematical calculation of the remainder of the claim and addressing what remained in dispute concerning those numbers:

- unpaid principal balance of $42,124,649.94;
- accrued interest of $151,999.78;
- pre-petition default interest of $3,554,681.98;
- post-petition default interest of $7,521,751.82;
- special servicing fees of $351,143.12; and
- property protection advances, including legal fees, of $891,494.02 (this number appears to be made up of the $841,135.72 in legal fees, the $30,858.30 in legal expenses, and the $19,500 total appraisal fees).[39]

The stipulation indicates that the Joint Objectors agreed that the unpaid principal balance of $42,124,649.94 and the accrued interest of $151,999.78 was due. The Joint Objectors dispute, however, that either the pre-petition default interest or the post-petition default interest is owed or that the special servicing fee is owed, although for all three, the Joint Objectors agree with the mathematical calculation of the amount. No indication of the Joint Objectors position on the "property protection advances" was given within the stipulation, although at trial, counsel for the Joint Objectors argued that one hotel bill of $1120.06 should be reduced and that fees for the creditor's bankruptcy appeals should be reduced because the appeals were not well-founded. To

---

[38] Doc. 2769. In the initial round of briefing, the parties vigorously disputed whether the yield maintenance premium stated on the proof of claim was allowable, or even ripe for decision. The latest stipulation, however, does not mention a yield maintenance premium.

[39] Doc. 2787.

sum, as best this Court can discern, the total amount of $43,131,130.68 is not disputed ($42,124,649.94 principal, $151,999.78 interest, and $854,480.96 of the legal fees, expenses, and appraisal fees), and the total amount of $12,072,930.30 is disputed ($3,554,681.98 pre-petition default interest, $7,521,751.82 post-petition default interest, $351,143.12 special servicing fee, $608,340.32 work-out fee, and $35,893 and $1120.06 of the legal fees and costs).

Midland Loan Funding alleges risks and costs experienced by CMBS Lenders—and the investors in those trusts—justifying a default interest rate upon a bankruptcy filing. Most of the support for Midland Loan Funding's argument comes from the (credible) testimony and declaration of Ronald F. Greenspan.[40] Mr. Greenspan is an expert in the CMBS market: he has thirty years' experience in structured financing, frequently speaks on the topic, has been qualified as an expert on the topic more than fifty times, and has taken a "deep dive" into more than a thousand CMBS transactions. Mr. Greenspan groups the risks and costs investors are exposed to in the event of a borrower's bankruptcy into four categories, as follows:[41]

- risks imposed by the delays and uncertainties inherent in bankruptcy:
  - the negative effect on the market value of CMBS bonds held by investors caused by the uncertainty that results from a bankruptcy filing; the risk of unfavorable changes in CMBS re-investment rates due to delays in the ability to timely reinvest principal;
  - the risk of non-recoupment of all costs and expenses incurred in connection with a bankruptcy;
  - a disruption in monthly CMBS bond payments due to alterations in payments caused by bankruptcy cash collateral orders;
  - the accrual of interest expense on advances that must be made to provide the monthly payments to CMBS investors when a disruption in monthly debt service payments occurs; the inability of CMBS Lenders to promptly exercise

---

[40] The parties stipulated to Mr. Greenspan's qualification as an expert.

[41] The additional risks and costs expressed by the CMBS Lenders as to matured loans (delayed recovery of principal balances due and owing upon maturity, receiving non-market rate interest during the period before principal is repaid on matured loans, inability of investors to control the timing of their reinvestments, and missed re-investment opportunities caused by the delay in return of capital) are not specifically relevant to the unmatured Chateau Lake Loan, other than the fact that they represent risks to the market in general.

remedies against their collateral or guarantors; and
- o the inability of CMBS Lenders to control the market timing of the disposition of the collateral that secures their non-recourse loans.
- risks imposed by the Bankruptcy Code:
  - o the risk of nonconsensual changes to maturity or interest rates;
  - o the risk of nonconsensual reduction in principal amount;
  - o the risk of discharge of debt;
  - o the risk of non-consensual changes to the terms of loan documents;
  - o the risk of a non-consensual sale of collateral under § 363(f) or under a bankruptcy plan;
  - o the non-consensual alteration in the CMBS Lender's collateral rights through the disposition of debtor assets based upon JD Holdings' promise to pay amounts owed to all creditors over and above the Court-ordered disputed claims escrow;
  - o confirmation of plans over the objection, and allowance of claims over the objection of the CMBS Lender and the resulting implied substantive consolidation permitted only in bankruptcy;
  - o non-consensual changes to the nature and identity of borrowers and guarantors; and
  - o non-consensual release of the collateral in a non-recourse loan.
- out of pocket expenses and costs:
  - o appraisals and valuation issues;
  - o collateral review and monitoring;
  - o workout negotiation, including Chapter 11 plan and negotiation;
  - o negotiations regarding terms of potential § 363(f) sales
  - o lender presence at and preparation for hearings, depositions, and mediations;
  - o lender involvement in preparation in pleading review and preparation, preparation of discovery and subpoena responses, and preparation for and giving of testimony, either in court or in depositions; and
  - o lender involvement in preparation of claim documents, the review and analysis of disclosure statements and plans of reorganization, preparation and prosecution of stay relief motions and cash collateral contests, including negotiation and preparation of cash collateral orders.
- loss of the benefit of the bargain struck with the borrower:
  - o the existence of the default rate of interest upon a bankruptcy filing lowers the original interest rate extended to borrowers of CMBS loans, due to the protection offered by that default rate;
  - o industry-wide, interest rates charged to CMBS borrowers would be higher if the lending markets could not rely on default interest rate protection; and
  - o the lack of the ability to enforce default interest would have a negative impact on rating agency analysis of CMBS bonds, leading to more costly credit for commercial real estate borrowers.

A major point of Mr. Greenspan's testimony on this subject was to emphasize that CMBS loans

are structured for certainty: the loans' defined terms (maturity, duration, interest, etc.) allow

12

investors to engage in cost-efficient hedging of their investments. A loan with a default—be it a structural default or a bankruptcy filing—is worth less, both because it is more uncertain, and because it is costlier. Mr. Greenspan has essentially reviewed every CMBS loan agreement in the industry, and he does not recall a single agreement without a default interest rate. Further, Mr. Greenspan testified that there could not be such an agreement, because without one, the loan would not be rated by the rating agencies.

Mr. Greenspan also testified about the default interest rate on the Chateau Lake Loan specifically. In an effort to determine the reasonableness of the default interest rate, Mr. Greenspan looked at the average rates in the market at the time of the bankruptcy petition in these cases, comparing the most secure loans to the lowest rated, least secure loans. (And the Chateau Lake Loan, then in default, would have been rated below the lowest investment grade.) Ultimately, Mr. Greenspan concluded that 5% was a market-reasonable default rate. According to Mr. Greenspan, default interest, and its enforceability, is itself important for the efficient functioning of the CMBS marketplace. First, non-defaulting borrowers benefit from a lower interest rate made possible by the default-rate structure. In addition, a default rate is necessary to incentivize a borrower to abide by the terms of its loans.[42] And default rates are part of the "standardized structure" that has been adopted in the CMBS marketplace, all of which yield dependable loans with greater efficiency.

