**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF KANSAS AT KANSAS CITY**

| | |
|---|---|
| In re | Chapter 11 |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*, | Case No. 16-21142 (RDB) |
| Debtors. | *Jointly administered* |

**OBJECTION OF THE UNITED STATES TO DEBTOR'S MOTION TO DETERMINE**
**EXTENT OF LIABILITY FOR QUARTERLY FEES PAYABLE**
**PURSUANT TO 28 U.S.C. § 1930(a)(6)**

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
ANDREW W. BEYER
WENDY COX
MELANIE D. HENDRY
BETH A. LEVENE
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

ILENE J. LASHINSKY
United States Trustee, Region 20
JORDAN M. SICKMAN
Assistant United States Trustee

Department of Justice
Office of the United States Trustee
Epic Center Building
301 North Main Street, Suite 1150
Wichita, KS  67202
(316) 269-6637
Fax: (316)-269-6182

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

SUMMARY .................................................................................................................. 1

BACKGROUND ........................................................................................................... 5

   I. Congress Established Chapter 11 Quarterly Fees So the Cost of the Bankruptcy System Is Not Borne by Taxpayers ................................................................. 5

      A. Congress Pays Close Attention to Bankruptcy Fees: On No Fewer Than 12 Occasions, Congress Has Carefully Recalibrated Quarterly Fees and Other Court Fees to Meet the Funding Needs of the Bankruptcy System ............................. 5

      B. Any Quarterly Fees Charged in Judicial Districts in Alabama and North Carolina Must "Equal" Those Charged in the Rest of the Country ........................................... 8

      C. Congress Temporarily Increased Fees in 2017 to Protect Taxpayers from Having to Pay for the Program and to Fund Additional Judgeships ............................ 9

   II. The Debtors' Chapter 11 Cases and Their Reorganization Plan ....................... 13

ARGUMENT ............................................................................................................... 14

   I. THE COURT SHOULD DENY DEBTORS' MOTION BECAUSE THE RELIEF SOUGHT REQUIRES AN ADVERSARY PROCEEDING ............................ 14

   II. DEBTORS' UNIFORMITY ARGUMENTS FAIL .......................................... 17

      A. Congress Had the Constitutional Power to Enact the 2017 Amendment Under the Necessary and Proper Clause. .................................................................................... 18

      B. The 2017 Amendment Is Not a "Law on the Subject of Bankruptcies" within the Meaning of the Constitution ...................................................................................... 19

      C. Even if it applies, the 2017 Amendment Satisfies the Bankruptcy Clause's Uniformity Requirement Because Section 1930(a)(7) Requires "Equal" Fees to those Charged Under Section 1930(a)(6) ............................................................. 26

      D. If There Were a Difference in Fees, It Would Be Within the Scope of Flexibility Permitted by the Bankruptcy Clause ......................................................................... 30

      E. Even If There Were Any Unconstitutional Lack of Uniformity, the Remedy Debtors Seek Would Be Improper .............................................................................. 32

      F. The Tax Uniformity Clause Does Not Apply to the Quarterly Fee Statute ................ 33

   III. THE 2017 AMENDMENT APPLIES TO THIS CASE ..................................... 35

      A. The 2017 Amendment Says When and to What it Applies: It Applies to All Disbursements Made on or After January 1, 2018, Which Includes the Disbursements at Issue Here. ...................................................................................... 36

      B. Application to Pending Cases is Prospective, Not Retroactive .................................. 41

i

IV. EVEN IF THE AMENDMENT'S APPLICATION TO THIS CASE WERE
   RETROACTIVE, IT WOULD BE CONSTITUTIONAL BECAUSE IT
   WOULD NOT VIOLATE THE DUE PROCESS CLAUSE ........................................... 43

V.  NO REFUND OR CREDIT IS PAYABLE UNTIL APPEALS HAVE BEEN
   EXHAUSTED ........................................................................................................ 48

CONCLUSION ........................................................................................................................ 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re A.H. Robins Co., Inc.*,
219 B.R. 145 (Bankr. E.D. Va. 1998)........................................................................40, 43, 48

*Allen v. Cooper*,
No. 18-877, 2020 WL 1325815 (U.S. March 23, 2020)........................................................20

*Augusta Towing Co. v. United States*,
5 Cl. Ct. 160 (Ct. Cl. 1984).................................................................................................34

*In re Buffets, LLC*,
597 B.R. 588 (Bankr. W.D. Tex. 2019)..........................................................2, 27, 47, 48

*Cedar Chem. Corp. v. United States*,
18 Cl. Ct. 25 (1989) ............................................................................................................50

*In re Cent. Fla. Elec., Inc.*,
197 B.R. 380 (Bankr. M.D. Fla. 1996) ...............................................................................43

*In re CF&I Fabricators of Utah, Inc.*,
150 F.3d 1233 (10th Cir. 1998) ..........................................................34, 42, 47, 48

*In re Circuit City Stores, Inc.*,
606 B.R. 260 (Bankr. E.D. Va. 2019).......................................................................... *passim*

*In re Clayton Gen. Inc.*,
No. 15-64266, 2020 Bankr. Lexis 842 (Bankr. N.D. Ga. Mar. 30, 2020) ...................... *passim*

*Clinton Nurseries, Inc. v. Harrington* (*In re Clinton Nurseries, Inc.*),
608 B.R. 96 (Bankr. D. Conn. 2019) ............................................................................. *passim*

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993)....................................................................................................44, 46

*Conn. Gen. Ins. Corp. v. U.S. Ry. Ass'n*,
383 F. Supp. 510 (E.D. Pa 1974) ........................................................................................23

*Cont'l Ill. Nat. Bank & Trust v. Chicago, R.I. & P.R. Co.*,
294 U.S. 648 (1935)............................................................................................................21

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)............................................................................................................28

iii

*Dixon v. United States*,
  900 F.3d 1257 (11th Cir. 2018) .................................................. 50

*In re Driggs*,
  206 B.R. 787 (Bankr. D. Md. 1997) ..............................................43

*In re Dziurgot-Farnsworth*,
  No. 14-10915, 2014 WL 7145712 (Bankr. D.R.I. Dec. 12, 2014) ...........16

*EPA v. New Orleans Pub. Serv., Inc.*,
  826 F.2d 361 (5th Cir. 1987) ....................................................41

*In re Exide Techs.*,
  611 B.R. 21 (Bankr. D. Del. 2020) ................................... *passim*

*FCC v. Beach Comms.*,
  508 U.S. 307 (1993)................................................................27

*FDIC v. Faulkner*,
  991 F.2d 262 (5th Cir. 1993) ....................................................42

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995) ......................................................16

*Fernandez-Vargas v. Gonzales*,
  548 U.S. 30 (2006)..................................................................35

*In re Fisher Island Invests., Inc.*,
  778 F.3d 1172 (11th Cir. 2015) ............................................14, 21

*Foulston v. Harness (In re Harness)*,
  218 B.R. 163 (D. Kan. 1998) ....................................................43

*In re Foxcroft Square Co.*,
  198 B.R. 99 (Bankr. E.D. Pa. 1996) ...........................................43

*Gen. Motors Corp. v. Romein*,
  503 U.S. 181 (1992)................................................................44

*Hanover Nat'l Bank v. Moyses*,
  186 U.S. 181 (1902)................................................................21

*Holywell Corp. v. Smith*,
  503 U.S. 47 (1992).................................................................48

*Jahr v. Frank (In re Jahr)*,
  BAP No. EW–11–1538–MkHJu, 2012 WL 3205417 (B.A.P. 9th Cir. Aug. 1,
  2012) ...................................................................................16

iv

*In re Kindred Healthcare, Inc.*,
  Nos. 99-3199 ..................................................................................................33

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................................35, 40, 41, 42, 46

*In re Life Partners Holdings, Inc.*,
  606 B.R. 277 (Bankr. N.D. Tex. 2019 .....................................................2, 17, 23

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ......................................................................................18, 21

*In re McLean Square Assocs., G.P.*,
  201 B.R. 436 (Bankr. E.D. Va. 1996) ...........................................................43

*MF Global Holdings LTD. v. Harrington*, Adv. Case No. 19-01379,
  ___ B.R. ___, 2020 WL 1970507 (Bankr. S.D.N.Y Apr. 24, 2020) ............................. *passim*

*In re Miles*,
  330 B.R. 861 (Bankr. M.D. Ga. 2005) ...........................................................31

*In re Mosaic Management Group, Inc.*,
  Case No. 16-20833, ___ B.R. ___, 2020 WL 1808605
  (Bankr. S.D. Fla. Apr. 9, 2020) ................................................................. *passim*

*In re Munford, Inc.*,
  216 B.R. 913 (Bankr. N.D. Ga. 1997) ...........................................................43

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018) ....................................................................................38

*NCNB Texas Nat. Bank v. Cowden*,
  895 F.2d 1488 (5th Cir. 1990) ........................................................................40

*Nijhawan v. Holder*,
  557 U.S. 29 (2009) ...........................................................................................34

*Norman v. Baltimore & O.R. Co.*,
  294 U.S. 240 (1935) ....................................................................................18, 19

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984) ....................................................................................46, 47

*Peony Park v. O'Malley*,
  121 F. Supp. 690 (D. Neb. 1954) ....................................................................29

*In re PJ Keating Co.*,
  205 B.R. 663 (Bankr. D. Mass. 1997) .............................................................40

*In re Postconfirmation Fees*,
    224 B.R. 793 (E.D. Wash. 1998) .................................................................43, 48

*In re Prines*,
    867 F.2d 478 (8th Cir. 1989) ........................................................ *passim*

*In re Reese*,
    91 F.3d 37 (7th Cir. 1996) .................................................................20, 22

*Reina v. United States*,
    364 U.S. 507 (1960).................................................................................18

*In re Rhead*,
    232 B.R. 175 (Bankr. D. Ariz. 1999) ...................................................43

*In re Richardson*,
    210 B.R. 332 (Bankr. W.D. Mo. 1997)...................................................43

*Rosenberg v. United States*,
    72 Fed. Cl. 387 (Ct. Fed. Cl. 2006).......................................................29

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) ............................................................................28

*Ry. Labor Execs. Ass'n v. Gibbons*,
    455 U.S. 457 (1982).................................................................20, 21, 23

*Schultz v. United States*,
    529 F.3d 343 (6th Cir. 2008) .......................................................20, 31

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017).................................................................32, 33

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
    530 F.3d 230 (3d Cir. 2007).................................................................16

*St. Angelo v. Victoria Farms, Inc.*,
    38 F.3d 1525 (9th Cir. 1994), *as amended by* 46 F.3d 969 (1995)................ *passim*

*In re Staker*,
    525 F. App'x 811 (10th Cir. 2013) .................................................15, 16

*Thomson Multimedia Inc. v. United States*,
    340 F.3d 1355 (Fed. Cir. 2003)............................................................34

*United States Trustee v. Gryphon at Stone Mansion, Inc.*,
    166 F.3d 552 (3d Cir. 1999)......................................22, 43, 47, 48

vi

*United States Trustee v. Prines* (*In re Prines*),
    82 B.R. 110 (D.S.D. 1987)..................................................................43

*United States v. Carlton*,
    512 U.S. 26 (1994).........................................................44, 45, 46

*United States v. Comstock*,
    560 U.S. 126 (2010)...............................................................18, 24

*United States v. Fisher*,
    6 U.S. 358 (1805)............................................................................21

*United States v. Kras*,
    409 U.S. 434 (1973).......................................................................45

*United States v. Mitchell*,
    463 U.S. 206 (1983).......................................................................49

*United States v. Mottaz*,
    476 U.S. 834 (1986).......................................................................49

*United States v. Pusey*,
    27 F. Cas. 631 (C.C.E.D. Mich. 1872)...............................22, 24, 25

*United States v. Sperry Corp.*,
    493 U.S. 52 (1989)......................................................5, 34, 45

*Matter of Upton Printing*,
    197 B.R. 616 (Bankr. E.D. La. 1996) ..........................................43

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)........................................................44, 45, 46

*Vergos v. Uncle Bud's, Inc.*,
    No. 3-97-0296, 1998 WL 652542 (M.D. Tenn. Aug. 17, 1998)...........................43

*Willy v. Coastal Corp.*,
    503 U.S. 131 (1992).......................................................................19

*Wright v. Union Cent. Life Ins. Co.*,
    304 U.S. 502 (1938).......................................................................22

## Statutes

2 U.S.C. §§ 651-658g ...............................................................................38

2 U.S.C. § 1501, *et seq*.............................................................................38

11 U.S.C. § 106(a)(4).................................................................................49

Case 16-21142   Doc# 2868   Filed 04/27/20   Page 8 of 62

11 U.S.C. § 1112(b)(4) .................................................................................... 24

18 U.S.C. § 151, *et seq.* ................................................................................. 24

28 U.S.C. § 158(b)(6) .................................................................................... 25

28 U.S.C. § 331 ........................................................................................... 9, 28

28 U.S.C. § 589a .................................................................................... 6, 7, 10

28 U.S.C. § 1930(a)(6) ................................................................................. *passim*

28 U.S.C. § 1930(a)(7) ................................................................................. *passim*

28 U.S.C. § 2414 ........................................................................................ 49, 50

31 U.S.C. 3717 ............................................................................................. 13

Additional Supplemental Appropriations for Disaster Relief
   Requirements Act of 2017, Pub. L. No. 115-72, 131 Stat. 1224 (2017) ............... 7, 11, 12, 37

Balanced Budget Downpayment Act, Pub. L. 104-99, § 211, 110 Stat. 26 (1996) ...................... 7

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
   109-8, tit. III, § 325, 119 Stat. 23, 98-99 (2005) ........................................................ 7

Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of
   1986, Pub. L. 99-554, 100 Stat. 3088 (1986) ............................................................... 5, 8, 38

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978) .................................. 5

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844,
   1914 (2007) ............................................................................................... 7

Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, § 10101, 120 Stat. 4,
   184 (2006) ................................................................................................. 7

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
   Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, § 406, 103 Stat. 988,
   1016 (1989) .............................................................................................. 7

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
   Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782,
   795 (1991) ............................................................................................... 7

Departments of Commerce, Justice, and State, the Judiciary and Related Agencies
   Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, § 111, 107 Stat. 1153,
   1164-65 (1993) .......................................................................................... 7

viii

Emergency Supplemental Appropriations Act for Defense, the Global War on
Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 6058, 119 Stat. 297
(2005).................................................................................................................................7

Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §§ 102-105, 114
Stat. 2410, 2411 (2000)...............................................................................................7, 8

Justice Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, § 219, 133
Stat. 2317, 2415 (2019)........................................................................................7, 10, 49

National Marine Fisheries Laboratories Act of 1996, P.L. 104-91, § 101(a), 110
Stat. 7 (1996)..............................................................................................................7, 39

Omnibus Consol. Appropriations Act of 1997, Pub. L. No. 104-208, § 109(a), 110
Stat. 3009 (1996)........................................................................................................7, 40

Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121,
§ 3, 126 Stat. 346, 348-349 (2012) ..............................................................................8

## Other Authorities

Fed. R. Bankr. P. 2020.................................................................................................15, 16

Fed. R. Bankr. P. 7001...........................................................................................3, 14, 15

Fed. R. Bankr. P. 7062....................................................................................................50

Fed. R. Bankr. P. 9014.................................................................................................15, 16

Fed. R. Bankr. P. 9029....................................................................................................25

Fed. R. Civ. P. 62.........................................................................................................49, 50

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................5

H.R. Rep. No. 99-764 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227 ............................6

H.R. Rep. No. 115-130 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154 .................. *passim*

Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017,
https://www.govinfo.gov/content/pkg/BUDGET-2017-PER/pdf/BUDGET-
2017-PER.pdf...........................................................................................................11, 47

Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of
2017 (May 18, 2017), https://www.cbo.gov/system/files/2018-07/52739-
hr2266.pdf.................................................................................................................12, 38

Cong. Budget Office Estimate for H.R. 2266, with an Amendment—the
    Additional Supplemental Appropriations for Disaster Relief Requirements Act
    of 2017, at 2 (Oct. 12, 2017), https://www.cbo.gov/system/files/115th-
    congress-2017-2018/costestimate/hr2266amend.pdf ...............................................12

Dept. of Justice, U.S. Tr. Program, Chapter 11 Quarterly Fees,
    https://www.justice.gov/ust/chapter-11-quarterly-fees ...........................................49

Dep't of Justice U.S. Tr. Program FY 2016 Performance Budget Cong.
    Submission, https://www.justice.gov/sites/default/files/jmd/
    pages/attachments/2015/02/01/18._u.s._trustee_program_ustp.pdf .......................10

Dep't of Justice U.S. Tr. Program FY 2017 Performance Budget Cong.
    Submission, https://www.justice.gov/jmd/file/821021/download; ..........................11

Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong.
    Submission, https://www.justice.gov/file/968761/download ............................10, 11

Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal
    Courts Improvement Act of 1999: Hearing Before the Subcomm. on Courts
    and Intellectual Property of the H. Comm. on the Judiciary on H.R. 2112 and
    H.R. 1752, 106 Cong. 26-27, https://babel.hathitrust.org/cgi/
    pt?id=pur1.32754071547271&view=1up&seq=1 .................................................8

Report of the Proceedings of the Judicial Conference of the United States
    (Sept./Oct. 2001), http://www.uscourts.gov/sites/default/files/2001-09_0.pdf ........9

Report of Significant Accomplishments: Fiscal Years 2017 – 2018,
    https://www.justice.gov/ust/file/ar_2017.pdf/download ...........................................5

Statement of Clifford J. White III Before the Subcommittee on regulatory Reform,
    Commercial & Antitrust Law, Committee on the Judiciary, U.S. House of Representatives
    (Sept. 29, 2016), https://republicans-judiciary.house.gov/wp-
    content/uploads/2016/09/EOUST-White-Testimony.pdf ......................................47

U.S. Const., art. I, § 8, cl. 1 .............................................................................29, 30, 33

U.S. Const. art. 1, § 8, cl. 4 ..............................................................8, 19, 20, 26

U.S. Const. art. 1, § 8, cl. 18 ...........................................................................18

On behalf of the United States, Ilene J. Lashinsky, the United States Trustee for Region 20 (the "United States"), respectfully submits this Objection to *Debtors' Motion To Determine Extent Of Liability For Quarterly Fees Payable To The United States Trustee Pursuant To 28 U.S.C. § 1930(a)(6)* (Doc. 2823; "Motion"). In support of this objection, the United States respectfully states as follows:

## SUMMARY

1.      Under 28 U.S.C. § 1930(a)(6), a quarterly fee must be paid in every chapter 11 case, calculated on the value of disbursements during the quarter. In 2017, Congress amended 28 U.S.C. § 1930(a)(6). That 2017 amendment temporarily increased the quarterly fees in larger chapter 11 cases, those with disbursements of $1 million or more in a quarter. 28 U.S.C. § 1930(a)(6)(B). Congress passed the 2017 amendment to enable the United States Treasury to collect enough fees to fully offset the congressional appropriations that fund the United States Trustee Program (the "Program") and to pay for 18 additional bankruptcy judgeships, so that ordinary taxpayers would not bear these costs of the bankruptcy system. The amendment expressly applies to disbursements made on or after January 1, 2018.

2.      The chapter 11 cases of Debtors were open when the 2017 amendment became effective on January 1, 2018. Disbursements in some of the cases exceeded $1 million in subsequent quarters. Consequently, Debtors incurred quarterly fees under the amended fee schedule in those cases for those quarters.

3.      Debtors challenge the constitutionality of the 2017 amendment. They contend the amendment is unconstitutionally non-uniform because the 2017 amendment results in different fees being paid under certain circumstances in the 88 Program districts compared to the 6 districts in North Carolina and Alabama overseen by bankruptcy administrators. *See* Mot. ¶ 41-46. They

further argue that the amendment does not apply to their cases because their cases were pending at the time of its enactment and application of the amendment would be retroactive and violate due process. *See* Mot. ¶ 47-57.

4. On both scores, Debtors advance arguments that most bankruptcy courts have rejected. Debtors rely heavily on two early bankruptcy courts decisions on these issues, both currently on appeal. *See In re Circuit City Stores, Inc.*, 606 B.R. 260 (Bankr. E.D. Va. 2019), *appeal pending sub nom. Fitzgerald v. Siegel*, No. 19-2240 (4th Cir.); *In re Buffets, LLC*, 597 B.R. 588 (Bankr. W.D. Tex. 2019), *appeal pending sub nom. Hobbs v. Buffets, LLC*, No. 19-50765 (5th Cir.).[1]

5. But those decisions conflict with a string of more recent decisions, each of which upholds the 2017 amendment's constitutionality. *See MF Global Holdings LTD. v. Harrington*, Adv. Case No. 19-01379, ___ B.R. ___, 2020 WL 1970507 (Bankr. S.D.N.Y Apr. 24, 2020) (holding 2017 amendment applies to pending cases and does not violate due process, and upholding the fee as constitutionally uniform);[2] *In re Mosaic Management Group, Inc.*, Case No. 16-20833, ___ B.R. ___, 2020 WL 1808605 (Bankr. S.D. Fla. Apr. 9, 2020) (holding 2017 amendment applies to pending cases and does not violate due process, and upholding 98% of the fee as constitutionally uniform);[3] *In re Clayton Gen. Inc.*, No. 15-64266, 2020 Bankr. Lexis 842

---

[1] *See also In re Life Partners Holdings, Inc.*, 606 B.R. 277 (Bankr. N.D. Tex. 2019), *appeal pending*, No. 20-10032 (5th Cir.) (not cited by Debtors but agreeing with the *Buffets* court).

[2] This is a joint opinion by Judges Bernstein and Glenn of the Southern District of New York that resolved two separate adversary proceedings pending before each of them, *MF Global Holdings LTD. v. Harrington*, Adv. Case No. 19-01379 (J. Glenn) and *Sun Edison, Inc. v. United States*, Adv. Case No. 19-01443 (J. Bernstein), both of which raised substantially similar challenges to the 2017 amendment. *Id.* at *1.

[3] The *Mosaic* court held the portion of the quarterly fee used to defray the cost of the United States Trustee Program or fund the related reserve was constitutionally uniform but struck down the remaining 2% intended for the purpose of offsetting the cost of certain temporary bankruptcy

(Bankr. N.D. Ga. Mar. 30, 2020) (holding 2017 amendment applied to pending case and was not impermissibly retroactive or unconstitutionally non-uniform); *In re Exide Techs.*, 611 B.R. 21 (Bankr. D. Del. 2020) (holding 2017 amendment applies to pending cases and does not violate due process, and upholding the fee as constitutionally uniform); *Clinton Nurseries, Inc. v. Harrington* (*In re Clinton Nurseries, Inc.*), 608 B.R. 96 (Bankr. D. Conn. 2019) (upholding the fee as constitutionally uniform), *appeal pending*, No. 20-1209 (2d Cir.); *see also Circuit City*, 606 B.R. at 268-69 (ruling for the United States that 2017 amendment applied to pending case and was not impermissibly retroactive but ruling against it on uniformity).

6.      As a threshold matter, the Court should deny Debtors' Motion because it is procedurally improper. Debtors seek an order (1) finding Congress's 2017 amendment to 28 U.S.C. § 1930(a)(6) is unconstitutional and (2) directing the United States Trustee to refund $2,495,956, the purported "Unconstitutional Difference," in quarterly fees already paid by Debtors.[4] Mot. ¶¶ 36, 40. But Rule 7001 requires that actions seeking monetary relief or to determine an interest in property be brought by adversary complaint. *See* Fed. R. Bankr. P. 7001(1), (2). In virtually every instance where similar issues have been raised, parties have done so by complaint or the bankruptcy court has converted the motion into a complaint.

---

judgeships. *See Mosaic*, 2020 WL 1808605, at *7; *see also infra* at ¶ 26. The United States has appealed this narrow portion of the *Mosaic* court's holding.

[4]      The United States believes that Debtors have paid more in quarterly fees than would have been due under the pre-2017 version of section 1930(a)(6), however, she reserves the right to dispute the exact amount of the difference if the Court holds the 2017 amendment does not apply to Debtors' cases. The parties have agreed to defer determination of the exact amount of the difference until after the Court resolves the constitutional issues raised in this Motion. For purposes of the court's determination of this Motion, the United States Trustee assumes without conceding that the aggregate pre- versus post-2017 amendment quarterly fee differential for Debtors' cases is approximately $2.5 million.

3

7.     To the extent this Court nevertheless considers the merits of Debtors' Motion, it should deny it.

8.     Debtors first argue that the 2017 amendment is unconstitutionally non-uniform under either the Bankruptcy Clause or the tax Uniformity Clause. *See* Mot. ¶ 41-46. This Court should reject Debtors' arguments. The amendment was authorized by the Necessary and Proper Clause of the Constitution, which has no uniformity requirement. To the extent the 2017 amendment is subject to any constitutional uniformity requirement, the quarterly fee statute is constitutionally uniform. Both before and after the 2017 amendment, federal law has required that fees imposed by bankruptcy-administrator districts be "equal to those imposed" in Program districts, 28 U.S.C. § 1930(a)(7), as explained in depth by recent bankruptcy court decisions addressing this issue. *See Exide*, 611 B.R. at 37-38; *Clinton Nurseries*, 608 B.R. at 116; *see also MF Global*, 2020 WL 1970507, at *23 n.20. And any failure to enforce the 2017 amendment in the six judicial districts administered by bankruptcy administrators does not render the law itself constitutionally infirm for the reasons explained below. *See Clinton Nurseries*, 608 B.R. at 113 & 115-16; *Exide*, 611 B.R. at 38; *MF Global*, 2020 WL 1970507, at *23.

9.     The Debtors next argue the 2017 amendment does not apply to the fees in these cases, and if it does, it is impermissibly retroactive. Mot. ¶¶ 47-57. But the 2017 amendment is not retroactive. It is prospective because it was enacted in October 2017 and only applies to disbursements made on or after January 1, 2018. An impressive array of courts has rejected this argument. *See Mosaic*, 2020 WL 1808605, at *5; *Clayton Gen.*, 2020 Bankr. Lexis 842, at *9-13; *Exide*, 611 B.R. at 26-27; *Circuit City*, 606 B.R. at 268-69. And even if the amendment were retroactive, it does not violate the Due Process Clause because its application to both new and

4

existing cases "is justified by a rational legislative purpose," a modest standard that Congress easily satisfied here. *United States v. Sperry Corp.*, 493 U.S. 52, 64 (1989).

10.     Accordingly, this Court should deny Debtors' Motion.

## BACKGROUND

### I. Congress Established Chapter 11 Quarterly Fees So the Cost of the Bankruptcy System Is Not Borne by Taxpayers

#### A. Congress Pays Close Attention to Bankruptcy Fees: On No Fewer Than 12 Occasions, Congress Has Carefully Recalibrated Quarterly Fees and Other Court Fees to Meet the Funding Needs of the Bankruptcy System

11.     In 1978 on a pilot basis, Congress freed bankruptcy courts from case-specific administrative duties by transferring them to "United States trustees" in the Justice Department. *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978); H.R. Rep. No. 95-595, at 3, 4, 100 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5965; s*ee also In re Prines*, 867 F.2d 478, 480 (8th Cir. 1989). The success of the pilot led Congress to nationalize the Program in 1986. *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986).

