# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS AT KANSAS CITY

| | |
|---|---|
| In re | Chapter 11 |
| JOHN Q. HAMMONS FALL 2006, LLC, *et al.*, | Case No. 16-21142 (RDB) |
| Debtors. | *Jointly administered* |

## DEBTORS' REPLY IN SUPPORT OF MOTION TO DETERMINE EXTENT OF LIABILITY FOR QUARTERLY FEES PAYABLE TO THE UNITED STATES TRUSTEE PURSUANT TO 28 U.S.C. § 1930(a)(6)

The above-captioned debtors in these jointly administered bankruptcy cases (collectively, the "Debtors") hereby file this Reply in Support of their Motion to Determine Extent of Liability for Quarterly Fees Payable to the United States Trustee Pursuant to 28 U.S.C. § 1930(a)(6) ("Debtors' Motion"). In support of the Motion, the Debtors state as follows:

### PRELIMINARY STATEMENT

The United States Constitution mandates that laws "on the subject of bankruptcies" must be uniform across the country. Section 1930(a)(6) of chapter 28 of the United States Code ("Section 1930(a)(6)") requires payment of quarterly fees to the United States Trustee ("UST") by chapter 11 debtors and outlines the amounts required, yet does not contain any language relating to the fees chapter 11 debtors pay in the two states where the bankruptcy administration ("BA") is in place as opposed to the UST. When this situation first arose, the Ninth Circuit held that the statute was unconstitutional and struck down the provision that allowed the BA districts to continue with a separate, less costly system. In response, rather than addressing the constitutional issue outlined in this ruling, Congress enacted a companion statute which gave BA districts the authority to charge fees, and those districts charged fees in the same amount as UST districts for nearly twenty years. As a result, the law, while remaining unconstitutional, caused no injury. On

January 1, 2018, pursuant to the passage of the 2017 Amendment (defined *infra*) UST districts and BA districts charged chapter 11 debtors dramatically different quarterly fees. These dramatic differences remained in place until October 1, 2018, and this injury remained ongoing as to Debtors and others past October 1, 2018 because when BA districts imposed comparable fees, it did so only prospectively. The Debtors and other chapter 11 debtors in 48 states who commenced bankruptcy cases prior to October 1, 2018 have paid more than 833% higher fees than chapter 11 debtors in the North Carolina and Alabama. This non-uniform imposition of fees violates the United States Constitution and is therefore invalid.

The UST disputes almost none of the foregoing. Rather, it asks the court to take a "nothing to see here" approach and strains to make broad leaps and inferences, twisting precedent, facts, and plain language in the interest of avoiding and obscuring the nature of this non-uniform, clearly unconstitutional law. First, the UST suggests the Court dismiss both the reasoning of every other court that has examined Section 1930(a)(6) and the statements of drafters of the legislation and hold that the law outlining fee requirements for Chapter 11 debtors is not a "law on the subject of bankruptcies." Second, it tells the Court that Section 1930(a)(6) actually *did increase* fees in BA districts, even though Congress didn't have the authority to do so and those fees did not, in fact, increase until a separate body—the Judicial Conference—decided to change them in 2018. Third, the UST claims the statute is uniform because it treats debtors the same *in the 48 states where they are being treated differently*. Finally, the UST claims the statute should be interpreted to contain language that does not appear in the text because, while Congress did not see fit to include the language or anything in the legislative record supporting that language, an implied assumption in a budget calculation should be sufficient to insert this language and meaning into the unambiguous statute.

CORE/3506839.0003/159122629.5

The UST's arguments should be dismissed for what they are—creative attempts to avoid the unavoidable. Section 1930(a)(6) only raised quarterly fees dramatically for chapter 11 debtors in 48 states. It did not—and could not—require quarterly fees to be similarly increased in BA districts, and these fees were not increased. As a result, the statute violates the uniformity requirement for bankruptcy laws and is unconstitutional. The Debtors were damaged by this unconstitutional provision when they paid millions more in fees than they or any chapter 11 debtor would have paid in North Carolina and Alabama, and this damage is ongoing because those fees were implemented prospectively in those states. The Court must grant the Debtors' Motion because Section 1930(a)(6) violates the United States Constitution.

## **ARGUMENT**

## I. **Section 1930(a)(6) is a Law on the Subject of Bankruptcies Subject to the Uniformity Requirements of the Constitution**

1. This Court should follow the reasoning of every other court that has addressed this issue in concluding that Section 1930(a)(6) is a "law on the subject of bankruptcies" subject to the uniformity requirement of Article I, Section 8, clause 4 of the Constitution (the "Bankruptcy Clause"). The Supreme Court has long-ago established that the scope of this clause is broad, and Section 1930(a)(6) is subject to this requirement even within the narrow definitions of both the clause and this statute espoused by the UST. Both the previous iterations of the statute and the current version, which was amended by Congress in 2017 (the "2017 Amendment") fall squarely within the Bankruptcy Clause.

### A. **The Bankruptcy Clause Applies to Section 1930(a)(6)**

2. The UST argues that Section 1930(a)(6) is not subject to the uniformity requirements of the Constitution. Specifically, the UST argues that neither the Tax Clause found at Article I, Section 8, clause 1 nor the Bankruptcy Clause apply to this provision. The Bankruptcy

3

Clause mandates that Congress may enact only "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const., art. I § 8, cl. 4; *see, e.g.*, *Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 468, 472 (1982). The Tax Clause imposes a uniformity requirement as to duties, imposts, and excises. *Id.* art. I § 8, cl. 1

3. The UST claims that Section 1930(a)(6) is an exercise of Congress's powers under the Necessary and Proper Clause because it is not a "duty, impost, or excise" subject to the Tax Clause and is not a "law on the subject of Bankruptcies" subject to the Bankruptcy Clause. UST Opp'n ¶¶ 51-67. The UST's argument ignores the context, language, and substance of Section 1930(a)(6), instead relying on scattershot arguments and flawed logic. The UST first cites cases that establish the non-controversial proposition that Congress has broad powers to enact laws that are necessary and proper for the execution of its powers, which include authority over revenue and court practice and procedure. Next, the UST characterizes Section 1930(a)(6) as simply a "revenue measure" and/or a "matter of court procedure" in order to shoehorn it within those definitions as opposed to its clear status as a bankruptcy law. UST Opp'n ¶¶ 42, 50. Finally, the UST espouses an improperly narrow definition of both the Bankruptcy Clause and the statute in question in an attempt to obscure the fact that Section 1930(a)(6) clearly fits within the scope of the Bankruptcy Clause. The UST's positions are contrary to the holdings of every court that has considered the issues as well as the expressed intent and understanding of the legislators who enacted the 2017 Amendment law.

4. At the core of this attempt to avoid the Bankruptcy Clause is an incorrect and overly narrow definition of both the statute at issue and the scope of Congress's powers. As to the statute, the UST argues that "[b]ecause section 1930(a)(6) does not modify any rights or remedies as between a bankrupt debtor and its creditors, it is not a law 'on the subject of Bankruptcies' subject

4

to the uniformity provision of the Bankruptcy Clause." UST Opp'n ¶ 67. As to Congress, the UST claims that powers under the Bankruptcy Clause are limited to laws that "adjust the obligations of a failing debtor" and "alter the relationship between a failing debtor and its creditors." UST Opp'n ¶¶ 58, 59. Both positions are contradicted by an avalanche of authority stating otherwise, including in cases the UST relies on throughout its Opposition. Moreover, Section 1930(a)(6) justifies the application of the Bankruptcy Clause even within this improperly narrow scope.

5.      A narrow depiction of Congress's bankruptcy powers ignores the fact that "the scope of bankruptcy power conferred upon Congress . . . covers all intermediate legislation, affecting substance and form, but tending to further. . . distribution and discharge." *In re MF Global Holdings Ltd.*, 2020 WL 1970507, \*20 (U.S. Bankr. S.D.N.Y. Apr. 24, 2020). The court in *In re Clinton* held that the narrow definition the UST had advanced (which is similar to that argued here) was "wholly without merit," noting that *Gibbons*, which the UST had claimed limits the scope to "adjustment of a failing debtor's obligations", had also held that "[t]he subject of bankruptcies is incapable of final definition." *In re Clinton Nurseries, Inc.*, 608 B.R. 96, 111 (Bankr. D. Conn. 2019). Moreover, even the *Gibbons* case, which the UST relies on again in its arguments here, notes that Congress's power under the clause "extends to all cases where the law causes to be distributed, the property of the debtor among his creditors." *Gibbons,* 455 U.S. at 466 (citing *Hanover Nat'l. Bank v. Moyses*, 186 U.S. 181, 186 (1902)).

6.      *Gibbons* is not the only case the UST relies on that actually supports the application of the Bankruptcy Clause. The UST cites *United States Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552 (3d Cir. 1999), in its attempt to distinguish Section 1930(a)(6) as a "revenue law" that is supposedly "ancillary to the Bankruptcy Clause's core purpose." UST Opp'n ¶ 59. But the *Gryphon* court, analyzing Section 1930(a)(6), held that "[t]he trustee's award of fees . . . directly

5

relates to the debtor's liabilities – in fact it creates a liability – and could impact the handling and administration of the estate." *Gryphon*, 166 F.3d at 556.

7.     As noted in *MF Global*, "every bankruptcy court that has addressed the constitutionality of the 2017 Amendment under the Bankruptcy Clause expressly rejected the UST's narrow definition and concluded that the 2017 Amendment is 'on the subject of Bankruptcies.'" *MF Global*, 2020 WL 1970507, at *22. Section 1930 originated as a part of the current Bankruptcy Code when it was adopted in 1978 and entitled "An act to establish a uniform Law on the Subject of Bankruptcies." Pub. L No. 95-598, tit. II, § 246(a), 92 Stat. 2671. It "creates a claim that arises only in bankruptcy cases, in favor of the UST, an entity that exists solely to participate in bankruptcy cases" and "the amount of the fee due to the UST directly impacts distributions to other creditors." *In re Mosaic Mgmt. Grp., Inc.*, No. 16-20833-EPK, 2020 WL 1808605, at *6 (Bankr. S.D. Fla. Apr. 9, 2020).

8.     This universal conclusion is consistent with courts' conclusions on the prior iteration of the statute. In *St. Angelo v. Victoria Farms, Inc.*, the court rejected the UST's argument that the program and Section 1930(a)(6) were not subject to the Bankruptcy Clause, which the Court called the "Uniformity Clause." *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1530 (9th Cir. 1994), *as modified*, 46 F.3d 969 (9th Cir. 1995). The *Victoria Farms* court held that Section 1930(a)(6) "clearly governs the relationships between creditor and debtor and, accordingly, falls within the scope of the Uniformity Clause," noting that "[t]he U.S. Trustee program is not only intimately connected to the government's regulation of the *relationship* between creditor and debtor, it also has a concrete effect upon the *relief* available to creditors." *Id*. at 1530-31.