Where does the default interest ultimately go? The Pooling and Servicing Agreement that

---

[42] According to Mr. Greenspan, without enforceable default interest terms, there could be little incentive for a CMBS borrower to abide by the terms of its loan. Once a lender provides funds to a CMBS borrower, there is no further performance by the lender that can be withheld or suspended to incentivize a borrower to timely perform. If interest rates increase, a borrower may not repay the lower interest rate loan, if the only consequence is that a below-market rate continues. Mr. Greenspan indicated that a late fee generally does not incentivize behavior, because once imposed, if there is no default interest, then there is no longer an incentive to perform sooner rather than later.

governs the activity of the multiple vendors involved in a CMBS transaction (e.g., the collecting agent, the disbursing agent, the master servicer, the special servicer, etc.) directs how the money goes in and out. The Pooling and Servicing Agreement in this case directs the distribution of default interest after it has been collected. Under the waterfall arrangement of that agreement, once the servicer collects the default interest, the servicer pays the default interest into the CMBS trust. Then a three step-process is followed: first, application to unpaid interest on servicing advances (alleviating an expense that would otherwise be incurred by the lenders),[43] then repayment of already paid interest on servicing advances (i.e., reimbursing lenders for the cost they had already paid), and then finally to the special servicer as compensation for the special servicing function.[44] Mr. Greenspan testified that a special servicer generally has a separate agreement with its certificate holders wherein half of this final portion of the waterfall would then go to the actual investor, based on that investor's loss position. Mr. Greenspan has not, however, actually reviewed the separate agreement between Midland Loan Funding and its investors.

Because there would have been no servicing advances in this case because the Chateau Lake Loan payments have all been timely, all default interest would be distributed to the Special Servicer, and then some portion split with the actual investors in the CMBS. A special servicer cannot know which loans will ultimately default; that said, Mr. Greenspan testified that the expectation of earning these amounts is a material consideration for a special servicer's

---

[43]  Mr. Greenspan testified that if a CMBS borrower enters bankruptcy and does not make post-petition taxes, insurance, or principal or interest payments, then the special servicer is required to make "protective advances" on behalf of the borrower. The funds are then distributed out to the certificate holders, as they typically would have been. The special servicer would obviously be out the money they paid, but they are also entitled to interest on their advances from the CMBS trust itself. Again, here, however, all scheduled principal and interest payments have been timely made.
[44]  Exh. F § 3.25 p.274.

agreement to specially service defaulted loans and the consideration of what is an acceptable based-level monthly special servicing fee. Without the ability collect the default interest, Mr. Greenspan expects the base-level special servicing fee to be higher than is currently customary. A higher fee would be passed on to borrowers in the form of higher base-level interest rates.

## III.    Conclusions of Law

The Court has jurisdiction of this matter under 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(B), as it concerns the allowance or disallowance of claims against these bankruptcy estates.

### A.    Proofs of Claim and Burden of Proof Generally

"When a debtor declares bankruptcy, each of its creditors is entitled to file a proof of claim—i.e., a document providing proof of a right to payment—against the debtor's estate. Once a proof of claim has been filed, the court must determine whether the claim is 'allowed' under § 502(a) of the Bankruptcy Code."[45] When a creditor files a properly executed proof of claim, it is deemed allowed under § 502(a).[46] A party objecting to a proof of claim must "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves."[47] Even when a party does object to a claim, "the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)."[48] Generally stated, § 502(b)(1) prohibits claims that would be unenforceable under non-bankruptcy law.[49] The creditor "has the ultimate burden of persuasion as to the validity and amount of the claim."[50]

---

[45] *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007).
[46] *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 352 (Bankr. D.N.M. 2010).
[47] *Id.*
[48] *Travelers Cas. & Sur. Co. of Am.*, 549 U.S. at 449.
[49] *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. at 351.
[50] *Id.* at 352*; see also In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 950 (Bankr.

15

## B.    Default Interest

### 1.    Commingling Default and Pre-Petition Default Interest

Article III of the parties' loan agreement governs "events of default," and Article III.C. dictates that it will be an event of default for the borrower to fail "to perform any covenant, agreement, obligation, term or condition set forth in Section[] . . . 2.28 . . . , subject to any applicable notice and cure periods."[51] Article III.C. then states, however,

> with respect to any covenant, agreement, obligation, term or condition set forth in . . . Section 2.28A, an Event of Default shall not exists to the extent (i) such failure is immaterial, (ii) such failure is curable and (iii) to the extend curable, the failure shall be promptly cured within 15 calendar days after the earlier to occur of (x) notice from Lender and (y) the date on which Borrower or Guarantor first has knowledge of such failure.[52]

Section 2.28A then governs a laundry list of "Covenants" regarding "Indebtedness, Operations, and Fundamental Changes of Borrower."[53] Subsection 2.28A.16 states that the Borrower "shall separately identify, maintain and segregate its assets (and has continuously done so in the past)."[54] The section continues:

> Borrower's assets have always been and shall continue at all times to be held by or on behalf of Borrower and if held by another entity, have at all times been kept and shall at all times be kept identifiable (in accordance with customary usages) as assets owned by Borrower. This restriction requires, among other things, that (a) Borrower funds shall be deposited or invested in Borrower's name, (b) Borrower funds shall not be commingled with the funds of any Affiliate of same or other person or entity, (c) Borrower shall maintain (or cause Hotel Manager to maintain) all accounts in tis own name and with its own tax identification number, separate from those of any Affiliate of same or other person or entity, and (d) Borrower

---

N.D. Ill. 1989) ("Claims filed in bankruptcy are prima facie presumed valid under 11 U.S.C. § 502(a) and are prima facie proof of their validity under Bankr. R. 3001(f). [The debtor] therefore bears an initial burden of proof to overcome the presumed validity and amount of [the creditor's] secured claim. However that burden is easily satisfied, and the ultimate burden of persuasion is upon claimant . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral which secures its claim.").

[51] Exh. K Art. III.C. p.84.
[52] *Id.*
[53] *Id.* § 2.28 p.71.
[54] *Id.* § 2.28.A.16 p.73.

16

funds shall be sued only for the business of Borrower, subject to the right of Borrower to distribute funds to its members in accordance with the terms and conditions of this Agreement.[55]

Subsection 2.28A.17 then states that the borrower "shall maintain (and has continuously maintained) its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or same or other person or entity."[56]

In the proof of claim filed December 23, 2016, Midland Loan Servicing stated a claim for pre-petition default interest for $3,554,681.98, apparently arising from a default under Section 2.28A.17, since December 11, 2014.[57] Then in the CMBS Lenders' motion to allow claims, filed April 16, 2018, the CMBS Lenders specifically stated they would *not* seek pre-petition default interest on the Chateau Lake Loan, although the motion reserved the right to seek pre-petition default interest if the motion to allow claims was denied or if the Jointly Administered Debtors' plan failed to be confirmed or consummated.[58] In an attachment to that motion detailing the applicable default provisions of the CMBS Loans, Section 2.28A.16 was stated as the basis for the pre-petition default.[59] Again, in response to the Joint Objectors' objection to the Chateau Lake Loan proof of claim, the only mention of pre-petition default interest was to expressly state—in a footnote—that pre-petition interest was *not* sought, but the right to seek it was reserved if the motion to allow claims was denied or the plan was not confirmed or consummated.[60] At the May 2018 oral argument on the issues, the Court was informed the commingling default had been withdrawn.[61]

---

[55] *Id.* p.73-74.
[56] *Id.* § 2.28.4.17 p.74.
[57] Exh. E p.7. The attachment to the proof of claim mentions default under "§ 28.8(a)(17) of the Loan Agreement, since December 11, 2014," but that loan section does not exist.
[58] Doc. 2038 p.7 n.8.
[59] Doc. 2038 Exh. B.
[60] Doc. 2179 p.17 n.13.
[61] Doc. 2330 Tr. p.13 lines 6 to 12 ("[T]he CMBS lenders had at one point alleged that there was

Pre-petition default interest was not mentioned again for a year and a half, until November 7, 2019, two weeks in advance of trial, in Midland Loan Servicing's supplemental brief.[62] Therein, Midland Loan Servicing argued that it had "not been dealt with in good faith" by the Joint Objectors, and that, therefore, the claim for pre-petition default interest was reasserted. For the first time, Midland Loan Servicing alleged a pre-petition default based on Sections 2.28A.8 (requiring "separate bank accounts, payroll and correct, complete and separate books of account")[63] and 2.28A.12 (requiring borrower to hold "title to its assets in its own name and act solely in its own name")[64] of the loan agreement, and then also stated a violation of Section 2.28A.16. In support, Midland Loan Servicing argued that the Jointly Administered Debtors admitted in their "first day motions" that their hotels used a cash management system whose express purpose was to facilitate the movement of funds among multiple entities "by centralizing cash operations" and funding expenses through a common cash management account.[65]