12.     United States Trustees "were given responsibility for many administrative functions, such as appointing private trustees and monitoring their performance, and monitoring cases for signs of fraud or abuse." *Prines*, 867 F.2d at 480. They also act as civil prosecutors, litigating thousands of bankruptcy matters each year. Thus, as envisioned by Congress, the Program was integral to the new bankruptcy system. H.R. Rep. No. 95-595, at 88-109. United States Trustees are particularly active in chapter 11, where they conduct initial debtor interviews, appoint committees and litigate a broad array of chapter 11 matters. By way of example, United States Trustees moved to convert or dismiss 2,217 chapter 11 cases in FY 2017 and 2,045 in FY

2018. *See* United States Trustee Program Annual Report of Significant Accomplishments: Fiscal Years 2017–2018 at 11, https://www.justice.gov/ust/file/ ar_2017.pdf/download.[5]

13.     Congress intended that the Program would be "self-funded by the users of the bankruptcy system—at no cost to the taxpayer." H.R. Rep. No. 99-764, at 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5237-38; *see also id.* at 22. Therefore, to recover the cost of the United States Trustee System, Congress imposed a variety of "bankruptcy fees," including the quarterly fees required by 28 U.S.C. § 1930(a)(6). *See* 28 U.S.C. § 589a(b). Quarterly fees under section 1930(a)(6) and a portion of the filing fees collected by the clerk of the bankruptcy court under other provisions of section 1930 are deposited into the United States Trustee System Fund established in the United States Treasury (the "Fund"), and are used to offset congressional appropriations made to fund the cost of the Program. *See* 28 U.S.C. § 589a(a) & (b); H.R. Rep. No. 115-130, at 7 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154, 159-160.

14.     If the amounts collected exceed the appropriations by Congress for a particular year, the excess remains in the Fund at Treasury to offset appropriations in subsequent years. *See* 28 U.S.C. § 589a(c). Conversely, if the costs of operating the Program in a particular year exceed the amounts available in the Fund, monies collected from taxpayers might be required to fund part of the appropriation to the Program. *See* 28 U.S.C. § 589a(e).

15.     Before settling on quarterly fees based on disbursements to recoup the cost of the Program, Congress "considered many different possible mechanisms . . . including fees based on a debtor's assets, fees based on a debtor's liabilities, and a flat fee for all debtors." H.R. Rep. No. 99-764, at 26. Congress decided to charge graduated quarterly fees based on the size of a chapter

---

[5]     They also took formal action relating to over 1,000 disclosure statements, 650 proposed plans, 100 trustee and examiner appointments, 600 professional fee requests, and 75 section 503(c) key employee retention plans. *Id.*

11 case's disbursements because it determined that "[s]maller chapter 11 debtors should pay smaller additional fees than larger debtors; [and] the funding mechanism [in section 1930(a)(6)] ensures that this will be the case." *Id.*

16.     Congress also specifically delineated the purposes for which monies in the Fund could be used and required the Attorney General periodically to report on the use of amounts in the Fund. *See* 28 U.S.C. § 589a. This regime allows Congress easily to increase or reduce the fees paid under section 1930, so that the amount collected for deposit in the Fund will never be unacceptably small or unreasonably large. And Congress regularly does so. On no fewer than twelve occasions, Congress has amended section 1930(a) or section 589a of title 28, to adjust the amount, allocation, or both, of filing fees and quarterly fees to be deposited into the Fund.[6]

---

[6]     *See* Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, § 406, 103 Stat. 988, 1016 (1989) (increasing filing fee); Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782, 795 (1991) (increasing filing fee and quarterly fees, and directing deposit of a percentage of fees into Fund); Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, § 111, 107 Stat. 1153, 1164-65 (1993) (increasing filing fees, changing percentage of fees allocated to Fund, and requiring Judicial Conference to report on bankruptcy fee system and possible impact of using graduated fee system based on assets, liabilities, or both, of debtor); National Marine Fisheries Laboratories Act of 1996, Pub. L. No. 104-91, § 101, 110 Stat. 7 & Balanced Budget Downpayment Act, Pub. L. No. 104-99, § 211, 110 Stat. 26, 37-39 (together enacting into law provisions of H.R. Conf. Rep. No. 104-378 (1995), including section 111(a), which extended quarterly fee payments into post-confirmation period); Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. I, § 109, 110 Stat. 3009, 3009-18–3009-19 (1996) (increasing quarterly fees and clarifying that prior quarterly fees amendment applies regardless of confirmation status of debtor's reorganization plan); Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §§ 102-105, 114 Stat. 2410, 2411 (increasing filing fee and conversion fee, and providing for fees under subsection (a)(7)); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, tit. III, § 325, 119 Stat. 23, 98-99, as amended by Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 6058, 119 Stat. 297 (increasing filing fees and changing percentage of fees allocated to Fund); Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, § 10101, 120 Stat. 4, 184 (2006) (increasing filing fees); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. B, tit. II, §§ 212, 213, 121 Stat. 1844, 1914 (2007) (adjusting quarterly fees and directing deposit of fines into Fund);

7

### B. Any Quarterly Fees Charged in Judicial Districts in Alabama and North Carolina Must "Equal" Those Charged in the Rest of the Country

17.     United States Trustees oversee bankruptcy matters in all federal judicial districts except those in North Carolina and Alabama. *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, § 302(d)(3), 100 Stat. 3088; Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §501, 114 Stat. 2410, 2411. In those states, Judicial Branch employees known as bankruptcy administrators oversee bankruptcy cases.

18.     Bankruptcy administrators initially could not charge quarterly fees, but at the request of the Judicial Conference of the United States Congress enacted 28 U.S.C. § 1930(a)(7) as part of the Federal Courts Improvements Act of 2000. Section 1930(a)(7) was enacted specifically to fix what one court—the majority of a divided Ninth Circuit panel—perceived to be an unconstitutional non-uniformity under the Bankruptcy Clause, U.S. Const. art. 1, § 8, cl. 4, between the United States Trustee and bankruptcy administrator districts.[7] *See* Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary on H.R. 2112 and H.R. 1752, 106 Cong. 26-27 ("1999 H. Subcomm. Hearing") (statement of Harvey F. Schlesinger, Judge, U.S. District Court for the Middle District of Florida), https://babel.hathitrust.org/cgi/pt?id=pur1.32754071547271& view=1up&seq=1.[8]

---

Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, § 3, 126 Stat. 346, 348-349 (2012) (increasing filing fee and decreasing allocation of fees into Fund); Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, div. B, § 1004, 131 Stat. 1224, 1232 (increasing quarterly fees for largest chapter 11 debtors); Department of Justice Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, § 219, 133 Stat. 2317, 2415 (2019) (adjusting Fund threshold for application of the 2017 amendment's temporary quarterly fee increase).

[7]     *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *as amended by* 46 F.3d 969 (1995).

[8]     Each website cited in this brief was last viewed on April 23, 2020.

19.     In his testimony supporting the enactment of section 1930(a)(7) on behalf of the Judicial Conference, Judge Schlesinger explained that "the Judicial Conference determined that implementing the establishment of chapter 11 quarterly fees in the bankruptcy administrator districts would eliminate" any uniformity problem.  *Id*. at 26.

20.     As the Judicial Conference requested, section 1930(a)(7) provides that in the bankruptcy administrator districts "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees *equal to* those imposed by paragraph (6) of this subsection."  28 U.S.C. § 1930(a)(7) (emphasis added).

21.     Promptly upon section 1930(a)(7)'s enactment, the Judicial Conference mandated the imposition of quarterly fees in bankruptcy administrator districts "in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time.*"  Report of the Proceedings of the Judicial Conference of the United States, at 45-46 (Sept./Oct. 2001) (emphasis added),      http://www.uscourts.gov/sites/default/files/2001-09_0.pdf      ("2001   Directive"). Bankruptcy administrators were required by statute to comply with the 2001 Directive. 28 U.S.C. § 331 ("All judicial officers and employees of the United States shall promptly carry into effect all orders of the Judicial Conference[.]").  Through its 2001 Directive, the Judicial Conference thus guaranteed that bankruptcy administrator districts would always be in compliance with section 1930(a)(7) by increasing or decreasing fees to "equal" those required by section 1930(a)(6), as it is amended from time to time.

### C. Congress Temporarily Increased Fees in 2017 to Protect Taxpayers from Having to Pay for the Program and to Fund Additional Judgeships

22.     In October 2017, Congress amended section 1930(a)(6) to temporarily increase quarterly fees when disbursements in a case equal or exceed $1 million in a quarter during fiscal

9

years 2018 through 2022 and the Fund balance is below $200 million in the most recent fiscal year.

*See* H.R. Rep. No. 115-130, at 7-8.  The new subparagraph (B) provides:

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).[9]

23.     The 2017 amendment provides that it "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment" of the amendment.  Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified).  The first quarter in which the amendment applied began on January 1, 2018, more than two months after its enactment.

24.     Congress passed the 2017 amendment following a seven-year decline in bankruptcy filings.  *See* Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong. Submission at 9, https://www.justice.gov/file/968761/download ("UST FY2018 Sub.").  In February 2015, because of this decrease in bankruptcy filings, the Justice Department suggested an increase in fees would be necessary.  *See* Dep't of Justice U.S. Tr. Program FY 2016 Performance Budget Cong. Submission at 7, https://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/01/18._u.s._trustee_program_ustp.pdf ("To address the offsetting collection shortfall, the USTP plans to propose a temporary increase to the quarterly fee structure for chapter 11 cases[.]"); 28 U.S.C. § 589a(d) (requiring Attorney General to report on amounts in and expenditures from the Fund).  The following year, the Department proposed a temporary fee increase similar to what

---

[9]     Pursuant to a recent appropriations statute, for fiscal years 2020 and 2021, the applicable reserve threshold is $300 million.  *See* Department of Justice Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, § 219, 133 Stat. 2317, 2415 (2019).

Congress enacted in October 2017 in its congressional submissions for each of the next two fiscal years.  *See* Dep't of Justice U.S. Tr. Program FY 2017 Performance Budget Cong. Submission at 9, https://www.justice.gov/jmd/file/821021/download; UST FY2018 Sub. at 9.

25.     In February 2016, the President published his proposed budget for fiscal year 2017, which included the fee increase challenged here: "The quarterly fees for these large cases would be assessed at 1% of the disbursements with a $250,000 per quarter cap."  *See* Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017 at 217, https://www.govinfo.gov/content/ pkg/BUDGET-2017-PER/pdf/BUDGET-2017-PER.pdf; *see also* https://www.govinfo.gov/app/ collection/budget/2017 (showing Feb. 9, 2016 as the date).  Congress did not enact the fee increase at that time, however.

26.     By 2017, the Fund's unrestricted balance was projected to be exhausted during fiscal year 2017.  *See* UST FY2018 Sub. at 9.  The Fund was thus predicted to fall $92 million short of offsetting the Program's appropriation for fiscal year 2017.  *Id*.  In other words, without a fee increase, taxpayers would have to fund the projected $92 million shortfall.  Congress passed the 2017 amendment on October 26, 2017, to avoid imposing these costs on taxpayers and used 2% of the increase to fund additional bankruptcy judgeships.  A May 17, 2017 House Report explains that the increase in quarterly fees for large chapter 11 cases was to provide needed funds for the operations of the Program, as well as to cover the costs of converting 14 temporary bankruptcy judgeships to permanent judgeships and adding four new bankruptcy judgeships.[10] H.R. Rep. No. 115-130, at 7-8.

---

[10]     H.R. 2266 was later amended to extend the temporary judgeships rather than convert them to permanent judgeships.  H.R. Rep. No. 115-130, at 7.

27.     The House Report explained that the Judiciary Committee expected "based on informal estimates by" the Congressional Budget Office ("CBO") that the increased quarterly fees would increase revenues "by an amount sufficient to fully offset the increases in direct spending caused by the bill." *Id*. at 9.  The day after the House Report was issued, the CBO issued a Cost Estimate, which reflects that when it made its calculations it understood that the increased fees would apply to cases pending on the amendment's effective date.  For example, the Cost Estimate states that the amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than $1 million per quarter."  *See* Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 1 (May 18, 2017), https://www.cbo.gov/system/files/2018-07/52739-hr2266.pdf; *see also id*. ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases[.]"); *id*. at 5 ("H.R. 2266 would . . . increase the amount of fees paid to the DOJ by entities *that are already in bankruptcy* and that have disbursements . . . of more than $1 million per quarter.") (emphasis added); *id*. at 6 ("Some portion of those [increased quarterly fee] collections would be from entities *already in bankruptcy*[.]") (emphasis added).  *See also* Cong. Budget Office Estimate for H.R. 2266, with an Amendment—the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, at 2 (Oct. 12, 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/hr2266amend.pdf (reiterating that the Bankruptcy Judgeship Act of 2017 would "adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases").

28.     Notably, the 2017 amendment made the percentage charged in the largest chapter 11 cases more consistent with the percentages charged in smaller cases.

29.     Both before and after the 2017 amendment, in cases with disbursements of less than $1 million, the fees range between 0.49% to more than 4% of quarterly disbursements. By contrast, before the 2017 amendment, cases with $1 million or more in disbursements paid a fee that was never *more* than 0.65%—while the fees were never *less* than 0.65% in cases with less than $300,000 in disbursements. Even after the 2017 amendment, high-disbursement cases still never pay a fee of more than 1%.