9.     The UST suggests the Court should disregard this widespread consensus and claims that these bankruptcy courts "neither mentioned the Necessary and Proper Clause nor considered

6

the distinction" that the UST is attempting to draw. UST Opp'n ¶ 63. This statement is incorrect. The Court in *MF Global* not only mentioned the Necessary and Proper Clause, it noted that "[t]he UST counters that the 2017 Amendment is not a law 'on the subject of Bankruptcies' and instead, was enacted under the Necessary and Proper Clause" before rejecting this argument entirely and concluding that the Bankruptcy Clause applies. *MF Global*, 2020 WL 1970507, at *20. The Court made clear in this holding that "[o]ur conclusion necessarily *rejects* the UST's contention that the 2017 Amendment was enacted by Congress pursuant to its powers under the Necessary and Proper Clause, not pursuant [sic] the Bankruptcy Clause." *Id.* at *22.[1]

10.    Similarly, the other courts have also considered—and rejected—the arguments the UST raises. In *In re Clinton*, the Court noted that the UST had argued that quarterly fees were "merely a funding mechanism for the efficient administration of bankruptcy matters" and rejected the argument. *In re Clinton*, 608 B.R. at 111. Moreover, in all of these decisions, the conclusion that the Bankruptcy Clause applies and the courts' uniformity analysis serves as a rejection of the theory that the Necessary and Proper Clause applies and the UST's arguments.

11.    The UST's reliance on *U.S. v. Pusey*, 27 F. Cas. 631 (E.D. Mich. 1872), is misplaced even notwithstanding the many holdings cited herein regarding the breadth of Congressional powers under the Bankruptcy Clause. The *Pusey* Court specifically noted that the scope of the Bankruptcy Clause was already recognized to be very broad and that it was not reaching any conclusion on that question:

> From what has been said and written by early commentators, and by high authority, in regard to the power of congress over bankruptcies as well as from the nature of the subject itself, there is some ground for assuming that it extends to the regulation of all the relations of debtor and creditor . . .to the end of placing all creditors of the same debtor, not expressly preferred, upon one broad basis of equality, and of

---

[1] *MF Global* was decided only three days before the UST's filing.  However, this timing should not excuse the UST's omission given that it was clearly well aware of the holding—*MF Global* is cited more than twenty times in the UST's Opposition in support of its arguments.

securing the honest appropriation of a debtor's property, not expressly exempted, to the payment of his debts . . . But in this case it is unnecessary to go to that extent, and I therefore leave the point undecided.

*Pusey*, 27 F. Cas at 634.

12.    A foundational claim in the UST's faulty argument is its claim that Section 1930(a)(6) is not subject to the Bankruptcy Clause because it "does not modify any rights or remedies as between a bankrupt debtor and its creditors." UST Opp'n ¶ 67. In addition to being an improperly narrow interpretation of the Bankruptcy Clause, this statement is also inaccurate. By granting the UST program "significant rights to the assets of a debtor's estate" and requiring debtors to pay UST fees before it pays creditors, Section 1930(a)(6) modifies these rights and remedies by "re-dividing the pie." *MF Global*, 2020 WL 1970507, at *6.

13.    The UST's position on Section 1930(a)(6) is further contradicted by Congress itself, both in the original enactment of the law and in the 2017 Amendment. As the Court noted in *MF Global*, Section 1930 came into being as part of the law establishing the current Bankruptcy Code. *MF Global*, 2020 WL 1970507, at *6. That law was entitled "An act to establish a *uniform Law* on the Subject of Bankruptcies." Pub L. No. 95-598, 92 Stat. 2549 (1978). In the time period between Section 1930's inception and the 2017 Amendment, the House of Representatives adopted a rule amendment requiring bills to include a document identifying "as specifically as practicable the power or powers granted to Congress in the Constitution to enact the bill." *MF Global*, 2020 WL 1970507, at *6. The bill that included the 2017 Amendment was accompanied by a statement pursuant to this rule identifying the Bankruptcy Clause as the source of Congress's power to enact the bill. *Id.* (citing Cong. Rec. Vol. 163, No. 74, at H3003 (May 1, 2017) at 3)). Throughout its Opposition, the UST asks the Court to infer Congress's intended meaning and draw the broadest of interpretations from its legislative language and statements. This sharply contrasts with the

UST's argument here, as it advocates for ignoring the statements of Congress entirely and asserts that Congress repeatedly misstated and misunderstood the nature of its own legislative authority.

B.    **Even if the Bankruptcy Clause Did Not Apply, Uniformity Would Still be Required Under the Constitution**

14.    Were the Bankruptcy Clause inapplicable, Section 1930(a)(6) would nevertheless be constitutionally required to be uniform in its application. The Tax Clause states "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The UST argues that the fees imposed under Sections 1930(a)(6) and (a)(7) do not qualify as "duties, imposts, and excises" because they are "user fees, payable only by debtors or others in ongoing chapter 11 cases, for the purpose of funding the bankruptcy system they are using." UST Opp'n ¶ 85.

15.    The precedent the UST cites on this point predates the version of Section 1930(a)(6) at issue in this matter. This distinction is notable because the 2017 Amendment to Section 1930(a)(6) represents a departure from previous iterations of the statute regarding quarterly fees. As a result of the 2017 Amendment, a portion of the fees collected go to the United States Treasury and have no direct relationship to the "funding of the bankruptcy system." *See Mosaic*, 2020 WL 1808605, at *6. These fees clearly do not qualify as "user fees" as a result. It is unclear how the UST reconciles this issue, as its Opposition states that "[q]uarterly fees under Section 1930(a)(6) . . . are deposited into the United States Trustee System Fund", which is accurate for the majority of these funds but not all of them. UST Opp'n ¶ 13. In a footnote, the UST suggests that this distinction is immaterial because it claims the fees have been used by the judicial system. UST Opp'n ¶ 12, n.5. However, the mere fact that the fees have been used to support the judicial system

9

should not convert a tax to a user fee when that use was discretionary, and could change without violating the statute.

16.     Notably, while the UST argues against interpreting these fees as a tax in order to avoid the application of the Tax Uniformity Clause, it analogizes the quarterly fees to taxes in order to advance other arguments. *See* UST Opp'n ¶ 109 (describing quarterly fee as "no different from a new property tax"). The fees paid pursuant to Section 1930(a)(6) constitute a tax, and if the Court were to somehow find that Section 1930(a)(6) is not a "law on the subject of bankruptcies," it should nevertheless impose a uniformity requirement under the Tax Uniformity Clause of the Constitution.

## II.     Section 1930(a)(6) is Non-Uniform and Unconstitutional

17.     Pursuant to the Bankruptcy Clause, Section 1930(a)(6) must be uniform. It is not. Both the plain language of Section 1930(a)(6) and the exercise of congressional authority it contains are non-uniform and unconstitutional. The statute fails to apply equally across the group of debtors and creditors it impacts, and represents the very type of "wildly divergent" state bankruptcy court scheme that the Bankruptcy Clause was intended to prevent.

18.     As outlined in Debtors' Motion, Section 1930(a)(6) is non-uniform and therefore unconstitutional because it fails to treat chapter 11 debtors uniformly—it creates a bankruptcy system in which debtors in one state are required to pay dramatically higher fees than debtors in another, impacting both debtor costs and debtor assets available for disbursement. The UST argues that despite these vast disparities, the law is still constitutional because it claims that (1) the language in Section 1930(a)(7) means the fees are, in fact, not different; (2) the fees can be different without violating uniformity requirements; and (3) the lack of uniformity is not a result of Section 1930(a)(6). UST Opp'n ¶ 43. The first argument fails because Section 1930(a)(7) does

10

should not convert a tax to a user fee when that use was discretionary, and could change without violating the statute.

16.     Notably, while the UST argues against interpreting these fees as a tax in order to avoid the application of the Tax Uniformity Clause, it analogizes the quarterly fees to taxes in order to advance other arguments. *See* UST Opp'n ¶ 109 (describing quarterly fee as "no different from a new property tax"). The fees paid pursuant to Section 1930(a)(6) constitute a tax, and if the Court were to somehow find that Section 1930(a)(6) is not a "law on the subject of bankruptcies," it should nevertheless impose a uniformity requirement under the Tax Uniformity Clause of the Constitution.

## II.     Section 1930(a)(6) is Non-Uniform and Unconstitutional

17.     Pursuant to the Bankruptcy Clause, Section 1930(a)(6) must be uniform. It is not. Both the plain language of Section 1930(a)(6) and the exercise of congressional authority it contains are non-uniform and unconstitutional. The statute fails to apply equally across the group of debtors and creditors it impacts, and represents the very type of "wildly divergent" state bankruptcy court scheme that the Bankruptcy Clause was intended to prevent.

18.     As outlined in Debtors' Motion, Section 1930(a)(6) is non-uniform and therefore unconstitutional because it fails to treat chapter 11 debtors uniformly—it creates a bankruptcy system in which debtors in one state are required to pay dramatically higher fees than debtors in another, impacting both debtor costs and debtor assets available for disbursement. The UST argues that despite these vast disparities, the law is still constitutional because it claims that (1) the language in Section 1930(a)(7) means the fees are, in fact, not different; (2) the fees can be different without violating uniformity requirements; and (3) the lack of uniformity is not a result of Section 1930(a)(6). UST Opp'n ¶ 43. The first argument fails because Section 1930(a)(7) does

10

not require uniform fees and it is undisputed that debtors in BA districts have been charged dramatically lower fees. The second argument fails because the types of permissible differences that the UST references are far different than the substantial cost differences at issue here. And the third argument is simply a rehashing of the first, which again fails because Section 1930(a)(6) was implemented exactly as written, and the suggested additional action the UST claims to be a failure in implementation was not required or contemplated by the statute.

19.     This non-uniformity has been clear for more than twenty-five years and has been recognized by multiple United States Circuit Courts of Appeals. The debtor in *Victoria Farms* asserted that it should not be liable for payments to the UST because 28 U.S.C. § 1930 was a non-uniform, unconstitutional law. The Ninth Circuit held that the "because creditors and debtors in states other than North Carolina and Alabama are governed by a different, more costly system for resolving bankruptcy disputes. . . it is clear that 28 U.S.C. § 1930, *as currently amended,* does not apply uniformly to a defined class of debtors. " *Victoria Farms,* 38 F.3d at 1531-32. The court struck down the statutory provision that allowed these two states to delay entry into the UST program. *Id.* at 1532.

20.     Rather than resolve this constitutional issue, either in the manner suggested by the Ninth Circuit or otherwise, Congress instead chose to assist the Judicial Conference in eliminating the injury caused by it, enacting a statute that allowed the BA districts to charge similar fees. This did not address the lack of uniformity but rather ensured that chapter 11 debtors were no longer harmed. The constitutional issue remained because the issue that the *Victoria Farms* court had identified was not different—chapter 11 debtors in different states were still "governed by a different . . .system for resolving bankruptcy disputes." *Victoria Farms,* 38 F.3d at 1532. That system had simply changed so that the *Victoria Farms* description of the UST system as "more

11

costly" was no longer accurate. This status reigned until January 1, 2018, when, pursuant to the directive in the amended Section 1930(a)(6), UST districts began to charge dramatically higher quarterly fees, and, in accordance with the Judicial Conference's discretion and the complete lack of any mandate found in the amended statute, BA districts did not.