At trial, however, Midland Loan Servicing introduced zero evidence to support its claim of a commingling default. Under the simple terms of the loan agreement, there has to be more than just an allegation of commingling. Was the alleged commingling an "Event of Default" under Article III.C.? Was the alleged failure under Section 2.28 "immaterial?" Under Section 2.28A.16, assets may be "held by another entity" as long as they are "identifiable (in accordance with customary usages) as assets owned by Borrower." Under Section 2.28A.17, assets must be

---

a commingling of accounts by the Debtor and the complaint related to that was about $3.6 million. We understand the CMBS lenders have withdrawn that default as an issue, so those are off the table.").
[62] Doc. 2769 p.10-12.
[63] Exh. K p.73.
[64] *Id.*
[65] Doc. 17 (Motion for Authorization to Continue to Use Existing Bank Accounts, Check Stock, Existing Business Forms and Cash Management Systems).

maintained in a manner such that it is not difficult to segregate or identify them. Were these sections violated? Without evidence concerning the accounting system used by the Borrower and Jointly Administered Debtors, as well as evidence concerning the materiality of the alleged default, whether the assets were identifiable, able to be segregated, the cost of doing so, etc., there is no way for the Court to know whether Midland Loan Servicing is entitled to pre-petition default interest or that a pre-petition default even occurred. Simply put, Midland Loan Servicing did not satisfy its burden to prove the validity of its claim to pre-petition default interest. As a result, Midland Loan Servicing's claim for prepetition default interest is overruled. In addition, the Court expressly finds that the only default applicable herein is the filing of bankruptcy petitions by both the Borrower and the Guarantor.

> 2. *Ipso Facto Default: Contracted, Default Interest Based on Borrower and Guarantor Bankruptcy Petitions and Post-Petition Interest*

"Interest, fees, costs, and charges that accrue after the petition has been filed, or post-petition, are permitted only if authorized under 11 U.S.C. § 506(b)."[66] Section 506(b) grants oversecured creditors the ability to include post-petition interest as part of the secured claim up to the value of the collateral.[67] Specifically, under § 506(b) the oversecured creditor may claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose." This section "mandates that interest on over-secured claims is allowable" and "draws no distinction between pre and post-default interest."[68] In addition, § 506(b) does not itself "specifically require that post-petition interest be

---

[66] *Rushton v. State Bank of S. Utah (In re Gledhill)*, 164 F.3d 1338, 1340 (10th Cir. 1999).

[67] *U.S. Trust Co. of N.Y. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 150 B.R. 529, 538 (Bankr. S.D.N.Y. 1993) (noting that § 506(b) "codified for the first time pre-Code case law recognizing a limited exception to the general rule of disallowance of post-petition interest in the case of oversecured creditors").

[68] *In re K&J Props., Inc.*, 338 B.R. 450, 460 (Bankr. D. Colo. 2005).

reasonable."[69] Section 506(b), therefore, (1) applies to over secured creditors and (2) allows post-petition interest and any "'reasonable' post-petition fees, costs, or charges provided for under the agreement or state statute under which such claim arose."[70]

As explained more fully below, there is no dispute that the post-petition default interest claim is for an oversecured creditor, for an allowed secured claim, and that default interest is provided for by the parties' loan agreement. As such, § 506(b) governs Midland Loan Funding's claim's allowance.

The Supreme Court has ruled that "[r]ecovery of postpetition interest is unqualified" under § 506(b), and distinguished recovery of interest from the recovery of "fees, costs, and charges," which are allowable only when reasonable.[71] The Supreme Court did not need to determine in that opinion, however, what the rate of interest should be under § 506(b), only that the plain language of the statute unqualifiedly granted it to all oversecured claims.[72] Nearly two decades later, the Supreme Court again addressed § 506(b), although in the context of unsecured claims and contract-based claims for attorneys' fees thereon.[73] The Supreme Court expressly held that courts should look to state law to determine whether a claim for attorneys' fees on the claim was permitted.[74]

Based on this Supreme Court case law, many courts permit default interest rates for

---

[69] *In re Gledhill*, 164 F.3d at 1340 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

[70] *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. at 352.

[71] *Ron Pair Enters., Inc.*, 489 U.S. at 241.

[72] *Id.* at 241-42 (rejecting proposition that a distinction should be made between voluntary and involuntary secured claims); *see also Fischer Enters., Inc. v. Geremia* (*In re Kalian*), 178 B.R. 308, 312 (Bankr. D.R.I. 1995) ("Section 506(b)'s language, however, does not compel the conclusion that the contract rate or rates bind the court. The statute provides only that the holder of an oversecured claim be allowed 'interest on such claim.' Section 506(b) does not specify the rate.").

[73] *Travelers Cas. & Sur. Co. of Am. v. P. Gas & Elec. Co.*, 549 U.S. 443 (2007).

[74] *Id.* at 450-51.

oversecured claims in bankruptcy proceedings so long as they would be permitted under state law.[75] Many courts note this majority rule, but then also note that the rule should be applied flexibly, with a consideration of the equities of the case.[76] A Bankruptcy Court in the Southern District of New York summarized the case law as follows:

> While the accrual of interest is plainly allowed under Section 506(b), courts have held that in the case of default interest, the contract interest rate can be subject to adjustment based on equitable considerations. At the same time, courts recognize that the power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty.[77]

The Joint Objectors bear the burden "of rebutting the presumption that the contract rate of interest applies post-petition."[78]

---

[75] *See, e.g.*, *Gen. Elec. Capital Corp. v. Future Media Prods., Inc. (In re Future Media Prods., Inc.)*, 547 F.3d 956, 961 (9th Cir. 2008) (referring to the "rule adopted by the majority of federal courts" that a court "should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law").

[76] *See, e.g.*, *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (recognizing a "presumption in favor of the contract rate subject to rebuttal based upon equitable considerations"); *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir. 1992) (noting majority rule that courts should utilize "the contract rate of interest when allowing an oversecured creditor to collect post-petition interest pursuant to § 506(b)" but then recognizing that most courts take "a flexible approach" and examine the equities involved in a contractual default interest rate); *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 358 (Bankr. D.N.M. 2010) (recognizing the "rule regarding default interest rates" but also noting "a judicial gloss on the federal rule by asking whether equitable circumstances should impact the allowance of a default rate").

[77] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 736 (Bankr. S.D.N.Y. 2019) (internal quotation and alteration omitted).

[78] *Id.*; *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) ("The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition."); *In re Residential Capital, LLC*, 508 B.R. 851, 856 (Bankr. S.D.N.Y. 2014) ("While the Bankruptcy Code governs postpetition interest, there is a rebuttable presumption that the parties' contract rate should apply.").