## II.     The Debtors' Chapter 11 Cases and Their Reorganization Plan

30.     On June 26, 2016 and July 5, 2016 Debtors commenced their various chapter 11 cases. Their cases are jointly administered. *See* Doc. 40 (order granting motion for joint administration of 71 cases filed on June 26, 2016); Doc. 197 (order granting motion for joint administration of 5 additional cases filed on July 5, 2016).[11]

31.     On March 30, 2018—3 months *after* the 2017 amendment under attack here became effective—creditor JD Holdings, L.L.C. filed the reorganization plan and disclosure statement for all Debtors. Doc. 1946 (Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by Creditor JD Holding, L.L.C.); Doc. 1948 (Modified Amended Disclosure Statement with Respect to Modified Amended Joint and Consolidated Chapter 11 Plans of Reorganization for All Debtors Filed by Creditor JD Holding, L.L.C.).

32.     The plan defines "U.S. Trustee Fees" as "fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. 3717." Doc. 1946 at 9. The plan provides that JD Holdings would pay all quarterly fees "due and owing on the" effective date and continue to pay the quarterly fees for each quarter until the chapter

---

[11]     References to "Doc." are to documents filed in the jointly administered bankruptcy case no. 16-21142.

11 cases are "converted, dismissed, or closed." Doc. 1946 at 12. The disclosure statement—which included statements concerning the quarterly fee obligations—includes a disclaimer recognizing that it is "forward looking" and cautioning that the disclosure statement "contains estimates, assumptions and projections that may be materially different from actual future results." Doc. 1948 at 2; *see also id*. at 37 (explaining that the disclosure statement "does not reflect any events that may occur or circumstances that may exist subsequent to the date hereof and that may have a material impact on the information contained herein").

33. This Court confirmed the plan on May 11, 2018 (Doc. 2188), and it became effective on May 17, 2018 (Doc. 2238).

34. On March 3, 2020, over two years after the 2017 amendment became effective, Debtors filed their Motion seeking a determination declaring the amendment of section 1930 unconstitutional. (Doc. 2823).

## ARGUMENT

### I. THE COURT SHOULD DENY DEBTORS' MOTION BECAUSE THE RELIEF SOUGHT REQUIRES AN ADVERSARY PROCEEDING

35. Preliminarily, Debtors' Motion should be denied because it improperly seeks relief that may only be obtained through an adversary proceeding under Rule 7001. Fed. R. Bankr. P. 7001. Rule 7001 "lists ten types of matters which must be brought as adversary proceedings." *In re Fisher Island Invests., Inc.*, 778 F.3d 1172, 1194 (11th Cir. 2015). These matters include proceedings to: (a) "recover money or property," Fed. R. Bankr. P. 7001(1) and (b) "determine the validity" of an "interest in property," Fed. R. Bankr. P. 7001(2).

36. Here, Debtors ask the Court to order the United States to refund them over $2.5 million—the amount Debtors claim to have overpaid—and to find that they are not liable for quarterly fees based on the 2017 amendment. Mot. ¶¶ 36, 40. Thus, the Motion seeks "to recover

money." Fed. R. Bankr. P. 7001(1).  The Motion also seeks "to determine the validity" of the government's "interest in property," Fed. R. Bankr. P. 7001(2), *i.e.*, it asks this Court to determine that they are entitled to any amount of fees assessed above what the pre-amendment statute required.  *See In re Clinton Nurseries, Inc*., 608 B.R. at 105.  This relief, too, may only be pursued through an adversary proceeding.  *Id*.; *see also In re Staker*, 525 F. App'x 811, 814 (10th Cir. 2013) (recognizing that the plain language of Rule 7001 calls "for an adversary proceeding to challenge the validity of an interest in property and expressly prohibit[s] including such challenges in an objection to a claim").

37.     Debtors cite no rule authorizing their Motion, and none exists.  First, it is not within the scope of Bankruptcy Rule 2020 for several reasons.  Fed. R. Bankr. P. 2020.  Rule 2020, which provides that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014," contemplates proceedings to contest acts of the United States Trustee related to the administration of the case.  *See* Fed. R. Bankr. P. 2020 advisory committee's note; *see also* 2 Norton Bankr. L. & Prac. 3d § 26:18 ("U.S. Trustees have discretion in the performance of administrative functions, but some of those functions are subject to judicial review" through "[t]he procedural vehicle" of Rule 2020).  The rule does not apply here because Debtors—in challenging the constitutionality of the 2017 amendment to section 1930(a)—are challenging an act of Congress, not an act or failure to act by the United States Trustee.  Moreover, Rule 2020 does not permit a party to sue the United States for money simply by filing a motion naming the United States Trustee as a defendant.

38.     Alternatively, Rule 2020 does not apply because the Motion seeks an advance determination as to Debtors' liability for future quarterly fees.  *See In re Clinton Nurseries, Inc.*, 608 B.R. at 105. However, the 1991 notes of the Advisory Committee state that the rule "provides

for review of acts already committed by the United States trustee, but does not provide for advisory opinions in advance of the act." Fed. R. Bankr. P. 2020 advisory committee's note.

39. Even if Rule 2020 applied, it would independently require Debtors to file a Rule 7001 complaint to pursue the relief they seek. Rule 2020 provides that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014." Fed. R. Bankr. P. 2020. And Rule 9014(a) says that "[i]n a contested matter *not otherwise governed by these rules*, relief shall be requested by motion." Fed. R. Bankr. P. 9014(a) (emphasis added). Because proceedings required to be filed as adversary complaints under Rule 7001, like this proceeding to recover money, are "otherwise governed by these rules," Rule 9014(a) does not permit them to be brought by motion. *See, e.g.*, *In re Dziurgot-Farnsworth*, No. 14-10915, 2014 WL 7145712, at *2 (Bankr. D.R.I. Dec. 12, 2014) ("Rule 9014 states that in 'a contested matter not otherwise governed by these rules, relief shall be requested by motion.' This contested matter is governed by Rules 7001 *et seq.*, and the relief Armistead requests may not be pursued by motion.").

40. Adversary proceedings provide procedural protections not required for motions. "[W]hen an adversary proceeding is required" under Rule 7001, "courts are not free to disregard the Rule." *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230, 236 (3d Cir. 2007); *see also In re Staker*, 525 F. App'x 811 at 814; *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 763 (5th Cir. 1995) ("Including a matter governed by Rule 7001 in another matter already before the court . . . does not satisfy the procedural rules required by Rule 7001."); *Jahr v. Frank (In re Jahr)*, BAP No. EW–11–1538–MkHJu, 2012 WL 3205417, at *4 (B.A.P. 9th Cir. Aug. 1, 2012) ("[I]t is settled law in this circuit that it is error for a bankruptcy court to determine property interests outside of an adversary proceeding.").

41.     Other courts have held that similar motions should be brought as adversary proceedings. *See, e.g.*, *Clinton Nurseries*, 608 B.R. at 106 (converting motion challenging 2017 amendment to adversary proceeding); *In re Life Partners Holdings, Inc.*, 606 B.R. at 283 (converting motion to adversary proceeding for resolution of monetary claims); *Circuit City*, 606 B.R. at 267 (concluding that motion to determine quarterly fees seeks the type of relief included in Bankruptcy Rule 7001 and converting to adversary proceeding).  This Court should too. Accordingly, the Court should deny Debtors' Motion.

## II.     DEBTORS' UNIFORMITY ARGUMENTS FAIL

42.     Debtors have not satisfied their burden to show that Congress exceeded its constitutional powers under either the tax Uniformity Clause or the Bankruptcy Clause by passing the 2017 amendment.  As explained below, the 2017 amendment is an exercise of Congress's broad powers under the Necessary and Proper Clause.  It is not a duty, impost or excise subject to the uniformity requirement of the tax Uniformity Clause.  Nor is this revenue measure a law "on the subject of Bankruptcies" that must be uniform under the Bankruptcy Clause.

43.     Even if a constitutional uniformity requirement applies, the 2017 amendment would not contravene it.  The law is constitutionally uniform for several reasons.  First, because section 1930(a)(7) requires that any fees charged in bankruptcy administrator districts be "equal to" those imposed under section 1930(a)(6).  Additionally, any difference in fees is within the flexibility afforded Congress by the Bankruptcy Clause.  Finally, the Bankruptcy Clause applies to Congress's power to enact "Laws."  But the alleged lack of uniformity—the failure to collect the section 1930(a)(6) fees in bankruptcy administrator districts—is not the result of the law that Congress enacted but from a difference in how it was implemented.

44.     Even if there were an unconstitutional disuniformity, relieving Debtors of the fees Congress intended them to pay is not the proper remedy.

17

### A. Congress Had the Constitutional Power to Enact the 2017 Amendment Under the Necessary and Proper Clause.

45.     Debtors' argument boils down to an argument that Congress lacked the constitutional power to enact the 2017 amendment.  Supreme Court precedent, however, makes clear that Congress has ample power to pass revenue measures such as the amendment under the Constitution's Necessary and Proper Clause.

46.     The Constitution empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers."  U.S. Const. art. 1, § 8, cl. 18. Congress thereby possesses "broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'"  *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819)).  A law is within Congress's authority to enact under the Necessary and Proper Clause so long as it is "rationally related to the implementation of a constitutionally enumerated power."  *Id*. at 134.

47.     Notably, Congress's powers under the Necessary and Proper Clause need not be tied to one specific enumerated power.  As explained by the Supreme Court in the *Legal Tender Cases*, the power's "existence may be deduced fairly from more than one of the substantive powers expressly defined, or from them all combined.  It is allowable to group together any number of them and infer from them all that the power claimed has been conferred."  79 U.S. 457, 534 (1870). *See also Reina v. United States*, 364 U.S. 507 (1960); *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819).

48.     Thus, the Supreme Court has long recognized that Congress has "broad and comprehensive national authority over the subjects of revenue, finance, and currency."  *Norman v. Baltimore & O.R. Co.*, 294 U.S. 240, 303 (1935).  This authority "is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow

money, to regulate commerce with foreign nations and among the several states, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power 'to make all laws which shall be necessary and proper for carrying into execution' the other enumerated powers." *Id.*

49.     Congress's "broad and comprehensive national authority over . . . revenue," *Norman*, 294 U.S. at 303, arising from these aggregate powers includes the power to levy quarterly fees in chapter 11 cases.  Such fees are necessary and proper to further Congress's enumerated revenue-related powers discussed in *Norman*, as well as Congress's enumerated power to establish a uniform law on the subject of bankruptcies, Art. I, § 8, cl. 4, discussed further below.

50.     Quarterly fees are also necessary and proper to execute the enumerated power to establish courts.  Art. I, § 8, cl. 9.  *See Willy v. Coastal Corp.*, 503 U.S. 131 (1992).  As the Supreme Court held in the landmark case of *Hanna v. Plumer*, "the constitutional provision for a federal court system (augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing the practice and pleading in those courts, which in turn includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either."  380 U.S. 460, 472 (1965).  As with any other matter of court procedure, Congress has the power to set chapter 11 fees because doing so is necessary and proper to the power to establish courts to hear bankruptcy cases.

### B.  The 2017 Amendment Is Not a "Law on the Subject of Bankruptcies" within the Meaning of the Constitution

51.     Debtors' uniformity argument incorrectly presumes the 2017 amendment is subject to the uniformity requirement of either the tax Uniformity Clause or Bankruptcy Clause of the Constitution, *see* Mot. ¶ 41-46, rather than the Necessary and Proper Clause.  Although the former require uniformity as that term applies in the Constitution, the latter does not.

19

52.     That the 2017 amendment relates to bankruptcy does not mean that the power to enact it arises from the Bankruptcy Clause rather than the Necessary and Proper Clause.

53.     The Bankruptcy Clause of the Constitution provides that Congress "shall have the power . . . [t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. 1, § 8, cl. 4.

54.     As the Supreme Court has held, the Bankruptcy Clause serves two purposes: (a) it enables Congress to pass a nationwide bankruptcy law enforceable among the states because, "[g]iven the sovereign status of the States, questions were raised as to whether one State had to recognize the relief given to a debtor by another State"; and (b) it prevents Congress from enacting private bankruptcy laws.  *See Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 472 (1982); *see also In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (holding the Bankruptcy Clause thus "forbids only two things": "arbitrary regional differences in the provisions of the Bankruptcy Code" and "bankruptcy laws limited to a single debtor").  "[T]he term 'uniform' was intended to grant an additional power at the expense of the fifty states, rather than to limit the scope of Congress's delegated powers."  *Schultz v. United States*, 529 F.3d 343, 356 (6th Cir. 2008).

55.     As the Supreme Court reiterated last month, the Bankruptcy Clause "emerged from a felt need to curb the States' authority" because states "'had wildly divergent schemes' for discharging debt, and often 'refus[ed] to respect one another's discharge orders'" and that "'the Framers' primary goal' in adopting the Clause was to address that problem[.]"  *Allen v. Cooper*, No. 18-877, 140 S. Ct. 994, 1002 (2020) (quoting *Cent. Va. Cmty Coll. v. Katz*, 546 U.S. 356 (2006)).

56.     This power to provide a discharge of debts recognized in all states is the defining characteristic of "Laws on the subject of Bankruptcies," as that phrase is used in the Constitution. Revenue provisions like the 2017 amendment are not such laws.

57.     As the Supreme Court has explained, "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" *Gibbons*, 455 U.S. at 466.  Of particular importance, "[t]he subject of 'bankruptcies' includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property.  The grant to Congress involves the power to impair the obligation of contracts, and this the states were forbidden to do." *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902).