21.     In a recent case rejecting an attempted appellate argument on procedural grounds, the Seventh Circuit noted that the constitutional issue had remained following *Victoria Farms*. In *In re Cranberry Growers Cooperative*, 930 F.3d 844 (7th Cir. 2019), a debtor attempted to raise the constitutional uniformity issue for the first time on appeal. The UST challenged the argument as untimely. *Id.* at 854. The Seventh Circuit noted that "[t]he disparity in the fees assessed by these separate systems [the UST and BA] came to the fore" in *Victoria Farms* and recounted the *Victoria Farms* holding that the provision continuing the BA districts guaranteed a "dissimilar, more costly bankruptcy system" for the rest of the country. *Id.* at 855. The court then explained that Congress had subsequently amended the statute "to allow the Judicial Conference to impose in non-trustee districts fees equal to those imposed in trustee districts," but that with the adoption of the 2017 Amendment, "the disparity re-emerged." *Id.*

22.     In defending its decision not to raise the issue at the bankruptcy court, the debtor noted that the Judicial Conference decision was issued after the fee issue was fully briefed. *Id.* at 856. But the Seventh Circuit was unconvinced because it held that the debtor and other litigants were already aware of the constitutional issue. The court outlined the issue thusly:

> *St. Angelo* made litigants—including [the debtor]—generally aware that constitutional problems would arise if bankruptcy fees were imposed in trustee, but not bankruptcy-administrator, districts. When Congress amended § 1930(a)(6) in late 2017, that problem arose. [The debtor] began paying nonuniform fees early in 2018 and began litigating the calculation of those fees in mid-2018. Nevertheless, despite the potential constitutional issue, [the debtor] kept silent. Indeed, even when the Judicial Conference did not cure fully the nonuniformity—and the

CORE/3506839.0003/159122629.5

constitutional problem became concrete—[the debtor] did not bring the issue before the Bankruptcy Court.

*Id.* at 857.

The *Cranberry Growers* court declined to consider the constitutional raised by the debtor. Its decision was based on its conclusion that the non-uniformity of this statute has existed since its origins and the resulting injury for Debtors and others "re-emerged" with the January 1, 2018 fee increases in UST districts.

23.     Similarly, in *Schultz v. U.S.*, 529 F.3d 343 (6th Cir. 2008), the plaintiffs challenged the uniformity of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which included a "means test" for debtors based on median income. *Schultz*, 529 F.3d at 347. Certain deductions within this test, such as housing expenses, have a geographical component. The *Schultz* court found that BAPCPA was constitutionally uniform because it applied uniformly to a defined class of debtors. *Id.* at 352. The court explained that "*[a]ll* Chapter 13 below-median-income debtors" have the same commitment period "and are subject to more favorable treatment in calculating their disposable income than all debtors above the median" and that "*all* above-median-income debtors are subject" to the same commitment period as one another "and have their income recalculated in accordance with" the standards outlined in BAPCPA. *Id.* The court concluded that "the general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.* (citing *Moyses*, 186 U.S. at 190).

24.     In the very next paragraph, however, the *Schultz* court explained that without this operational uniformity, it would have reached a different conclusion. "Had Congress described the 'means test' in explicit geographic terms, by enacting legislation exempting residents of certain states without justification, we would be faced with a significantly different case." *Id.* The court then recited the facts and holding from *Victoria Farms* to describe just such a case. The court noted

13

that two differences contrast BAPCPA from the statute at issue in *Victoria Farms* and prevent the matter before them from being "a significantly different case": (1) the fact that "all debtors whose income is above the media family income are treated alike, as are all debtors whose income falls below" and (2) that in *Victoria Farms* "there was no indication that Congress intended for the exemption to deal with a problem specific to North Carolina and Alabama," as opposed to BAPCPA, where the test in question was intended to address regionally isolated problems by factoring in differences in expenses. *Id.* at 353.

25.     The contrast the *Schultz* court drew between the constitutional uniformity of BAPCPA and the unconstitutionality identified in *Victoria Farms* is instructive here because the aspects of *Victoria Farms* the court described continue to be accurate as to Section 1930(a)(6). Unlike BAPCPA, Section 1930(a)(6) does not apply equally to *all* chapter 11 debtors, nor does it "take into account differences that exist between different parts of the country" in excluding chapter 11 debtors in North Carolina and Alabama from its requirements.

## A.     Section 1930(a)(6) is Unconstitutional on its Face

26.     The centerpiece of the UST's argument on uniformity is its claim that while Section 1930(a)(6) does impose dramatically different fees on debtors in 48 of 50 states, Section 1930(a)(7) resolves any uniformity issue and ensures uniformity in fees. It does not. The UST claims that Section 1930(a)(7) "mandates that quarterly fees in bankruptcy administrator districts 'be equal to those imposed by'" Section 1930(a)(6), and that "Congress thus established a regime in which the same quarterly fees are required in every federal judicial district." UST Opp'n ¶ 68.

27.     This argument twists the words of the statute, relies upon independent action of the Judicial Conference, and stands directly contradicted by reality. The UST claims that the 2017 amendment "increased fees equally in both Program districts and bankruptcy administrator

14

districts beginning on January 1, 2018." This is incorrect. First, nothing in the amendment relates to bankruptcy administrator districts or even purports to. Second, fees in bankruptcy administrator districts were not increased until October 1, 2018, when the Judicial Conference of the United States ("JCUS") authorized the increase to begin applying to BA districts. *See* Report of the Judicial Conference, at 11-12 (Sept. 2018), https://www.uscourts.gov/sites/default/files/2018-09_proceedings.pdf. The UST or other bankruptcy courts may believe that the BA districts *should* have acted sooner, but the fact is that they did not and nothing in Section 1930(a)(6) required them to act any differently. Moreover, the fact that the Judicial Conference provided the 2018 directive itself is evidence that the fees did not increase prior to that point in time.

28.     The UST's characterization of Section 1930(a)(7) as a "mandate" is also belied by the plain language of the statute. Section 1930(a)(7), which was not amended when Congress amended Section 1930(a)(6) in 2017, provides that "[i]n districts that are not part of a United States trustee region . . . the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection." 28 U.S.C. § 1930(a)(7). This "may require" language falls far short of the "mandate" that the UST describes. By its plain language, Section 1930(a)(7) *permits* the Judicial Conference to impose quarterly fees  but does not *require* it. Despite this clear language, the UST asserts that use of the term "may" is a mandate that requires the Judicial Conference to impose fees equal to those imposed by Section 1930(a)(6). This claim is contradicted by the language itself as well as its context.

29.     "Statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376, 133 S. Ct. 1886, 1893, 185 L. Ed. 2d 1003 (2013). Use of the word "may" in subsection (a)(7) plainly means that the Judicial Conference can, but is

CORE/3506839.0003/159122629.5

not required to, assess quarterly fees up to an amount equal to those charged in UST districts. The subsection lacks any mandatory words relating to the amount of fees that the Judicial Conference might decide to charge – "the statute does not say that the Judicial Conference 'shall' or 'must' require BA district debtors to pay uniform fees." *In re Life Partners Holdings, Inc*., 606 B.R. 277, 286 (Bankr. N.D. Tex. 2019). Therefore, "the plain language of § 1930 (a)(7) is permissive, not mandatory." *Cranberry Growers*, 930 F.3d at 856. This interpretation of the statute is consistent with the limitations of Congress's powers over BA districts, where quarterly fees are set by directive of the Judicial Conference rather than pursuant to Section 1930.

30.    Moreover, Congress's use of the word "shall" in Section 1930(a)(6) contrasts its use of the word "may" in subsection (a)(7), making clear that the Judicial Conference's ability to impose quarterly fees is permissive. *Id*. at 288; *Cf. Lopez v. Davis*, 531 U.S. 230, 241 (2001)("Congress' use of the permissive 'may' in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same section. Elsewhere in § 3621, Congress used 'shall' to impose discretionless obligations ...."); *Cisneros v. Corpus Christi Indep. Sch. Dist*., 560 F.2d 190, 191 (5th Cir. 1977)(noting that statutes under consideration used the permissive word "may" instead of the unconditional "shall"). Section 1930(a)(6) provides that "a quarterly fee *shall* be paid to the United States trustee," but subsection (a)(7) states that the Judicial Conference "*may* require the debtor…to pay fees equal to those imposed by paragraph (6)" (emphasis added). Furthermore, the word "shall" is used 6 times in 28 U.S.C. §§ 1930 (a)(1)-(6) and is used 3 times in subsection (a)(7). It simply is not rational to conclude that Congress repeatedly used the word "shall" throughout § 1930, but suddenly decided to use the word "may" in subsection (a)(7) to convey the same meaning as the word "shall," without providing anything in the legislative record suggesting that it intended to use these words interchangeably. "May" and "shall" are two different

16

words with different meanings. Congress's repeated use of the word "shall" throughout § 1930 shows that Congress intentionally placed the word "may" in subsection (a)(7). The Courts that hold otherwise are imposing an absurd interpretation onto the plain language utilized by Congress in an effort to avoid acknowledging the unconstitutionality of the statute.

31.     The UST cites to *In re Clinton* in support of its position. UST Opp'n ¶ 73. The *In re Clinton* court found that the only plausible construction of subsection (a)(7) is that the Judicial Conference may only impose fees in BA districts equal to those in Section 1930(a)(6). *In re Clinton*, 608 B.R. at 116. The court believed that any other reading would render the words "equal to" superfluous. *Id*. This interpretation flies in the face of the plain meaning of the word "may." In fact, it is the UST's interpretation that renders portions of (a)(7) superfluous. An interpretation that contravenes the plain meaning of the word "may" disregards Congress's choice of words and fails to give effect to the word "may." The UST can provide no reason why Congress chose to use "may" in subsection (a)(7) rather than "must" or "shall" because the only plausible reason is that (a)(7) is permissive.

32.     The constitutional history of 28 U.S.C. § 1930 further contravenes the UST's interpretation of subsection (a)(7). In *Victoria Farms*, the Ninth Circuit held that 28 U.S.C. § 1930 was invalid under the Uniformity Clause. *Victoria Farms*, 38 F.3d at 1535. In 2000, Congress amended 28 U.S.C. § 1930 to include subsection (a)(7), which "*authorized* the Judicial Conference to impose quarterly fees equal to those imposed in UST districts." *In re Exide Techs.*, 611 B.R. 21, 34 (Bankr. D. Del 2020) (emphasis added). Soon thereafter, in a 2001 directive, "the Judicial Conference mandated the imposition of quarterly fees in BA districts, 'in the amount specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time.'" *Id*. It was the actions of the Judicial Conference's choice to apply the same quarterly fees that, as the *In re Clinton* court

CORE/3506839.0003/159122629.5

called it, "avoid[ed]" the constitutional issue, not Section 1930(a)(7). If subsection (a)(7) held the meaning suggested by the UST, this could not be the case – the Judicial Conference's actions would not have been necessary.

33.     This conclusion is implicit in the decision of virtually every court to consider this issue. *See MF Global*, 2020 WL 1970507 at *15 (stating that "the Judicial Conference exercised its *authority* under 28 U.S.C. § 1930(a)(7)") (emphasis added); *see also In re Clayton Gen. Inc.*, No. 15-64266, 2020 Bankr. Lexis 842, *4-5 (Bankr. N.D. Ga. Mar. 30, 2020) (stating "In 2000, Congress *authorized* the Judicial Conference to impose quarterly fees equal to those imposed in U.S. Trustee districts") (emphasis added); *see also Exide*, 611 B.R. at 34. The legislative history of subsection (a)(7) further supports this interpretation. In 1999, U.S. District Judge Harvey F. Schlesinger, a representative of the Judicial Conference, appeared as a witness before the Subcommittee on Courts and Intellectual Property of the United States House of Representatives Committee on the Judiciary. Judge Schlesinger explained that "the proposed language *authorizes* the Judicial Conference to implement fees in the bankruptcy administrator program in the judicial districts in the state of Alabama and North Carolina *similar to those* currently imposed by 28 U.S.C. § 1930(a)(6)."[2] It is clear from this testimony that even the Judicial Conference representative advocating for its passage did not adopt the interpretation that the UST now urges this Court to accept.