The Joint Objectors recognize that the Tenth Circuit has not addressed *ipso facto* default interest clauses for oversecured claims, but argue that bankruptcy courts within the Tenth Circuit facing "similar situations" have disapproved *ipso facto* clauses. Doc. 2032 p.13. But the cases cited by the Joint Objectors are Chapter 7 consumer bankruptcy cases, rather than solvent

21

There is ample evidence that Midland Loan Servicing is entitled to default interest under the parties' contract. Article III.H. of the parties' loan agreement clearly states than an "Event of Default" occurs if the Borrower or any Guarantor files a "petition in bankruptcy."[79] Both the Borrower (Chateau Lake, LLC) and one of the guarantors of the loan (Revocable Trust of John Q. Hammons; the guaranty given is discussed more fully below) filed separate Chapter 11 bankruptcy petitions on June 26, 2016. The loan documents then state that if an Event of Default exists, "interest shall accrue on the Debt from the date of default at the Default Rate."[80] The "Default Rate" is defined as "a rate per annum equal to five percent (5.0%) in excess of the Note Rate."[81] As such, there is a rebuttable presumption that the default interest provision should be enforced.[82]

---

commercial real estate cases: *i.e.*, totally different animals. *See In re Hutchins*, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) (considering attorneys' fees charged by a creditor to a Chapter 7 debtor within a reaffirmation agreement and stating, in that context, that "[b]ankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code"); *In re Peacock*, 87 B.R. 657, 659 (Bankr. D. Colo. 1988) (concluding that a creditor could not "force a default" on a Chapter 7 debtor via an *ipso facto* clause so that the debtor would be required to redeem or reaffirm to keep collateral under pre-BAPCPA practice with respect to secured collateral).

There are also courts who have made blanket statements that "*ipso facto* clauses are void," but these cases are generally not dealing with the exact issue before this Court. *See e.g.*, *Riggs Nat'l Bank of Wash. v. Perry (In re Perry)*, 729 F.2d 982 (4th Cir. 1984) (refusing to apply an *ipso facto* clause in Chapter 7 case because the clause would "intrude upon" the fresh start policy for consumers "reorganization of their financial obligations"); *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings, Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) (calling it "axiomatic" that *ipso facto* clauses are "unenforceable" in a complex Chapter 11 dispute over whether an *ipso facto* contract term could modify a payment priority scheme); *In re Chedick*, No. 95-01096, 1996 WL 762329, at *3 (Bankr. D.C. Mar. 22, 1996) (calling a five percent fee upon bankruptcy filing in a Chapter 13 case "void as a matter of public policy" because it would penalize the debtor's efforts to obtain a fresh start); *In re Rose*, 21 B.R. 272, 276-77 (Bankr. D.N.J. 1982) (refusing to enforce an *ipso facto* clause in a consumer Chapter 7 case because of its potential to impact the debtors' fresh start).

[79] *See* Exh. K Art. III.H. p.85 (event of default includes a Borrower or any Guarantor filing a "petition in bankruptcy").

[80] *Id.* § 1.4 p.10.

[81] *Id.* § 1.2.D. p.3.

[82] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. at 740; *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011) (noting the "rebuttable presumption in favor of granting

State law dictates the viability of claims,[83] and the parties agree the state law of Missouri applies.[84] As Midland Loan Funding points out, Missouri statutes do not impose a usury limitation to (i) loans made either to limited liability companies (such as the Borrower under the Chateau Lake Loan) or (ii) real estate loans other than residential real estate loans.[85] In addition, in Missouri, liquidated damages provisions[86] are "valid and enforceable;" on the other hand, "penalty clauses are not."[87] The key question is whether the default interest provision in this loan is a valid liquidated damages provision or an invalid penalty?

Courts in Missouri follow the Restatement of Contracts to determine whether a liquidated

---

[83] *Rushton v. State Bank of S. Utah (In re Gledhill)*, 164 F.3d at 1340; *Travelers Cas. & Sur. Co. of Am. v. P. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) ("[T]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." (internal quotations omitted)).

an oversecured creditor interest at the rate specified in the contract, subject to equitable considerations"); *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) (noting the "rebuttable presumption that the oversecured creditor is entitled to default interest at the contract rate subject to adjustment based on equitable considerations").

[84] *See* Exh. K § 6.7 p.100 (stating that the loan agreement would be governed by the law of the state in which the real estate is located).

[85] Rev. Stat. Mo. § 408.035(1), (3) ("Notwithstanding the provisions of any other law to the contrary, it is lawful for the parties to agree in writing to any rate of interest, fees and other terms and conditions in connection with any . . . (1) loan to a . . . limited liability company . . . [or] (3) [r]eal estate loan, other than residential real estate loans."); *see also In re Family Pharmacy, Inc.*, 605 B.R. 900, 908 (Bankr. W.D. Mo. 2019) (stating that "Missouri law generally authorizes parties to a business loan to 'agree in writing to any rate of interest, fees, and other terms and conditions in connection with'" the loan and citing Mo. Rev. Stat. § 408.035).

[86] Liquidated damages are "a measure of compensation which, at the time of contracting, the parties agree shall represent damages in case of breach." *Paragon Group, Inc. v. Ampleman*, 878 S.W. 2d 878, 880 (Mo. Ct. App. 1994). Penalty clauses, on the other hand, "are a punishment for breach." *Id.* at 880-81. *See also Goldberg v. Charlie's Chevrolet, Inc.*, 672 S.W.2d 177, 179 (Mo. Ct. App. 1984) ("The term 'liquidated damages' means that amount which, at the time of contracting, the parties agree shall be payable in the case of breach. In contrast, a penalty is not a measure of compensation for contract breach, but rather, a punishment for default or a security for actual damages sustained due to non-performance which incorporates the idea of punishment.").

[87] *Grand Bissell Towers, Inc. v. Joan Gagnon Enters., Inc.* 657 S.W.2d 378, 379 (Mo. Ct. App. 1983) ("Liquidated damages clauses are valid and enforceable; penalty clauses are not.").

damages clause is actually a penalty.[88] That rule states:

> '(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless
> > (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and
> > (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.'[89]

In other words, there must be "some reasonable relation between the damages agreed upon and those expected to result from the breach."[90]

The intention of the parties at the time the loan agreement was contracted controls, although the label the parties attach to the contract provision is not conclusive.[91] "The showing of harm or damage necessary to trigger the liquidated damages clause need not be a precise dollar amount but simply a showing that some harm or damage did in fact occur."[92] For the

---

[88] *Id.* The reason for this standard of law is that "the objective behind contractual remedies is to effect a compensatory award, not to provide a penalty for the breach of an agreement." *Star Dev. Corp. v. Urgent Care Assocs., Inc.*, 429 S.W.3d 487, 491 (Mo. Ct. App. 2014) (internal quotation omitted). Of course, any damages provision, liquidated damages or penalty notwithstanding, will have some penal effect. *In re 785 Partners LLC*, 470 B.R. 126, 136 (Bankr. S.D.N.Y. 2012) ("All higher default rates of interest have some penal effect in that they compel the timely compliance with the payment requirements under a loan agreement; if you default you pay more.").

[89] *Grand Bissell Towers, Inc.*, 657 S.W.2d at 379 (quoting *Restatement of Contracts* § 339 (1932)).

[90] *Id*; *see also Strouse v. Starbuck*, 987 S.W.2d 827, 829 (Mo. Ct. App. 1999) ("Missouri law requires a showing of actual harm to trigger a liquidated damages clause. Appellant must show not only that Respondents breached the contract, but also that damages have in fact accrued in consequence thereof." (internal citation and quotation omitted)).

[91] *Star Dev. Corp.*, 429 S.W.3d at 492; *Goldberg*, 672 S.W.2d at 179 ("The case law and treatises indicate that to determine the character of a specific contract provision, it is the intent of the parties and the special circumstances of the case which control; not the contract terminology."). Here, the default interest is generally referred to as such, without distinguishing as liquidated damages or a penalty, other than one reference as a penalty in an unrelated section.

[92] *Grand Bissell Towers, Inc.*, 657 S.W.2d at 379 n.3. Note that "although *proof* of actual loss is not a prerequisite to collecting liquidated damages, a *showing* of some actual harm or damage is necessary." *Taos Constr. Co., Inc. v. Penzel Constr. Co., Inc.*, 750 S.W.2d 522, 526 (Mo. Ct. App. 1988).