58.     The essential characteristic of laws "on the subject of Bankruptcies" has always been that they adjust the obligations of a failing debtor.  *See, e.g.*, *Cont'l Ill. Nat. Bank & Trust v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 668 (1935).  Thus, the Supreme Court held—in an opinion by Chief Justice Marshall that presaged his later landmark opinion in *McCulloch v. Maryland*— that Congress had the power to grant priority to the United States on debts, not by virtue of the Bankruptcy Clause, but by virtue of the Necessary and Proper Clause, because "[t]he government is to pay the debt of the union, and must be authorized to use the means which appear to itself most eligible to effect that object." *United States v. Fisher*, 6 U.S. 358, 396 (1805).  It makes sense that the *Fisher* Court did not look to the Bankruptcy Clause because that Clause's purpose was to empower Congress to enact federal law to displace a disparate set of state laws regarding when a debtor would be discharged from debts.  *See Gibbons*, 455 U.S. at 472.  The law at issue in *Fisher* did not do this.

59.     Likewise, revenue laws to fund the system to adjudicate bankruptcy cases— including the United States Trustee system that polices it—do not discharge any debts.  Nor do

they alter the relationship between a failing debtor and its creditors. *See Gibbons*, 455 U.S. at 466; *Reese*, 91 F.3d at 39-40; *cf. United States Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 (3d Cir. 1999) ("Congress's mandate requiring payment of post-confirmation quarterly fees is not an effort to alter the terms of pre-existing debts; rather, it creates a new expense that did not exist before the plan was confirmed.") (internal quotations omitted). Laws establishing such fees are thus ancillary to the Bankruptcy Clause's core purpose of eliminating the disparate set of state bankruptcy laws with which the Founders were concerned.

60.    Indeed, in assessing Congress's constitutional powers, "it is important to bear in mind the distinction between the subject matter, bankruptcy, in regard to which congress is empowered to legislate, and the means, machinery or practice congress has prescribed for carrying that power into effect." *United States v. Pusey*, 27 F. Cas. 631, 632 (C.C.E.D. Mich. 1872). It is the Necessary and Proper Clause that empowers Congress to establish the latter. *See Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938) ("To this specific grant [of power by the Bankruptcy Clause], there must be added the powers of the general grant of clause eighteen. 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *.'"); *Pusey*, 27 F. Cas. at 633 ("The proceedings in bankruptcy do not constitute the end to be accomplished by a bankrupt act. They constitute the machinery, so to speak, by which that end is to be obtained, viz.: the appropriation of the debtor's property to the payment of his debts.").

61.    Like other aspects of the "machinery" through which bankruptcy laws are implemented, the 2017 amendment is authorized by Congress's broad powers under the Necessary and Proper Clause. *See United States v. Comstock*, 560 U.S. 126, 133-34 (2010) ("[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative

authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'") (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 413, 418 (1819)).

62.     Because section 1930 is not a law "on the subject of Bankruptcies," Congress did not need to rely on its enumerated Bankruptcy Clause power, instead of its other powers, for the authority to enact it.  *See Gibbons*, 455 U.S. at 465-66 (concluding statute was enacted under Bankruptcy Clause not Commerce Clause because Congress "prescribe[d] the manner in which the property" of the railroad "is to be distributed among its creditors"); *Conn. Gen. Ins. Corp. v. U.S. Ry. Ass'n*, 383 F. Supp. 510, 534 (E.D. Pa 1974) ("[R]ecourse to the bankruptcy clause to justify Congressional action is necessary only if that action impairs the obligation of contracts."). And because it is not such law, the Bankruptcy Clause's uniformity provision does not apply.

63.     Bankruptcy courts that have concluded that section 1930(a)(6) is a law "on the subject of Bankruptcies" neither mentioned the Necessary and Proper Clause nor considered the distinction between laws that are within the enumerated power versus those that are within Congress's broad "necessary and proper" powers.  *See Clinton Nurseries*, 608 B.R. at 111-13; *Life Partners*, 606 B.R. at 288; *Exide*, 611 B.R. at 35; *Clayton General*, 2020 Bankr. LEXIS 842, at *20-21; *Mosaic*, 2020 WL 1898605, at *6.  However, precedent makes clear that the breadth of Congress's powers noted by those courts is due to the broad powers conferred by the Necessary and Proper Clause.  Thus, for example, the Supreme Court explained in *United States v. Fox* (cited in *Clinton Nurseries*, 608 B.R. at 112):

> There is no doubt of the competency of Congress to provide, by suitable penalties, for the enforcement of *all legislation necessary or proper* to the execution of powers with which it is intrusted.  And as it is authorized 'to establish uniform laws on the subject of bankruptcies throughout the United States,' it may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system

23

95 U.S. 670, 672 (1878) (emphasis added). The emphasized language shows that the Supreme Court was referring to Congress's broad powers under the Necessary and Proper Clause when it concluded that Congress "may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system." *Id*. *Accord Comstock*, 560 U.S. at 136; *Pusey*, 27 F. Cas. at 632-633.

64. Similarly, the divided panel in *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *as amended by* 46 F.3d 969 (1995), also did not address the Necessary and Proper Clause. Contrary to the *Victoria Farm's* court's holding, the fact that a law affects a bankruptcy right or remedy cannot mean, without more, that the law is one "on the subject of Bankruptcies" within the scope of the Bankruptcy Clause. *See Victoria Farms*, 38 F.3d at 1530-31 (reasoning that the Program has a "direct effect" upon debtors and creditors and higher fees have "a concrete effect" on the relief available to creditors). Every statute imposing or increasing a financial obligation, such as a property tax, a license fee, or a domestic support obligation, likewise could "reduce[] the amount of funds that the debtor can ultimately pay to his creditors." *Victoria Farms*, 38 F.3d at 1531. Such laws also have a direct impact on bankruptcy proceedings because failure to pay taxes or domestic support obligations can be grounds to dismiss or convert a case or to deny plan confirmation. *See* 11 U.S.C. § 1112(b)(4)(I), (P); *id*. § 1129(b)(14), (d). The Supreme Court has never intimated that taxes or laws imposing domestic support obligations would be on the subject of bankruptcies.

65. Nor does the fact that a law may only exist because of bankruptcy mean that Congress may enact it only under the Bankruptcy Clause. To the contrary, the Supreme Court has stated that criminal laws such as bankruptcy fraud—which would not exist absent bankruptcy— are authorized by the Necessary and Proper Clause. *See* 18 U.S.C. § 151, *et seq*.; *Comstock*, 560

U.S. at 136 ("Congress routinely exercises its authority [under the Necessary and Proper Clause] to enact criminal laws in furtherance of, for example, its enumerated powers . . . to regulate bankruptcy[.]"); *see also Pusey*, 27 F. Cas. at 632-633 (holding the Necessary and Proper Clause empowered Congress to pass a law criminalizing certain transfers made within three months before filing for bankruptcy).

66.     Thus, for example, no one contends that the fact that some jurisdictions have bankruptcy appellate panels ("BAPs"), and others do not, violates the Bankruptcy Clause even though BAPs exist only to adjudicate bankruptcy appeals.  28 U.S.C. § 158(b)(6).  Nor does anyone contend that differences in bankruptcy courts' local rules, which again arise only in bankruptcy, raise any constitutional uniformity problem, although those rules may affect both procedural rights and substantive outcomes.  *See* Fed. R. Bankr. P. 9029(a)(2) (contemplating the enforcement of "[a] local rule imposing a requirement of form . . . in a manner that causes a party to lose rights" in the event of a "[]willful failure to comply with the requirement"); Fed. R. Bankr. P. 9029(b) (contemplating that a single judge may impose a "sanction or other disadvantage" on a litigant for failure to comply with the judge's procedures so long as the alleged violator had "actual notice of the requirement").  Neither the law governing BAPs, local rules of procedure, nor the law governing fees in bankruptcy cases, are substantive bankruptcy laws that fall within the purview of the Bankruptcy Clause.

67.     Because section 1930(a)(6) does not modify any rights or remedies as between a bankrupt debtor and its creditors, it is not a law "on the subject of Bankruptcies" subject to the uniformity provision of the Bankruptcy Clause.

### C. Even if it applies, the 2017 Amendment Satisfies the Bankruptcy Clause's Uniformity Requirement Because Section 1930(a)(7) Requires "Equal" Fees to those Charged Under Section 1930(a)(6)

68.     Debtors' claim of non-uniformity is erroneous because the statutes governing quarterly fees are uniform on their face.  Sections 1930(a)(6) and (7) govern the imposition of quarterly fees in chapter 11 cases.  Section 1930(a)(6) applies throughout all Program districts, imposing the same fee schedule in every district.  Section 1930(a)(7), in turn, mandates that quarterly fees in bankruptcy administrator districts "be equal to those imposed by [section 1930(a)(6)]."  Congress thus established a regime in which the same quarterly fees are required in every federal judicial district, regardless of whether that district participates in the Program.  Thus, the "laws" governing quarterly fee are "uniform."  *In re Exide Techs.*, 611 B.R. at 37-38; *In re Clinton Nurseries*, 608 B.R. at 117; *MF Global*, 2020 WL 1970507, at *23 n.20; *cf.* U.S. Const. art. I, § 8, cl. 4.

69.     The leading opinion on this point is *Exide*, where the court explained that Congress provided in section 1930(a)(7) that fees imposed for the bankruptcy administrator districts "had to be equal to the fees in UST districts"—a uniformity requirement "the Judicial Conference acknowledged" when it "stat[ed] that it would impose fees equal to those specified in section 1930(a)(6) 'as those amounts may be amended from time to time.'"  611 B.R. at 38 (citing 2001 JCUS Report at 45-46); *see also MF Global*, 2020 WL 1970507, at *23 n.20.

70.     This statutory uniformity requirement meant the 2017 amendment increased fees equally in both Program districts and bankruptcy administrator districts beginning on January 1, 2018.  *See Clinton Nurseries*, 608 B.R. at 117 n.28; *Exide*, 611 B.R. 38.

26

71. Debtors' Motion rests on the fundamentally mistaken view that the 2017 Amendment "increased quarterly fees only in the UST program."[12]  Mot. ¶ 43.  The 2017 amendment contained no such limitation.  The fact that the bankruptcy administrator districts did not promptly implement the new fees does not call the constitutionality of the legislation into question.  As three bankruptcy courts have explained in rejecting that reasoning, "[t]he 2017 Amendments did *not* increase quarterly fees in the UST districts only," because "[a]s soon as the higher fees imposed by the 2017 Amendments went into effect in UST districts, 28 U.S.C. § 1930(a)(7) *automatically* operated to mandate higher fees in [bankruptcy administrator] districts." *Clinton Nurseries*, 608 B.R. at 117 n.28 (first emphasis added); *Exide Techs.*, 611 B.R. at 38 (holding "the 2017 Amendment should have been self-executing in BA districts"); *MF Global*, 2020 WL 1970507, at *23 n.20.

72. Any failure of bankruptcy administrators to implement the amended fee schedule in January 2018 was inconsistent not only with the statute but also with the Judicial Conference's then effective 2001 Directive commanding that quarterly fees "be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C § 1930, as those amounts may be amended from time to time," 2001 JCUS Report at 46, and the administrators' duty to "promptly

---

[12]  Debtors compound this error by arguing that "'[u]nder any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to be irrational and arbitrary.'"  Mot. ¶ 43, 45 (quoting *Victoria Farms*, 38 F.3d at 1532).  Yet the *Victoria Farms* panel reconsidered and amended its decision to strike that very statement, something that both Debtors and *Buffets*, 597 B.R. at 594 (relied on by Debtors), failed to acknowledge.  *Victoria Farms*, 46 F.3d 969 (9th Cir. 1995).  The passage was struck for good reason.  The Supreme Court has held that Congress need not state its reasons for a law to pass rational-basis review.  *See FCC v. Beach Comms.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

27

carry into effect" those orders. 28 U.S.C. § 331. It is not apparent why bankruptcy administrators failed to adhere to the 2001 Directive or section 1930(a)(7).

73.     As *Clinton Nurseries* explains, the use of the term "may" in section 1930(a)(7) does not change this conclusion. 608 B.R. at 115. "'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Id.* (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The statute authorizes the Judicial Conference to impose fees "equal to those imposed by" section 1930(a)(6) and no others. *Cf. Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004) (rejecting argument that "may" should be read permissively to authorize both actions that satisfy the subsequent condition specified in the statute and those that do not). Any other reading would render the words "equal to" superfluous, contrary to basic principles of statutory interpretation. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018). "[B]y stating that the Judicial Conference may require equal fees, Congress implied that the Judicial Conference could not require fees that were not equal." *Clinton Nurseries*, 608 B.R. at 115.

74.     The Judicial Conference's belated decision to require bankruptcy administrator districts to implement the increased fee schedule only as of October 1, 2018, and only for newly filed cases, also does not implicate the constitutionality of the statute. Nothing in the 2017 amendment authorized the Judicial Conference to take that action. To the contrary, section 1930(a)(7) requires the imposition of fees "equal to those imposed" under section 1930(a)(6).