34.     In *Exide* the court summarized Section 1930(a)(7) as requiring that "Congress provided that if the Judicial Conference did implement any fees for the BA system, then those fees had to be equal to the fees in UST districts." *Exide*, 611 B.R. at 38. But this statement

---

[2] Multidistrict, Multiparty, Multiform Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing on H.R. 2112 and H.R. 1752 Before the Subcommittee on Courts and Intellectual Property of the H. Comm. on the Judiciary, 106 Cong. 26-27 (June 16, 1999) (statement of Judge Harvey F. Schlesinger) (emphasis added).

18

mischaracterizes the language of Section 1930(a)(7), which simply does not contain language stating any such directive. Moreover, implicit in the *Exide* court's statement that Section 1930(a)(7) outlines responsibilities of the Judicial Conference *if* it implements fees is the understanding that the Judicial Conference may not implement any fees at all. As each of these courts have implicitly recognized and as indicated by the legislative history, subsection (a)(7) does not require the Judicial Conference to do *anything*. It is merely a grant of discretion to the Judicial Conference to impose quarterly fees up to those assessed in UST districts.

35.    As demonstrated by this background, there is only one interpretation that gives meaning to all of the words in Section 1930(a)(7) without rendering any words superfluous. If, as suggested by the 2001 Judicial Conference, the intent of Section 1930(a)(7) was to grant BA districts the *authority* to impose quarterly fees and to provide the limit of this grant of authority (*i.e.* fees equal to those outlined in Section 1930(a)(6)), all of the words in the statute, including "may", are given their plain meaning. As such, this is the only logical and legally sound interpretation.

36.    Because the Judicial Conference lacks the authority to impose quarterly fees without subsection (a)(7), the words "equal to" are not superfluous because they serve as a limitation on the powers granted to the Judicial Conference. The BA districts are not bound by the laws enacted by Congress, which is exactly the issue identified by the court in *Victoria Farms*. *Victoria Farms*, 38 F.3d at 1533. Similarly, the *Exide* court noted that Congress had "acknowledged that it could not impose fees for the BA system, which is part of the judicial branch." *Exide*, 611 B.R. at 37-38. Thus, Section 1930(a)(7) can only be seen as a grant of authority, consistent with the "may" language employed, and the interpretation encouraged by the UST and the *In re Clinton* court is invalid.

19

37.     Serving as further evidence of the meaning of Section 1930(a)(7) is the fact that the Judicial Conference did not require uniform fees for cases filed before October 1, 2018. *Life Partners*, 606 B.R. at 286. The Judicial Conference's construction is "entitled to great deference" and "should be given effect unless plainly unreasonable or in conflict with the plain intent of the legislature." *Mesa Farm Co. v. United States*, 475 F.2d 1004, 1008 (9th Cir. 1973). Here, the Judicial Conference's interpretation of subsection (a)(7) certainly cannot be deemed plainly unreasonable or in conflict with the plain intent of the subsection because it aligns with Section 1930(a)(7)'s ordinary meaning.

38.     The UST effectively asks the Court to rewrite subsection (a)(7) in direct contravention of its plain language. Its interpretation requires the Court to graft the words "that must be" before the words "equal to" into subsection (a)(7). When interpreting a statute, a court must not "read words into the text or treat any words as surplusage." *Nielen-Thomas v. Concorde Inc. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019); *accord United States v. Pocklington*, 792 F.3d 1036, 1041 (9th Cir. 2015)(it is "a cardinal sin of statutory interpretation…to read words into a statute that are not there"). Yet, that is exactly what the UST asks the Court to do. Commanding the Judicial Conference to set quarterly fees in a specific way under subsection (a)(7) is a reading that simply cannot be squared with the subsection's plain meaning.

39.     "Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). The UST's interpretation would certainly yield an absurd result—it would require this court to find that fees did increase in North Carolina and Alabama on January 1, 2018, which is not factually accurate, as no chapter 11 debtors in BA districts paid any increased fees until October 2018. Moreover, even if, as the UST argues,

CORE/3506839.0003/159122629.5

subsection (a)(7) creates a mandatory directive for the Judicial Conference to impose fees equal to those imposed in UST districts, such a result would certainly be absurd, as it requires us to read "may" to mean "shall," in contravention of its established definition. A logical interpretation, consistent with the legislative purpose, is obvious, and is the conclusion that subsection (a)(7) permits the Judicial Conference to assess quarterly fees up to those assessed in UST districts.

40.     The only interpretation which gives effect to every word and which respects Congress' choice of words is that "may" modifies all of the words in the sentence that follow it. Because of this, the Judicial Conference "may" decide to charge quarterly fees that are no higher than those specified in (a)(6). "Equal to" in the subsection serves as a qualifier, establishing a ceiling for the fees that the Judicial Conference can impose. The interpretation advanced by the UST requires the court to interpret "may" to mean "shall" and grafts additional language onto subsection (a)(7) in contravention of established canons of statutory construction.

B.     **Section 1930(a)(6) is Non-Uniform Regardless of Courts' Interpretation of Section 1930(a)(7) or Section 1930(a)(6)'s Plain Language**

41.     The key holding of the *Exide* court underscores the unconstitutionality of the statute because it makes clear that Sections 1930(a)(6) and 1930(a)(7) do not require bankruptcy administrator districts to charge *any* quarterly fees, let alone equal fees. In citing to *Exide* as "the leading opinion on this point", the UST tellingly omits a key portion of the holding, claiming that the *Exide* court explained that Congress had "provided in Section 1930(a)(7) that fees imposed for the bankruptcy administrator districts 'had to be equal to the fees in UST districts.'" UST Opp'n ¶ 69. As cited *supra*, the first part of this sentence in *Exide* identified this requirement as applying "*if* the Judicial Conference did implement any fees for the BA system." *Exide*, 611 B.R. at 38 (emphasis added). Thus, the *Exide* opinion implicitly concedes that the BA system could have continued with no quarterly fees (a system which the *Victoria Farms* court had found to be

unconstitutional and other courts would have as well) without being in violation of the statute. Similarly, the UST cites footnote 20 in the *MF Global* opinion five times on this point. But in making this determination the *MF Global* court noted that in imposing fees "the Judicial Conference exercised its *discretion* under section 1930(a)(7)" and "*rendered*" the subsections "uniform in their effect." *MF Global*, 2020 WL 1970507, at \*23, n.20 (emphasis added). *In re Clinton*, the third case cited by UST, contains similar language in concluding that in Section 1930(a)(7), "Congress granted the Judicial Conference permission to require quarterly fees." *In re Clinton*, 608 B.R. at 116. As the Seventh Circuit implicitly notes in *Cranberry Growers*, it is only the action of the Judicial Conference that can "cure fully the nonuniformity", not Section 1930(a)(6), Section 1930(a)(7), nor any other statute or act of Congress. *See Cranberry Growers*, 930 F.3d at 857 (Declining to hear constitutionality issue on appeal based on conclusion that debtor did not raise issue "when the Judicial Conference did not cure fully the nonuniformity—and the constitutional problem became concrete" through the Judicial Conference's 2018 directive imposing fees only as of October and only prospectively).

42.    The bankruptcy court cases relied on by the UST argue that the language in the 2001 Judicial Conference adopting a fee structure similar to the then-existing fee structure of Section 1930(a)(6) should have operated to increase quarterly fees in BA districts when the fee increases went into effect in UST districts. The UST claims that the non-uniformity resulting from the fact that the Judicial Conference did not increase fees, and when it did, it did so only prospectively, is "attributable not to the laws enacted by Congress, but by the differential implementation of those laws." UST Opp'n ¶ 75. This argument fails on multiple levels. First, neither Section 1930(a)(6) or 1930(a)(7) required the Judicial Conference to take any action. The UST, in discussing the Judicial Conference's decision to delay implementation until October 1,

CORE/3506839.0003/159122629.5

2018, and limit its application to newly filed cases, claims that "[n]othing in the 2017 amendment authorized the Judicial Conference to take that action." UST Opp'n. ¶ 74. This statement misses the point entirely. The issue with the 2017 Amendment, indeed the entire constitutional issue that has given rise to this untenable statute, is that there is nothing in the 2017 Amendment that *requires* the Judicial Conference to take this, or any other action. *See, e.g.*, *Exide,* 611 B.R. at 37-38 ("Congress, in implementing fees for UST districts, acknowledged that it could not impose fees for the BA system, which is part of the judicial branch"); *MF Global*, 2020 WL 1970507 at *23, n.20 (referencing "the Judicial Conference exercise[ing] its discretion" under the relevant statutes). Put simply, there was nothing in Section 1930(a)(6) for the Judicial Conference to implement.

43.    The other issue with framing the lack of uniformity as an implementation problem is the nature of what the UST and the cases it cites are claiming should have been implemented. In discussing implementation, the UST and the *Exide* court both rely on 2001 Judicial Conference language. The Judicial Conference's directive from 2001 stated that Congress had passed a statute "that authorizes the Conference to impose quarterly fees in chapter 11 cases in bankruptcy administrator districts comparable to those already being charged in United States trustee districts" and that "[t]o implement this statute, the Conference approved a Bankruptcy Committee recommendation that such fees be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." Report of the Proceedings of the Judicial Conference of the United States (Sept./Oct. 2001), http://www.uscourts.gov/sites/default/files/2001-09_0.pdf at 46. The UST argues that the Judicial Conference erred in (1) not implementing changes in fees in BA districts at the same time as Section 1930(a)(6) operated to increase fees in UST districts; and (2) making implementation retroactive when it did implement changes in October 2018. UST Opp'n ¶¶ 72, 84.

CORE/3506839.0003/159122629.5

44.     That the implementation argument is based in a 2001 Judicial Conference directive as opposed to the statute itself serves only to further emphasize the unconstitutionality of Section 1930(a)(6). In citing to the 2001 directive, the UST effectively concedes that, as the *Exide* court noted, Congress could not direct the BA districts to charge the dramatically higher fees it was imposing on debtors in the rest of the country, and that it was instead relying on what the *MF Global* court calls the Judicial Conference "exercis[ing] its discretion." *MF Global*, 2020 WL 1970507 at *23, n.20. The UST and these courts' interpretation of the 2001 directive is also faulty. As the more complete citation to and timing of the 2001 Judicial Conference shows, the 2001 directive was limited to the then-existing Section 1930 and the fee structure it contained. The UST argues otherwise, but this argument is negated by the actual implementation in which the Judicial Conference engaged. The Judicial Conference, which has authority over BA district fees, implemented those fees in October 2018 and implemented them prospectively. This action in itself shows both that the Judicial Conference had not previously had any directive requiring these fees to match UST district fees and that the Judicial Conference had the discretion not to implement fees retrospectively.