24

amount of harm to "to be a reasonable forecast of damages," the amount "must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made."[93] In addition, to determine reasonableness, the amount fixed must approximate "'the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.'"[94] Missouri case law shows a wide range of what is "reasonable" under the facts of a particular case.[95] "The burden of proof to show that the default clause constitutes an unenforceable penalty rests on the Debtor."[96]

There are no cases in Missouri analyzing anything close to the facts at hand: a default interest provision in a sophisticated business contract supported by a securitized real estate mortgage conduit, itself with certificate holders and tax implications. But extrapolating the above case law to the facts at hand, this Court concludes that Missouri courts would find the default interest provision an enforceable liquidated damages provision, and not a penalty. Starting with the second portion of the test first, the harm caused by the breach is certainly one that is incapable or very difficult to estimate. As Mr. Greenspan noted in his testimony, a CMBS loan is an investment vehicle. The investors therein chose that investment based on the fact that the

---

[93] *Paragon Group*, 878 S.W.2d at 881 (internal quotation omitted).

[94] *Id.* (quoting comment b to § 356 of the *Restatement (Second) of Contracts*).

[95] *Id.* (approving a 16.6% liquidated damages clause in a residential landlord/tenant dispute as a reasonable estimate of damages upon breach); *Standard Improvement Co. v. DiGiovanni*, 768 S.W.2d 190, 191 (Mo. Ct. App. 1989) (approving a 30% liquidated damages clause in a residential home improvement contract); *Taos Constr. Co., Inc.*, 750 S.W.2d at 527 (approving as reasonable liquidated damages of 66% of value of subcontract in public works project); *Goldberg*, 672 S.W.2d at 179 (approving as reasonable a liquidated damages clause amounting to 2% of the purchase price of a real estate sales contract).

[96] *In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 951 (Bankr. N.D. Ill. 1989); *see also In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 740 (Bankr. S.D.N.Y. 2019) ("The debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition."); *JMD Holding Corp. v. Congress Fin. Cop.*, 828 N.E.2d 604, 609 (N.Y. 2005) ("The burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty.").

special purpose entity was a relatively safe corporate structure, with little risk of bankruptcy. At contracting, the parties hedged their risk by the very structure of the loan. A loan with a default is more costly to service and more risky for investors.[97] A CMBS loan in default has a decreased market value, a cost that is passed directly to investors. And there are a multitude of actual costs associated with a bankruptcy default: appraisals and valuations, collateral review and monitoring, lender assistance with workout negotiations, pleadings, clams, disclosure statements and plans, cash collateral issues, etc. Some of those costs are separately compensated by the loan agreement, but many are not. But there are other risks from a bankruptcy filing: market value uncertainties, monthly payment flow uncertainties, market timing losses, changes to terms or the collateral, or changes to the identity of the borrower, costs from increased collateral reviews, costs to the lender from lender participation in the bankruptcy process, etc. A standard interest rate of 4.33% and then a 5% differential default provision appears to be a reasonable approximation of the amount of harm anticipated by a bankruptcy default when the contract was made.

Finally, despite (1) the presumption that the default rate should be enforced, and (2) the underlying state law permitting such a default rate, are there any countervailing equitable considerations that would justify a reduction in the amount of the contracted default interest rate? Generally stated, "when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest," so long as a higher, default rate does not "produce an

---

[97] *See, e.g.*, *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("Parties use default interest rates as a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments. Because the costs incurred in performing this task will vary from case to case, the increased interest rate is a compromise by the lender and the borrower in recognition of the fact that attempting to quantify the exact dollar amount of the lender's injury would be impractical.") The same expenses and costs in monitoring for "untimely payments" exist in monitoring a debtor/borrower in bankruptcy.

inequitable or unconscionable result."[98] This Court agrees with those courts concluding,

however, that a modification of a contracted-for default rate based on equitable considerations

"should be exercised sparingly and limited to situations where the secured creditor is guilty of

misconduct, the application of the contractual interest rate would harm the unsecured creditors or

impair the debtor's fresh start or the contractual interest rate constitutes a penalty."[99]

There is no misconduct by the CMBS Lender in this case or by the Special Servicer,

Midland Loan Servicing. The only allegation of "misconduct" by the Joint Objectors is that the

Lender did not try to expedite the resolution of the default interest issue. To the contrary,

Midland Loan Servicing casts the Lender as "patiently waiting" while the Jointly Administered

Debtors and JD Holdings litigated their issues, and contends that it was the Jointly Administered

Debtors' calculated litigation strategies that placed them in bankruptcy in the first place.

Regardless, the Court finds no misconduct by the parties' conduct. This not a situation where the

creditor failed to notify the Court or the Borrower that default rate interest was being sought.[100]

---

[98] *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir. 1992) (internal quotation omitted); *see also In re Family Pharmacy, Inc.*, 605 B.R. 900, 910 (Bankr. W.D. Mo. 2019) (stating that "[a]ll circuits that have decided the issue either hold outright or at least suggest that courts may consider equitable factors in allowing postpetition interest at the contract rate under § 506(b)," and citing cases).

[99] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. at 740 (internal quotation omitted); *In re K&J Props., Inc.*, 338 B.R. 450, 457 (Bankr. D. Colo. 2005) (noting that courts have considered "whether the bankruptcy estate is solvent, . . . whether the default rate of interest in issue is unusually high considered by itself or in comparison to the pre-default rate and whether there is a relationship between the default rate and the loss by the over-secured creditor that may be compensated, as opposed to a default rate that merely serves as a 'penalty.'"); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 328 (Bankr. S.D.N.Y. 2011) ("The payment of default interest in this matter is also consistent with the increasing reluctance of courts in this and other circuits, in construing the requirement of § 506(b) that an oversecured creditor receive 'interest,' to modify private contractual arrangements imposing default interest rates except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to the unsecured creditors; (iii) the contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's fresh start.").

[100] *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 747 (Bankr. S.D. Tex. 2010) (concluding that the creditor's failure to seek post-petition interest at the default rate under § 506(b) was an

27

There is no actual evidence of bad faith.[101]

In addition, the Court expressly finds that the Jointly Administered Debtors' estates are solvent. This is a full payment plan.[102] This alone is a determining factor for some courts.[103] The Joint Objectors point out, however, that because creditor iStar Financial Inc. and JD Holdings agreed to be subordinated to the Chateau Lake Loan in the plan, they would "necessarily" be

---

obstruction of the bankruptcy process). The Chateau Lake Loan proof of claim very clearly states that default interest of approximately $3.5 million is being sought, and that the loan was in default as a result of the filing of the Chapter 11 petition by the Borrower. Exh. E. Attach. p.3.

[101] *See, e.g.*, *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 356 (Bankr. D.N.M. 2010) (rejecting allegation of bad faith because there was no evidence presented of the same).

[102] Doc. 1948 p.15 (Disclosure Statement § V.B) (noting that all claims—priority, secured, unsecured, and equity—are unimpaired).