75.     Any non-uniformity in practice thus is attributable not to the laws enacted by Congress, but by the differential implementation of those laws. *See, e.g.*, *Clinton Nurseries*, 608 B.R. at 113 & 115-16 (agreeing that the quarterly fee statute is "uniform on its face" and that the

different fees assessed across districts was "the consequence of the Judicial Conference's late, and only prospective, implementation of fee increases [on] October 1, 2018," which was "contrary to the text of 28 U.S.C. § 1930(a)(7)"); *Exide*, 611 B.R. at 38 (holding that the failure to properly enforce the 2017 amendment in bankruptcy administrator districts did "not render the law itself non-uniform"); *MF Global*, 2020 WL 1970507, at \*23 n.20; *cf. Rosenberg v. United States*, 72 Fed. Cl. 387, 395-96 (Ct. Fed. Cl. 2006) (holding that complaint alleging that IRS engaged in "*ultra vires* and nonuniform collection" of a tax did not allege a violation of the tax Uniformity Clause, U.S. Const., art. I, § 8, cl. 1, because "[t]he Uniformity Clause . . . is a limitation on legislative, not executive, action"); *Peony Park v. O'Malley*, 121 F. Supp. 690 (D. Neb. 1954) (rejecting tax uniformity challenge where statute was uniform but enforcement was not), *aff'd*, 223 F.2d 668 (8th Cir. 1955).

76.     It would be particularly anomalous to interpret the law as non-uniform given that Congress enacted section 1930(a)(7) specifically to cure what the Ninth Circuit—incorrectly— found to be a lack of uniformity in prior law by the divided panel in *Victoria Farms*, 38 F.3d 1525. At the time of the *Victoria Farms* case, debtors did not have to pay any quarterly fees in the bankruptcy administrator districts located in Alabama and North Carolina.  In a divided opinion, the *Victoria Farms* majority held that the bifurcated system of Program and bankruptcy administrator districts, with no quarterly fees charged in the latter, violated the Bankruptcy Clause. *Id*. at 1532.  The Ninth Circuit thus struck down section 317(a), which extended the time for North Carolina and Alabama to opt-in to the Program, but did not strike down the quarterly fees provision, instead ordering the debtor to pay all of the quarterly fees owed.  *Id.* at 1534.

77.     In response to that decision, rather than advocating for elimination of the bankruptcy administrator program (the remedy preferred by the Ninth Circuit), the Judicial

Conference recommended that Congress authorize the imposition of quarterly fees in bankruptcy administrator districts. *See* 1999 H. Subcomm. Hearing at 26-27. Congress enacted section 1930(a)(7) pursuant to that recommendation. *See In re Clinton Nurseries*, 608 B.R. at 116 ("[T]he very reason why 28 U.S.C. § 1930(a)(7) was enacted in the first place [was] to avoid the constitutional issue identified in *Victoria Farms*."). It would subvert congressional intent to read a statutory provision specifically adopted to ensure uniformity between the bankruptcy administration systems as continuing to allow the very non-uniformity it was designed to prevent.

### D. If There Were a Difference in Fees, It Would Be Within the Scope of Flexibility Permitted by the Bankruptcy Clause

78. As explained by Judge Walrath in *Exide*, the 2017 amendment is uniform for the separate and independent reason that even if there were a statutory difference in fees, such a difference would not render the fees unconstitutionally non-uniform. *Exide*, 611 B.R. at 37-38. The Bankruptcy Clause's "uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Blanchette*, 419 U.S. at 159. Nor was it "intended to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions." *Id.* (internal quotation omitted).

79. As the Supreme Court has explained, this construction of the Bankruptcy Clause comports with the Court's construction of the tax Uniformity Clause, U.S. Const., art I, § 8, cl. 1. *See Blanchette*, 419 U.S. at 160. In the tax context, the Supreme Court has explained that constitutional uniformity "does not require Congress to devise a tax that falls equally or proportionately on each State," nor does it "prevent Congress from defining the subject of a tax by drawing distinctions between similar classes." *Ptasynski*, 462 U.S. at 82 (citing the *Head Money Cases*, 112 U.S. 580, 595 (1884)). Rather, a "tax is uniform when it operates with the same force

and effect in every place where the subject of it is found." *Id.* (quoting the *Head Money Cases*, 112 U.S. at 594). *Cf. Schultz*, 529 F.3d at 355 (finding that a lower level of scrutiny should apply to the uniformity requirement of the Bankruptcy Clause than applied in *Ptasynski* to the tax Uniformity Clause).

80.     Thus, the Eighth Circuit found no unconstitutional lack of uniformity in an analogous challenge to the implementation of quarterly fees at different times in different districts when they were first enacted. *See Prines*, 867 F.2d at 480. *Prines* addressed the gradual roll-out of the Program, when it was expanded with different effective dates for districts that participated in the pilot program than for those that did not. *Id.* at 482-83. The Eighth Circuit upheld the different effective dates for charging quarterly fees. The Eighth Circuit rejected the argument that heightened scrutiny was required because of the uniformity provision of the Bankruptcy Clause, holding instead that the "appropriate standard for measuring classifications in bankruptcy legislation to be 'that of rational justification.'" *Id.* at 485 (quoting *United States v. Kras*, 409 U.S. 434, 446 (1973)). The Eighth Circuit held that "[t]he assessment of a quarterly fee to fund the trustee program consistent with the exercise of authority by the trustee over a case satisfies the rational basis test." *Id.* The Eighth Circuit also ruled that debtors were being treated equally because "pending cases are subject to the quarterly fee assessment only if the [United States] trustee has authority over them." *Id.* at 485; *see also In re Miles*, 330 B.R. 861, 863 (Bankr. M.D. Ga. 2005).

81.     The same is true here. As the *Exide* court specifically held, "section 1930(a)(6) is uniform, because it applies with the same force and effect in every place where the subject of it is found—that is, in all UST districts." *Exide*, 611 B.R. at 37; *cf. Prines*, 867 F.2d at 485 (upholding disparate effective dates for quarterly fees imposed in roll-out of Program against equal protection

challenge, because debtors were being treated equally when "pending cases are subject to the quarterly fee assessment only if the [United States] trustee has authority over them"). And if, counterfactually, the 2017 amendment increased fees only in Program districts, such an assessment to fund the Program "consistent with the exercise of authority" by the United States "satisfies the rational basis test." *Prines*, 867 F.2d at 845.

82. The 2017 amendment "addresses a geographically isolated problem," which "is confined to UST districts, namely the depletion of the UST System Fund." *Exide*, 611 B.R. at 37. Because the depletion of the Fund "is only a problem in UST districts," it was "proper for Congress to increase the fees in those districts to solve that problem." *Id.* (citing *Blanchette*, 419 U.S. at 160); *see also MF Global*, 2020 WL 197507, at 23; *Mosaic*, 2020 WL 1808605, at *7 ("Because the Amendment effected a fee increase only in districts where the UST is active, and in all of such districts, the Amendment is uniform.");[13] *Clayton Gen.*, 2020 Bankr. Lexis 842, at *27.

### E. Even If There Were Any Unconstitutional Lack of Uniformity, the Remedy Debtors Seek Would Be Improper

83. Even assuming that the law is unconstitutionally non-uniform, this would not excuse Debtors from paying the fees required by Congress. "When the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of equal treatment." *Sessions v. Morales-*

---

[13] The government does not agree with the *Mosaic* court's conclusion invalidating the 2% portion of the fee not specifically designated to the United States Trustee Fund as non-uniform. As recognized by the *MF Global* judges in rejecting the *Mosaic* court's reasoning, "both the 2% portion of the UST District quarterly fees and BA Districts quarterly fees support judges nationally and not only in their respective districts" and all but one of the "temporary judgeships covered by the 2% fee increases are assigned to UST Districts" so the portion of the 2% attributable to a single bankruptcy administrator district "is *de minimis* when measured against the funding required in the UST Districts." *MF Global*, 2020 WL 1970507, at *24. Furthermore, there is no uniformity issue in any event because even if the Bankruptcy Clause applies, section 1930(a)(7) requires that fees imposed for the bankruptcy administrator districts are equal to those in Program districts. *See supra* Section II.C.

*Santana*, 137 S. Ct. 1678, 1698 (2017) (brackets omitted).  But that result "can be accomplished" in one of two ways, and "[t]he choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand."  *Id*. at 1698-99; *see id*. at 1698 (noting, in context of government benefits, that equal treatment "can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class").

84.      It cannot reasonably be disputed which remedial outcome Congress would choose here.  Any differences in the fees assessed is contrary to Congress's express instruction to impose fees "equal to those imposed under [section 1930(a)(6)]."  28 U.S.C. § 1930(a)(7).  Indeed, "had the Judicial Conference implemented the quarterly fees in [bankruptcy administrator] districts without any change in the UST's actions, the Debtors would have nothing to complain of under the facts alleged."  *Clinton Nurseries*, 608 B.R. at 120.  To the extent this case presents any problem of constitutional dimension (it does not), the appropriate remedy would be to require nationwide adherence to the statute as written—not to compel the United States to disregard the statute.  *Id*. at 121 ("[T]he remedy does not lie in striking down the law or forcing the UST to disregard the law as written").

### F.  The Tax Uniformity Clause Does Not Apply to the Quarterly Fee Statute

85.      Debtors argue that the amendment violates the tax Uniformity Clause, U.S. Const., art. I, § 8, cl. 1.  *See* Mot. ¶ 41.  However, that clause has no bearing on this issue.  The Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises . . . but *all Duties, Imposts and Excises* shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1 (emphasis added).  Quarterly fees imposed under sections 1930(a)(6) and (7) are not "Duties," "Imposts," or "Excises."  Rather, they are user fees, payable only by debtors or others in ongoing chapter 11 cases, for the purpose of funding the bankruptcy system they are using.  *See Exide*, 611 B.R. at 32 ("[U.S. Trustee] quarterly fees are user fees associated with the debtors' use

33

of the bankruptcy system."); *In re Kindred Healthcare, Inc.*, Nos. 99-3199 et al., 2003 WL 22327933, at *4 (Bankr. D. Del. Oct. 9, 2003) (same and collecting cases); *cf. United States v. Sperry*, 493 U.S. 52, 63-64 (1989) (holding that 1.5% charge imposed on litigants pursuing relief in particular international tribunal was a "reasonable user fee").

86.     Section 1930's structure supports this conclusion because all of its subsections impose bankruptcy fees, not taxes. *See Nijhawan v. Holder*, 557 U.S. 29, 39 (2009) ("Where, as here, Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations."). Section 1930(a)(6) denominates the charges at issue here as fees. And the other provisions of section 1930 prescribe a series of fees rather than taxes.

87.     User fees are not subject to the constitutional limitations on the government's power to tax, and thus are "outside the scope of the Uniformity Clause's prohibitions." *Thomson Multimedia Inc. v. United States*, 340 F.3d 1355, 1363-64 (Fed. Cir. 2003); *see also Augusta Towing Co. v. United States*, 5 Cl. Ct. 160, 167 (Ct. Cl. 1984) ("A user charge is one type of revenue measure designed to compensate the Government for supplying a benefit to the user and, as such, is not subject to the constitutional limitations on the Government's power to tax, including the Tax Uniformity clause."). Thus, the tax Uniformity Clause does not apply. *See Exide*, 611 B.R. at 32.

88.     Even if this clause somehow applied to the quarterly fee statute, Congress did not violate it. As discussed above, the statute enacted by Congress is uniform, inconsistent application of the statute does not deprive Congress of the authority to enact it, and, if there were a uniformity problem, excusing Debtors from paying the fee Congress mandated would not be the appropriate remedy.

## III. THE 2017 AMENDMENT APPLIES TO THIS CASE

89. Debtors next argue that the 2017 amendment does not apply to this case based on a presumption against retroactivity. Mot. ¶¶ 47-52. As most bankruptcy judges have ruled, Debtors are wrong. *See MF Global*, 2020 WL 1970507, at *11-13; *Mosaic*, 2020 WL 1808605, at *5; *Clayton Gen.*, 2020 Bankr. Lexis 842, at *13-14; *Exide*, 611 B.R. 26-27, 29-30; *Circuit City*, 606 B.R. at 268.

90. No presumption against retroactivity applies here. The Supreme Court has set forth the sequence of "analysis when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006). Before a court may apply the presumption, it must "first look to 'whether Congress has expressly prescribed the statute's proper reach,'" *id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)), or in the absence of such express language, this Court must determine the "temporal reach specifically intended" by applying "normal rules of construction." *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). If the statute is not express or the intended reach is not clear from the normal rules of construction this Court must "ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment." *Id.* (quoting *Landgraf*, 511 U.S. at 278). Only "[i]f the answer is yes," this Court must "then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question[.]" *Id.*

91. Under this analysis, the presumption does not apply. By its plain language and normal rules of statutory construction, the 2017 amendment applies to all chapter 11 cases where qualifying disbursements were made after January 1, 2018. *See MF Global*, 2020 WL 1970507,

35

at *11; *Mosaic*, 2020 WL 1808605, at *5; *Clayton Gen.*, 2020 Bankr. Lexis 842, at *13-14; *Exide*, 611 B.R. 26-27; *Circuit City*, 606 B.R. at 268. That application is prospective, not retroactive, because it applies only to disbursements made two months or more after the statute's enactment. *See Mosaic*, 2020 WL 1808605, at *5; *Exide*, 611 B.R. at 29-30; *Circuit City*, 606 B.R. at 268. Indeed, the Tenth Circuit already has held that application of a prior amendment to section 1930(a)(6) to pending cases was "not retroactive . . . because '[t]he amendment only triggers *prospective* assessment of fees from the amendment's effective date until entry of the final decree.'" *In re CF&I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998) (quoting *In re Richardson*, 210 B.R. 332, 334–35 (Bankr. W.D. Mo. 1997)) (emphasis in original).

    **A. The 2017 Amendment Says When and to What it Applies: It Applies to All Disbursements Made on or After January 1, 2018, Which Includes the Disbursements at Issue Here.**

    92. The 2017 amendment plainly says when it applies and to what it applies. Under the 2017 amendment's plain language, it applies to disbursements made on or after January 1, 2018.