45.     Moreover, to the extent the UST argues that "differential implementation of . . . laws [enacted by Congress]" excuses non-uniformity, this position misconstrues its position and those of the cases it cites. UST Opp'n ¶ 75. The UST, Section 1930(a)(7) and courts like *Exide* concede that it is the action of the Judicial Conference that provides for the BA districts' imposition of fees. The Judicial Conference directives are actions of the courts' policy-making body, and, in the case of the BA districts, constitute that body acting within powers delegated to it by Congress. They are, by definition, thus not "laws enacted by Congress". Each of the cases cited by the UST for the position that non-uniform implementation of a statute cannot render that statute

24

unconstitutional involved not only implementation of a *statute*, they involved implementation of the specific statute at issue as opposed to a related Judicial Conference directive. *See Rosenberg v. United States*, 72 Fed. Cl. 387, 395 (2006)(plaintiff's complaint that 26 U.S.C § 4251 was non-uniform due to the IRS's ultra vires and non-uniform collection of taxes failed because the statute itself was uniform); *see also Peony Park v. O'Malley*, 121 F. Supp. 690 (D. Neb. 1954) (rejecting plaintiff's argument that cabaret tax was non-uniform as a result of IRS Commissioner's enforcing the tax only in the state of Nebraska because tax was uniform as written).

46.     The facts of *Rosenberg* and *Peony Park* illustrate a key distinction from the facts of this case and a fatal flaw in the UST's non-uniform implementation argument. In both cases, the government's action in implementing the statute via tax collection was itself unlawful—*Rosenberg* involved *ultra vires* tax collection and *Peony Park* unlawful selective enforcement. *Rosenberg*, 72 Fed. Cl. at 395; *Peony Park*, 121 F. Supp. at 695. No court has made any such finding here. Indeed, such a finding would require a bankruptcy court to invalidate the directives and actions of the very body that provides it with policy directives.

47.     Finally, the UST argues that interpreting Section 1930(a)(6) as non-uniform would be "particularly anomalous" because it claims that section 1930(a)(7) was implemented to cure the lack of uniformity identified by the Ninth Circuit in the *Victoria Farms* case. UST Opp'n ¶ 76. The UST claims it would "subvert congressional intent" to read the provision as allowing non-uniformity because the provision was adopted with uniformity as a goal. UST Opp'n ¶ 77. This argument mischaracterizes the nature of the adoption of Section 1930(a)(7) and incorrectly presumes that Congress's intent in addressing an unconstitutional law determines whether the law remains unconstitutional.

CORE/3506839.0003/159122629.5

48. The UST cites *In re Clinton* for the concept that this section was enacted to "avoid the constitutional issue identified in *Victoria Farms*". UST Opp'n ¶ 77. But that court's use of "avoid" is an apt description of that issue. *In re Clinton*, 608 B.R. at 116. As noted in the 2001 Judicial Conference Directive, the purpose of the section was to "authorize" BA districts to impose these fees, not to order them to do so. Report of the Proceedings of the Judicial Conference of the United States (Sept./Oct. 2001), http://www.uscourts.gov/sites/default/files/2001-09_0.pdf, at 45-46. The fact that Congress did not have the power to order them to do so is the true constitutional issue identified in *Victoria Farms*. *Victoria Farms*, 38 F.3d at 1533. The *Victoria Farms* court made it clear in its holding that the constitutional issue it identified was not the disparity in fees, but the portion of the law that permitted Alabama and North Carolina to delay entrance into the U.S. Trustee program. *Id.* The Court struck down the provision that permitted this, holding that it was this statute that "guarantees that creditors and debtors in the 48 other states are governed by an[sic] dissimilar, more costly bankruptcy system than members of the same groups in Alabama and North Carolina." *Id.*

49. Rather than implement the holding of *Victoria Farms*, Congress and the Judicial Conference chose instead to enact Section 1930(a)(7), which gave the Judicial Conference discretion to make debtors in Alabama and North Carolina subject to a bankruptcy system that was not dissimilar nor less costly. But this statute only served to "avoid" the constitutional issue rather than resolve it, limiting the harm caused by the statute (and eliminating standing for a challenge) unless and until the system was again "dissimilar" and "more costly" for debtors in the other 48 states than for members of the same groups in Alabama and North Carolina. When the Judicial Conference delayed implementation of these substantial fee changes in these states, an unconstitutional, dissimilar bankruptcy system existed for all these debtors, and because it

26

implemented them only prospectively, the system still exists for chapter 11 debtors who filed prior to that date.

50.    In explaining the background of Section 1930(a)(7), the UST's citation of testimony regarding the purpose of Section 1930(a)(7) is telling in its misleading depiction of the issue and helps to demonstrate that the section did not resolve the constitutionality issue identified in *Victoria Farms*. The UST claims that in testimony supporting the enactment of this statute, "Judge Schlesinger explained that 'the Judicial Conference determined that implementing the establishment of chapter 11 quarterly fees would eliminate' any uniformity problem." UST Opp'n ¶ 19 (citing Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing Before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary on H.R. 2112 and H.R. 1752, 106 Cong. 26-27 (statement of Harvey F. Schlesinger, Judge, U.S. District Court for the Middle District of Florida), https://babel.hathitrust.org/cgi/pt?id=pur1.32754071547271& ("Judge Schlesinger Testimony"). But the UST's convenient paraphrasing at the close of that sentence serves to misstate Judge Schlesinger's testimony. Judge Schlesinger did not, in fact, testify that implementing fees in the BA districts would "eliminate any uniformity problem." Instead, he testified that implementing the fees would "eliminate any *Victoria Farms* problem." Judge Schlesinger Testimony at 26-27. Judge Schlesinger made no reference to uniformity, and as even the UST acknowledges, the *Victoria Farms* court did not view amendment to Section 1930 as a means to resolve the uniformity issue. UST Opp'n ¶ 77 (noting that the Judicial Conference did not adopt "the remedy preferred by the Ninth Circuit").

51.    This argument also suggests that we must read any statute that Congress enacts in response to a court's identification of a constitutionality issue as resolving that issue and rendering

CORE/3506839.0003/159122629.5

the statute in question constitutional. But the Supreme Court's treatment of constitutional issues in bankruptcy and related actions of Congress unequivocally demonstrates the fallacy of this reasoning. As the Court outlined in *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Bankruptcy Reform Act, which was passed in 1978, created the current system of United States Bankruptcy Courts for each district and provided that these courts "shall exercise all of the jurisdiction conferred by this section on the district courts." *Northern Pipeline*, 458 U.S. at 53 (quoting 28 U.S.C. § 151(a) (Supp. IV 1981); 28 U.S.C. § 1471 (Supp. IV 1981). "Congress knew that this provision raised serious constitutional concerns because it permitted an Article I tribunal to exercise the same jurisdiction bestowed upon an Article III court, but the risk of invalidation was deemed worth achieving the goal of setting up a faster and cheaper method to accomplish reorganization." *In re Marshall*, 600 F.3d 1037 (9ᵗʰ Cir. 2010) (citing U.S.Code Cong. & Admin.News 1978, p. 5963, which the court identified as "acknowledging 'serious constitutional doubts' raised by the full grant of jurisdiction under the proposed bankruptcy system to non-Article III judges").

52.    The 1978 Act thus prompted the question of whether this grant of authority was improper as to matters outside of bankruptcy given that unlike district courts, bankruptcy courts were not Article III courts pursuant to the Constitution. The Supreme Court soon answered this question in *Northern Pipeline*, which involved the constitutionality of a bankruptcy court's jurisdiction over a debtor's state-law breach of contract claim against a third party. *Northern Pipeline* is a plurality opinion but the shared opinion of six justices was that the bankruptcy judges could not be constitutionally vested with jurisdiction to decide the contract claim. *Northern Pipeline*, 458 U.S. at 88 n. 40 (Brennan, J., plurality) (joined by Justices Marshall, Blackmun, and Stevens) (citations omitted); *see also id.* at 91–92 (Rehnquist, J., concurring) (joined by Justice

CORE/3506839.0003/159122629.5

O'Connor). The Court's holding concluded that "it is for Congress to determine the proper manner of restructuring the Bankruptcy Act of 1978 to conform to the requirements of Art. III in the way that will best effectuate the legislative purpose." *Id.*

53.     In response to *Northern Pipeline*, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"). Rather than provide bankruptcy judges with Article III authority, the 1984 Act instead changed the language of Section 151 outlined *supra* and defined bankruptcy judges' authority in a new Section 157(b) which stated that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11", then went on to define "core proceedings" and give examples. 28 U.S.C. § 157(b).

54.     The Supreme Court revisited *Northern Pipeline* in 2011 in *Stern v. Marshall*, 564 U.S. 462 (2011). *Stern* involved a case in which a party had filed a bankruptcy proof of claim asserting a defamation claim, and the debtor had responded with a counterclaim. *Id.* at 470. The bankruptcy court concluded that the counterclaim was a "core proceeding" under Section 157(b)(2)(C), which includes in the definition of "core proceedings" "counterclaims by the estate against persons filing claims against the estate." *Id.* at 471; 28 U.S.C. § 157(b)(2)(C). The Supreme Court held that the bankruptcy judge had authority to resolve the claim under that section of the statute, but did not have this authority under the Constitution. *Id.* at 482. The court noted that it had already taken up this issue in *Northern Pipeline* and that Congress had revised the applicable statutes following that decision. *Id.* at 485-486. However, it noted that with respect to the matters identified as "core", "the bankruptcy courts under the 1984 Act exercise the same powers they wielded under the Bankruptcy Act of 1978." *Id.* In doing so, it necessarily concluded that in failing to implement the direction it encouraged in *Northern Pipeline* of reconciling bankruptcy judges'

29

authority with Article III's requirements for judicial power, Congress had failed to resolve the constitutional issue the court had identified more than twenty-five years earlier.

55. The *Northern Pipeline* and *Stern* cases demonstrate that Congress is not always successful when it attempts to or purports to resolve a constitutional issue in the bankruptcy laws, and that these constitutional issues can lurk beneath the surface until circumstances change or courts otherwise have occasion to reexamine the issue. They also demonstrate the folly in the UST's argument that this court should rewrite and impose broad interpretations on Section 1930(a)(6) or Section 1930(a)(7) simply because Congress wanted the *Victoria Farms* issue to go away. In the 1984 Act, Congress intended to address the constitutional issues outlined in *Northern Pipeline*. However, it did not accomplish this goal. "In *Stern*, the Supreme Court made clear that the 1984 Act 'failed to remedy all the constitutional infirmities identified in *Northern Pipeline*.'" *In re Extended Stay, Inc.*, 466 B.R. 188, 199 (S.D.N.Y. 2011). Section 1930(a)(7) similarly failed to remedy the core constitutional infirmity outlined by *Victoria Farms*. When Congress raised quarterly fees by 833% in 48 states and BA districts in the other two states did not follow suit, the existing constitutional issue "re-emerged" from the depths where Congress had attempted to bury it with Section 1930(a)(7). This court should follow the example of *Stern* and adopt the still-sound reasoning of *Victoria Farms* in holding the statute unconstitutional.

56. The UST's Opposition, the "leading opinion" case, and the other cases they cite do not describe a statute that is uniform, on its face or otherwise. Rather, they depict a statutory scheme where the constitutionality of a statute as amended by Congress is dependent on whether and how the Judicial Conference decides to take action. There is nothing in Section 1930(a)(6) *or* Section 1930(a)(7) that requires the Judicial Conference to charge equal fees to chapter 11 debtors nor mandates that they charge equal fees, or indeed any fees at all, in the two states where they

dictate the amounts debtors pay to avail themselves of the bankruptcy laws. As a result, Section 1930(a)(6) is not uniform, and is unconstitutional because it violates the requirements of the Bankruptcy Clause.