[103] S*ee e.g.*, *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced."); *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) (stating that when the debtor is solvent, contractual provisions that are valid under state law should be enforced); *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir. 1959) (noting that in a "contest" between "a creditor and a stockholder of the debtor," equitable considerations required contractual terms be applied to solvent debtors); *In re 139–141 Owners Corp.*, 313 B.R. 364, 369 (S.D.N.Y. 2004) ("[I]t would be inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent and knowingly bargained for the terms of his contract."); *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. at 743 (concluding that the debtor did not meet burden of rebutting presumption that the contract rate of default interest should apply post-petition when debtor itself benefited from bankruptcy, the debtor was solvent, all unsecured creditors would be paid in full, and there was no evidence of misconduct by the lender); *In re 785 Partners LLC*, 470 B.R. at 134 ("Debtor has failed to offer proof that the application of the Default Rate will harm the unsecured creditors or impair its fresh start. To the contrary, the Debtor proposes to pay the unsecured creditors in full and permit equity to retain their interests. Thus, the Debtor is solvent, and the reluctance to modify the contract interest rate is especially strong where the debtor is solvent. Reducing the contract interest payable by a solvent debtor would unfairly grant a windfall to its equity."); *In re Gen.l Growth Props.*, 451 B.R. at 329 ("This reluctance is particularly evident in cases where the debtor proves to be solvent."); *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 116-17 (Bankr. D. Colo. 1988) ("When the debtor is solvent, the equities dictate that additional interest be paid to the secured creditor rather than to the debtor. . . The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11.").

harmed by payment of default interest and would not be paid in cash in full on the effective date of the plan.[104] But JD Holdings will receive equity in its new entities and iStar Financial will receive cash and payments over time. And as Midland Loan Servicing points out, JD Holdings and iStar Financial stipulated to this treatment knowing of the CMBS Lenders' claim to default interest—they are not remotely like the junior or unsecured creditors who are involuntarily subjected to a bankruptcy plan that pays them little or nothing. There is simply no risk of harm to either the fresh start of the Jointly Administered Debtors or any unsecured creditors by the payment of default interest.[105] In fact, the Jointly Administered Debtors ended up with a liquidating sales plan, with no fresh start concerns at all. The Jointly Administered Debtors walked away with a fixed number—there is no harm to them in any way. The only issue is whether the purchaser of the Jointly Administered Debtors' assets—the current equity holders—should pay the default interest. But even if there may be harm to the equity holders, harm to equity interests from use of a default rate is not an equitable reason to disallow.[106] And even if the Jointly Administered Debtors were *not* solvent, the Court concludes that any harm by the payment of default interest would be minimal, at best.[107]

---

[104]  Doc. 2032 p.29.

[105]  *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 358 (Bankr. D.N.M. 2010) (citing cases for the proposition that "if the increased rate does not impact the unsecured creditors and only impacts equity interests, there are no equitable reasons to not enforce the contract rate"); *Fischer Enters. v. Geremia (In re Kalian)*, 178 B.R. 308, 314-15 (Bankr. D.R.I. 1995) ("To begin, relative distribution rights of creditors in bankruptcy are federal law concerns. They are affected, sometimes determined, by the amount of postpetition interest allowed to oversecured creditors. When the estate is insolvent, the debtor's prebankruptcy bargain for escalated default interest can be enforced only at the expense of junior, usually unsecured, creditors.").

[106]  *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. at 358.

[107]  *See, e.g.*, *In re Residential Capital, LLC*, 508 B.R. 851, 859 (Bankr. S.D.N.Y. 2014) (considering "the balance of the equities" in a case seeking default interest for an over-secured, but insolvent, debt and concluding that the harm to the unsecured creditors was minimal (a reduction to the pool of distributable assets of only two-tenths of a percent) and unsecured creditors actually benefited from a default interest provision because it kept the standard rate lower).

29

This is also not a situation where the default rate is shockingly high or unjustified.[108] On its face, a five percent differential does not appear out of the range of reasonableness.[109] Yes, a five percent differential yields a high dollar amount here because of the high dollar amount of the underlying contract, but that is the risk of the bargain made, not an indication of an unreasonable default rate.

As detailed above, Mr. Greenspan testified at length—and without significant cross examination or challenge by the Joint Objectors—regarding both the risks and costs associated with a bankruptcy default and the harms to the CMBS market meant to be remedied with default interest provisions. The risks and costs imposed by a bankruptcy filing are myriad: market value uncertainties, monthly payment flow uncertainties, market timing losses, changes to terms or the collateral, or changes to the identity of the borrower, costs from appraisals and increased collateral reviews, costs to the lender from lender participation in the bankruptcy process, etc. The presence of the default interest rate is intended to stabilize these risks for lenders and the investors in the CMBS vehicle, and without the assurance of the default rate, the interest rate and

---

[108] *See, e.g.*, *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) ("Courts have found the presumption to be sufficiently rebutted in cases where the contract rate was significantly higher than the predefault rate without any justification offered for the spread."); *see also In re Bownetree, LLC*, No. 1-08-4854-dem, 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009) (finding an *ipso facto* default rate of 24% inequitable because the differential from the standard interest was "significant and unexplained," the default rate would have an adverse effect on unsecured creditors, and the default was cured by the parties' plan).

[109] *See, e.g.*, *In re 111 Myrtle Ave. Group, LLC*, 598 B.R. at 742 (concluding that a seven percent differential was not a penalty, even if the lender was not monetarily harmed by a default, because creditors would be repaid in full and the default rate was designed to compensate the lender for the increased risk of nonpayment); *In re 785 Partners LLC*, 470 B.R. at 136 (concluding that a five percent rate differential was not a penalty where the default rate "was designed to compensate the Original Lenders for the increased risk of non-payment and the costs associated with the Debtor's default"); *In re Jack Kline Co., Inc.*, 440 B.R. 712, 746 (Bankr. S.D. Tex. 2010) (finding a differential of 12.75 to 13.75 percent "significantly large" to be inequitable and unreasonable); *In re Vest Assocs.*, 217 B.R. 696, 703 (Bankr. S.D.N.Y. 1998) ("a differential of 5% certainly falls within the range of reasonableness").

the rating analysis of the CMBS trust would be impacted.[110] The court finds Mr. Greenspan's testimony considering the risks to the loan at issue, and to the market in general, from a bankruptcy default to be well reasoned.[111] In addition, Mr. Greenspan's testimony supported the contention that the actual rate used in the loan agreement is market supported, as it is reasonable in the industry/market at issue.[112]

The Court also concludes that this is not a situation where the default interest on the loan is so onerous that it could be considered a fee, cost, or charge, and therefore must be "reasonable" as that term has developed under § 506(b).[113] As the Court discussed above, the default interest in this case serves important functions of compensating for the extra monitoring of the CMBS loan, reimbursing the special servicer for potential costs, and adjusting for the increased risk of bankruptcy.[114] If Congress intended that a straight "reasonableness" evaluation should be made concerning interest under § 506(b), then it would have used that modifier as it did with "fees, costs, or charges."

The Joint Objectors argue that the default interest is especially not reasonable in this case, because there has been no actual missed payment, and the Chateau Lake Loan will be paid in

---

[110] *See In re Vest Assocs.*, 217 B.R. at 701 ("The inclusion of a default rate actually may benefit a debtor because it has the benefit of a lower rate until an event triggering default occurs.").

[111] The case law generally supports Mr. Greenspan's testimony as well. *See, e.g.*, *Anderson v. Hancock*, 820 F.3d 670, 676 (4th Cir. 2016) ("When debtors . . . miss payments or otherwise default, they reveal an increased likelihood that secured creditors will realize these risks. But just as statisticians update their probability estimates of a given outcome whenever they receive new information . . . lenders may use default interest rates to increase risk premiums whenever events reveal that their debtors may be riskier than the lenders might have thought initially.").

[112] *See, e.g.*, *In re K&J Props., Inc.*, 338 B.R. 450, 457 (Bankr. D. Colo. 2005) (crediting expert testimony that default intertest rate was a reasonable market rate).

[113] *See In re AE Hotel Venture*, 321 B.R. 209, 215-16 (Bankr. N.D. Ill. 2005) (concluding that default interest is not "true interest" but is instead "a form of late charge"); *Fischer Enters. v. Geremia (In re Kalian)*, 178 B.R. 308, 317 (Bankr. D.R.I. 1995) (concluding that the default interest operated as an unreasonable charge and should be disallowed under § 506(b)).

[114] *In re K&J Props., Inc.*, 338 B.R. at 458 (concluding that post-default interest is a pricing issue: "[t]he money costs more if not repaid when agreed.").