    93. Section 1930(a)(6)(B) of title 28 expressly states that it applies "[d]uring each of fiscal years 2018 through 2022." 28 U.S.C. § 1930(a)(6)(B). In addition, the 2017 amendment expressly provides that the amendment "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment" of the amendment. Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified).

    94. The amendment was enacted on October 26, 2017. Thus, under the amendment's plain language, "disbursements" made on or after January 1, 2018 are subject to the 2017 amendment's temporary fee structure.

95. As explained by Judge Walrath, "[t]he language of [§ 1930(a)(6)(B)] indicates that the object of the amendment is not cases, but disbursements." *Exide*, 611 B.R. 26. *Accord Mosaic*, 2020 WL 1808605, at *5; *Clayton Gen.*, 2020 Bankr. Lexis 842, at *13-14. And "the temporal reach of the amendment is also expressly defined, not through case dates, but through fiscal years: 2018 through 2022." *Exide*, 611 B.R. 26.

96. The only reference in the statute to cases is in a portion not amended in 2017. Section 1930(a)(6)(A) provides that "a quarterly fee shall be paid . . . *in each case* . . . ." 28 U.S.C. § 1930(a)(6)(A) (emphasis added). This again indicates that the prescribed fees are due in all cases, regardless of filing date. *See Exide*, 611 B.R. 27. By providing that the fees apply "in each case," Congress structured the statute so that the listed fees would apply in all open cases, regardless of filing date, even when it amended the fee amounts.

97. Debtors effectively ask the Court to re-write the amendment to apply to quarterly fees payable in "any calendar quarter that begins on or after the date of enactment <u>other than in pending cases</u>." But those are not the words that Congress wrote.

98. To the contrary, "[t]he application of the increased fees is not a function of when a case was filed or a plan confirmed; rather, the application of the increased fees is a function of the amount and timing of a disbursement and the health of the UST fund." *Exide*, 611 B.R. at 26. *Accord MF Global*, 2020 WL 1970507, at *8-9; *Mosaic*, 2020 WL 1808605, at *5; *Clayton Gen.*, 2020 Bankr. Lexis 842, at *13-14.

99. Any attempt to rewrite the 2017 amendment to exclude pending cases would be contrary to congressional intent and undermine Congress's funding goals. The Judiciary Committee recommended passage of the amendment to replenish the Fund and to fund bankruptcy judgeships. *See* H.R. Rep. No. 115-130, at 8. The Committee expected the amendment to

accomplish this goal in part based on an estimate from the CBO, *id.* at 9, which read the amendment to increase the fees paid "by entities *that are already in bankruptcy*"—not just those that file for bankruptcy after the amendment's effective date. Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 5 (May 18, 2017) (emphasis added).[14]  It was based on this application to all open cases that the CBO concluded that the fee increase would fully offset the increases in direct spending.[15]  *Id.* at 9.  "[T]he only permissible inference is that Congress adopted the CBO's funding assumption without which the 2017 Amendment would not have worked." *MF Global*, 2020 WL 1970507, at *9.

100.    If Congress did not intend to apply the amendment to pending cases, it would have reconsidered whether the increased fees were sufficient to meet its purpose. *Cf. Murphy v. NCAA*, 138 S. Ct. 1461, 1484 (2018) (holding that severing provision of law would be contrary to legislative intent where CBO's estimate that the law would impose no cost on the federal government "would certainly be incorrect" if the statute were severed).

101.    And, Congress was not operating on a blank slate when it amended the statute in 2017.  In the thirty-plus years since Congress first imposed quarterly fees in 1986, Congress has *never* exempted previously filed cases from laws imposing or increasing quarterly fees.  When

---

[14]    *See also id.* at 1 (stating amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than $1 million per quarter") (emphasis added); *id.* ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases . . . .") (emphasis added).

[15]    The fact that the fee increase would apply to pending cases was essential to the CBO's analysis.  By statute, the CBO must determine whether the aggregate costs of "mandates" would be greater than certain statutory thresholds established in Unfunded Mandates Reform Act, 2 U.S.C. § 1501, *et seq*. *See also* 2 U.S.C. §§ 651-658g (governing CBO duties).  According to the CBO's analysis, however, it was only because the fee increase applied to pending cases that it constituted a "mandate" that required this determination. *See, e.g.*, *id.* at 6 ("Some portion of those [increased quarterly fee] collections would be from entities *already in bankruptcy* . . . and those are the entities that would face a mandate under the act.") (emphasis added).

Congress first enacted the quarterly fee statute in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986), the Eighth Circuit squarely rejected the argument, similar to the one the Debtors make here, that the fees did not apply to cases pending in pilot districts on its effective date. *See In re Prines*, 867 F.2d 478, 484 (8th Cir. 1989) (rejecting debtor's argument that the quarterly fee statute enacted in Pub. L. 99-554, 100 Stat. 3088 (1986), did not apply to pending cases on its effective date, notwithstanding the relevant provision's failure to "expressly state" the fees would be assessed in pending cases, as "that is [the] plain meaning").[16]

102.    The government's reading is also consistent with the January 26, 1996 amendment to section 1930(a)(6), which applied quarterly fees to all open chapter 11 cases, including those in which a plan had been confirmed, but did not expressly reference pending cases. The 1996 amendment's effective date provision, like the 2017 amendment, made no reference to case-filing date. *See* Balanced Budget Downpayment Act, Pub. L. 104-99, § 211, 110 Stat. 26 (1996) (amending section 101(a) of Public Law 104-91 to state that "the General Provisions for the Department of Justice included in title I" of House Conference Report 104-378 "are hereby enacted into law").[17]

---

[16]    The 1986 Act provided that in non-pilot districts the quarterly fees would not become effective until a specified period of time after the statute's general effective date. *See Prines*, 867 F.2d at 484; Pub. L. No. 99-554, § 302(d), 1986 U.S.C.C.A.N. 100 Stat. 3120-21. By contrast, for pilot districts, the Act contained no such provision for a delayed effective date. *In re Prines*, 867 F.2d at 483.

[17]    Section 101(a) of Public Law 104-91 referred to House Report 104-378, which contained the statutory change extending the quarterly fee obligation past the date of confirmation. *See* National Marine Fisheries Laboratories Act of 1996, P.L. 104-91, § 101(a), 110 Stat. 7 (Jan. 6, 1996) (incorporating by reference change to statute proposed by House Conference Report 104-378); H.R. Conf. Rep. No. 104-378, Title I, General Provisions—Department of Justice § 111, at 17 (1995) (providing language of amendment enacted into law by the Public Law 104-99).

103.     Because some courts initially did as Debtors ask and effectively rewrote the 1996

amendment to exclude cases pending on its enactment date,[18] Congress was obligated to clarify in

a subsequent amendment that the January 1996 amendment applied to all open cases.  *See* Omnibus

Consol. Appropriations Act of 1997, Pub. L. No. 104-208, § 109(d), 110 Stat. 3009, 3009-19 (Sept.

30, 1996) (amending section 101(a) of Public Law 104-91, as amended by section 211 of Public

Law 104-99, to clarify that quarterly fees payable under 28 U.S.C. § 1930(a)(6) "shall accrue and

be payable from and after January 27, 1996, in all cases (including, without limitation, any cases

pending as of that date), regardless of confirmation status of their plans").[19]  That Congress was

forced to issue a clarifying amendment because some courts refused to apply the statutory language

as written does not change the fact that Congress intended the 1996 amendment to apply to pending

cases in the first instance.[20]  *See NCNB Texas Nat. Bank v. Cowden*, 895 F.2d 1488, 1500 (5th Cir.

1990) (clarifying amendments to statutes simply "make what was intended all along even more

unmistakably clear").   Having established that it meant what it said in the original 1996

---

[18]     *See In re A.H. Robins Co., Inc.*, 219 B.R. 145, 147 (Bankr. E.D. Va. 1998) (discussing "staggering amount of litigation" generated by the 1996 amendment, including the many cases that, prior to the 1996 clarification, incorrectly held that the amendment "was applicable only to cases that did not have a confirmed plan prior to the amendment" and were later reversed on appeal (collecting cases)).

[19]     Notably, in the same statute as the clarifying amendment, Congress also increased the quarterly fees, again with no express reference to the fee change's application to pending cases. Omnibus Consol. Appropriations Act of 1997, Pub. L. No. 104-208, § 109(a), 110 Stat. 3009 (Sept. 30, 1996).  Yet again, that September 1996 fee increase applied to post-enactment disbursements with no exception for cases filed before its enactment date.  *See In re PJ Keating Co.*, 205 B.R. 663, 666 (Bankr. D. Mass. 1997) (reflecting application of amendment).

[20]     *See* Omnibus Consol. Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-19 (1996) (clarifying that quarterly fees payable under 28 U.S.C. § 1930(a)(6) "shall accrue and be payable from and after January 27 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans").

amendment, Congress had no reason to think bankruptcy courts would again refuse to apply another quarterly fee amendment to pending cases.

104.    Likewise, "[i]t is telling that Congress has increased the UST quarterly fees several times since 1996, without specifying that the increases apply to pending cases, and it has been uniformly accepted that the increased fees apply in all chapter 11 cases including those previously filed." *Mosaic*, 2020 WL 1808605, at *5; *see also Clayton General*, 2020 Bankr. Lexis 842, at *13-14.

### B.  Application to Pending Cases is Prospective, Not Retroactive

105.    Contrary to Debtors' claim, Congress's application of the 2017 amendment to post-enactment disbursements to determine the amount of post-enactment fees, is prospective, not retroactive. *See MF Global*, 2020 WL 1970507, at *13; *Mosaic*, 2020 WL 1808605, at *5; *Exide*, 611 B.R. at 29-30; *Circuit City*, 606 B.R. at 268.  For this reason, as well, the presumption against retroactivity does not apply.

106.    The Supreme Court's *Landgraf* decision undermines Debtors' contention that the amendment is retroactive as applied here.  A statute does not operate retroactively "merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269 (citation omitted).  Nor is a law retroactive simply because its application requires some reference to antecedent facts. *EPA v. New Orleans Pub. Serv., Inc.*, 826 F.2d 361, 365 (5th Cir. 1987) (holding that law altering classification of transformers for purposes of future matters is not retroactive).

107.    "To determine whether a statute's application in a particular situation is prospective or retroactive, we focus on the conduct which is implicated by the application of the statute. '[A] statute's application is usually deemed prospective when it implicates conduct occurring on or

after the [statute's] effective date.'" *FDIC v. Faulkner*, 991 F.2d 262, 266 (5th Cir. 1993) (quoting *McAndrews v. Fleet Bank of Massachusetts*, 989 F.2d 13, 16 (1st Cir.1993)).

108.    In the 2017 amendment, Congress identified the relevant conduct—disbursements in a chapter 11 case—and expressly provided that the statute applied *prospectively* to such conduct on or after January 1, 2018.  The 2017 amendment does not assess or increase quarterly fees on disbursements made before its enactment.  Because it is triggered only by conduct that occurs after its effective date, the 2017 amendment is prospective, not retroactive.  *See Martin*, 527 U.S. at 360-61 (finding "no retroactivity problem" in applying new attorney compensation rate to attorney's work done after statutory amendment in cases filed before the amendment).

109.    Debtors' liability for quarterly fees under the 2017 amendment arose only after they made disbursements months after the statute's effective date.   "That parties may have acted differently if they were able to look into the future and see that [Debtors] would be required to pay increased UST fees for transactions completed after confirmation does not make the increase retroactive." *Mosaic*, 2020 WL 180865 at *4.  It is no different from a new property tax. *See id.*; *MF Global*, 2020 WL 1970507, at *11; *Exide*, 611 B.R. at 29 (citing *CF & I Fabricators*, 150 F.3d at 1238); *Circuit City*, 606 B.R. at 268.  Although the property may have been purchased prior to enactment of the tax, a new tax on that property is "uncontroversially prospective." *See Landgraf*, 511 U.S. at 269 n.24.

110.    As the Tenth Circuit held in *CF&I Fabricators*, "the statute is not retroactive . . . because '[t]he amendment only triggers *prospective* assessment of fees from the amendment's effective date until entry of the final decree.'"  150 F.3d at 1237 (quoting *In re Richardson*, 210 B.R. 332, 334–35 (Bankr. W.D. Mo. 1997)) (emphasis in original); *see also id.* at 1235 (noting

42

1995 House Conference Report reflected the intent to apply the fee in "both pending and new cases"). Debtors fail to cite, much less distinguish, this Tenth Circuit decision.

111.    The vast weight of authority in reviewing similar quarterly fee challenges in the past has also rejected this argument.[21] These courts agreed with the United States that the quarterly fee provision, which required payment of quarterly fees based on disbursements issued after the amendment's effective date, acted prospectively only.

112.    The 2017 amendment does not backdate collection of increased fees from the date a case was filed or the date a plan was confirmed. The amendment only triggers prospective assessment of the increased fees based on disbursements made after the amendment's effective date. Therefore, it does not operate retroactively. *See MF Global*, 2020 WL 1970507, at *13; *Mosaic*, 2020 WL 180865 at *5; *Exide*, 611 B.R. at 29; *Circuit City*, 606 B.R. at 268.

## IV.    EVEN IF THE AMENDMENT'S APPLICATION TO THIS CASE WERE RETROACTIVE, IT WOULD BE CONSTITUTIONAL BECAUSE IT WOULD NOT VIOLATE THE DUE PROCESS CLAUSE

113.    Finally, Debtors argue that application of the 2017 amendment to their cases—filed before its enactment—would violate the Due Process Clause of the Constitution. Mot. ¶¶ 53-57. This argument also lacks merit.