### C. Section 1930(a)(6) Does Not Fit Within Any Exceptions to the Uniformity Requirement

57.     Courts have in limited circumstances permitted Congress to enact statutes that might otherwise violate the uniformity clause if the statutes "take into account differences that exist between different parts of the country" where Congress is acting "to fashion legislation to resolve geographically isolated problems." UST Opp'n ¶ 78 (citing *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 159 (1974)). The uniformity requirements of the Bankruptcy Clause require laws to "apply uniformly to a defined class of debtors" and to be "geographically uniform". *Exide*, 611 B.R. at 36 (citing *Gibbons*, 455 U.S. at 473; *Moyses*, 186 U.S. at 188). Relying heavily on *Exide*, the UST argues that Section 1930(a)(6) meets these uniformity requirements because it applies with the "same force and effect in every place where the subject of it is found." UST Opp'n ¶ 81. The UST also claims that the 2017 amendment to Section 1930(a)(6) addresses the problem of the UST fund depletion, which necessarily is only present in UST districts.

58.     The UST's arguments and the *Exide* opinion ignore the glaring lack of uniformity when substantial difference exist between BA districts and UST districts that was first identified in *Victoria Farms*. The *Exide* court notes that one requirement for uniformity, even when Congress "fashion[s] legislation to resolve geographically isolated problems," is that "a law must at least apply uniformly to a defined class of debtors." *Exide*, 611 B.R. at 36 (citing *Gibbons*, 455 U.S. at 473). However, the *Exide* court devoted only two sentences to its analysis of the class uniformity requirement, concluding that "the law does apply uniformly to a class of debtors" because "[t]he amended fees in section 1930(a)(6) apply to chapter 11 debtors for disbursements made during the

31

years 2018 to 2022." *Id.* at 36. The *Exide* court correctly define the defined class as chapter 11 debtors, but fails to explain its conclusory statement that the amended fees apply uniformly to this class. Debtors can avail themselves of chapter 11 protections in both BA districts and UST districts, and as outlined in Debtors' Motion, Debtors in the present case could have filed in North Carolina or Alabama rather than Kansas. Debtors' Motion ¶¶ 2-8. Thus, the fees do not apply uniformly to chapter 11 debtors in Kansas and chapter 11 debtors in North Carolina—the former have been subjected to 833% fee increases while the latter have not paid increased fees unless they filed after October 1, 2018. Debtors' Motion ¶ 9. The current situation mirrors the situation the *Victoria Farms* court addressed, and justifies the same analysis and conclusion on this issue. That court held that "because creditors and debtors in states other than North Carolina and Alabama are governed by a different, more costly system for resolving bankruptcy disputes . . . it is clear that 28 U.S.C. § 1930*, as currently amended*, does not apply uniformly to a defined class of debtors." *Victoria Farms*, 38 F.3d at 1531-32. As described above, because Section 1930(a)(6), either alone or read with Section 1930(a)(7), causes creditors and debtors in states other than North Carolina and Alabama to be "governed by a different, more costly system." It does not apply uniformly to chapter 11 debtors and thus is unconstitutional.

59.     Section 1930(a)(6) also fails the second part of the uniformity test, which requires laws to be "geographically uniform." The UST urges the Court to adopt the reasoning of the *Exide* court, which held that the amendment "addresses a geographically isolated problem" and that this requirement is met "because it applies with the same force and effect in every place where the subject of it is found—that is, in all UST districts." *Exide*, 611 B.R. at 37.

60.     This urged interpretation stretches the power of Congress to "fashion legislation to resolve geographically isolated problems" far past its breaking point. Section 1930(a)(6) is not a

32

provision that is designed to address a problem that is isolated geographically—rather, it provides fees for every single district over which Congress has authority. Its geographic limitations—indeed, its unconstitutional lack of uniformity—are a function of the fact that Section 1930(a)(6) does not and cannot require BA districts to raise quarterly fees rather than Congress "fashion[ing] legislation."

61.     *Blanchette* is the sole case *Exide* relies upon to reach this conclusion. But the *Blanchette* court's reasoning illustrates the non-uniformity of Section 1930(a)(6). The court noted that the Rail Act, the statute in question, arose from the national rail transportation crisis, and that "no railroad reorganization proceeding, within the meaning of [the statute], was pending outside" the region defined by the statute on its effective date nor during the 180-day period following the statute's effective date. "Thus," the court concluded, the statute "in fact operates uniformly upon all bankrupt railroads then operating in the United States and uniformly with respect to all creditors of each of these railroads." *Blanchette*, 419 U.S at 159-160. The *Blanchette* court concluded that "[t]he uniformity clause requires that the Rail Act apply equally to all creditors and all debtors, and plainly this Act fulfills those requirements." *Id.* at 160.

62.     This analysis in *Blanchette* highlights the inherent flaw in the UST's proposed argument as to geographic limitation. The *Blanchette* court examined whether reorganization proceedings of the type impacted by the Rail Act were pending outside the impacted region, and based its holding on the fact that none were. The opposite is true for chapter 11 bankruptcy proceedings. Such proceedings were pending outside the impacted region at the time of the changes to Section 1930(a)(6) and were filed following its accompanying fee increase. The conclusion that Section 1930(a)(6) is geographically uniform is based on the flawed analysis of treating chapter 11 debtors in UST districts as a distinct group akin to bankrupt railroads. As

33

outlined in Debtors' Motion, Debtors and many others are not solely confined to chapter 11 status in UST or BA districts—rather, they may apply in either venue. As a result, treating UST chapter 11 debtors as a distinct group in order to find uniformity is inconsistent with the Supreme Court's analysis in *Blanchette*.

63.     This conclusion also runs counter to the very purpose of the Bankruptcy Clause and the outcomes it was implemented to guard against. As the Supreme Court outlined in *Central Virginia Community College v. Katz*, 546 U.S. 356, 365 (2006), the Bankruptcy Clause emerged to address the issue of States' "wildly divergent schemes for discharging debtors and their debts." For example, some jurisdictions had debtor's prisons and other jurisdictions provided "no relief at all" for debtors. *Id.* at 366. A provision that charges debtors in South Carolina 833% more than similarly situated debtors in North Carolina is the modern equivalent of such a "wildly divergent scheme." The *Circuit City* court outlined the issue clearly:

> The geographic discrimination that remains ongoing is particularly apparent in the case at bar. Had the Debtors filed their chapter 11 bankruptcy petitions a mere 140 miles south in Raleigh, North Carolina, the Debtors would be paying substantially lower quarterly fees than they are paying now. This is the type of 'regionalism' the Uniformity Clause was intended to prevent.

*In re Circuit City Stores, Inc.*, 606 B.R. 260, 270 (Bankr. E.D. Va. 2019) (internal citation omitted).

###     D.     Reimbursement of Overpayment and Relief from Future Overpayment are Appropriate Remedies for Debtors' Injury

64.     Debtors have paid millions in quarterly fees pursuant to Section 1930(a)(6), a non-uniform, unconstitutional statute, and seek the return of those fees and an order excusing further payment of the unconstitutional portion. However, the UST argues that the appropriate remedy is instead to provide what it calls "equal treatment", the so-called "remedy" of this Court simply determining that Debtors, and all other debtors in the United States, should comply with the

unconstitutional statute. UST Opp'n ¶ 83. The UST's basis for this improbable and illogical solution is not sound, and the remedy it proposes is inappropriate and impossible under the law.

65. *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), is the sole case relied upon by the UST for its argument in favor of this non-remedy. *Sessions* involved a gender-based equal-protection challenge to an immigration exception that applied only to unwed mothers. *Sessions*, 137 S. Ct. at 1686. The Supreme Court found that the government had not met the standard for gender-specific criteria under the equal protection clause, and evaluated the "remedial alternatives" available to it "when a statute benefits one class . . . and excludes another from the benefit." *Id.* at 1698. The alternatives were declaring the statute a nullity or extending its coverage to include those aggrieved by exclusion, and as the UST correctly cites, the *Sessions* court noted that "[W]hen the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." UST Opp'n ¶ 83 (quoting *Sessions*, 137 S. Ct. at 1698).

66. The UST's reliance on this series of equal-protection claims is wholly misplaced. The "right invoked" by Debtors is not a right "to equal treatment." Debtors are objecting to payment of massive fees pursuant to a statute that violates the uniformity requirements of the Constitution. The plaintiffs in *Sessions* and in the cases the Supreme Court cites on this remedy issue brought claims based on equal protection, not on non-uniform unconstitutionality. *See Sessions*, 137 S. Ct. at 1698; *Iowa–Des Moines Nat. Bank v. Bennett*, 284 U.S. 239, 247 (1931). The misleading nature of the "appropriate remedy" quote above illustrates this dichotomy well. The *Sessions* court cited *Heckler* for the language in the prior paragraph. *Sessions*, 137 S. Ct. at 1698 (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984). The full context for this quote

35

confirms its importance to the facts in *Sessions* but illustrates that the concept is inapposite to the case at hand. The *Heckler* court held "as we have repeatedly emphasized, discrimination itself . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 739. "Accordingly, as Justice Brandeis explained, when the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Id.* at 740. The prior sentence's reference to discrimination and "non-economic injury" and the use of "accordingly" preceding the key quote both make it clear that the rights, remedies, and benefits the *Sessions* and *Heckler* court were referring to were non-economic and focused on equal protection rather than constitutionally-required uniformity.

67.     If this area of jurisprudence were applicable to the present facts, the cases the UST cites would nevertheless justify the remedy Debtors seek. *Heckler* cites *Iowa-Des Moines Nat'l Bank* for the quote from Justice Brandeis. *Id. Iowa-Des Moines Nat'l Bank* involved a state tax authority imposing taxes on national bank shareholders at a rate higher than the maximum permitted by federal tax law. *Iowa-Des Moines Nat'l Bank*, 284 at 245-46. The Court held that the petitioners had been discriminated against and that the state's action violated the 14th amendment's equal protection clause. *Id.* at 247. In determining a remedy, Justice Brandeis noted the right invoked of equal treatment, as later cited in *Heckler* and *Sessions*, and that equal treatment could be attained either by reducing the taxes of the petitioners or increasing the taxes of their competitors, those who were not subject to the discrimination. *Id.* In deciding between these options, the Court invoked the "well settled" principle that "a taxpayer who has been subjected to discriminatory taxation through the favoring of others in violation of federal law cannot be

36

required himself to assume an increase of the taxes which the others should have paid." *Id.* The actual remedy Justice Brandeis ordered was to provide the petitioners "refund of the excess of taxes enacted from them." *Id.* The UST's arguments on remedy do not apply to this case because they are grounded in remedies for discrimination and violations of equal protection rather than non-uniformity under the Constitution. However, should these precedents be applied to the case at hand, the *Iowa-Des Moines Nat'l Bank* reasoning is most applicable and analogous to Debtors' claims and remedy. Like the petitioners in that case, Debtors should not be "required to assume the burden of seeking an increase" in the fees paid in BA districts but instead are entitled to a refund of the excess of fees they paid due to an unconstitutional law.

68.    The alternative remedy suggested pursuant to this argument also fails because it seeks a remedy that is beyond this Court's authority to grant. The UST claims that "the appropriate remedy would be to require nationwide adherence to the statute as written." UST Opp'n ¶ 84. First, this remedy does not address the unconstitutionality of the statute nor render the UST's execution of the unconstitutional law somehow to be constitutionally valid. Second, the UST offers no basis for nor explanation of its apparent assertion that this Court can declare that chapter 11 debtors *nationwide* were responsible for 833% higher fees beginning January 1, 2018 and remain responsible for such fees. Even if such a declaration were possible, it would be necessarily mandating that bankruptcy courts in North Carolina and Alabama wholly disregard the directive they received from the Judicial Conference applying these fees only beginning October 1, 2018 and only prospectively.