31

full. The Borrower did not miss any principal or interest payments on the loan, either prepetition or post-petition. The Joint Objectors contend that the bankruptcy petitions even "theoretically" *decreased* the risk to the lender, as they had been the subject of prepetition litigation prior to filing that was ultimately settled with the bankruptcy asset sale. But these arguments miss the point: the default interest was a reasonable assessment of the risk the CMBS Lender would expect upon a bankruptcy filing.[115] It must be judged at the time the default interest was negotiated, not with the benefit of hindsight.[116]

Finally, the Joint Objectors argue that after the default interest is paid, it will then in reality pass through to only the Special Servicer, not the actual CMBS bondholders who hold the security risk. Based on the testimony of Mr. Greenspan, the Court concludes that in this case, all default interest will be distributed to the Midland Loan Servicing, and then some portion split with the actual investors in the CMBS. The Joint Objectors call this a "windfall" to the Special Servicer who also has "other fees" that are being compensated. Midland Loan Servicing

---

[115] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 741 (Bankr. S.D.N.Y. 2019) ("That there were *in fact* minimal or no monetary losses to the Lender does not retroactively render the interest unwarranted, because default interest serves future-looking purposes. To tie the legitimacy of default interest to questions of whether or not the contemplated risks actually materialized would defeat the very purpose of default interest provisions. An insured is not entitled to reimbursement on her premiums simply because she did not make use of the insurance. Such is the cost of risk." (internal citation omitted)).

[116] *Id.* at 742 (Bankr. S.D.N.Y. 2019) ("It would be unfair and inequitable to allow the Debtor to re-write the contract based on what actually occurred as opposed to the risks that were contemplated at time the contract was entered."); *In re 785 Partners LLC*, 470 B.R. 126, 135 (Bankr. S.D.N.Y. 2012) ("The Debtor's arguments regarding the inequitable, unreasonable and penal nature of the Default Rate, and particularly, whether it covered the additional costs of administering a loan in default, is primarily based on hindsight. The Debtor devotes its discussion to the amount of time that the Original Lenders spent after the default dealing with the Loans, emphasizing [the creditor's] inability to quantify these efforts due to the lack of time records. The Debtor has not offered any evidence regarding the parties' intentions or the reason for the selection of the 5% Default Rate when they entered into the Loans, and the Debtor's *post hoc* analysis of the time spent addressing the Loans after default sheds no light on this question.").

responds that the ultimate party receiving the funds is irrelevant—if a lender makes a separate contract with a third-party servicer to pay over funds to that servicer, why would it invalidate the initial contract the Lender has with the Borrower? Ultimately, the Court finds that neither the Lender, nor the Special Servicer, are being "double-compensated" for anything because of the default interest rate. The default interest rate compensates the Lender for the increased risks and costs imposed by a bankruptcy filing. That the Lender has a separate contract passing a portion of those fees to others is immaterial. Yes, the "portion" ended up being "most" in this case, but again that is not always the case, and cannot be known ahead of time.

### 3. Do Code §§ 365 or 1124 Change the Court's Analysis?

The Bankruptcy Code does address *ipso facto* clauses, although not exactly based on the situation at hand. In alternate situations, however, namely, executory contracts, § 365 limits *ipso facto* provisions in contracts. Should that Code provision be extended to the matter at hand?

The Joint Objectors argue that *ipso facto* default interest ought not be awarded under § 506(b) due to the operation of § 1124. Section 1124(1) states that a class of claims under a plan need not be treated by the plan if the claimants' rights are unaltered—i.e., if the creditors are unimpaired. Section 1124(2) states that a class of claims is impaired under a plan unless the plan, notwithstanding contractual provisions to the contrary, cures defaults other than those defaults "of a kind specified in § 365(b)(2)." Section 365(b)(2) applies to defaults relating to breach of *ipso facto* provisions, by giving examples of defaults that need not be cured in executory contracts under § 365(b)(1). The Joint Objectors argument goes like this:

1. The confirmed Plan provides that the CMBS Lenders are unimpaired.

2. Under § 1124(2)(A), a debtor need not cure "a default of a kind specified in section 365(b)(2) of this title" for a claim to be unimpaired.

3. Debtors' *ipso facto* defaults are "of a kind" specified in § 365(b)(2).

33

4.   Therefore, the jointly Administered Debtors need not cure the *ipso facto* defaults for the CMBS Lenders to be unimpaired under § 1124(2)(A).

Midland Loan Funding argues, however, that the Tenth Circuit has adopted the so-called "Countryman" test for determining whether a contract is executory.[117] Under that definition, a court "looks to whether the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[118] The loan agreement at issue in this case is non-executory under the Countryman test. Because the loan agreement is non-executory, Midland Loan Funding argues that § 365's limitation on *ipso facto* provisions does not directly invalidate the *ipso facto* provisions at issue here.

The Court finds that arguments based on §§ 1124 and 365 miss the mark.[119] At its base, § 1124 "concern[s] de-acceleration and reinstatement of the original maturity date of a loan upon curing of a default. They say nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure."[120] The key here is that § 1124(2) applies to accelerated payment, and that is all it does. The point of § 1124(2) is to de-accelerate—it does not invalidate all *ipso facto* defaults, it only reverses *acceleration* arising out of *ipso facto* defaults. Section 1124 simply provides "no basis to nullify the post-petition default interest claimed by [a creditor] to the extent it is otherwise allowable under [the creditor's] loan documents and applicable nonbankruptcy law."[121]

---

[117]  *See Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1211 (10th Cir. 2009).

[118]  *Id.* at 1210 (internal quotation omitted).

[119]  *See, e.g.*, *U.S. Bank Trust Nat'l Assoc. v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 297 (Bankr. S.D.N.Y. 2013) (concluding that *ipso facto* clauses are not per se invalid because the Code's prohibitions on them are limited to the factual predicates stated in the Code).

[120]  *In re K&J Props., Inc.*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005).

[121]  *Id.*

34

### C.     Fees and Other Charges[122]

As stated above, under § 506(b) the oversecured creditor may claim "any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose." The parties' loan agreement, in § 2.21, governs the payment of costs, and very broadly places those costs on the Borrower's shoulders. Specifically, the Borrower is required to pay costs of both the Lender and the Servicer (defined by the agreement as anyone retained by the Lender for servicing of the loan).[123] The range of fees and costs are broad: "reasonable fees" associated with the loan, any default, servicing, or "the exercise, enforcement, compromise, defense, litigation, or settlement of any of Lender's rights or remedies under the Loan Documents."[124] In addition, the Borrower must pay "any and all fees, costs and expenses of the Servicer . . . , including, without limitation, special servicing fees, work-out fees, liquidation fees . . . ."[125]

#### 1.     *Special Servicing Fee and Workout Fee*

As stated above, § 2.21 of the loan agreement requires the Borrower to pay the Servicer's "special servicing fees" and "work-out fees." The Lender's Pooling and Servicing Agreement with its vendors, then states that the special servicing fee is paid to the Special Servicer "as compensation for its activities" under the Pooling and Servicing Agreement, and is computed at the "Special Servicing Fee Rate" on the principal balance of the loan.[126] That "Special Servicing Fee Rate" is then set at "0.25% *per annum*" or if less than a given amount per month, then at

---

[122]  As mentioned above, the parties previously also debated the propriety of a yield maintenance fee, and whether that fee was ripe for decision as it would only be charged for the interest payment "lost" by the Lender if the Borrower paid the principal balance prior to maturity. As Midland Loan Servicing is not currently making a claim for yield maintenance fees and put on no evidence to support the same, however, the Court will not consider them further. The Chateau Lake Loan matures on January 1, 2025.

[123]  Exh. K § 2.20.B. p.63.

[124]  Exh. K. § 2.21 p.66.

[125]  *Id.*

[126]  Exh. F.§ 3.11(c) p.215.

least high enough to yield that given amount per month.[127] Similarly, the Pooling and Servicing Agreement grants the Special Servicer "[a]s further compensation for its activities" a work-out fee, computed by applying the "Workout Fee Rate" to "each payment of interest (other than Default Interest . . . )."[128] The "Workout Fee" is stated at "1.00%."[129] In Midland Loan Servicing's latest filings, it states its special servicing fee is $351,143.12 and its workout fee is $608,340.32.