---

[21]    *See also Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557 n.7 (in dictum); *Prines*, 867 F.2d at 485; *In re A.H. Robins Co., Inc.*, 219 B.R. 145, 148 (Bankr. E.D. Va. 1998); *Foulston v. Harness* (*In re Harness*), 218 B.R. 163, 165 (D. Kan. 1998); *In re Postconfirmation Fees*, 224 B.R. 793, 796 (E.D. Wash. 1998); *Vergos v. Uncle Bud's, Inc.*, No. 3-97-0296, 1998 WL 652542, at *8–9 (M.D. Tenn. Aug. 17, 1998); *In re Richardson Serv. Corp.*, 210 B.R. 332, 334–35 (Bankr. W.D. Mo. 1997); *In re Driggs*, 206 B.R. 787, 791 (Bankr. D. Md. 1997); *In re Munford, Inc.*, 216 B.R. 913, 916 (Bankr. N.D. Ga. 1997); *In re McLean Square Assocs., G.P.*, 201 B.R. 436, 440–41 (Bankr. E.D. Va. 1996); *In re Foxcroft Square Co.*, 198 B.R. 99, 105 (Bankr. E.D. Pa. 1996); *Matter of Upton Printing*, 197 B.R. 616, 619–20 (Bankr. E.D. La. 1996); *In re Cent. Fla. Elec., Inc.*, 197 B.R. 380, 381–82 (Bankr. M.D. Fla. 1996); *United States Trustee v. Prines* (*In re Prines*), 82 B.R. 110, 112 (D.S.D. 1987). Although some bankruptcy courts held applying the quarterly fee requirement to pending cases was retroactive, this was considered a minority opinion, *see In re Rhead*, 232 B.R. 175, 180 n.3 (Bankr. D. Ariz. 1999), and no appellate court so held.

43

114.     As the *Exide*, *Mosaic*, and *MF Global* courts have squarely held, the 2017 amendment easily satisfies the requirements of the Due Process Clause.  *See Exide*, 611 B.R. at 31; *Mosaic*, 2020 WL 1808605, at *5; *MF Global*, 2020 WL 1970507, at *14; *see also Clayton Gen.*, 2020 Bankr. Lexis 842, at *16.  The constitutional restraint upon enacting retroactive civil legislation is a "modest" one.  *Landgraf*, 511 U.S. at 272.

115.     "Under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 639 (1993).  As long as there is a legitimate legislative purpose furthered by rational means, economic legislation meets the test of due process.  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (rejecting due process challenge to retroactive statute requiring nearly $25 million payment by petitioners); *United States v. Carlton*, 512 U.S. 26 (1994) (upholding amendment to estate tax deduction that operated retroactively).

116.     Laws "adjusting the burdens and benefits of economic life" are presumed to be constitutional and the burden is on the party complaining of a due process violation to establish that Congress has acted in an arbitrary and irrational way.  *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976); *Concrete Pipe*, 508 U.S. at 637.

117.     Debtors have not satisfied that burden.  Congress's amendment to the quarterly-fee statute raises no due process concerns.  Congress's action here was far from arbitrary and irrational.  As explained above, the 2017 amendment was enacted to collect sufficient funds to fully offset Program appropriations and the costs of 18 bankruptcy judgeships so that taxpayers would not have to bear those costs of the bankruptcy system.  H.R. Rep. No. 115-130, at 8.  The Supreme Court long ago held that "[t]he rational basis" for bankruptcy fees "is readily apparent" because

Congress "sought to make the system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large." *United States v. Kras*, 409 U.S. 434, 488 (1973).

118. Further, temporarily imposing a higher quarterly fee on the largest chapter 11 debtors currently availing themselves of the bankruptcy system is a "rational means" of achieving that goal. *Carlton*, 512 U.S. at 31. Spreading the costs among all of the larger chapter 11 debtors using the bankruptcy system, instead of making comparatively fewer debtors shoulder the burden, allowed Congress's funding goal to be met more quickly. *See* May 2017 CBO Report at 5 (relying on application of the fee increase to pending cases for cost and revenue estimates). "It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." *Sperry*, 493 U.S. 52, 65 (1989). Because the 2017 amendment "approaches the problem of cost spreading rationally; whether a broader"—or narrower—"cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery*, 428 U.S. at 19.

119. Debtors rest their due process argument on the unproven assertions that they and other constituents lacked notice of the quarterly fee increase when they decided to file their bankruptcy cases—notwithstanding the fact that the amended fee schedule was in place while they negotiated and ultimately filed their plan—and that they did not have the opportunity to "make informed choices regarding the viability of a Chapter 11 filing versus other restructuring options outside of bankruptcy to avoid quarterly fees." Mot. ¶¶ 54-55. But Debtors have no constitutional right to insist that quarterly fees remain forever static or that Congress search them out and warn them before passing legislation. *See MF Global*, 2020 WL 1970507, at *14 ("The Due Process Clause does not require Congress to give personal notice to affected parties before enacting a

change in fees or taxes.")  While fair notice is one of the interests protected by the Due Process Clause in some contexts, *Landgraf*, 522 U.S. at 266, it does not alter the test for constitutionality: whether Congress had a legitimate legislative purpose furthered by rational means.  Thus, "[w]hile an increase in the quarterly fees may not have been anticipated . . . that is insufficient to find the statute a violation of due process."  *Exide*, 611 B.R. at 30.

120.    If "fair notice" were the sole test, retroactive legislation frequently would be overturned.  But the Supreme Court has routinely rejected due process challenges even where the statutory change or a new liability was not expected.  *See, e.g.*, *Carlton*, 512 U.S. at 33 ("Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his reliance alone is insufficient to establish a constitutional violation."); *Usery*, 428 U.S. at 16 ("[I]t may be that the liability imposed by the Act . . . was not anticipated at the time of actual employment.  But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."); *Concrete Pipe*, 508 U.S. at 637 (same); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (same).

121.    "This is true even though the effect of the legislation is to impose a new duty or liability based on past acts."  *Usery*, 428 U.S. at 16.  "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches."  *R.A. Gray & Co.*, 467 U.S. at 729.  As discussed above, Congress had a rational legislative purpose here.

122.    In any event, as the Tenth Circuit has held any "assumption" that quarterly fees would never change was "patently unreasonable."  *CF & I Fabricators*, 150 F.3d at 1239.  No

debtor has a reasonable expectation that fees won't increase. *See Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557 n.7 (noting quarterly fees do not violate the Takings Clause "because, due to the vagaries of the bankruptcy process, there can be no reasonable expectation that the amount of the final distribution will remain fixed throughout the process").

123. Such an assumption was particularly unreasonable here in any event because in February 2016—before Debtors ever filed for bankruptcy—the President already had published a budget proposing the very fee increase that Debtors claim was completely unexpected. *See* Analytical Perspectives, Budget of the U.S. Gov't Fiscal Year 2017, p. 217, https://www.govinfo.gov/content/pkg/BUDGET-2017-PER/pdf/BUDGET-2017-PER.pdf.[22] *Cf. R.A. Gray & Co.*, 467 U.S. at 732 (holding employers had ample notice of liability imposed by retroactive statute where legislative proposals debated by Congress included retroactive effective dates).

124. In addition, the statute was amended and became effective before the final plan of reorganization was filed and confirmed. Thus, even Debtors' own reading of the *Buffets* decision, on which they exclusively rely, is limited to "cases having a *confirmed* plan when the statute became effective on October 26, 2017, and the fees became effective in the first quarter of 2018." Mot. ¶ 50 (citing *Buffets*) (emphasis added). *Buffets* does not support Debtors' argument in this case. "Here the facts are different, and the concerns voiced by" the *Buffets* court "do not exist." *Clayton Gen.*, 2020 Bankr. Lexis 842, at *16. "While this case was *filed* before the statute was

---

[22] *See also, e.g.*, Statement of Clifford J. White III Before the Subcommittee on regulatory Reform, Commercial & Antitrust Law, Committee on the Judiciary, U.S. House of Representatives, at 15 (Sept. 29, 2016), https://judiciary.house.gov/wp-content/uploads/2016/09/EOUST-White-Testimony.pdf (noting the President's Budget for Fiscal Year 2017 contains a proposal to increase fees for the largest chapter 11 debtors, capped at one percent of disbursements or $250,000).

amended in 2017, the plan was filed after the 2017 amendments, and the plan was *confirmed* after the amended U.S. Trustee fees took effect." *Id.* (emphasis in original). So "[i]n actuality, the [Debtors] had the option to make other decisions." *Id.* At the very least, "it is not a violation of due process . . . for the increased U.S. Trustee fees to apply to a case where the plan was filed and confirmed after the statute was amended." *Id.*

125.    Even if the plan had been confirmed before the amendment's enactment, however, there would be no constitutional issue. *Buffets* was incorrect to conclude that plan confirmation prior to the 2017 amendment's enactment makes any difference. As the Tenth Circuit and other appellate courts have recognized, a reorganization plan can no more immunize a reorganized debtor from post-confirmation fee increases than it can from increased taxes or any of the other infinite number of potential increases to its post-confirmation costs of doing business. *See In re CF & I Fabricators*, 150 F.3d at 1238; *Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557; *In re A.H. Robins Co. Inc.*, 219 B.R. at 148; *In re Postconfirmation Fees*, 224 B.R. 793, 796 (E.D. Wash. 1998); *see also Holywell Corp. v. Smith*, 503 U.S. 47, 58 (1992).

126.    In sum, when Congress amended section 1930(a)(6) in 2017, it did so thoughtfully and carefully. Congress ensured that the temporary increase in fees would not be charged if the Fund balance reached a certain level. It set caps on fees. And it provided for the temporary increase to expire. This is a far cry from the sort of arbitrary or irrational action that could violate the Due Process Clause.

## V.    NO REFUND OR CREDIT IS PAYABLE UNTIL APPEALS HAVE BEEN EXHAUSTED

127.    If Debtors prevail after all levels of review on their claim that the 2017 amendment does not apply to this case or is unconstitutional, the government will refund fees to the extent they were overpaid. Congress authorized payments of refunds from (1) deposits to the System Fund

and (2) annual appropriations for the necessary expenses of the Program, in its most recent annual appropriation law.  Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. B, tit. II, 133 Stat. 2317, 2398 (2019).  The annual appropriation for 2020 was over $227 million, *id.*, and the Fund balance as of September 30, 2019 approached $135 million.  *See* Dept. of Justice, U.S. Trustee Program, Chapter 11 Quarterly Fees, https://www.justice.gov/ust/chapter-11-quarterly-fees.

128.    Under federal law, however, Debtors may not enforce a money judgment, nor may this Court order the United States to refund fees, before the government has had the opportunity to exhaust all avenues of review.  28 U.S.C. § 2414; Fed. R. Civ. P. 62.  It is a fundamental principle of sovereign immunity that a court has no jurisdiction over claims against the United States unless Congress by statute expressly and unequivocally waives the United States' immunity to suit.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983).  Moreover, when the United States does consent to be sued, "the terms of [the] waiver of sovereign immunity define the extent of the court's jurisdiction."  *United States v. Mottaz*, 476 U.S. 834, 841 (1986).  Debtors have not identified any waiver of sovereign immunity that would permit a monetary recovery from the United States.

129.    Section 106(a) waives sovereign immunity only as to specific Code provisions but even if this waiver applies here, the waiver is limited by section 106(a)(4), which provides that "[t]he enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such government unit . . . ."  11 U.S.C. § 106(a)(4).  The non-bankruptcy law that section 106(a)(4) applies makes clear that "the United States cannot be required to pay [a] money judgment against it until it has exhausted all appeals it decides to take."  *Dixon v. United States*, 900 F.3d 1257, 1268 (11th Cir. 2018).

130.    Congress has authorized the payment of judgments only after the Attorney General certifies no further review will be sought.  28 U.S.C. § 2414.  Finality under 28 U.S.C. § 2414 "protects the Government from prematurely paying a claim that might later be reversed on appeal." *Cedar Chem. Corp. v. United States*, 18 Cl. Ct. 25, 31-32 (1989).

131.    Independent of that, the Federal Rules of Bankruptcy Procedure entitle the government to stay a judgment requiring the payment of money pending appeal.  *See* Fed. R. Bankr. P. 7062 (incorporating Fed. R. Civ. P. 62).  Rule 62(e) entitles the United States to a mandatory stay while it appeals as a matter of right without posting a bond.  *Dixon*, 900 F.3d at 1268.  Like section 2414, Rule 62 "ensure[s] that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed."  *Dixon*, 900 F.3d at 1268.

132.    There is good reason for the critical protections to the public fisc provided in 28 U.S.C. § 2414 and Rule 62.  If courts were to compel the United States to refund quarterly fees in bankruptcy cases before it has exhausted its right to appellate review, in many cases, the government would be unlikely to recoup the funds once a judgment is overturned on appeal. Parties seeking refunds in the burgeoning number of post-confirmation cases could distribute or dissipate available assets during the appellate process, leaving the government without recourse, and could substantially impact the Fund's balance.

## **CONCLUSION**

For these reasons, the United States respectfully asks the Court to deny Debtors' Motion.

April 27, 2020

Respectfully submitted,

ILENE J. LASHINSKY
UNITED STATES TRUSTEE

/s/ *Jordan M. Sickman*

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
ANDREW W. BEYER
WENDY COX
MELANIE D. HENDRY
BETH A. LEVENE
SUMI K. SAKATA
Trial Attorneys

JORDAN M. SICKMAN
Assistant United States Trustee
Admitted in Michigan, P69823
Appearing under 28 U.S.C. § 515(a)
301 North Main Street, Suite 1150
Wichita, KS  67202
Telephone: (316) 269-6637
Facsimile: (316)-269-6182
Email: Jordan.sickman@usdoj.gov

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397