69.    The remedy sought by the UST is not a remedy for the constitutional deficiencies and it is not justified by the facts nor the precedents relied upon. Additionally, it is wholly

CORE/3506839.0003/159122629.5

impractical and would require compelled violation of a Judicial Conference directive in order to effectuate an unconstitutional law. The remedy Debtors seek is appropriate and proper.

## III. Section 1930(a)(6) is Also Invalid Due to the UST's Attempt at Retroactive Application of the Statute.

### A. Section 1930(a)(6) was not Intended to Apply to Pending Cases

70. As outlined in Debtors' Motion, the presumption against retroactivity found in *Landgraf v. USI Film Prod.*, 511 U.S. 244, 245 (1994) is founded upon elementary considerations of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. *Id.* To determine if a statute applies retroactively, the Court must first determine whether Congress has expressly prescribed the statute's proper reach. *Lindh v. Murphy*, 521 U.S. 320, 323-26 (1997). If Congress did not prescribe the reach, then the Court should apply the rules of construction to determine the reach intended by Congress. *Landgraf,* 511 U.S. at 280.

71. The UST argues incorrectly that intent is clear as to applicability of the amendment to pending cases because the increased fees are a function of the amount and timing of a disbursement. UST Opp'n ¶ 95. However, even if the object of the amendment were disbursements, the amendment is still unclear as to which disbursements are included. *Life Partners*, 606 B.R. at 283. The UST further argues that the phrase "a quarterly fee shall be paid to the United States Trustee…in each case under chapter 11 of title 11" in 28 U.S.C. § 1930(a)(6)(A) indicates that Congress structured the statute so that the listed fees would apply in all open cases regardless of filing date, even when it amended the fee amounts. UST Opp'n ¶ 96. The UST argues claims this "each case" language indicates that Congress intended the listed fees to apply in all open cases regardless of filing of date. But there is no evidence of this intent in the legislative record, and the recent history of Congress suggests that such a dramatic change would be discussed

38

both in the record and made clear in the statute itself. When BAPCPA was enacted, "the landscape for bankruptcy filings dramatically changed" as a result. *Schultz*, 529 F.3d at 347. The "means test" for Chapter 7 filers forced higher income debtors to seek relief under Chapter 13 instead, and as a result made more funds available for payment of unsecured creditors. *Id.* Congress included within the statute specific language establishing its effective date as 180 days after enactment. BAPCPA at sec. 1501. It also provided that other than specific exception which would apply to cases commenced on or after the enactment date, BAPCPA would not apply to cases commenced prior to the effective date. *Id.* The language and history of BAPCPA show that when Congress makes dramatic changes that impact an individual entity's options within the bankruptcy system and potentially the decision on whether to file for bankruptcy at all, it does so in a manner that allows potential debtors notice of the changes and does not impose them upon debtors who were not given the benefit of such notice. The interpretation the UST seeks assumes Congress intended to deprive Debtors of the clear notice and direction it explicitly provided debtors and potential debtors impacted by BAPCPA.

72.     Moreover, this argument again fails to fill the gap left by the 2017 amendment and does not answer the question of "which cases?" Nowhere in the text of the amendment does it expressly provide that the quarterly fee increase is to apply to disbursements in pending cases. Both the language itself and Congress's history with wholesale changes to debtors' relief counsel against assuming an intent to apply to pending cases.

73.     The UST further argues that the Congressional Budget Office's ("CBO") score of the 2017 amendment brings clarity to the amendment's interpretation, but this only serves to muddy the waters. UST Opp'n ¶¶ 99-100. The CBO's estimate is unclear as to which "ongoing" cases the amendment is to apply to. *Life Partners*, 606 B.R. at 284. Furthermore, the "CBO is not

39

Congress" and its reading of a statute "is not tantamount to congressional intent." *Sharp v. United States*, 580 F.3d 1234, 1239 (Fed. Cir. 2009). The UST has not cited to any case stating that CBO estimates provide direct evidence of Congress's intent, which is telling of the CBO estimate's interpretive value. Moreover, the fact that the UST has turned to the CBO's estimate as guidance only serves to highlight that the legislative record is unclear with respect to the amendment's applicability to pending cases. Additionally, while the CBO estimate may have concluded that the 2017 amendment was budget neutral it is unreasonable to infer that Congress, in enacting the 2017 amendment, intended that it apply to pending cases merely because a calculation, which might or might not include pending cases, found budget neutrality. It is a stretch to say that the intent of Congress can be gleaned from one calculation of the CBO, especially where Congress has had an opportunity to speak to applicability, but did not.

74.     Congress's prior history on this exact issue is instructive in evaluating retroactive application. On January 27, 1996, Congress enacted the Balanced Budget Downpayment Act, which amended Section 1930(a)(6) to require the payment of quarterly fees in each case under chapter 11 of title 11 for each quarter until the case is converted or dismissed. *See Life Partners*, 606 B.R. at 284. Thereafter, courts were split on the applicability of the 1996 amendment to pending bankruptcy cases. *Id.* In response to this confusion, a mere three weeks later, Congress enacted clarifying legislation that explicitly made the 1996 amendment applicable to pending cases. *Id.* at 285; *see also In re CF & I Fabricators of Utah, Inc*., 150 F.3d 1233, 1235 (10th Cir. 1998).

75.     The 1996 amendment explicitly stated that a large substantive change in Section 1930(a)(6) applied to pending cases. This past history establishes that Congress provides express language of applicability when implementing amendments to UST fees, or at the very least

provides a supplemental amendment in short order establishing this intent. Neither the 2017 amendment nor anything in the legislative record contains or references such express language of applicability, and no such amendment has been passed. The only rational explanation for the lack of express language of applicability in the 2017 amendment is that Congress did not intend for it to apply to pending cases, especially in light of the 833% increase imposed by the amendment.

76.     The UST argues that in the thirty years since Congress first imposed quarterly fees it has never exempted previously filed cases from laws imposing or increasing quarterly fees, so the amendment must be applicable to pending cases. UST Opp'n ¶ 101. However, rather than supporting the UST's conclusion, this fact works against the UST's position. In the past, Congress has expressly stated the applicability of quarterly fee amendments where it felt the need to clarify its intent. On August 1, 2019, Congress again amended U.S.C. § 1930(a)(6) to add the words "other than under subchapter V" after the words "chapter 11 of title." If Congress intended that the 2017 amendment apply to pending cases, it could have said so when it had the opportunity, just as it did in 1996.

77.     The UST further argues that "it has been uniformly accepted that the increased fees apply in all chapter 11 cases including those previously filed." UST Opp'n ¶ 104 (quoting *Mosaic*, 2020 WL 1808605, at *5) (citing *Clayton*, 2020 Bankr. Lexis 842 at *13-14). But neither the *Mosaic* or *Clayton* court cite to any authority in support of this blanket statement. Moreover, the fact that no one has challenged the applicability of quarterly fee amendments in the past does not speak to its applicability. Rather, the lack of a prior challenge is only instructive in showing that a party did not deem it worthwhile to raise the issue, perhaps because, as the *Clayton* court noted, the prior amendments "were relatively minor." *Clayton*, 2020 Bankr. Lexis 842 at *13-14. Parties' acquiescence to "relatively minor" amendments does not dictate foreclosure of the ability to

41

challenge this 833% percent increase in fees and the underlying constitutional issues implicated by its retroactive application.

78.     *In re Prines*, 867 F.2d 478 (8th Cir. 1989), which the UST cites in support of its arguments, is inapplicable to the 2017 amendment. In *Prines*, the Eighth Circuit held that quarterly fees introduced by the 1986 Act were applicable to pending cases in pilot program districts as of the general effective date of the act. *In re Prines*, 867 F.2d at 485-86. However, this holding was largely based on the fact that other portions of the 1986 Act expressly stated when quarterly fees would become applicable to pending cases in non-pilot districts. *Id.* at 484 ("Moreover, subsections (1) and (2) of section 302(e) expressly provide that the quarterly fee provision would be applied to pending cases in non-pilot districts, at the same time that the trustee began to exercise authority over the case."). In contrast, no portion of the 2017 amendment speaks to its applicability to pending cases. Furthermore, the *Prines* holding predates all of the events which led to the conclusion that Congress did not intend the 2017 amendment to apply to pending cases.

79.     In the same legislation that amended the quarterly UST fees, Congress enacted amendments to Chapter 12 of the Bankruptcy Code. Those amendments expressly apply to cases filed after enactment of the amendment and to certain cases filed before the enactment. Some courts have suggested that this supports the amendment's application to pending cases, rather than refuting it, because the express language provides an exception to the general rule of applicability. *Exide*, 611 B.R. at 27; *Clayton*, 2020 Bankr. Lexis 842, at *13. However, this conclusion only follows if the Chapter 12 amendments are viewed in a vacuum, ignoring the issues that ensued after the 1996 amendment and the clarifying legislation of the 1996 amendment. Moreover, these additional amendments show that Congress is aware of the need to provide explicit language of applicability in bankruptcy legislation but failed to do so here. The UST's argument hinges on a

42

conclusion that rather than providing direct guidance, Congress instead assumed all users of the bankruptcy system would be aware of a general rule of applicability in an amendment imposing an 833% increase and would assume and accept that the language applied broadly, with no indication of this application in the text of the statute or legislative record, and in direct contrast to how these fees had been previously legislated.

80.    The text of the 2017 amendment does not provide that the quarterly fee increase applies to disbursements in pending cases, and based on the lack of any such language, Debtors have argued that application to their case is improper. The UST argues that it is *Debtors* who asking the Court to re-write the amendment. UST Opp'n ¶ 97. This accusation is much more accurately applied to the UST. Essentially, the UST asks the Court to read a clarifying amendment similar to the 1996 legislation into the current version of Section 1930(a)(6), not explicitly stated as in the prior legislation but instead implied in the plain language of Section 1930(a)(6), without basis in the legislative record.

81.    The express language of applicability provided by the 1996 amendment and Chapter 12 amendment does not exist for the 2017 amendment, meaning Congress did not intend for the amendment to apply to cases already pending.

### B.    The 2017 Amendment Has a Retroactive Effect

82.    If the Court determines that it cannot determine the statute's reach, then it must determine whether the statute has a retroactive effect. *Landgraf*, 511 U.S. at 280. If the statute is retroactive then it does not govern absent clear congressional intent favoring such a result. *Id.* Despite the arguments advanced by the UST, if the Court is unable to determine the statute's reach, then it should find that the statute is impermissibly retroactive.

43

83. A statute has retroactive effect if it increases a party's liability for past conduct or imposes new duties with respect to transactions already completed. *Id* at 280. Before filing their bankruptcy petitions, the Debtors weighed the options and ultimately concluded that the most advantageous option would be to file chapter 11 petitions in this Court. The increase in financial liability negatively impacts the Debtors and requires the Debtors to pay at least 833% more in UST fees than were required as of the Commencement Date. This case differs from those reaching a different conclusion because here, the Debtors could have filed in the BA Districts of North Carolina or Alabama.