The problem is that the Court has absolutely no basis upon which to judge the reasonableness of these fees. They are certainly provided for by the loan agreement, and further defined by the Pooling and Servicing Agreement. But are they reasonable? The only argument was given by the Joint Objectors, who likened the workout fee to a penalty. The bottom line is that Midland Loan Servicing "has the ultimate burden of persuasion as to the validity and amount of the claim,"[130] and it did not meet that burden with respect to the special servicing fee and the workout fee. Both fees, in the amounts of $351,143.12 and $608,340.32, respectively, will be disallowed.

### 2. Attorneys' Fees

Again, § 2.21 of the loan agreement governs, and it requires payment by the Borrower of all the Lender's litigation-related fees and costs incurred in litigating the Lender's rights under

---

[127] *Id.* § 1.01 p.100.
[128] *Id.* § 3.10(c) p.225.
[129] *Id.* § 1.01 p.111.
[130] *Id.* p.352*; see also In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 950 (Bankr. N.D. Ill. 1989) ("Claims filed in bankruptcy are prima facie presumed valid under 11 U.S.C. § 502(a) and are prima facie proof of their validity under Bankr. R. 3001(f). [The debtor] therefore bears an initial burden of proof to overcome the presumed validity and amount of [the creditor's] secured claim. However that burden is easily satisfied, and the ultimate burden of persuasion is upon claimant . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral which secures its claim.").

36

the loan agreement. And again, under § 506(b), those requested fees must be "reasonable."[131]

At various times the parties disputed the reasonableness of the requested attorneys' fees,[132] but the latest dispute focuses solely on one hotel bill for $1120.03 and appeal-related litigation costs of $35,893. Regarding the hotel bill, the Joint Objectors contend that $1120.06 for a hotel room is excessive and unreasonable, considering that the stay was for a three-hour deposition. But counsel for Midland Loan Servicing responds that the deposition was scheduled to begin early morning in New York City (where the deponent was then-located), so counsel had to travel the night before and stay overnight. And then the deposition did conclude at mid-day, so counsel could have returned home that afternoon, but the cancellation fees were about the same as staying. The Court concludes that $1120.03 for two nights in a hotel room in New York City is reasonable, and allows this fee.

Regarding the appeal-related litigation costs, the Joint Objectors contend that the CMBS Lenders' appeal of (1) the Court's Order granting the Joint Objectors' settlement with each other and fixing the amount of JD Holdings' claim and (2) the Court's Order confirming the Jointly Administered Debtors' Plan were not taken in good faith. Regarding the first appeal, Midland Loan Servicing dismissed the appeal after full briefing of all issues, but before oral argument. Midland Loan Servicing contends that the relief it was after became no longer necessary because

---

[131]    *Eastman Nat'l Bank v. Sun 'N Fun Waterpark, LLC (In re Sun 'N Fun Waterpark, LLC)*, 408 B.R. 361 (10th Cir. BAP 2009) (stating that four requirements must be met for the allowance of fees to a secured creditor: "(1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be over-secured; (3) the entitlement to fees, costs, or charges must be provided for under the agreement or state statute under which the claim arose; and (4) the fees, costs and charges sought must be reasonable in amount."). As discussed herein, this is an allowed secured claim by an oversecured creditor, and the fees are provided for by the parties' loan agreement. The remaining dispute centers on reasonableness.

[132]    *See, e.g.*, Doc. 2330 Tr. p.11 lines 19-25 (stating that at that point, the Joint Objectors concluded the "legal fees were reasonable under the circumstances, and so we no longer have that objection").

JD Holdings subsequently did not use its subordinated claim in the way they feared. Regarding the second appeal, Midland Loan Servicing did not seek a stay of the confirmation order, and the appeal was dismissed, but again, Midland Loan Servicing's basis for appeal ended up resolving itself because the disputed claim amount set by the confirmation of the plan ended up being enough to cover its disputed claim. Regarding the total appeal fees of $35,893, the Court finds that the amount was reasonable. Litigation evolves, especially in a complicated case like this that has been pending for three and half years, with many twists and turns. Not every litigation decision is going to be clear-cut and straightforward, and the Court finds that the fees were reasonable when incurred, notwithstanding the hindsight the parties can now apply.

### D. Guarantor Liability

Finally, the underlying loan agreement is subject to an Indemnity and Guaranty Agreement, wherein Debtor Revocable Trust of John Q. Hammons Dated December 28, 1989, as Amended and Restated (hereinafter the "Guarantor" or the "Hammons Trust") guarantees payment to Lender for "those items for which Borrower is personally liable."[133] Section 1.(a) of that Guaranty states that the Hammons Trust "assumes liability for, . . . absolutely and unconditionally guarantees" and "agrees to pay, protect, defend and save Lender harmless from and against" the "Full Recourse Liabilities," all "Guaranteed Costs" as stated therein, and all Guaranteed Costs incurred due to a violation of the Guaranty.[134] The term "Full Recourse Liabilities" is defined in § 5.2 of the loan agreement.[135] That section states that if the Borrower or Guarantor files a bankruptcy petition, then the loan will become full recourse to the Borrower. Under § 1.(a) of the Guaranty, the Hammons Trust then assumes liability for that full recourse.

---

[133]  Exh. L p.1.
[134]  Exh. L § 1.(a). p.2.
[135]  Exh. K § 5.2 p.92-93.

The term "Guaranteed Costs" is also defined in § 5.1 of the loan agreement.[136] Section 5.1.G states that the Borrower is liable for "any and all" fees or costs arising from the Borrower filing a bankruptcy petition,[137] and then again, the Hammons Trust assumes liability for those Guaranteed Costs in the Guaranty. In addition, § 1.(b) of the Guaranty states that it is "direct and immediate," "not conditional or contingent" upon remedies against the Borrower, and that the Guarantor remains liable even if the Borrower's liability is reduced under the Code.[138] As a result, the Court allows and disallows, for the reasons indicated herein, the portions of the claim against the Hammons Trust as equal to those portions allowed and disallowed as to the claim against the Borrower.

## IV.     Conclusion

The parties' dispute has been a long, hard-fought battle. The Court appreciates the parties' use of mediation and negotiation to winnow the dispute from a starting point of $750 million to the relatively small amounts discussed herein. (And yes, the Court understands the fallacy of calling the Chateau Lake Loan portion of this dispute "small," even in relative terms.)

Based on the above analysis, the Court allows proofs of claim numbers 614 and 615 in the amount of $50,689,895.56 (consisting of $42,124,649.94 principal, $151,999.78 interest, $7,521,751.82 post-petition default interest, and $891,494.02 legal fees, expenses, and appraisal fees). To reiterate the above, the Court disallows the following interest and fees: the pre-petition default interest of $3,554,981.98, the special servicing fee of $351,143.12, and the workout fee of $608,340.32.

THEREFORE, IT IS HEREBY ORDERED as follows: proofs of claim numbers 614 and

---

[136]  Exh. K § 5.1. p.89-92.
[137]  Exh. K § 5.1.G p.91.
[138]  Exh. L § 1.(b). p.2.

615 shall be allowed in the amount of $50,689.56, as necessarily updated for any passage of time since the numbers reflected herein have been posted.

IT IS FURTHER ORDERED that the Joint Objection of the Debtors and JD Holdings to the Chateau Lake Loan claim[139] is granted in part and denied in part. The Joint Objection of the Debtors and JD Holdings to the G7 Loan claim[140] is denied, as moot. The CMBS Lenders' motion to Allow Oversecured CMBS Claims[141] is granted in part and denied in part.

IT IS SO ORDERED.

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE

---

[139] Doc. 2032.
[140] Doc. 2033.
[141] Doc. 2038.