84. Absent clear congressional intent, courts are not to read a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment. *Landgraf*, 511 U.S. at 284. Given the 833% increase in quarterly fees provided for by the amendment, it is improper for the Court to fill the gaps of the statute and legislative history to apply the amendment to cases that were pending as of the date of the amendment. *See Life Partners* 606 B.R. at 285.

85. The UST's reliance on *Martin v. Hadix*, 527 U.S. 343 (1999), is misplaced. UST Opp'n ¶ 108. There, the court held that the Prison Litigation Reform Act of 1995 ("PLRA") did not operate retroactively to limit the recovery of attorneys' fees for cases pending as of the effective date of the PLRA. *Martin*, 119 S. Ct. 2006-2007. The Court ultimately concluded that the PLRA did not have a retroactive effect because it only had an effect on future work. *Id.* at 2007. Thus, the *Martin* holding was completely reliant on the idea that the respondents could avoid the burden imposed by the PLRA without suffering additional financial consequences. This is not true of the Debtors' Bankruptcy Cases. The UST's position ignores the existing investment in the Debtors' Bankruptcy cases and the familiarity this Court had developed with the Bankruptcy Cases.

44

86.     Furthermore, any argument that the amendment is prospective because the object of the amendment is disbursements fails to recognize that the amendment does not define the disbursements which are impacted. *Life Partners*, 606 B.R. at 283. The lack of legislative intent contained in the legislative record, the clarifying legislation of the 1996 amendment, the Chapter 12 amendments and the 833% increase in quarterly fees all contravene this argument and indicate that the amendment is retroactive, if at all applicable to these Bankruptcy Cases.

87.     The UST relies heavily upon *CF & I Fabricators* to argue that the amendment is "not retroactive…because 'the amendment only triggers prospective assessment of fees from the amendment's effective date until entry of the final decree.'" UST Opp'n ¶ 110. In *CF & I*, the court had the benefit of making its decision in light of the clarifying legislation of the 1996 amendment, issued a mere three weeks after its enactment. *CF & I Fabricators*, 150 F.3d at 1235. Here, almost 2 years after going into effect, Congress has offered no such clarifying legislation for the 2017 amendment. In *CF & I*, the court likens an increase in UST fees to an increase in taxes and the UST relies on this analogy in advancing its argument. *Id.* at 1238. But this argument is flawed for two reasons. First, there is no comparison between the types of tax increases and other changes the *C F & I* court and the UST cited and the substantive financial changes at issue here – for example, property taxes do not routinely rise 833%. Second, this analogy fails to take into account that the Debtors could have filed in a BA District, but chose not to.

88.     Furthermore, the UST mischaracterizes the state of authority on this issue when it states that "the vast weight of authority in reviewing similar quarterly fee challenges in the past has also rejected this argument." UST Opp'n ¶ 111. The cases cited to by the UST all found that the 1996 amendment was prospective and not retroactive, but these decisions were all made in light of the clarifying legislation. The court in *In re Harness*, 218 B.R. 163, 165 (D. Kan. 1998),

45

specifically noted this fact when it stated that its opinion was joining "the growing consensus of courts *since the September 1996 clarifying legislation* to reject the claim that requiring the payment of post-confirmation quarterly fees is an impermissible retroactive application of the amendment to § 1930(a)(6)" (emphasis added).

89.     The 2017 amendment imposes new duties and liabilities on the Debtors that were not present when the Debtors chose to file in this Court, instead of in North Carolina or Alabama. The amendment's retroactive effect is clear and the text of the amendment, 1996 clarifying legislation and the Chapter 12 amendments, also make clear that this was not Congress's intended result.

## C.     The Application of Section 1930(a)(6) Violates Debtors' Due Process Rights Due to Lack of Notice and the Dramatic Increase in Fees.

90.     As outlined in Debtors' Motion, the retroactive application of Section 1930(a)(6) violates Debtors' due process rights because Debtors did not receive adequate notice of the dramatically higher fees in the UST districts before they made their decision to file in a UST district rather than a BA district. The UST focuses on the fact of the increase rather than the substance in response, and argues that the "Debtors have no constitutional right to insist that quarterly fees remain forever static or that Congress search them out and warn them before passing legislation." UST Opp'n at ¶ 119. The UST mischaracterizes the Debtors' position. Debtors complaint is not based merely on the existence of an increase, but also on the scale of Section 1930(a)(6), which increases quarterly fees by 833%.

91.     "Congress crossed the line when…it applied an 833% increase in maximum quarterly fees" *Life Partners*, 606 B.R. at 288. The *Life Partners* court noted that "if the fee increase were a modest increase (or even anything close to a modest increase) as it has been in the

46

past, the Court would be more inclined to agree with the U.S. Trustee that Chapter 11 debtors have no constitutional right to insist that quarterly fees will remain static." *Id.*

92.     This "line-crossing" 833% increase in quarterly fees was applied to the Debtors Bankruptcy Cases after the Debtors decided to file their petitions in this Court, as opposed to North Carolina or Alabama, and after the creditors and parties in interest heavily negotiated the terms of the plan and while the plan was on the verge of being confirmed. Had the increase been modest, as the *Life Partners* court suggests, a Due Process violation would have been unlikely. However, the ongoing multi-million dollar difference in fees does constitute a violation.

93.     The UST again cites to *CF & I Fabricators* in support of its position that "any 'assumption' that quarterly fees would never change is 'patently unreasonable.'" UST Opp'n ¶ 122 (citing *CF & I Fabricators*, 150 F.3d at 1239). This argument does not speak to an 833% increase, which clearly was violative of due process.

94.     The UST also argues that the Debtors' due process argument fails because the Debtors actually received notice through a budget proposing the fee increase published by the President. UST Opp'n ¶ 123. It is patently unreasonable to hold Debtors to a standard that would require them to sift through every budget of the U.S. Government for each fiscal year to determine if new legislation might be enacted. The UST has not cited to any authority which requires the Debtors to review each budget of the U.S. Government.

95.     Furthermore, the UST points to the fact that the 28 U.S.C. § 1930(a)(6) was amended and effective before the final plan of reorganization was filed and confirmed. UST Opp'n ¶ 124. However, this point ignores the steps the Debtors took before filing their Bankruptcy Cases. As discussed *supra*, the primary issue with the statute's retroactive application is that the Debtors chose to file in this Court, instead of North Carolina or Alabama, at a time when fees were equal

CORE/3506839.0003/159122629.5

between UST districts and BA districts. While a plan had not been confirmed on the effective date of the 2017 amendment, the concerns raised by the court in *Buffets* still existed in these cases because the Debtors had the option of filing in the BA districts. Moreover, because the Debtors had the option of filing in the BA districts, the reasoning and holding of *Clayton* is inapplicable.

## IV. Debtors' Motion follows Appropriate Procedures for Challenging UST Actions, and Any Other Finding Otherwise Justifies Conversion, Not Dismissal.

96.     The UST claims that Debtors' Motion should be denied based on a manufactured and ultimately semantic procedural issue. But Debtors' Motion was brought pursuant to applicable rules governing the actions of the UST, and even if the Court adopts the alternative interpretation the UST advocates, denial of the motion is not the appropriate result.

97.     The UST claims that the issues in Debtors' Motion should have been brought pursuant to Fed. R. Bankr. P. 7001 because it seeks relief that can only be brought through an adversary proceeding and not as a contested matter. *See* UST Opp'n ¶ 35. Debtors' Motion is filed pursuant to and consistent with Fed. R. Bankr. P. 2020, which provides for the filing of motion to challenge the actions of the UST by stating that "[a] proceeding to contest any act or failure to act by the United States trustee is governed by Rule 9014." Fed. R. Bankr. P. 2020. Rule 9014 allows a party to seek relief "by motion." Fed. R. Bankr. P. 9014.

98.     As outlined in Debtors' Motion, the acts of the UST are both the impetus and the crux of these proceedings. The UST imposed and collected fees that were unconstitutional, and the Debtors' Motion challenges these acts. The UST argues that Debtors "are challenging an act of Congress, not an act or failure to act by the United States Trustee." UST Opp'n ¶ 37. But Debtors have alleged that the fee at issue was "applied by the UST across the board to all Chapter 11 cases, including those pending prior to the effective date of the amendment." Debtors' Mot. ¶ 9. These

48

actions of the UST directly caused the Debtors' harm. Rules 2020 and 9014 prescribe the procedure for challenging the acts of the UST — filing a motion as the Debtors have here.

99.     Moreover, the distinction the UST advocates for is ultimately immaterial because it does not support the remedy the UST seeks. The UST fails to provide any authority to support its assertion that the motion should be denied on these procedural grounds, and every case in which a court has examined a Section 1930(a)(6) challenge in this context supports the opposite conclusion because there are no material issues of fact involved in this dispute. For example, in *Mosaic*, the court recognized its power to convert the contested motion to an adversary proceedings but declined to do so: "[B]ecause there are no material issues of fact, the issues before the Court are purely matters of law, and the Court may apply the law to the undisputed facts using simple math, there is no need for the Court to direct the Clerk to open an adversary proceeding in this matter." *Mosaic*, 2020 WL 1808605, at *4. Just as in *Mosaic*, there are no material issues of fact before the Court, and the issues are purely legal and ripe for resolution.

100.    The UST cites to three cases in which "courts have held that similar motions should be brought as adversary proceedings." UST Opp'n ¶ 41. However, it is instructive that none of these courts nor any others who have taken up the question have denied the motion on this basis. For example, in *In re Clinton*, the court faced the identical Rule 7001 procedural issue in a case involving Section 1930(a)(6). *In re Clinton*, 608 B.R. at 105. The Court held that Rule 7001 was the proper procedural vehicle, but the court declined to dismiss the motion. *Id.* at 106. To force the debtors to "start over" by filing an adversary proceeding "would severely elevate form over substance." *Id.* Instead of dismissing, the *In re Clinton* court exercised its discretion and converted the contested motion to an adversary proceeding and ruled on the substantive issues. *Id.*

49

101.     Thus, even if the Court determines Rule 7001 applies rather than Rule 2020—which it does not—the Court should rule on Debtor's Motion on the merits rather than deny it on procedural grounds. Just as in *Mosaic*, the Court can rule on the Debtors' motion because the issues are purely legal and there are no material issues of fact. Alternatively, the Court can decline to "elevate form over substance" and use its power to convert Debtors' Motion to an adversary proceeding. *See Circuit City*, 606 B.R. at 266 (collecting cases) ("Rather, the Court can simply convert the contested matter to an adversary proceeding."); *In re Clinton*, 608 B.R. at 106 ("The Bankruptcy Code allows this Court 'to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code.") (quoting 11 U.S.C. § 105(a))); *Life Partners*, 606 B.R. at *4 (converting a contested motion to an adversary proceeding out of "an abundance of caution.").

WHEREFORE, the Debtors respectfully request that the Court enter an order:  (a) finding and concluding that the Amendment is unenforceable because it violates the United States Constitution; (b) holding that the Debtors are only liable for quarterly fees under 28 U.S.C. § 1930 as it existed prior to the Amendment; (c) directing the Office of the United States Trustee to refund the Unconstitutional Difference to the Debtors; and (d) granting such other and further relief as is just and proper.

Respectfully submitted,

STINSON LLP

/s/ Nicholas J. Zluticky
Nicholas J. Zluticky KS # 23935
1201 Walnut, Suite 2900
Kansas City, MO 64106
(816) 691-3278
nicholas.zluticky@stinson.com

*Counsel for the Debtors*
